# EXHIBIT B

Beth Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Kieran Gostin (*pro hac vice*)
Grace Hill (*pro hac vice*)
Anastasia M. Pastan (*pro hac vice*)
Jenna Pavelec (*pro hac vice*)
WILKINSON STEKLOFF LLP
2001 M Street, N.W., 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
ghill@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com

Bambo Obaro (Bar No. 267683)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3083
Facsimile: (650) 802-3100
bambo.obaro@weil.com

*Counsel for Microsoft Corporation*

[Additional Counsel Identified on Signature Page]

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>*Plaintiff*,<br><br>v.<br><br>MICROSOFT CORPORATION and<br>ACTIVISION BLIZZARD, INC.,<br><br>*Defendants*. | Case No. 3:23-cv-02880-JSC<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hon. Jacqueline Scott Corley<br><br>Date: June 22, 2023<br>Time: 8:30 a.m.<br>Courtroom: 8 – 19th Floor |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ..............................................................................................................1

BACKGROUND ...............................................................................................................4

LEGAL STANDARD.........................................................................................................9

    I.      Section 7 of the Clayton Act ...................................................................9

    II.     Preliminary Injunction Standard ............................................................9

ARGUMENT ..................................................................................................................10

    I.      The FTC Is Unlikely to Prevail on the Merits Because It Cannot Prove a Likely Substantial Lessening of Competition.........................................10

        A.     The FTC Has Failed to Identify a Relevant Antitrust Market. ..................10

            1.     Nintendo Switch and PCs Compete With "High-Performance Consoles." ...................................................................11

            2.     Multi-Game Content Library Subscriptions and Cloud Gaming Subscription Services Are Not Relevant Product Markets. ...........12

        B.     The FTC Cannot Show that the Merger Will Result in Vertical Foreclosure in the Console or Gaming Services Markets..........................14

            1.     The FTC Cannot Show a Substantial Likelihood of Harm in the Gaming Console Market. ..............................................15

            2.     The FTC Cannot Show a Substantial Likelihood of Harm in the Putative "Content Library" and "Cloud Gaming" Services Markets. ...................................................................20

    II.     The Equities Weigh Against a Preliminary Injunction. ........................................23

CONCLUSION................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.*,
  826 F.2d 1235 (3d Cir. 1987) ........................................................................... 19, 22

*Am. Booksellers Ass'n v. Barnes & Noble, Inc.*,
  135 F. Supp. 2d 1031 (N.D. Cal. 2001) ................................................................. 15

*In re AMR Corp.*,
  625 B.R. 215 (Bankr. S.D.N.Y. 2021), *aff'd*, 2023 WL 2563897 (2d Cir. 2023) ................ 20

*Barry Wright Corp. v. ITT Grinnell Corp.*,
  724 F.2d 227 (1st Cir. 1983) ................................................................................ 18

*Brown Shoe Co. v. U.S.*,
  370 U.S. 294 (1962) ........................................................................................... 10

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ........................................................................................... 15

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
  363 F.3d 761 (8th Cir. 2004) ................................................................................ 15

*Fruehauf Corp. v. FTC*,
  603 F.2d 345 (2d Cir. 1979) ............................................................................ 18, 19

*FTC v. CCC Holdings, Inc.*,
  605 F. Supp. 2d 26 (D.D.C. 2009) ........................................................................ 10

*FTC v. Dean Foods Co.*,
  384 U.S. 597 (1966) ........................................................................................... 23

*FTC v. Exxon Corp.*,
  636 F.2d 1336 (D.C. Cir. 1980) ........................................................................ 2, 10

*FTC v. Facebook, Inc.*,
  560 F. Supp. 3d 1 (D.D.C. 2021) ..................................................................... 14, 22

*FTC v. Great Lakes Chem. Corp.*,
  528 F. Supp. 84 (N.D. Ill. 1981) ........................................................................... 23

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ......................................................................... 10, 23

*FTC v. Meta Platforms, Inc.*,
  2022 WL 16637996 (N.D. Cal. 2022) .................................................................... 10

-ii-

*FTC v. Meta Platforms Inc.*,
 2023 WL 2346238 (N.D. Cal. 2023) ...........................................................................9, 10, 23

*FTC v. Pharmtech Rsch., Inc.*,
 576 F. Supp. 294 (D.D.C. 1983) .................................................................................................23

*FTC v. Qualcomm Inc.*,
 969 F.3d 974 (9th Cir. 2020) ......................................................................................................10

*FTC v. Staples, Inc.*,
 190 F. Supp. 3d 100 (D.D.C. 2016) ............................................................................................23

*FTC v. Sysco Corp.*,
 113 F. Supp. 3d 1 (D.D.C. 2015) ..........................................................................................10, 23

*FTC v. Warner Commc'ns Inc.*,
 742 F.2d 1156 (9th Cir. 1984) ...........................................................................2, 4, 9, 10, 23

*Hicks v. PGA Tour, Inc.*,
 897 F.3d 1109 (9th Cir. 2018) ......................................................................................................3

*McWane, Inc. v. FTC*,
 783 F.3d 814 (11th Cir. 2015) ..............................................................................................19, 22

*Newcal Indus., Inc. v. Ikon Office Sol.*,
 513 F.3d 1038 (9th Cir. 2008) ....................................................................................................11

*Ohio v. Am. Express Co.*,
 138 S. Ct. 2274 (2018) ................................................................................................................20

*Paddock Publ'ns, Inc. v. Chi. Trib. Co.*,
 103 F.3d 42 (7th Cir. 1996) .........................................................................................................18

*Pistacchio v. Apple Inc.*,
 2021 WL 949422 (N.D. Cal. 2021) .............................................................................................13

*Reilly v. Apple Inc.*,
 578 F. Supp. 3d 1098 (N.D. Cal. 2022) ......................................................................................13

*Roland Mach. Co. v. Dresser Indus., Inc.*,
 749 F.2d 380 (7th Cir. 1984) .......................................................................................................19

*Sewell Plastics, Inc. v. Coca-Cola Co.*,
 720 F. Supp. 1196 (W.D.N.C. 1989) ...........................................................................................15

*Sprint Nextel Corp. v. AT&T Inc.*,
 821 F. Supp. 2d 308 (D.D.C. 2011) .............................................................................................19

*U.S. v. Aetna Inc.*,
 240 F. Supp. 3d 1 (D.D.C. 2017) ................................................................................................13

-iii-

*U.S. v. AT&T Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018) ........................................................................14, 21

*U.S. v. AT&T, Inc.*,
   916 F.3d 1029 (D.C. Cir. 2019) .......................................................................2, 9, 21

*U.S. v. Baker Hughes, Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) ....................................................................................9

*U.S. v. Falstaff Brewing Corp.*,
   410 U.S. 526 (1973) ...................................................................................................20

*U.S. v. Marine Bancorp., Inc.*,
   418 U.S. 602 (1974) ...................................................................................................20

*U.S. v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .............................................................................19, 22

*U.S. v. Oracle Corp.*,
   331 F. Supp. 2d 1098 (N.D. Cal. 2004) .............................................................12, 21

*U.S. v. UnitedHealth Grp.*,
   2022 WL 4365867 (D.D.C. 2022) ...........................................................2, 14, 15

**Statute**

15 U.S.C. § 53(b) ...........................................................................................................9

**Other Authority**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
   Principles and Their Application* (online ed. Aug. 2022) .......................................14

## INTRODUCTION

Seventeen months ago, Microsoft Corporation, the third-place manufacturer of video game consoles, announced an agreement to purchase Activision Blizzard, Inc., one of many video game publishers. Microsoft's motivations are simple. Its gaming division (Xbox) has next to no presence in mobile gaming, the fastest-growing gaming segment where 94% of gamers spend time today. By contrast, Activision's King division makes popular mobile games (such as *Candy Crush*), allowing Xbox to compete in this critical market. ██████████████████████████████████████████████████████████████████████████████. Activision publishes several popular video game franchises, including *Call of Duty* ("*COD*"), which are profitable precisely because they generate sales on many different platforms. Indeed, the majority of *COD* sales—a significant part of Activision's revenues—occur on Sony's PlayStation, the dominant console that routinely outsells the Xbox console 2:1.

The FTC has *never* persuaded a court to preliminarily enjoin a merger involving anything close to the facts here.  Unlike in other merger contexts, the government gets no presumption of harm as to vertical mergers because they do not eliminate a competitor from the marketplace and are widely recognized to be procompetitive.  The U.S. antitrust agencies have rarely sought to enjoin vertical mergers and have lost every recent case when they tried.  Indeed, the FTC is asking this Court to be the first in decades to find a vertical merger unlawful.

Moreover, unlike in every recent vertical merger case, the Court need not just rely on the defendants' claims that they will not foreclose their rivals and that the merger will increase output and lower prices. This is the exceptional case where the Court can rely on actions rather than words. Microsoft's valuation of the deal was premised on making Activision's limited portfolio of popular games *more accessible*. And since the transaction was announced, Microsoft has sought to address any concerns that might be raised about the deal. Here is what Microsoft has done:

- Committed to bring Activision's games to Xbox Game Pass, a subscription gaming service offering numerous games for $9.99 per month, rather than up to $70 per game;

- Signed a binding contract to bring *COD* to Nintendo (which does not currently have it);

- Offered Valve, the popular digital PC game distributor, a ten-year deal for Activision content, which Valve declined ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

- Signed contracts to make Activision games available on leading services that "stream" popular games to devices of consumers' choosing;

- Obligated itself, as part of the global regulatory process, to grant streaming rights to current and future Activision games to other cloud gaming services, regardless of whether Xbox decides to stream those games on its own service; and

- Offered Sony a contract to guarantee access to Activision content on PlayStation for ten years, on equal footing with the Xbox console versions, ████████████████████

Microsoft's actions to try to give *COD* to anyone who wants it eliminate any conceivable claim of foreclosure. This deal will make popular content more broadly available and at a lower price.

The FTC simply ignores these facts, claiming that it needs to offer only scant proof to stop the transaction. The FTC is wrong. The government has the burden of proof in seeking the "extraordinary and drastic remedy" of "a preliminary injunction prior to a full trial on the merits." *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343–44 (D.C. Cir. 1980). Because the FTC's central claim is that Xbox will withhold Activision content from rivals (principally the market leader, Sony), it must also show that the combined firm would have "the ability and incentive" to foreclose competitors. *U.S. v. UnitedHealth Grp.*, 2022 WL 4365867, at *25–27 (D.D.C. 2022). And the FTC must show that such foreclosure "is likely to substantially lessen competition" in a properly pleaded product and geographic market. *U.S. v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019). On each of these issues, the FTC must show that the evidence "raise[s] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984) (citation omitted).

The FTC cannot come close to carrying its burden. After 18 months of investigation and litigation, including 56 investigational hearings and depositions and the production of nearly 6 million documents, the FTC offers only a minuscule collection of incomplete quotations in support of its motion. The record will decisively refute the FTC's claims.

1       *First*, there is no evidence to support the FTC's central theory that Xbox will take *COD* away

2   from PlayStation. The FTC does not cite a single document or witness even suggesting this will

3   happen. On the contrary, Jim Ryan, the CEO of Sony Interactive Entertainment ("SIE") and the chief

4   commercial opponent of this deal, said privately on the day it was announced █████████████

5   ████████████████████████████████████████████████████████████

6   █████████████████████ Ex. 1.[1] ████████████████ Withholding *COD* would harm

7   Xbox. It would contradict the valuation the Board relied on in approving the deal, which assumed

8   profits from continued PlayStation sales. It would cut off a highly lucrative income stream to one of

9   Microsoft ████████████████. And it would make *COD* a worse game and enrage the gaming

10  community, because much of the game's popularity stems from the way it brings together players

11  who use competing consoles. It is therefore unsurprising that *every single worldwide regulator that*

12  *has examined the deal other than the FTC* has rejected this theory—including both the European

13  Union and the UK's Competition and Markets Authority ("CMA").

14      *Second*, even assuming Xbox were to withhold *COD* from Sony's PlayStation, it would not

15  harm *competition*. The acquisition of a single game by the third-place console manufacturer cannot

16  upend a highly competitive industry. *COD* may be popular, but it is just one game: ███████████

17  █████████████████████████████████████████████████████████.

18  █████████████████████████████████████████████████████████████

19  █████████████████████—a wildly implausible scenario—PlayStation would still remain the

20  console leader. Put simply, foreclosing access to *COD* would at most put a small dent in

21  PlayStation's massive lead, making the market *less concentrated*. Defendants are aware of no case

22  where a court has blocked a merger to protect a dominant firm's position.

23      *Third*, the FTC has failed to identify relevant antitrust markets, dooming their entire case.

24  Potential anticompetitive effects can be measured only in a properly defined market. But the FTC

25  has replaced sound economic analysis with results-oriented "contort[ions] to meet [its] litigation

26  needs." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120–21 (9th Cir. 2018). As one example, the FTC

27  _____

28  [1] Exhibit citations ("Ex.") refer to the contemporaneously filed Declaration of Beth Wilkinson.

claims that gaming PCs and Nintendo's consoles (both far more popular than Xbox) are not in the same market as PlayStation and Xbox, even though both the economic evidence ███████ have said the opposite. Why does the FTC contradict ████ in this respect? Because recognizing Nintendo and PCs as part of the market would destroy the FTC's flimsy foreclosure theory: Nintendo has been successful for years without *COD*, as was the dominant PC game store, Valve's Steam. *COD* cannot be essential to competition if market participants thrive without it.

*Fourth*, the FTC has literally no factual basis for its claim that the merger will harm competition in the supposed markets for multi-game library subscription and cloud gaming services. Among other things, there is *absolutely no evidence* that Activision content would put its content on these services without the deal. To the contrary, Activision views such a step as anathema to its business strategy. The transaction will thus *benefit* consumers by bringing Activision content to Xbox Game Pass for the first time.

*Finally*, the equities cut sharply against injunctive relief. The merger agreement expires on July 18, 2023. The injunction sought by the FTC would thus almost certainly scuttle the transaction. *Warner*, 742 F.2d at 1165 (such "private injuries [are] entitled to serious consideration" in balancing the equities). Moreover, there is no need for a preliminary injunction because the FTC could obtain effective relief at the end of the administrative process if it prevailed. Microsoft intends to operate Activision similarly to other recent acquisitions, whose studio and creative operations remained separate and continued to build games as they had done pre-acquisition. That means divestiture would be possible if it ever proved necessary.

The Court should deny the FTC's motion for a preliminary injunction.

## BACKGROUND

**The gaming industry.** Gaming is one of the fastest-growing and most competitive industries in the world. There are 3 billion gamers around the world, and 4.5 billion are expected by 2030. Ex. 2.██ Gaming generates hundreds of billions of dollars of revenue each year—more revenue than music and movies combined—and is projected to continue to grow still more. *Id.* Seeing this rising

demand, new and established companies are competing fiercely by regularly releasing new games and continuing to innovate new ways for gamers to play.

Activision is a well-known game developer with popular titles such as *COD*, *Diablo*, and *World of Warcraft*. But Activision is not the biggest or most successful publisher. Ex. 3, Bailey Rep. ¶ 29 & ex. 16. And the size and pedigree of a publisher is no guarantee of success. Many popular games were unexpected breakout successes by small independent studios. Ex. 3, Bailey Rep. ¶ 8. Many highly anticipated and well-funded games are busts. Ex. 60. ███████████████.

Gamers can play on many different devices. The three major gaming consoles are the PlayStation 5, the Nintendo Switch, and the Xbox. But consoles now represent the smallest share of video game revenue. Ex. 2, ████; *see* Ex. 3, Bailey Rep. ¶ 9. More gamers play on PCs,[2] and substantially more play on mobile devices—the fastest growing segment. Ex. 2, at 3; Ex. 3, Bailey Rep. ¶ 9 & ex. 3; *see also* Ex. 4. As a result, the industry is exploring how to expand beyond the traditional model of selling individual games. Some companies have had great success with free-to-play games, which allow gamers to download the game and then decide whether to make in-game purchases such as costumes or special powers. Free-to-play games have allowed small independent companies to grow quickly. For example, Epic Games' valuation has increased from $1 billion in 2012 to over $30 billion, powered by the 2017 launch of its flagship free-to-play game, *Fortnite*. Exs. 5, 6. Free-to-play games are a key part of Activision's strategic vision, and it has successfully launched free-to-play versions of popular games like *COD*.

Innovation is also occurring in distribution. In 2017, Xbox launched Game Pass, a subscription service allowing consumers to play a library of games for $9.99 a month rather than having to purchase each individual title. Xbox invests heavily in Game Pass, making its own new games available in the service immediately upon release (so-called "day and date" releases). Although this means Xbox loses revenue on the sales of individual game titles, Xbox believes that Game Pass will ultimately prompt subscribers to engage with a variety of games and spend more

---

[2] Games for PC can be purchased and downloaded from the publisher directly or from an online distributor like Steam. Ex. 3, Bailey Rep. ¶¶ 22, 91.

-5-

1   overall. But others in the industry are much more skeptical. ███████████████████

2   █████████████████████████████████████████████████████████████████████

3   █████████████████████████████████████████████████████████████████████

4   █████████████████████████████████████████████████████████████████████████

5   *See* Ex. 3, Bailey Rep. ¶ 76 & n.117; ██████████████████████ Sony ██████

6   █████████████████████████████████████████████████████████ ███████

7   primarily puts old games in its service,[4] forcing customers to pay high per-game fees to access new

8   content.

9         Last, some companies are experimenting with delivery of games through cloud gaming

10  "streaming," which runs games on remote servers that gamers can access on consoles, PCs, mobile

11  devices, or TVs. The idea is to let gamers play games on less highly powered and more affordable

12  devices, particularly salient in less developed nations. Several companies, including Xbox, Amazon,

13  Nvidia, and smaller upstarts, have experimented with different forms of cloud gaming. But the

14  technology remains challenging, particularly for latency-sensitive multiplayer games. Gameplay is

15  balky, and it has proved hard to generate consumer demand or consistent profits. Here too,

16  █████████████████████████████████████████████████████████████████████

17  █████████████████████████████████. Likewise, Sony Group's CEO has admitted that

18  cloud gaming faces substantial "technical difficulties" and is "very tricky" from both a financial and

19  technological standpoint." Ex. 56; *see* Exs. 16, █████

20      **Sony's dominance.** Sony is a gaming giant. ███████████████████████████

21  ████████████████████████████████████████ Sony's PlayStation has

22  been the leading console both worldwide and in the U.S. for over two decades and through five

23  console generations. As a game publisher, Sony's in-house developer, PlayStation Studios, is

24  responsible for major hits like *God of War*, *The Last of Us*, and *Spider-Man*, most of which can be

25  played only on PlayStation. As a purchaser of third-party games, Sony pursues exclusivity ████

26

27  [3] ██████████████████████████████████████████████████ Ex. 12, at 39.

28  [4] *See* ██████████████████████████████████████

1 ██████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████ ,

3 Sony dwarfs Xbox on exclusives, ██████████████████████████

4 ██████ Ex. 3, Bailey Rep. ¶ 19 & ex. 11A.

5      **Xbox's position.** By contrast, Xbox's console has consistently ranked third behind

6 PlayStation (first) and Nintendo (second). Ex. 3, Bailey Rep. ¶¶ 13–15; *see, e.g.,* Ex. 23

7 ███████████████████████████████████████████ Ex. 24, at 6.

8 Xbox has thus pivoted to a different business strategy of making games more accessible. As noted

9 above, Xbox invests heavily in Game Pass. For years, Xbox has tried to get a foothold into mobile

10 gaming, but has had no success. Ex. 28, █████████ ████████████

11 ██████████████████████████████████████████████████████

12 ███████████████████████████████████████████████

13 █████████████████████████████████████████

14      **The transaction.** Against this backdrop, Xbox and Activision determined that, together, they

15 could significantly improve gaming and increase Xbox's competitiveness. Xbox's vision is to

16 expand choice for gamers and developers by making games more widely accessible on Xbox Game

17 Pass and on mobile devices. Ex. 53, ███████████████████ ; *see also* Ex. 34 ██████████ .

18 ████████ A key driver of the merger was Activision's mobile gaming business, which includes

19 popular games like *Candy Crush Saga* and *COD Warzone*, a free-to-play variant. Ex. 35. Acquiring

20 these mobile games would enhance Microsoft's ability to compete in the fastest growing industry

21 segment. On January 18, 2022, Microsoft and Activision announced the merger. *See* Ex. 36.

22      Regulators around the world have been reviewing the transaction ever since. And Microsoft

23 has tried to accommodate any concerns they raised—however speculative those concerns may be. As

24 noted above, Microsoft has signed a ten-year agreement to bring *COD* to Nintendo for the first time

25 since 2013. ███████████████████████████████████████

26 ███████████████████████████████████ ); *see also* Ex. 38.  It has offered

27 ────────────────────

28 [5] *See also* Ex. 29; Ex. 30 ██████████████████████████████

a similar agreement to Sony that would preserve Sony's access to the game ███████████ it ████████████ but Sony has refused to deal—instead focusing on trying to derail a transaction that would strengthen a rival. Xbox offered a ten-year agreement to keep *COD* on Valve, the popular PC game platform, but Valve turned down the agreement as unnecessary ███████████ ███████████████████████████████████████████████████████████ █████████ Separately, Xbox has entered five separate ten-year agreements with cloud gaming providers—Boosteroid, EE, Nvidia, NWare, and Ubitus, *see* Exs. 39–44—to ensure that all Xbox games, including Activision games, can be played on their services. In addition to those agreements, during the European Commission's regulatory process, Xbox committed to grant streaming rights to Activision games to other cloud gaming services—regardless of whether Xbox ultimately decides to stream those games itself. Ex. 45.

As a result of these efforts, all but one foreign regulator to pass on the issue has cleared the transaction. The lone exception is the United Kingdom's CMA. But like the European Commission and other global competition authorities, the CMA rejected the FTC's core theories of harm here, tied to console foreclosure and subscription service foreclosure. Its only objection to the transaction was that it might harm, at some point in the future, the evolution of cloud gaming. Xbox is currently appealing that decision.

**This proceeding.** After investigating the transaction, the FTC filed an administrative complaint ("FTC Complaint") on December 8, 2022, alleging that the merger violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45. *See In re Microsoft Corp.*, FTC Matter No. 2210077, Docket No. 9412 (F.T.C.).

The FTC alleges that Xbox will withhold access to Activision games in three "markets": high-performance consoles, multi-game content library subscription services, and cloud gaming subscription services. *Id.* ¶¶ 63, 73, 83. The FTC defines the high-performance console market to include only Xbox and Sony, excluding even Nintendo, the second most popular console maker. *Id.* ¶ 65. The FTC defines the geographic market as the U.S. *Id.* ¶ 92. The FTC claims this foreclosure "is reasonably likely to substantially lessen competition in the Relevant Markets." *Id.* ¶ 118. The

FTC makes no allegations of harm to competition in any game publishing or distribution market, or involving PC or mobile gaming.

The administrative hearing on the FTC's complaint was scheduled to begin on August 2, 2023. *See In re Microsoft Corp.*, FTC Matter No. 2210077, Docket No. 9412 (F.T.C.). On June 12, 2023, the FTC filed this lawsuit seeking to enjoin the transaction until its years-long administrative process concludes.

## LEGAL STANDARD

### I.      Section 7 of the Clayton Act

The FTC is pursuing only a vertical theory of harm—in other words, it is challenging Xbox's acquisition of an input, rather than the consolidation of two firms in an area of overlap, such as game publishing. As a result, the burden of persuasion "remains with the government at all times." *U.S. v. Baker Hughes, Inc.*, 908 F.2d 981, 983 (D.C. Cir. 1990). To satisfy its burden, the FTC must first "define the relevant market," which in turn requires identifying both "(1) the relevant product market and (2) the relevant geographic market" in which the anticompetitive effects will allegedly occur. *FTC v. Meta Platforms Inc.*, 2023 WL 2346238, at *8 (N.D. Cal. 2023) (citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 324 (1962)). If it identifies a proper market, the FTC must then prove that the merger "is *likely* to *substantially lessen* competition in the relevant market." *U.S. v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (emphases added).

### II.     Preliminary Injunction Standard

Section 13(b) of the FTC Act authorizes federal district courts to preliminarily enjoin a challenged merger "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). This standard requires a court to (1) "determine the likelihood that the [FTC] will ultimately succeed on the merits" and (2) "balance the equities." *Warner*, 742 F.2d at 1160.

A sufficient likelihood of success requires "more than mere questions or speculations supporting" allegations of anticompetitive conduct. *Meta*, 2023 WL 2346238, at *8. The FTC meets its burden only by "rais[ing] questions going to the merits so serious, substantial, difficult and

-9-

doubtful as to make them fair ground for thorough investigation, study, deliberation and determination." *Warner*, 742 F.2d at 1162. The Court must exercise "'independent judgment' and evaluat[e] the FTC's case and evidence on the merits." *FTC v. Meta Platforms, Inc.*, 2022 WL 16637996, at *5 (N.D. Cal. 2022).

If the FTC can establish a likelihood of success, a court must then weigh the public and private equities. *See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726–27 (D.C. Cir. 2001). Public equities include the merger's procompetitive benefits. *Warner*, 742 F.2d at 1165. Harm to the merging parties if the merger is enjoined—*i.e.*, "private equities"—are also "entitled to serious consideration." *Id.* And in weighing these concerns, a court must keep in mind that the issuance of a preliminary injunction is an "extraordinary and drastic remedy." *Exxon*, 636 F.2d at 1343. Thus, even where an injunction may be warranted, any less intrusive alternatives should be considered. *Id.* at 1344.

## **ARGUMENT**

**I.    The FTC Is Unlikely to Prevail on the Merits Because It Cannot Prove a Likely Substantial Lessening of Competition.**

### **A.    The FTC Has Failed to Identify a Relevant Antitrust Market.**

To meet its burden to show a substantial lessening of competition, the FTC first must "define the relevant market" in which anticompetitive effects will occur. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). Courts determine "[t]he outer boundaries of a product market" based on "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325. Within a relevant market, "[p]roducts need not be fungible." *Meta*, 2023 WL 2346238, at *9. Rather, the "overarching goal of market definition is to 'recognize competition where, in fact, competition exists.'" *Id.* (quoting *Brown Shoe*, 370 U.S. at 326). By those metrics, the FTC's proposed markets fail entirely.[6]

---

[6] The relevant market has a geographic component, which is where "the defendants compete." *See, e.g.*, *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 37 (D.D.C. 2009); *see also FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 48 (D.D.C. 2015). As will be demonstrated at trial, the FTC also baselessly seeks to limit the relevant geographic market to the United States, when both Microsoft and Activision compete in dynamic global markets. *See* Ex. 3, Bailey Rep. ¶¶ 114–16.

1. **Nintendo Switch and PCs Compete With "High-Performance Consoles."**

The FTC offers two unduly narrow proposed definitions of its "high-performance consoles" market. The FTC primarily proposes that PlayStation and Xbox alone compose the entire console market and then alternatively adds Nintendo Switch but still excludes PCs. Both Nintendo and PCs are "economic substitutes," *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008), that must be considered in any relevant market.

*Nintendo*. There is no basis for excluding Nintendo. ███████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████ ███ ████████████████████████████

█████████████████████ By excluding Nintendo, the FTC inflates Xbox's market share. Ex. 3, Bailey Rep. ¶ 13 ex. 4. It also conveniently excludes a key competitor that has thrived without *COD* for the past decade.

In response, the FTC offers its expert's *ipse dixit* that Nintendo's Switch is so differentiated along price, specifications, and content that it is in a different product category than the other two consoles. To the contrary, Xbox and Sony compete with Nintendo and with each other on all of these features. For example, the entry-level versions of the current Xbox and Nintendo consoles are offered at the same price point ($299.99). Ex. 48, Lee Rep., fig. 14; Ex. 3, Bailey Rep. ¶ 89 & ex. 42. Moreover, while the FTC makes much of Nintendo's supposed technical differences from the other consoles, it ignores that Xbox and Sony also differentiate their consoles based on performance.[8] The substantial overlap in the three consoles' content libraries further demonstrates that they compete:

---

[7] Customer preference likewise demonstrates that Xbox and PlayStation compete with Nintendo Switch for customers and playtime. *See* Ex. 47, ███████████████ Ex. 3, Bailey Rep. ¶¶ 85–87.

[8] Both the Xbox Series S and PlayStation digital edition are offered at lower entry price points in exchange for less advance technological specifications. The Xbox Series S, for example, has less GPU processing power, system memory, and internal storage and renders images at a lower resolution than the Xbox Series X. *See* Ex. 48, Lee Rep. ¶ 194 fig. 13. PlayStation, meanwhile, currently offers two different versions of the PlayStation 5—one with a Blu-Ray player (Standard) and one without (Digital)—and is anticipated to released further differentiated Pro and Slim models in the near future. Exs. 49–50.

Many of the most popular games on PlayStation and Xbox consoles are also available on Switch. Ex. 3, Bailey Rep. ¶ 88. To the extent there are differences, the FTC fails to show that the difference is the result of Xbox and PlayStation games not being available on Switch, as opposed to the many Switch-exclusive titles (such as *Mario* and *Zelda*). *See, e.g.*, Ex. 51.

*PC Gaming*. The FTC is likewise wrong to exclude PC gaming, which offers specifications and features comparable to or even greater than those offered by consoles. Ex. 3, Bailey Rep. ¶ 21. There is also substantial catalogue overlap: In 2022, all but one of the top 30 Xbox titles and all but three of the top 30 PlayStation titles were available on PC. *See* Ex. 3, Bailey Rep. ¶¶ 22, 91 & exs. 12–13. Indeed, even SIE's CEO ███████████████████████████████████████.[9]

Finally, even accepting that Nintendo and PC gaming are differentiated from Xbox and PlayStation in certain ways, including with respect to "price, use and qualities," that does not decide the market definition question. *U.S. v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1131 (N.D. Cal. 2004). That products are differentiated, even in ways that some customers prefer, "do[es] not negate interchangeability," because the relevant question "is not what solutions the customers would *like* or *prefer*," but instead "what they *could* do in the event of an anticompetitive price increase." *Id.* As just explained, the evidence shows that Xbox, PlayStation, Nintendo, and PCs all serve as substitutes and compete.

### 2. Multi-Game Content Library Subscriptions and Cloud Gaming Subscription Services Are Not Relevant Product Markets.

**a.    Multi-Game Subscription Services.** Subscription services, such as Game Pass or Sony's PlayStation Plus, are not their own market, but rather an alternative way for consumers to pay for console, PC, or mobile games that are otherwise offered as standalone buy-to-play or free-to-play games. *Pistacchio v. Apple Inc.*, 2021 WL 949422, at *2 (N.D. Cal. 2021) (rejecting "narrowing

---

[9] Ex. 10, ███████████████████████████████████████████████████████████████████████████████. The only evidence the FTC cites to support its position that PCs "are not commercially reasonable alternatives" is testimony from one Microsoft executive in an unrelated case that "she does not 'view the Xbox console as a replacement or substitute *for the iPhone or iPad.*'" FTC Br. 13 (emphasis added). But the iPhone and iPad are both mobile devices, not gaming PCs.

of a market to consideration of a subscription based payment model" without explaining why the market is not instead "the broader video game market generally"); *see also Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1108 (N.D. Cal. 2022). ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████ . ███████████████████████    ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ . That cannibalization risk is why many game publishers, Activision included, do not embrace the subscription model.[10]

      **b.**    **Cloud Gaming Subscription Services.** The FTC's proposed cloud-gaming subscription services market is similarly incoherent. As an initial matter, cloud gaming is not a separate product—it is a euphemism for a technology that allows for a game to be streamed from an external source, such as the cloud, rather than downloaded onto a device (like a PC or console) and played natively. In addition, the FTC's proposed market includes some multi-game subscription services, like Game Pass, that offer cloud streaming of console games as feature for subscribers, who typically use it to try games before downloading them. But it also includes other distinct services, like Nvidia's GeForce NOW, that allow consumers to stream games they already own on PC. The FTC provides no explanation for how these products are substitutable, particularly given its own argument that consoles and PCs are in distinct markets.

      Beyond that, cloud-gaming is entirely unproven—while the technology has been around for some time, it has never seen significant demand—and predictions about its future development and Xbox's role are conjectural. Even assuming that perceived harm to a future market is relevant,[11] the FTC itself has recognized that projecting harm in future markets "can be difficult," must be "strongly rooted in the evidence," and requires "considerable evidence" that the market will emerge

---

██ ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

[11] The Supreme Court has never addressed whether harm to "potential competition is a viable theory of section 7 liability." *U.S. v. Aetna Inc.*, 240 F. Supp. 3d 1, 75 (D.D.C. 2017).

and that the merger will result in a substantial lessening of competition. *Nielsen Holdings, N.V. & Arbitron Inc.*, FTC File No. 131-0058, at 2–3; *see also, e.g.*, *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 4 (D.D.C. 2021) (rejecting reliance on a future market as "too speculative and conclusory").

The FTC cannot make those showings. As noted, Sony Group's CEO recently acknowledged the financial and technical difficulties cloud gaming faces. Ex. 56. And even if the FTC had evidence of what this segment would look like in the future, it is wholly speculative that Xbox would participate in it in a meaningful way, ███████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████

**B.      The FTC Cannot Show that the Merger Will Result in Vertical Foreclosure in the Console or Gaming Services Markets.**

The FTC alleges a single theory of harm: vertical foreclosure. Courts appropriately place a heavy burden on the government in vertical merger cases because "[v]ertical mergers often generate efficiencies and other procompetitive effects." *U.S. v. AT&T Inc.*, 310 F. Supp. 3d 161, 197 (D.D.C. 2018); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 755c (online ed. Aug. 2022) ("Vertical integration is ubiquitous in our economy and virtually never poses a threat to competition when undertaken unilaterally and in competitive markets."). These considerations apply with particular force here as the merger will make Activision's games *more accessible* to consumers.

The FTC's central claim is that the combined firm would withhold certain Activision content—in particular, *COD*—from Sony, the longtime market leader. In citing such "foreclosure" as its basis for opposing this transaction, the FTC must prove, among other things, (1) that the combined company would have the *incentive* to withhold *COD* from rivals to whom an independent Activision would otherwise sell *COD* (*i.e.*, that doing so would be profitable despite the forgone Activision sales), (2) that it has the *ability* to foreclose (*i.e.*, that rivals cannot effectively compete without *COD* and could not offset any harm through a competitive response), and (3) that

-14-

*competition* (as opposed to individual competitors) would likely be harmed. *See UnitedHealth*, 2022 WL 4365867, at \*25–27. The FTC cannot make these showings.

### 1.   The FTC Cannot Show a Substantial Likelihood of Harm in the Gaming Console Market.

*No incentive.* This element is simple. Microsoft has committed not to withhold from anyone by signing binding contracts to bring *COD* on nondiscriminatory terms to Nintendo and multiple different cloud gaming providers. The FTC must account for these economic realities in trying to meet its burden, rather than relying on "assumptions and simplifications that are not supported by real-world" facts, *Am. Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001), and that ignore "economic reality," *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004). The government fails to do so.

As further proof of its lack of incentive, Microsoft has offered to provide Activision content to Sony for the next *ten years*. Ex. 57. ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████ The only plausible reason why Sony has declined to sign is not because it fears "foreclosure" (which it could prevent with the stroke of a pen), but because it believes this transaction will make third-place Xbox a more effective competitor. Sony is presumably worried that putting Activision games in Game Pass "day and date" will increase consumer interest in subscription services—a business model Sony believes is less profitable than making consumers pay $70 for each new release. But that belief is a reason to *approve* this deal because the antitrust laws "were enacted for the protection of competition not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 488 (1977). The antitrust laws do not protect a dominant firm's profit margin.

Even setting aside the offer, withholding *COD* would harm Xbox economically. *See Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1216–17 (W.D.N.C. 1989) (rejecting antitrust claim where defendants had no "economic incentive" to "lock out existing suppliers" and "raise the

cost of an input"). Xbox would be losing *COD* revenues on the *largest* console provider, Sony. Ex. 58, Carlton Rep. ¶ 11. Those revenues were critical to the price Microsoft paid for Activision, the Board's evaluation of the transaction, and the financial targets to which Xbox is held accountable. Ex. 2; Ex. 68, J███████████████████

Withholding would cause even greater harm by degrading the game and infuriating gamers. A significant appeal of *COD* is that it is a multi-player game oft-played by groups across different platforms, including PlayStation (known as cross-play). Ex. 58, Carlton Rep., at 6; Ex. 8, A. Zerza Dep. 39:8-39:20; Ex. 69, C. Schnakenberg Dep. 143:22-144:5. Having a broad community of gamers ensures players can easily find groups of comparable skill levels, making the game fun. Removing *COD* from PlayStation would dramatically shrink the community, making the gaming experience worse for anyone left. Ex. 58, Carlton Rep. ¶ 14.

Microsoft's acquisition of Mojang's *Minecraft* franchise in 2014 illustrates why all of these incentives cut against withholding. *Id.* ¶ 15. Like *COD*, *Minecraft* is a popular franchise with substantial cross-platform play. Under the reasoning advanced by the FTC, Xbox would have had incentives to make *Minecraft* exclusive to its Xbox. *Id.* It did not, and has not since. On the contrary, Xbox has expanded access to the game, and continues to release new editions available on PlayStation. *Id.* Indeed, Defendants are not aware of *any* situation where a publisher has chosen to take exclusive an existing game franchise that is multi-player and offers cross-platform play. *Id.* ¶¶ 14–15. There is no reason to believe this would be the first.

The government's two responses to this straightforward logic are unavailing. The FTC primarily relies on its expert, Dr. Lee, ██████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████ ████████████████████████████████████████████ ███████████████ Ex. 48, Lee Rep., at 148. Dr. Lee initially tried to justify this prediction with his ███████████, *id.*, but Defendants' expert Dr. Carlton demonstrated that it had serious conceptual flaws Ex. 58, Carlton Rep., at Section IV.A. Dr. Lee then pivoted to saying that

1  his ████████████████████████████████████████████

2  ████████████████████████████. Ex. 63, Lee Rebuttal, at 6. Even assuming that is a proper

3  role for an expert (which it is not), the sources do not support his conclusion. And Dr. Carlton

4  further shows that Dr. Lee's ███████████████████

5  ███████████████████████████████████████████████. Ex. 58,

6  Carlton Rep., at Section IV.B.6. Ultimately, Lee's analysis provides no basis to disregard the real

7  world, where Sony has a favorable offer for *COD*, Xbox has made plain that it wants to provide

8  *COD* to Sony (and in fact needs to continue to sell to Sony), and regulators around the world all

9  agree that withholding *COD* from Sony would be unprofitable and is thus not a serious concern.

10      The FTC's strained analogy to Microsoft's acquisition of ZeniMax, a fundamentally different

11  game developer, likewise fails to establish that *COD* would become exclusive. The first two

12  ZeniMax games Xbox released post-acquisition (*Deathloop* and *Ghostwire*) were exclusives *for*

13  *Sony*, ████████████████████████████████████████

14  ███████████████████████████████████████████████████

15  ███████████████████████████████████████████████

16  ███████████████████████████████████████████████████

17  ████████████████████████████████. The ZeniMax story thus says

18  nothing about what Xbox would do with an existing, multi-player, cross-platform franchise like

19  *COD*—the relevant analogy there is *Minecraft*.[12]

20      ***No ability.*** There is likewise no reason to think Xbox could foreclose PlayStation by

21  withholding ████████████████████████████████████████

22  ████████████████████████████████████████████████

23

---

24  [12] In drawing its analogy to Zenimax, the FTC wrongly implies that Xbox misled the European

25  Commission about its intent regarding future Zenimax titles. The European Commission took the extraordinary step of responding directly when the FTC made this claim in its administrative

26  complaint, by stating publicly that Microsoft did not make any "commitments" to the European Commission, nor did the European Commission "rely on any statements made by Microsoft about

27  the future distribution strategy concerning ZeniMax's games." Instead, the European Commission cleared the transaction "unconditionally as it concluded that the transaction would not raise

28  competition concerns." Ex. 61.

███████████████████████ Ex. 3, Bailey Rep. ¶ 15. If any such shift occurred between Xbox and PlayStation, that would serve only to make the console market *less concentrated* and more competitive. But the existence of such an extreme shift is implausible: Nintendo outcompetes Xbox even though it does not currently have access to *COD*. *Id.* ¶ 14. Likewise, Steam, the leading PC game store, has also risen in popularity without *COD*. *Id.* ¶ 55 & ex. 35. That is no doubt why the FTC tries to exclude Nintendo and PC from the console market—they are proof that *COD* is not essential to competition.

Moreover, any claim that Xbox could foreclose PlayStation would need to take account of Sony's ability to respond competitively. *See Fruehauf Corp. v. FTC*, 603 F.2d 345, 352 n.9 (2d Cir. 1979) (requiring assessment of competitive response). The myriad options available to Sony are fatal to the FTC's case. Sony could lower prices or improve the quality of its console. It could invest in other first-party or third-party games, as it recently did with Bungie in a deal the FTC quickly cleared. Ex. 62. Or, as Sony's CEO told investors in the wake of news of Microsoft's acquisition of Activision, it could "grow [Sony's] own studios organically" to increase Sony's own value proposition to consumers. Ex. 67. These likely competitive responses are integral to antitrust analysis, but the FTC simply ignores them. *See Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 232 (1st Cir. 1983) (Breyer, J.) (the "long term effects" of any proposed merger will "depend in large measure on competitors' responses."); *Paddock Publ'ns, Inc. v. Chi. Trib. Co.*, 103 F.3d 42, 44 (7th Cir. 1996) (rejecting challenge to exclusivity agreement between incumbent newspaper and content creators because any rival newspaper "deprived of access" even to the "best known" content can compete on the basis of alternative content).

***No harm to competition.*** In any event, even if Microsoft *could* be expected to make *COD* exclusive, the FTC has not shown harm to competition. The entirety of the FTC's analysis is Dr. Lee's assertion that ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ That is not the law. *See Fruehauf*, 603 F.2d at 352 n.9

(rejecting the proposition that foreclosing a competitor from a previously available input is sufficient to demonstrate a lessening of competition). Exclusivity arrangements (whether from contract or vertical integration) are ubiquitous throughout the economy and are usually procompetitive. *See*, *e.g.*, *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984). Indeed, both Sony and Nintendo have entered into a wide range of exclusivity arrangements of their own with various game publishers, and each has far more exclusive gaming content than Xbox does. Ex. 58, Carlton Rep. ¶ 20 & n.51; *see also id.* ¶ 11. Dr. Lee himself has recognized in his prior academic work about gaming that such arrangements can be procompetitive. Ex. 58, Carlton Rep. ¶ 11 n.22 (citing Dr. Lee's academic work); *id.* ¶ 20.

This transaction also does not exhibit, and the FTC's motion does not address, any of the special features that have led courts in unusual cases to conclude that vertical integration will give rise to anticompetitive outcomes. In particular, *COD* is not a "necessary input" for Xbox rivals, *see Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 330 (D.D.C. 2011), and any "foreclosure" percentages would be far too small to warrant any presumption of competitive harm.[13] Tellingly, Dr. Lee never seeks to show that competition would be harmed such that Xbox would be able to raise console (or game) prices. *See Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1244–46 (3d Cir. 1987) ("foreclosure" concerns are only raised where withholding of inputs would result in "post-merger market power"); *cf.* Ex. 58, Carlton Rep. ¶ 140.

In short, the FTC cannot show what it must to justify blocking this vertical transaction: that the supposed withholding of *COD* would make the combined company's rivals *ineffective as competitors*. *See McWane, Inc. v. FTC*, 783 F.3d 814, 838–39 (11th Cir. 2015) (vertical integration is generally found to raise antitrust concerns only where it leaves rivals "stunted" as competitors and materially impairs their ability to discipline the defendant's prices); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 71 (D.C. Cir. 2001) (issue is whether exclusive dealing keeps competitors "below the

---

[13] Even if, counterfactually, Xbox had the incentive to withhold all of Activision's content, that would be a modest share of the console game publishing by any measure—███████████ Ex. 3, Bailey Rep. ¶¶ 28, 31. Such a "foreclosure percentage" would be far smaller than the level (30–50%) needed to raise any presumption of anticompetitive effect even if Xbox were a platform *monopolist*. *See Microsoft*, 253 F.3d at 70; *Fruehauf*, 603 F.2d at 352–54.

-19-

critical level necessary … to pose a real threat" to defendant's market power); *Fruehauf*, 603 F.2d at 352 n.9 (discussing *Brown Shoe* and *DuPont* and concluding that "we are unwilling to assume that any vertical foreclosure lessens competition.").

Finally, the FTC ignores critical variables in the economic analysis by disregarding the new options the merger will create for playing Activision content. "[I]ncrease[ed] output" is a clear "indicator[] of a merger's competitive impact." *In re AMR Corp.*, 625 B.R. 215, 255 (Bankr. S.D.N.Y. 2021), *aff'd*, 2023 WL 2563897 (2d Cir. 2023); *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2289 (2018) (practices that "expand[] output and improv[e] quality" are procompetitive).

Here, the acquisition would benefit consumers by making *COD* available on Microsoft's Game Pass on the day it is released on console (with no price increase for the service based on the acquisition), on Nintendo, and on other services that allow cloud streaming. Ex. 58, Carlton Rep. ¶¶ 45,140. Activision has historically refused to provide this type of access to *COD*, ███████ ███████████████████████████████████████████████████████████████████████ ██████████████ These clear consumer benefits likewise eviscerate the FTC's case.

### 2. The FTC Cannot Show a Substantial Likelihood of Harm in the Putative "Content Library" and "Cloud Gaming" Services Markets.

With respect to the console market, the FTC at least *purports* to offer a quantitative analysis—however flawed—of likely foreclosure effects. But it makes no such pretense when it turns to the putative markets for "content library" and "cloud gaming" subscription services. Even if these gaming features were (wrongly) considered separate "markets," the FTC's claims regarding "content-library" and "cloud gaming" services would fail. Indeed, the FTC does not even allege, let alone substantiate, any allegation that the merger will *likely* cause the withholding of content that Activision *would otherwise provide* to third-party content-library or cloud-gaming providers.

-20-

As a threshold matter, the FTC misconceives the law. Even accepting the government's framing of the standard,[15] the question is whether this "merger will likely lead to a substantial lessening of competition," *Oracle Corp.*, 331 F. Supp. 2d at 1109—*i.e.*, whether the world with this merger is "likely" to be substantially less competitive than the but-for world without it. *See AT&T*, 916 F.3d at 1032. The FTC does not even purport to make that showing as to content-library subscription services and cloud gaming subscription services. Instead, Dr. Lee contends that he need only show that ███████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 63, Lee Rebuttal ¶ 39; *see also id.* ¶¶ 44, 48. But that is not enough under the law—████████████████████████ ██████████████████████████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████ *See AT&T*, 310 F. Supp. 3d at 246–47 (rejecting claim of increased coordination risk given the Government expert's concession "that he was not in a position to say that coordination is more likely to happen than not") (cleaned up). ██████████████████ ██████████████████████, Ex. 63, Lee Rebuttal ¶ 48 & n.389, which dooms the government's case here, just as it did in *AT&T*. *See* 310 F. Supp. 3d at 246–47.

More generally, to carry its burden as to the content-library and cloud-gaming "markets," the FTC must prove that *all* of the following claims are likely true. In fact, *none* is true.

*First*, the FTC must prove that, but for this merger, Activision would allow *COD* to be included in third-party content-library or cloud-gaming services. ██████████████████████ ██████████████████████████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████████████████████████

---

[15] A plain-meaning interpretation of Section 7 precludes liability for the simple reason that Activision does not make *COD* available to content-library or cloud-gaming providers today; thus, continued withholding could not constitute a "substantial lessening" of competition. *U.S. v. Falstaff Brewing Corp.*, 410 U.S. 526, 537 (1973) ("[w]e leave for another day the question of the applicability of § 7 to a merger that will leave competition in the marketplace exactly as it was" but will nonetheless result in "less competition than there would have been" in the but-for world); *U.S. v. Marine Bancorp., Inc.*, 418 U.S. 602, 639 (1974) (continuing to "express no view on the appropriate resolution of the question reserved in *Falstaff* "). As discussed in the text, the FTC's alternative-market theories of harm fail even if the relevant Section 7 comparison is between future but-for and with-merger worlds.

1 ███████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████ This merger

3 could only *increase* access to *COD* on these services, to the benefit of consumers—as cloud provider

4 Nvidia agrees. Ex. 64.

5     *Second*, the FTC must then prove that the post-merger combined company would likely

6 withhold *COD* from subscription and cloud gaming services. Again, however, the FTC does not

7 even try to make that showing, nor could it—particularly in light of the binding contracts Microsoft

8 has already struck with Nvidia and other cloud providers.

9     *Third*, the FTC must additionally prove that any post-merger withholding would substantially

10 lessen *competition*. It cannot do so because exclusivity arrangements are ubiquitous; Sony and

11 Nintendo already use them more than Microsoft does; and, as discussed above, they raise no

12 competitive concerns except in narrow circumstances involving substantial market power and large

13 foreclosure percentages, neither of which is present here. *See, e.g.*, *McWane*, 783 F.3d at 838–39;

14 *Microsoft*, 253 F.3d at 71; *Alberta Gas*, 826 F.2d at 1244–46.

15     *Fourth*, as to the cloud-gaming "market," the FTC must prove that cloud gaming will

16 develop in the near-to-intermediate term as a genuine alternative to consoles or performance PCs, in

17 particular for multi-player, fast-twitch, graphics-intensive games such as *COD*. ████████████

18 █████████████████████████████████████████████████████████████████

19 ████████████████ The FTC can show no such thing. As Sony admits, network engineers are

20 nowhere close to solving the immense technological challenges presented by that cloud game-play

21 model, *e.g.*, Exs. 65–66, which is one of the reasons why Activision refuses to make *COD* available

22 for cloud gaming. And there is no basis for blocking a merger based on speculation about harm to

23 non-existent markets that are unlikely to materialize anytime in the foreseeable future. *See*

24 *Facebook*, 560 F. Supp. 3d at 4.

25     *Fifth*, if the FTC could establish that a cloud-gaming market will develop, it would also have

26 to show that Xbox will be a major player in it; otherwise, it would have no cloud-gaming business to

27 promote through exclusivity arrangements. The FTC cannot substantiate that speculation either.

28

-22-

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6 ▮▮▮▮▮▮▮▮▮▮

7 **II.    The Equities Weigh Against a Preliminary Injunction.**

8       The FTC's failure to demonstrate a likelihood of ultimate success means there is no reason to

9 consider the equities. *Meta*, 2023 WL 2346238, at *33. But in any event, the equities—both public

10 and private—weigh against granting the "extraordinary and drastic remedy" the agency requests.

11 *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 115 (D.D.C. 2016).

12       As a threshold matter, Microsoft's merger with Activision does not implicate the "principal"

13 "public equity consideration [that Congress had] in mind when it enacted section 13(b)"—namely,

14 the need to maintain the pre-merger "status quo" so the FTC can award effective relief if it succeeds

15 on the merits. *Heinz*, 246 F.3d at 726. This consideration applies chiefly in the context of horizontal

16 mergers where two competing companies integrate their operations and, in the process, often

17 eliminate stores, factories, or other redundant assets, making it difficult to unscramble the merger.

18 *FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966); *Sysco Corp.*, 113 F. Supp. 3d at 87.

19       Microsoft's *vertical* merger with Activision, however, raises none of these concerns. *Cf.* FTC

20 Br. 23. Microsoft and Activision are not competitors in the relevant markets alleged. And Microsoft

21 intends to operate Activision similar to other recent acquisitions, such as *Minecraft* developer

22 Mojang. In other words, Activision's creative operations will remain separate and continue to run as

23 they did pre-merger. Consequently, even in the (unlikely) event the FTC continues to press its Part 3

24 case and then succeeds on the ultimate merits in that proceeding, the agency can order Microsoft's

25 divesture of Activision—"an effective ultimate remedy," *FTC v. Great Lakes Chem. Corp.*, 528 F.

26 Supp. 84, 99 (N.D. Ill. 1981). As a result, the "principal public equity" cuts against the government,

27 *Heinz*, 246 F.3d at 726.

28

In addition, granting a preliminary injunction would kill the deal, robbing consumers of the "beneficial economic effects and procompetitive advantages" resulting from this merger, including increased availability of Activision content. *FTC v. Pharmtech Rsch., Inc.*, 576 F. Supp. 294, 299 (D.D.C. 1983); *see also Warner*, 742 F.2d at 1165. By contrast, there is no risk that consumers would be injured while the administrative process runs its course—Sony's existing contract for *COD* runs through 2024 and it has an offer for much longer access.

## CONCLUSION

For the foregoing reasons, Microsoft respectfully requests that the Court deny the FTC's motion for a preliminary injunction.

Dated: June 16, 2023

Jack DiCanio (Bar No. 138782)
Caroline Van Ness (Bar No. 281675)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (213) 621-5430
Email: jack.dicanio@skadden.com
Email: caroline.vanness@skadden.com

Steven C. Sunshine (*pro hac vice*)
Julia K. York (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
Email: steven.sunshine@skadden.com
Email: julia.york@skadden.com

Maria Raptis (*pro hac vice*)
Matthew M. Martino (*pro hac vice*)
Michael J. Sheerin (*pro hac vice*)
Evan R. Kreiner (*pro hac vice*)
Bradley J. Pierson (*pro hac vice*)
Jessica R. Watters((*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1 Manhattan West
New York, NY 10001

By: */s/ Beth Wilkinson*
Beth Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Kieran Gostin (*pro hac vice*)
Grace Hill (*pro hac vice*)
Anastasia M. Pastan (*pro hac vice*)
Sarah E. Neuman (*pro hac vice*)
Alysha Bohanon (*pro hac vice*)
Jenna Pavelec (*pro hac vice*)
WILKINSON STEKLOFF LLP
2001 M Street, N.W., 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
ghill@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com
abohanon@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com

Jonathan E. Nuechterlein (*pro hac vice*)
C. Frederick Beckner III (*pro hac vice*)
William R. Levi (*pro hac vice*)
Daniel J. Hay (*pro hac vice*)
SIDLEY AUSTIN LLP
150 K Street, N.W.
Washington, D.C. 20005
jnuechterlein@sidley.com
rbeckner@sidley.com
william.levi@sidley.com

-24-

Telephone: (212) 735-3000
Fax: (212) 735-2000
Email: maria.raptis@skadden.com
Email: matthew.martino@skadden.com
Email: michael.sheerin@skadden.com
Email: evan.kreiner@skadden.com
Email: bradley.pierson@skadden.com
Email: jessica.watters@skadden.com

*Counsel for Defendant Activision Blizzard, Inc.*

dhay@sidley.com

Bambo Obaro (Bar No. 267683)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3083
Facsimile: (650) 802-3100
bambo.obaro@weil.com

Michael Moiseyev (*pro hac vice*)
Megan A. Granger (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
michael.moiseyev@weil.com
megan.granger@weil.com

*Counsel for Microsoft Corporation*

No. 3:23-CV-02880-JSC
DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION