James H. Weingarten, DC Bar No. 985070
Peggy Bayer Femenella, DC Bar No. 472770
James Abell, DC Bar No. 990773
Cem Akleman, FL Bar No. 107666
Meredith R. Levert, DC Bar No. 498245
Jennifer Fleury, NY Bar No. 5053178
James Gossmann, DC Bar No. 1048904
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3570
jweingarten@ftc.gov; pbayer@ftc.gov:
jabell@ftc.gov; cakleman@ftc.gov;
jfleury@ftc.gov; mlevert@ftc.gov;
jgossmann@ftc.gov

Erika Wodinsky, Cal. Bar No. 091700
90 7th Street, Suite 14-300
San Francisco, CA 94103
Tel: (415) 848-5190
ewodinsky@ftc.gov

[Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]

Attorneys for Plaintiff Federal Trade Commission

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **MICROSOFT CORP.** <br><br> and <br><br> **ACTIVISION BLIZZARD, INC.**, <br><br> Defendants. | Case No. 3:23-cv-2880 <br><br> *Hearing: As soon as the matter may be heard.* <br><br> **PLAINTIFF FEDERAL TRADE COMMISSION'S REPLY TO DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION MOTION** <br><br> **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

**TABLE OF CONTENTS**

ARGUMENT ..................................................................................................................................1

    I.   The FTC raises "substantial questions" about the legality of the Acquisition ..................2

        A.  Defendants Fail to Rebut the FTC's Market Definitions.............................................2

            1.  Defendants' Assertions about Nintendo and PCs Ignore the Evidence. ................3

            2.  Multi-Game Content Library and Cloud Gaming Subscription Services Are Relevant Antitrust Markets ...................................................................................5

        B.  Microsoft has both the incentive and ability to foreclose competitors ........................7

            1.  Microsoft's decision to make ZeniMax games exclusive is powerful evidence of incentive to foreclose ............................................................................................7

            2.  Microsoft's deal model for valuing Activision does not constrain its ability to foreclose rivals .......................................................................................................9

            3.  The Proposed Acquisition may substantially lessen competition in the multi-game content library and cloud gaming markets ...................................................11

        C.  Microsoft's commitments to foreign regulators and private agreements are not relevant here..................................................................................................................12

        D.  Defendants' interest in completing the acquisition cannot outweigh the public equities .........................................................................................................................14

CONCLUSION ............................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Brown Shoe v. United States*, 370 U.S. 294 (1962) ..................................................................3, 5

*FTC v. Elders Grain*, Inc., 868 F.2d 901 (7th Cir. 1989) ................................................................2

*FTC v. Exxon Corp.*, 636 F.2d 1336 (D.C. Cir. 1980) ..................................................................14

*FTC v. Food Town Stores, Inc.*, 539 F.2d 1339 (4th Cir. 1976) ...................................................13

*FTC v. H.J. Heinz*, 246 F.3d 708 (D.C. Cir. 2001) ........................................................... 12, 13, 14

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) ..............................................2

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ....................................................................15

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984) .........................................2, 12, 13

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ................................2, 3, 13, 14

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) ................................14

*Greyhound Computer Corp., Inc. v. Int'l Bus. Machines Corp.*, 559 F.2d 488
    (9th Cir.1977) ...........................................................................................................................12

*In re Illumina*, No. 9401, 2023 WL 2823393 (F.T.C. Mar. 31, 2023) ..........................................13

*In the Matter of Union Carbide Corp.*, 59 F.T.C. 614, 1961 WL 65409 (1961) ............................6

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021) ............................3

*TRW, Inc. v. FTC*, 647 F.2d 942 (9th Cir. 1981) ............................................................................3

*United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019) ........................................................7

*United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHO, 2014 WL 203966
    (N.D. Cal. Jan. 8, 2014) ......................................................................................................4, 12

*United States v. Bertelsmann SE & Co.*, No. 21-2886-FYP, 2022 WL 16949715
    (D.D.C. Nov. 15, 2022) ............................................................................................................4

*United States v. Kimberly-Clark Corp.*, 264 F. Supp. 439 (N.D. Cal. 1967) ...............................11

1   Defendants' arguments might be persuasive if they were aimed at the applicable law, the
2   FTC's actual claims, and the record evidence. They are not. Defendants assert that the
3   upcoming hearing must decide the merits of their deal, lest they be forced to renegotiate their
4   self-imposed July 18 deadline for completing their transaction. But the law, as this Court
5   already ruled, is that the FTC need only present "evidence sufficient to raise serious, substantial,
6   difficult questions regarding the anticompetitive effects" of Microsoft's acquisition of
7   Activision. Order (Dkt. No. 76) at 2. Defendants assert that the "FTC's central claim is that the
8   combined firm would withhold certain Activision content—in particular, *COD*—from Sony."
9   Opp. at 14. But that is a strawman. The FTC's actual claim is that it is reasonably probable that
10  the combined firm will have the ability and incentive to harm competition, including from
11  future competitors, in several ways in multiple markets where the competitive effects of this
12  transaction will be felt, including consoles, content subscription, and cloud gaming services.
13      As for the evidence, Defendants focus on points irrelevant in a § 13(b) proceeding (e.g.,
14  ex post agreements with companies operating outside the United States) and ignore the
15  voluminous record developed for the merits trial on August 2. Contrary to Defendants'
16  arguments, the evidence shows the following: 1) the Nintendo Switch is not a "Generation 9"
17  console, and ███████████████████████████████████████████████
18  ███████████ 2) that Microsoft ████████████████████████████████
19  ████████████████████████████████████████████; 3) that cloud
20  gaming will be a critical part of gaming's future; 4) that ████████████████
21  ██████████████████████████████████████████; 5) that after
22  Microsoft acquired video game developer ZeniMax in 2021, ████████████
23  ██████████████████████████████████████████; and 6) that Microsoft
24  █████████████████████████████████████████████████
25  ████████████████████. And this is but a fraction of the evidence supporting
26  the FTC's request for a preliminary injunction.

## ARGUMENT

28  Defendants incorrectly attempt to cast this hearing as the merits trial to determine

PLAINTIFF'S REPLY TO DEFENDANTS' OPP. TO PRELIM. INJ. MOTION, CASE NO. 3:23-CV-2880
1

1  whether the Proposed Acquisition is unlawful. *See FTC v. Warner Commc'ns Inc.*, 742 F.2d
2  1156, 1162 (9th Cir. 1984) ("Our present task#s not to make a final determination on whether
3  the proposed merger violates Section 7[.]"). As the Court already explained, the FTC has the
4  "burden of demonstrating a likelihood of success by presenting evidence sufficient to raise
5  serious, substantial, difficult questions regarding the anticompetitive effects of the proposed
6  [transaction.]" Docket No. 76 at 2 (citation omitted, brackets in original). Once the FTC raises
7  "serious, substantial, difficult questions," Defendants must dispel any doubts about the legality
8  of their transaction, such that the Court would be "certain[]" and have "no doubt that [the]
9  merger would not substantially lessen competition." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d
10 1028, 1035-36 (D.C. Cir. 2008). "[A]ny 'doubts are to be resolved against the transaction.'"
11 *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016) (quoting *FTC v. Elders*
12 *Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989)).

   The evidence here amply demonstrates that the FTC satisfies the §13(b) standard and
that the equities weigh entirely in favor of preliminarily enjoining the transaction.

**I.    The FTC raises "substantial questions" about the legality of the Acquisition**

   Defendants endeavor to turn the Court away from the correct legal standard at this preliminary proceeding, while failing to dispel the substantial questions that the FTC has raised. Far from "claiming that it needs to offer only scant proof," Opp. at 2, the FTC intends to present testimony from senior Microsoft executives, and has more documents supporting its position than it can feasibly introduce during the hearing. *See* Ex. I to Fleury Dec. in Support of FTC's Motion for a Temporary Restraining Order (Dkt. No. 10) (FTC's Part 3 exhibit list). Relying here on only a fraction of the evidentiary record available in the administrative hearing on the merits that is set to begin on August 2, the FTC will show that the Microsoft-Activision entity has the incentive and the ability to harm competition in several well-defined relevant antitrust markets. Finally, neither Microsoft's ex post agreements nor groundless claims of private injury outweigh the public interest in maintaining the status quo until a full administrative trial on the merits, which begins in just 6 weeks.

   **A.    Defendants Fail to Rebut the FTC's Market Definitions**

1 | The purpose of defining a relevant antitrust market is to determine the "locus of
2 | competition" and enable analysis of a proposed acquisition's competitive effects. *TRW, Inc. v.*
3 | *FTC*, 647 F.2d 942, 947 (9th Cir. 1981) (quoting *Brown Shoe v. United States*, 370 U.S. 294, 324
4 | (1962)). The FTC's proposed relevant markets are supported both quantitatively and
5 | qualitatively, using either the Hypothetical Monopolist Test (HMT) or the Supreme Court's
6 | *Brown Shoe* factors. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 (9th Cir.
7 | 2021) ("[N]o requirement to use any specific methodology in defining the relevant market.").
8 | Defendants fail to even mention the HMT or the *Brown Shoe* factors, and their unsupported
9 | assertions about the proposed relevant markets fail to persuade that any of the alleged markets is
10 | not a "locus of competition" relevant to analyzing this transaction.[1]

### 1. Defendants' Assertions about Nintendo and PCs Ignore the Evidence.

The qualitative and quantitative evidence demonstrates that the Nintendo Switch is properly excluded from a market comprised of high-performance video game consoles. The Xbox Series X and S and PlayStation 5 are recognized as Generation 9 consoles ████████████. PX7048 at 42:19-25. Microsoft and Sony's documents and testimony ████████████████████████████████████████████████. PX1635-002; PX1752-001; PX3081-040; PX1747-020; PX6000 at 537:14-19 (Nintendo competes with Microsoft "to a much lesser extent" than PlayStation does.); PX1950-001 (███████████████████████████████ Microsoft leadership emphasizes only Generation 9 console competition (i.e., not including Nintendo) to investors, PX 9015-005; PX9084-005, and ██████████████████████████████. PX1747-009; PX1240-019. Defendants are quick to point out that Nintendo "has thrived without [Call of Duty] for the past decade," Opp. at 11, but that only supports the FTC's point: Nintendo has sold well without *Call of Duty* in part *because* █

---

[1] Defendants also continue to muddy the standard applicable here. *See* Opp. at 10. In the Section 13(b) stage, the FTC need only "rais[e] some question of whether [the candidate market] is well-defined." *Whole Foods Mkt.*, 548 F.3d at 1037.

PX7054 at 89:19-90:10.

Defendants' critiques of Dr. Lee's analysis are likewise unavailing. Dr. Lee, unlike Defendants' experts, thoroughly examined the evidence in this matter, including evidence demonstrating that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[2] PX5000-075-84. Dr. Lee also concluded that, even if the Switch were included in the market, the likely anticompetitive effects of the Proposed Acquisition are the same as in the high-performance console market. PX5000-069.

Defendants' arguments regarding PCs likewise fail. There are significant differences between ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. PX4182-004. Microsoft's ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇." PX5000-093. Sony ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. PX3085-022. Importantly, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. PX7011-010 at 35:9-23.

"[E]ven if alternative submarkets exist . . . or if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by the government unusable." *United States v. Bertelsmann SE & Co.*, No. 21-2886-FYP, 2022 WL 16949715, at *14 (D.D.C. Nov. 15, 2022). The fact that the Nintendo Switch and Gaming PCs may compete in some broad sense with high performance consoles does not render that product market invalid. "[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHO, 2014 WL 203966, at *26 (N.D. Cal. Jan. 8, 2014) (citation omitted). Rather, the question is whether the

---

[2] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. PX7053 at 21:6-22:3.

1  proposed relevant antitrust market "recognize[s] competition where, in fact, competition exists."
2  *Brown Shoe v. United States*, 370 U.S. 294, 326 (1962). Both the high-performance console
3  market and the alternative broader console market easily meet that the § 13(b) standard for
4  properly defined relevant markets.

   **2. Multi-Game Content Library and Cloud Gaming Subscription Services Are Relevant Antitrust Markets.**

7  *First*, Defendants' argument that multi-game content library subscription services "are
8  not their own market, but rather an alternative way for consumers to pay for . . . games that are
9  otherwise offered as standalone buy-to-play or free-to-play games," Opp. at 12, rests on a single
10 cite from one of Defendants' retained experts. That expert incorrectly claims ▓▓▓
11 ▓▓▓
12 ▓▓▓. *See* PX5001-115-117. Microsoft executives
13 ▓▓▓
14 ▓▓▓. PX1767-001; PX7003 at 139:7-19.
15 The FTC's proposed multi-game content library subscription service market accords with
16 the evidence. For example, ▓▓▓
17 ▓▓▓
18 ▓▓▓
19 ▓▓▓." PX7007 at 102:16-103:19. ▓▓▓
20 ▓▓▓. PX7053 at 19:4-8. Amazon ▓▓▓. PX3206-004.
21 Market participants also view content library services as a distinct product segment. For
22 example, ▓▓▓
23 ▓▓▓. PX1995-008. And ▓▓▓
24 ▓▓▓
25 ▓▓▓ PX0003-007.
26 Defendants' narrow focus on potential for cannibalization of buy-to-play sales from
27 multi-game content library subscription services does nothing to undermine this evidence. Even
28 if Game Pass cannibalized sales of individual games, there is no evidence that individual game

prices constrain or cannibalize Game Pass sales. Nor could there be, because multi-game content libraries are a distinct product with qualities that cannot be replicated by any individual game.

*Second*, cloud gaming subscription services also are a well-defined market. While Defendants refer here to cloud gaming as a "euphemism," a "feature," a "capability" and "unproven," (Opp. at 13, 22), Microsoft's own documents ▮▮▮▮. For example, ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ ▮▮▮▮. PX1613-003. ▮▮▮▮ ▮▮▮▮. PX1110-024; PX4182-002. Microsoft told the investor community that Microsoft "continue[d] to lead in the fast-growing cloud gaming market." PX9012-006. Cloud gaming subscription services ▮▮▮▮ ▮▮▮▮. PX8000-002. These benefits help to explain why industry participants, ▮▮▮▮ ▮▮▮▮ PX80000-002; PX1538-006; PX7036 at 93:18-24.

Defendants' focus on cloud gaming subscriptions as a nascent market is both irrelevant and misleading. The antitrust laws are designed for the protection of competition, including in markets that are still developing. *In the Matter of Union Carbide Corp.*, 59 F.T.C. 614, 1961 WL 65409, at *35 (1961). Documents from ▮▮▮▮ and an "▮▮▮▮." PX4057-001 ("▮▮▮▮ PX1043-004 ("▮▮▮▮ PX3272-010, 12. Any ▮▮▮▮. In fact, Microsoft ▮▮▮▮ ▮▮▮▮. PX7055 at 51:6-52:2, 56:5-57:9; PX7041 at 26:21-27:3.

B. **Microsoft has both the ability and incentive to foreclose competitors**

Microsoft has the ability and incentive to foreclose or partially foreclose Activision content post-acquisition. Microsoft's prior actions with its ZeniMax acquisition is one of many pieces of evidence demonstrating this fact. Defendants generalize about vertical mergers and their effects. Opp. at 19. But *this* case is about the effects of *this* merger. And while Defendants argue that vertical mergers are not a source of concern for courts, the law is clear that vertical mergers can lessen competition in a variety of ways and can violate the antitrust laws. *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1037 (D.C. Cir. 2019). This vertical merger—the largest ever in the gaming industry and in Microsoft's own history—is not exempt from antitrust review.

Defendants mischaracterize the nature of foreclosure analysis in vertical mergers. In their telling, this is a case about whether Microsoft will pull *Call of Duty* from PlayStation. But that is not the FTC's claim. Vertical mergers can result in harm via *total* foreclosure, for example, withholding Activision games entirely from rivals, or via *partial* foreclosure, for example, degrading Activision content or otherwise offering an inferior product to rivals. Both result in harm to consumers, and evidence demonstrates that both types of foreclosure would harm competition here. Defendants fail to acknowledge partial foreclosure is even possible and fail to rebut the harms that flow from it here.

Defendants' arguments here alternate between contradicting and omitting necessary evidence. For example, Defendants refer to Microsoft's offer to make Activision content available to Sony, but the assertions that follow are pure *ipse dixit* as to what Sony "is presumably worried" about, rather than reliance on the record evidence. Opp. at 15. Sony ███████████████████████████████████████████████████████████████. PX7053 at 70:13-23; PX7043 at 61:2-67:13. Without citation, Defendants baldly assert that "[m]ost PlayStation gamers do not play [COD] at all." Opp. at 3. The evidence, however, █████████████████████████████████████████████████████████████████████████. PX7053 at 54:14-55:2; PX8001-011.

1. **Microsoft's decision to make ZeniMax games exclusive is powerful evidence**

1  of incentive to foreclose.
2   Microsoft's actions following its 2021 acquisition of ZeniMax speak louder than Defendants'
3  words. ZeniMax makes " ███████████████████████████████████
4  ███████████████████████████████." PX7049 at 268:5-16. The evidence shows that
5  ███████████████████████████████████████████████████████
6  ███████████████████████████████████████████████████.
7  During antitrust review of the ZeniMax deal, ███████████████████████
8  ███████████████████████████████████████████████████████
9  ███████████████ PX1651-0125-129. █████████████████████████
10 ███████████████████████████████████████████████████████
11 ███████████████████████████████████████████████████████
12 ███████████████████████████████████████████████████████
13 ███████████████████████████
14 Microsoft determined ███████████████████████████████████
15 ███████████████████████████████████████████████████████
16 ███████████████████████████████████████████████████████
17 ███████████████████ PX4435-001 ████████████████████████
18 ███████████████████████████████████████████████████████
19 ███████████████████████████.
20  Defendants put great stock in Microsoft's concerns about "infuriating gamers" if it were to
21 foreclose rivals' access to Activision content, Opp. at 16, but those same concerns did not stop
22 the ZeniMax decision. One ZeniMax executive publicly apologized to fans who were frustrated
23 by Microsoft's decision to make new ZeniMax games exclusive to the Xbox ecosystem, but the
24 decision stands. PX9186-004-05, Tr. 12:9-16:6.
25  Defendants omit crucial details in their attempt to distinguish ZeniMax. First, Defendants
26 highlight that the "first two ZeniMax games Xbox released post-acquisition . . . were exclusives
27 *for Sony*." Opp. at 17. Defendants fail to note ████████████████████████
28 ███████████████████████████████████████████████. PX7053 at

29:8-29:21. Second, Defendants try to distinguish *Redfall* and *Starfield* as being unlike *Call of Duty* because those games do not "materially feature multi-player play" or lacked "existing cross-platform gaming communities." Opp. at 17. "[M]aterially feature" does much work here; ▮▮▮▮▮▮▮▮▮▮. PX 4079 at 316:7-318:7; PX7012 at 407:19-21. In any event, such distinctions had no role in Microsoft's ZeniMax decision, which applied to *all* future ZeniMax games. The surest sign of Defendants' struggle to distinguish Activision's content from ZeniMax's is the multi-hyphenate description ("existing, multi-player, cross-platform") Defendants need to append to *Call of Duty* to try to make their point. Opp. at 17.

Faced with the ZeniMax evidence, Defendants pivot to Microsoft's 2014 acquisition of *Minecraft*. Defendants concoct their own category of a "popular franchise with substantial cross-platform play" to shoehorn *Minecraft* and *Call of Duty* together. Opp. at 16. Defendants fail to note that *Minecraft* is played across many kinds of devices, including mobile phones, tablets, and the Switch. Even if Microsoft took *Minecraft* off of rival consoles and subscription and cloud gaming services, it would still be available for play on many other devices. The context for *Call of Duty* is very different. PX5001-064, 092-93. And Microsoft ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX7058 at 245:12-246:17. Microsoft ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id*.

Microsoft's ZeniMax decision is powerful evidence as to Microsoft's incentives here and should give this Court significant pause when considering Defendants' assurances that "Microsoft intends to operate Activision similarly to other recent acquisitions. . . ." Opp. at 4.

**2. Microsoft's deal model for valuing Activision does not constrain its ability to foreclose rivals**

Defendants argue that Microsoft's deal valuation shows that it will not make Activision content exclusive. But this is a red herring. First, Microsoft's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1 ▮▮▮. PX7042 at 223:4-14, 246:4-13,
2 249:25-250. ▮▮▮
3 ▮▮▮ PX4672-001. Indeed, ▮▮▮
4 ▮▮▮.
5 PX7042 at 223:4-14; 246:4-13, 249:24-250:10.
6 Second, Microsoft's own internal documents ▮▮▮
7 ▮▮▮. *See* Opp. at 15. Microsoft
8 ▮▮▮
9 PX4341-0025. ▮▮▮
10 ▮▮▮ PX7040 at 97:15-19. ▮▮▮
11 ▮▮▮
12 ▮▮▮ Finally, as the ZeniMax decisions show, ▮▮▮
13 ▮▮▮
14 ▮▮▮. PX4672-001.

3. **The Proposed Acquisition may substantially lessen competition in high-performance consoles and all consoles**

Defendants try mightily to use the fact that Microsoft and Sony are fierce competitors in the high-performance console and broader console markets to suggest (incorrectly) that the FTC's case is about protecting Sony and not competition itself. Opp. at 15, 18. The FTC's evidence and sound economics show otherwise. Dr. Lee concludes that this transaction would ▮▮▮ ▮▮▮ ▮▮▮" PX5001-23. Dr. Lee will testify to the economic harm to competition and consumers—▮▮▮ ▮▮▮. PX5000-231-34. The fact that Microsoft ▮▮▮ ▮▮▮. PX5000-230-31. Other non-price harms from the proposed acquisition include lost innovation. For example, ▮▮▮

1
2
3   ████████. PX7053-30, 34-36, 39.
4       Defendants' speculation about Sony's potential responses to anticompetitive conduct,
5   Opp. at 18, does not persuade. Whether Sony can or should "invest in other first-party or third
6   party-games" is irrelevant. And if an anticompetitive merger would spur counter acquisitions,
7   that counts *against* the merger, not in favor of it. *E.g. United States v. Kimberly-Clark Corp.*,
8   264 F. Supp. 439, 460 (N.D. Cal. 1967).
9       4.  **The Proposed Acquisition may substantially lessen competition in the multi-**
10          **game content library and cloud gaming markets**
11      Defendants incorrectly claim that there is "*absolutely no evidence*" that Activision would put
12  its content on cloud or content subscription services absent this deal. Opp. at 4 (emphasis in
13  original). But Activision ████████
14  ████████. PX7006 at 169:7-25; 204:13-205:10; *see also* PX2133-
15  001; PX2406-001. ████████
16  ████████. PX8000-008-09. Activision ██
17  ████████
18  ████████. PX8000-009-010.
19  As recently as December 2021, ████████
20  ████████ PX2197-001. Activision ██
21  ████████. PX2189-015; PX7054 at 23:24-25:2. And
22  Activision ████████
23  ████████
24  ████████. PX2006-001.
25      Defendants also attempt to downplay both the viability of the cloud gaming market and
26  Microsoft's primacy in it. Opp. at 22-23. Microsoft and other market participants ██
27  ████████. PX9012-006; PX8000-002 ██
28  ████████

1  ▮▮▮"); PX3272-012, 010 (stating ▮▮▮
2  ▮▮▮
3  ▮▮▮
4      Again, Microsoft's prior strategic decisions demonstrate the risk of foreclosure that is likely
5  to harm competition in cloud gaming. In 2021, ▮▮▮
6  ▮▮▮." PX1030-001. Dr. Lee
7  opines that foreclosure arising from the proposed transaction would likely harm competition in
8  the subscription and cloud gaming services markets relative to the but-for world in which
9  Microsoft does not acquire Activision. PX5000-221. Such foreclosure weakens Microsoft's
10 competitors in each market and increases Microsoft's power in markets where Microsoft is
11 already a market leader. PX5000-223. In the nascent cloud market, harm from this foreclosure is
12 likely to be magnified in the future if entrants and smaller players are disadvantaged. PX5000-
13 235; *United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966, at *76
14 (N.D. Cal. Jan. 8, 2014) ("[R]apid technological progress may provide a climate favorable to
15 increased concentration of market power rather than the opposite." (quoting *Greyhound*
16 *Computer Corp., Inc. v. Int'l Bus. Machines Corp.*, 559 F.2d 488, 497 (9th Cir.1977)).

17     **C.**    **Microsoft's commitments to foreign regulators and private agreements are**
18         **not relevant here**

19     Defendants tout Microsoft's commitments to foreign regulators and agreements it has
20 reached with certain third parties, Opp. at 8, but none of that is relevant here. At the preliminary
21 injunction stage, courts "do not resolve the conflicts in the evidence . . . or undertake an
22 extensive analysis of the antitrust issues. *Warner Commc'ns*, 742 F.2d. at 1164. Predicting the
23 government's "likelihood of success" in a § 13(b) proceeding is limited to the threshold question
24 of liability, not the subsequent question of what remedy may be appropriate. *H.J. Heinz Co.*, 246
25 F.3d at 714.
26     The Court, therefore, should decline Defendants' invitation to engage in an "extensive
27 analysis" and decide whether Defendants' European and private remedies suffice to answer the
28 substantial questions the FTC has raised. The FTC is "entitled to preserve the status quo pending

1 adjudication" regardless of what "ultimate remedy" might eventually be deemed appropriate.
2 *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345 (4th Cir. 1976). The proper forum to raise
3 such defenses is during the trial on the merits that begins in 6 weeks on August 2.
4     Even if Defendants' proposed remedies were relevant here, they would properly be
5 considered as part of Defendants' rebuttal burden, not part of the FTC's initial burden. *Cf. In re*
6 *Illumina*, No. 9401, 2023 WL 2823393 at *50-51 (F.T.C. Mar. 31, 2023). This is, in fact, what
7 happened in Europe with respect to this transaction—Microsoft offered remedies to address a
8 finding of liability.[3] European Commission Press Release IP/23/2705, Mergers: Commission
9 clears acquisition of Activision Blizzard by Microsoft, subject to conditions (May 15, 2023),
10 https://ec.europa.eu/commission/presscorner/detail/en/ip_23_2705.
11     In any event, under U.S. law, any proposed remedy would need to dispel any and all
12 doubts about the transaction's legality. *See Warner Commc'ns*, 742 F.2d at 1162; *Whole Foods*,
13 548 F.3d at 1036.; *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 725 (D.C. Cir. 2001). There are serious
14 questions as to whether Microsoft's agreements meet that heavy burden. First, some of
15 Microsoft's agreements are with foreign companies that have no meaningful business in the
16 United States. The Agreements are facially ambiguous and present significant questions. For
17 example, ███████████████████████████
18 ███████████████████████████
19 ███████████████████████████
20 ███████████████████████████.
21 PX7065 at 126:9-17, 177:22-178:8, 150:18-151:11, 154:16-156, 158:5-12. A section labeled
22 ███████████████████████████
23 ███████████████████████████. PX7044 at 159:11-
24 164:19; PX1781-010-11. These loopholes and ambiguities give Microsoft wide latitude to ensure

---

[3] The United Kingdom's Competition and Markets Authority blocked this transaction after considering Microsoft's proposed remedies. Press Release, Competition and Markets Authority, Microsoft/Activision deal prevented to protect innovation and choice in cloud gaming, (Apr. 26, 2023), https://www.gov.uk/government/news/microsoft-activision-deal-prevented-to-protect-innovation-and-choice-in-cloud-gaming.

that whatever faux "competition" occurs pursuant to them will be largely subject to Microsoft's own business interests. Third, multiple rival firms have not reached agreements with Microsoft. Defendants devote space to unsupported speculation about why a rival like Sony would not sign Microsoft's offer. Opp. at 15. But ████████████████████████████████████ ████████████████████████████████████ PX7053 at 61:2-67:13, 70:13-23.

### D. Defendants' interest in completing the acquisition cannot outweigh the public equities

Defendants claim that granting a preliminary junction at this stage "would kill the deal, robbing consumers of the 'beneficial economic effects and procompetitive advantages' resulting from this merger." Opp. at 24. "[A] 'risk that the transaction will not occur at all,' by itself, is a private consideration that cannot alone defeat the preliminary injunction." *Whole Foods*, 548 F.3d at 1041. Defendants' claimed injury would be of their own making, resulting from their own agreed termination date, a date that could be extended. "[T]he parties' stated intention to abandon the transaction prior to the merits proceeding is a private equity, and cannot on its own overcome the public equities that favor the FTC." *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 774 (D.D.C. 2018).

Defendants' reliance on *Heinz* and *Exxon* are particularly misplaced. *H.J. Heinz Co.*, 246 F.3d at 708 (cited in Opp. at 10, 23) states that, if the FTC establishes a likelihood of success, then private equities "should not affect the outcome of the proceeding." *Id.* at 727 n.25. Courts "must afford such [private] concerns little weight, lest we undermine section 13(b)'s purpose of protecting the public-at-large, rather than the individual private competitors." *Id.* (citation omitted). *FTC v. Exxon Corp.*, 636 F.2d 1336 (D.C. Cir. 1980) (cited in Opp. at 2, 10), explains that "[i]n enacting [§13(b)], Congress further demonstrated its concern that injunctive relief be *broadly available to the FTC." Id.* at 1343 (emphasis added).

Finally, Defendants simply invent an argument that Section 13(b) injunctions "apply chiefly in the context of horizontal mergers." Opp. at 23. Congress ensured that the antitrust laws apply with equal force to all mergers. *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967). Regardless, if Microsoft actually intends to operate Activision as a truly separate entity, Opp. at

23, then it should suffer little to no private hardship from relief that temporarily preserves Activision as a separate company.

## CONCLUSION

For the forgoing reasons, Plaintiff Federal Trade Commission respectfully requests that the Court enter the requested preliminary injunction.

Dated: June 20, 2023

Respectfully submitted,

*/s/ James H. Weingarten*
James H. Weingarten
Peggy Bayer Femenella
James Abell
Cem Akleman
J. Alexander Ansaldo
Michael T. Blevins
Amanda L. Butler
Nicole Callan
Maria Cirincione
Kassandra DiPietro
Jennifer Fleury
Michael A. Franchak
James Gossmann
Ethan Gurwitz
Meredith R. Levert
David E. Morris
Merrick Pastore
Stephen Santulli
Edmund Saw

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3570

Erika Wodinsky

Federal Trade Commission
90 7th Street, Suite 14-300
San Francisco, CA 94103

*Counsel for Plaintiff Federal Trade Commission*