# ATTACHMENT 1

## NVIDIA's Proposed Redactions to Complaint (Underlined in Red)

James H. Weingarten, DC Bar No. 985070
Peggy Bayer Femenella, DC Bar No. 472770
James Abell, DC Bar No. 990773
Cem Akleman, FL Bar No. 107666
Jennifer Fleury, NY Bar No. 5053178
Meredith R. Levert, DC Bar No. 498245
James Gossmann, DC Bar No. 1048904

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3570

*jweingarten@ftc.gov; pbayerfemenella@ftc.gov;*
*jabell@ftc.gov; cakleman@ftc.gov;*
*jfleury@ftc.gov; mlevert@ftc.gov;*
*jgossmann@ftc.gov*

[Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **MICROSOFT CORP.,** <br> and <br> **ACTIVISION BLIZZARD, INC.,** <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT** <br><br> **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

Plaintiff Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, petitions this Court to enter a temporary restraining order and grant a preliminary injunction enjoining Defendants Microsoft Corp. ("Microsoft") and Activision Blizzard, Inc. ("Activision") from consummating their proposed acquisition (the "Proposed Acquisition") or a similar transaction. Plaintiff seeks this provisional relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b). Both a temporary restraining order and a preliminary injunction are necessary because Microsoft and Activision have represented that they may consummate the Proposed Acquisition at any time ▮▮▮▮▮▮▮▮ without any further notice to the Commission. A preliminary injunction is necessary to maintain the status quo and prevent interim harm to competition during the pendency of the FTC's administrative proceeding to determine whether the Proposed Acquisition violates U.S. antitrust law. A temporary restraining order is necessary to maintain the status quo while this Court decides whether to grant the requested preliminary injunction.

On December 8, 2022, the Commission initiated an administrative proceeding to determine whether the Proposed Acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45. An evidentiary hearing in that proceeding will begin in just seven weeks, on August 2, 2023. Fact discovery in the administrative proceeding has closed, expert reports have been served, and final witness lists and exhibit lists have been exchanged. The parties have scheduled expert depositions through the end of June, and motions *in limine* and pretrial briefs are due in July. The administrative hearing will assess the legality of the Proposed Acquisition and will provide all parties a full opportunity to present testimony and other evidence regarding its likely competitive effects. The record from the evidentiary hearing can be submitted to this Court in aid of its adjudication of Plaintiff's request for a preliminary injunction. *See, e.g.*, *FTC v. Tronox Ltd.,* 332 F. Supp. 3d 187, 196 (D.D.C. 2018).

Until recently, Defendants indicated that they would not complete the Proposed Acquisition unless and until they received clearance from European regulators, including in proceedings before this Court in a private case challenging the Proposed Acquisition.

On April 26, 2023, the United Kingdom Competition and Markets Authority ("UK CMA") issued a report finding that the Proposed Acquisition may be expected to result in a substantial lessening of competition in cloud gaming services in the United Kingdom. On May 5, 2023, the UK CMA issued an interim order blocking the Proposed Acquisition as of that date. On May 18, it issued a proposed final order prohibiting the Proposed Acquisition for a ten-year period. Defendants have appealed the UK CMA's decision.

On May 24, ███████████████████████████████████████ ███████████████████████████████████. Press reports began circulating suggesting that Defendants were seriously contemplating closing the Proposed Acquisition despite the pending administrative litigation and the CMA Orders. ████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████

Accordingly, pursuant to FTC Act § 13(b), Plaintiff requests (1) a preliminary injunction to protect the Commission's ability to evaluate the antitrust merits of the Proposed Acquisition and (2) a temporary restraining order to protect this Court's ability to decide the FTC's request for a preliminary injunction and order appropriate relief. Plaintiff's request for a temporary restraining order is the subject of a separate emergency motion, in which Plaintiff asks the Court to enter—before 8:59 p.m. Pacific Time on June 15, 2023—an order prohibiting Defendants from consummating the Proposed Acquisition or a substantially similar acquisition until after this Court rules on the FTC's request for a preliminary injunction.

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### NATURE OF THE CASE

1.      Microsoft and Sony control the market for high-performance video game consoles. The number of independent companies capable of developing standout video games for those consoles has contracted, with only a small group of firms commanding that space today. Microsoft now proposes to acquire Activision, one of the most valuable of those developers, in a vertical merger valued at nearly $70 billion (the "Proposed Acquisition") that will increase Microsoft's already considerable power in video games. If consummated, the Proposed Acquisition would be the largest in the history of the video game industry and the largest in Microsoft's history. The Proposed Acquisition would continue Microsoft's pattern of taking control of valuable gaming content. With control of Activision's content, Microsoft would have the ability and increased incentive to withhold or degrade Activision's content in ways that substantially lessen competition—including competition on product quality, price, and innovation. This loss of competition would likely result in significant harm to consumers in multiple markets at a pivotal time for the industry.

2.      Microsoft, one of only two manufacturers of high-performance video game consoles, develops and sells Xbox gaming consoles. Microsoft is vertically integrated: through its in-house game studios, it develops and publishes popular video game titles such as Halo. Such in-house games are known as "first-party" titles in the industry. Microsoft also offers a leading video game subscription service, Xbox Game Pass, for which customers pay a monthly fee to access a library of hundreds of first- and third-party video games for console or personal computer ("PC"). The top tier of Xbox Game Pass, called Xbox Game Pass Ultimate, includes "cloud gaming" functionality that enables subscribers to stream certain games, as opposed to downloading games locally, and then to play those games across a variety of devices including consoles, PCs, tablets, and mobile phones.

3.      Activision develops and publishes high-quality video games for multiple devices, including video game consoles, PCs, and mobile devices. Activision's games include high-quality games that are commonly referred to in the industry as "AAA" titles. AAA games are

costly to produce because of the creative talent, budgets, and time required for development. Gamers highly anticipate the release of AAA games.

4.      Activision produces some of the most iconic video game titles, including several leading AAA franchises. For example, Activision develops the popular franchises *Diablo* and *Overwatch* and the marquee franchise *Call of Duty*.

5.      The *Diablo* and *Overwatch* AAA franchises are among several Activision franchises that have individually earned more than ███████ in lifetime revenues. *Overwatch* just released a successful new title, *Overwatch 2*, available for play on multiple gaming consoles and PCs. Diablo, a long-running franchise first introduced in the 1990s, launched a highly anticipated new title, *Diablo IV*, on June 6, 2023. An Activision Press Release noted that *Diablo IV* quickly became its Blizzard division's "fastest-selling game of all time, with Blizzard's highest pre-launch unit sales ever on both console and PC. In the four days since early access started on June 1, *Diablo IV* has been played for 93 million hours, or over 10,000 years --- the equivalent playing 24 hours a day since the beginning of human civilization."

6.      Activision and industry participants also recognize *Call of Duty* as Activision's "key product franchise." *Call of Duty* was originally launched in 2003, and Activision releases new titles for the franchise on an annual basis. Activision allocates substantial resources to the franchise. As many as ███ primary development studios are devoted to it at any one time and its budget is significantly larger than other AAA titles.

7.      By any measure, *Call of Duty* is a leading AAA franchise. It is one of the most successful console-game franchises ever. From its launch in 2003 up through 2020, it generated $27 billion in revenues. *Call of Duty* also has a massive following, with ███ million monthly active users ("MAU") in 2020, according to an Activision strategy document. Its loyal fanbase and enduring appeal have made it particularly valuable, influencing gamer engagement and gaming product adoption. The franchise has achieved sustained dominance over the past decade, with *Call of Duty* titles comprising 10 of the top 15 console games sold between 2010–2019. No other franchise had more than one title in the top 15. *Call of Duty* has continued to top the charts

in 2020 and 2021, and its latest installment, *Modern Warfare* II, amassed more than $1 billion in sales within just ten days of its release. The previous franchise record was held by *Call of Duty: Black Ops II*, which took 15 days to hit the $1 billion mark.

8.    Activision's content is extremely important for, and drives adoption of, video game consoles. Given their immense popularity, Activision's titles are of particular importance to console makers, including Microsoft's competition.

9.    Microsoft produces its own first-party video game titles. Microsoft has acquired over ten third-party studios and their titles in recent years to expand its offerings. Microsoft has frequently made those acquired titles exclusive to its own consoles and/or subscription services, eliminating the opportunity for consumers to play those titles on rival products or services. By taking games exclusive, Microsoft strengthens the position of its console and subscription service products relative to competitors.

10.    The Proposed Acquisition is reasonably likely to substantially lessen competition or tend to create a monopoly in multiple markets because it will create a combined firm with the ability and increased incentive to use its control of Activision titles to disadvantage Microsoft's competitors. The Proposed Acquisition also may accelerate an ongoing trend towards vertical integration and consolidation in, and raise barriers to entering, the relevant markets.

11.    Microsoft's ownership of Activision would provide Microsoft with the ability to withhold or degrade Activision content through various means, including manipulating Activision's pricing, degrading game quality or player experience on rival offerings, changing the terms and timing of access to Activision's content, or withholding content from competitors entirely.

12.    Microsoft's past conduct provides a preview of the combined firm's likely plans if it consummates the Proposed Acquisition, despite any assurances the company may offer regarding its plans. In March 2021, Microsoft acquired ZeniMax Media Inc. ("ZeniMax"), the parent company of the well-known game developer and publisher Bethesda Softworks LLC ("Bethesda"). Microsoft assured the European Commission ("EC") during its antitrust review of

the ZeniMax purchase that Microsoft would not have the incentive to withhold ZeniMax titles from rival consoles. But, shortly after the EC cleared the transaction, Microsoft made public its decision to make several of the newly acquired ZeniMax titles, including Starfield, Redfall, and Elder Scrolls VI, Microsoft exclusives.

13.     Today, Activision touts that it is ███████████ and seeks to offer its games wherever gamers want to be playing them. It has an incentive to offer its titles broadly. Microsoft's ownership of Activision's content would alter that dynamic. As Microsoft seeks to increase its profits from the lucrative video game industry, the Proposed Acquisition will increase Microsoft's incentive to withhold Activision content from, or degrade Activision content on, consoles and subscription services that compete with Xbox consoles and Xbox Game Pass. Such conduct would be reasonably likely to substantially lessen competition and harm gamers in the United States.

14.     These effects are likely to be felt throughout the video gaming industry. The Proposed Acquisition is reasonably likely to substantially lessen competition and/or tend to create a monopoly in both well-developed and new, burgeoning markets, including high-performance consoles, multi-game content library subscription services, and cloud gaming subscription services.

15.     Defendants cannot show cognizable, merger-specific efficiencies that would offset the reasonably probable and substantial competitive harm resulting from the Acquisition.

16.     On December 8, 2022, the Commission found reason to believe that the Acquisition would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45, and commenced an administrative proceeding on the antitrust merits of the Proposed Acquisition.  The administrative proceeding provides a forum for fact discovery, which closed on April 7, 2023, after all parties issued document subpoenas, requests for admission, interrogatories, and conducted over thirty depositions of party and non-party witnesses. Pretrial disclosures are underway and the evidentiary hearing is scheduled to begin before an Administrative Law Judge ("ALJ") on

August 2, 2022, with up to 210 hours of live testimony permitted by rule. *See* 16 C.F.R. § 3.41.

17.     A temporary restraining order is necessary to prevent Defendants from consummating the Proposed Acquisition until after the fifth business day after this Court rules on the Commission's motion for a preliminary injunction pursuant to Section 13(b), or until after the date set by the District Court, whichever is later.  Such a temporary restraining order is necessary to preserve the status quo and protect competition while the Court considers the Commission's application for a preliminary injunction.

18.     Preliminary injunctive relief is similarly necessary to preserve the status quo and protect competition during the Commission's ongoing administrative proceeding. Allowing the Proposed Acquisition to proceed while the Commission is assessing whether it violates Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18 and is an unfair method of competition that violates Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, would undermine the Commission's ability to order any necessary relief.

## JURISDICTIONAL STATEMENT

### A.     Jurisdiction

19.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345.  This is a civil action arising under the Acts of Congress protecting trade and commerce against restraints and monopolies, and is brought by an agency of the United States authorized by an Act of Congress to bring this action.

20.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond. . . .

21.     Defendants and their relevant operating entities and subsidiaries are, and at all relevant times have been, engaged in activities affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

**B.      Venue**

22.     Personal jurisdiction exists where service is effected pursuant to a federal statute. Fed. R. Civ. P. 4(k)(1)(C).  The FTC Act § 13(b), 15 U.S.C. § 53(b), authorizes nationwide service of process.  Defendants are therefore subject to personal jurisdiction in the Northern District of California.  Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) and (c), as well as under 15 U.S.C. § 53(b) ("Any suit may be brought where such person, partnership, or corporation resides or transacts business, or wherever venue is proper under section 1391 of Title 28.")

**C.      Assignment to the San Francisco Division**

23.     Assignment to the San Francisco Division is proper.  A related proceeding regarding the Proposed Acquisition was filed in the San Francisco Division: *DeMartini v. Microsoft Corp.*, No. C-22-08991-JSC (N.D. Cal.).

**THE PARTIES AND THE PROPOSED ACQUISITION**

24.     Plaintiff, the Commission, is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580.  The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

25.     Defendant Microsoft is a publicly traded technology company incorporated in the State of Washington with headquarters in Redmond, Washington. Microsoft sells software, services, and devices across the technology industry and is among the most valuable companies in the world. Microsoft's gaming division produces Xbox hardware and Xbox content and services. Its total gaming revenues in FY2022 were over $16 billion. Microsoft's total revenues in FY2022 were over $198 billion.

26.     Defendant Activision is a publicly traded company, incorporated in the State of Delaware with headquarters in Santa Monica, California. Activision develops and publishes video games for consoles, PCs, and mobile devices. Activision's revenues in FY2021, its most recently reported fiscal year, were $8.8 billion.

27.     Microsoft entered into an Agreement and Plan of Merger with Activision on January 18, 2022, for an all-cash purchase price of $95 per Activision share and a total estimated value of $68.7 billion.

28.     Unless temporarily restrained and preliminarily enjoined by this Court, Defendants have represented that they that they may consummate the Proposed Acquisition at any time after June 15, 2023.

## **BACKGROUND**

29.     Activision's gaming content is extremely important in a gaming industry where content availability shapes gamers' decisions about which video game consoles and services to purchase. If the Proposed Acquisition is allowed to proceed, Microsoft would gain control of Activision's content and have the ability and increased incentive to withhold or degrade Activision's content, which is reasonably likely to reduce competition and cause a number of harmful outcomes, including dampened innovation, diminished consumer choice, higher prices and/or lower quality products, and harm to the millions of Americans who benefit from competition in video game consoles and subscription services.

30.     Today, gaming is the largest category in the entertainment industry, with revenues that far exceed those of both the film and music industries. This year, the gaming industry is

expected to be worth more than $170 billion in global revenues, five times greater than global movie box office revenues.

31.     Gaming's unrivaled popularity among consumers is expected to continue. Microsoft projects global gaming revenues to grow to ███ billion in annual sales by ███. Microsoft also expects the number of gamers worldwide to increase significantly, expanding by another ██ billion players and reaching ███ of the global population over the next ███ years.

32.     Video game content and services are generally available on a variety of devices, including video game consoles that are predominantly used for playing video games; PCs, including general purpose PCs as well as high-performance gaming PCs configured to play computationally demanding games; and mobile devices.

33.     Consumers purchase consoles based on the technological capability of the console, the price, and the games available for that specific console, among other factors.

**II.     Consoles**

34.     For gamers who play games on gaming consoles today, the most popular options, Microsoft's Xbox, Sony's PlayStation, and Nintendo's Switch, come from the same trio of companies that have been manufacturing consoles for decades with no meaningful new competition.

35.     Since the 1970s, competing video game console makers have periodically released consoles featuring the latest technological advances, with a new generation of consoles released approximately every five to ten years. Within the video game industry, competition for sales and technological supremacy is commonly referred to as "the console wars."

36.     Of these three console makers, PlayStation and Xbox compete in a high-performance segment that includes only the most technologically advanced and capable consoles. In November 2020, both Microsoft and Sony launched their current generation of consoles, the Xbox Series X and Series S consoles (collectively, "Xbox Series X|S") and the PlayStation 5 and PlayStation 5 Digital Edition consoles (collectively, "PS5"), respectively. Xbox Series X|S and PS5 consoles are the only high-performance consoles available today, and

are considered to be in the ninth generation of gaming consoles. In contrast, Nintendo's most recent console—the Nintendo Switch—is not a ninth-generation gaming console. The Nintendo Switch was released in 2017, in the latter half of the eighth generation of gaming consoles, which had begun in approximately 2013. The Nintendo Switch ("Switch") also has lower computational performance, more in line with Microsoft's and Sony's eighth generation consoles.

37.    The Xbox Series X|S are two ninth-generation Xbox consoles offered by Microsoft. The Series X is a more powerful console while the Series S is more affordable. Together, these consoles provide Microsoft's ████████████████████

38.    Microsoft closely tracks the performance of its Xbox consoles relative to Sony's PlayStation consoles. For example, in FY2022, the first full year that Xbox Series X|S consoles were available, one of Microsoft's key metrics for evaluating success was ███████████████ ██████████████████████    In internal communications, Microsoft executives regularly discuss ████████████████████████

39.    Xbox Series X|S consoles have been a commercial success. In a July 26, 2022 earnings call, Microsoft CEO Satya Nadella announced that the company "ha[d] been the market leader in North America for three quarters in a row among next gen consoles."

40.    The Xbox Series X|S and PS5 consoles are ████████████████ from a broad consumer perspective, in a number of technical specifications, including offering similar graphics, user experiences, and hardware features. In addition, the Xbox Series X and PlayStation 5 are sold at the same price, while the Series S offers lower performance and is sold at a lower price.

41.    Other consoles lack the high performance of the Xbox Series X|S and PS5 consoles. For example, the Nintendo Switch, which is designed to allow portable, handheld use, necessarily sacrifices computing power, which leaves it unable to play certain games that require more advanced graphic processing. Retailing at $299.99, the Nintendo Switch is also less expensive than the Xbox Series X and PlayStation 5 consoles, both priced at $499.99. While the

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Xbox Series S had the same retail price at launch as the Nintendo Switch, the graphical and processing capabilities of the Series S are much more aligned with the Xbox Series X and PS5 consoles. The Xbox Series S enables gamers to play the same video games as the Xbox Series X, both of which offer more graphically advanced gameplay than on the Nintendo Switch.

## III.    Gaming Content

### A.    Multi-Game Content Library Subscription Services

42.    For the last several decades, gamers have purchased games through a "buy-to-play" model: either purchasing physical copies of games or, more prevalent today, purchasing digital copies of individual games that gamers download to their gaming console, PC, or other device.

43.    Recent years, however, have seen the expansion of a subscription model. Multi-game content library subscription services allow gamers to access a library of games for a fixed monthly or yearly fee. Microsoft's multi-game content library subscription service, Xbox Game Pass, launched in 2017, rapidly grew to 10 million subscribers by 2020 and in 2022 announced it had grown to 25 million subscribers.

44.    Xbox Game Pass provides subscribers with unlimited access to a library of over 300 first- and third-party games at no additional cost. The service is priced at $9.99 per month for gamers who seek to download games to play solely on an Xbox console or solely on a PC. The higher tiered service, Xbox Game Pass Ultimate, priced at $14.99 per month, allows gamers to download games for play on either an Xbox console or a PC, and additionally enables gamers to stream games from an off-site server to any web-enabled local device that can access Game Pass (*e.g.*, an Xbox console, PC, mobile device, or smart TV).

45.    Sony also offers a multi-game content library subscription service, PlayStation Plus, which at certain tiers is comparable to Xbox Game Pass. The lower comparable tier, PlayStation Plus Extra, priced at $14.99 per month, provides access to a library of hundreds of games that can be played on PlayStation consoles as well as online multiplayer access, discounts on other games, and cloud storage. The higher comparable tier, PlayStation Plus Premium,

priced at $17.99 per month, provides access to an even larger library of games that can be played on PlayStation, along with cloud streaming.

46.     In addition to Sony's PlayStation Plus Extra and Premium, other multi-game content library subscription services include EA Play and Ubisoft+. EA Play, starting at $4.99 per month, and Ubisoft+, starting at $14.99 per month, each offer access only to content from the respective publishers, Electronic Arts Inc. ("EA") and Ubisoft Entertainment SA ("Ubisoft").

## B.     Cloud Gaming Subscription Services

47.     Today, video game software typically runs locally on the player's gaming device. Recently, however, cloud gaming subscription services have been introduced that allow players to stream games that run on remote hardware without downloading the game locally. The primary processing for the game occurs in off-site datacenters and a live feed of the game is streamed to the player's device.

48.     Microsoft touts numerous benefits of cloud gaming to customers. Cloud gaming enables gamers to begin playing a game in seconds, rather than waiting for games to download or update, and streaming rather than downloading avoids burdening the storage limits on a gaming device. Cloud gaming also broadens access to gaming by expanding the universe of devices that can play games. Today, cloud gaming subscription services are available on consoles, Windows PC, Mac PC, Chromebook PC, tablet, mobile phones, and some smart TVs, with device compatibility varying by service. This permits gamers to play computationally demanding games on less powerful devices that otherwise lack the computing power or storage to support the games.

49.     In September 2020, Microsoft added cloud gaming to its top-tier multi-game content library subscription service offering, Xbox Game Pass Ultimate. To date, more than 20 million gamers have used the service to stream games from the cloud. Microsoft has stated that cloud gaming subscription services are integral to its goal of expanding gaming to 3 billion gamers worldwide and enabling gamers "to play the games you want, with the people you want, anywhere you want."

50.     Other cloud gaming subscription services include Amazon Luna, Nvidia GeForce NOW, and Google Stadia, although Alphabet Inc. announced that it discontinued Stadia in January 2023. Amazon's Luna+ (a tier of Amazon Luna), priced at $9.99 per month with additional options available for further purchases, provides streaming access to a library of over 100 third-party games. Nvidia GeForce NOW, priced at $49.99 for six months for the Priority tier or $99.99 for six months for the RTX 3080 tier, allows gamers to stream game titles that they already own, with the streaming hosted on Nvidia Corporation ("Nvidia") datacenters. Although it will soon be discontinued, Stadia Pro, priced at $9.99 per month with additional options for further purchases, allows gamers to stream games from a library of hundreds of third-party games.

### C.     Importance of AAA Games

51.     AAA games are particularly important within the gaming industry. The term "AAA" is frequently used by industry participants to refer to highly anticipated games bearing similar characteristics: high development costs, superior graphical quality, and expectations of high unit sales and revenue, typically from a studio with large development and publishing teams, supported by extensive marketing and promotion. AAA content can act as ███████ content, where, as a consultant to Microsoft explained, it ████████████████████ ████████████████████████████ ████████████████████

52.     In the words of one Microsoft executive, AAA games are ███████████ They are also not numerous. Phil Spencer, CEO of Microsoft Gaming, estimates there are ████████ ████████████████████████

53.     Production budgets for AAA games frequently exceed ███ million, if not ███ million, and development teams can include thousands of developers working over several years. The high cost of AAA game development is driven by many factors such as long development cycles and the scarcity of AAA-capable studios and talent.

54.     The gaming industry recognizes a limited top tier of independent game publishers.

sometimes referred to as the "Big 4" or simply the AAA publishers: Activision, Electronic Arts, Take-Two, and Ubisoft. These publishers reliably produce AAA games for high-performance consoles and collectively own a significant portion of the most valuable IP in the gaming industry. These high-profile franchises include, for example, *Call of Duty* (Activision), *FIFA* (EA), *Grand Theft Auto* (Take-Two), and *Assassin's Creed* (Ubisoft).

55.     Only a few other studios are typically credited with releasing AAA games. Epic Games, maker of *Fortnite*, a free-to-play game that is currently one of the most popular games in the United States, is sometimes viewed within the industry as a AAA-level publisher, such that industry participants will sometimes refer to the "Big 4 + Epic."

56.     Internally, Microsoft recognizes that ████████████████████████████ ████████████████████████████████████████ Despite significant growth in the gaming industry, the head of Xbox Game Studios has noted ███████████ ████████████████████████████████████ Creating a studio with the capability to produce AAA games requires scarce talent and is a capital-intensive endeavor.

57.     Microsoft and Sony also produce AAA games. The *Elder Scrolls*, *Halo*, and *Forza* franchises are AAA games from Microsoft, while the *God of War*, *MLB The Show*, and *Spider-Man* franchises are AAA games from Sony.

58.     Microsoft's own experience with releasing AAA games reflects the cost and time to develop such content. *Halo Infinite*, a recent title from the Microsoft's first-party *Halo* franchise, was in production for ███████ years, and cost almost $██ million. Other AAA games may take even longer to develop. For instance, according to one Microsoft executive, ██████████████ a forthcoming title from the ██████████ franchise, may take a ████████ to develop.

59.     Access to AAA content is crucial for Microsoft, and the company strives to ensure that new AAA content is available on its console and subscription services on a regular basis. In May 2022, Mr. Spencer of Microsoft ████████████████████████████

60.     AAA content has particularly important downstream effects because it generates player interest, develops a base of users, and drives monetization opportunities. As Microsoft's CEO has explained, ██████████████████████████ ██████████████████████████████ As an internal Microsoft document explained, ██████████████████ ████████████████████████████ ██████████████████ An internal strategy document on scaling Xbox Game Pass █████████████████ ██████████████████████████ ████████████████

61.     To differentiate their products from rivals, console manufacturers and subscription service providers may seek to make certain titles exclusive to their products and unavailable on rivals' products, including by obtaining exclusive licenses from third-party game publishers. An internal Microsoft analysis estimates ██████████████████ ███████████████ Typically, exclusivity in this context does not prevent a game from being available for PC or other non-console devices.

62.     A diverse array of AAA content that increases adoption and engagement gives a console or subscription service greater leverage in attracting additional content. The console or subscription service can tout the size of its player base in negotiations with publishers and developers seeking to increase the discoverability and engagement of their content. As an internal Microsoft strategy document notes, █████████████████████ ██████████ The result of these dynamics is to generate competition among console manufacturers and subscription service providers for AAA content.

63. Microsoft Xbox's Chief Marketing Officer has emphasized the importance of such content, noting: ████████████████████████████████████
████████████████████████████████████████████████

64. Microsoft expects that Activision's AAA content ████████████████
████████████████████████████████████████████████████████
████████████████ As Mr. Spencer explained to Microsoft investors, "[a]s our platform becomes more attractive, the flywheel of content creators and players accelerates. As the creative range on our platform continues to expand, more players are attracted to the service, and the growing scale of the customer base makes the platform more attractive for additional publishers, and so on."

65. Activision content is especially valuable to any gaming console or subscription service due to the ability of Activision games to drive sales and engagement. Activision's CEO Bobby Kotick testified that Activision's games are "██████" and "██████." Microsoft, in presentations to its Board of Directors regarding this Proposed Acquisition, called Activision's content ████████████████████████████████████████

66. Activision currently has a combined ██ million MAU globally across its console and PC games and the company expects this number to grow to over ██ million MAU by 2024. Activision's statements reflect its ability to influence video game product purchase decisions.
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

67. Even among AAA games, Activision's most well-known franchise, *Call of Duty*, is particularly strong. First released nearly twenty years ago in 2003, *Call of Duty* is, in Activision's own words, "***one of the most successful entertainment franchises of all time***." In 2021, *Call of Duty*: *Vanguard* topped the revenue charts as the best-selling game in the United States, with *Call of Duty: Black Ops Cold War* coming in second. And in 2022, *Call of Duty: Modern Warfare II* took in $1 billion globally *in the first ten days following its launch*. By

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

comparison, the highest grossing film of the year so far, *Top Gun: Maverick*, took one month to reach the $1 billion threshold.

### THE RELEVANT ANTITRUST MARKETS

68.     The Proposed Acquisition will result in a combined firm with the ability and increased incentive to withhold or degrade Activision's valuable gaming content to undermine its competitors in multiple Relevant Markets. This anticompetitive behavior is reasonably likely to lead to reduced consumer choice, higher prices and/or lower quality products, and less innovation, and the Proposed Acquisition will not produce cognizable procompetitive effects sufficient to offset such harms.

69.     The Proposed Acquisition is likely to harm innovation, for instance, by decreasing the combined firm's incentive to optimize Activision's content for gameplay on rival hardware, thereby reducing the quality of consumer gaming experiences on competing products.

70.     The Proposed Acquisition is reasonably likely to substantially lessen competition or tend to create a monopoly in the Relevant Markets for High-Performance Consoles, Multi-Game Content Library Subscription Services, and Cloud Gaming Subscription Services. The Proposed Acquisition is therefore reasonably likely to result in harm to both competition and consumers.

### I.     High-Performance Consoles are a Relevant Product Market

71.     High-Performance Consoles are a Relevant Market for evaluating the likely competitive effects of the Proposed Acquisition.

72.     The only High-Performance Consoles offered for sale today are the most recent generation of Microsoft Xbox and Sony PlayStation consoles—the Xbox Series X|S and the PS5. The Xbox Series X|S and PS5 are therefore included within the Relevant Market.

73.     The third major gaming console available today, the Nintendo Switch, is highly differentiated from the Xbox and PlayStation consoles in significant ways. The Nintendo Switch, therefore, is not included in the Relevant Market.

74.     Microsoft's Xbox Series X|S and Sony's PS5 consoles are characterized by

greater computational power, different content portfolios, different form factors and technical specifications, generally higher prices, and different release cadences than the Nintendo Switch and other handheld consoles.

75.     Superior computational power enables faster processing that shapes the kind of content that can run on High-Performance Consoles, enabling higher resolution, more realistic graphics, and cutting-edge performance. Both Xbox Series X|S and PS5 consoles have similar hardware, and Microsoft and Sony compete closely on hardware innovation, including over graphics and performance. Conversely, Nintendo pursues a different strategy of integrating its lower performance, portable hardware with its own distinctive first-party games to appeal to player nostalgia for Nintendo's unique gaming experience over high resolution, life-like graphics, and performance speed. While Microsoft's Xbox Series X|S and Sony's PS5 consoles incorporate semi-custom systems-on-a-chip ("SoC") designed by AMD, Nintendo's Switch runs on a non-AMD SoC that is more closely related to a mobile device processor found in higher-end mobile phones and tablets.

76.     Microsoft and Sony compete closely for high-quality, resource-intensive AAA console games. They compete over genre coverage, portfolio size and quality, and multiplayer game availability, and they routinely benchmark their ██████████ against each other. A substantial share of High-Performance Console content is available on both Xbox and PlayStation consoles. By contrast, although Nintendo offers third-party content on the Switch, Nintendo's main strategy centers on ████████████████████████████████ ██████.

77.     Xbox Series X|S and PS5 consoles provide a technologically advanced gaming experience from a stationary endpoint. The Xbox Series X|S and PS5 consoles are plug-in devices that draw electrical power to support advanced computations and are connected to an external display like a television. In contrast, the Nintendo Switch is a portable battery-operated device with a built-in display screen, and it can optionally be connected to an external display. Nintendo's Switch also has detachable controllers that can be used for motion-based game play

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

that is not available on the Xbox or PlayStation consoles. Microsoft and Sony commonly benchmark against each other on ███

78. The PlayStation 5 and the Xbox Series X, the companies' latest flagship consoles, retail for $499.99. By contrast, the Nintendo Switch retails for $200 less at $299.99.

79. Since the 2000s, Microsoft and Sony have released new console generations largely contemporaneously—most recently in 2020. The prior generation (Generation 8) Xbox One and PlayStation 4 were released in 2013, and the current generation (Generation 9) Xbox Series X|S and PS5 consoles were released in November 2020. By contrast, the Nintendo Switch launched in March 2017, nearly five years after the beginning of the eighth generation.

80. Microsoft's own ordinary course documents regularly ████████████ ███████████████████████████████████████████████ ██████ Defendants conceded in a regulatory filing that ████████████████████ ██████

81. Due to their distinct offerings, Microsoft and Sony consoles appeal to different gaming audiences than the Nintendo Switch. While Xbox Series X|S and PS5 consoles offer more mature content for more serious gaming, Nintendo's hardware and content tends to be used more for casual and family gaming.

82. Indeed, "dual console owners" are more likely to own one High-Performance Console and a Nintendo Switch than two High-Performance Consoles. NPD Group, a trusted source for video game industry data, shows that as of 2020, nearly 40 percent of PlayStation and Xbox owners also owned a Switch, while only █ percent of PlayStation console owners owned an Xbox and only █ percent of Xbox console owners own a PlayStation.

83. Other video gaming devices available today are not commercially reasonable alternatives to High-Performance Consoles and are therefore not included in the Relevant Market. These include gaming PCs, and mobile devices.

84. Gaming PCs are distinct from High-Performance Consoles due to differences in price, hardware, performance, and functionality (*i.e.*, where and when a game can be played),

among other factors. Gaming PCs are therefore not included in the Relevant Market. Mobile devices are distinct from High-Performance Consoles due to differences in complexity and quality of game performance, content offerings, monetization approach, gameplay and interface, and audience, among other factors. Microsoft recently confirmed this factual distinction in testimony during the trial of *Epic Games, Inc. v. Apple Inc.,* 559 F.Supp.3d 898, 981 (N.D. Cal. 2021). Mobile gaming devices are therefore not included in the Relevant Market.

85.    High-Performance Consoles are a relevant antitrust market. However, although the Nintendo Switch is highly differentiated from the Xbox Series X|S and PS5 consoles, it shares many of the same characteristics that make High-Performance Consoles distinct from PCs, and mobile devices. Accordingly, the anticompetitive effects of the Proposed Acquisition alleged in this Complaint are also reasonably likely to occur in a broader market for gaming consoles that includes High-Performance Consoles and the highly differentiated Nintendo Switch.

## II.    Multi-Game Content Library Subscription Services are a Relevant Product Market

86.    Multi-Game Content Library Subscription Services are a relevant product market for evaluating the competitive effects of the Proposed Acquisition.

87.    The Relevant Market for Multi-Game Content Library Subscription Services includes services that offer unlimited access to a library of video games that are predominantly played on non-mobile devices and are available to play at zero additional cost beyond the subscription fee, either via download or cloud streaming.

88.    Microsoft is already a significant player in this market through its Xbox Game Pass offerings and continues to expand rapidly in this market. Microsoft offers three tiers of Game Pass, each of which provide unlimited access to hundreds of games, with Game Pass Ultimate also providing access to Xbox Cloud Gaming. Microsoft is already the market leader with an announced 25 million Game Pass subscribers.

89.    Each service competes aggressively to offer the best, most exciting titles to attract users to its service, with each attempting to provide access to a compelling library of high-end,

AAA games. Services offer a range of incentives to developers and publishers including attractive revenue splits or co-marketing arrangements in order to ensure games are available on their services.

90.     Multi-Game Content Library Subscription Services rely on distinct pricing compared to the traditional "buy to play" model, where gamers purchase individual games for up to $70 per title, or more. Multi-Game Content Library Subscription Services seek to offer a new method of accessing games by offering access to an entire library of games for a periodic fee, rather than a single title for a fixed cost.

91.     Subscription services in the Relevant Market ███████████████████████ ████████████████████████ Microsoft's ordinary course documents show that ██████████████████████████████████████████████████████████████████ For example, Xbox CFO Tim Stuart sent an email ████████████████████████ ████████████████████████████████████████████████████ ██████ Mr. Stuart went on to report: ██████████████████████████████ ████████████████████████████████████

92.     Buy-to-play games are not commercially reasonable alternatives and therefore are not included in the Relevant Market. Multi-Game Content Library Subscription Services provide immediate access to hundreds of game titles for a monthly fee, facilitating content discovery. The pricing of individual games does not dictate Microsoft's pricing decisions for its Xbox Game Pass subscriptions. Additionally, when speaking with third-party game developers, Microsoft's executives tout Game Pass as ██████████████████████████████ ████████████████ Microsoft further showcases the additive nature of Game Pass through public statements that report Game Pass subscribers invest more time and money in gaming than their fellow gamers without a subscription.

93.     Subscription services that focus on enabling online multiplayer gaming, such as Xbox Live Gold and PlayStation Plus Essential, are not commercially reasonable alternatives and therefore are not included in the Relevant Market. Xbox Live Gold and PlayStation Plus

Essential, as currently structured, award a limited number of free games as "bonus content." These services do not provide access to the same breadth and diversity of content as Multi-Game Content Library Subscription Services and do not facilitate the same level of game discoverability.

94.     Subscription services that do not offer a library of video games that are predominantly played on non-mobile devices are also not commercially reasonable alternatives and therefore are not included in the Relevant Market. Mobile-native games are distinct from games accessed natively on a console and from the most performant games accessed natively on a PC, due to differences in complexity and quality of game performance, monetization approach, gameplay and interface, and audience, among other factors.

95.     Multi-Game Content Library Subscription Services comprise a Relevant Market. The anticompetitive effects of the Proposed Acquisition also are reasonably likely to occur in any relevant antitrust market that contains Multi-Game Content Library Subscription Services, including a combined Multi-Game Content Library and Cloud Gaming Subscription Services market.

**III.     Cloud Gaming Subscription Services are a Relevant Market**

96.     Cloud Gaming Subscription Services are a relevant product market for evaluating the competitive effects of the Proposed Acquisition.

97.     The Relevant Market for Cloud Gaming Subscription Services includes services that offer the ability to play predominantly non-mobile video games via cloud streaming.

98.     The Relevant Market includes Multi-Game Content Library Subscription Services that offer access to games via cloud streaming as well as any services that offer streaming via a "Bring Your Own Game" ("BYOG") approach where users play games they own in their own personal library by streaming those games through their Cloud Gaming Subscription Service. In all cases, users pay a periodic fee, either monthly or yearly, to access the Cloud Gaming Subscription Service.

99.     Cloud Gaming Subscription Services provide a way to play games that is distinct

from running them locally on the player's gaming device. Such subscription services make predominantly non-mobile video games available instantly on a wide variety of devices, reducing the need for gamers to make large investments in expensive hardware, such as a High-Performance Console or a gaming PC, and eliminating download time.

100.    Cloud Gaming Subscription Services are designed to reach a different set of consumers than other forms of game distribution. These subscription services enable gaming on devices that do not meet the minimum specifications for large and technologically complex games, such as older and less expensive PCs, MacBooks, Chromebooks, tablets, mobile devices, and smart TVs. They also enable gamers to play games that were developed for other devices and/or operating systems. Microsoft has estimated that the total addressable market for cloud gaming is approximately 3 billion users, compared to █████████ console users.

101.    Microsoft's executives recognize the expanded opportunity Cloud Gaming Subscription Services offer. For example, Microsoft executives have explained that xCloud (now referred to as Xbox Cloud Gaming) offers ████████████████████████ ████████████████████████████████████ and that, ████████████████████ ████████████████████████

102.    Microsoft's documents show that ███████████████████ ████████████████████████ In a recap of insights and learnings from FY2022, the Xbox Cloud Gaming team reported that " ████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ █████████████████

103.    Cloud Gaming Subscription Services also require specialized inputs. Cloud Gaming Subscription Services operate on cloud infrastructure, either by deploying their own dedicated infrastructure or by contracting with a third party. For example, Microsoft built Xbox Cloud Gaming by deploying racks of dedicated Xbox console hardware in Microsoft data

centers, investing ███████████████. Microsoft has plans to support ██████ on its ████████ in the future and expects to spend over ███████ on Xbox Cloud Gaming infrastructure in the next several years.

104.    Cloud Gaming Subscription Services are a Relevant Market. The anticompetitive effects of the Proposed Acquisition alleged in this complaint are also likely to occur in any relevant antitrust market that contains Cloud Gaming Subscription Services, including a combined Multi-Game Content Library and Cloud Gaming Subscription Services market.

**IV.    The Relevant Geographic Market is the United States**

105.    The relevant geographic market in which to assess the Proposed Acquisition's effects is the United States.

106.     In each of the Relevant Markets, consumer preferences and gaming behavior differ across countries. Internal research from both Microsoft and Activision also finds significant variation among countries on metrics like ███████████████. For its most recent Generation 9 consoles, Microsoft differentiated its ████████ ███████████████. Given its large installed base of Generation 8 consoles, Microsoft placed the United States into a ████████ ███████████████████████ along with only ██ other countries. Microsoft has identified the United States as a ███████████████ ██████████.

107.    Microsoft is a leader in the United States in the Multi-Game Content Library Subscription Services market. As of the ███████████████ ████████████ Microsoft offers Game Pass at different price points outside the United States.

108.    Microsoft and other Cloud Gaming Subscription Service providers have similarly focused on the United States ███████████████. Microsoft launched Game Pass Ultimate first in the United States and Canada, with Nvidia's GeForce NOW and Amazon Luna undertaking a similar strategy. Cloud Gaming Subscription Service providers also

note that the proximity of cloud servers to gamers is important in light of the technological demands of cloud gaming.

## ANTICOMPETITIVE EFFECTS

109.   The Proposed Acquisition is reasonably likely to substantially lessen competition or tend to create a monopoly in the Relevant Markets by creating a combined firm with the ability and increased incentive to withhold Activision's valuable gaming content from, or degrade Activision's content for, Microsoft's rivals. The combined firm would have the ability to exclude Microsoft's rivals from access to some or all of Activision's content in the Relevant Markets. Microsoft would have the power to decide if, when, and to what extent Activision content will be available on competing products. The Proposed Acquisition is likely to increase entry barriers, thereby dampening beneficial rivalry and innovation. If permitted to make Activision a captive supplier, Microsoft would have a substantially increased incentive to engage in strategies to that would likely lead to reduced consumer choice, higher prices or lower quality products, and less innovation.

I.   **As the Owner of Activision's Gaming Content, Microsoft Would Have the Ability to Disadvantage Rivals by Withholding or Degrading Activision Content in the Relevant Markets**

110.   AAA gaming content is a substantially important input for High-Performance Consoles, Multi-Game Content Library Subscription Services and Cloud Gaming Subscription Services, as these products use AAA content to attract and retain users and drive adoption. AAA content is difficult to produce given the intense resources and specialized competency required to develop these valuable games.

111.   Activision is a leader amongst an already limited number of developers able to produce such content through its cherished gaming franchises, including *Call of Duty*, *Diablo*, and *Overwatch*. As the owner of Activision's gaming content, Microsoft would have the ability to disadvantage rivals by withholding or degrading Activision content in the Relevant Markets.

**A.    AAA Content is a Substantially Important Input for Products in the Relevant Markets**

112.    As discussed above, AAA gaming content is an important input for consoles and gaming subscription services. AAA games typically represent an outsized portion of revenue on these products and drive greater engagement and adoption.

113.    Microsoft's own executives repeatedly emphasize █████████████████████████ In a 2019 internal email, Xbox's then-Chief Marketing Officer told Microsoft's Mr. Nadella that ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ In a June 2020 conversation between other Microsoft executives about Game Pass growth drivers, one aptly points out, "████████████."

114.    Similarly, Microsoft echoes the importance of AAA content on its High-Performance Consoles. As one direct report to Mr. Spencer relayed to him, ████████████████████████████████████████████████████████████████████ During negotiations with top third-party publishers for inclusion of their games on Xbox Series X|S, Microsoft internally noted that Activision "████████████████████████ " entitled to "████████████████████."

115.    Activision's powerful influence on gaming product adoption is also borne out by its revenue share negotiations with ████████████████████████████████████████████████████████████████████████████████████ In one Microsoft executive's words, Activision's share on *Call of Duty* is "████████" and is the ████████████████████████████████████████

**B.    As the Owner of the Activision Content, Microsoft Would Have the Ability to Withhold Activision's Content from, or Degrade Activision Content on, Rival Consoles and Subscription Services**

116.    The Proposed Acquisition would give Microsoft total control over Activision's

content, thereby giving Microsoft the ability to fully withhold Activision content from rivals, raise rivals' costs, change the terms and timing of access to Activision content, or degrade the quality of Activision content available for rival consoles and subscription services.

117.    The Proposed Acquisition would give Microsoft the ability to engage in several strategies to degrade access to Activision content on rival consoles and subscription services, including timed exclusivity, exclusive downloadable content available only on Microsoft's products, and a variety of other means across the Relevant Markets.

118.    Microsoft also would gain the ability to engage in tactics to degrade the quality of Activision content on competing consoles and subscription services and create a less desirable player experience for users choosing to play anywhere other than on Microsoft's products.

119.    The Proposed Acquisition also would give Microsoft the ability to reduce efforts to optimize Activision content for rival products. Currently, Activision collaborates closely with gaming hardware manufacturers to ensure an optimal experience for gamers. For example, Activision collaborated with ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ Should the Proposed Acquisition close, the combined firm will have the ability to reduce such collaboration in the High-Performance Console Market.

120.    Activision also works to optimize its games, including *Call of Duty*, to work on ████████████. A GPU (or Graphics Processing Unit) is a hardware component that renders graphics for video games. ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ The Proposed Acquisition would give Microsoft the ability to reduce efforts to optimize Activision content for hardware used by rival Cloud Gaming Subscription Services.

1

2

**II.      The Proposed Acquisition Would Increase Microsoft's Incentive to Disadvantage Rivals by Withholding or Degrading Activision Content in the Relevant Markets**

3      121.    If permitted to take control of Activision, Microsoft would have an incentive to

4   disadvantage rivals by withholding or degrading Activision content. Gaming is a growing and

5   lucrative market opportunity and one in which Microsoft is already well-positioned. Microsoft

6   already has a built-in incentive to promote its own products wherever possible, and it fully

7   understands the competitive power that owning Activision's leading gaming content would yield.

8      122.    Prior to the Proposed Acquisition, Activision sought to maximize its profits from

9   sales of its video game titles. The Proposed Acquisition would change Activision's incentives,

10   because Microsoft stands to gain significant profits from additional gamers purchasing Xbox

11   consoles or Xbox Game Pass. Hence, the combined firm will be incentivized to disadvantage

12   Microsoft rivals by withholding Activision content from, or degrading Activision content on,

13   rival consoles and subscription services to promote sales of Microsoft's products.

14      123.    While AAA content in general is important to competitors in the Relevant

15   Markets, Activision content is especially important because of its ability to drive gaming product

16   adoption and engagement by users.

17      124.    Activision's own documents point out the significant role Activision content plays

18   in consumers' choice of gaming products. In a 2019 presentation to ███, Activision

19   highlighted consumer survey data showing that ████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████████

22   ██████████████

23      125.    The Proposed Acquisition would reduce Microsoft's incentive to optimize

24   Activision content for rival products, including via collaboration with Microsoft's rivals. Given

25   the competition between Microsoft and Sony, the combined firm will have less incentive to

26   collaborate with Sony to ████████████████████. In addition, because

27   Microsoft's Game Pass Ultimate competes ████████████████████

28

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  ████████████████████████████

**III.**  **Microsoft's Statements and Past Actions Indicate that It Will Likely Act on Its Incentives to Disadvantage Rivals by Withholding or Degrading Activision Content**

126.   Microsoft stated in 2022 that it ███████████████████████████ ██████████████ Microsoft subsequently has wavered in its representations as to ████ ███████████████████████████████████

127.   Moreover, Microsoft's past conduct is telling. Despite statements by Microsoft to European regulators disavowing the incentive to make ZeniMax content exclusive post-close, after the EC cleared the transaction, Microsoft plans for three of the newly acquired titles to become exclusive to Microsoft's Xbox consoles and Xbox Game Pass subscription services. For example, although previous titles in ZeniMax's ████████ franchise were released on PlayStation, Microsoft has confirmed that the upcoming ████████ will be available only on Xbox consoles, Windows PCs, and Xbox Game Pass subscription services. Microsoft has also stated that *Starfield* and *Redfall,* two of the highly anticipated new games in development at the time of Microsoft's purchase of ZeniMax, will also become Xbox console and Xbox Game Pass exclusives upon release.

128.   Microsoft's previous representations to the EC about its incentives after its purchase of ZeniMax were not borne out by Microsoft's own post-merger behavior. Instead, Microsoft put its true post-merger incentives on full display when it decided to deny rivals its newly acquired future releases and thwart consumers who would choose to play them on a competing product. Microsoft's past behavior should also cast more suspicion on its non-binding public commitments to keep *Call of Duty* available on PlayStation consoles through the end of Activision's existing agreement with Sony (*i.e.*, through ████ ).

129.   Microsoft is eager to further build upon its already significant strength in gaming,

with Mr. Nadella declaring publicly, "Microsoft's *all-in on gaming*." Looking to reap the financial opportunity available in the gaming industry, Microsoft would be incentivized to withhold Activision content from, or degrade content on, rival products in order to disadvantage its rivals, thereby weakening competition and increasing its profits.

130. Moreover, as Microsoft internally recognizes, acquisitions in this industry ███ ████████████████████████████████████ This Proposed Acquisition—the largest ever announced in the gaming industry—poses a reasonable probability of further accelerating this trend.

**IV.** **Withholding Activision Content From, or Degrading Activision Content On, Microsoft's Rival Products Will Harm Competition and Consumers in the Relevant Markets**

131. Withholding Activision content from, or degrading Activision content on, Microsoft's rivals' products is reasonably likely to substantially lessen competition in the Relevant Markets.

132. This lessening of competition will result in harm to consumers, including reduced consumer choice, reduced product quality, higher prices, and less innovation.

### LACK OF COUNTERVAILING FACTORS

133. Defendants cannot demonstrate that entry or expansion in the Relevant Markets would be timely, likely, or sufficient to reverse the anticompetitive effects of the Proposed Acquisition.

134. Defendants cannot demonstrate that the Proposed Acquisition would likely generate verifiable, cognizable, merger-specific efficiencies that would reverse the likely competitive harm from the Proposed Acquisition.

### LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

135. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed merger is unlawful, to seek preliminary

injunctive relief to prevent consummation of a merger until the Commission has had an opportunity to adjudicate the merger's legality in an administrative proceeding. In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the equities, using a sliding scale. The principal equity in cases brought under Section 13(b) is the public's interest in effective enforcement of the antitrust laws and ensuring the Commission is not deprived of the ability to order appropriate relief. Private equities affecting only Defendants' interests cannot tip the scale against a preliminary injunction.

136.    The Commission is likely to succeed in proving that the effect of the Proposed Acquisition may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act and/or Section 5 of the FTC Act, and that the Merger Agreement and Proposed Acquisition constitute unfair methods of competition in violation of Section 5 of the FTC Act.

137.    Preliminary relief is warranted and necessary. Should the Commission rule, after the full administrative proceeding, that the Proposed Acquisition is unlawful, reestablishing the status quo would be difficult, if not impossible, if the Proposed Acquisition has already occurred in the absence of preliminary relief. Allowing the Proposed Acquisition to close before the completion of the administrative proceeding would enable the combined firm to, among other things, begin altering Activision's operations and business plans, accessing Activision's sensitive business information, eliminating key Activision personnel, changing Activision's game development efforts, and entering into new contractual relationships on behalf of Activision. In the absence of relief from this Court, harm to competition would occur in the interim.

138.    Accordingly, the equitable relief requested here is in the public interest. The Commission respectfully requests that the Court:

1.    Enter a temporary restraining order and preliminarily enjoin Defendants from consummating the Proposed Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

2. Retain jurisdiction and maintain the status quo until the administrative proceeding initiated by the Commission is concluded; and

3. Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: June 12, 2023

Respectfully submitted,

Of counsel:

/s/ *James H. Weingarten*
James H. Weingarten
Deputy Chief Trial Counsel

Holly Vedova
Director
Bureau of Competition

Peggy Bayer Femenella
Assistant Director

Patty Brink
Acting Deputy Director
Bureau of Competition

James Abell
Deputy Assistant Director

Shaoul Sussman
Associate Director for Litigation
Bureau of Competition

Cem Akleman
J. Alexander Ansaldo
Michael T. Blevins
Amanda L. Butler
Nicole Callan
Maria Cirincione
Kassandra DiPietro
Jennifer Fleury
Michael A. Franchak
James Gossmann
Ethan Gurwitz
Meredith R. Levert
David E. Morris
Merrick Pastore
Stephen Santulli
Edmund Saw

*Counsel for Plaintiff Federal Trade Commission*