James H. Weingarten, DC Bar No. 985070
Peggy Bayer Femenella, DC Bar No. 472770
James Abell, DC Bar No. 990773
Cem Akleman, FL Bar No. 107666
Meredith R. Levert, DC Bar No. 498245
Jennifer Fleury, NY Bar No. 5053178
James Gossmann, DC Bar No. 1048904
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3570
*jweingarten@ftc.gov; pbayer@ftc.gov:*
*jabell@ftc.gov; cakleman@ftc.gov;*
*jfleury@ftc.gov; mlevert@ftc.gov;*
*jgossmann@ftc.gov*

Erika Wodinsky, Cal. Bar No. 091700
90 7th Street, Suite 14-300
San Francisco, CA 94103
Tel: (415) 848-5190
*ewodinsky@ftc.gov*

[Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

**FEDERAL TRADE COMMISSION**,

      Plaintiff,

      v.

**MICROSOFT CORP.**

and

**ACTIVISION BLIZZARD, INC.**,

      Defendants.

Case No. 3:23-cv-2880

**PLAINTIFF FEDERAL TRADE COMMISSION'S INITIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**REDACTED VERSION**

# TABLE OF CONTENTS

I. BACKGROUND ........................................................................................................ 1

    A. Gaming is the Largest Category in the Entertainment Industry, and It Continues to Grow ................................................................................. 1

    B. Console Gaming ........................................................................................ 3

        1. PlayStation and Xbox are Fierce Competitors, and Nintendo is Differentiated ........................................................................... 4

        2. Console Gaming is Distinct from PC and Mobile Gaming ............ 10

        a) PC Gaming Is Distinct ................................................................. 10

        b) Mobile Gaming Is Distinct .......................................................... 13

    C. Multi-Game Content Subscription Services .......................................... 14

    D. Cloud Gaming Subscription Services ..................................................... 16

    E. A Gaming Platform Must Offer AAA Content to Succeed .................... 19

        1. The Industry Has a History of Consolidation ............................... 20

        2. A Small Group of Top AAA Games Is Particularly Important ........ 22

        3. AAA Games are Difficult and Costly to Make .............................. 23

    F. Exclusive Gaming Content is Important for Attracting Customers and Driving Sales ...................................................................................... 24

    G. Activision Content is Particularly Important ......................................... 26

    H. Microsoft Has a History of Making Content from Acquired Studios Exclusive ................................................................................................. 29

II. RELEVANT MARKETS ..................................................................................... 30

    A. High-Performance Consoles Constitute a Relevant Product Market ......... 30

    B. Video Game Consoles Also Constitute a Relevant Market .................. 36

    C. Multi-Game Content Subscription Services Constitute a Relevant Product Market ....................................................................................... 37

    D. Cloud Gaming Subscription Services Constitute a Relevant Product Market..... 41

    E. Multi-Game Content Subscription Services and Cloud Gaming Subscription Services Together Constitute a Relevant Product Market ............. 46

    F. The Relevant Geographic Market Is the United States ......................... 46

III. RELATED PRODUCT ....................................................................................... 48

    A. Activision Content Is an Important Input that Drives Acquisition, Engagement, and Retention ................................................................... 48

IV. THE PROPOSED ACQUISITION IS LIKELY TO RESULT IN A SUBSTANTIAL LESSENING OF COMPETITION ......................................... 52

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A.    Microsoft Would Have the Ability to Foreclose Rivals in the Relevant Markets ........................................................................................... 52

B.    Unlike an Independent Activision, the Combined Firm Would Have an Incentive to Foreclose in the Relevant Markets .................................... 53

     1.   The Combined Firm Will Have an Increased Incentive to Foreclose in High-Performance Consoles and Video Game Consoles ..................... 53

     2.   The Combined Firm Will Have an Increased Incentive to Foreclose in Content Subscription Services and Cloud Gaming Services ............... 57

     3.   The Combined Firm Will Have Increased Incentive to Collaborate on Innovations with Only Microsoft in the Relevant Markets ................ 61

C.    Microsoft's Past Statements and Actions Demonstrate Microsoft has the Ability and Incentive to Foreclose Rivals Post-Acquisition ................ 63

     1.   Microsoft is Willing to Lose Money on First-party Exclusive Titles and Treat Them as a "Loss Leader." ................................................... 63

     2.   Past Acquisitions ................................................................................ 63

     3.   ZeniMax ............................................................................................. 65

     4.   Minecraft is Not Predictive of Microsoft's Behavior Here ............... 71

     5.   Current First Party Games ................................................................. 75

D.    The Proposed Acquisition is Likely to Harm Competition ................... 75

     1.   The Proposed Acquisition is Likely to Result in Competitive Harm in the Market for High-Performance Consoles and Video Game Consoles. ........... 75

     2.   The Proposed Acquisition is Likely to Result in Competitive Harm in Content Subscription Services and Cloud Gaming Services ............... 77

     3.   The Proposed Acquisition is Likely to Harm Innovation ................... 80

E.    Respondents Cannot Rebut Complaint Counsel's Prima Facie Case Showing the Proposed Acquisition Would Result in Competitive Harm ........... 83

     1.   Respondents Cannot Demonstrate that Entry or Expansion would be Timely, Likely, or Sufficient to Prevent Harm from the Proposed Acquisition ...... 83

        a) Entry into Consoles Markets is Unlikely to be Timely, Likely, or Sufficient to Reverse the Likely Harm of the Proposed Transaction. ........... 83

        b) Entry or Expansion into the Broader Content and Cloud Services Market, and the Content Library Services Market and Cloud Gaming Services Market—is Unlikely to be Timely, Likely, or Sufficient to Reverse the Likely Harm of the Proposed Transaction ...................................... 84

     2.   Defendants Cannot Show Efficiencies or Procompetitive Benefits that Negate Competitive Harm ................................................................. 86

F.    Microsoft's Recently Executed or Proposed Agreements Fail to Replace the Competitive Intensity Likely to Be Lost from the Proposed Acquisition ........... 88

**V.    PROPOSED CONCLUSIONS OF LAW** ................................................................ 94

   A.    The FTC Is Likely to Succeed on the Merits of Its Section 7 Challenge ............ 98

   B.    High-Performance Consoles, Multi-Game Content Library Subscription
          Services, and Cloud Gaming Subscription Services Are Relevant Markets ..... 102

       1.    The Relevant Markets Satisfy the *Brown Shoe* Practical Indicia ..................... 104

       2.    The Relevant Markets Satisfy the HMT ......................................................... 105

       3.    Harm is Also Likely to Occur in Broader Relevant Product Markets .............. 106

   C.    The United States is the Relevant Geographic Market ..................................... 107

   D.    Activision's Gaming Content Is a Related Product to the Relevant Markets .... 108

   E.    The Proposed Acquisition Has a Reasonable Probability of Substantially
          Lessening Competition in the Relevant Markets ............................................. 108

       1.    Foreclosure of Microsoft's Rivals in the Relevant Markets ............................ 108

       2.    Harm to Innovation in the Relevant Markets ................................................. 112

   F.    Defendants Fail to Meet their Burden to Show Entry Will Be Timely,  Likely,
          and Sufficient to Counteract the Competitive Harm from the Proposed
          Acquisition ..................................................................................................... 113

   G.    Defendants Fail to Meet their Burden to Demonstrate That Their Proposed
          Efficiencies and Any Other Alleged Procompetitive Benefit Offset the
          Competitive Harm ........................................................................................... 114

   H.    Proposed Remedies Are Irrelevant in a § 13(b) Proceeding ............................. 118

   I.    Temporary Relief to Preserve the Status Quo is in the Public Interest ............. 119

# I. BACKGROUND

1. Through an "Agreement and Plan of Merger" dated January 18, 2022, Microsoft Corp. ("Microsoft") proposes to acquire Activision Blizzard, Inc. ("Activision") (the "Acquisition"), for approximately $68.7 billion. PX0083 at 1 (Agreement); PX9050 at 25 (Microsoft 10-K 2022).

2. Defendant Microsoft is a publicly traded company organized under the laws of Delaware and is headquartered in Redmond, Washington. PX0083 at 5 (Agreement); PX9050 at 1 (Microsoft 10-K 2022).

3. Microsoft made $198 billion in revenue in 2022. PX9050 at 43 (Microsoft 10-K 2022).

4. Gaming is part of Microsoft's More Personal Computing division. PX9050 at 1 (Microsoft 10-K 2022).

5. Microsoft's gaming business includes Xbox, Xbox Game Pass (a gaming subscription service) and Xbox Cloud Gaming. PX9050 at 14 (Microsoft 10-K 2022).

6. Defendant Activision is a publicly traded company organized under the laws of Delaware and headquartered in Los Angeles, California. PX0083 at 5 (Agreement); PX9388 at 33 (Activision 10-K 2022).

7. Activision earned $7.5 billion in revenue in 2022. PX9388 at 40 (Activision 10-K 2022).

8. During the last three years, three Activision franchises, Call of Duty, Warcraft, and Candy Crush, accounted for approximately 80% of its revenue. PX9388 at 10 (Activision 10-K 2022).

## A. Gaming is the Largest Category in the Entertainment Industry, and It Continues to Grow

9. Today, the gaming industry has over three billion players worldwide, with revenues larger than the film, music, and print industries. ████████████ ████████████

10. Gaming is the fastest growing form of media and entertainment, and it is expected to reach over 4.5 billion gamers by 2030. ████████████ ████

11. In 2021, one in three people in the world played video games. ████████████
████████████████████████████

12. Video games can be played on different devices, including consoles, PCs, and mobile
devices. ████████████████████████████████████

13. Gaming consoles are designed to primarily play video game software. ████████
████████████████ .

14. Games can be played on general purpose PCs or gaming PCs, but gaming PCs typically
have more advanced hardware to allow them to play more computationally demanding
games. ████████████████████ .

15. Conversely, games played on mobile have lower graphics and are less sophisticated than
games played on consoles or gaming PCs. ████████████████████ .

16. The three primary console makers are Microsoft (Xbox Series X|S), Sony (PlayStation 5),
and Nintendo (Switch). ████████████████████████████
████

17. A game publisher brings games to market and sometimes provides funding to the game
developer to do so. ████████████████████

18. A developer creates the assets for a game, including writing the code and designing the
art. ████████████████████████

19. First-party content is created and developed by a console manufacturer at an in-house
studio. ████████████████████████

20. Microsoft has first-party content that is created at Xbox Game Studios. PX9050 at 15
(Microsoft 10-K 2022); ████████████████████

21. Some of Microsoft's first-party franchises include DOOM, Forza, Gears of War, Halo,
Minecraft and The Elder Scrolls. PX9252 (Microsoft website).

22. Third-party content refers to games that are independently developed and published by a
third-party publisher. ████████████████████████ ; ████████████
████████████

23. Occasionally, console manufacturers will publish titles developed by a third-party development studio, known as second-party games. ███████████████████ ███████; █████████████████████████████████████████████████ ██████

**B. Console Gaming**

24. Video game consoles are consumer devices that are designed for, and whose primary use is, to play video games. ████████████████████████.

25. Consumers purchase video game consoles based on the hardware features of the consoles as well as the availability of game content on that console. ████████████████ ████████████████████████████████████

26. Console manufacturers earn revenues from several sources: sales of consoles (*i.e.*, hardware) and revenue shares or royalties from sales of video game titles (*i.e.*, software) and accessories for the console, including game controllers, headsets, supplemental storage, cables, and power supplies. ████████████████████████ ████ ██████

27. Console manufacturers can also earn revenue from post-sale monetization. For example, console manufacturers may split royalties with publishers and developers on the sale of add-on content or in-game purchases. █████████████████████████ ██████████

28. A trio of gaming companies—Microsoft (under its Xbox brand), Sony (under its PlayStation brand), and Nintendo—produce the most popular video game consoles today. █████████████████████████

29. These manufacturers historically release new generations of their consoles approximately every five to ten years in "generations." █████████████████████████ ██████ PX9037 at 001-003.

30. Consoles are in the Ninth Generation and include Sony's PlayStation 5 and Microsoft's Xbox Series X|S. ████████████

31. Nintendo's most recent console, the Switch, was released in 2017. ████████
████████████████████████

32. The Nintendo Switch is not a Generation 9 console, ████████████████████████
████████████████████████████████████

33. In addition to the Switch, Nintendo also makes the Switch OLED and the Switch Lite,
two models of the Switch with slight hardware differences. ████████████████
████████████

34. The OLED version has the same features and functionality of the Switch, but with a
slightly larger OLED touch screen that allows for more vivid color and sharper contrast.
████████████████████████ There are no additional games or
functionality available on the OLED version as compared to the Switch. ████████
████████████

35. The Switch Lite can only be played in handheld mode. All games that play in handheld
mode are supported on the Switch Lite. ████████████████████

**1. PlayStation and Xbox are Fierce Competitors, and Nintendo is Differentiated**

36. ████████████, Microsoft and Sony have viewed each other as ████████████
████████████████████████████

37. An internal Microsoft Gaming analysis provides: ████████████████
████████████████████████████████████
████████████████████

38. Each console generation represents an opportunity for Sony or Microsoft to ████████
████████████████████████████████
████████████████

39. In the United States, Microsoft won Generation 7 with the Xbox 360 pitted against the
PlayStation 3. ████████████████████ However, Sony won
Generation 8 with the PlayStation 4. ████████████████████

40. In this current generation—the ninth generation—the Xbox Series X|S and PlayStation 5
were both launched in November 2020 in direct competition. ████████████

1    41.    The release of the Nintendo Switch in 2017, 3 years before the PlayStation 5 and Xbox

2           Series X|S ███████████████████████████████████████████████████████

3           ███████████████████████████████████████████████

4    42.    Microsoft Gaming CEO, Phil Spencer, ████████████████████████████████████

5           ████████████████████████████████████████████████████████████████████████

6           ████████████████████████████████████████████████████████████

7           ██████████████████████████

8    43.    Microsoft's President of Xbox Games Marketing, Aaron Greenberg, ████████████████

9           ██████████████████████████████████████████████████████████████

10          ██████████████████████████████████████████████

11   44.    The Xbox Series X|S and PlayStation 5 also launched with similar pricing schemes.  The

12          more advanced Xbox Series X and PlayStation 5 launched with a price of $499 while the

13          Xbox Series S and PlayStation 5 Digital Edition launched at $299 and $399, respectively.

14          ████████████████████████████████████  ████████████████████████████████████

15          ████████

16   45.    The Xbox Series X is a "premium" console while the Series S is more affordable.

17          ██████████████████████████████████████████████████████████

18          ████████████████████████████████

19   46.    Microsoft CEO Satya Nadella hailed the success of the Xbox Series X|S in a July 26,

20          2022 earnings call when he announced that the company "ha[d] been the market leader in

21          North America for three quarters in a row among next gen consoles." ███████████████

22          █████████████████████████; PX9015 (Nadella IH exhibit) at 005.

23   47.    In Generation 9, Microsoft's Xbox Series X|S and Sony's PlayStation 5 have engaged in

24          very close competition in the United States. ██████████████████████████████████

25          █████████████████████████████████  █████████████████████████████████████

26          ████████

27   48.    Although Nintendo ████████████████████████████████████████████████████████

28          ████████████████████████████████████████████████████████████████████████

1 ███████████████████████████████████████████

2 ███████████

3 49. As Nintendo's ████████████████████████████████

4 ████████████████████████████████████████

5 ██████████████████████

6 50. ████████████████████████████████████████████

7 █████████████████████████████████████

8 ████████████████████

9 51. The Switch ████████████████████████████████████

10 █████████████████████████████████████

11 ████████████████████

12 52. To start, Nintendo is a "hybrid" console, while Xbox and PlayStation are considered

13 stationary consoles. ████████████████████████████████

14 ████████████████████

15 53. As a hybrid console, Nintendo offers both stationary and portable play modes, which

16 include handheld or tabletop mode. ████████████████████████

17 54. The Switch controllers, called "Joy-Cons," can be detached to control gameplay both

18 through movement and pressing buttons, and ██████████████████████

19 █████████████████████████████████

20 55. Joy-Cons can be used separately so that two players can simultaneously enjoy

21 multiplayer games while physically in the same place, and they can also be used in

22 tabletop mode. ████████████████████████

23 56. The Xbox and PlayStation do not have these same capabilities.  The Xbox and

24 PlayStation have more traditional gaming console controllers that cannot be detached,

25 and the system itself, being stationary, ████████████████████████████

26 ████████████████████████████; ████████████████████████████

27 ██

28

57.  While the Switch can run from a battery in portable mode, the Xbox and PlayStation must be plugged into a wall and connected to a TV. ██████████████████████ ██████

58.  As a result of these hardware differences, Nintendo provides a differentiated console experience, in which motion controls and portability inform game development. ██████ ████████████████████████; █████████████████████████████ ███████████████████ ████████████████████████████.

59.  While Nintendo provides a unique form of gameplay, the Xbox and PlayStation offer higher performance. █████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████

60.  █████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

██████████████████

61.  ██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████

62.  The Xbox and PlayStation are significantly more powerful than the Switch.  The Switch's maximum processing power reaches only █████████████ (even less in handheld mode – ████████████), while the Xbox Series X and PlayStation 5 are at least 26 times (i.e., 2600%) more powerful, ██████████████████████████████████████████ respectively. ████████████████████████.

63. The Switch can only accommodate 32 gigabytes of storage, some of which is used for the operating system, meaning that less than 32 gigabytes is available for game storage. ██████████████████████████

64. The Xbox Series X and PlayStation 5 have one terabyte and 825 gigabytes, respectively, of internal storage, providing more than 25 times the storage capacity for game downloads. ██████████████████████████

65. While the Switch only has four gigabytes of system memory, the Xbox Series X and PlayStation 5 each have 16 gigabytes, four times as much as the Switch. ████████████ ██████████████

66. ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████ PX3270 at 2; PX5000 at 80, fig. 13.

67. The Switch's hardware differences also limit the kinds of third-party games that can be offered on the Switch. The Nintendo Switch lacks the PlayStation 5 or Xbox Series X|S's processing power and graphics ability. ███████████████████████████; ████████████████████████████████████

68. Because of performance limitations, there are games that can run on Xbox and PlayStation consoles (including the previous generations of these consoles) that cannot run on the Switch. ████████████████████████████████████████ ████ PX9372 (press release explaining that, while *The Forgotten City* is available natively on Xbox One, Xbox X/S, PS4 and PS5, "the Switch isn't quite powerful enough to run [the game] at its best," and must be streamed in order to be played on the Switch); ████████████████ ██████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████

69. Some third-party games are only available on the Switch via cloud streaming (meaning they are not capable of running appropriately on the Switch locally). ████████████████

[REDACTED] ; PX9372 (press release explaining that, while *The Forgotten City* is available natively on Xbox One, Xbox X/S, PS4 and PS5, "the Switch isn't quite powerful enough to run [the game] at its best" and must be streamed in order to be played on the Switch).

70. Porting games that run on Xbox and PlayStation to the Switch can be difficult and at times impossible. [REDACTED] PX9371 at 1 (Hi Rez press release announcing the end of support of its game Rogue Company due to "performance of [its] Switch port."); [REDACTED]

[REDACTED]

71. Part of Nintendo's strategy [REDACTED]

72. Nintendo's strategy also includes [REDACTED]

73. Nintendo's content portfolio differs from Xbox and PlayStation in other ways too. An internal Activision [REDACTED] In 2022, Nintendo's first party sales accounted for [REDACTED] of Nintendo's total software sales. [REDACTED]

74. As of December 31, 2022, Nintendo's top 10 selling titles were Nintendo first-party games. PX9209.

75. Nintendo's distinctive gaming experiences has created a deeply loyal fanbase. ███
███████████████

76. By contrast, Xbox and PlayStation consoles depend heavily on third party titles for software revenue. █████████ ; ████████████████████
█████████████████████████████████████
████████████████████████████████
███████████████████

77. For several reasons, the Switch content ██████████████████████
█████████████████████████████████████
██████████████████████

78. Nintendo tends to be more family-friendly and its most iconic games appeal to a younger audience. ██████████████ ████████████
███████████

79. Nintendo has ████████████████████
████████████████████

80. ████████████████████
█████████████████████████████
██████████████

81. Because of these differences, ████████████████████
█████████████████████████████████
█████████████████████████████████
██████████████████. ████████████████
███████████

### 2. Console Gaming is Distinct from PC and Mobile Gaming

#### a) PC Gaming Is Distinct

82. █████████████████████████████████
███████████████

83. Although consumers may play games on personal computers ("PCs"), it is a distinct and differentiated experience. PX5000 (Lee Report) at 93.

84. Gaming PCs, which possess specialized parts dedicated to run computationally demanding games, may have superior performance than that of even the most recent Generation 9 consoles; they can more easily handle games with greater graphical intensity and run them faster. ████████████████████████████ ; ████████ ████████ ████████████████ .

85. Gaming PCs tend to be more expensive than video game consoles with gaming PCs costing anywhere from $800 to more than $2500, while Generation 9 consoles retail for approximately $300 to $500. ████████████████████████

86. High-performance consoles—unlike PC gaming devices—rely heavily on subsidies, generating most of their revenue from subsequent game sales after a customer has purchased a console. ██████████████████

87. The audience for PC gaming is also different than the audience for console gaming. High-end PC gaming often requires a higher level of technical competency in assembling specialized equipment. ██████████████████████ PC gamers will often build or specially customize their devices with a wide variety of components to add extra upgrades and personalize their experience. ████████████████████████ That stands in contrast to consoles, which are designed to be used out of the box, and whose users tend to customize their devices far less. ████████████████████ ████

88. PC gamers tend to favor keyboard-and-mouse inputs to play their games while console gamers predominantly rely on the accessory controller sold by Microsoft, Sony, or Nintendo. ██████████████

89. The content portfolio is an additional differentiator between PC gaming and console gaming. According to a 2020 analysis by Sony, ███ of indie games and ███ of AAA games are exclusive to PC. PX3050 at 034 (Sony). ████████████████████████

██████████████████████████████████████████

██████ PX3050 at 019-020, 031 (Sony).

90. These differences between PC gaming and console gaming affect the commercial strategy and revenues of gaming companies. ███████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████

91. Microsoft's internal documents █████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████

92. In a yearly report on the gaming market, █████████████████████

████████████████████████████████████

████████

93. Similarly, ███████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

███████████████████████

94. ████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

95. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

96.    Microsoft is much more likely to publish their games on PC than rival consoles.

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

97.    The most popular distribution channels for PC games does not resemble the distribution

channels for consoles. ████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

        **b)  Mobile Gaming Is Distinct**

98.    ██████████████████████████████████████████████████

████████████████████████████████████████

99.    Microsoft reported ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

100.   ████████████████████████████████████████████████████

████████████████████

101.   ███████████████████████████████████████████████████

████████████████████████████

102.   █████████████████████████████████████████

█████████████████████████████████████████

103.   Mobile gaming also requires different design considerations given the large difference in

form factor. ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

████

104.   ███████████████████████████████████████████████████

████████████████████████████████████████████████

105. Lori Wright, Vice President of Business Development for Gaming, Media, and Entertainment at Microsoft, testified in the *Epic Games Inc. v. Apple, Inc.* trial that "[w]e [Microsoft] certainly don't view iPhone as a competing device" to Xbox consoles and that [w]e do not view the iPad as a competing device." PX6000 at 51-52 (Lori Wright testimony).

### C. Multi-Game Content Subscription Services

106. Multi-Game Content Subscription Services (or "content subscription services") provide subscribers access to a library of video games for a periodic subscription fee, typically monthly or yearly. ███████████████████.

107. Unlike traditional buy-to-play games, with content subscription services, gamers purchase a recurring subscription and can play any game contained in the library for zero additional cost above the subscription fee. ██████████████████

108. Microsoft launched its content subscription service, Game Pass, in 2017. ████████

109. Game Pass is available in two different tiers. ████████ Xbox Game Pass for Console and Xbox Game Pass for PC provides subscribers access to a library of over 300 first-party and third-party games for download to play on an Xbox console or Windows PC, respectively. ████████

110. The highest tier, Xbox Game Pass Ultimate, provides access to a library of games for both Xbox consoles and Windows PCs, which subscribers can download and play or access through cloud gaming. ████████

111. Approximately ████ of Game Pass subscribers subscribe to Game Pass Ultimate. ████████

112. ███████████████████████████████████████████████ ████████████████████████████

113. Xbox Game Pass had over ████████ total subscribers by the beginning of 2022. ████████████ PX9003 at 003.

114. In the United States, Xbox Game Pass had over ████████ paid subscribers, including over ████████ subscribing to Game Pass Ultimate and over ████████ subscribing to

Game Pass PC. PX5000-055, -056 (citing Microsoft monthly subscriber counts data). Xbox Game Pass is the market leader in content subscription services. PX5000 (Lee Report) at 041; ████████████████

115. Aside from Game Pass, Microsoft also offers Xbox Live Gold, which provides subscribers to access to online, multiplayer games and a limited selection of downloadable games each month among other benefits, such as audio and visual communications and certain discounts. ████████████

116. Xbox Live Gold does not provide subscribers with access the vast library of games that subscribers of Xbox Game Pass for PC or Console and Game Pass Ultimate receive. ████████████

117. Sony has the second most popular content subscription service, called PlayStation Plus. PlayStation Plus has three tiers. The highest two tiers—PlayStation Plus Extra and PlayStation Plus Premium—are content subscription services. ████████████ ████████████. Those two tiers provide similar features that correspond to Microsoft's Xbox Game Pass for PC or Console and Game Pass Ultimate. ████████████ ████████████

118. By subscribing to PlayStation Plus Extra, subscribers gain access to up to ██ games within PlayStation's library. ██████████████████████. Those who subscribe to PlayStation Plus Premium receive access to a library of up to ██ games and cloud gaming services for certain games. ████████████████

119. As of July 2022, PlayStation Plus Extra had approximately ████████████ and PlayStation Plus Premium had approximately ████████████. ████████████ ████████████

120. Like Microsoft's Xbox Live Gold, the lowest tier of PlayStation Plus—PlayStation Plus Essential—offers subscribers access to online, multiplayer games and two monthly downloadable games alongside discounts on other games and cloud storage. ████████ ████████████████ PlayStation Plus Essential does not provide subscribers

access to the vast libraries available to subscribers of PlayStation Plus Extra and PlayStation Plus Premium receive. ████████████████████

121. PlayStation Plus Essential, the most basic tier, of PlayStation Plus services provides similar services to Microsoft's Xbox Live Gold: access to online multiplayer and the ability to access a limited selection of monthly downloadable games. ████████ ████████████████

122. Amazon provides two content subscription services: Prime Gaming and Luna+. Prime Gaming is included with an Amazon Prime subscription, which costs $14.99 per month and includes several other non-gaming related benefits. Luna+ offers subscribers access to a library of games, priced at $9.99 per month with additional options available for further purchases and provides streaming access to a library of over 100 third-party games. See Amazon Luna, https://www.amazon.com/luna; ██████████████████ ████████████

123. Electronic Arts also offer content library services, EA Play, for its own published titles. EA Play can also be accessed through a subscription to Microsoft's Game Pass Ultimate. ████████████████████████████████████

124. Ubisoft offers Ubisoft+ in two tiers: PC Access, for $14.99/month, and Multi Access, for $17.99/month. Both tiers allow subscribers to pay over 100 Ubisoft games on PC (through Ubisoft Connect or Steam), including new releases available at launch, premium editions, and select third-party indie games. ████████████

**D.    Cloud Gaming Subscription Services**

125. For years, video games have run locally on the player's hardware—typically a Windows PC or gaming console located in the player's home. PX8000 ████████████████████ ██████

126. Recently, however, cloud gaming services have been introduced that allow players to stream games that run on remote hardware without downloading the game locally. ████████████████████████; ████████████

127. The primary computational processing for the game occurs in a remote datacenter, and a live video feed of game is streamed to a player's device. ██████████ ██████████ ██████████

128. Cloud gaming broadens access to gaming by expanding the universe of devices that can play games. https://www.xbox.com/en-US/xbox-game-pass/supported-devices; see also ██████████

129. Today, cloud gaming subscription services can stream games to consoles, Windows PCs, Mac PCs, Chromebook PCs, tablets, mobile phones, and some smart TVs, with device compatibility varying by service. ██████████ ██████████ ██████████ ██████████ See also ██████████

130. Cloud gaming enables gamers to begin playing a game in seconds, rather than waiting for games to download or update, and streaming rather than downloading avoids burdening the storage limits on a gaming device. https://support.xbox.com/en-US/help/games-apps/cloud-gaming/playing-console-game-from-cloud-versus-installing ("You can start playing a game in seconds. There's no waiting for games to finish installing or updating…. download times or storage limits aren't a factor."); ██████████ ██████████

131. This permits gamers to play computationally demanding games on less powerful devices that otherwise lack the computing power or storage to support the games. https://www.nvidia.com/en-us/geforce/geforce-experience/; ██████████ ██████████ ██████████ ██████████ ; ██████████ ██████████.

132. In September 2020, Microsoft added cloud gaming to its top-tier multi-game content library subscription service offering, Xbox Game Pass Ultimate. PX9091.

133. Xbox Cloud Gaming (also referred to as xCloud) enables Xbox Game Pass Ultimate subscribers to stream certain games, as opposed to downloading games locally, and then to play those games on the device most convenient to them, including consoles, Windows PCs, tablets, and mobile phones. ████████████

134. Microsoft also offers free access to Xbox Cloud Gaming for Epic Games' *Fortnite*. ████████████

135. *Fortnite* on Xbox Cloud Gaming is separate for Game Pass Ultimate (i.e., no subscription is required to play *Fortnite*), and Microsoft expects to launch more streamable free-to-play games over time. ████████████

136. To date, more than 20 million gamers have used Xbox Cloud Gaming to stream games from the cloud. PX9171 (Microsoft 1Q FY23 Earnings Call (October 25, 2022)) (Nadella: "[W]ith Cloud Gaming, we're transforming how games are distributed, played, and viewed. More than 20 million people have used the service to stream games to date.").

137. According to Microsoft, ████████████████████████████████████████████████████████████████████████████████████████████

138. Other companies that have introduced cloud gaming include Amazon, Nvidia, and Google. ████████████ Sony has also introduced cloud gaming available on the highest tier of its PlayStation Plus subscription service, "PlayStation Plus Premium," with plans to expand its cloud gaming services. ████████████████████████

139. Amazon's Luna+ (a tier of Amazon Luna), priced at $9.99 per month with additional options available for further purchases, provides streaming access to a library of over 100 third-party games. See Amazon Luna, https://www.amazon.com/luna; ████████████

140. Nvidia GeForce NOW, priced at $49.99 for six months for the Priority tier or $99.99 for six months for the RTX 3080 tier, allows gamers access streaming versions of game titles that the gamers already own, with the streaming hosted on Nvidia Corporation datacenters. Nvidia, GeForce NOW, https://www.nvidia.com/en-us/geforce-now/; ████████████████████████████████████████

141. Google Stadia Pro was priced at $9.99 per month with additional options for further purchases, allows gamers to stream games from a library of hundreds of third-party games. ██████████████████████████

142. Google discontinued Stadia in January 2023 ███████████████████████ ████████████████████████████████████████████████

**E.    A Gaming Platform Must Offer AAA Content to Succeed**

143. "AAA" content is an industry term and can be synonymous with ██████████ ██████████████████████ that has a high development budget and high expectations for sales. ████████████████████████████ ███████████████████████████████████████ ████████████████████████████████ ██████████████████████████████████ ████████████ ██████████████████████████ ███████████████████████████████████████

144. AAA games are particularly important in the gaming industry. ██████████████ ███████████████

145. "AAA" or tentpole titles can drive customer growth and engagement, as they "lift the entire tent" for other types of content. ███████████████████████████████ ████████

146. Microsoft and Sony need to have these AAA titles to build their gaming ecosystem. ████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████

147. AAA titles have long development cycles with high engagement, leading to a reduced supply of gaming content. ████████████████

████████████████████████████████████████

████████████████████████

148. Consolidation in the industry has led to fewer AAA titles. ███████████

████████████████████████████████████████

████████████████████████████████

██████

149. In past acquisitions, ███████████████████████████

████████████████████████████████████████

██████████████████████████████

███████████████████████████████

**1. The Industry Has a History of Consolidation**

150. Over the last decade there has been significant, accelerating consolidation among video game publishers and developers. ███████████████████

███████████████

151. Between 2018 and 2020, Xbox Game Studios acquired eight additional game studios including Playground, The Initiative, Ninja Theory, Undead Labs, Compulsion Games, inXile, Obsidian, and Playground. █████████

152. The need for and scarcity of content has driven this consolidation. ██████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

153. ████████████████████████████████████████████

████████████████████████████████

154.    Microsoft gaming CEO Phil Spencer commissioned ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

155.    ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

156.    ████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

157.    When seeking board approval for the ZeniMax acquisition Microsoft noted that

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

158.    When analyzing the ZeniMax acquisition for its Board of Directors, ██████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

159.    Activision was also aware of consolidation in the Gaming Industry.██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

**2.  A Small Group of Top AAA Games Is Particularly Important**

160.    Video game sales and revenues are concentrated among a relatively small number of hit "blockbuster: titles and franchises often referred to as "AAA" games.  PX5000 at 035.

161.    ███████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

162.    ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████

163.    Microsoft documents ████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
███

164.    A 2021 report ████████████████████████████████
███████████████████████████████████

165. Regardless of the specific term used there is widespread industry recognition that certain games are particularly important drivers of sales and engagement. ████████ ████████████████████████

166. A declaration from ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ PX8000 at 006.

### 3. AAA Games are Difficult and Costly to Make

167. The gaming industry recognizes four independent publishers, collectively known as the "Big 4": Activision, Entertainment Arts, Take-Two, and Ubisoft. ████████████ ████████████████████████████████ ████████████████████

168. The latest version of Halo, Halo Infinite, took ████████████████████ ████████████████████████████████████ ██████████████████████████████████████████

169. Other games can take even longer. ████████████████████████████ ████████████████████████████████████ ████████████████████████████

170. Over 3,000 people worked on Call of Duty: Modern Warfare. PX9005 (Activision) at 4 (2021 Annual Report).

171. When considered ████████████████████████████ producers of console and PC gaming content, ████████████████████████████ ████████████████████████████████████ ██████████████████████████

172. During the ZeniMax acquisition, Microsoft ████████████████████ ████████████████████████████████ ██████████████████████████

173. Microsoft also believed that ████████████████████ ████████████████████████ ████████████████████

174. An Activision presentation ████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████

175. ████████████████████████ ██████████████████████████ ██████████████████████████ ██

176. The immense costs to develop quality games has limited the number of publishers with a proven track record of making AAA titles. ████████████████ ██████████████████████████ ████████████████████████ ████████████████████████ ████████

**F.    Exclusive Gaming Content is Important for Attracting Customers and Driving Sales**

177. Microsoft recognizes that ████████████████████ ██████████████████████████ ███████████████████ PX5000 at 149-50; ████████

178. ████████████████████████ ████████████████████████ ████████████████████████ ████

179. During the ZeniMax acquisition, ███████████████████████████
███████████████████████

180. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███

181. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████ Likewise, almost all of Microsoft's first-party games
are exclusive to Xbox. ████████████████████████████ PX5000 at
162.

182. Sony ███████████████████████████████████████████████
████████████████████████████████████████████████
███████ ██████████████████████████████████

183. A model of consumer demand for consoles and titles estimated by Dr. Robin Lee using
historical Microsoft sales data predicts an average share shift of ██████ toward Microsoft
from making *Call of Duty* titles exclusive, and a smaller but significant shift toward
Microsoft from making other Activision titles exclusive. PX5000 at 156-57.

184. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███ .

185. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████

186. 

187.

188.

189.

G. **Activision Content is Particularly Important**

190. Activision develops and publishes high-quality video games for multiple devices, including video game consoles, PC, and mobile devices.

191. According to Microsoft's Board presentation

192. Activision's ██████████ include Call of Duty. World of Warcraft, Diablo, and Overwatch.

193.

194.

195. Activision's iconic video game titles include several leading AAA franchises – like Call of Duty, Overwatch and Diablo, that have individually earned more than

1  lifteme revenues. ████████████████ ████████████████

2  ████████████████████████████████████████████████████████

3  ████████████

4  196.  Microsoft, in presentations to its Board of Directors████████████████

5  ████████████████████████████████████████████████████████

6  ████

7  197.  Activision's largest franchise, Call of Duty, is one of the most successful entertainment

8       franchises of all time. PX9005 at 4 (Activision2021 Annual Report).

9  198.  ████████████████████████████████████████

10      ████████████████████████████████████████████

11 199.  Even among AAA games, Activision's most well-known franchise, Call of Duty, is

12      particularly strong.  First released nearly twenty years ago in 2003, Call of Duty is, in

13      Activision's own words, "one of the most successful entertainment franchises of all

14      time."  PX9005 at 004.  Microsoft concurs. ████████████████████████

15      ████████████████████████████████████████████

16      ████████████████

17 200.  Call of Duty is Activision's "key product franchise."  PX9052 at 037 (Activision calls

18      Call of Duty its "key product franchise"); ████████████████████████

19      ████████████████████; ████████████████████████████

20      ████████.

21 201.  Activision releases new Call of Duty titles every year.  This annual release cycle is

22      unique among AAA games, with the exception of sports games, because games of this

23      caliber often require immense time and resources that take years in between releases.

24      Activision has overcome that barrier by using four separate studios and several support

25      studios to complete the development work necessary to launch an annual release.

26      ████████████████████████████████; ████████████████████████

27      ████████████████████████████████████████████████████████

28

1  ██████████████████████████████████████████████████████

2  ████████████████████████████

3  202.  Call of Duty's loyal fanbase and enduring appeal have made it particularly valuable,

4  influencing gamer engagement and gaming product adoption. ████████████████████████

5  ████████

6  203.  Call of Duty has a massive following, with ████████████████████████████████████

7  ████████████████████████████████████████████

8  204.  In every year since 2014, the best-selling buy-to-play console game in the United States

9  has been a Call of Duty game except for 2018, when Red Dead Redemption II was

10  released. ████████████████████████████; *see* PX9053 at 003 (Call of Duty

11  will remain best-selling U.S. franchise in 2022 for 14th consecutive year). In 2018, Call

12  of Duty Black Ops 4 ranked #2. ████████████████████████████████████

13  205.  In 2020, the #1 and #2 best-selling paid console games were Call of Duty titles. ████████

14  ██████████████████████████████

15  206.  In 2021, Call of Duty: Vanguard topped the revenue charts as the best-selling game in the

16  United States, with another Call of Duty title, Black Ops Cold War, coming in second.

17  PX2056 at 001.

18  207.  In 2022, Call of Duty: Modern Warfare II took in $1 billion globally in the first ten days

19  following its launch, making it the highest grossing entertainment opening of 2022.

20  PX9132 (Activision 2021 Annual Report).

21  208.  By comparison, the highest grossing film of 2022, Top Gun: Maverick, took one month

22  to reach the $1 billion threshold.

23  https://www.economist.com/business/2022/11/29/microsoft-activision-blizzard-and-the-

24  future-of-gaming.

25  209.  Call of Duty is the most requested title on GeForce NOW in April 2022. PX3052 at 31.

26  210.  ████████████████████████████████  ████████████████████████████████

27  ████████████████████████████████  ████████████████████████████████

28  ██████████████████████████

211. 

212.

213.

214.

**H.   Microsoft Has a History of Making Content from Acquired Studios Exclusive**

215.   As described *infra* in Sections IV.C., Microsoft has a history of acquiring game studios and making future releases from those studios exclusive to Xbox.

216.   For example, Microsoft acquired a number of game studios in 2018-2019, and its approach to those acquisitions was that █████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ *see infra*, Section IV.C.2.

217.   As discussed infra in Section IV.C.3., in 2021 Microsoft acquired ZeniMax Media ("ZeniMax"), the parent company of the large game developer and publisher Bethesda Softworks LLC ("Bethesda"), for $7.5 billion. Microsoft told the European Commission that it would not have the incentive to withhold future ZeniMax titles from rival consoles, but subsequently decided to do exactly that. *See infra*, Section IV.C.3.

## II. RELEVANT MARKETS

### A. High-Performance Consoles Constitute a Relevant Product Market

*Brown Shoe* **– Industry and Public Recognition**

218. It is acknowledged within the industry that Microsoft and Sony are extremely close competitors. ████████████████████ ████████████████████
████████

219. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████

220. For example, in FY2022, the first full year that Xbox Series X|S consoles were available,
████████████████████████████████████
████████████████████████████████████
████████████

221. Internal analyses ██████████████████████████████
██████████████████████████████████████████
████████████████

222. Microsoft analyses ████████████████████████████
████████████████████████████████████████████
████████████████████████████

223. ████████████████████████████████████████
████████████████████████████████████████
████████████████

224. ████████████████████████████████████
████████████████████████████████████
████████████████████████████ PX3081 at 028, 040.

225. As Sony's CEO describes, ████████████████████████████████
████████████████████████  ████████████████████████████

226. Gaming journalists and commentators in the public also frequently observe the vigorous competition between Xbox and PlayStation while excluding Nintendo's consoles. In a public interview, the former head of Xbox commented, "We encouraged the console wars, not to create division, but to challenge each other. And when I say each other I mean Microsoft and Sony." PX9061 at 001; PX9037 at 006 ("Microsoft and Sony at the forefront of the console wars, releasing competing devices within months of each other: first with the Xbox 360 and PlayStation 3 in the 00s, then with the Xbox One and PlayStation 4 in 2013, and now with the Xbox Series X and PlayStation 5. Nintendo, meanwhile, decided that warring over the cutting edge of entertainment was for suckers, and instead put out a series of comparatively underpowered consoles, most recently the Nintendo Switch, that cheerfully sold hundreds of millions of units.").

***Brown Shoe* – Characteristics and Uses**

227. Xbox Series X|S and PS5 consoles are the only high-performance consoles available today, and are considered to be in the ninth generation of gaming consoles. ████████.
An internal ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████

228. The new generation of Xbox and PlayStation consoles possess extremely fast processing, which shapes the kind of content that can run on high-performance consoles, enabling higher resolution, realistic graphics, and cutting-edge performance. The delta between the technical performance of the Xbox Series X and PlayStation 5 is smaller than the delta between the Xbox One X and PS4 Pro. ████████████ *See also* ████████████
████████████████████████  ████████████████████████████████
████████████████████████████████; ████████████████████
████████████████████████████████████████████

229. From a consumer perspective, the Xbox Series X|S and PlayStation5 consoles are ███████████████████ in a number of technical specifications, including offering similar graphics, user experiences, and hardware features. ███████████

230. Nintendo ████████████████████ ████████████████████████ ████████████ ████████████████████████ ████████████████████████ ██████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████████

231. Microsoft's internal strategy documents confirm this view. ████████████ ████████████████████████ ████████████████████████ ████████████

232. Both the Xbox Series X|S and PlayStation 5 consoles are home consoles typically played on television screens and use a "traditional type of control scheme" relies on analog sticks and buttons as opposed to motion control. ████████████████ ████████ They lack the ability to remove controllers from their console and cannot be easily taken out of the home. ████████████████

233. However, ████████████████████████ ████████████████████████ James Ryan Depo Vol.1 (PX7053), 21:16-22:3, 4/6/2023) ████████████████████ ██████████████

234. In contrast, Nintendo's most recent console—the Nintendo Switch—is not a ninth-generation gaming console. ████████████████████ ████████████████████████

[█████████████████████████████████]

[███████████████████████████████████]

[█████████████████████████] [████████████]

[████████]

***Brown Shoe*** **– Sensitivity to Price Changes / Substitutability**

235.   Multi-homing patterns also show that gamers tend to find the Xbox Series X|S and

PlayStation 5 more substitutable for each other than the Nintendo Switch. [████████]

[███████████████████████████████████]

[███████████████████████████████████]

[█████████████████████████████████]

[██████████████] PX5000 (Lee Report) at ¶ 213.

236.   Similarly, according to [████████████] [████████████]

[███████████████████████████████]

[██████████████████████████████]

[████████████████]

***Brown Shoe*** **– Distinct Prices**

237.   The Xbox Series X|S and PlayStation 5 also launched with similar pricing schemes. The

more advanced Xbox Series X and PlayStation 5 launched with a price of $499 while the

Xbox Series S and PlayStation 5 Digital Edition launched with a price of $299 and $399,

respectively. [██████████████████████] [████████████]

[███████████]

238.   While the Xbox Series S had the same retail price at launch as the Nintendo Switch,

[████████████████████████████] the graphical and processing

capabilities of the Series S are much more aligned with the Xbox Series X and

PlayStation 5 consoles. [████████████████████] PX5000 at

080. [████████████████████████████████]

[████████████████]

***Brown Shoe*** **– Distinct Customers**

239. According to NPD data for October 2020–December 2020, ██████████

████████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████ ██████████████

██████████ ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████. PX3065 at -051

██████████████████████ █████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

240. ███████████████████████ ██████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████ ██████████████████████████████

241. These multi-homing patterns are consistent with, on average, owners of an Xbox Series X|S console obtaining more value from purchasing a Nintendo Switch than a PlayStation 5 console and, likewise, owners of a PlayStation 5 console obtaining more value from purchasing a Nintendo Switch than an Xbox Series X|S console.

242. The patterns are also consistent with ████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████ █████████████████████████

████████████████████

243. The Switch is considered a ███████████████ PX3047 (Sony), ██████████

███████████████████████████████████████████████

244. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ The geographic footprint of the high-performance consoles are also different because the Nintendo consoles "skews much more heavily towards the Japanese market than the PlayStation market does or the Xbox market does."

████████████████████████████

245. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

246. Dr. Robin Lee's analysis shows Microsoft and Sony impose the most significant competitive constraints on one another among console manufacturers and consumer substitution to products outside of the High-Performance Video Games Consoles Market would not constrain a hypothetical monopolist of high performance consoles from likely profitably implementing a small but significant and non-transitory increase in price ("SSNIP").  PX5000 at 102.  His analysis concluded that a hypothetical monopolist of high performance consoles would likely profitably impose a SSNIP on at least one

product contained within this market and thus High-Performance Video Game Consoles market satisfies the hypothetical monopolist test. PX5000 at 102.

**B.      Video Game Consoles Also Constitute a Relevant Market**

247.   The console market can be expanded to include Xbox Series X|S, PlayStation 5, and Nintendo Switch, although this is broader than necessary and does not eliminate the anticompetitive effects. PX5000 at 102 (Lee Report).

248.   ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████ . ██████████████████████████

249.   ███████████████████████████████████████████████████████ ███████████████████████████████ . ████████████████████████ █████████████████

250.   Dr. Robin Lee found the Nintendo Switch accounted for ███ of console unit sales, PlayStation 5 video game console accounted for ███ of unit sales, the Xbox Series X|S accounted for ███ of unit sales in 2022. PX5000 at 108 (Lee Report).

251.   Dr. Robin Lee found the PlayStation 5 accounted for ███ of console revenue, the Xbox Series X|S accounted for ███ of revenue and the Nintendo Switch accounted for ███ of revenue in 2022. PX5000 at 108 (Lee Report).

252.   By comparison, the next largest video game console is the Valve Steam Deck, which according to Dr. Lee accounted for ███ of console unit sales and ███ of console revenue in 2022. PX5000 at 108 (Lee Report).

253.   Nintendo ██████████████████████████████████████████████ █████████████████████████████████████████ ████████████████████ █████████████████████

254.   Dr. Robin Lee's analysis of the High-Performance Video Game Consoles market shows that the High-Performance Video Game Consoles market satisfies the hypothetical monopolist test. PX5000 at 103. Because all products within the High-Performance Video Game Consoles market are wholly contained within the Video Games Consoles

market, that indicates the Video Game Consoles market also satisfies the hypothetical monopolist test. PX5000 at 103. Dr. Lee explained that the aggregate diversion ratio for the Video Games Consoles market would necessarily be greater than or equal to the aggregate diversion ratio for the High-Performance Video Game Consoles market because the hypothetical monopolist of the Video Game Consoles market would own strictly more products than the hypothetical monopolist of the High-Performance Video Game Consoles market.

### C. Multi-Game Content Subscription Services Constitute a Relevant Product Market

***Brown Shoe* - Industry and Public Recognition**

255. Market participants view content library services as a distinct product segment. For example, ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████

256. Microsoft has represented that it ████████████████████
███████████████████████████████████████
████████████████ ███████████████████████

***Brown Shoe* – Characteristics, Benefits and Uses**

257. Sarah Bond, Microsoft Gaming Corporate Vice President of Creator Experiences and Ecosystem Management, testified that ████████████████████
███████████████████████████████████████
██████████████████ ████████████████████
████████

258. ███████████████████████████████████████████ █
███████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████." ████████
█████████

259. ████████████████████████████████████████████
██████████████████████████████████████████████
████████████████ ███████████████████████

*260.* In a July 2021 Earnings Call, Microsoft told investors "Game Pass is growing rapidly and it's transforming how people discover, connect, and play games. Subscribers play approximately 40% more games and spend 50% more than non members." PX9012 at 006

261. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████ ██████████████
████████████████

***Brown Shoe* – District Pricing and Marketing**

262. Subscribers to Multi-game content subscription services typically pay periodic subscription fees, frequently monthly, quarterly, or annually, for access to the games offered by the service. The monthly subscription fee for Xbox Game Pass ranges from $9.99 to $14.99 per month. The monthly subscription fee for PlayStation Plus Extra and Premium tiers (the content subscription tiers) ranges from $14.99 to $17.99. ████████
██████████████████████████

263. ████████████████████████████████████████████
███████████████████████████. ██████████████████████

1    264.  Sony also ████████████████████████████████████
2    ████████████████████████████████████████████
3    ███████████████████████████████████ ██████████████
4    ██████████████████

5    265.  In a ██████████████████████████████████
6    ███████████████████████████████████
7    ████████████████████████████████████
8    ██████████████████████████  PX3090 at -002 (Sony).

9    266.  ████████████████████████████████████
10   ██████████████████████████████████████
11   ██████████████████████████████████████
12   █████████████████████████████████████
13   ████████████████████████████████████████
14   ████████████████████████████████████████
15   ███████ ████████████████████████████████

16   ***Brown Shoe* – Distinct Customers**

17   267.  ██████████████████████████████████████
18   █████████████████████████████████████
19   ██████████████████████████████████████
20   █████████████████████████████████████
21   ███████████████████

22   ***Brown Shoe* – Sensitivity to Price Changes**

23   268.  ██████████████████████████████████████
24   █████████████████████████████████████████
25   █████████████████████████████████████████
26   █████████████████████████████████████████
27   █████████████████████████████████████████
28   ███████████████ ███████████████████



269. 

270.

271.

272. Consumer substitution to products outside of the Content Library Services (otherwise known as multi-game content subscription services) market does not constrain a hypothetical monopolist of Content Library Services from likely profitably implementing a SSNIP. PX5000 at -133. For this reason, a hypothetical monopolist of Content Library Services would likely profitably impose a SSNIP on products within this this market, including Game Pass, and thus, the Content Library Services market satisfies the hypothetical monopolist test. PX5000 at 133-134.

### D. Cloud Gaming Subscription Services Constitute a Relevant Product Market

**Brown Shoe - Industry and Public Recognition**

273. Microsoft identifies Xbox Cloud Gaming as a separate economic entity in its public statements. *See, e.g.*, PX9050, Microsoft Corp. Annual Report Form 10-K (July 28, 2022) at -014 ("Gaming, including Xbox hardware and Xbox content and services, comprising first- and third-party content (including games and in-game content), Xbox Game Pass and other subscriptions, Xbox Cloud Gaming, third-party disc royalties, advertising, and other cloud services").

274. In Microsoft's July 2021 earnings call, CEO Satya Nadella stated: "We continue to lead in the fast-growing cloud gaming market with last month -- just last month, we made Xbox Cloud Gaming available on PCs as well as Apple phones and tablets via the browser in 22 countries with more to come." PX9012 at -006.

275. ██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████

276. Documents from ████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████

277. Documents from ████████████████████████████████████
███████████████████    ██████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████

278. Documents from ████████████████████████████████████
██████████████████████████████████████████████████

279. Documents from ██████████████████████████████████

**Brown Shoe – Characteristics and Uses**

280. ██████████████████████████████████████

281. Cloud Gaming Subscription Services allow gamers to play computationally demanding games on less powerful devices that otherwise lack the computing power or storage to support the games, reducing the need for gamers to make large investments in expensive hardware. https://www.nvidia.com/en-us/geforce/geforce-experience/; ██████

282. Cloud Gaming Subscription Services enable gaming on devices that do not meet the minimum specifications for large and technologically complex games, such as older and less expensive PCs, MacBooks, Chromebooks, tablets, mobile devices, and smart TVs.

1    https://support.xbox.com/en-US/help/games-apps/cloudgaming/about-cloud-gaming;

2     .

3    283.  Cloud Gaming Subscription Services enable gamers to play games that were developed

4    for other devices and/or operating systems. https://support.xbox.com/en-US/help/games-

5    apps/cloudgaming/about-cloud-gaming;

6    284.  As an

7

8

9    285.

10

11

12

13

14

15

16    287.

17

18

19

20    288.

21

22

23

24

25

26

27    ***Brown Shoe* – Unique Production Facilities**

28

289. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ ████████████████

290. ████████████████████████████████████████████

████████████████████████████

291. ████████████████████████████████████████

███████████

292. ████████████████████████████████████████████

████████████████████

**Brown Shoe – Distinct Prices and Marketing**

293. Users access cloud gaming services either by paying a periodic fee (either monthly or yearly) or by streaming free-to-play games (which is available for free on some services). ████████████ https://www.xbox.com/en-US/cloud-gaming; https://www.nvidia.com/en-us/geforce-now/memberships/; https://www.amazon.com/luna/landing-page; https://www.playstation.com/en-us/ps-plus/#premium.

294. Xbox Cloud Gaming marketing highlights the "play anywhere" functionality of cloud gaming, encouraging users to "discover the freedom and flexibility the cloud brings to your gaming experience" with "more choices in how to play" and the ability to "jump in and start playing in seconds." PX9091 at -001 to -002, Kareem Choudhry, "Cloud Gaming with Xbox Game Pass Ultimate Launches with More Than 150 Games," XBOX NEWS (Sept. 14, 2020), https://news.xbox.com/en-us/2020/09/14/cloud-gaming-with-xbox-game-pass-ultimate.

295. Nvidia GeForce NOW marketing highlights the "play anywhere" functionality of cloud gaming, using the slogan "Your Games. Your Devices. Play Anywhere." Nvidia, GeForce NOW, https://www.nvidia.com/en-us/geforce-now/.

**Brown Shoe – Distinct Customers**

296. Cloud gaming expands the total addressable market for high-end video games by making these games available to customers that do not own high-end Windows gaming PCs or consoles. ████████████████████████████████

297. When Microsoft introduced Xbox Cloud Gaming, Corporate Vice President for Cloud Gaming Kareem Choudhry announced "cloud gaming as part of Xbox Game Pass Ultimate now opens up the world of Xbox to those who may not own a console at all." PX9091 at -002, Kareem Choudhry, "Cloud Gaming with Xbox Game Pass Ultimate Launches with More Than 150 Games," XBOX NEWS (Sept. 14, 2020), https://news.xbox.com/en-us/2020/09/14/cloud-gaming-with-xbox-game-pass-ultimate.

298. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████ PX9012 at-006.

299. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████

300. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

301. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

███████████████████████████████████████████████

██ .

302. Google has also recognized that cloud gaming appeals to a distinct set of customers and is currently marketing three of its Chromebooks as "cloud gaming machines, disguised as Chromebooks." Google, "Cloud Gaming Chromebooks," https://www.google.com/chromebook/discover/gaming.

303. Dr. Lee opines that the combined qualitative and quantitative evidence supports the conclusion that a hypothetical monopolist owning all cloud gaming services would likely implement a SSNIP on at least one of these products. PX5000 at 137. Hence, the Cloud Gaming Services market satisfies the hypothetical monopolist test. PX5000 at 138.

**E.  Multi-Game Content Subscription Services and Cloud Gaming Subscription Services Together Constitute a Relevant Product Market**

304. The market for multi-game content subscription services and cloud gaming subscription services includes all video game subscription services that offer either content library services for games played primarily on non-mobile devices or cloud gaming services for games played primarily on non-mobile devices. PX5000 at -103 (Lee Report).

305. Because Microsoft's Game Pass Ultimate subscription service offers both content library services and cloud gaming services, each product in the multi-game content subscription and cloud gaming subscription services market competes with Game Pass Ultimate on at least one of these services. PX5000 at -103 (Lee Report).

306. A hypothetical monopolist of all products in the multi-game content subscription services and cloud gaming subscription services market would likely profitably impose a small but significant non-transitory increase in price that would not be defeated by products outside the market, including buy-to-play games. PX5000 at -127-31 (Lee Report).

**F.  The Relevant Geographic Market Is the United States**

**i.  Game Prices and Releases Vary Country-by-country, Supporting the Ability of Market Participants to Price Discriminate**

307. Console manufacturers set prices on a country-by-country basis. PX5000-104 (Lee Report).

308. 

PX5000-104 (Lee Report).

309. 

310. 

311. 

312. 

313. 

314. 

315. If users "move[] to a different country" or are "already in a region different from the one set for your account and/or console," they must "change [their] Xbox country/region." _____ (citing "Update your Microsoft account if you're moving to a new country or region," https://support.xbox.com/en-US/help/account-profile/manage-account/update-microsoft-account-country-region.)

i. **Gamer Preferences and Behavior Vary Country-by-country and Inform Market Participants' Strategic Decisions**

316. 

317.

318.

319.

320.

321.

; .

**III. RELATED PRODUCT**

    **A.    Activision Content Is an Important Input that Drives Acquisition, Engagement, and Retention**

322.

323.

324. 

325.

326.

327.

328.



329.

330.

331.

332.

333.

334. ████████████ ███████████████████████████████████
████████████████████ █████████████████████████

335. The *Call of Duty* franchise is one of the most recognizable and popular video game
series. ████████████████████████████ ████████████████
██████ ████████████████████████████
████████████████████████████████
████████████████

336. █████████████████████████████████████████████
██████████████████████████████████ ██████████
██████████████

337. █████████████████████████████████████████████
███████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████
███████████████████████████████████
██████████████████████████████████████
██████████████████████████████████

338. ██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████
██████████████████████████████████████
█████████████████████████████████

## IV. THE PROPOSED ACQUISITION IS LIKELY TO RESULT IN A SUBSTANTIAL LESSENING OF COMPETITION

### A. Microsoft Would Have the Ability to Foreclose Rivals in the Relevant Markets

339. ██████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████

340. ██████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████

341. ██████████████████████████████████████
████████████████████████████████████████

342. Partial foreclosure strategies include 1) timed exclusivity, where Microsoft could delay the release of Activision games on competing products, 2) content exclusivity, where Microsoft makes certain versions or add-on content for Activision games exclusive to Microsoft products, and 3) degraded content, where Microsoft degrades the performance, gameplay, or features of Activision games. PX5000 (Lee Report) at 181.

343. ██████████████████████████████████████████
███████████████████████████████████

344. ██████████████████████████████████████████
██████████████████████████████████████
██████

345. ██████████████████████████████████████████
█████████████████

**B.     Unlike an Independent Activision, the Combined Firm Would Have an Incentive to Foreclose in the Relevant Markets**

    **1.     The Combined Firm Will Have an Increased Incentive to Foreclose in High-Performance Consoles and Video Game Consoles**

346. ████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

347. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████

348. Dr. Robin Lee's quantitative economic analysis shows that the combined firm would likely have an incentive to engage in the foreclosure of acquired Activision content from PlayStation consoles.  PX5000 at -215 (Lee Report).  Dr. Lee's model predicts that the combined firm would incur substantial costs by foreclosing PlayStation consoles, but these costs are more than offset by the benefit of bringing additional gamers to Xbox consoles and Xbox Game Pass—which provide Microsoft additional sales of complementary products.  PX5000 at -215 (Lee Report).  Therefore, Dr. Lee predicts that Microsoft would recoup more than 100% of its lost profits from foreclosing Activision's content and the substantial benefits that Microsoft would incur as a result of bringing additional players to Xbox consoles and adding Activision content to Game Pass would have the effect of also making foreclosure more valuable to Microsoft.  PX5000 at -215 (Lee Report).

349.

350.

351.

352.



353. 

354.

355.

356. A model of consumer demand for consoles and titles estimated by Dr. Robin Lee using historical Microsoft sales data predicts an average share shift of ▮ toward Microsoft from making *Call of Duty* titles exclusive, and a smaller but significant shift toward Microsoft from making other Activision titles exclusive. PX5000-156 to -158 (Lee Report); *see* ▮

357. 

358.    The combined firm is also incentivized to partially foreclose or degrade Activision content on PlayStation consoles for the same reasons that it has to remove games entirely from PlayStation.

359.

360.



**2. The Combined Firm Will Have an Increased Incentive to Foreclose in Content Subscription Services and Cloud Gaming Services**

361. Several Microsoft documents explicitly reference longer-term benefits of gaining scale in content library and cloud gaming service markets.

362.

363.

364.

365. 

366. Microsoft's statements and internal documents recognizing the company's incentive to withhold content from rival content library services providers are consistent with actions and statement Microsoft made for prior acquisitions, and in the case of Minecraft and ZeniMax, executed.

367.

368.

369.

370. 

371.

372.

373.

374.

375.



376.

377.

378.

### 3. The Combined Firm Will Have Increased Incentive to Collaborate on Innovations with Only Microsoft in the Relevant Markets

379. Hardware providers work closely with video game developers. ███████

███████████████ ███████████████████████

████████████████████████████

██████████████████████████████

█████

380. ████████████████████ █████████████████

███████████████████████████████

███████████████████████████████

██████ ████████████████████

381. In particular, ██████████████████████

█████████████████████████

████████████ █████████████████████ ███████

██████████████████████████

████████████████████████████

██████████████████████████

█████████████████████████

█████

382. For example, ████████████████████████

█████████████████████████████

██████████ █████████████████████ ███████

██████████████████████████████

██████████████ ████████████████

383. ████████████████████ ████████████████

███████ ████████████████████████ ███████

████████████████████████████████



384. For example, ████████████████████████████
████████████████████████████████
████████████████████████████████████
████████████             ███████████████████████

385. █████████████████████████       █████████████
████████████████         ████████████████████████
████████████████████████████████████████████
████████████████████████████

386. The acquisition of a major publisher would jeopardize this relationship. ████████
██ ████████████████████████████████████████████
████████████████████████ ██████████████████████ ███
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
█████████████████████

387. This would also affect Activision's incentives to work with other platforms. █████████
████████████████████████████

**C.** **Microsoft's Past Statements and Actions Demonstrate Microsoft has the Ability and Incentive to Foreclose Rivals Post-Acquisition**

    **1.** **Microsoft is Willing to Lose Money on First-party Exclusive Titles and Treat Them as a "Loss Leader."**

388. ███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████████████
███████

389. ██████████████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████

    **2.** **Past Acquisitions**

390. Microsoft's discussion and actions surrounding proposed and consummated acquisitions of video game studios also indicate Microsoft's willingness to forgo profits on content sales to obtain benefits arising from content exclusivity, which is economically rational if the benefits of exclusivity outweigh the foregone sales on other gaming platforms. This has been the case even for new titles that are

released in existing franchises.

391. 

392.

393.

394.

*395.*

### 3. ZeniMax

396. In addition, Microsoft's actions following the acquisition of ZeniMax Media ("ZeniMax") are consistent with Microsoft recognizing that it obtains significant benefits from exclusivity.

397. ██████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████████
█ ██████████████████████████████████████████████
███████████████████

399. Prior to being acquired by Microsoft, ZeniMax had historically released its games on both Xbox and PlayStation. ████████████████████

400. █████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████

401. █████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████

402. ███████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████

403. ███████████████████████████████████████████████

404. In the meantime, Microsoft informed the European Commission that it had "strong incentives to continue making ZeniMax games available for rival consoles (and their related storefronts)" and that it would be "implausible" to earn enough new Xbox console users to offset the losses it would realize from lost sales on competing platforms due to an exclusive strategy. Notably, Microsoft cited to the "relative value of ZeniMax games compared to the gaming landscape" as one factor contributing to this conclusion. *See* PX9036 (European Commission Decision, Case M.10001 *Microsoft/ZeniMax* (May 3, 2021) at 21, *available at* https://ec.europa.eu/competition/mergers/cases1/202124/m10001_438_3.pdf.);

405.

406.



412. This financial analysis found the "Xbox-Focused" strategy to drop the value of ZeniMax "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.")

413. Nevertheless, following the acquisition, Microsoft announced that it planned to release several highly-anticipated future ZeniMax titles, including *Starfield* and *Redfall*, exclusively on Xbox and PC. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

414. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

415. Prior to the ZeniMax transaction, *Starfield* and *Redfall* were originally planned for

release on PlayStation 5 consoles. ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████

416. Following clearance by the European Commission on March 8, 2021, Microsoft closed the ZeniMax transaction. In a press release on March 9, Microsoft Gaming CEO Phil Spencer stated that some future ZeniMax titles would be exclusive. "With the addition of the Bethesda creative teams, gamers should know that Xbox consoles, PC, and Game Pass will be the best place to experience new Bethesda games, including some new titles in the future that will be exclusive to Xbox and PC players." Phil Spencer, "Officially Welcoming Bethesda to Team Xbox," Xbox Wire, Mar. 2021, https://news.xbox.com/en-us/2021/03/09/officially-welcoming-bethesda-to-the-xbox-family/.

417. Subsequently, Microsoft announced publicly they intended to release Elder Scrolls VI as an Xbox exclusive. ████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████; PX9095, Sam White, "How Xbox outgrew the console: inside Phil Spencer's multi-billion dollar gamble," GQ UK (Nov. 15, 2021) at -016-017

418. Microsoft announced that Indiana Jones would be exclusive ███████████████

██████████████████████████████████████████

1　[redacted]

2　[redacted]

3　[redacted]

4　419.　Additionally, in August 2021, Microsoft Gaming CFO Tim Stuart made statements

5　consistent with a desire to prioritize the quality of Bethesda content on Microsoft's own

6　products, even if they were not withheld from rivals: "[W]hat we want is we want that

7　content, in the long run, to be either first or better or best or pick your differentiated

8　experience, on our platforms. We will want Bethesda content to show up the best as – on

9　our platforms." PX9330 Matt Kim, "Microsoft Wants Bethesda Games 'First or Better or

10　Best' on Xbox," IGN, Aug. 16, 2021 https://www.ign.com/articles/xbox-bethesda-first-

11　better-best/.

12　420.　[redacted]

13　[redacted]

14　[redacted]

15　[redacted]

16　[redacted]

17　[redacted]

18　[redacted]

19　[redacted]

20　[redacted]

21　[redacted]

22　[redacted]

23　[redacted]

24　421.　[redacted]

25　[redacted]

26　[redacted]

27　422.　[redacted]

28　[redacted]

1    423.    ████████████████████████████████████████

2            ████████████████████████████████████

3            ████████████████████████████████████████

4            ████

5    424.    ██████████████████████████████████████████

6            ████████████████████████████████████████

7            ████████████████████████████  ███████████

8            ████████████████████  ███████████████████

9            ████████████████████████████████████████

10           ██████████████████████████████████████████████

11           ████████████████████████████████████████

12           ██████████████████████████████████████

13           ███████████████████████████████████████████

14           ██████████████████████████████████████████████

15           ██████████████████████████████████████████

16           ██████████████████████████████████████████

17           ███████████████████████████████████████████

### 4. Minecraft is Not Predictive of Microsoft's Behavior Here

19   425.    In 2014, Microsoft acquired Mojang, the developer of Minecraft. ███████████

20           ██████████████████████

21   426.    Minecraft is played across many different kinds of devices, including mobile

22           phones, tablets, and the Nintendo Switch, and is available on more devices than

23           Call of Duty. ████████████████████████████████████████

24           Unlike Call of Duty, Minecraft was made by a single developer incurring relatively

25           limited costs. ████████████

26   427.    At the time of Microsoft's acquisition of Mojang, Mojang had already released a

27           version of Minecraft on Sony's PlayStation consoles. █████████████

28   428.    Minecraft is a sandbox game in which users can create a world within the game,

1    which focuses on user-driven experiences, creativity, and freedom rather than

2    preset goals or a narrative storyline. ████████████████████████████

3    ██    In the words of a Microsoft executive, ████████████████████████

4    █████████████████████████████████████████████████

5    ████████████████████████████████████████████████████

6    ██████████████████████████

7    429.  ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████

10   ██████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ███████████████

15   430.  As a result, unlike franchises possessing numerous sequels like Call of Duty or

16   Diablo to progress a story, Minecraft does not release "sequels" and new versions

17   of Minecraft tend to be more akin to updates to the existing game. ███████████

18   █████████████████████████████████████████████████

19   █████████████████████████████████████████████████

20   ██████████████████████████████████████████████

21   █████████████████████████████████████████████████

22   █████████████████████████████████████████████████

23   ███████████████████████████████████████████████

24   ███████████████████████████████████████████████

25   ██████████████████████████████████████████████████

26   ██████████████████████████

27   431.  While Call of Duty is unique in that its franchise comprises three separate

28   storylines, ████████████████████, each annually released game in the series

1    is far more than an "update" to an existing game.  Each is a true standalone game to

2    preceding titles in the franchise.  

3

4

5    432.    Minecraft's unique and differentiated approach to gaming has led it to develop a

6    gamer audience distinct from typical Xbox and PlayStation gamers.

7

8

9

10

11

12

13

14    433.

15

16

17

18

19

20

21

22    434.

23

24

25

26

27

28



**5. Current First Party Games**

439. Almost all of Microsoft's first-party games are exclusive. ████████████████████

████████████████

440. Microsoft's past and current first-party console franchises with significant online multi-player functionality including *Halo* and *Gears of War* are exclusive on Xbox consoles or PC only. ████████████████████████████████████ ████████ If there are significant benefits to supporting multiple platforms for multiplayer franchises like *Call of Duty*, Microsoft would be expected to treat its new franchise similarly to its existing first-party multi-player franchises.

**D. The Proposed Acquisition is Likely to Harm Competition**

**1. The Proposed Acquisition is Likely to Result in Competitive Harm in the Market for High-Performance Consoles and Video Game Consoles.**

441. Activision would likely continue to release console titles on multiple high-performance consoles, absent the Proposed Transaction. ████████████████████

442. All non-Call of Duty Activision console games released since 2020 are available on Xbox and PlayStation consoles. ████████████████████████ ████

443. ████████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████

444. All Call of Duty titles released since the introduction of Microsoft and Sony's Generation 8 consoles in 2013 have been available on both Xbox and PlayStation consoles. ████ ████████████████████

445. ███████████████████████████████████████████
███████████████████████████████████████
████████ ).

446. Foreclosure of Activision content from Sony PlayStation consoles would lead to lower-quality products and reduced consumer choice in the High-Performance Video Game Consoles market relative to the but-for world described above. ████████████
█████

447. Withholding or degrading Activision content would lead to a less attractive game catalog on PlayStation consoles and eliminate options for devices that consumers could use to play the foreclosed games. ███████████████

448. Any foreclosed PlayStation consumer who does not already own an Xbox would need to incur the cost of purchasing an Xbox console to continue playing Activision content on a high-performance video game console. PX5000-230 (Lee Report).

449. ███████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████

450. ███████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

451. Microsoft choosing to foreclose its rivals in the Console Markets by withholding or degrading Activision content would also effectively "punish" gamers on other consoles and tend to harm competition in these markets. PX5000-230 (Lee Report).

452. Microsoft's actions following the ZeniMax acquisition inform the likelihood of harm arising from the Proposed Transaction. As noted above, prior to the ZeniMax acquisition, *Starfield* and *Redfall* were expected to be on Sony PlayStation. ████████

1  ████████████████████████████████████████████ By deciding to take certain

2  ZeniMax titles, including *Starfield* and *Redfall*, exclusive following the acquisition,

3  Microsoft has reduced the quality of the portfolio of games available to play on

4  PlayStation relative to the scenario where those titles were available on PlayStation.

5  ██████████████████████████████████████████████████████████████

6  █████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ██████████████████

9  453.  Microsoft's own distribution decisions with its past and current first-party console

10  franchises with significant online multi-player functionality, including *Halo* and *Gears of*

11  *War*, reveal its understanding of the value of keeping its titles exclusive on Xbox

12  consoles or PC only, and the likelihood of harm arising from the Proposed Transaction.

13  PX5000-195–96 (Lee Report); ███████████████████████████████

14  **2. The Proposed Acquisition is Likely to Result in Competitive Harm in**

15  **Content Subscription Services and Cloud Gaming Services**

16  454.  An independent Activision would likely be willing to support non-Microsoft subscription

17  services. ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  █████████████████████████████████████████████████████

20  ████████████████████████████████

21  455.  ███████████████████████████████████████████████████

22  ███████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ███████████████████████████████████████████████

26  ██████████████████████████

27  456.  █████████████████████████████████████████████████

28  ████████████████████████████████████████████████

457. Speaking directly about a potential cloud gaming services arrangement with Nvidia, ████████████████████████████████████████████████

458. ████████████████████████████████████████ For example, Activision titles were available on ████ ████████████████████████████████████████ ██ . ████████████████ ████████████████

459. ████████████████████████████████████████████████ ████████████████████████████████████ ██████ ████████████████████████████

460. Activision and Microsoft have identified large financial benefits from bringing Activision content to Game Pass. ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████

461. Activision also recognized significant financial benefits from putting its content onto cloud gaming services. ████████████████████████ ████████████████████████████████████████████ ████████████████████

462. Microsoft analyses reinforce that there were substantial benefits to the merged firm from adding Activision content to Game Pass. ████████████████████ ████████████████████████████████████████

463. In fact, Activision had not ruled out offering its titles on content or cloud subscription services, including those offered by Microsoft, Sony, Nintendo, and Nvidia, and █

464. Activision nearly added its content to Game Pass █

465. Several of the other major AAA publishers have added their content to Game Pass, including Ubisoft, Take-Two, and Electronic Arts. █

466. The foreclosure of Activision content from Microsoft's rivals would likely increase those rivals' costs of acquiring content for their cloud and content subscription services.

467. The result of foreclosure is to make it more difficult for rival content subscription services and cloud gaming services providers to expand the content available on their products. ████████████████████████████

████████████████████████████████████

████████████████████████████

468. Cloud gaming services require substantial infrastructure and investment. ████████

████████████████████████████████ ██████████

████████████████████████████████████████████

████████████████████████ ██████████████████████

███

469. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

470. Fewer entrants and competitors with adequate scale protects Microsoft's position as the leading provider of content subscription services and cloud gaming services. The dominance of Microsoft's Game Pass and Xbox Cloud Gaming services would likely result in a softening of competition, reducing the incentive for Microsoft's rivals to invest and innovate in their products and force gamers to play games on Microsoft's services even where they prefer alternatives. ████████████████████████; ████████

███████████████████.

471. Microsoft would be more likely to increase the prices of its content subscription and cloud gaming services, understanding that gamers could not play Activision content elsewhere. ██████████████████████████████

### 3. The Proposed Acquisition is Likely to Harm Innovation

472. The competition between Microsoft's Xbox and Sony's PlayStation has resulted in significant advances in hardware innovation of their respective consoles. ████████████

████████████████████

473. To provide a better gaming experience, ███████████████ ██████████ . For example, ████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████. ██████████████████ █

474. ████████████████████████████████ ████████████████████████ It doubled the computing power of the previous generation Xbox console—the Xbox One X—and added a solid state drive to the Xbox Series X. ████████████ ██ ████████████████████████████████ ████████████████████

475. ████████████████████████████████ ████████████████████████████████ ████████ ██████████████████

476. Microsoft and Sony ████████████████████████ ████████████████████. ████████████████ ████████████████████████████████ ████████████████████. ██████████████ ██████████

477. ████████████████████████████████ ████████████████████████████████ ████████████████████. ██████████████ ████████

478. ████████████████████████████████ ████████████████████████████████ ████████████████████████████████

1 ████████████████████████████████████████████████████

2 ██████ ███████████████████████

3 479. ███████████████████████████████████████████████

4 ███████████████████████████████████████████

5 ██████ ███████████████████████

6 480. The loss of Activision content may also dampen innovation in the multi-game content

7 subscription gaming market. Microsoft's dominant position in multi-game content

8 subscription services is likely to be further strengthened by the exclusivity of Activision's

9 content. ███████████████████████████████ PX5000 at 141.

10 481. Sony's CEO, Jim Ryan, ███████████████████████████

11 ████████████████████████████████████████████

12 █████████████████████████████████████████████

13 ███████████████████████████████████████████████

14 █████████████████████████████████████████████

15 ██████████████████████ █████████████████████

16 482. The foreclosure of Activision content is also likely to impact the nascent market of cloud

17 gaming services. █████████████████████████████████

18 █████████████████████████████████████████

19 ████████████████████████

20 483. █████████████████████████████████████████

21 █████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ██████████ ██████████████████████

24 484. █████████████████████████████████████████

25 ██████████████████████████████████████ ██████████

26 █████████████████

27 485. ███████████████████████████████████████████████

28 █████████████████████████████████████████████████

[REDACTED]

[REDACTED]

**E.** **Respondents Cannot Rebut Complaint Counsel's Prima Facie Case Showing the Proposed Acquisition Would Result in Competitive Harm**

    **1.** **Respondents Cannot Demonstrate that Entry or Expansion would be Timely, Likely, or Sufficient to Prevent Harm from the Proposed Acquisition**

        **a)** **Entry into Consoles Markets is Unlikely to be Timely, Likely, or Sufficient to Reverse the Likely Harm of the Proposed Transaction.**

486. Meaningful entry into the Consoles Markets is uncommon. Prior to the Xbox console's launch, formerly prominent video game console manufacturers Atari and Sega exited the industry. PX9347 at 001; PX9346 at 008.

487. Microsoft represented that [REDACTED] [REDACTED] [REDACTED]

488. Recent entrants, such as the [REDACTED], have sold significantly fewer consoles than Microsoft, Sony, and Nintendo. PX5000 (Lee Report) at 093. In 2022, over [REDACTED] [REDACTED] were sold in the United States, with less than [REDACTED] in revenue. RX3113. [REDACTED] [REDACTED] [REDACTED]

489. Entry is expensive. [REDACTED] [REDACTED] [REDACTED] [REDACTED] [REDACTED] [REDACTED]

490. [REDACTED] [REDACTED] Due to porting and development costs,

1    publishers are more likely to support consoles with an established user base and larger
2    installed base. PX5000 (Lee Report) at 049, ¶ 89, Figure 5.
3  491.  It is unlikely that entrant console manufacturers will be able to replace Activision content
4        in their prospective video game catalogs if they are foreclosed. The "Big 4" publishers
5        have accounted for the majority of game sales on Xbox and PlayStation consoles in
6        almost every year since 2013. PX5000 (Lee Report) at 049, ¶ 89, Figure 5.
7  492.  Few publishers have the resources to consistently produce "AAA" titles. █████████
8        ████████ █████████████████████████████████████████
9  493.  ████████████████████████████████████████████████████████████████
10       ████████████████████████████████████████████████████████
11       ████████████████████████████" ██████████████████████████████
12  494.  In a 2020 internal email, ████████████████████████████████████████████████
13       ████████████████████████████████████████████████████████
14       █████████████████████████████████████████████████████████████
15       ████████████████████████████████████████████████████
16       █████████████████████████████████████████████████████████
17       ██████████████████████████████████████████████████████
18       ████████████████████████████████████████████████
19       ███████████████████████████████████████████████████████
20       ███████████████

21       **b)  Entry or Expansion into the Broader Content and Cloud Services**
22           **Market, and the Content Library Services Market and Cloud Gaming**
23           **Services Market—is Unlikely to be Timely, Likely, or Sufficient to**
24           **Reverse the Likely Harm of the Proposed Transaction**
25  495.  Entry and success in content library and cloud gaming services is challenging. Other
26       subscription services available today significantly lag the scale of Xbox Game Pass.
27       PX5000 (Lee Report) at 141. ███████████████████████████████████████
28       ████████████████████████████████████████████████████████



; PX3206 at 001 (███).

496. Cloud gaming services, in particular, require substantial infrastructure. ███

497. ███

498. Nvidia's Vice President and General Manager of GeForce Now, Phil Eisler, testified that ███

499. There are significant economies of scale in subscription services. ███

500. Subscriber scale is also an important determinant of the cost and profitability of investing in new content in that it allows the service to spread investments in content over a larger subscriber base. ███

501. Indeed, Microsoft finds ███

502. ███

503. As noted above for the Consoles Markets, it is unlikely that entrants into the subscription services market will be able to replace Activision content in their prospective video game catalogs if they are foreclosed.

### 2. Defendants Cannot Show Efficiencies or Procompetitive Benefits that Negate Competitive Harm

504. █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████ None of these claimed pro-competitive benefits constitutes a verifiable, merger-specific efficiency.

505. Microsoft's claim that it ████████████████████████████████████

████████████████████████████████ is not a merger-specific efficiency. ███████

███████████████████████

506. ███████████████████████████████████████████████████████████

████████████████████████████ Despite these limitations, ████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

███████ ████████████████████████████ Absent the Proposed Transaction,

Activision could ██████████████████████████████████████████████

████████████████████████████. ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

507. Similarly, Microsoft's claim that it █████████████████████████████████

██████████████████████████████████████ is neither verifiable nor merger-

specific. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

508.  Even assuming that Microsoft does put Activision titles into Game Pass, the claimed pro-
competitive benefit is not merger-specific because Microsoft and Activision could
achieve the same result through contract. Although Microsoft ████████████████

████████████████████████████████████████████████

█████████████████████████████████ the evidence shows that an independent
Activision would likely agree to make its content available on subscription services,
including as day-and-date releases, if it received adequate commercial terms.

509.  Activision's CEO Bobby Kotick testified that ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

510.  Indeed, Activision executive Chris Schnakenberg testified that ████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

511.  Activision's actions are consistent with predicted economic incentives for independent
third-party publishers, who generally stand to realize greater rewards from supporting
multiple content library and cloud gaming services than do console manufacturers
offering their own subscription services. PX5000 at 163–65.

512. For the same reason, the agreements that Microsoft reached during the pendency of regulatory review of the Proposed Transaction to bring Activision content to cloud gaming services, discussed further *infra* in § IV.F, are not merger-specific efficiencies.

513. Finally, Microsoft's highly speculative plan to expand into mobile gaming is not a verifiable efficiency. ████████████████████████████
████████████████████████████████
████████████████████████████████
██████████████

514. Microsoft has not provided details by which to verify claimed efficiencies in mobile gaming. ████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

**F.     Microsoft's Recently Executed or Proposed Agreements Fail to Replace the Competitive Intensity Likely to Be Lost from the Proposed Acquisition**

**Agreement with Nintendo**

515. On December 7, 2022, the day before the Commission voted to challenge the Proposed Transaction in this Court, Microsoft signed a letter of intent purporting to bring certain to-be-developed *Call of Duty* games to Nintendo. PX4578; RX1212.

516. ████████████████████████████████
████████████████████████████████████
██████████████████████ ████████████
████

517. ████████████████████████████
████████████████████████████████████
██████████████████████████

518. Nintendo's agreement required a joint public statement and allowed disclosure to the U.S. Federal Trade Commission, the European Commission, and the UK Competition and Markets Authority (and other antitrust regulators as part of the regulatory approval process). PX4578 at 005 (Nintendo Side Letter); RX1212 at 005.

519. ███████ ██████████████████████████████████████████████████
████████████████████████████████████████████ █████████████
███████████████████████████

520. In the letter agreement between Microsoft and Nintendo, ██████████████████
████████████████████████████████████████████████████████████
███████████████████████

521. ████████████████████████████████████████████████████████████
████████████████████████████████████████ █████████████
██████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

522. Nintendo ████████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████ ███████████████████████
████████████████████████

523. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████

524. ████████████████████████████████████████████████████████
████████████████████████████████████

525. ████████████████████████████████████████████
████████████████████████████████████████
█████████████

526. Tim Stuart, the CFO of Xbox, claimed privilege ███████████████
████████████████████████████████████████████
██████████████████████████████████████████████
███████████████

527. Microsoft claimed privilege ███████████████████████████
████████████████████████████████████████████
███████████████

**Agreement with Nvidia and Foreign Cloud Gaming Companies**

528. On February 20, 2023, the day before Microsoft appeared before the European Commission at a hearing on the Proposed Transaction, Microsoft signed an agreement purporting to bring Activision games to Nvidia. RX1211; PX1784 (Windows Addendum Nvidia Agreement).

529. ███████████████████ ██████████████████████
████████████████████████████████████ ████████
█████████████████

530. ████████████████████████████████████████████
████████████████████████████████████████
████████

531. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████

532. Lori Wright claimed privilege ██████████████████████████
████████████████████████████████████████████
██████████████████████████

533. Matt Booty claimed privilege ███████████████████████████
████████████████████████████████
███████████████████

534. Microsoft claimed privilege ██████████████████████
████████████████████████████████████
█████████

535. In order for Nvidia to be able to allow access to Game Pass on GeForce Now under their

agreement with Microsoft, ████████████████████████
███████████████████████████████████
████████████████

536. Under the agreement with Microsoft, ████████████████
████████████████████████████████
████████████████████████████

537. ██████████████████████████████████
████████████████████████████████████
██████████

538. ███████████████████████████████████
████████████████████████████████████
███████████████

539. ████████████████████████████████████
███████████████████████████████████
███████████████████████

540. Microsoft claimed privilege ██████████████████████████
██████████████████████████████████████
██████████████████████████████████████
█████████████████



541. Microsoft claimed privilege ████████████████████████████
██████████████████████████████████
████████████

542. Lori Wright claimed privilege ██████████████████████████
████████████████████████████████████
██████████████████████████████████████
████████████████

**Discussions with Sony**

543. No agreement has been reached with Sony. ██████████ In their Opposition Memorandum, Defendants referenced an email SIE CEO Jim Ryan sent on the day the deal was announced, in an attempt to cast doubt over Mr. Ryan's assessment of the competitive impact of the proposed transaction. Opp'n Memo, at 3. However, ████████
████████████████████████████████████
████████████████████. ████████████████
████████████

544. ████████████████████████████████
████████████████████████████████████
██████████████████████████████
██. ████████████████████

545. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████
████████████████



546.

547.

548.

549.

## V.   PROPOSED CONCLUSIONS OF LAW

1. Section 7 of the Clayton Act prohibits mergers when "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

2. Section 5 of the FTC Act proscribes "[u]nfair methods of competition in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a)(1).

3. An acquisition that violates Section 7 of the Clayton Act, by definition, is a violation of Section 5 of the FTC Act. *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986).

4. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Federal Trade Commission, whenever it has reason to believe that a proposed merger is unlawful, to seek preliminary injunctive relief to prevent consummation of a merger until the Commission has the opportunity to adjudicate the merger's legality in an administrative proceeding.

5. Specifically, Section 13(b) "allows a district court to grant the Commission a preliminary injunction '[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest.'" *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999) (quoting 15 U.S.C. § 53(b)).

6. The purpose of a § 13(b) proceeding "is not 'to determine whether the antitrust laws have been or are about to be violated. That adjudicatory function is vested in the FTC in the first instance.'" *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 67 (D.D.C. 2009) (quoting *FTC v. Whole Foods Mkt. Inc.*, 548 F.3d 1028, 1042 (D.C. Cir. 2008) (Tatel, J., concurring); *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984) ("Our present task is not to make a final determination on whether the proposed merger violates Section 7, but rather to make only a preliminary assessment of the merger's impact on competition.").

7. Preliminary injunctions under § 13(b) "are meant to be readily available to preserve the status quo while the FTC develops its ultimate case." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327,

352 (3d Cir. 2016) ("The purpose of Section 13(b) is to preserve the status quo and allow the FTC to adjudicate the anticompetitive effects of the proposed merger in the first instance."); *FTC. v. Food Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976) ("The only purpose of a proceeding under § 13 is to preserve the status quo until FTC can perform its function.").

8.   "[A]t this preliminary phase [the FTC] just has to raise substantial doubts about a transaction." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008); *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984) ("'serious, substantial, difficult' questions"). As to market definition, for example, the FTC's burden is simply to "rais[e] some question of whether [a market] is [] well-defined." *FTC v. Whole Foods Mkt. Inc.*, 548 F.3d 1028,1037 (D.C. Cir. 2008). The FTC's burden is met by a "tenable showing," even if there is also "conflicting evidence on the relevant product market" or "market shares." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984).

9.   Likelihood of ultimate success is not determined by a "statistical calculation of the parties' odds" of winning on the merits. *Fed. Trade Comm'n v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2022 WL 16637996, at *5 (N.D. Cal. Nov. 2, 2022). Although the district court in *Meta Platforms* explained that a court is "charged with exercising their 'independent judgment' and evaluating the FTC's case and evidence on the merits," the court clarified with, "[i]n summary, the Court considers Section 13(b)'s 'likelihood of ultimate success' inquiry … mean[s] the likelihood of the FTC's success on the merits in the underlying administrative proceedings, as opposed to success following a Commission hearing, the development of an administrative record, and appeal before an unspecified Court of Appeals." *F.T.C. v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2022 WL 16637996, at *5–6 (N.D. Cal. Nov. 2, 2022) (citing *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1090–91 (S.D.N.Y. 1977) ("[W]hile the statute requires us to consider the FTC's likelihood of ultimate success and to exercise our independent judgment in that regard, it appears that it does not require the FTC to prove, or us to find, probable success on the merits but something less.").

10. To carry their responsive burden on likelihood of success, Defendants must dispel any and all doubts about the legality of their transaction, such that the court would be "certain[]" and have "no doubt that [the] merger would not substantially lessen competition." *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008).

11. Even as to the ultimate merits, and all the more so at the preliminary injunction stage under Section 13(b), "any 'doubts are to be resolved against the transaction.'" *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3rd Cir. 2016) (quoting *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) (Posner, J.)).

12. If there are adequate questions or doubts about the transaction's legality, § 13(b) temporary relief is warranted—even if ultimately "post-hearing, the FTC may accept the rebuttal arguments proffered by the [defendants]." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 725 (D.D.C. 2001).

13. The statute "places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984); *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1096 (S.D.N.Y. 1977) ("The equities to be weighed here are not the usual equities of private litigation but public equities.").

14. "Under this more lenient standard, 'a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities.'" *FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999) (quoting *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984)).

15. And "[w]hen the [FTC] demonstrates a likelihood of ultimate success, a counter showing of private equities alone would not suffice to justify denial of a preliminary injunction barring the merger." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984) (citing *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981)).

16. In weighing the equities under § 13(b), "public equities receive far greater weight." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984). Public equities include "effective enforcement of the antitrust laws" and ensuring the Commission's ability to

obtain adequate relief if it ultimately prevails on the merits. *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991). "[T]he preservation of competition is always in the public interest." *United States v. Tribune Publ'g Co.*, No. CV 16-01822-AB, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016).

17. Defendants often complain about the "cost that delaying [their proposed] transaction would exact" on them, but courts "must afford such concerns little weight" to avoid undermining "section 13(b)'s purpose of protecting the 'public-at-large, rather than individual private competitors.'" *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991) (quoting *FTC v. Nat'l Tea Co.*, 603 F.2d 694, 697 n.4 (8th Cir. 1979)).

18. Defendants' assertion "that a preliminary injunction would force them to abandon" their proposed transaction is a private equity at best, and "private equities alone do not outweigh the Commission's showing of likelihood of success." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984). "[A]lthough the court recognizes the time, resources, and effort that Defendants have put into planning this transaction, the Defendants' stated intention to abandon the transaction prior to the merits proceeding is a private equity and cannot on its own overcome the public equities that favor the FTC." *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 74 (D.D.C. 2018); *see also FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 882 n.8 (E.D. Mo. 2020).

19. "[A] 'risk that the transaction will not occur at all,' by itself, is a private consideration that cannot alone defeat the preliminary injunction." *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1041 (D.C. Cir. 2008); *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1346 (4th Cir. 1976) (holding that such arguments are irrelevant to § 13(b) proceedings); *FTC v. Rhinechem Corp.*, 459 F. Supp. 785, 791 (N.D. Ill. 1978) ("That leaves the claimed injury [from the target's] announced intention of walking away from the acquisition. [But] the equities, and consequently the injuries, to be reckoned in section 13(b) cases are not private ones, but public ones."); *FTC v. Rhinechem Corp.*, 459 F. Supp. 785, 791 (N.D. Ill. 1978) ("[T]his conclusion is particularly appropriate where . . . the alleged private

injury is caused by the parties' own decision to, in effect, cancel the deal in the event that an injunction be issued.").

20. Plaintiff FTC has shown that it is likely to succeed on the merits of its Section 7 challenge in the agency's administrative court, and the equities favor issuing a preliminary injunction.

## A. The FTC Is Likely to Succeed on the Merits of Its Section 7 Challenge

21. In the administrative merits proceeding, the FTC's burden will be to prove that the effect of the Acquisition "*may be* substantially to lessen competition, or to tend to create a monopoly" in violation of Section 7 of the Clayton Act. *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984) (emphasis in original) ("It is well established that a section 7 violation is proven upon a showing of reasonable probability of anticompetitive effect").

22. At this preliminary stage, the Ninth Circuit has explained that the government can meet "its burden of demonstrating a likelihood of success by presenting evidence sufficient to raise serious, substantial, difficult questions regarding the anticompetitive effects of the proposed [transaction]." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984) (cleaned up); *see also FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008) ("[A]t this preliminary phase [the FTC] just has to raise substantial doubts about a transaction. One may have such doubts without knowing exactly what arguments will eventually prevail.").

23. "Because the issue in this action for preliminary relief is a narrow one, [courts] do not resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984); *see also California v. Am. Stores Co.*, 872 F.2d 837, 841 (9th Cir. 1989) ("At this stage, we do not resolve conflicts in the evidence."), *rev'd on other grounds*, *California v. Am. Stores Co.*, 495 U.S. 271 (1990); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001) (the FTC "is not

required to *establish* that the proposed merger would in fact violate Section 7" (emphasis in original)); *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 67 (D.D.C. 2009) ("the district court's task is not to determine whether the antitrust laws have been or are about to be violated. That adjudicatory function is vested in the FTC in the first instance." (quoting *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1042 (D.C. Cir. 2008) (Tatel, J., concurring))); *see also FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1048 (D.C. Cir. 2008) (Tatel, J., concurring) ("Although courts certainly must evaluate the evidence in section 13(b) proceedings and may safely reject expert testimony they find unsupported, they trench on the FTC's role when they choose between plausible, well-supported expert studies.").

24. Rather, this Court's task is only to "measure the probability that, after an administrative hearing . . . the Commission will succeed in proving that the effect of the [proposed] merger 'may be substantially to lessen competition, or to tend to create a monopoly' in violation of section 7." *FTC v. H.J. Heinz,* 246 F.3d 708, 714 (D.C. Cir. 2001) (quoting 15 U.S.C. § 18).

25. Section 7 analysis "necessarily focuses on 'probabilities, not certainties.'" *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys. Ltd*, 778 F.3d 775, 783 (9th Cir. 2015) (quoting *Brown Shoe v. United States*, 370 U.S. 294, 323 (1962)).

26. This entails "'a prediction of [the merger's] impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their incipiency.'" *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys. Ltd*, 778 F.3d 775, 783 (9th Cir. 2015) (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963)).

27. At the merits phase, which in this case is the administrative proceeding that begins on August 2, Courts and the Commission have traditionally analyzed Section 7 claims under a burden-shifting framework. *See St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015); *Otto Bock HealthCare N. Am., Inc.*, No.

9378, 2019 WL 5957363, at *11 (F.T.C. Nov. 1, 2019); *Polypore Int'l, Inc.*, No. D-9327, 2010 WL 9549988, at *9 (F.T.C. Nov. 5, 2010).

28. The same burden-shifting framework applies to both horizontal and vertical mergers. *See Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *19 (F.T.C. Mar. 31, 2023) (applying the burden-shifting framework to a vertical merger); *see United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019). Section 7 of the Clayton Act applies to all mergers, which "must be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate, or other." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967).

29. Here, the Proposed Acquisition is a vertical transaction. "Economic arrangements between companies standing in a supplier-customer relationship are characterized as 'vertical.'" *Brown Shoe v. United States*, 370 U.S 294, 323 (1962).

30. At the merits phase, "[f]irst, the government must establish its *prima facie* case by making a 'fact-specific' showing that a merger is 'likely to be anticompetitive.'" *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *19 (F.T.C. Mar. 31, 2023) (quoting *United States v. AT&T*, 916 F.3d 1029, 1032 (D.C. Cir. 2019); *Polypore Int'l*, 2010 WL 9549988, at *9; *see also St. Alphonsus Med. Ctr.-Nampa Inc.*, 778 F.3d at 783; *United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966, at *64 (N.D. Cal. Jan. 8, 2014).

31. To establish a prima facie case at the merits trial, the government's burden will be to show a "reasonable probability" that the Proposed Acquisition would substantially lessen competition. *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962); *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *19 (F.T.C. Mar. 31, 2023); ("'reasonable likelihood' of a substantial lessening of competition" (quoting *Brown Shoe*, 370 U.S. 294, 362 (1962))). In general, "[a] reasonable probability is, of course, less than a certainty, or even a likelihood." *United States v. Koziol*, 993 F.3d 1160, 1186 (9th Cir. 2021) (quoting *United States v. Joseph*, 716 F.3d 1273, 1280 (9th Cir. 2013) (internal quotation marks omitted)), *cert. denied*, 142 S. Ct. 1372 (2022).

32. The Government's burden of production at this step will be low. Even at the ultimate merits—and all the more so at the preliminary injunction stage under Section 13(b)—any "doubts are to be resolved against the transaction." *Otto Bock HealthCare N. Am., Inc.*, 2019 WL 2118886, at *2 (F.T.C. May 6, 2019) (Chappell, A.L.J.) (quoting *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989)).

33. If the Government is able to carry its initial burden, "[t]he burden [will] then shift[]to the defendant to rebut the prima facie case." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015).

34. "[I]f the [defendant] successfully rebuts the *prima facie* case, the burden of production [will] shift[] back to the Government and merge[] with the ultimate burden of persuasion, which is incumbent with the Government at all times." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (quoting *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008)).

35. Here, Plaintiff has more than met its burden of establishing a likelihood of success on the merits under both the *Brown Shoe* and ability and incentive frameworks. *See of Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *33 (F.T.C. Mar. 31, 2023); *infra* Conclusions of Law § V.E.

36. The Government has raised sufficiently serious, substantial, difficult questions to warrant temporary relief under § 13(b). *Infra* Conclusions of Law at § V.E. In fact, the evidence shows that even the eventual merits standard is met: the Proposed Acquisition has a reasonable probability of substantially lessening competition through foreclosure in the markets for High-Performance Consoles, Multi-Game Content Library Subscription Services, and Cloud Gaming Subscription Services (the "Relevant Markets"). *Infra* Conclusions of Law at § V.E.1.

37. The Proposed Acquisition also has a reasonable probability of harming innovation in the Relevant Markets. *Infra* Conclusions of Law § V.E.2. An emerging market like Cloud Gaming Subscription services is particularly susceptible to innovation harm. *Infra* Conclusions of Law § V.E.2.

38. New entry or expansion is unlikely to be sufficient to offset the competitive harm of the Proposed Acquisition. *Infra* Conclusions of Law § V.F.

39. Any proposed efficiencies or alleged procompetitive benefits are unlikely to offset the competitive harm in the Relevant Markets. *Infra* Conclusions of Law § V.G.

40. Indeed, proposed remedies, such as the agreements with third parties offered by Microsoft, are irrelevant to a § 13(b) proceeding. *See FTC v. Food Town Stores, Inc*., 539 F.2d 1339, 1345 (4th Cir. 1976) (holding FTC was "entitled to preserve the status quo pending adjudication" regardless of what "ultimate remedy" might eventually be deemed appropriate); *Infra* Conclusions of Law § V.H.

41. Again, "at this preliminary phase [the FTC] just has to raise substantial doubts" about whether a transaction poses a reasonable probability of lessening competition. *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008).

## B. High-Performance Consoles, Multi-Game Content Library Subscription Services, and Cloud Gaming Subscription Services Are Relevant Markets

42. The Supreme Court has recognized that Section 7 prohibits acquisitions that may "substantially lessen competition within the area of effective competition." *Brown Shoe v. United States*, 370 U.S. 195, 324 (1962) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957) (internal quotations omitted).

43. To determine the "area of effective competition," courts "reference . . . a product market (the 'line of commerce') and a geographic market (the 'section of the country')." *Brown Shoe v. United States*, 370 U.S. 194, 324 (1962). "Often, the first steps in analyzing a merger's competitive effects are to define the geographic and product markets affected by it." *ProMedica Health Sys., Inc. v. F.T.C.*, 749 F.3d 559, 565 (6th Cir. 2014). Whether the transaction at issue is horizontal or vertical, courts use the same set of analytic tools to define the affected market. *See Brown Shoe v. United States*, 370 U.S. 194, 324–28 (1962).

44. It is well-settled that "the boundaries of the relevant market must be drawn with sufficient breadth to . . . recognize competition where, in fact, competition exists." *Brown Shoe v.*

*United States*, 370 U.S. 294, 326 (1962); *see also United States v. Kimberly-Clark Corp.*, 264 F. Supp. 439, 452–53 (N.D. Cal. 1967) (citing *Brown Shoe Co.*, 370 U.S. 294, 325) ("[W]ithin a market, 'well-defined submarkets may exist, which, in themselves, constitute product markets for antitrust purposes.'").

45. A product market's "outer boundaries" are determined by the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 198 (D.D.C. 2018) (quoting *Brown Shoe v. United States*, 370 U.S. 194, 325 (1962)).

46. Even at the merits stage, "[r]elevant markets need not have precise metes and bounds." *Pac. Steel Grp. v. Comm. Metals Co.*, No. 20-CV-07683, 600 F. Supp. 3d 1056, 1070 (N.D. Cal. 2022). "[E]ven if alternative submarkets exist . . . or if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by the government unusable." *United States v. Bertelsmann SE & Co.*, No. 21-2886-FYP, 2022 WL 16949715, at *14 (D.D.C. 2022); *see also Newcal Indus., Inc. v. Ikon Office Sol'n*, 513 F.3d 1038, 1045 (9th Cir. 2008).

47. Whether a market can be characterized as "nascent" or "emerging" bears "limited weight" on whether it constitutes a relevant market. *See Fed. Trade Comm'n v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2023 WL 2346238, at *19 (N.D. Cal. Feb. 3, 2023).

48. To determine the validity of a relevant antitrust market definition, courts generally look to two types of evidence: "the 'practical indicia' set forth by the Supreme Court in *Brown Shoe* and testimony from experts in the field of economics" regarding the Hypothetical Monopolist Test ("HMT"). *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 27 (D.D.C. 2015).

49. There is "no requirement to use any specific methodology in defining the relevant market." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 482 (9th Cir. 2021). As such, courts have determined relevant antitrust markets using, for example, only the *Brown Shoe* factors, or a combination of the *Brown Shoe* factors and the HMT. *See, e.g.*, *Lucas Auto. Eng., Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 766–68 (9th Cir. 2001) (relying on *Brown Shoe* factors alone in review of district court's determination

of relevant market); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 20–21 (D.D.C. 2017) (using HMT and *Brown Shoe* factors to analyze relevant market).

50.  In a § 13(b) proceeding, the Government's burden is only to "rais[e] some question of whether" a market is "well-defined." *Whole Foods Mkt., Inc.*, 548 F.3d at 1037. Here, under both the *Brown Shoe* practical indicia, infra Conclusions of Law § V.B.1, and the HMT, *infra* Conclusions of Law § V.B.2, the relevant markets are High-Performance Consoles, Multi-game Content Library Subscription Services, and Cloud Gaming Subscription Services. Harm is also likely to occur in broader relevant product markets. *infra* Conclusions of Law § V.B.3.

## 1. The Relevant Markets Satisfy the *Brown Shoe* Practical Indicia

51.  In *Brown Shoe,* the Supreme Court identified a series of "practical indicia" courts may consider in determining the relevant product market. The indicia include "industry or public recognition of the [market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962); *see also Otto Bock*, 2019 WL 2118886, at *5 (Chappell, A.L.J.); *Sysco* 113 F. Supp. 3d at 27; *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 21 (D.D.C. 2017); *United States v. H&R Block*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011).

52.  Relevant markets "can exist even if only some of these [*Brown Shoe*] factors are present." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997); *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *33 (F.T.C. Mar. 31, 2023); *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 308-309 (7th Cir. 1976); *see Int'l T. & T. Corp. v. General T. & E. Corp.*, 518 F.2d 913, 932–33 (9th Cir. 1975) ("These indicia were listed with the intention of furnishing practical aids in identifying zones of actual or potential competition rather than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue.")

53.    The market for High Performance Consoles satisfies the *Brown Shoe* indicia factors, including industry and public recognition; characteristics and uses; sensitivity to price changes; distinct prices; and distinct customers. *See* Plaintiff's Pre-trial Findings of Fact (*"PPFF"*) § II.A.

54.    The market for Multi-Game Content Library Subscription Services satisfies the *Brown Shoe* indicia factors, including industry and public recognition; benefits, characteristics and uses; sensitivity to price changes; distinct pricing and marketing; and distinct customers. *See* PPFF § II.C.

55.    The market for Cloud Gaming Subscription Services satisfies the *Brown Shoe* indicia factors, including industry and public recognition, characteristics and uses, unique production facilities, distinct pricing and marketing, and distinct customers. *See* PPFF § II.D.

### 2. The Relevant Markets Satisfy the HMT

56.    Courts and the Commission may, alternatively or in addition, use the Hypothetical Monopolist Test to assess the relevant product market. *See FTC v. Advocate Health Care Network*, 841 F.3d 460, 468–69 (7th Cir. 2016) (applying the hypothetical monopolist test to define a relevant geographic market); *see also FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016); *ProMedica Health Sys., Inc.*, 2012 WL 1155392, at *14 (F.T.C. Mar. 28, 2012); *Sysco*, 113 F. Supp. 3d at 33; *H&R Block,* 833 F. Supp. 3d at 51–52; *Horizontal Merger Guidelines* § 4.1.1.

57.    Under the HMT, a candidate market constitutes a relevant antitrust market if a hypothetical monopolist could profitably impose a "small but significant and non-transitory increase in price" ("SSNIP"), or a reduction in product quality or service, on at least one product of the merging parties in the candidate market. The candidate market does not satisfy the HMT if customers switching to alternative products would make such a price increase unprofitable. *See Horizontal Merger Guidelines* §§ 4, 4.1.1; *see also Sidibe v. Sutter Health*, No. 12-CV-04854-LB, 2019 WL 2078788, at *4 (N.D. Cal. May

9, 2019); *United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966, at *28 (N.D. Cal. Jan. 8 2014).

58.   The market for High Performance Consoles satisfies the HMT. *See* PPFF § II.A.

59.   The market for Multi-Game Content Library Subscription Services satisfies the HMT. *See* PPFF § II.C.

60.   The market for Cloud Gaming Subscription Services satisfies the HMT. *See* PPFF § II.D.

### 3.   Harm is Also Likely to Occur in Broader Relevant Product Markets

61.   "[E]ven if alternative submarkets exist . . . or if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by the government unusable." *United States v. Bertelsmann SE & Co.*, No. 21-2886-FYP, 2022 WL 16949715, at *14 (Nov. 15, 2022 D.D.C. 2022).

62.   High-Performance Consoles are a relevant product market for evaluating the likely competitive effects of the Proposed Acquisition. *Supra* Conclusions of Law § V.B.1 & § V.B.2.; *see* PPFF § II.A.

63.   The anticompetitive effects of the Proposed Acquisition are also reasonably likely to occur in a broader market for gaming consoles that includes High-Performance Consoles and the highly differentiated Nintendo Switch. *See* PPFF § II.B.

64.   Multi-Game Content Library Subscription Services are a relevant product market for evaluating the likely competitive effects of the Proposed Acquisition. *Supra* Conclusions of Law § V.B.1. & <u>§ V.B.2</u>; *see* PPFF § II.C.

65.   Cloud Gaming Subscription Services are a relevant product market for evaluating the likely competitive effects of the Proposed Acquisition. *Supra* Conclusions of Law § V.B.1. & § V.B.2.; *see* PPFF § II.D.

66.   The anticompetitive effects of the Proposed Acquisition are also likely to occur in any relevant antitrust market that contains Cloud Gaming Subscription Services, including a combined Multi-Game Content Library and Cloud Gaming Subscription Services market. *See* PPFF § II.E.

## C.  The United States is the Relevant Geographic Market

67.  The relevant market in which to assess the anticompetitive harms of the Acquisition necessarily includes the relevant geographic market, or the area of competition affected by the merger. *See Sysco*, 113 F. Supp. 3d at 48 ("[T]he proper question to be asked . . . [is] where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate.'" (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 357 (1963)); *see also Advocate Health Care Network*, 841 F.3d at 476 (citing *Phila. Nat'l Bank*, 374 U.S. at 357) (relevant geographic market is "the place where the 'effect of the merger on competition will be direct and immediate'"); *see also Horizontal Merger Guidelines* § 4.2.

68.  The relevant geographic market is the region in "which consumers can practically turn for alternative sources of the product and in which the antitrust defendant faces competition." *FTC v. Staples Inc.*, 970 F. Supp. 1066, 1073 (D.D.C. 1997).

69.  As the Supreme Court has explained, the relevant geographic market must "correspond to the commercial realities of the industry" as determined by a "pragmatic, factual, approach." *Brown Shoe v. United States*, 370 U.S. 294, 336 (1962).

70.  Here, the United States is the relevant geographic market in which to analyze the effects of the Proposed Acquisition. *See* PPFF § II.F.

71.  Under Section 7 of the Clayton Act, 15 U.S.C. § 18, the government need only show a substantial lessening of competition in "any section of the country." Sales into the United States is a "section of the country." *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 620–21 & n.20 (1974) (finding "section of the country" to be synonymous with "relevant geographical market," which can be the United States as a whole.)

72.  The Clayton Act does not require the government to analyze whether a transaction results in anticompetitive effects in products sold outside the United States. 15 U.S.C. § 18.

**D. Activision's Gaming Content Is a Related Product to the Relevant Markets**

73. In vertical transactions, upstream inputs to downstream products in a relevant product market are referred to as "related products." *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *28 (F.T.C. Mar. 31, 2023).

74. The Government need not prove that the related product constitutes a relevant antitrust market. *See Brown Shoe v. United States*, 370 U.S. 294, 325–26, 344 (1962) (finding a Section 7 violation when only a relevant product market was shown); *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593–97, 607 (1957) (same).

75. No court has held that the government must prove monopoly power in a related product market to prove that a merger violates the Clayton Act. Instead, the proper inquiry here is whether Activision supplies related products on which Microsoft's rivals rely. *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (accepting the district court's finding of a relevant antitrust product market for downstream multichannel video distribution in which alleged harm from transaction would occur, but not requiring definition of an antitrust product market around the related product of upstream programming).

76. Activision's gaming content is a related product to High-Performance Gaming Consoles, Multi-Game Content Subscription Services, Cloud Gaming Subscription services, and the broader markets discussed above, serving as a substantially important input for the Relevant Markets. *See* PPFF § III.

**E. The Proposed Acquisition Has a Reasonable Probability of Substantially Lessening Competition in the Relevant Markets**

**1. Foreclosure of Microsoft's Rivals in the Relevant Markets**

77. As the Supreme Court has explained, "[t]he primary vice of a vertical merger . . . is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a clog on competition, which deprives rivals of a fair opportunity to compete." *Brown Shoe v. United States*, 370 U.S. 294, 323–24 (1962) (cleaned up).

78. Foreclosure in the vertical merger context can mean either "foreclosing competitors of [one party] from access to a potential source of supply, or from access on competitive terms." *Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 673 (S.D.N.Y. 2002); *see also Sprint Nextel Corp. v. AT&T, Inc.*, 821 F. Supp. 2d 308, 330 (D.D.C. 2011) (explaining rivals "paying more to procure necessary inputs" is the type of injury "that the antitrust laws were designed to prevent").

79. Importantly, the Clayton Act does not require that there be complete foreclosure to run afoul of antitrust laws. *See Brown Shoe v. United States*, 370 U.S. 294, 323 n.39 (1962) (citing S. Rep. No. 81-1775, at 4298 (1950)) (explaining that the goal of Section 7 is "to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act."); *Brown Shoe v. United States*, 370 U.S. 294, 328–29 (1962) ("[T]he tests for measuring the legality of any particular economic arrangement under the Clayton Act are to be less stringent than those used in applying the Sherman Act.").

80. "Such foreclosure may be achieved by increasing prices, withholding or degrading access, reducing service or support, or otherwise increasing the costs or reducing the efficiency or efficacy" of rival products. *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *32 (F.T.C. Mar. 31, 2023); *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 605 (1957) (finding vertical foreclosure in violation of § 7 although competitors "did obtain higher percentages of the General Motors business in later years").

81. "Case law provides two different . . . standards for evaluating the likely effect of a vertical transaction." *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *32 (F.T.C. Mar. 31, 2023). These are referred to as the *Brown Shoe* multifactor analysis and the ability and incentive analysis. *Brown Shoe v. United States*, 370 U.S. 294, 328–29 (1962); *see United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (examining the district court's analysis under an ability and incentive framework).

82. The Supreme Court in *Brown Shoe* set forth a multifactor analysis for assessing liability in the context of vertical mergers. *Brown Shoe v. United States*, 370 U.S. 294, 328–34

(1962). These factors include: "the size of the share of the market foreclosed," "the very nature and purpose of the arrangement," "the trend toward concentration in the industry," and entry barriers, among others. *Brown Shoe v. United States*, 370 U.S. 294, 328–34 (1962); *Ford Motor Co. v. United States*, 405 U.S. 562, 566–70 (1972); *see also Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *33 (F.T.C. Mar. 31, 2023).

83. The multifactor analysis of *Brown Shoe* and progeny is not a "precise formula[]," and not every factor must be present or even considered to support a finding of liability. *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *32 (F.T.C. Mar. 31, 2023) (finding liability when four *Brown Shoe* liability factors were met). In *Ford Motor*, for example, the Supreme Court affirmed that a vertical merger was illegal after considering "the effect of raising barriers to entry," "the number of competitors in the . . . industry," and the amount of foreclosure.) *Ford Motor Co. v. United States*, 405 U.S. 562, 566–70 (1972).

84. The ability and incentive analysis focuses "on whether a transaction is likely to increase the ability and/or incentive of the merged firm to foreclose rivals." *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *33 (F.T.C. Mar. 31, 2023); *Union Carbide Corp.*, 59 F.T.C. 614, 1961 WL 65409, at *34–35 (1961) (finding anticompetitive harm where the merged firm has the power to exclude competing producers from a segment of the market).

85. While "it is the power [to harm competitors] that counts, not its exercise," *Union Carbide Corp.*, 59 F.T.C. 614, 1961 WL 65409, at *19 (1961) (Lipscomb, A.L.J.), courts may examine a merged firm's incentives to foreclose the relevant market when considering whether there is the potential for competitive harm. *See, e.g., Ford Motor Co. v. United States*, 405 U.S. 562, 571 (1972) (Because Ford "made the acquisition in order to obtain a foothold" in the aftermarket spark plug market, "it would have every incentive to . . . maintain the virtually insurmountable barriers to entry" in that market through foreclosure.); *see also United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (examining the district court's analysis under an ability and incentive framework).

86. Satisfying both the *Brown Shoe* and ability and incentive standards is not required to find liability. *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *33 (F.T.C. Mar. 31, 2023).

87. But here, Plaintiff has satisfied its burden as required for a §13(b) preliminary injunction and has shown a likelihood of success in the administrative proceeding under both *Brown Shoe* and ability and incentive standards. *Infra* Conclusions of Law at § E.E.1.

88. Plaintiff has established *Brown Shoe* functional liability factors sufficient to warrant temporary § 13(b) relief. *See* PPFF § IV.

89. The Proposed Acquisition's "very nature and purpose" is anticompetitive. *Brown Shoe v. United States*, 370 U.S. 294, 329–30 (1962). The Proposed Acquisition's purpose is to transform an independent source of supply into a captive one controlled exclusively by Microsoft. *See* PPFF §§ IV.A. & IV.B. The nature and purpose of the Proposed Acquisition is also anticompetitive because the Proposed Acquisition is a response to other vertical mergers and furthers the vertical consolidation of the industry. *United States v. Sybron Corp.*, 329 F. Supp. 919, 929 (E.D. Pa. 1971), s*ee* PPFF § I.E.1., and because the acquirer's past conduct following similar transactions demonstrates its likely anticompetitive nature. *See* PPFF §§ I.H., IV.C.

90. Here, there is also a "trend toward concentration in the industry." *Brown Shoe v. United States*, 370 U.S. 294, 332–33 (1962); *see also Warner Commc'ns Inc.*, 742 F.2d at 1162–63 (listing "industry trends toward concentration, the degree of concentration within the industry, [and] prior mergers by the firms in question" among "[f]actors to consider when determining the impact on competition")." *See* PPFF § I.E.1.

91. The Proposed Acquisition would also increase entry barriers in the Relevant Markets. *See Ford Motor*, 405 U.S. at 568–72 (explaining that, after Ford made its vertical acquisition, "it would have every incentive to . . . maintain the virtually insurmountable barriers to entry to the aftermarket") (citing *Brown Shoe v. United States*, 370 U.S. 294, 323–24 (1962)). *See* PPFF §§ I.E–G., III., IV.B.

92. Courts have held that the creation or increase of entry barriers can militate in favor of prohibiting a vertical merger. *See U.S. Steel*, 426 F.2d at 605; *Ford Motor*, 405 U.S. at 568–71. As the Sixth Circuit explained in *U.S. Steel Corp. v. FTC*, such barriers can include "possible reliance on suppliers from a vertically integrated firm with whom [a new entrant in the relevant market] is also competing" and "the psychological 'fears' of smaller rivals competing with large integrated concerns." 426 F.2d at 605 (citing *Procter & Gamble*, 386 U.S. at 578).

93. Microsoft has the ability and incentive to use control of Activision content to weaken its rivals in the Relevant Markets. *See* PPFF §§ IV.A.–D.

94. The Government will be able to carry its burden in the merits proceeding without specifying the precise actions Microsoft would take to weaken it rivals in the Relevant Markets. *E.g.*, *United States v. Sybron Corp.*, 329 F. Supp. 919, 928–29 (E.D. Pa. 1971) (observing that even if "absolute foreclosure" would be unlikely, "there are many more subtle avenues available").

95. Microsoft has the ability to control access to Activision content in many ways. PPFF § IV. A.

96. The evidence demonstrates Microsoft has incentive to foreclose its rivals, including its past behavior after its acquisition of ZeniMax . *See* PPFF §§ IV.B., IV.C.

97. Plaintiff has also established that Microsoft has the incentive and ability to foreclose its rivals in the Relevant Markets, *see* PPFF §§ IV.A-C.

### 2. Harm to Innovation in the Relevant Markets

98. Anticompetitive harm under Section 7 includes harm to innovation. *See Otto Bock*, 2019 WL 5957363, at *2 (finding that the acquisition "is likely to cause future anticompetitive effects in the form of higher prices and less innovation"); *Polypore Int'l, Inc.*, 2010 FTC LEXIS 17, at *281–82, 552 (F.T.C. Mar. 1, 2010) (Chappell, A.L.J.) (finding that in one market "innovation competition has been eliminated post-acquisition" and another in which innovation has been impacted); *R.R. Donnelley & Sons Co.*, No. 9243, 1995 WL 17012641, at *73 (F.T.C. July 21, 1995) (competitive harm under Section 7 may "include

a prediction of adverse effects in competitive dimensions other than price—reductions in output, product quality, or innovation"); *see also Horizontal Merger Guidelines* § 6.4 (explaining that harm to innovation can be an anticompetitive effect of a merger). In fact, in *United States v. AT&T, Inc.*, the D.C. Circuit explained that it "does not hold that quantitative evidence of price increase is required in order to prevail on a Section 7 challenge. Vertical mergers can create harms beyond higher prices for consumers, including decreased product quality and reduced innovation." 916 F.3d 1029, 1045–46 (D.C. Cir. 2019).

99. In addition, the Federal Trade Commission has recognized the special importance of protecting competition in nascent markets, such as Cloud Game Subscription Services are here:

> While monopolies are to be abhorred wherever they appear, it is of particular importance that they be arrested in an infant industry which appears destined for far greater expansion and growth. Strong and vigorous competition is the catalyst of rapid economic progress. Any lessening of competition is therefore doubly harmful in a new industry since its inevitable effect is to slow down the growth rate of the industry. *Union Carbide Corp.*, 59 F.T.C. 614, 1961 WL 65409, at *35 (Sept. 25, 1961).

100. That the market may be an emerging one poised for rapid growth might make it particularly susceptible to antitrust harm. *Bazaarvoice*, 2014 WL 203966 at *76 ("rapid technological progress may provide a climate favorable to increased concentration of market power rather than the opposite.") (quoting *Greyhound Computer Corp., Inc. v. Int'l Bus. Machines Corp.*, 559 F.2d 488, 497 (9th Cir. 1977)).

101. The Proposed Acquisition has a reasonable probability of harming innovation competition in the Relevant Markets. *See* (PPFF § IV.D.3.

### F. Defendants Fail to Meet their Burden to Show Entry Will Be Timely, Likely, and Sufficient to Counteract the Competitive Harm from the Proposed Acquisition

102. At the administrative merits hearing, Defendants will bear the burden of providing evidence that "ease of entry" rebuts Plaintiff's *prima facie* case. *Otto Bock*, 2019 WL 5957363, at *12 (citing *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 n.7 (D.C. Cir. 2001);

*see also H&R Block*, 833 F. Supp. 2d at 73 (noting that defendants "carry the burden to show" that entry or expansion is sufficient "to fill the competitive void" that would result from the merger) (internal quotations omitted). At this preliminary stage, Defendants would need to go further and leave "no doubt." *Whole Foods Mkt.*, 548 F.3d at 1035.

103.    "The mere existence of potential entrants does not by itself rebut the anti-competitive nature of an acquisition." *Chi. Bridge & Iron Co N.V. v. FTC*, 534 F.3d 410, 436 (5th Cir. 2008).

104.    Entry or expansion must be "'timely, likely, and sufficient in its magnitude, character, and scope' to counteract a merger's anticompetitive effects." *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 222 (D.D.C. 2017) (citations omitted).

105.    In assessing whether entry is likely, courts often look to the history of entry, including the "inability of new firms to gain traction," to assess "how difficult it is for new entrants to compete on the same playing field as the merged firm." *Anthem*, 236 F. Supp. 3d at 222–24 (dismissing Dr. Robert Willig's "breezy assurances" that developing a provider network is "not a big barrier to entry or expansion") (citations and quotations omitted).

106.    Defendants have not shown that entry is timely, likely, and sufficient and thus, fail to demonstrate that it would counteract the competitive harm from the Proposed Acquisition. *See* PPFF § IV.E.1.


**G.    Defendants Fail to Meet their Burden to Demonstrate That Their Proposed Efficiencies and Any Other Alleged Procompetitive Benefit Offset the Competitive Harm**

107.    In the administrative merits proceeding, the stronger the *prima facie* case "the greater [Defendants'] burden of production on rebuttal." *Polypore*, 2010 WL 9549988 at *9; *see also FTC v. H.J. Heinz Co.*, 246 F.3d 708, 725 (D.C. Cir. 2001); *Baker Hughes*, 908 F.2d at 991.

108.    "The Supreme Court has never expressly approved an efficiencies defense to a § 7 claim." *Saint-Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d

775, 788–89 (9th Cir. 2015). To the contrary, the Court has repeatedly "cast doubt" on such a defense. *Saint-Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788–89 (9th Cir. 2015). And this Circuit "remain[s] skeptical about the efficiencies defense in general and about its scope in particular." *Saint-Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 790 (9th Cir. 2015).

109.     To the extent they are valid at all, efficiencies cannot be based on self-serving testimony or the estimates of business executives but must be "reasonably verifiable by an independent party." *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *59 (F.T.C. Mar. 31, 2023) (citing *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 72–73 (D.D.C. 2018)); see also *United States v. Bertelsmann SE & Co. KGaA*, No. CV 21-2886-FYP, 2022 WL 16949715, at *35 (D.D.C. Nov. 15, 2022) (finding "defendants had failed to verify the efficiencies" and therefore the court did not consider the evidence).

110.     Even assuming the validity of the efficiencies defense, Defendants would bear the burden of producing "clear evidence showing that the merger will result in efficiencies that will *offset* the anticompetitive effects and ultimately benefit consumers." *Otto Bock*, 2019 WL 2118886, at *50 (Chappell, A.L.J.) (citing *Penn State Hershey*, 838 F.3d at 350) (emphasis added); *see also FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 175–76 (3d Cir. 2022). In assessing such efficiency claims, courts have applied strict standards in their review. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720–21 (D.C. Cir. 2001); *H&R Block*, 833 F. Supp. 2d at 89.

111.     No court has held that efficiencies could immunize an otherwise anticompetitive merger from a §13(b) preliminary injunction. *See Otto Bock Healthcare North America, Inc.*, Dkt. No. 9378, 2019 WL 2118886, at *50 (F.T.C. May 6, 2019) (Chappell, A.L.J.) (observing that "[r]esearch does not reveal a case that permitted an otherwise unlawful transaction to proceed based on claimed efficiencies."); *United States v. Anthem*, 855 F.3d 345, 353 (D.C. Cir. 2017) ("[I]t is not at all clear that [efficiencies] offer a viable legal defense to illegality under Section 7.") (citing *FTC v. Procter & Gamble Co.*, 386 U.S.

568, 580, (1967) ("Possible economies cannot be used as a defense to illegality.")); *FTC v. Penn State Hershey*, 838 F.3d 327, 347–48 (3rd Cir. 2016) ("Contrary to endorsing [an efficiencies] defense, the Supreme Court has instead, on three occasions, cast doubt on its availability . . . . Based on [the Supreme Court's past statements] and on the Clayton Act's silence on the issue, we are skeptical that such an efficiencies defense even exists.") (citations omitted).

112.     Courts that do assess such efficiency claims, have applied strict standards in their review. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720–21 (D.C. Cir. 2001); *H&R Block*, 833 F. Supp. 2d at 890. Specifically, "the court must undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 721 (D.C. Cir. 2001); *see also FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 72 (D.D.C. 2018); *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 72–73 (D.D.C. 2009).

113.     Assuming *arguendo* that the efficiency defense is even potentially available, Defendants would bear the heavy burden to show that their efficiencies claims are cognizable, meaning that they are "merger-specific efficiencies that have been verified and do not arise from anticompetitive reductions in output or service." *Horizontal Merger Guidelines* § 10; *see also FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 176 (3d Cir. 2022); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720-21 (D.C. Cir. 2001); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 137 n.15 (D.D.C. 2016); *Sysco*, 113 F. 3d Supp. at 81-82.

114.     To substantiate each efficiency, Defendants would be required to demonstrate that "it is possible to 'verify by reasonable means the likelihood and magnitude of each asserted efficiency, how and when each would be achieved (and any costs of doing so), how each would enhance the merged firms' ability and incentive to compete, and why each would be merger specific." *Otto Bock*, 2019 WL 2118886, at *50 (Chappell, A.L.J.)

(citing *H&R Block*, 833 F. Supp. 2d at 89); *see also Hackensack*, 30 F.4th 166-67; *Horizontal Merger Guidelines* § 10.

115.     To demonstrate merger specificity, Defendants would need to show that the claimed efficiencies "represent a type of cost saving that could not be achieved without the merger." *Wilhelmsen*, 341 F. Supp. at 72; *see also Hackensack*, 30 F.4th at 176 ("*i.e.*, the efficiencies cannot be achieved by either party alone").

116.     Even verifiable, merger-specific efficiencies are no defense absent "clear evidence" that they "will offset the anticompetitive effects and ultimately benefit consumers." *Otto Bock*, 2019 WL 2118886, at *50 (Chappell, A.L.J.) (citing *Penn State Hersey*, 838 F.3d at 350). "The critical question raised by the efficiencies defense is whether the projected savings from the mergers are enough to overcome the evidence that tends to show that possibly greater benefits can be achieved by the public through existing, continued competition." *Cardinal Health*, 12 F. Supp. 2d at 63*; see also Anthem*, 855 F.3d at 355–56 (affirming district court's rejection of the efficiencies defense "because the amount of cost saving that is both merger-specific and verifiable would be insufficient to offset the likely harm to competition"); *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 918 (E.D. Mo. 2020) ("[E]ven granting Defendants every dollar of their claimed efficiencies . . . and making the implausible assumption that they would pass every penny of those efficiencies on to their customers, Defendants' claimed efficiencies still would not offset the likely competitive harm to those same customers.").

117.     Where, as here, Defendants have failed to produce evidence that merger-specific, verifiable efficiencies will "neutralize if not outweigh the harm caused by the loss of competition and innovation," *Anthem*, 855 F.3d at 369 (Millett, J., concurring), the purported efficiencies defense fails. *See* PPFF § IV.E.2.

118.     Defendants cannot reliably quantify the claimed value of any efficiency resulting from the Proposed Acquisition. *See* PPFF § IV.E.2.

119.     Defendants have also failed to demonstrate that their claimed efficiencies are merger specific. *See* PPFF § IV.E.2.

120.     Defendants also have not met their burden to show that efficiencies would be passed through to consumers. *See* PPFF § IV.E.2.

121.     Defendants have failed to demonstrate efficiencies would offset the harm from this anticompetitive acquisition. *See* PPFF § IV.E.2.

### H.     Proposed Remedies Are Irrelevant in a § 13(b) Proceeding

122.     "Likelihood of success on the merits" means on the "antitrust merits" in the administrative proceeding. *See FTC v. Meta Platforms Inc.*, No. 5:22-cv-04325-EJD, 2022 WL 16697996, at *6 (N.D. Cal. Nov. 2 2022).

123.     The agreements Microsoft signed with third parties in an attempt to allay antitrust concerns in this matter constitute a proposed remedy. *See Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *48–51 (F.T.C. Mar. 31, 2023) (finding an agreement "cobbled together well after the Acquisition was announced," contingent on the Proposed Acquisition closing and unimplemented when the merger was consummated, to be a proposed remedy "crafted in anticipation of legal concerns about the Acquisition").

124.     The Supreme Court has indicated that it is proper to consider proposed remedies only at the remedy stage, not during the initial determination of whether a statutory violation exists at all. *See United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 556 (1971) (courts do not "reach the question of remedy" if there is "no violation of § 7"); *see also Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *51, 74 (F.T.C. Mar. 31, 2023).

125.     The "narrow" purpose of a § 13(b) proceeding does not extend even to the initial question of liability, *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984) ("Our present task is not to make a final determination on whether the proposed merger violates Section 7"), let alone to the subsequent question of what remedy might be appropriate if the administrative proceeding ultimately yields a finding of liability. *See FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345 (4th Cir. 1976) (holding FTC was "entitled to preserve the status quo pending adjudication" regardless of what "ultimate

remedy" might eventually be deemed appropriate); *see also FTC v. ProMedica Health Sys.*, No. 3:11-cv-47, 2011 WL 1219281, at *61-64 (N.D. Ohio Mar. 29, 2011) ("[A] principal reason for preliminary relief is to prevent interim harm to consumers while the merits trial and any appeals are underway, even if a suitable divestiture remedy could later be devised.").

126.     Even if Defendants' preferred remedy were relevant to a § 13(b) proceeding, it would be as part of Defendants' rebuttal burden, not part of the FTC's initial burden. *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *51 (F.T.C. Mar. 31, 2023). As such, the proposed remedy would need to dispel any and all substantial doubts and serious questions about the transaction's legality. *See Warner Commc'ns*, 742 F.2d at 1162; *Whole Foods Mkt.*, 548 F.3d at 1035.; FTC v. *H.J. Heinz Co.*, 246 F.3d 708, 725 (D.C. Cir. 2001). Defendants have failed to demonstrate their proposed remedies would offset the harms. *See* PPFF § IV.F.

127.     In any event, the Supreme Court has instructed that "all doubts as to the remedy are to be resolved in [the government's] favor." *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961)).

**I.      Temporary Relief to Preserve the Status Quo is in the Public Interest**

128.     "When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone does not justify denial of a preliminary injunction." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984) (citing *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981)).

129.     Public equities include "effective enforcement of the antitrust laws" and ensuring the Commission's ability to obtain adequate relief if it ultimately prevails on the merits. *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991). "[T]he preservation of competition is always in the public interest." *United States v. Tribune Publ'g Co.*, No. CV 16-01822-AB, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016).

130.     In weighing the equities under § 13(b), "public equities receive far greater weight." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984). *See also United States v. Tribune Publ'g Co.*, No. CV 16-01822-AB, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016). ("That the government enforces antitrust law on behalf of the public interest necessarily weighs heavily in the balance-of-hardships calculus.")

131.     Since there are "substantial doubts" regarding the Proposed Acquisition's legality, *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008), the Government has demonstrated a likelihood of ultimate success. As a result, the public interest favors granting temporary relief under § 13(b) to preserve the status quo pending the administrative adjudication.

132.     Defendants' assertion "that a preliminary injunction would force them to abandon" their proposed transaction is a private equity at best, and "private equities alone do not outweigh the Commission's showing of likelihood of success." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984).

133.     The only "injury" here is to Defendants themselves, and it would result solely from their own contract's termination date—which they voluntarily agreed upon and could presumably extend if they wish. "[A]lthough the court recognizes the time, resources, and effort that Defendants have put into planning this transaction, the parties' stated intention to abandon the transaction prior to the merits proceeding is a private equity and cannot on its own overcome the public equities that favor the FTC." *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 73–74 (D.D.C. 2018); *see also FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1041 1042 (D.C. Cir. 2008) (remanding to district court to determine the equities but instructing the court to "remember that a 'risk that the transaction will not occur at all,' by itself, is a private consideration that cannot alone defeat the preliminary injunction'"); *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345–46 (4th Cir. 1976); *FTC v. Rhinechem Corp.*, 459 F. Supp. 785, 791 (N.D. Ill. 1978).

134.     Defendants' speculation that divestiture may still be "possible" after the administrative proceeding, Oppo Br. at 4, is a non sequitur. *See Warner Commc'ns Inc.*,

742 F.2d at 1165 (rejecting defendants' argument "that effective relief would still be possible" following the administrative proceeding).

135.    Congress intended temporary relief under § 13(b) to be "readily available to preserve the status quo while the FTC develops its ultimate case." *FTC v. Whole Foods Mkt. Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008). It is appropriate here.

Dated: June 20, 2023                            Respectfully submitted,

                                                */s/ James H. Weingarten*
                                                James H. Weingarten
                                                Peggy Bayer Femenella
                                                James Abell
                                                Cem Akleman
                                                J. Alexander Ansaldo
                                                Michael T. Blevins
                                                Amanda L. Butler
                                                Nicole Callan
                                                Maria Cirincione
                                                Kassandra DiPietro
                                                Jennifer Fleury
                                                Michael A. Franchak
                                                James Gossmann
                                                Ethan Gurwitz
                                                Meredith R. Levert
                                                David E. Morris
                                                Merrick Pastore
                                                Stephen Santulli
                                                Edmund Saw

                                                Federal Trade Commission
                                                600 Pennsylvania Avenue, NW
                                                Washington, DC 20580
                                                Tel: (202) 326-3570

                                                Erika Wodinsky

                                                Federal Trade Commission
                                                90 7th Street, Suite 14-300
                                                San Francisco, CA 94103

                                                *Counsel for Plaintiff Federal Trade Commission*