1   Beth Wilkinson (*pro hac vice*)
    Rakesh N. Kilaru (*pro hac vice*)
2   Kieran Gostin (*pro hac vice*)
    James Rosenthal (*pro hac vice*)
3   Grace Hill (*pro hac vice*)
    Anastasia M. Pastan (*pro hac vice*)
4   Jenna Pavelec (*pro hac vice*)
    WILKINSON STEKLOFF LLP
5   2001 M Street, N.W., 10th Floor
    Washington, D.C. 20036
6   Telephone: (202) 847-4000
    Facsimile: (202) 847-4005f
7   bwilkinson@wilkinsonstekloff.com
    rkilaru@wilkinsonstekloff.com
8   kgostin@wilkinsonstekloff.com
    jrosenthal@wilkinsonstekloff.com
9   ghill@wilkinsonstekloff.com
    apastan@wilkinsonstekloff.com
10  jpavelec@wilkinsonstekloff.com

11  Bambo Obaro
    WEIL, GOTSHAL & MANGES LLP
12  201 Redwood Shores Parkway
    Redwood Shores, CA 94065
13  Telephone: (650) 802-3083
    Facsimile: (650) 802-3100
14  bambo.obaro@weil.com

15  *Counsel for Microsoft Corp.*

16  [Additional Counsel Identified on Signature Page]

17          **UNITED STATES DISTRICT COURT**
        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
18              **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 19  FEDERAL TRADE COMMISSION | Case No. 3:23-cv-02880-JSC |
| 20           *Plaintiff*, | **DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| 21      v. | |
| 22  MICROSOFT CORP. and ACTIVISION BLIZZARD, INC., | |
| 23           *Defendants*. | Hon. Jacqueline Scott Corley |
| 24 | Date: June 22, 2023 |
| 25 | Time: 8:30 a.m. |
| 26 | Courtroom: 8 – 19th Floor |

27

28

1

**TABLE OF CONTENTS**

2

INTRODUCTION ....................................................................................................................1

3

PROPOSED FINDINGS OF FACT ........................................................................................1

4

I. ..........The Merging Parties and the Proposed Transaction. ................................................1

5

II. ........The Gaming Industry Is Dynamic and Highly Competitive. ....................................3

6

    A. ........Gamers today can choose from more games than ever before. ...................4

7

    B. ........Gamers can play on many different platforms. ............................................5

8

    C. ........Gamers can access games through various payment and
           distribution models. ......................................................................................8

9

10

III. .......Xbox and Activision Both Face Intense Competition. ............................................12

11

    A. ........Xbox has lost the console wars, and its rivals are positioned to
           continue to dominate, including by leveraging exclusive content. ............12

12

    B. ........Activision's content faces intense and growing competition. ...................16

13

    C. ........Xbox has a negligible presence in mobile, the fastest growing
           gaming segment. ..........................................................................................22

14

IV........The Transaction Will Provide Xbox with a Position in Mobile and Expand
        Choice for Gamers and Developers. ..........................................................................23

15

    A. ........Xbox's primary rationale for the deal is to improve its mobile
           presence. ......................................................................................................23

16

17

    B. ........The transaction will give gamers more choices than would be
           available absent the deal. ............................................................................24

18

19

V. ........Numerous Foreign Antitrust Authorities Have Approved the Transaction. ..........34

20

21

22

23

24

25

VII. ......Dr. Carlton Demonstrates that the Transaction Would Produce Significant
          Pro-Competitive Benefits. ........................................................................................37

26

27

28

PROPOSED CONCLUSIONS OF LAW ..................................................................38

    I. ..........Legal Standard ...........................................................................38

          A. ........Section 7 of the Clayton Act ...................................................38

          B. ........Preliminary Injunction Standard ...............................................40

    II. ........The FTC Has Failed to Show That It Is Likely to Succeed on the Merits............41

          A. ........The FTC Has Failed to Identify a Proper Relevant Antitrust Market. ..................................................................................41

          B. ........The FTC Has Failed to Show that the Proposed Merger Is Substantially Likely to Lessen Competition. ..............................51

    III. .......The Equities Weigh Against a Preliminary Injunction. ..........................71

**INTRODUCTION**

The Federal Trade Commission ("FTC" or the "Commission") has failed to demonstrate that it is likely to show that the proposed merger between Microsoft Corporation ("Microsoft") and Activision Blizzard, Inc. ("Activision") is likely to substantially lessen competition. 15 U.S.C. § 18. Further, the balance of the equities and the public and private interests weigh against preliminarily enjoining the merger. Accordingly, the FTC's Motion for a Preliminary Injunction is **DENIED**.

**PROPOSED FINDINGS OF FACT**

**I.      The Merging Parties and the Proposed Transaction.**

1.      Microsoft is a publicly traded corporation organized under Washington law and headquartered in Redmond, Washington.

2.      Microsoft manufactures dedicated gaming consoles, including the Xbox Series X and S, and distributes video games via the Xbox Store and Microsoft Store.

3.      Microsoft also develops and publishes games for play on personal computers ("PCs"), mobile devices, and its Xbox consoles, as well as for play on third-party consoles, including the Sony PlayStation and Nintendo Switch.

4.      Microsoft offers a multi-game subscription service, called "Game Pass," that provides subscribers with access to a library of more than 500 games for a single monthly fee. The Game Pass Ultimate tier includes features like Xbox Cloud Gaming, which allows users to stream certain console games available on Game Pass through the cloud, instead of downloading native versions of the games.

5.      Activision is a publicly traded corporation organized under Delaware law and headquartered in Santa Monica, California.

6.      Activision is a global developer and publisher of video games that are available on dedicated gaming consoles, PCs, and mobile devices, and is comprised of three business units, each of which develops and publishes video game content: Activision Publishing, Inc. ("AP"), Blizzard Entertainment, Inc. ("Blizzard"), and King Digital Entertainment ("King").

1   7.      Activision also owns and operates a PC gaming platform, Battle.net, which serves

2   as a distribution outlet and social platform for Activision's PC titles.

3   8.      On January 18, 2022, Microsoft announced an agreement to acquire Activision

4   for $68.7 billion. That agreement provides, among other things, that either party may terminate

5   the merger agreement if the transaction has not closed by July 18, 2023. If the agreement is

6   terminated, Microsoft is obligated to pay Activision a termination fee of $3 billion.

7   9.      The planned merger was reported to the FTC, as required under the Hart-Scott-

8   Rodino Antitrust Improvements Act ("HSR Act"), on February 1, 2022. The FTC thereafter

9   commenced an 11-month investigation, requiring Defendants to produce nearly 3 million

10  documents and sit for 15 investigational hearings. The waiting period under the HSR Act that

11  prevents the parties from closing the transaction was extended by agreement with the FTC until

12  November 21, 2022, and the parties thereafter agreed voluntarily to delay closing until December

13  12, 2022.

14  10.     On December 8, 2022, the FTC filed an administrative complaint against the

15  merger, alleging that it violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of

16  the FTC Act, 15 U.S.C. § 45. Defendants produced an additional nearly 1 million documents and

17  sate for more than 30 depositions during discovery in the administrative proceeding.

18  11.     The FTC alleges that Xbox will withhold access to Activision games in four

19  "markets": high-performance consoles, multi-game content library subscription services, cloud

20  gaming subscription services, and a combined multi-game and cloud gaming subscription

21  services market. The FTC defines the high-performance console market to include only Xbox

22  and Sony PlayStation. The FTC defines the geographic market as the U.S. The FTC claims that

23  withholding Activision content will result in foreclosure that "is reasonably likely to

24  substantially lessen competition in the Relevant Markets." The FTC makes no allegations of

25  harm to competition in any game publishing or distribution market, or any market involving

26  mobile gaming.

27

28

Defendants' Proposed Pretrial Findings of Fact and Conclusions of Law
(No. 3:23-cv-02880-JSC)

1    12.    In its administrative complaint, the FTC scheduled a hearing on the complaint for

2    August 2, 2023—a date eight months in the future that is plainly after the July 18th merger

3    termination date—despite the fact that the FTC is permitted under its rules to set an earlier date

4    and usually does so in unconsummated mergers. Indeed, the FTC also did not follow its standard

5    practice of filing, at the same time as its administrative complaint, a preliminary injunction

6    action in federal court pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

7    13.    On June 12, 2023, six weeks before the merger agreement could be terminated,

8    the FTC filed this action, seeking a temporary restraining order and preliminary injunction

9    barring the acquisition pending a trial before a hearing, decision, and appeal of the FTC's

10   administrative complaint.

11   14.    If the Court grants a preliminary injunction that prevents the transaction from

12   closing, that could derail the deal entirely.

13   15.    The FTC administrative process ordinarily takes years to resolve. As just one

14   example, in the most recent administrative challenge to a merger (*In the Matter of Illumina, Inc.,*

15   *and Grail, Inc.*, 201 F.T.C. 0144 (2023)), it took over 19 months from the time of the

16   administrative trial (August 24, 2021) to when the Commission issued its opinion (April 3,

17   2023). The matter is now on a "fast-track" appeal (timing the FTC opposed) before the 5th

18   Circuit, but the case has yet to be argued. If the same timing holds in this case, even if the

19   administrative proceeding begins on August 2, 2023 as scheduled, it would still likely not be

20   resolved before 2026.

21   **II.    The Gaming Industry Is Dynamic and Highly Competitive.**

22   16.    Gaming is a highly dynamic and competitive industry, and the fastest growing

23   portion of the media and entertainment sector. Gaming is larger in revenue than TV, home video

24   (including streaming), cinema, music, books or newspapers, and magazines.

25   17.    There are 3 billion gamers around the world. Over half of the world's current

26   gamers are in Asia, and gaming is growing most quickly in developing countries like India and

27   Mexico (in large part due to increased accessibility to free games on mobile phones). By 2030,

28

1    roughly half of the global population (4.5 billion) is expected to participate in the gaming

2    industry.

3        18.    Gaming generates hundreds of billions of dollars of revenue a year and is

4    projected to grow substantially in the future. Gaming grew to record high levels during the global

5    pandemic, with people seeking at-home entertainment options more than ever before.

6        19.    The gaming sector is highly fragmented, and includes traditional participants

7    (*e.g.*, Sony, Nintendo, Tencent, Valve), new entrants (*e.g.*, Amazon, Mediatonic, Moon Studios,

8    Purple Lamp, Hello Games) and new services (*e.g.*, the gaming offerings of Amazon, Apple,

9    Google, Netflix, and Nvidia).

10       20.    Microsoft and Activision are just two companies in the highly competitive and

11   diverse gaming industry. Microsoft is the number three console manufacturer, behind Sony and

12   Nintendo. Likewise, Activision is just one of dozens of game publishers.

13       **A.    Gamers today can choose from more games than ever before.**

14       21.    Given the dynamism of the market, the number of games released each year has

15   been increasing, offering a greater variety of choice to gamers. The Entertainment Software

16   Association estimates that there were more than 1,600 game developers in the U.S. alone in

17   2019.

18       22.    In 2021, there were around 1,700 unique titles launched on Nintendo Switch, over

19   980 on Sony PlayStation and around 725 on Xbox.

20       23.    Microsoft estimates that gamers play over ███ different games on Microsoft's

21   gaming platform each week.

22       24.    Certain game franchises release new titles every year, including (among others)

23   Activision's *Call of Duty* ("*COD*"), Electronic Art's ("EA's") *FIFA*, and Ubisoft's *Assassin's*

24   *Creed*. Many games, like *Grand Theft Auto*, regularly update their content (for example, offering

25   new maps or quests for gamers to complete), while releasing new titles every few years.

26       25.    Studios both large and small develop popular games. Many popular games were

27   unexpected breakout successes developed by small independent studios. For example, *Among Us*

28

- 4 -

1   was developed by a studio with only four employees, yet quickly attracted record numbers of

2   monthly players and generated over $86 million in revenue. Many other successful games such

3   as *Fall Guys*, *Player Unknown: Battlegrounds*, and *Rocket League* were launched by small

4   independent studios with relatively small development and marketing budgets.

5       26.     The console makers also produce hit games. One of the most acclaimed games of

6   2022 was Sony's *God of War: Ragnarok*. Similarly, Naughty Dog, a subsidiary of Sony,

7   published the PlayStation exclusive *The Last of Us*, one of the best-selling games of all time.

8   That game and its sequel has only ever been available on PlayStation and has been converted

9   into a critically acclaimed HBO series.

10      27.     Although major gaming companies invest millions of dollars trying to create the

11  next big hit, investment and reputation does not always guarantee success. Every year, there are

12  highly anticipated and well-funded games that are unsuccessful. For example, Xbox's *Halo*

13  *Infinite* (released in 2021) and Activision's *Call of Duty: Vanguard* (released in 2019) were both

14  widely regarded as critical and financial flops despite high expectations, large budgets, and

15  affiliations with popular franchises. More recently, the much-anticipated Xbox and PC-exclusive

16  *Redfall* was panned by critics and gamers upon release.

17      28.     For any platform to be successful, it is important that it offer gamers a variety of

18  games.  No single game drives platform success.

19      **B.      Gamers can play on many different platforms.**

20              **1.      The leading gaming platforms are mobile, PC, and console.**

21      29.     Games are available to play across a wide range of platforms, including mobile,

22  PC, and console.

23      30.     Over the past few decades, the gaming industry has changed dramatically.

24  Gamers used to play video games primarily in arcades. In later years, they purchased individual

25  game cartridges or discs to play on consoles in their homes. Now, gamers can download games

26  directly to their consoles, and play games on PC and mobile devices.

27

28

31.    The three major gaming consoles today are Sony PlayStation, Nintendo Switch, and Microsoft Xbox. While consoles used to be the predominant form of home gaming, they now represent a smaller share of video game revenue than mobile and PC.

32.    Most gamers today play on mobile devices, which is also the fastest growing segment as the technical capabilities of mobile devices increase. Gamers spend far more hours gaming on Android and Apple iOS mobile devices than on any other platform. The technical capabilities of mobile devices are increasing.

33.    After mobile, PC gaming is the next largest source of video game revenue. PlayStation's CEO, Jim Ryan, referred to PC gaming as "█████████████████████ ████████████████████████████████.

**2.    Gamers can play the same games on different platforms.**

34.    Many of the most-played games are available on multiple platforms (including different consoles, PC, and mobile). For example, platform access to the *Minecraft* franchise has expanded to over twenty devices across these three types of platforms.

35.    Nearly all of the best-selling games for Xbox and PlayStation are also sold for PC. In 2022, for example, all but one of the top 30 Xbox titles and all but ███ of the top 30 PlayStation titles were available on PC.

36.    Gamers can now play certain multiplayer games across platforms. For example, a gamer on PlayStation can now play many games with other gamers playing on another platform, like Xbox or PC. That mode of play is referred to as "cross-platform" gaming or "cross-play."

37.    In most multiplayer games, a gamer selects multiplayer game mode, the game matches the gamer with other gamers, and the gamers are then placed in a lobby and either enter the game or are placed in teams. Before the advent of cross-play, gamers could play multiplayer games only with other gamers using the same platform (*e.g.*, a PlayStation console). In 2018, Epic Games enabled cross-play functionality in its hugely popular *Fortnite* game, allowing gamers from different platforms, including PlayStation, Xbox, Nintendo, and PC, to play against each other simultaneously.

38.     Cross-play leads to material and measurable improvements in the quality of gamers' user experience. Because games with cross-play increase the number of gamers available to partner with, cross-play enhances the value of a game, including by more effectively and quickly matching comparably skilled gamers. In addition, cross-play makes games more valuable to consumers because they can play the game with friends and access larger lobbies of players.

39.     Many of the most popular multiplayer titles (*e.g.*, *Fortnite, PUBG*, *Call of Duty*, and *Minecraft*) allow gamers to cross-play between at least PC and console.

40.     A significant appeal of *Call of Duty* is that it has a multi-player mode often played by groups across different platforms, including PlayStation.

41.     Activision introduced a cross-play feature to *Call of Duty* in 2019, with the *Call of Duty: Modern Warfare* title, and that feature has existed in every subsequent annual *Call of Duty* title. It also exists in the free-to-play *Call of Duty: Warzone*. The introduction of cross-play to *Call of Duty* has significantly improved players' experience; the game's online multiplayer functionality thrives on a large and active player base, and cross-play has increased the number of available players. With a larger pool of available players, matches can be more evenly populated in terms of skill level, resulting in quicker and more competitive matchmaking, and ultimately improving players' gaming experience.

42.     The introduction of cross-play and its significance to *Call of Duty* gamers prompted Activision to eliminate any material differences between gameplay on Xbox and PlayStation. Before cross-play became popular on *Call of Duty*, Activision had offered or contemplated offering certain feature and content ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. However, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Thus, while Activision's ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

1 ████████████████████████████████████████████████

2 ████████████████████████.

43.     Removing *Call of Duty* from PlayStation would dramatically shrink the community of potential gamers, making the gaming experience worse for anyone remaining.

**C.     Gamers can access games through various payment and distribution models.**

44.     Gamers are able to access games through a growing variety of payment and distribution models. The diversity of payment and distribution models has increased the accessibility of games and expanded gamer choice.

**1.     Buy-to-play and free-to-play models.**

45.     Most gamers obtain entitlements to access and play console games via the "buy-to-play" model of purchasing the games in the form of a cartridge, DVD or Blu-Ray disc, or digital download for an upfront price (*e.g.*, $70) and adding them to their own libraries.

46.     As mobile gaming has grown more popular, the "free-to-play," or "F2P," model has grown with it. With F2P, games are downloaded for free but are then monetized through in-game purchases or in-game advertising. The free-to-play model is now found on PC and console as well.

47.     Free-to-play is the fastest growing business model in the industry today, and there are thousands of free-to-play games available, particularly on mobile. Free-to-play games like *Fortnite*, *League of Legends*, and *Apex Legends* (among many others) have become some of the most popular games in the industry, and generate substantial revenues even though the initial entitlement is free.

48.     Free-to-play games have allowed small independent companies to grow quickly. For example, Epic Games' valuation has increased from $1 billion in 2012 to over $30 billion in 2022, powered by the 2017 launch of its flagship free-to-play game, *Fortnite*.

**2.     Subscription models.**

49.     Subscription models are an example of innovation in game payment. With multi-game subscription offerings, gamers pay a flat monthly fee to access a library of games. In the

1   case of most subscription offerings, subscribers download the games they want to play to their

2   devices, and then play them using those devices. With some services, gamers can stream games

3   while waiting for the game to download, or try out a game before downloading.

4        50.    Sony and Xbox offer their users the option of accessing games through

5   subscriptions.

6        51.    In 2017, Xbox launched Game Pass, one of the first multi-game subscription

7   offerings. The value proposition behind Game Pass was relatively straightforward: subscribers

8   could access a broad catalog of games for a set monthly fee instead of purchasing the games

9   outright. To make Game Pass more attractive, Xbox includes all games developed by its studios

10  (known as "first-party games") in Game Pass the day of release ("day-and-date").

11       52.    Small and independent game developers, in particular, benefit from this model

12  because it gives their products wider exposure than would occur in a digital store, since gamers

13  who may not otherwise discover or try out games from lesser-known creators are more likely to

14  do so when the games are included in a set fee. Game Pass has thus been credited with

15  contributing to the breakout success of games from various indie studios, like *High on Life* and

16  *Atomic Heart*.

17  ████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████

20       54.    Other subscription services offer access to only a single game. Still others are

21  limited to the games of a single publisher, like EA's subscription service, EA Play, which offers

22  a rotating multi-game catalog of EA games and features limited trials of new games to help

23  promote new releases.

24       55.    There is considerable variation among subscription offerings. Although Xbox

25  simultaneously offers most of its first-party games as buy-to-play and on its Game Pass

26  subscription offering, Sony does not. Even though Sony releases some of the most popular first-

27  party games each year, Sony has affirmatively decided not to add any of its new first-party

28

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-CV-02880-JSC)

1    content to subscription service day-and-date. Last year when Sony revamped its subscription

2    offering under the PlayStation Plus banner, PlayStation CEO Jim Ryan publicly stated, "This is

3    not a road that we've gone down in the past, and it's not a road that we're going to go down with

4    this [PlayStation Plus] service" because doing so would take revenues away from its lucrative

5    buy-to-play business. Despite choosing not to invest in the growth of PlayStation Plus and

6    excluding current first-party content from the service, Ryan revealed that PlayStation Plus is

7    "just shy of 50 million subscribers," which is far larger than Game Pass. Subscribership to

8    PlayStation Plus would likely increase substantially if Sony added its vast catalog of hit first-

9    party games to PlayStation Plus day-and-date.

10          56.    Some subscription services offer access to online multiplayer gameplay along

11   with other benefits, such as additional game save storage and access to a limited number of

12   catalog titles each month for free.

13          57.    Like Sony, publishers of popular games that generate significant buy-to-play

14   revenues are reluctant to allow their games to be included in subscriptions upon release because

15   of the significant cannibalization of buy-to-play revenues that can occur. Activision does not

16   allow its games to be put in multi-game subscription libraries upon release and only rarely allows

17   even its older back-catalog titles to be included in subscriptions for brief periods of time due to

18   concerns about cannibalization. And nearly all Activision titles that have been included on

19   subscription services have been included only as a bonus back-catalog game for a limited period

20   of time (i.e., on Sony's Instant Game Collection) rather than in the library of a multi-game

21   content library subscription service.

22          58.    Subscription offerings compete directly with traditional buy-to-play options:

23   When a game is added to a subscription library, buy-to-play sales decrease, and when a game is

24   withdrawn, buy-to-play sales increase. ████████████████████████████████████

25   ████████████████████████████

26

27

28

1   59.   Game Pass is not accessible on PlayStation consoles, and PlayStation Plus is not

2   accessible on Xbox consoles. Consequently, gamers cannot substitute between Game Pass and

3   PlayStation Plus without incurring the cost of switching consoles as well.

4          **3.   Cloud gaming.**

5   60.   Cloud gaming (also known as cloud game "streaming") is a potential alternative

6   delivery mechanism to downloading native games for play onto hardware. Cloud gaming is a

7   euphemism for technology that runs games on remote servers that gamers can access using

8   consoles, PCs, mobile devices, or TVs. Cloud gaming can allow gamers to play games on less

9   highly-powered and more affordable devices, particularly salient in less modernized nations.

10   61.   Although cloud gaming technology is not new, it makes up only a tiny fraction of

11   the billions of hours of gameplay each year and has never achieved consumer demand beyond its

12   current niche.

13   62.   Several companies, including Xbox, Amazon, Nvidia, and other smaller

14   companies, have experimented with different forms of cloud gaming. But the technology remains

15   challenging, particularly for latency-sensitive multiplayer games.

16   63.   Cloud gaming has suffered from latency issues that negatively affect the gaming

17   experience. Due to those latency issues, users sometimes experience a "stuttering" effect or lags

18   in gameplay. Cloud gaming is also limited in its ability to replicate controller functions for

19   console games streamed to mobile devices.

20   64.   PlayStation CEO Jim Ryan acknowledged that cloud gaming faces substantial

21   "technical difficulties" and is "very tricky" from both a financial and technological standpoint.

22   Likewise, Sony Group's CEO, Kenichiro Yoshida, has opined that "cloud itself is an amazing

23   business model, but when it comes to games, the technical difficulties are high." Activision

24   executives have similarly observed that, with respect to cloud gaming technology generally,

25   "[t]he player experience isn't simply there" and is "not probably going to be there for years to

26   come."

27

28

Defendants' Proposed Pretrial Findings of Fact and Conclusions of Law
(No. 3:23-cv-02880-JSC)

65.     In 2020, Xbox launched a cloud gaming feature as part of its Game Pass subscription service, known as Xbox Cloud Gaming. Unlike some other providers that offer cloud gaming as a standalone service that allows users to stream games they already own through a buy-to-play purchase (for example, Nvidia's GeForce NOW and Amazon's Luna), Xbox offers cloud gaming only as a feature within the most expensive Game Pass subscription tier, Game Pass Ultimate (with the exception of *Fortnite*, which is available to play for free on Xbox Cloud Gaming via browser). The feature allows users to stream certain console games available on Game Pass through the cloud, instead of downloading native versions of the games.

66.     Xbox Cloud Gaming on Game Pass Ultimate is played predominantly by Xbox console players on their consoles.



68.     As a result of technical limitations, a large majority of Xbox Cloud Gaming users report relying on the service to try new games in order to decide whether to download them natively to play, rather than streaming for regular play.

## III.    Xbox and Activision Both Face Intense Competition.

### A.    Xbox has lost the console wars, and its rivals are positioned to continue to dominate, including by leveraging exclusive content.

#### 1.    Xbox has consistently ranked third in consoles behind PlayStation and Nintendo.

69.     In 2001, Microsoft entered the gaming industry with the launch of its first Xbox video game console, in competition with the established incumbents Sony and Nintendo. In that "generation," Sony and Nintendo outsold Xbox by a significant margin. With every succeeding generation over the twenty years since, Sony, Nintendo, and Xbox have remained the three major console producers, and have been engaged in what the industry refers to as the "console wars."

70.     Sony is the dominant player in consoles. Sony PlayStation, for over two decades and through five generations, has been the leading console both worldwide and in the U.S. Sony's gamer base is �897◻◻◻ as large as Xbox's worldwide, and ◻◻◻ larger in the United States.

71.     Xbox's console has consistently ranked third (of three) behind PlayStation and Nintendo in sales. In 2021, Xbox had a share of 16% while Nintendo and PlayStation had shares of ◻◻ and ◻◻, respectively. Likewise for console revenues and share of consoles currently in use by gamers ("installed base"), Xbox trails with 21% while PlayStation and Nintendo have shares of ◻◻ and ◻◻, respectively.

72.     ◻◻◻ Xbox ◻◻◻ view Nintendo Switch as a principal rival and a competitive platform. The entry-level versions of the current Xbox (Series S) and Nintendo consoles are offered at the same price point ($299.99). Many of the most popular games on PlayStation and Xbox consoles are also available on Switch. ██████████████████ ██████████████████████ ███████████

73.     As with prior generations, Sony leads in sales of "generation 9" consoles, which consist of Sony's PS5 and Xbox's two consoles, the Series X and the budget version Series S. Sony's lead is so significant that press reports have recently declared that "Sony's PlayStation brand dominates 2021's worldwide console market" and noted that "[b]etween console and game sales, as well as their online services like PlayStation Plus and PlayStation Now, Sony has claimed just under 50% of the console market with the remainder being shared between Nintendo and Xbox."

> **2.     Building on their leading consoles, PlayStation and Nintendo rely heavily on exclusive gaming content.**

74.     Each of the three major console companies is also a first-party game developer and publisher.

1    75.    As a game publisher, Sony's in-house developer, PlayStation Studios, is

2 responsible for major hits like *God of War*, *The Last of Us*, and *Spider-Man*, most of which can

3 be played only on PlayStation. As a purchaser of third-party games, ███████████████

4 ████████████████████████████████████████████████████████████████

5 ████████████████████

6    76.    Sony views exclusive content as crucial to PlayStation's continued success. As a

7 result, Sony offers far more exclusive first- and third-party titles than Xbox, and plans to

8 continue to acquire game studios to further its exclusive-heavy strategy. The number of exclusive

9 games available on PlayStation dwarfs the number available on Xbox, with eight exclusive

10 games on PlayStation for every one on Xbox.

11    77.    Nintendo also is a significant first party publisher with some of the most popular

12 exclusive game franchises in the world, including *Mario*, *Zelda* and *Pokémon*.

13    78.    Sony and Nintendo, due to their past and present successes, are able to leverage

14 their existing gamer bases, respective catalogs, and resulting revenues to maintain and grow the

15 attractiveness of their consoles.

16    79.    Nintendo Switch has been wildly successful even though it does not currently

17 have access to *Call of Duty*. Likewise, Sony is well-positioned to overcome any theoretical loss

18 of Activision content. As Sony's CEO told investors in the wake of the Microsoft/Activision

19 merger, Sony can ████████████████████████████████████████████████████

20 ████████████ Sony has also proven willing to use its installed base advantage over Xbox to

21 acquire exclusive (relative to Xbox) rights to valuable third-party content.

22    **3.    Xbox approaches exclusivity on a case-by-case basis.**

23    80.    The economics of exclusivity differ significantly among the three major

24 platforms. The reason is simple: the larger the platform's user base of potential purchasers

25 relative to rivals, the smaller the portion of the market that must be "bought out" (internally or

26 externally) to take a game exclusive. This basic economic calculus makes exclusivity

27 considerably more costly for Xbox than it is for Sony and Nintendo.

28

81.     Like Sony and Nintendo, Xbox develops first-party console games at Xbox Game Studios, as well as games that are created by outside developers (known as "third-party games"). Sony and Nintendo both sell more first-party games than Xbox, and also generally keep those first-party games exclusive to their respective consoles. By contrast, Xbox has taken the approach of shipping many of its first-party games, such as *Minecraft*, to other platforms.

82.     Having exclusive content, however, is important to differentiate consoles—that is, to give gamers a reason to buy your console. To illustrate, if one console offered gamers both exclusive and non-exclusive content and the other offered only content available on the first, all else being equal, gamers seeking access to the broadest range of games would naturally gravitate to the console that offered exclusive content. Because of that dynamic, all three consoles have to offer some exclusive content to attract gamers.

83.     Given the need for some exclusive content to keep the Xbox relevant in the console space and the reality of the costs of exclusivity, Xbox assesses whether it makes sense for a game to be exclusive (and on what terms) on a "title-by-title" basis. Among other considerations that factor into the exclusivity decision, Xbox considers whether a game has launched on multiple platforms previously or is designed to be played multiplayer with as many people as possible. A related consideration is the magnitude of lost sales that would come from making a game exclusive. If a game is already designed for multiple platforms or the quality of gameplay depends on large pools of gamers for cross-play modes, Xbox is less likely to make a game exclusive. Under those circumstances, the costs of exclusivity would likely outweigh the potential upside.

84.     Xbox's experience with *Minecraft* is illustrative. Microsoft acquired Mojang, the developer of the *Minecraft* franchise, in 2014. *Minecraft* is one of the most successful games of all time. It includes a popular multiplayer mode and has produced a large community. At the time of the Mojang acquisition, *Minecraft* was available on Xbox, PlayStation, and PC. Xbox could have made *Minecraft* exclusive to its own platform, yet it determined that was not in its economic interest nor in the interest of the brand or the game. Instead, Xbox continued to ship

1   *Minecraft* on all those platforms post-acquisition and also made subsequent games in the

2   franchise (*e.g.*, *Minecraft: Dungeons*) available for Nintendo consoles and even Sony's

3   subscription service, PlayStation Plus. Xbox's decision to ship *Minecraft* on all these platforms

4   was dictated by the economics and the desire to "not break up existing communities" of gamers.

5          85.    Xbox's handling of the ZeniMax games is consistent with that general approach.

6   After acquiring the ZeniMax studios in 2020, Xbox has continued to release updates of existing

7   ZeniMax games such as *Fallout 76* and *Elder Scrolls Online* on both Xbox and PlayStation,

8   because these games are designed to be played together by broad communities of gamers on

9   different platforms. Moreover, ZeniMax's first two new games released post-transaction were

10  made exclusive to PlayStation for one-year post-launch (consistent with preexisting contractual

11  arrangements). In keeping with the need to offer some exclusive content while mitigating the

12  economic costs and damage to its player-focused brand, Xbox made the ZeniMax title *Redfall*

13  exclusive to Xbox, and has announced that the new single-player game *Starfield*, expected to

14  launch later this year, exclusive to Xbox as well. Neither of these exclusivity decisions,

15  involving new games without established communities, is likely to have a material impact on

16  console sales; indeed, *Redfall* has been widely panned by critics and has generated minimal

17  sales. At the same time, Xbox expects that many other future ZeniMax titles will be shipped on

18  PlayStation and Nintendo.

19         86.    In general, Xbox has a history of continuing to publish its newly acquired first-

20  party games on PlayStation after acquiring game studios.

21         **B.     Activision's content faces intense and growing competition.**

22         87.    Activision's content—in particular, the games within its three core franchises—

23  competes with a large variety of games and game franchises of all types and genres.

24                **1.     Activision has three core video game franchises.**

25         88.     Activision generates 80% of its annual revenue—which totaled $8.5 billion in

26  fiscal year 2022—through three video game franchises. These core video game franchises are

27

28

1  *Call of Duty*, which is developed by Activision; *World of Warcraft* ("*WoW*"), which is developed

2  by Blizzard; and *Candy Crush*, which is developed by King.

3     89.    The *Call of Duty* games are "shooter" games that are based on armed conflicts. In

4  fiscal year 2022, the *Call of Duty* franchise generated about ███ billion in revenue, comprising

5  approximately ███ of Activision's overall annual revenue. *Call of Duty* games have been

6  continuously available on both PlayStation and Xbox consoles since 2003 and are also available

7  for Mac and Windows PC and iOS and Android mobile devices. Activision typically releases a

8  new buy-to-play *Call of Duty* game every year at a price point of $70 each. The latest annual

9  *Call of Duty* titles are playable across platforms via a cross-play feature.

10    90.    Activision also develops and publishes free-to-play versions of *Call of Duty*

11 called *Call of Duty: Warzone*—available on PlayStation, Xbox, and Windows PC—and *Call of*

12 *Duty: Mobile* ("*COD: Mobile*")—available on iOS and Android mobile devices—which it

13 monetizes through optional in-game microtransactions.

14    91.    King's *Candy Crush* franchise consists of casual, free-to-play puzzle games made

15 for mobile devices. *Candy Crush* generated approximately ███ billion in revenue in fiscal year

16 2022—roughly ███ of Activision's overall annual revenue. King primarily monetizes *Candy*

17 *Crush* through optional in-game microtransactions, and also generates revenue through in-game

18 advertising placements.

19    92.    Blizzard's *WoW* franchise consists of a massively-multiplayer-online fantasy role-

20 playing game, and related expansions and content, based on Blizzard's *Warcraft* intellectual

21 property ("IP"). In fiscal year 2022, *WoW* generated about ███ billion in revenue, comprising

22 approximately ███ of Activision's overall annual revenue. Blizzard makes *WoW* available only

23 for Mac and Windows PC (not consoles) and generally sells *WoW* to gamers as a single-game

24 subscription for $14.99 per month; Blizzard also occasionally releases *WoW* expansions for

25 purchase on a standalone basis.

26    93.    Beyond its three core franchises, Activision also develops and publishes other

27 games, including *Diablo* and *Overwatch*, both of which are developed and published by

28

1  Blizzard. Blizzard's *Diablo* and *Overwatch* franchises generated approximately ▓▓ million and

2  ▓▓ million in revenue in fiscal year 2022, respectively. *Diablo* is a fantasy role-playing

3  franchise available on gaming consoles, PCs, and mobile devices. While most *Diablo* titles are

4  available for sale on a buy-to-play basis, the mobile entry in the *Diablo* franchise, *Diablo*

5  *Immortal*, is free to play. *Overwatch* is a free-to-play, multiplayer team-based shooter franchise

6  (which was previously buy-to-play) available on gaming consoles and PCs, which Blizzard

7  monetizes through optional in-game microtransactions.

8      94.   Activision and its various business units also have a portfolio of previously

9  successful, but largely dormant, IP that presents significant opportunities for further franchise

10  development.

11              **2.   Activision's games face significant competition.**

12     95.   Despite these successes, Activision is not the biggest or most successful

13  publisher. Its share in console video game publishing is just ▓▓ by revenue globally and ▓▓

14  by revenue in the U.S. By contrast, Nintendo captures almost a quarter of U.S. publishing

15  revenues (▓▓) and more than ▓▓ what Activision does on a global basis (▓▓)

16     96.   Competition faced by Activision's games includes games published by other

17  leading independent game developers and games in iconic franchises, such as the *FIFA* and

18  *Battlefield* franchises (developed by EA), the *Assassin's Creed* and *Rainbow Six* franchises

19  (developed by Ubisoft), the *Grand Theft Auto* franchise (developed by Rockstar Games of Take-

20  Two Interactive), and the *Fortnite* franchise (developed by Epic Games). It also includes

21  immensely popular games published by platforms' own first-party studios, such as Sony's own

22  *God of War*, *The Last of Us*, and *Uncharted* franchises; as well as games from smaller

23  publishers, such as Innersloth's *Among Us*.

24     97.   The rise of mobile gaming has broadened the competitive landscape for game

25  development and publishing exponentially, leading to the emergence of major Chinese

26  competitors, like Tencent (*e.g.*, *PUBG Mobile*), NetEase (*e.g.*, *Identity V*), and ByteDance (*e.g.*,

27

28

*Mobile Legends: Bang Bang*), who have enormous IP portfolios, complete control of their domestic market, and extraordinary talent, and who are now investing heavily in the U.S. market.

98.     Because the game publishing industry is so dynamic and hits can come from anywhere, new publishers and games can quickly enter the market and take share. For example, *Fortnite* was launched in 2017 and within a matter of months became a global phenomenon.

### 3.   Activision has popular mobile games and the necessary experience and expertise to expand mobile content.

99.     Expanding audience reach through the development of compelling mobile content is essential to Activision's strategy. Mobile gaming now represents almost half of Activision's annual net revenue and more than half of its user base.

100.    Activision successfully entered mobile in 2016 when it acquired King—a world-class developer of mobile games—a transaction valued at $5.9 billion. Through the King acquisition, Activision broadened its portfolio of iconic video game franchises by obtaining two of the five highest-grossing mobile games in the United States at the time: *Candy Crush Saga* and *Candy Crush Soda Saga*. Given the scale of the *Candy Crush* franchise, the acquisition vastly expanded Activision's overall audience reach.

101.    Since the King acquisition, *Candy Crush* has become a multi-billion dollar per year franchise that continues to grow and that would be an incredibly attractive asset for any potential entrant in mobile—much as it was for Activision.

102.    Success in mobile game development requires specific engineering expertise and data analysis. A successful mobile business also must have a deep understanding of free-to-play models and how to service a game with live operations and a constant cadence of content. King excels both in mobile game development and in the management of mobile games, and the success of *Candy Crush* is driven by this expertise.

103.    Activision's other business divisions have also cultivated robust mobile-specific expertise in recent years and, in particular, have acquired an acumen for launching and managing mobile entries in its popular franchises. Popular franchises are becoming more widely available

on mobile devices, and releasing native mobile entries in such franchises is a proven means of driving user engagement. Activision has pursued this strategy to great success with its *Call of Duty* and *Diablo* franchises through its successful releases of *Call of Duty: Mobile* and *Diablo Immortal*. In fiscal year 2022 alone, *Call of Duty: Mobile* earned over ▉▉▉▉▉ in revenue. And *Diablo Immortal* has earned more than ▉▉▉▉▉ within 11 months of its release in June 2022, becoming one of only ▉ mobile games ever to reach that milestone in that same period of time.

104.    Activision's experiences with *Call of Duty: Mobile* and *Diablo Immortal* have further fostered institutional knowledge regarding premium mobile games. Activision is now developing numerous mobile entries in its popular franchises completely in-house. This includes: (1) *Warzone: Mobile*, which Activision is developing with its own proprietary engine and that is expected to release in fall 2023; (2) *Warcraft Arclight Rumble*, which is a mobile action strategy game set within the *WoW* universe; and (3) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉.

105.    Activision's expertise with native mobile entries in popular franchises is extensive and continuing to grow at a rapid pace: for example ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉. Xbox aims to leverage this expertise in developing and managing native mobile versions of popular console franchises.

### 4.    Activision's existing strategy depends on distributing its content broadly.

106.    Activision's current relationship with Microsoft is principally governed by a base publishing agreement, the Xbox Console Publisher Licensing Agreement (the "Xbox Console PLA"), executed in August 2020. Under the terms of the Xbox Console PLA, Activision and Microsoft have agreed to a ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉



. The result is (i) that Activision receives a royalty rate of ████ of the revenues generated by sales of more recent titles in the *Call of Duty* franchise via the Microsoft Store if Activision meets certain requirements and (ii) that Activision is eligible to receive a royalty rate of ████ for other titles that meet certain requirements.

107.

108.   And under the terms of Activision's

Defendants' Proposed Pretrial Findings of Fact and Conclusions of Law
(No. 3:23-cv-02880-JSC)

109.    Activision's current relationship with Nintendo is principally covered by ██████ Activision

currently does not develop titles in the *Call of Duty* franchise for the Nintendo Switch. Activision

previously released titles in the *Call of Duty* franchise on Nintendo's Wii and Wii U consoles but

has not released a *Call of Duty* title on a Nintendo platform since the release of *Call of Duty:*

*Ghosts* in 2013. While Activision could develop a *Call of Duty* title for the Nintendo Switch,

Activision has finite development resources and has chosen to deploy those resources to

opportunities that Activision believes present greater potential financial returns.

### C.    Xbox has a negligible presence in mobile, the fastest growing gaming segment.

110.    Mobile is the largest and fastest-growing sector of the gaming industry, and Xbox

has tried for years without success to gain a foothold into mobile gaming. Xbox today still has no

real mobile presence. Xbox has had almost no revenues from mobile gaming, no hit mobile

games, and no success monetizing its console games on mobile.

111.    Although Xbox has had a number of hit console games, it lacks the technical

capability to create mobile versions of these games. Activision, by contrast, has significant

mobile game development capability.

112.    Xbox leadership has discussed the importance of a mobile acquisition dating back

to the early 2010s.

1 ████████████████████████████████████████████████████

2 ███████████████████████

3      113.  ████████████████████████████████████

4 ██████████████████████████████████████████████████

5 ████████████  The mobile component of the strategic rationale for a potential Activision

6 acquisition was well known to Xbox and Microsoft leadership due to the analysis that had been

7 conducted ████████.

8      114.  The importance of mobile to the Activision deal rationale is reflected throughout

9 internal materials, including the final deck about the deal presented to the Microsoft Board of

10 Directors. In particular, Xbox was interested in Activision's King segment, which is responsible

11 for the ██████████████████████ free-to-play game, *Candy Crush*. Xbox

12 was also attracted to the success Activision had releasing the mobile *Call of Duty* game *Call of*

13 *Duty: Mobile*.

14 **IV.**   **The Transaction Will Provide Xbox with a Position in Mobile and Expand Choice**
       **for Gamers and Developers.**

15

16      115.  Xbox's future relevance depends on finding a way to reach the billions of gamers

17 who want to enjoy games regardless of location, socio-economic status, or device. Xbox is thus

18 betting on accessibility by making its games available through alternative payment structures, on

19 multiple platforms, and even via streaming technology.

20      116.  Xbox and Activision determined that, by merging, they could significantly

21 improve gaming and increase Xbox's competitiveness.

22     **A.**  **Xbox's primary rationale for the deal is to improve its mobile presence.**

23      117.  Xbox sees ████████████████ of the Activision deal as the opportunity to

24 ████████████████████████████████████████████

25      118.  Microsoft is acquiring Activision for its talented game developers and well-

26 regarded game franchises. While maintaining existing revenue streams (including sales of

27 Activision games to Play Station users) is required to justify the purchase price, the strategic

28

1  value of the transaction is to (i) help Xbox meet the billions of gamers who choose to play on

2  mobile devices instead of a console or PC and (ii) learn how to make games that appeal to and

3  engage gamers wherever they want to play. In addition, Xbox intends to add Activision content

4  to Game Pass, though it recognizes that doing so will significantly reduce sales of those

5  standalone games to Xbox users.

6      119.    Activision's popular free-to-play mobile games offer Xbox consistent revenue

7  from in-game purchases and advertising. But beyond those lucrative revenue streams, Xbox

8  valued the potential access to Activision's established mobile gamer communities, especially its

9  casual gaming audience.

10     120.    Xbox sees an opportunity to use Activision's existing mobile games as ███

11  ███ to bring that casual gaming audience to the Xbox platform.

**B.    The transaction will give gamers more choices than would be available absent the deal.**

14     121.    Having lost the console wars, Xbox is betting on a different strategy than Sony

15  and Nintendo by making games more widely accessible.

16     122.    Xbox generates profits through game sales, not console sales. That is because

17  Xbox sells its consoles at a loss, effectively subsidizing gamers' purchase of the hardware in

18  hopes of making up the revenue through sales of games and accessories.

19     123.    Xbox accordingly seeks to expand access for gamers by not only continuing to

20  distribute Activision games everywhere they currently exist, but also making those games

21  available for play in new ways and on new platforms.

**1.    Xbox has made a number of commitments to maintain and expand access to Activision Games after the Transaction.**

23     124.    In connection with the transaction, Xbox has made a number of commitments to

24  maintain and expand access to Activision games including (i) adding Activision games to Game

25  Pass; (ii) bringing *Call of Duty* to Nintendo Switch; and (iii) streaming Activision content on

26  third-party cloud gaming services.

27

28

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-cv-02880-JSC)

a.   ***Xbox will add Activision games to the Game Pass subscription service.***

125.    From the day that the deal was announced, Xbox has been clear about its plans to make Activision games available for play under its Game Pass subscription.

126.    Adding Activision games—including new releases—to Game Pass will give gamers a new, low-cost way to pay for and access those games. And in the absence of the deal, new Activision games would not be available on any subscription service. To date, Activision has never placed one of its new games on a subscription service.

127.    Activision's long and considered strategy is to not make its new games available on multi-game subscription services.

128.    Among other concerns, Activision believes that putting new Activision games on multi-game subscription services would "highly cannibalize" individual sales. That is, if gamers can access new Activision games through a subscription that they already pay for, those gamers are unlikely to make standalone purchases of those games.

129.    Given that cannibalization, no company has ever offered Activision economics that, from Activision's perspective, would make it profitable for Activision to release new games onto a multi-game subscription.

130.    Over the years, Activision has refused offers to place its new games on subscription services. For example, in 2020, while negotiating an updated partnership agreement with Activision, Xbox sought to put certain Activision games (like ███████████████ ███████ on Game Pass. Activision refused, based in part on its concern that doing so could ██████████████████████████████. In the end, Xbox dropped the request.

131.    Sony, for its part, has never asked Activision about the possibility of putting the current version of *Call of Duty* on PlayStation Plus, largely because Activision has been so "██████" and ██████" about not doing so. Activision's participation on PlayStation Plus has been limited to a handful of back-catalog games available for a limited time (*e.g.*, one-month), all of which had been commercially available for over a year at the time of inclusion and selected in an

1  effort to drive interest in Activision's upcoming new releases, which would not be available on
2  subscription services.

3      132.   Beyond that, multi-game subscription services are inconsistent with Activision's
4  increased use of free-to-play models.

5      133.   Ultimately, placing new Activision games on a multi-game subscription service
6  would require specific approval from Activision CEO Bobby Kotick and Activision CFO Armin
7  Zerza. Yet Mr. Kotick has expressed a "philosophical aversion" to multi-game subscription
8  services for the reasons described above. And Mr. Zerza has similarly explained that Activision's
9  "declared strategy is not to put any games on any multi-game subscription services."

10          **b.**   ***Xbox will bring Call of Duty to Nintendo Switch.***

11     134.   Activision's *Call of Duty* games have not been available on Nintendo devices for
12  over a decade.

13     135.   In February 2023, however, Xbox and Nintendo entered a ten-year agreement (a
14  much longer commitment than the industry standard) to bring future *Call of Duty* titles to Switch
15  (and any successor Nintendo consoles) after the deal closes.

16     136.   That agreement guarantees feature and content parity, and commits Xbox to
17  releasing new *Call of Duty* titles on Nintendo simultaneous with their launch on other platforms.

18     137.   Post-transaction (and post-porting), approximately 100 million gamers would be
19  able to play *Call of Duty* on their existing Nintendo devices for the first time in many years.

20          **c.**   ***Xbox has made contractual and regulatory commitments to***
21              ***stream Activision content on third-party cloud gaming services.***

22     138.   To date, Xbox has entered into four separate ten-year agreements with cloud
23  gaming providers Boosteroid, Nvidia GeForce NOW, NWare, and Ubitus to bring Activision
24  content to their platforms. It has entered into a similar letter of intent with EE Limited, a
25  subsidiary of British Telecommunications.

26     139.   In addition to those agreements, during the European Commission's regulatory
27  process, Xbox made binding commitments to grant streaming rights to Activision games to other

28

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(No. 3:23-cv-02880-JSC)

1    cloud gaming services offered to consumers in the European Economic Area—regardless of

2    whether Xbox ultimately decides to stream those games on Xbox Cloud Gaming.

3          140.    These licenses will ensure that gamers that have purchased one or more

4    Activision games on a PC or console store, or that have subscribed to a multi-game subscription

5    service that includes Activision games, have the right to stream those games with any cloud

6    game streaming service of their choice and to play them on any device using any operating

7    system.

8          141.    The agreements also ensure that Activision's games available for streaming will

9    have the same quality and content as games available for traditional download.

10          142.    Margrethe Vestager, European Commissioner for Competition, said regarding the

11    commitments, "this solution fully addressed our concerns. And on top of that, it had significant

12    procompetitive effects [compared to] the pre-merger situation, where Activision does not license

13    its games to cloud services."

14          143.    These agreements would expand consumer access to Activision's content because

15    Activision has adopted a general "strategy of not participating in cloud streaming services." It

16    has done so for at least three reasons.

17          144.    *First*, Activision has determined that cloud gaming technology is not viable for its

18    games due to its technical deficiencies. The biggest problem with cloud gaming technology is

19    that it introduces "significant latency," which, in competitive situations, puts players on cloud

20    gaming services at a "perpetual disadvantage."

21          145.    Activision believes it will be a decade or more before cloud gaming technology

22    might have a chance to deliver the low latency performance required to provide a good player

23    experience for fast-paced and/or online multiplayer games like *Call of Duty*.

24          146.    Activision has thus opted not to place its content on cloud streaming services, for

25    fear that the poor user experience associated with cloud gaming would harm Activision's and its

26    franchises' brands.

27

28

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-cv-02880-JSC)

147.    *Second*, Activision has concluded that cloud gaming's value to consumers is constrained—and rapidly being eclipsed by—improvements in the local processing capabilities of mobile phones and other consumer electronics. Already powerful local hardware, including mobile devices and TVs, will see "continued improvements in the micro processing capabilities," which could avoid latency issues that currently limit cloud gaming technology. As Activision has determined, it is not in its best interest to invest its limited resources in cloud gaming opportunities, which only offer only "speculative potential" relative to these continued improvements in local hardware.

148.    *Third*, Activision has concluded that the cloud gaming distribution opportunity cannot offer attractive economics because cloud gaming services lack scale. Cloud gaming services are unlikely to "[result] in any material incremental new gamers joining [Activision's] ecosystem." Meanwhile, supporting cloud gaming services would require significant investment from Activision.

149.    Like Activision's aversion to multi-game subscription services, Activision's aversion to cloud gaming services is borne out in practice. Activision's content is not available on any cloud gaming platforms today, and Activision has rebuffed every offer by cloud gaming companies to place its content on their platforms.

150.    Any cloud gaming partnership would require specific approvals from Activision's senior leadership, such as Mr. Kotick and Mr. Zerza. But in the words of Mr. Kotick, cloud gaming is not "realistic" for games like *Call of Duty* today or "in any reasonable near-term future."

   **d.     *Xbox has offered Sony a ten-year deal to keep Call of Duty on PlayStation—that Sony has refused.***

151.    From the day the deal was announced, Xbox made clear its intentions to keep *Call of Duty* available to its substantial existing PlayStation gamer community long into the future. In particular,

1

2

3      152.    Since that time, Xbox made repeated offers to keep *Call of Duty* on PlayStation,

4  which Sony has rebuffed. Sony claims that losing *Call of Duty* would be disastrous to its

5  business, yet has refused Xbox's proposal to license those games to PlayStation on the same

6  terms given to Xbox.

7      153.    On January 31, 2022, Microsoft sent a first written proposal to Sony. Sony took

8  nine months to provide a mark-up to this written proposal.

9      154.    Sony sent Microsoft a draft publishing agreement on September 29, 2022 (the

10  "Sony Proposal"). Sony states that the draft publishing agreement reflects what it "

11

12  The Sony Proposal provides for continued distribution of all Activision games on the PlayStation

13  platform at parity to Xbox. In response, Microsoft sent Sony a red-line of this draft agreement on

14  December 23, 2022. The duration of Microsoft's commitment to Sony is a 10-year term, to take

15  effect upon completion of the Transaction. This term would in any case go beyond the expected

16  starting period of the next generation of consoles (in 2028). Thus, *Call of Duty* will be published

17  on successor PlayStation consoles should one be released during the term of the agreement. The

18  agreement also would ensure that *Call of Duty* console games are offered on PlayStation at parity

19  with Xbox.

20      155.

21

22

23

24

25

26

27

28

156.    Sony has consistently rejected these offers (1) in an attempt to leverage its objection to the deal to extract far more favorable economic terms and rights than it currently has; or (2) to increase the chances the deal is blocked by regulators.

157.    There is no reason for Xbox to not make this deal with Sony, as discontinuing distribution of Activision's titles on other platforms would cost Microsoft billions in revenue.

158.    Sony also refuses ███████████████ ██████████████████ Activision's CEO Bobby Kotick has attempted to discuss ████████████████ ████████████████████ ███████████████████ ██████████████████ Tellingly, Mr. Ryan also said privately on the day it was announced that the deal is ████████████████ ████████████████████

### 2.      The economics of the transaction depend on maintaining broad access to Activision games, including on PlayStation.

159.    Although mobile was the primary strategic driver for Microsoft's investment, ████████████████████ ██████ In other words, nearly half the deal's value is based on the projected revenue stream from continuing business on console and PC as usual. That includes continuing to sell games in the popular *Call of Duty* franchise on both PlayStation and Xbox.

160.    For the past several years, the majority of Activision's console business has derived from sales on PlayStation. Activision's SEC filings reflect that after Google and Apple, Sony is the platform with the next largest share of Activision revenues. In fiscal year 2021, that amounted to 15% of Activision's consolidated net revenues. By contrast, Activision's sales on the Xbox platform were too low for Activision to break out.

161.    The valuation model presented to the Microsoft Board of Directors to justify the purchase price for Activision relies on sales on PlayStation and other platforms post-acquisition.



162.

163.     Because Xbox loses money on each console sold, Xbox is actually better off financially having a PlayStation gamer purchase *Call of Duty* for PlayStation (for which Xbox would collect royalties) than having a PlayStation gamer purchase an Xbox console for the sole purpose of playing one *Call of Duty* game (because the subsidy loss would be greater than the profit from the game).

164.     There are other reasons why it would harm Xbox to withhold *Call of Duty* from PlayStation. Exclusivity would decimate *Call of Duty*'s cross-play functionality, which would degrade the gameplay experience for all players. Indeed, taking *Call of Duty* exclusive would risk destroying what makes the game so popular in the first place. According to Activision's internal documents, for *Call of Duty* gamers, the ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉" Exclusivity would thus hurt even *Call of Duty* gamers who play on an Xbox; they would no longer be able to play with their friends who play on a PlayStation.

165.     In addition, Xbox cannot afford to incur the reputational damage that would result from pulling a popular Activision game, like *Call of Duty*, off PlayStation. Pulling *Call of Duty* from PlayStation would be an unprecedented move in the industry. There are no instances of a game publisher choosing to make exclusive an existing game franchise that is multiplayer, multi-platform, and offers cross-platform play. This is in part because exclusivity is less likely to be profitable for games that come from established franchises and for games with important cross-platform, multiplayer components.

166.    In short, keeping Activision games on PlayStation is both good for gamers and good for Xbox's business. Xbox is thus committed to shipping Activision games, including future titles of *Call of Duty*, on PlayStation for years to come.

### 3.    Even withholding Activision content would not foreclose PlayStation because Activision's content is not essential for platform growth.

167.    The broad and ever-expanding nature of competition within video game development and publishing ensures that no one developer, studio, franchise, or game is essential to a platform. Though Activision has enjoyed great success with its core franchises, experience shows that Activision's content—including *Call of Duty*—does not drive platform adoption and is not "must-have" or otherwise essential content on any platform.

168.    ▮ of all PlayStation gamers spent zero time playing *Call of Duty* in 2022. And despite *Call of Duty*'s annual release cadence, in the past six years it has only been the most-played franchise on PlayStation by month for ▮—in other words, just ▮ of total months over a six-year period. By contrast, *Fortnite* was the most played game on PlayStation by month in ▮ of months.

169.    If every PlayStation device that accounted for as little as two hours of *Call of Duty* per month were to somehow transform into an Xbox device overnight, PlayStations would *still* comfortably outnumber Xboxes. Similarly, the FTC's economic expert, Dr. Lee, ▮
▮
▮

170.    Furthermore, *Call of Duty* does not uniquely drive PlayStation console purchase decisions, and it is not uniquely important as the first game played on PlayStation. In 2022, ▮ of new PlayStation owners did not play a *Call of Duty* game on the first day of play. And in late 2022, ▮ opted to play Sony's newly released title *God of War: Ragnarok* on their first day of play on a new PlayStation console rather than Activision's newly released title *Call of Duty: Modern Warfare II*.

1    171.    Three natural experiments, in particular, demonstrate that having access to *Call of*
2    *Duty* content does not "make" a platform and that a lack of such content does not "break" a
3    platform.

4    172.    *First*, Xbox and Activision had an exclusive co-marketing agreement with respect
5    to *Call of Duty* titles from 2005 to 2015. During that time, Activision brought certain *Call of*
6    *Duty* content to Xbox before it brought that content to PlayStation, including map packs and
7    other add-ons. Yet despite that agreement, PlayStation maintained and even *grew* its platform
8    lead over Xbox during that period.

9    173.    *Second*, Activision has not released a single *Call of Duty* title on the Nintendo
10   Switch—and, indeed, has not released any *Call of Duty* titles on a Nintendo platform since it
11   released *Call of Duty: Ghosts* on the Nintendo Wii U in 2013. Without access to a single *Call of*
12   *Duty* title, the Nintendo Switch has still been a resounding success, and is the second-best selling
13   gaming console in the United States today, behind only Sony's PlayStation and well ahead of
14   Microsoft's Xbox.

15   174.    *Third*, Activision's attempt to take PC digital sales of *Call of Duty* exclusive to its
16   Battle.net platform was a resounding failure. Before 2018, Activision sold digital versions of PC
17   *Call of Duty* titles on Valve's successful Steam platform. In 2018, Activision decided to take the
18   game off of Steam and make it exclusively available on Battle.net—largely in an effort to attract
19   users to, and grow, Activision's own platform. Battle.net's monthly active users remained
20   relatively flat during the period when it had exclusive access to digital sales of *Call of Duty* on
21   PC, from 2018 through 2022. Meanwhile, during that same period and without access to *Call of*
22   *Duty*, Steam's monthly active users *grew* by tens of millions of users.

23   175.    Moreover, Sony would have a variety of options for responding even if Activision
24   content were withheld, including by lowering its prices, improving its console's quality, by
25   growing its own studios organically, investing in additional third-party games, or by purchasing
26   another publisher (as it did with Bungie in 2022 while the Microsoft/Activision deal was
27   pending).

28

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(No. 3:23-cv-02880-JSC)

176.    Ultimately, Activision's games are but a few of the endless game options that are available to gamers, who can and will play other games on their preferred platform if Activision's games are unavailable.

**V.    Numerous Foreign Antitrust Authorities Have Approved the Transaction.**

177.    The transaction has been cleared in nine jurisdictions. Most regulators – including those in Brazil, Chile, China, Japan, Saudi Arabia, Serbia, South Korea and Ukraine[1] – have cleared the transaction unconditionally. The transaction received conditional clearance in the European Union ("EU"), which covers 27 countries. In Canada, the waiting period expired end of last year (on October 17, 2022) without action by the Canadian competition regulator, the CCB.

178.    The United Kingdom's ("UK's") Competition and Markets Authority ("CMA") has sought to block the merger, but its only objection to the transaction was that it might harm, at some point in the future, the evolution of cloud gaming. Xbox is currently appealing that decision.



**VI.**

179.

180.

---

[1] Brazil: Clearance decision issued on Wednesday October 5, 2022 became final with the issuance of the Certificate of Clearance (signaling the decision was not appealed before the Tribunal) published on Monday October 24, 2022; Chile: Unconditional clearance granted on Wednesday December 28, 2022; China: Unconditional clearance granted on Friday May 19, 2023; Japan: Unconditional clearance granted on Tuesday March 28, 2023; Saudi Arabia: Unconditional clearance granted on Thursday June 16 2022; Serbia: Unconditional clearance granted on Friday August 12, 2022; South Korea: Unconditional clearance granted on Monday May 29, 2023; Ukraine: Unconditional clearance granted on Thursday April 27, 2023.



DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-CV-02880-JSC)



DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-CV-02880-JSC)

**C.** [redacted]

194. [redacted]

## VII. Dr. Carlton Demonstrates that the Transaction Would Produce Significant Pro-Competitive Benefits.

195. Vertical mergers produce efficiencies by internalizing of pricing externalities, aligning the incentives of the merging firms, and reducing transaction costs between the merging firms. These efficiencies must be accounted in determining the economic effect of a vertical merger.

196. By aligning incentives and eliminating transaction costs, the proposed merger will result in *Call of Duty* and other Activision games being available via subscription for the first time, increasing output and producing significant benefits for gamers. When *Call of Duty* is made available in Game Pass, Game Pass subscribers will pay a lower price (nothing) for Activision games, whereas before they had to pay for them. For purchasers of Activision games who do not subscribe to Game Pass, the effective cost of subscribing to Game Pass drops by the price they would otherwise pay for Activision games.

197. The merger will also result in additional distribution of Activision content to Nintendo gamers and will allow owners of Activision games to stream the games from the cloud for free.

198. [redacted]

1

**PROPOSED CONCLUSIONS OF LAW**

2

**I.    Legal Standard**

3

**A.    Section 7 of the Clayton Act**

4          1.        Under Section 7 of the Clayton Act, the FTC bears the burden of demonstrating

5    that this merger "is likely to substantially lessen competition in the relevant market." *United*

6    *States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019); *see* 15 U.S.C. § 18; *United States v.*

7    *Oracle Corp.*, 331 F. Supp. 2d 1098, 1109 (N.D. Cal. 2004) (rejecting merger challenge because

8    government failed to prove "merger will likely lead to a substantial lessening of competition").

9          2.        In making this showing, the FTC cannot "veer into the realm of ephemeral

10   possibilities." *FTC v. Meta Platforms Inc.*, No. 5:22-cv-04325-EJD, 2023 WL 2346238, at *28

11   (N.D. Cal. Feb. 3, 2023); *see also FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 115 (D.D.C.

12   2004) (Section 7 analysis "deals in *probabilities* not ephemeral possibilities"); *United States v.*

13   *Baker Hughes, Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990) (Section 7 "involves probabilities,

14   not . . . possibilities"); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 220

15   (D.C. Cir. 1986) (Section 7 "applies a much more stringent test than does rule-of-reason analysis

16   under section 1 of the Sherman Act"). Nor can the FTC rely on "assumptions and simplifications

17   that are not supported by real-world" facts, *Am. Booksellers Ass'n v. Barnes & Noble, Inc.*, 135

18   F. Supp. 2d 1031, 1041 (N.D. Cal. 2001), or ignore the "economic reality" of the markets at

19   issue, *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004). Instead,

20   taking that economic reality into account, the agency must prove a "reasonable probability of

21   anticompetitive effect." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984) (per

22   curiam); *see also United States v. Marine Bancorp. Inc.*, 418 U.S. 602, 623 n.22 (1974) (alleged

23   harm to competition must be "sufficiently probable and imminent" to warrant relief).

24         3.        In vertical mergers[2] such as this, the FTC carries a particularly heavy burden

25   because "[v]ertical mergers often generate efficiencies and other procompetitive effects." *United*

26

---

27   [2] A vertical merger is "one that involves firms that do not operate in the same market." *AT&T*, 310 F. Supp. 3d at
192 (citation omitted). This merger is appropriately treated as vertical because the FTC challenges only the

28                                                                                                   (*continued on next page*)

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-CV-02880-JSC)

1  *States v. AT&T Inc.*, 310 F. Supp. 3d 161, 197 (D.D.C. 2018), *aff'd United States v. AT&T, Inc.*,

2  916 F.3d 1029 (D.C. Cir. 2019). The standard for enjoining a vertical merger is so demanding

3  that U.S. antitrust agencies have rarely even tried to do so: until 2017, the government had not

4  litigated a challenge to a vertical merger for more than four decades, *see AT&T*, 310 F. Supp. 3d

5  at 193–94, and its recent court challenges to vertical mergers have all failed, *see id.*; *United*

6  *States v. UnitedHealth Group*, No. 1:22-cv-0481, 2022 WL 4365867 (D.D.C. Sept. 21, 2022).

7  4.    Unlike in horizontal merger cases, the FTC "cannot use a short cut to establish a

8  presumption of anticompetitive effect through statistics about the change in market

9  concentration, because vertical mergers produce no immediate change in the relevant market

10  share." *AT&T, Inc.*, 916 F.3d at 1032. Instead, the FTC must make a merger-specific, market-

11  specific factual showing of how the merger is likely to result in a substantial lessening of

12  competition, taking marketplace realities into account. *Id.* And the "ultimate burden of

13  persuasion . . . remains with the government at all times." *Baker Hughes*, 908 F.2d at 983.

14  5.    To satisfy its burden, the FTC must first "define the relevant market," which in

15  turn requires identifying both "(1) the relevant product market and (2) the relevant geographic

16  market" in which the anticompetitive effects will allegedly occur. *Meta Platforms Inc.*, 2023 WL

17  2346238, at *8 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962)). "The outer

18  boundaries of a product market are determined by the reasonable interchangeability of use or the

19  cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370

20  U.S. at 325. Put differently, courts must "look at whether two products can be used for the same

21  purpose, and, if so, whether and to what extent purchasers are willing to substitute one for the

22  other." *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011) (citation

23  omitted). The relevant market must also be defined with precision; the government may neither

24  combine distinct markets into a single market nor artificially subdivide a market into smaller

25

26

27  combination of Activision's game publishing business and Microsoft's game platform business and does not allege
competitive concerns arising from any overlap in the parties' game publishing operations.

28

1    slivers. *See, e.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120–21 (9th Cir. 2018); *FTC v. RAG-*

2    *Stiftung*, 436 F. Supp. 3d 278, 294–95 (D.D.C. 2020).

3         6.    Having identified the correct market, the FTC must then prove that the merger "is

4    likely to substantially lessen competition in the relevant market." *AT&T, Inc.*, 916 F.3d at 1032.

5         **B.    Preliminary Injunction Standard**

6         7.    Section 13(b) of the FTC Act authorizes federal district courts to grant a

7    preliminary injunction against a challenged merger "[u]pon a proper showing that, weighing the

8    equities and considering the Commission's likelihood of ultimate success, such action would be

9    in the public interest." 15 U.S.C. § 53(b). This standard requires a court to (1) "determine the

10   likelihood that the [FTC] will ultimately succeed on the merits" and (2) "balance the equities."

11   *Warner Commc'ns Inc.*, 742 F.2d at 1160.

12        8.    A sufficient likelihood of success requires "more than mere questions or

13   speculations supporting" allegations of anticompetitive conduct. *Meta Platforms Inc.*, 2023 WL

14   2346238, at *8. The FTC meets its burden only when the evidence "raise[s] questions going to

15   the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough

16   investigation, study, deliberation and determination." *Warner Commc'ns Inc.*, 742 F.2d at 1162.

17   Likewise, a court may not determine the agency's "'likelihood of success' by [relying on] a

18   statistical calculation of the parties' odds" before the agency tribunal. *See FTC v. Meta Platforms*

19   *Inc.*, No. 5:22-CV-04325-EJD, 2022 WL 16637996, at *5 (N.D. Cal. Nov. 2, 2022). Instead, a

20   court must exercise its "'independent judgment' and evaluat[e] the FTC's case and evidence on

21   the merits." *Id.*

22        9.    If the FTC can establish a likelihood of success, a court must then weigh the

23   public and private equities. *See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726–27 (D.C. Cir. 2001).

24   Public equities include the merger's procompetitive benefits, *Warner Commc'ns. Inc.*, 742 F.2d

25   at 1165, and the need to maintain the pre-merger "status quo" so the FTC can award effective

26   relief, *H.J. Heinz Co.*, 246 F.3d at 726. Harm to the merging parties if the merger is enjoined—

27

28

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-cv-02880-JSC)

1   *i.e.*, "private equities"—is also "entitled to serious consideration." *Warner Commc'ns. Inc.*, 742

2   F.2d at 1165.

3       10.   In weighing these concerns, a court must keep in mind that the issuance of a

4   preliminary injunction is an "extraordinary and drastic remedy." *FTC v. Exxon Corp.*, 636 F.2d

5   1336, 1343 (D.C. Cir. 1980). Thus, even where a court finds a likelihood of success on the

6   merits, it must also consider whether less intrusive alternatives would be effective to maintain the

7   status quo. *Id.* at 1344.

8       11.   Judicial scrutiny at the preliminary injunction stage is essential. Despite its

9   "preliminary" nature, the decision to grant or deny a preliminary injunction is often the only

10  judicial determination on the merits the merger parties will receive because such injunctions

11  often "kill, rather than suspend, a proposed transaction." *FTC v. Weyerhaeuser Co.*, 665 F.2d

12  1072, 1087 (D.C. Cir. 1981); *see Exxon Corp.*, 636 F.2d at 1343 ("[A]s a result of the short life-

13  span of most tender offers, the issuance of a preliminary injunction blocking an acquisition or

14  merger may prevent the transaction from ever being consummated."). For this reason, even at the

15  preliminary injunction stage, courts require "rigorous proof" to enjoin a merger. *See FTC v.*

16  *Sysco Corp.*, 113 F. Supp. 3d 1, 23 (D.D.C. 2015); *see also Arch Coal, Inc.*, 329 F. Supp. at 116

17  ("Given the stakes, the FTC's burden is not insubstantial.").

18  **II.   The FTC Has Failed to Show That It Is Likely to Succeed on the Merits.**

19      **A.   The FTC Has Failed to Identify a Proper Relevant Antitrust Market.**

20      12.   To meet its burden to show a substantial lessening of competition, the FTC must

21  first "define the relevant market" in which anticompetitive effects will allegedly occur. *FTC v.*

22  *Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). Defining the relevant market "is a necessary

23  predicate to deciding whether a merger contravenes the Clayton Act." *Marine Bancorp.*, 418

24  U.S. at 618 (internal quotation marks omitted). The burden to establish a relevant market falls

25  entirely on the FTC; a defendant has no corresponding obligation to propose alternative markets.

26  *See RAG-Stiftung*, 436 F. Supp. 3d at 299–300, 303.

27

28

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-CV-02880-JSC)

1       13.    A relevant market has two components: a product market and a geographic

2   market. *See FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 37 (D.D.C. 2009). A product market

3   "identifies the products and services with which the defendants' products compete." *Id.* Its "outer

4   boundaries . . . are determined by the reasonable interchangeability of use or the cross-elasticity

5   of demand between the product itself and other substitutes for it." *Brown Shoe*, 370 U.S. at 325.

6   Put another way, "products constitute part of a single product market if they are reasonably

7   interchangeable by consumers for the same purposes." *Xerox Corp. v. Media Scis., Inc.*, 660 F.

8   Supp. 2d 535, 543 (S.D.N.Y. 2009).

9       14.    The product market is defined by the substitutes a consumer *could* turn to if the

10   combined company increased price or decreased quantities, including substitutes they would not

11   prefer under pre-merger circumstances. *See Oracle Corp.*, 331 F. Supp. 2d at 1131 ("Customer

12   preferences towards one product over another do not negate interchangeability."). As a result,

13   even products that vary "widely" on issues like price or quality "may, in fact, be in the same

14   market" if customers could substitute them. *See id.* at 1121.

15       15.    A geographic market is "the area to which consumers can practically turn for

16   alternative sources of the product and in which the antitrust defendants face competition." *FTC v.*

17   *Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 49 (D.D.C. 1998); *accord, e.g.*, *Marine Bancorp.*, 418

18   U.S. at 620–21. "Like the product market, the geographic market must correspond to the

19   commercial realities of the industry and be economically significant." *Sysco Corp.*, 113 F. Supp.

20   3d at 48 (internal quotation marks omitted).

21       16.    If the FTC fails to appropriately define either the product market or the

22   geographic market, the agency "has not met its burden," and its preliminary injunction motion

23   must be denied. *See RAG-Stiftung*, 436 F. Supp. 3d at 309.

24       17.    Here, the FTC proposes four relevant product markets and one relevant

25   geographic market. The proposed product markets are: (i) high-performance consoles; (ii) multi-

26   game subscription services; (iii) cloud gaming subscription services; and (iv) a combined multi-

27

28

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-CV-02880-JSC)

1   game and cloud gaming subscription services market. The proposed geographic market is the

2   United States.

3        18.    None of the FTC's proposals satisfies the criteria for a relevant market. With

4   respect to the "high-performance consoles" market, the FTC's proposed market arbitrarily

5   excludes Nintendo Switch and PC gaming in order to conjure the illusion that Xbox has market

6   power. In fact, Microsoft is the third-place console maker (out of three), and any increase in

7   market share as a result of this merger will *lessen* market concentration by making a straggling

8   competitor more competitive. And with respect to the other three proposed product markets, the

9   FTC presents an inaccurate picture of the gaming industry. Finally, with respect to the proposed

10   geographic market, the FTC erroneously limits the market to the United States, when in reality

11   both Microsoft and Activision compete in dynamic global markets.

12        **1.    "High-Performance Consoles" Are Not a Relevant Product Market.**

13        19.    The FTC offers two alternative definitions of its "high-performance consoles"

14   market: the first proposes that PlayStation and Xbox alone comprise the entire console market,

15   and the second adds the Nintendo Switch. Any relevant market, however, "must encompass the

16   product at issue as well as *all* economic substitutes for the product." *Newcal Indus., Inc. v. Ikon*

17   *Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (emphasis added). Doing so "ensures that the

18   relevant product market encompasses 'the group or groups of sellers or producers who have

19   actual or potential ability to deprive each other of significant levels of business.'" *Hicks*, 897

20   F.3d at 1120–21 (quoting *Newcal Indus.*, 513 F.3d at 1045). The relevant market thus may not be

21   "contorted to meet [the FTC's] litigation needs," *id.* at 1121, because "a market definition that is

22   too narrow or excludes relevant competition is misleading," *Malaney v. UAL Corp.*, No. 3:10-

23   CV-02858-RS, 2010 WL 3790296, at *5 (N.D. Cal. Sept. 27, 2010), *aff'd*, 434 F. App'x 620 (9th

24   Cir. 2011). Here, both of the FTC's proposed console market definitions fail as a matter of law

25   because the first arbitrarily excludes Nintendo and they both arbitrarily exclude PCs.

- 43 -

1          a.    ***The Console Market Must Include Nintendo.***

2          20.    First, there is no basis for excluding Nintendo from any market. The Nintendo

3    Switch is the second most popular and fastest growing console among the three major

4    developers. In terms of installed base ███, units sold ███, and revenue ███ Xbox is a

5    distant third behind Sony ███) and Nintendo ███. By excluding Nintendo, the

6    FTC artificially elevates Xbox's market share from ███.

7          21.    Contrary to the position of the FTC and its expert, Sony, Nintendo, and Xbox all

8    compete in a dynamic platform market, as evidenced by gamer behavior, marketplace dynamics,

9    and ███. Gamer behavior demonstrates that

10   Xbox and PlayStation compete with the Switch for customers and playtime. In particular, ███

11   ███

12   ███

13         22.    Contemporaneous internal Xbox and Sony communications and sworn testimony,

14   ███

15   ███

16   ███

17         23.    The FTC assumes without evidence that certain features that make some Xbox

18   and PlayStation models similar to one another warrant a narrowly defined market for so-called

19   "high-performance consoles," despite the absence of any evidence that anyone in the gaming

20   industry uses that terminology. In reality, consumers weigh a variety of factors—including

21   performance, cost, and game library—and goods can be substitutes for one another even where

22   they vary dramatically on qualities such as "price, use and qualities." *See, e.g.*, *Oracle Corp.*,

23   331 F. Supp. at 1131. In fact, Xbox and PlayStation differentiate their own products in material

24   ways in order to *compete* with each other and the Switch along each of these dimensions.

25

26   _____

27   [3] ███

28

24. **Price.** The FTC contends that Xbox and PlayStation constitute a market of two because they are offered at a similar price. That is unpersuasive. To begin with, "[t]he Supreme Court has repeatedly held that a price differential alone is insufficient to infer two separate product markets." *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007). Equally important, the FTC's analysis considers only the high-end models of Xbox (Series X) and PlayStation (Standard Edition), thereby ignoring the differentiation within Xbox's console lines. In fact, the entry-level versions of the current Xbox and Switch are offered at the same price point ($299.99), and the Xbox Series S is sold for $50 less than the Switch OLED model ($349.99). PlayStation likewise sells a less expensive Digital Edition for $399.99, and is expected to release a PlayStation 5 Slim later this year at the same reduced price point.[4]

25. **Performance.** Xbox and PlayStation are also differentiated on performance. The less expensive Xbox Series S has less GPU processing power, system memory, and internal storage and renders images at a lower resolution than the Xbox Series X or PlayStation 5. PlayStation, meanwhile, currently offers two different versions of the PlayStation 5—one with a Blu-Ray player for physical media (Standard) and one without (Digital)—and is anticipated to release further differentiated Pro and Slim models in the near future. These models are differentiated from Xbox offers, ███████████████████████ There is simply no evidence to support the FTC's assumption that Xbox and PlayStation customers prioritize performance above all other measures, such that they would never even consider the Switch, when those very customers make trade-offs between performance and cost.

26. **Content.** The FTC also conveniently ignores key similarities between the Nintendo Switch and the other consoles that make them clear substitutes. Most importantly, many of the most popular games on PlayStation and Xbox consoles are also available on the Switch, including *Fortnite*, *Minecraft*, *Rocket League*, *Lego Star Wars*, *Fall Guys*, and the *FIFA*, *MLB The Show*, and *NBA 2K franchises*. Although some popular Xbox and PlayStation games

---

[4] Sony is also anticipated to release a handheld version of PlayStation 5 later this year for under $300.

1    are not available on the Switch, many of those titles are platform exclusives (*e.g.*, the *Halo*

2    (Xbox) or *Last of Us* (PlayStation) franchises); are coming to the Switch in the near future (*e.g.*,

3    *Hogwarts: Legacy*); or, in the case of the *Call of Duty* franchise, will become available on the

4    Switch as a result of this merger. To the extent there are differences, the FTC fails to show that

5    the differences are the result of Xbox and PlayStation games not being available on the Switch,

6    as opposed to the many Switch-exclusive titles (such as *Mario* and *Zelda*). The fact that

7    Nintendo Switch has games that are not available on Xbox or PlayStation hardly shows that the

8    Switch is a "different" product. To the contrary, because so many games are on all three

9    consoles, it is clear that there is a high degree of substitutability that undercuts any narrower

10   market definition.

11       27.    And regardless, except for pure commodities markets, every market contains

12   differentiated products. Even accepting that Xbox and PlayStation are differentiated from the

13   Switch in certain ways, including with respect to price, use, and quality, that does not decide the

14   market-definition question because products "need not be identical to be considered reasonably

15   interchangeable." *See W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d

16   1052, 1059 (N.D. Cal. 1998) (requiring "consideration of the cross-elasticity of demand"), *aff'd*,

17   190 F.3d 974 (9th Cir. 1999). To the contrary, it is settled law that products may differ markedly

18   and yet remain in the same product market given cross-elasticities of demand. *See United States*

19   *v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 400 (1956) (holding that "cellophane's

20   interchangeability with the other [flexible packaging] materials . . . suffices to make it a part of"

21   the same market despite significant differences); *see Hicks*, 897 F.3d at 1122 (alleged differences

22   in price and effectiveness did not imply "a distinct market"); *Gorlick Distrib. Ctrs., LLC v. Car*

23   *Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013) (per curiam) ("perfect fungibility

24   isn't required" for products to belong in the same antitrust market). Likewise, that products are

25   differentiated in ways that some customers prefer "do[es] not negate interchangeability," because

26   the relevant question "is not what [products] the customers would *like* or *prefer*," but instead

27   "what they *could* do in the event of an anticompetitive price increase." *Oracle Corp.*, 331 F.

28

- 46 -

1  Supp. 2d at 1131. Here, the evidence shows that Xbox, PlayStation, and the Nintendo Switch all

2  serve as substitutes and compete.[5]

### b.   *PC Gaming Competes with Consoles.*

4  28.   There is also no basis for excluding PC gaming from any market. PC games can

5  be downloaded directly from publishers or can be accessed through distributors like Steam, and

6  PC gaming offers specifications and features that are comparable to or even greater than those

7  offered by consoles.

8  29.   There is also substantial catalog overlap. In 2022, all but one of the top 30 Xbox

9  titles and all but ███ of the top 30 PlayStation titles were also available on PC.

10  30.   Leaders of both Microsoft ████████ similarly, have identified PC gaming as a

11  meaningful alternative (and competitor) to console gaming.

### 2.   Multi-Game Subscription Services Are Not a Relevant Product Market.

31.   As for the FTC's second proposed product market, multi-game subscription

services—such as Xbox's Game Pass or Sony's PlayStation Plus—are not their own market, but

rather are simply an alternative way for consumers to pay for console, PC, or mobile games that

are otherwise offered as standalone buy-to-play or free-to-play games. Many game publishers,

including Sony and Activision, fear that putting newly released games into multi-game

subscription services will cannibalize sales of those games, which is why they do not embrace

that subscription model.

32. ████████████████████████████████████████████████████████████████ To the contrary, years of

data demonstrate not only that buy-to-play sales decrease when a game is added to a subscription

library, but also that buy-to-play sales increase when a game is removed from a subscription

library. Subscription services thus compete directly with traditional buy-to-play options.

---

[5] Similarly, the FTC fixates on issues that are irrelevant to consumer behavior and choices, such as whether the
consoles are arbitrarily labeled by industry insiders as "Generation 8" or "Generation 9."

33. ██████████████████████████

██████████████████████████

██████████████████████████. A

decision from this District has already rejected a similar effort at "narrowing of a market to

consideration of a subscription based payment model" rather than "the broader video game

market generally." *Pistacchio v. Apple Inc.*, No. 4:20-cv-07034-YGR, 2021 WL 949422, at *2

(N.D. Cal. Mar. 11, 2021); *see also Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1106 (N.D. Cal.

2022).

> **3.     Cloud Gaming Subscription Services Are Not a Relevant Product Market.**

34.     The FTC's third proposed market, cloud gaming subscription services, is similarly

untenable.

35.     At the outset, cloud gaming is a *feature* of various types of gaming services but is

not itself a distinct gaming product. The fact that cloud gaming uses a different technology to

deliver content—streaming from a central server, rather than using a disc or hard drive to enable

gameplay natively on a device—does not render cloud gaming a separate antitrust product

market. Indeed, technological differences between products "relate[] only to the respective

systems' peculiar features," not to whether customers would substitute one for the other. *See*

*Ojmar US, LLC v. Sec. People, Inc.*, No. 16-CV-04948-HSG, 2017 WL 5495912, at *2 (N.D.

Cal. Nov. 16, 2017).

36.     The FTC mashes together gaming services that offer very different value

propositions and that use cloud streaming in very distinct ways. The FTC's putative market

would include services like Xbox's Game Pass, which offers some cloud gaming functionality as

a relatively insignificant add-on to a subscription library of games not available via the cloud;

Amazon Luna, which offers cloud-based games on a subscription basis and has a bring-your-

own-game feature; and Nvidia GeForce NOW, which sells cloud streaming capabilities to

customers so that they can play PC games that they have previously purchased through remote

1  hardware via the cloud. There is no evidence that these diverse products compete with one

2  another in any meaningful sense or that customers would view them as reasonably

3  interchangeable substitutes.

4    37.    While not stated clearly, it appears that the FTC's concern is not with the cloud

5  gaming market as it purportedly exists today, but a cloud gaming market that may exist someday

6  in the future. Even assuming that perceived harm to a future, hypothetical market is relevant,[6] the

7  FTC itself has recognized that projecting harm in future markets "can be difficult," must be

8  "strongly rooted in the evidence," and requires "considerable evidence" that the market will

9  emerge and that the merger will result in a substantial lessening of competition in that market. *In*

10  *re Nielsen Holdings, N.V. & Arbitron Inc.*, FTC File No. 131-0058, at 2–3; *see also, e.g.*, *FTC v.*

11  *Facebook, Inc.*, 560 F. Supp. 3d 1, 4 (D.D.C. 2021) (rejecting FTC's reliance on a future market

12  as "too speculative and conclusory").

13    38.    Here, the FTC has failed to make those showings. Indeed, Sony's CEO admitted

14  that cloud gaming faces substantial "technical difficulties" and is "very tricky" from both a

15  financial and a technological standpoint, and Activision executives believe that, due to latency

16  problems with current technology, cloud gaming is at least a decade away from delivering "an

17  acceptable experience." ████████████████████████████████████████

18  ██████████████████████████████████████. For Xbox, cloud-

19  gaming capability is not a separate product but merely an add-on to Game Pass that allows

20  subscribers to try streaming games before downloading them.

21    39.    To the extent this market for device-agnostic cloud gaming exists, Xbox does not

22  compete in it. Of the very small segments of gamers who use Xbox cloud gaming, four in five do

23  so on Xbox. Xbox does not offer a "bring your own device" model.

24

---

25  [6] The Supreme Court has never addressed whether harm to "potential competition is a viable theory of section 7
liability." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 75 (D.D.C. 2017); *see also Fraser v. Major League Soccer,*

26  *LLC*, 284 F.3d 47, 71 (1st Cir. 2002) (noting that "there is no possible way to predict just what would happen" had a
challenged transaction not occurred); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1211 (2d Cir. 1981) ("The *existing*

27  *market* provides the framework in which the probability and extent of an adverse impact upon competition may be
measured." (emphasis added)).

28

1

2

### 4.    Multi-Game Subscription Services and Cloud Gaming Subscription Services Are Not a Coherent or Relevant Product Market.

40.    In addition to the separate multi-game and cloud gaming subscription services markets, the FTC also puts forward a putative market that combines these two markets into a single "gaming services market." But this combined market is no more coherent or tenable than its individual subparts. Multi-game subscriptions and cloud gaming are offered at different levels of the video game market. Multi-game subscriptions, such as Xbox and PlayStation's subscription services (Game Pass and PlayStation Plus, respectively) and subscription services offered by publishers (*e.g.*, EA Play), are a way to purchase gaming content. Cloud gaming, in contrast, is a delivery mechanism for gaming content—whether the game was acquired from a cloud platform's native store, from a third-party developer or retailer, or, critically, from a content library subscription provider. In other words, cloud gaming can be a *feature* of a subscription service, but the two are not inherently linked—cloud gaming can also be a feature of a buy-to-play or "freemium" acquisition model, such as Nvidia's GeForce Now, which provides cloud gaming functionality for gamers who have already purchased the game.

41.    The FTC offers no evidence that customers view multi-game libraries and cloud gaming as reasonably interchangeable for one another, and indeed, cloud gaming and multi-game libraries cannot compete with one another when some customers will use the former to play the latter.

### 5.    The Relevant Geographic Market Is Global.

42.    The FTC's proposed geographic market is the U.S., but that narrow definition does not reflect market realities. Both Microsoft and Activision compete in global markets.

43.    Virtually all top-selling Xbox and PlayStation games are played by gamers worldwide and allow for cross-regional play, which gives gamers access to a larger gaming pool and provides faster access to matches, no matter where they are located. Further, both consoles and video games are developed for and marketed on a global basis, meaning a console bought in one country and a game bought in another will work with each other and can be used in any

1  other country as well. All major console makers and game developers today have the same or

2  similar release dates across geographies. And those games are, with limited exceptions, identical

3  across markets.

**B.      The FTC Has Failed to Show that the Proposed Merger Is Substantially
         Likely to Lessen Competition.**

44.     The FTC has alleged only a single theory of harm: vertical foreclosure. Courts

place a heavy burden on the government in vertical merger cases because vertical integration is

generally pro-competitive. *See, e.g.*, *AT&T*, 310 F. Supp. 3d at 197 ("Vertical mergers often

generate efficiencies and other procompetitive effects."); *Nat'l Fuel Gas Supply Corp. v. FERC*,

468 F.3d 831, 840 (D.C. Cir. 2006) ("[V]ertical integration creates efficiencies for consumers.");

*Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 990 (D.C. Cir. 2013) (Kavanaugh, J.,

concurring) ("Vertical integration and vertical contracts in a competitive market encourage

product innovation, lower costs for businesses, and create efficiencies—and thus reduce prices

and lead to better goods and services for consumers."); Phillip E. Areeda & Herbert Hovenkamp,

*Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 755c (online ed. Aug.

2022) ("Vertical integration is ubiquitous in our economy and virtually never poses a threat to

competition when undertaken unilaterally and in competitive markets."). Indeed, the government

itself has stated that "[v]ertical mergers . . . should be allowed to proceed except in those few

cases where convincing, fact-based evidence relating to the specific circumstances of the vertical

merger indicates likely competitive harm." Delegation to the Organization for Economic Co-

operation and Development, Competition Committee 2 (Feb. 15, 2007), bit.ly/3Cz9hIb.

45.     The FTC's central claim is that the combined firm would withhold certain

Activision content—in particular, the *Call of Duty* franchise—from its console, subscription, or

cloud gaming competitors and that each of the alleged relevant markets would become

substantially less competitive as a result. *Cf. UnitedHealth Grp. Inc.*, 2022 WL 4365867, at *25–

27 (addressing, and rejecting, analogous vertical foreclosure theory). To establish such

"foreclosure" as a basis for opposing this transaction, the FTC must prove, among other things,

1   (1) that the combined company would have the *incentive* to withhold *Call of Duty* from rivals to

2   whom an independent Activision would otherwise sell *Call of Duty* (*i.e.*, that doing so would be

3   profitable despite the forgone sales), (2) that the combined company would have the *ability* to do

4   so (despite its long-term contracts to the contrary), and (3) that *competition* (as opposed to

5   individual competitors) would likely be harmed as a result. *See id.*[7] A vertical merger, in

6   particular, "will not have an anticompetitive effect" where "substantial market power is absent at

7   any one product or distribution level." *Auburn News Co. v. Providence J. Co.*, 659 F.2d 273, 278

8   (1st Cir. 1981).

9         46.    To make these showings, the FTC relies principally on the analysis of its expert,

10  ███████████████████████████████████████████████████████████████████

11  ████████████████████. But the FTC's "foreclosure theory has significant flaws," *UnitedHealth Grp.*

12  *Inc.*, 2022 WL 4365867, at *25–27, and the agency has failed to establish any likelihood of

13  ultimate success on its foreclosure claims, either in the console market or in the other allegedly

14  distinct markets for "content library services" and "cloud gaming services." That the FTC cannot

15  establish these essential prerequisites is unsurprising: at the end of the day, the FTC's challenge

16  is designed to protect the dominant console provider—Sony—from increased competition that

17  would flow from a merger of two entities that lack market power.

      **1.**    **The FTC Has Failed to Show that the Merger Is Likely to Result in**
          **Vertical Foreclosure in the Console Market.**

20        47.    With respect to the console market, the FTC has failed to show that Xbox would

21  have either the incentive or the ability to withhold *Call of Duty* from its rivals or that, if Xbox did

22  withhold *Call of Duty*, such an action would substantially lessen competition.

---

[7] To the extent the FTC suggests that *Brown Shoe* somehow excuses this showing, it is mistaken. The FTC does not seriously claim that it can demonstrate harm from the merger without showing that Xbox has the incentive and ability to withhold *Call of Duty*; without both, there could be no withholding in the first place. Further, as discussed in the text and below, an antitrust plaintiff challenging a vertical merger must show not merely that withholding is likely, but also that the withholding would have significant anticompetitive effects, such as when a monopolist withholds a critical input that rivals need to compete.

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(No. 3:23-cv-02880-JSC)

a.      ***Xbox has no incentive to withhold* Call of Duty *from its rivals.***

48.      Xbox and Activision operate in intensely competitive markets. Given this competition, Xbox has strong incentives to maximize distribution of *Call of Duty* post-merger, not restrict it. The FTC bases its contrary claim on the economic analysis of Dr. Lee, which contains serious errors and ignores marketplace realities.

(i)      **Market dynamics and the real-world example of** *Minecraft* **show that Xbox has no incentive to withhold** *Call of Duty.*

49.      The FTC cannot rely on "assumptions and simplifications that are not supported by real-world" facts, *Am. Booksellers*, 135 F. Supp. 2d at 1041, and that ignore "economic reality," *Craftsmen Limousine, Inc.*, 363 F.3d at 777. Here, undisputed market realities create a strong economic incentive for Xbox to maximize rather than withhold distribution of *Call of Duty.*

50.      Both Xbox and Activision operate in fragmented and highly competitive markets. As Xbox's expert Dr. Elizabeth Bailey explained in her report, "Xbox is a distant third-place console behind each of Sony and Nintendo. No matter which metric is used—console units sold, console revenues, or installed base—Xbox's console is now, and has almost always been, the third-place console." Likewise, Activision games account for only a modest fraction of games— approximately from ▮▮▮ to ▮▮▮, depending on market definition (all games vs. AAA,[8] global vs. U.S.).▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. It is implausible that a game with this market share could somehow reshape the console market. *See AT&T*, 310 F. Supp. 3d at 202 (rejecting argument that Turner content was "must-have" in the video distribution industry because "[t]he evidence showed that distributors have successfully operated, and continue to operate, without the Turner networks or similar programming").

51.      Indeed, as Dr. Bailey has explained, *Call of Duty* is not uniquely important to Sony (or any entity). For example, ▮▮▮t PlayStation gamers do not play *Call of Duty*, and of

---

[8] There is no generally accepted definition of the term "AAA" as a measure of game quality, except that it refers to the highest-quality titles.

1   those that do play it, about ███ spent only a small fraction of their time playing the game. The

2   majority of *Call of Duty* gamers play many other video games as well. Intensity and average

3   usage of *Call of Duty* is ████████ to many other games on Sony.

4   ████████████████████████████████████████████

5   ████████████████. Although the model of "perfect competition" uses "price

6   above marginal cost . . . as a benchmark against which to measure the behavior of firms," that

7   definition, if "applied literally," would suggest "every firm in the United States has at least a tiny

8   bit of market power" and "describes few, if any, actual industries." Carlton & Perloff, MODERN

9   INDUSTRIAL ORGANIZATION, at 642 4th ed. (2005). Instead, "when courts find that a firm has

10   market power, they must mean the firm has a substantial amount of market power for some

11   significant period of time." *Id.*

12          52.     Given these undisputed market dynamics, Xbox would have no incentive to

13   withhold Activision content from rival console providers for two reasons. *First*, Xbox could not

14   realistically expect to gain market power by driving PlayStation customers to Xbox, because

15   ████████████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████. Xbox therefore could not raise Xbox prices as a result of withholding

18   Activision content—in fact, the only result of such a strategy would be for Xbox to incur losses

19   from reduced game sales.

20          53.     Xbox's inability to gain market power by withholding Activision content is also

21   clear because Nintendo, for its part, outcompetes Xbox even though Nintendo does not currently

22   have access to *Call of Duty*. Likewise, Steam, the leading PC game store, has risen in popularity

23   without *Call of Duty*. That strong evidence that *Call of Duty* is not essential to competition may

24   account for the FTC's attempt to exclude both Nintendo and PC gaming from the relevant

25   market.

26          54.     Even if Xbox were able to gain console customers by making *Call of Duty*

27   exclusive, that would in fact make the console market *less concentrated* and *more competitive* by

28

1   reducing the large gap that currently separates the number one and two market actors (Sony and

2   Nintendo) from the lagging third-place Xbox. Enjoining a merger that both sides agree would

3   *deconcentrate* an industry would be unprecedented. Indeed, making Xbox more competitive vis-

4   à-vis Sony and Nintendo would be a reason to *approve* the deal, not to block it, because "the

5   antitrust laws . . . were enacted for the protection of competition not competitors." *Brunswick*

6   *Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (cleaned up).

7          55.    As further proof of Xbox's lack of incentive, Xbox has offered to provide

8   Activision content to Sony for the next *ten years*. That Sony has refused to sign reveals not a

9   genuine fear of "foreclosure" (which it could prevent with the stroke of a pen), but rather a

10   concern that this transaction will make third-place Xbox a more effective competitor. To the

11   extent that is Sony's concern, however, the obvious solution is to accept Activision's offer and

12   thereby guarantee Sony's continued access to Activision content. Even if Sony remains a

13   holdout, the contractually guaranteed availability of Activision content on Nintendo's

14   forthcoming console and other gaming platforms would make a foreclosure strategy targeting

15   Sony even more unprofitable than it would be in the absence of those guarantees because Xbox

16   would capture an even smaller percentage of dissatisfied PlayStation customers.

17          56.    *Second*, a foreclosure strategy would harm Xbox economically. *See Sewell*

18   *Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1216–17 (W.D.N.C. 1989) (rejecting antitrust

19   claim where defendants had no "economic incentive" to "lock out existing suppliers" and "raise

20   the cost of an input"). Xbox would be losing *Call of Duty* revenues on the largest console

21   provider, Sony. Those revenues were critical to the price Microsoft paid for Activision, the

22   Board's evaluation of the transaction, and the financial targets to which Xbox is held

23   accountable.

24          57.    Withholding *Call of Duty* from other platforms would cause even greater harm by

25   degrading the game and infuriating gamers. A significant appeal of *Call of Duty* is that it is a

26   multi-player game oft-played by groups across different platforms, including PlayStation (known

27   as cross-play or cross-platform play). Having a broad community of gamers ensures players can

28

1  quickly and easily find groups of comparable skill levels, making the game fun. Removing *Call*

2  *of Duty* from PlayStation would dramatically shrink the community and overall matchmaking

3  pool, making the gaming experience worse for anyone left.

4      58.    Microsoft's acquisition of Mojang's *Minecraft* franchise in 2014 illustrates why

5  these incentives cut against withholding a multi-player game that offers cross-platform play (like

6  *Call of Duty*). Like *Call of Duty*, *Minecraft* is an existing franchise with substantial cross-

7  platform play. Under the reasoning advanced by the FTC ███████, Xbox would have had

8  incentives to make *Minecraft* exclusive to Xbox. But that did not occur. On the contrary, Xbox

9  expanded access to the game and continues to make new editions of *Minecraft* available on

10 PlayStation, because withholding it from other platforms would lead to lost sales on other

11 platforms *and* on Xbox due to these cross-platform network effects.

12     59.    The FTC points to Xbox's acquisition of ZeniMax as a counterexample. But the

13 comparison fails because in its game development, ZeniMax is unlike Activision, and its games

14 are unlike *Call of Duty*. The first two ZeniMax games that Xbox released post-acquisition

15 (*Deathloop* and *Ghostwire*) were exclusives *for Sony*. Since then, Xbox has released or is

16 scheduled to release two new ZeniMax games exclusive to Xbox, but unlike *Call of Duty*, those

17 games do not depend on or materially feature multi-player play, and they are new games without

18 existing cross-platform gaming communities. Xbox's approach to the ZeniMax games thus says

19 nothing about what Xbox would do with an existing, multi-player, cross-platform franchise like

20 *Call of Duty*—unlike *Minecraft*, which offers a far better comparison.[9]

21     60.    More broadly, there is no evidence that *any* game publisher has ever made an

22 existing game franchise exclusive when the game—like *Call of Duty*—features multi-player and

23

---

24 [9] In drawing its analogy to Zenimax, the FTC wrongly implies that Xbox misled the European Commission about its
25 intent regarding future Zenimax titles. The European Commission took the extraordinary step of responding directly
   when the FTC made this claim in its administrative complaint in December 2022, by stating publicly that Microsoft
26 did not make any "commitments" to the European Commission, nor did the European Commission "rely on any
   statements made by Microsoft about the future distribution strategy concerning ZeniMax's games." Instead, the
27 European Commission cleared the transaction "unconditionally as it concluded that the transaction would not raise
   competition concerns."

28

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-CV-02880-JSC)

cross-platform play on multiple platforms. For this reason, it is highly unlikely that Xbox would have any incentive to do so now.

        (ii)      **The FTC's contrary view is based on flawed economic analysis and is without merit.**





Defendants' Proposed Pretrial Findings of Fact and Conclusions of Law
(No. 3:23-cv-02880-JSC)



DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-CV-02880-JSC)



\* \* \*

73.     An expert can make simplifying assumptions, but the resulting model must still accurately describe reality. The FTC cannot meet its burden with expert an opinion "based on a mathematical construction" that "in turn rests on assumptions" that are both "implausible and inconsistent with record evidence." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 n.19 (1986) (plurality opinion); *see also Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp*., 509 U.S. 209, 242 (1993) (antitrust plaintiff cannot meet its burden with expert opinion that "is not supported by sufficient facts"). For this reason, when "there are undisputed facts about the structure of the market that render the inference" drawn by an expert "economically unreasonable," the "expert opinion is insufficient" as a matter of law. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435–36 (9th Cir. 1995) (citing *Eastman Kodak Co. v.*

- 60 -

1    *Image Tech. Serv., Inc.*, 504 U.S. 451, 468–69 (1992)). Courts therefore routinely reject expert

2    opinions that "fai[l] to incorporate economic realities," *In re Wholesale Grocery Prods. Antitrust*

3    *Litig.*, 946 F.3d 995, 1003 (8th Cir. 2019), or that rest on "unsupported assumptions," *Merit*

4    *Motors, Inc.*, 569 F.2d at 673, such that they have "no anchor" in the real world, *Oracle Am., Inc.*

5    *v. Google Inc.*, 798 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011).

6    74.

7

8            **b.    *Xbox lacks the ability to withhold* Call of Duty *from its rivals.***

9           75.    Even if Xbox did have economic incentives to make *COD* exclusive, FTC's

10   foreclosure concerns would lack merit because Xbox has no ability to withhold *COD* from its

11   rivals. Specifically, Xbox cannot implement an exclusivity policy for any Activision content

12   because (1) all Xbox competitors other than Sony have already signed contracts that fully protect

13   their access to that content on nondiscriminatory terms for 10 years and (2) Xbox has also

14   contractually agreed to provide a version of *COD* to Nintendo for its upcoming console upgrade.

15          76.    The FTC must account for the "economic reality" of these existing contracts as

16   part of its burden to show that Xbox possesses the ability to withhold *Call of Duty* from its rivals.

17   *Craftsmen Limousine, Inc.*, 363 F.3d at 777.

18

19                                                              Put simply, "antitrust theory and

20   speculation cannot trump facts." *Arch Coal*, 329 F. Supp. 2d at 116. *See AT&T*, 916 F.3d at 1041;

21   *RAG-Stiftung*, 436 F. Supp. 3d at 304; *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179,

22   227–33 (S.D.N.Y. 2020); *UnitedHealth Grp. Inc.*, 2022 WL 4365867, at *15–24.

23          **c.    *The FTC has not shown that withholding* Call of Duty *would***
24                  ***harm competition.***

25          77.    As discussed, Xbox has no incentive to make *Call of Duty* or any other Activision

26   game exclusive post-merger. But even if Xbox *could* be expected to make *Call of Duty* or other

27   Activision content exclusive to itself, the FTC has not shown that such exclusion would harm

28

- 61 -

1    *competition* as opposed to other *competitors* in the console market. *See United States v. Microsoft*

2    *Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (practice has an "anticompetitive effect" only

3    if it "harm[s] the competitive *process* and thereby harm[s] consumers," and "harm to one or

4    more *competitors* will not suffice").

5         78.   ████████████████████████████████████████████

6    ████████████████████████████████████████████

7    ██████████████████████████████████████     But withholding an

8    input from a competitor—exclusivity—is routine business conduct and is insufficient by itself to

9    demonstrate a lessening of competition. *See Fruehauf Corp. v. FTC*, 603 F.2d 345, 352 n.9 (2d

10   Cir. 1979). Exclusivity arrangements (whether from contract or vertical integration) are

11   ubiquitous throughout the economy and are usually procompetitive. *See, e.g., Roland Mach. Co.*

12   *v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984).

13        79.   In fact, both Sony and Nintendo have entered into a wide range of exclusivity

14   arrangements of their own with various game publishers, and each has far more such

15   arrangements than Xbox does. ████████████████████████████████

16   ████████████████████     The FTC does not argue that there is anything generally

17   anticompetitive about these existing exclusivity arrangements or that consumers would be better

18   off with fewer such arrangements. This is particularly notable because Sony—the leading

19   console player—has many times more exclusive content on PlayStation than does Xbox.

20   Moreover, Sony goes to great lengths to secure exclusive advantages from third party publishers

21   vis-à-vis Xbox. This can only be read to suggest that input exclusivity is not by itself

22   anticompetitive at all.

23        80.   Nor does this transaction exhibit any of the special features that have led other

24   courts in unusual cases to conclude that vertical integration will give rise to anticompetitive

25   outcomes. In particular, *Call of Duty* is not a "necessary input" for Xbox rivals, *see Sprint Nextel*

26   *Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 330 (D.D.C. 2011), and any "foreclosure" percentages

27   would be far too small to warrant any presumption of competitive harm.

28

81. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓  *See Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1244–46 (3d Cir. 1987) ("foreclosure" concerns are only raised where withholding of inputs would result in "post-merger market power"). To the contrary, to the extent the Microsoft-Activision merger would allow Xbox to gain some console subscribers, that would only serve to make the market *less* concentrated and presumptively *more* competitive.

82. As noted, Activision's share of console-game publishing is modest by any measure—between approximately ▓▓▓ and ▓▓▓. These ▓▓▓▓▓ foreclosure figures would be far smaller than the level needed to raise any presumption of anticompetitive effect even if Xbox were a platform *monopolist. See McWane, Inc. v. FTC*, 783 F.3d 814, 838–39 (11th Cir. 2015) (vertical integration is generally found to raise antitrust concerns only where it leaves rivals "stunted" as competitors and materially impairs their ability to discipline the defendant's prices); *see also Microsoft Corp.*, 253 F.3d at 70 (foreclosure of "roughly 40% or 50% share" is "usually required in order to establish" a violation of Section 1 of the Sherman Act); *Fruehauf*, 603 F.2d at 352–54; *Alberta Gas*, 826 F.2d at 1244–46. And, of course, Xbox is *not* a monopolist; it is running a distant third behind Sony and Nintendo in the console market.

83. And, again, *Call of Duty* is not so uniquely important to gamers that Xbox could hope to obtain substantial market power by making it exclusive to Xbox. Even if every PlayStation owner that played *Call of Duty* for as little as two hours per month bought an Xbox, the number of PlayStations would still exceed the number of Xboxes by a wide margin. And Nintendo, for its part, outcompetes Xbox even though it does not currently have access to *Call of Duty*.

84. For these reasons, the FTC cannot show what it must to justify blocking this vertical transaction: that the supposed foreclosure would make the combined company's rivals ineffective as competitors. *See McWane*, 783 F.3d at 838–39 (vertical integration is generally found to raise antitrust concerns only where it leaves rivals "stunted" as competitors and

1  materially impairs their ability to discipline the defendant's prices); *Microsoft Corp.*, 253 F.3d at

2  71 (issue is whether exclusive dealing keeps competitors "below the critical level necessary . . .

3  to pose a real threat" to defendant's market power); *Fruehauf*, 603 F.2d at 352 n.9 (discussing

4  *Brown Shoe* and *DuPont* and concluding that "we are unwilling to assume that any vertical

5  foreclosure lessens competition.").[12]

6  85. ██████████████████████████████

7  ███████████████████████████████████. If

8  Microsoft *did* make *Call of Duty* exclusive to Xbox, doing so would prompt a fierce competitive

9  response from Sony and other rivals. *See Fruehauf*, 603 F.2d at 352 n.9 (requiring assessment of

10  competitive response to determine whether foreclosure "lessens competition"). Sony could lower

11  prices or improve the quality of its console. Or, as Sony's CEO told investors in the wake of

12  news of Microsoft's acquisition of Activision, "████████████████████████

13  ██████████████████████████

14  86. Dr. Lee's analysis ████████████████████████

15  ████████████, even though the "long term effects" of any proposed merger will "depend

16  in large measure on competitors' responses." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d

17  227, 232 (1st Cir. 1983) (Breyer, J.); *see id.* at 235 (highlighting the importance of considering

18  "competitors' responses to price shifts"); *see also Arch Coal, Inc.*, 329 F. Supp. 2d at 148–50

19  (relying on fact that competitors "can and would expand production in response to a [merger-

20  induced] price increase" to deny agency's injunction request). Indeed, such responses are the

21  essence of competition. In *Paddock Publishers, Inc. v. Chicago Tribune*, for example, the

22  Seventh Circuit rejected a challenge to an exclusivity agreement between incumbent newspapers

23  

24  ────────────
[12] "Exclusive dealing" arrangements raise the same foreclosure issues as vertical integration. Under an exclusive
dealing contract, a supplier agrees to sell all of its goods through one distributor (or vice versa), thereby aligning the
25  parties' interests in ways similar to a vertical merger. Such arrangements are routine and "presumptively legal."
*Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004) ("Unlike horizontal agreements
26  between competitors, vertical exclusive distributorships . . . are presumptively legal."). Notably, exclusive-dealing
cases arise under Section 3 of the Clayton Act, 15 U.S.C. § 14, whose text is identical to Section 7 in all relevant
27  respects ("may . . . substantially lessen competition") and is thus read *in pari materia* with that provision. *See
Fruehauf*, 603 F.2d at 352 n.9; *see also United States v. Phila. Nat'l Bank*, 374 U.S. 321, 365–66 (1963).

28  

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(No. 3:23-cv-02880-JSC)

1   and several content creators by a rival newspaper. 103 F.3d 42, 44 (7th Cir. 1996). The court

2   explained that a competitor who is "deprived of access" to even the "best known" content can

3   still compete using alternative content. *Id.*; *see also id.* ("[A] newspaper deprived of access to the

4   *New York Times* crosswords puzzles can find others, even if the *Times* has the best known one.").

5       87.   Finally, the FTC ignores critical variables in the economic analysis by

6   disregarding the new options the merger will create for consumers to access and play Activision

7   content. Indeed, "increased output" is a clear "indicator[] of a merger's competitive impact." *In*

8   *re AMR Corp.*, 625 B.R. 215, 255 (Bankr. S.D.N.Y. 2021), *aff'd*, No. 22-901, 2023 WL 2563897

9   (2d Cir. Mar. 20, 2023); *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2289 (2018)

10  (practices that "expand[] output and improv[e] quality" are procompetitive); *Chi. Pro. Sports*

11  *Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output.");

12  *FTC v. Univ. Health, Inc*., 938 F.2d 1206, 1222 (11th Cir. 1991) ("Whether an acquisition would

13  yield significant efficiencies is an important consideration in predicting whether the acquisition

14  would substantially lessen competition."). The FTC must account for such consumer benefits in

15  determining the "competitive effects" of the merger. *See FTC v. Tenet Health Care Corp.*, 186

16  F.3d 1045, 1054 (8th Cir. 1999). One cannot logically determine whether a merger makes

17  consumers worse off without considering the numerous new options the merger will create for

18  playing *Call of Duty* post-merger—including on platforms on which it is not available today. *See*

19  *id.* ("We further find that although Tenet's efficiencies defense may have been properly rejected

20  by the district court, the district court should nonetheless have considered evidence of enhanced

21  efficiency in the context of the competitive effects of the merger.").

22      88.   Here, the acquisition would benefit consumers by making *Call of Duty* available

23  on Xbox's Game Pass on the day it is released on console (with no price increase for the service

24  based on the acquisition), on Nintendo, and on other services that allow cloud streaming.

25  Activision has historically refused to provide this type of access to *Call of Duty*, and every

26  Activision witness to address the matter said that business strategy would continue into the

27

28

1  foreseeable future. These clear consumer benefits likewise vitiate the FTC's claim that the

2  merger will ultimately injure the competitive process and consumers.

3       **2.    The FTC Has Failed to Show That the Merger Is Likely to Result in**
            **Vertical Foreclosure in the Content Library Subscriptions or Cloud**
4           **Gaming Markets.**

5       89.    The FTC's showing is also insufficient with respect to its proposed markets for

6  "content library" and "cloud gaming" subscription services. ██████████████████████

7  ████████████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████████████

9  ████████████████████████████████  As discussed above, those are not genuine

10 "markets" in the first place: "content library" subscriptions compete with buy-to-play (and free-

11 to-play), and console-independent "cloud-gaming services" (to the limited extent they exist)

12 compete with native console- and PC-based gaming.

13      90.    But even if these gaming features are considered separate "markets" for antitrust

14 purposes, the FTC's Section 7 claims regarding "content-library" and "cloud gaming" services

15 would fail because the FTC does not allege—let alone substantiate any allegation—that the

16 merger will *likely* cause Activision to withhold content that it *would otherwise provide* to third-

17 party content-library or cloud-gaming providers.

18      91.    As a threshold matter, the FTC misconceives the applicable legal standard. The

19 FTC must prove that this "merger will *likely* lead to a substantial lessening of competition,"

20 *Oracle Corp.*, 331 F. Supp. 2d at 1109 (emphasis added)—*i.e.*, that the future world with this

21 merger is "likely" to be substantially less competitive than the but-for world without the merger.

22 *See AT&T*, 916 F.3d at 1032.[13] But the FTC does not even try to make that showing as to

23

24 ──────────────

[13] For these purposes, we are accepting *arguendo* the FTC's premise that the relevant comparison is between a *future* world with this merger and a *future* world without it. By its plain text, however, Section 7 would seem to preclude liability here for the simple reason that Activision does not make *Call of Duty* available to content-library or cloud-gaming providers today; thus, continued withholding of that content from content-library or cloud-gaming providers could not constitute a "substantial lessening" of competition. *See United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 537 (1973) ("[w]e leave for another day the question of the applicability of § 7 to a merger that will leave competition in the marketplace exactly as it was" but will nonetheless result in "less competition than there would have been" in the but-for world absent the transaction); *Marine Bancorp.*, 418 U.S. at 639 (continuing to "express

25

26

27                                                          (*continued on next page*)

28

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(No. 3:23-cv-02880-JSC)

1   content-library subscription services and cloud gaming subscription services. ███████████

2   ██████████████████████████████████████████████████████████████

3   ██████████████████████████████████████████████████████

4   ██████████████████████████████████████████████████████████

5   ████████████████

6          92.     To say that a merger makes an outcome "more" likely—for example, by ████████

7   ██████████████████████████████ in Dr. Lee's words—is not to say that the merger makes

8   that outcome *likely to occur:* a 20% chance of rain does not mean that rain is "likely." Again, the

9   relevant question instead is whether a merger is "likely" to produce anticompetitive outcomes

10  that would not otherwise occur. *See*, *e.g.*, *AT&T*, 310 F. Supp. 3d at 246–47; *Oracle Corp.*, 331 F.

11  Supp. 2d at 1109. Dr. Lee must therefore show (among many other things) that an independent

12  Activision would likely support relevant services offered by third parties and that the combined

13  company likely would not. ████████████████████████████████████████

14  ████████████████████   Similarly, in *AT&T*, the court rejected a claim of increased

15  coordination risk because, *inter alia*, the "the Government ha[d] failed to put forward sufficient

16  evidence to show more than a theoretical 'possibility' of coordination," given expert's concession

17  "that he was 'not in a position to say' that coordination is 'more likely to happen than not[.]'"

18  310 F. Supp. 3d at 246–47.

19          93.     More broadly, to carry its burden, the FTC must prove that *all* of the following

20  propositions are likely true:

21          •      But for this merger, Activision would *allow Call of Duty* to be included in third-

22                 party content-library or cloud-gaming services even though Activision has long

23                 refused to do so;

24          •      Xbox would nonetheless *prevent* Activision from making *Call of Duty* available to

25                 third-party services if this merger proceeds, when the evidence shows Microsoft is

26  _____

no view on the appropriate resolution of the question reserved in *Falstaff* "). In all events, as discussed in the text, the FTC's alternative-market theories of harm fail even if the relevant Section 7 comparison is between future but-for and with-merger worlds.

28

1      entering into contracts to provide even greater access than Activision

2      hypothetically would; *and*

3   •      Withholding this one game from third-party providers (that have never before

4         been granted access) would nevertheless hobble third-party providers and harm

5         the competitive process, even though any given consumer could readily mix and

6         match services from multiple providers to obtain access to his or her preferred

7         line-up of games, as they commonly do in other media markets like video

8         streaming.

9   94.    As to the cloud-gaming "market" in particular, the FTC must further prove that

10  both of the following additional propositions are *also* likely to be true:

11  •      That cloud gaming will develop in the near-to-intermediate term as a genuine

12         alternative to consoles or performance PCs for multi-player, fast-twitch, graphics-

13         intensive games such as *Call of Duty*, despite the formidable technological and

14         economic obstacles that no cloud provider has yet been able to overcome; *and*

15  •      That a post-merger Xbox will become a dominant player in that cloud-gaming

16         market even though the xCloud has experienced technical difficulties, high costs,

17         and relatively low engagement associated with the service.

18  95.    The FTC cannot substantiate *any* of these propositions.

19  96.    *First*, but for this merger, Activision would be very unlikely to offer content to

20  any third-party subscription library or cloud-gaming providers in the first place. That point is

21  confirmed by Activision's longstanding aversion to those business models, its ordinary-course

22  documents, and its executives' testimony. *See SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1211

23  (2d Cir. 1981) ("The *existing market* provides the framework in which the probability and extent

24  of an adverse impact upon competition may be measured." (emphasis added)). Activision has

25  consistently concluded (1) that allowing its games into a cloud library would cannibalize more

26  profitable direct sales of its games and (2) that allowing games such as *Call of Duty* to be played

27  on the cloud would generate poor user experiences, thereby harming the company's reputation.

28

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-CV-02880-JSC)

1    Thus, the Court concludes that the merger is likely to increase (rather than decrease) access to

2    *Call of Duty* on these services. As cloud-gaming provider Nvidia explained, ███████████

3    ██████████████████████████████████████████████████████████████

4    ██████████████████████

5         97.    *Second*, even assuming that Activision would license *Call of Duty* to some

6    content-library or cloud-service providers in the but-for world without the merger, the FTC—as

7    discussed—has alleged only that the combined company would be somewhat less likely (in a

8    comparative sense) to do so in the world with the merger. It has not alleged that the post-merger

9    company would in fact be *likely* to withhold that content in an absolute sense. But only the latter,

10    unmade showing would be sufficient to meet the FTC's burden to show a "likely" lessening of

11    competition.

12         98.    *Third*, even if the FTC could show both that an independent Activision likely

13    would make *Call of Duty* available to some third parties in the but-for world without the merger

14    *and* that the combined company likely would not do so in a post-merger world, that showing still

15    would not demonstrate any substantial lessening of *competition*. As discussed in the prior

16    section, exclusivity arrangements are ubiquitous, and Sony and Nintendo already make far more

17    use of them than Xbox does. And such arrangements raise no competitive concerns except in

18    narrow circumstances involving substantial market power and large foreclosure percentages,

19    neither of which is present here. *See, e.g.*, *McWane*, 783 F.3d at 838–39; *Microsoft Corp.*, 253

20    F.3d at 71; *Alberta Gas*, 826 F.2d at 1244–46. That point disposes of the FTC's claims of

21    "foreclosure" in any of the alleged markets.

22         99.    *Fourth*, as to the cloud-gaming "market," the FTC must prove that cloud gaming

23    will develop in the near-to-intermediate term as a genuine alternative to consoles or performance

24    PCs for multi-player, fast-twitch, graphics-intensive games such as *Call of Duty*. But the FTC

25    has shown no such thing; it merely speculates that it could happen. The evidence indicates that

26    widespread cloud gaming of the type that could support *Call of Duty* and similar multiplayer,

27    latency-sensitive games does not even exist today and is unlikely to do so within the foreseeable

28

1   future. As Sony and others have acknowledged, network engineers are nowhere close to solving

2   the enormous technological challenges presented by that cloud game-play model, which is why

3   Activision refuses to make *Call of Duty* available for cloud gaming.

4         100.    But under settled law, the Court cannot block a merger on the basis of speculation

5   about harm to non-existent markets that are unlikely to materialize anytime in the foreseeable

6   future. *See Facebook*, 560 F. Supp. 3d at 4 (rejecting the government's "naked allegation" as

7   "too speculative and conclusory," especially given that the market for Personal Social

8   Networking Services was "no ordinary or intuitive market" and the "exact metes and bounds" of

9   that market were "hardly crystal clear"); *see also Tenneco, Inc. v. FTC*, 689 F.2d 346, 354 (2d

10   Cir. 1982) (rejecting the FTC's "unsupported speculation" that "Tenneco would have entered the

11   market . . . absent its acquisition of Monroe"); *Fruehauf*, 603 F.2d at 355 (rejecting the FTC's

12   theory of anticompetitive effects as "based on speculation rather than fact").

13         101.    *Fifth*, the FTC's "cloud-gaming" theory of harm assumes not only that a cloud-

14   gaming market will develop, but that Xbox will be a major player in it. In fact, the overwhelming

15   evidence confirms that the users of Xbox's xCloud capability use it to try games they are buying

16   on console, not for the type of device-agnostic gaming that the FTC seems to believe is the

17   future. ██████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████

19   ██████████████████████████████

20         102.    In all events, as explained above, Microsoft has reached agreements with Nvidia

21   and other providers that do offer nascent cloud gaming services. Those agreements ensure that

22   such cloud providers will have access to Activision content post-merger—access that *they would*

23   *otherwise lack*, given Activision's entrenched opposition to making its games available on the

24   cloud. Tellingly, these companies *support* this merger even though, if the FTC's concerns were

25   valid, they would be the "victims" of any foreclosure strategy. In Nvidia's words, ██████████

26   ██████████████████████████████████████████████████████

27   ████████████████████████████████████████

28

1    **III.      The Equities Weigh Against a Preliminary Injunction.**

2         103.      Because the FTC has failed to demonstrate the requisite likelihood of ultimate

3    success, there is no reason for the Court to consider the equities. *Meta Platforms Inc.*, 2023 WL

4    2346238, at *33; *see also RAG-Stiftung*, 436 F. Supp. 3d at 291. "[E]quities alone will not justify

5    an injunction." *Arch Coal, Inc.*, 329 F. Supp. 2d at 116. Nonetheless, assuming for the sake of

6    argument that the FTC has made some showing of ultimate success, the equities—both public

7    and private—weigh against granting the "extraordinary and drastic remedy" of a preliminary

8    injunction. *FTC v. Staples*, 190 F. Supp. 3d 100, 115 (D.D.C. 2016).

9         104.      As a threshold matter, Microsoft's merger with Activision does not implicate the

10   "principal" "public equity consideration [that Congress had] in mind when it enacted section

11   13(b)"—namely, the need to maintain the pre-merger "status quo" so the FTC can award

12   effective relief if it succeeds on the merits. *H.J. Heinz Co.*, 246 F.3d at 726. This consideration

13   applies chiefly in the context of horizontal mergers where two competing companies integrate

14   their operations and, in the process, often eliminate stores, factories, or other redundant assets.

15   When that occurs, the FTC's "inability to unscramble merged assets," *FTC v. Dean Foods Co.*,

16   384 U.S. 597, 606 n.5 (1966), or revive shuttered stores post-merger may make it difficult for the

17   agency to "restore the parties to their pre-merger state," *Sysco Corp.*, 113 F. Supp. 3d at 87.

18        105.      Microsoft's *vertical* merger with Activision, however, raises none of these

19   concerns. Microsoft and Activision are not competitors in the relevant markets alleged. And

20   Microsoft intends to operate Activision similar to other recent acquisitions, such as *Minecraft*

21   developer Mojang. In other words, Activision's creative operations will remain separate and

22   continue to run as they did pre-merger. Consequently, even in the (unlikely) event the FTC

23   continues to press its Part 3 case and then succeeds on the ultimate merits in that proceeding, the

24   agency can order Microsoft's divesture of Activision—"an effective ultimate remedy," *FTC v.*

25   *Great Lakes Chem. Corp.*, 528 F. Supp. 84, 99 (N.D. Ill. 1981). As a result, the "principal public

26   equity" cuts against the government, *H.J. Heinz Co.*, 246 F.3d at 726.

27

28

1   106.   Other "public equities" likewise favor denying a preliminary injunction that

2   would rob consumers of the "beneficial economic effects and procompetitive advantages"

3   resulting from this merger. *See FTC v. Pharmtech Rsch., Inc.*, 576 F. Supp. 294, 299 (D.D.C.

4   1983) (citing *Weyerhaeuser Co.*, 665 F.2d at 1082–83); *see also Warner Commc'ns Inc.*, 742 F.2d

5   at 1165 ("public equities" include procompetitive benefits for consumers). The merger would

6   expand the availability of content to consumers and enhance Xbox's ability to compete against

7   the dominant console provider, Sony. While there is no risk that consumers would be injured

8   while the administrative process runs its course (even Sony's existing contract for *Call of Duty*

9   runs through 2024 and it has an offer for much longer access), consummating this merger would

10  immediately benefit consumers by increasing the availability of Activision content. The "public

11  equities" therefore cut against any delay in conferring those benefits on consumers.

12  107.   Nor would a preliminary injunction simply delay those benefits. As other courts

13  have recognized in this context, an injunction would likely eliminate the consumer benefits

14  entirely because the deal must close soon or it will fall through. *See Mo. Portland Cement Co. v.*

15  *Cargill Inc.*, 498 F.2d 851, 870 (2d Cir. 1974) ("the grant of a temporary injunction in a

16  Government antitrust suit is likely to [spell] the doom of an agreed merger"); *Weyerhaeuser Co.*,

17  665 F.2d at 1087 ("[a] preliminary injunction may kill, rather than suspend, a proposed

18  transaction"). Here, the parties' agreement expires on July 18, so the risk of the deal falling

19  through is imminent.

20  108.   Besides denying these benefits to consumers, a preliminary injunction would also

21  cause Microsoft's shareholders to incur substantial unrecoverable losses, such as a $3 billion

22  termination fee to Activision. Such "private equities," too, "are entitled to serious consideration."

23  *See Warner Commc'ns Inc.*, 742 F.2d at 1165; *Weyerhaeuser*, 665 F.2d at 1083 (explaining that

24  courts "have no warrant to drop private equities from the calculus").

25  109.   In sum, the FTC does not need an injunction to safeguard its ability to award

26  effective relief and other public and private interests favor consummating this pro-competitive

27

28

1  transaction. So, while "equities alone will not *justify* an injunction," *Arch Coal, Inc.*, 329 F.

2  Supp. 2d at 116 (emphasis added), in this instance they weigh decisively against granting one.

3

4  Dated: June 22, 2023                          Respectfully submitted,

5                                                By: */s/ Beth Wilkinson*

6

7  Jack DiCanio (SBN 138782)                     Beth Wilkinson (*pro hac vice*)
   Caroline Van Ness (SBN 281675)                Rakesh N. Kilaru (*pro hac vice*)
8  SKADDEN, ARPS, SLATE, MEAGHER                 Kieran Gostin (*pro hac vice*)
   & FLOM LLP                                    James Rosenthal (*pro hac vice*)
9  525 University Avenue                         Grace Hill (*pro hac vice*)
   Palo Alto, California 94301                   Anastasia M. Pastan (*pro hac vice*)
10 Telephone: (650) 470-4500                     Sarah Neuman (*pro hac vice*)
   Facsimile: (213) 621-5430                     Jenna Pavelec (*pro hac vice*)
11 jack.dicanio@skadden.com                      Alysha Bohanon (*pro hac vice*)
   caroline.vanness@skadden.com                  WILKINSON STEKLOFF LLP
12                                               2001 M Street, N.W., 10th Floor
   Steven C. Sunshine (*pro hac vice*)           Washington, D.C. 20036
13 Julia K. York (*pro hac vice*)                Telephone: (202) 847-4000
   SKADDEN, ARPS, SLATE, MEAGHER                 Facsimile: (202) 847-4005
14 & FLOM LLP                                    bwilkinson@wilkinsonstekloff.com
   1440 New York Avenue, N.W.                    rkilaru@wilkinsonstekloff.com
15 Washington, DC 20005-2111                     jrosenthal@wilkinsonstekloff.com
   Telephone: (202) 371-7000                     kgostin@wilkinsonstekloff.com
16 Facsimile: (202) 393-5760                     ghill@wilkinsonstekloff.com
   steven.sunshine@skadden.com                   apastan@wilkinsonstekloff.com
17 julia.york@skadden.com                        sneuman@wilkinsonstekloff.com
                                                 jpavelec@wilkinsonstekloff.com
18 Maria Raptis (*pro hac vice*)                 abohanon@wilkinsonstekloff.com
   Matthew M. Martino (*pro hac vice*)
19 Michael J. Sheerin (*pro hac vice*)           Jonathan E. Nuechterlein (*pro hac vice*)
   Evan R. Kreiner (*pro hac vice*)              C. Frederick Beckner III (*pro hac vice*)
20 Bradley J. Pierson (*pro hac vice*)           William R. Levi (*pro hac vice*)
   Jessica R. Watters (*pro hac vice*)           Daniel J. Hay (*pro hac vice*)
21 SKADDEN, ARPS, SLATE, MEAGHER                 Lucas Croslow (*pro hac vice*)
   & FLOM LLP                                    Manuel Valle (*pro hac vice*)
22 1 Manhattan West                              Aaron P. Haviland (*pro hac vice*)
   New York, NY 10001                            SIDLEY AUSTIN LLP
23 Telephone: (212) 735-3000                     1501 K Street, N.W.
   Fax: (212) 735-2000                           Washington, D.C. 20005
24 maria.raptis@skadden.com                      jnuechterlein@sidley.com
   matthew.martino@skadden.com                   rbeckner@sidley.com
25 michael.sheerin@skadden.com                   william.levi@sidley.com
   evan.kreiner@skadden.com                      dhay@sidley.com
26 bradley.pierson@skadden.com                   lcroslow@sidley.com
   jessica.watters@skadden.com                   manuel.valle@sidley.com
27                                               ahaviland@sidley.com

28

1  *Counsel for Defendant Activision Blizzard,*  Bambo Obaro (SBN 267683)
   *Inc.*                                        WEIL, GOTSHAL & MANGES LLP
2                                                201 Redwood Shores Parkway
                                                 Redwood Shores, CA 94065
3                                                Telephone: (650) 802-3083
                                                 Facsimile: (650) 802-3100
4                                                bambo.obaro@weil.com

5                                                Megan A. Granger (*pro hac vice*)
                                                 Michael Moiseyev (*pro hac vice*)
6                                                WEIL, GOTSHAL & MANGES LLP
                                                 2001 M Street, NW
7                                                Suite 600
                                                 Washington, DC 20036
8                                                Telephone: (202) 682-7000
                                                 Facsimile: (202) 857-0940
9                                                megan.granger@weil.com
                                                 michael.moiseyev@weil.com
10
                                                 *Counsel for Defendant Microsoft Corp.*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-CV-02880-JSC)