**Volume 5**

**Pages 918 - 1175**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

```
FEDERAL TRADE COMMISSION,       )
                                )
           Plaintiff,           )
                                )
  VS.                           )   NO. C 23-02880 JSC
                                )   SEALED PAGES 923 to 928
MICROSOFT CORPORATION, et al.,  )
                                )
           Defendants.          )
_____)
```

San Francisco, California
Thursday, June 29, 2023

**TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, D.C.  20580
BY:  **JAMES H. WEINGARTEN, ATTORNEY AT LAW**
     **JAMES ABELL, ATTORNEY AT LAW**
     **JENNIFER FLEURY, ATTORNEY AT LAW**
     **PEGGY FEMENELLA, ATTORNEY AT LAW**
     **CEM AKLEMAN, ATTORNEY AT LAW**
     **ALEX ANSALDO, ATTORNEY AT LAW**
     **NICOLE CALLAN, ATTORNEY AT LAW**
     **MARIA CIRINCIONE, ATTORNEY AT LAW**
     **MICHAEL FRANCHAK, ATTORNEY AT LAW**
     **MEREDITH LEVERT, ATTORNEY AT LAW**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

 1  **APPEARANCES:**   (continued)

 2  For Defendant Microsoft:

 3                          WILKINSON STEKLOFF LLP
                         2001 M Street, NW - 10th Floor
 4                          Washington, D.C.  20036
                   BY:  **BETH WILKINSON, ATTORNEY AT LAW**
 5                       **RAKESH N. KILARU, ATTORNEY AT LAW**
                       **KIERAN GOSTIN, ATTORNEY AT LAW**
 6                       **GRACE HILL, ATTORNEY AT LAW**
                       **SARAH NEUMAN, ATTORNEY AT LAW**
 7                       **ANASTASIA PASTAN, ATTORNEY AT LAW**

 8  For Defendant Activision Blizzard, Inc.:

 9                          SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                         1440 New York Avenue, N.W.
10                          Washington, D.C.  20005
                   BY:  **STEVEN C. SUNSHINE, ATTORNEY AT LAW**
11                       **JULIA K. YORK, ATTORNEY AT LAW**

12                          SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                         525 University Avenue
13                          Palo Alto, California  94301
                   BY:  **CAROLINE VAN NESS, ATTORNEY AT LAW**
14
                         SKADDEN ARPS SLATE MEAGHER & FLOM LLP
15                          1 Manhattan West
                         New York, New York  10001
16                   BY:  **EVAN R. KREINER, ATTORNEY AT LAW**

17
    For Nintendo of America, Inc.:
18
                         VENABLE LLP
19                          151 West 42nd Street - 49th Floor
                         New York, New York  10036
20                   BY:  **BENJAMIN P. ARGYLE, ATTORNEY AT LAW**

21

22

23

24

25

**I N D E X**

Thursday, June 29, 2023 - Volume 5

|                                          | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| Closing Arguments                        | 1050     | 5        |

| **PLAINTIFF'S WITNESSES**                | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| **STUART, TIMOTHY**                      |          |          |
| (SWORN)                                  | 931      | 5        |
| Direct Examination by Mr. Weingarten     | 932      | 5        |
| Cross-Examination by Mr. Gostan          | 1029     | 5        |

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|--------------------|----------|----------|----------|
| 0070               |          | 931      | 5        |
| 0083               |          | 929      | 5        |
| 1066               |          | 1032     | 5        |
| 1077               |          | 929      | 5        |
| 1078               |          | 929      | 5        |
| 1079               |          | 929      | 5        |
| 1080               |          | 929      | 5        |
| 1102               |          | 929      | 5        |
| 1105               |          | 929      | 5        |
| 1116               |          | 978      | 5        |
| 1119               |          | 1049     | 5        |
| 1120               |          | 1049     | 5        |
| 1128               |          | 1049     | 5        |
| 1133               |          | 1049     | 5        |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1137 | | 1040 | 5 |
| 1140 | | 1049 | 5 |
| 1151 | | 941 | 5 |
| 1154 | | 1049 | 5 |
| 1156 | | 1049 | 5 |
| 1186 | | 1049 | 5 |
| 1187 | | 1049 | 5 |
| 1190 | | 1010 | 5 |
| 1212 | | 930 | 5 |
| 1240 | | 936 | 5 |
| 1966 | | 978 | 5 |
| 3166 | | 1049 | 5 |
| 3218 | | 930 | 5 |
| 3225 | | 930 | 5 |
| 3233 | | 930 | 5 |
| 3234 | | 930 | 5 |
| 4028 | | 929 | 5 |
| 4029 | | 929 | 5 |
| 4033 | 1049 | 929 | 5 |
| 4044 | | 929 | 5 |
| 4308 | | 986 | 5 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 4319 | | 1012 | 5 |
| 4334 | | 988 | 5 |
| 4341 | | 1003 | 5 |
| 4358 | | 1015 | 5 |
| 4359 | | 1021 | 5 |
| 4367 | | 1024 | 5 |
| 4375 | | 994 | 5 |
| 4376 | | 965 | 5 |
| 4377 | | 963 | 5 |
| 4380 | | 946 | 5 |
| 4472 | | 1027 | 5 |
| 4905 | | 948 | 5 |
| 5060 | | 930 | 5 |
| 5060A | | 930 | 5 |
| 7065 | | 930 | 5 |
| 9009 | | 929 | 5 |
| 9192 | | 957 | 5 |
| 9372 | | 930 | 5 |



1   **Thursday - June 29, 2023**                                    **8:19 a.m.**

2                   P R O C E E D I N G S

3                        ---oOo---

4        (The following pages 923 through 928 were placed under

5        seal by Order of the Court:)

**SEALED PROCEEDINGS**



SEALED PROCEEDINGS



SEALED PROCEEDINGS





**PROCEEDINGS**



16      (The following proceedings were heard in open court:)

17          **THE CLERK:**  Court is now in session.

18      For all of our faithful listeners out there, please

19  remember any recording of this proceeding, either by video,

20  audio, including screenshots and other copying of the hearing

21  is strictly prohibited.  Thank you.

22          **THE COURT:**  All right.  Good morning.

23      So I understand Defendant has called Amy Hood by

24  declaration, which I've received in the record, and FTC has

25  chosen not to cross-examine Ms. Hood.

PROCEEDINGS

1          MR. WEINGARTEN:  Correct, Your Honor.

2          THE COURT:  So the declaration is admitted into

3    evidence.  And then are there exhibits to be admitted with

4    Ms. Hood?

5          MS. WILKINSON:  There are, Your Honor.  PX0083,

6    PX1102, PX4028, PX4029, PX4033, PX4044, PX9009, RX1077, RX1078,

7    RX1079, RX1080, and RX1105.

8       And, Your Honor --

9          THE COURT:  Yes.

10          MS. WILKINSON:  -- I assume you have no need to ask

11    her any questions since FTC has decided not to cross-examine

12    her, but she is here in case but I --

13          THE COURT:  No, I do not.

14          MS. WILKINSON:  Perfect.  Thank you.

15          THE COURT:  All right.  All those exhibits are

16    admitted.

17       (Trial Exhibits 0083, 1102, 4028, 4029, 4033, 4044,

18          9009, 1077, 1078, 1079, 1080, and 1105 received in

19          evidence.)

20          THE COURT:  Next, Defendants are calling Mr. Singer of

21    Nintendo.  I've gone over with the parties and so much of the

22    video deposition involves confidential third-party information,

23    that there's nothing really to show publicly.  So I'll review

24    that video deposition in camera.

25       Are there exhibits, then, to be admitted with Mr. Singer?

1          **MS. HILL:**  Yes, Your Honor.  Defendants would move in

2     RX5060, RX5060A, and RX1212.

3          **THE COURT:**  Does the FTC have exhibits?

4          **MS. CIRINCIONE:**  Yes, Your Honor.  Thank you.

5        PX3218, PX3225, PX3233, PX3234, PX9372, and PX7065.

6          **THE COURT:**  Okay.  All those exhibits are admitted.

7        (Trial Exhibits RX5060, RX5060A, RX1212, 3218, 3225,

8          3233, 3234, 9372, and 7065 received in evidence.)

9          **MS. HILL:**  Thank you, Your Honor.

10         **THE COURT:**  And does the FTC have another witness to

11    call.

12         **MR. WEINGARTEN:**  We do, Your Honor.  The Plaintiff

13    calls Mr. Tim Stuart.

14                    (Pause in proceedings.)

15         **MR. WEINGARTEN:**  While we're waiting, Your Honor,

16    there was one housekeeping.  We had discussed yesterday moving

17    into evidence some of the requests for admission responses that

18    we got, corporate admissions.

19         **THE COURT:**  Yes.

20         **MR. WEINGARTEN:**  So the exhibit is PX0070, which is

21    Respondent Microsoft's responses and objections to complaint

22    counsel's request for admission.

23        Just logistically, Your Honor, there's only obviously one

24    or two we want to move in as admissions.  Would Your Honor want

25    to receive all of it or should we redact the ones we don't --

 1          THE COURT:  Well, you don't need to redact them.  You
 2  can just tell me.
 3          MR. WEINGARTEN:  Excerpt it?
 4      Okay.  It's the response to Request Number 9.
 5          THE COURT:  Number 9?
 6          MR. WEINGARTEN:  Thank you, Your Honor.
 7          THE COURT:  All right.  That will be admitted.
 8      (Trial Exhibit 0070 received in evidence.)
 9          THE COURT:  Mr. Stuart, if you can stand right there,
10  Ms. Means will swear you.
11          THE CLERK:  Please raise your right hand.
12                      **TIMOTHY STUART**,
13  called as a witness for the Plaintiff, having been duly sworn,
14  testified as follows:
15          THE CLERK:  Can you please state your name for the
16  record?
17          THE WITNESS:  Tim Stuart.
18          THE CLERK:  Thank you.
19          THE COURT:  You may be seated.
20          MR. WEINGARTEN:  Can we approach with a binder,
21  Your Honor?
22          THE COURT:  Please.
23                      (Pause in proceedings.)
24          THE COURT:  You may proceed.
25  \\\

1                          <u>DIRECT EXAMINATION</u>

2     **BY MR. WEINGARTEN:**

3     **Q.**   Good morning, Mr. Stuart.

4     **A.**   Good morning.

5     **Q.**   You are the chief financial officer for Microsoft Gaming;

6     correct?

7     **A.**   That's correct.

8     **Q.**   And you are part of the overall Microsoft finance

9     organization; right?

10    **A.**   That's correct.

11    **Q.**   My understanding is you report to an intermediate person

12    who then reports to Ms. Amy Hood, the CFO of all of Microsoft?

13    **A.**   That's correct.

14    **Q.**   And even though there's a level between you, you do

15    interact with Ms. Hood quite frequently; correct?

16    **A.**   That's correct.

17    **Q.**   Especially when it comes to the financials and operations

18    of the Microsoft Gaming business?

19    **A.**   That's right.

20    **Q.**   You also sit on the Gaming Leadership Team; right?

21    **A.**   I do.

22    **Q.**   And that's the group of senior executives that helps run

23    Microsoft Gaming?

24    **A.**   That's correct.

25    **Q.**   Sometimes Gaming Leadership Team is abbreviated GLT?

STUART - DIRECT / WEINGARTEN

1   **A.**   That's right.

2   **Q.**   Now, you are responsible for modeling of the Activision

3   deal value and financials as part of this proposed acquisition

4   that brings us all here; correct?

5   **A.**   Yes, me and my team.

6   **Q.**   And you own the output of the model of the financials and

7   the synergies; correct?

8   **A.**   That's correct.

9   **Q.**   And the code word for that model was Denali; right?

10  **A.**   That's correct.

11  **Q.**   D-E-N-A-L-I?

12  **A.**   Yes.

13  **Q.**   That's like the mountain?

14  **A.**   It is.

15  **Q.**   Okay.  And you also sponsor and own the output for the

16  deal model that was created for the ZeniMax acquisition; right?

17  **A.**   That's correct.

18  **Q.**   Now, before we jump into those models, I want to ask you a

19  few questions about some agreements that we've heard about in

20  court.

21       You are not aware of any analysis of the profit and loss

22  impact to Microsoft from Microsoft having executed an agreement

23  with Nintendo about Call of Duty; correct?

24  **A.**   That's correct.

25  **Q.**   You and your team -- strike that.

1       Neither you nor your team has done any analysis of the

2   effect of entering into a listing agreement with Nvidia on the

3   Denali commitments or model; correct?

4   **A.**   That's correct.

5   **Q.**   And neither you nor your team has done any analysis of the

6   financial implications for Microsoft Gaming that could arise

7   from having entered into an agreement with Boosteroid; right?

8   **A.**   Correct.

9   **Q.**   And the same thing with respect to any agreement Microsoft

10   entered with Ubitus; correct?

11   **A.**   Correct.

12   **Q.**   And so on for EE, the cloud provider?

13   **A.**   Correct.

14   **Q.**   And for Nware, the cloud provider?

15   **A.**   Correct.

16   **Q.**   Okay.  And you and your team have not done any financial

17   analysis of the effects on Microsoft Gaming's business if any

18   of Microsoft's proposals to Sony were actually agreed and

19   executed; right?

20   **A.**   That's correct.

21   **Q.**   I want to ask you about some information that you shared

22   at the GLT with Mr. Spencer.

23       Now, Microsoft Gaming has something called a close review;

24   is that right?

25   **A.**   That's right.

 1   **Q.**   And a close review is a monthly business review that goes

 2   over things like the forecast and the budget for Microsoft

 3   Gaming; right?

 4   **A.**   That's right.

 5   **Q.**   And you and your team create the monthly close review

 6   presentation; right?

 7   **A.**   Correct.

 8   **Q.**   And you have a standing monthly meeting to discusses the

 9   close review with Mr. Spencer and other members of the GLT;

10   right.

11   **A.**   That's right.

12   **Q.**   It doesn't always happen but it's scheduled?

13   **A.**   Correct.

14   **Q.**   And even if it doesn't happen, I assume the close review

15   deck gets circulated; correct?

16   **A.**   That's right, we'll e-mail it out if it -- if the meeting

17   doesn't happen.

18   **Q.**   Okay.  If you can please turn in your binder to

19   Plaintiff's Exhibit 1240.  You'll have to skip past all the

20   testimony.  Thank you.

21   **A.**   Give me a second to move the papers.

22   **Q.**   Please take your time.

23                         (Pause in proceedings.)

24            **THE WITNESS:**  You said 1240?

25   \\\

1    BY MR. WEINGARTEN:

2    Q.   Yes, sir.

3    A.   (Witness examines document.)   Okay.   I'm here.

4    Q.   Okay.   The first page says "File provided natively," but

5    it indicates that the file is a close deck for April and it's

6    from April of 2022; is that right?

7    A.   That's correct.

8         MR. WEINGARTEN:   Okay.   The document has been entirely

9    designated as confidential, but I would move to admit

10   Plaintiff's Exhibit 1240, Your Honor?

11        THE COURT:   Admitted.

12        (Trial Exhibit 1240 received in evidence.)

13   BY MR. WEINGARTEN:

14   Q.   Okay.   So let's turn the page, sir, and you'll see the

15   cover page that says "Gaming Review April Results"; right?

16   A.   Yes.

17   Q.   Okay.   And I'd like to direct your attention in particular

18   to page 019.   It's the little pages in -- the little numbers in

19   the bottom corner.

20        And this document contains a lot of data that the GLT uses

21   to manage its business; right?

22   A.   That's right.

23   Q.   If you look at Plaintiff's Exhibit 1240-019 --

24        MR. WEINGARTEN:   I don't think the header is

25   confidential; right?   We're okay with that, the title of the

```
 1    slide?

 2              MR. GOSTAN:  That's fine.

 3              MR. WEINGARTEN:  Okay.

 4    BY MR. WEINGARTEN:

 5    Q.   Q3 console market size share, do you see that?

 6    A.   Yes.

 7    Q.   Okay.  And Microsoft finance reports to the Gaming

 8    leadership team about relevant information for the console

 9    market; right?

10    A.   Correct.

11    Q.   And it breaks down the console market into two different

12    components, a Gen 9 core console component and a total console

13    market; right?

14    A.   That's correct.

15    Q.   And the Gen 9 component of shares excludes the

16    Nintendo Switch and the Generation 8 consoles; right?

17    A.   That's correct.

18    Q.   And your team each month reports to the Gaming Leadership

19    Team -- if you look in the bottom left -- a share comparison

20    that's just in something called a core Gen 9 market; right?

21    A.   Those two lines, that's right, that's the Gen 9 market.

22    Q.   Okay.  And if you look in the upper right, there are two

23    geographies that are presented with special bar-and-line

24    graphs; right?

25    A.   Yes.
```

**STUART - DIRECT / WEINGARTEN**

1  **Q.**   And the close review breaks out the United States into a

2  separate chart and the other market because historically those

3  tend to be the biggest regions for Xbox; right?

4  **A.**   That's correct.

5  **Q.**   Okay.  And, likewise, in the bottom right-hand corner,

6  there is a core Gen 9 market share that's divided up by regions

7  and geographies again; right?

8  **A.**   Correct.

9  **Q.**   The top line there is for the United States alone;

10 correct?

11 **A.**   The top row is United States, yes.

12 **Q.**   Okay.  And there's a worldwide number that is put at the

13 bottom of that table; right?

14 **A.**   Yes.  These are the markets that we track and we call it

15 worldwide and then total.

16 **Q.**   Okay.  And so, for example, Japanese data is not shown

17 here; correct?

18 **A.**   That's correct.

19 **Q.**   And that's because the data in Japan skews quite heavily

20 in favor of Nintendo or Sony because those are Japanese

21 companies; right?

22 **A.**   Among other things.  Data is also not as reliable on a

23 quarterly or monthly basis so we exclude it for other reasons

24 too.

25 **Q.**   Okay.  And those are the market size and share figures

1  that are shared each month among the members of the Gaming

2  Leadership Team?

3  **A.**  That's correct.

4  **Q.**  And you can put that aside, sir.  Thank you.

5     Now I want to talk to you a little bit about content.

6     Content is a key differentiator for gaming products and

7  services; right?

8  **A.**  That's right.

9  **Q.**  And without games being available, there's really no

10  reason for a player to be in an ecosystem to play games; right?

11  **A.**  That seems reasonable.

12  **Q.**  And for a video game subscription service, let's focus on

13  that kind of gaming service.

14     For a subscription service to scale up and reach scale,

15  that requires having a robust content pipeline; right?

16  **A.**  Yes.

17  **Q.**  And Microsoft Gaming under Mr. Spencer's leadership has

18  been spending money to acquire video game studios for the last

19  several years; right?

20  **A.**  That's correct.

21  **Q.**  And has engaged in a series of acquisitions leading up to

22  the, again, present acquisition that's the reason we're all

23  here today?

24  **A.**  That's right.

25  **Q.**  And have you ever heard the amount of money that's been

1   spent as a dump truck full of money over the years?

2   **A.**   I have a friend at work that likes to say "dump trucks of

3   money" and I've repeated it back to him.

4   **Q.**   Okay.  And so you were talking about the Microsoft surge?

5   Is that another fair way to describe this acquisition period

6   that's been underway for a couple of years?

7   **A.**   I would just say we have been acquiring companies over the

8   last few years.

9   **Q.**   I see.  And informally with your friend you refer to it as

10  spending dump trucks of money on content; right?

11  **A.**   He said that to me once and I rephrased it back to him.

12  **Q.**   Okay.  And it's your view that a pipeline of content helps

13  drive user or consumer decisions about a subscription service

14  or an ecosystem for video games; right?

15  **A.**   Yes, content is a big piece of that puzzle.

16  **Q.**   Okay.  And we'll get to the model in more detail, but the

17  Activision acquisition as its modeled in the Denali model has a

18  component that talks about the impact of the Activision content

19  on Microsoft Game Pass; right?

20  **A.**   That's right.

21  **Q.**   And that's because when you add that content, it helps

22  create another reason for someone to subscribe to Game Pass;

23  right?

24  **A.**   That's right.

25  **Q.**   And the theory is that new users subscribe and existing

1  users play more and the hours go up and engagement goes up and

2  so on; right?

3  **A.**   That's the rough theory, that's right.

4  **Q.**   Okay.  There is a correlation, at least in some sense,

5  between content and engagement and revenue on a subscription

6  service; right?

7  **A.**   Yes.  You have to have good games to play and you have to

8  have reasons to come in and play in service.

9  **Q.**   Okay.  I want to talk to you about the subscription and

10  Game Pass offerings in a little more detail.

11     Could you please turn to PX1151?

12  **A.**   (Witness examines document.)  Yes, I'm here.

13  **Q.**   This is an e-mail at PX1151 that is dated March 29th,

14  2022, and it's from you to Ms. Hood; right?

15  **A.**   That's correct.

16  **Q.**   And it's also to a gentleman named Bill Duff.  Is Mr. Duff

17  your direct manager?

18  **A.**   That's right.

19  **Q.**   So then he reports in turn to Ms. Hood?

20  **A.**   Correct.

21  **Q.**   Okay.

22     **MR. WEINGARTEN:**  Your Honor, move to admit PX1151.

23     **THE COURT:**  Admitted.

24     (Trial Exhibit 1151 received in evidence.)

25     **MR. WEINGARTEN:**  Thank you.

1   BY MR. WEINGARTEN:

2   Q.   We'll talk around the document.  I believe it's --

3   actually, I don't have it marked as confidential.

4           MR. WEINGARTEN:   Karen, this one is okay?

5           MR. GOSTAN:   There's a portion underneath --

6           MR. WEINGARTEN:   Okay.  I'll talk around that.

7           MR. GOSTAN:   Yeah.

8           MR. WEINGARTEN:   Okay.

9           MR. GOSTAN:   Where it starts "There is an

10  opportunity."

11          MR. WEINGARTEN:   Okay.  Got it.

12  BY MR. WEINGARTEN:

13  Q.   So the unredacted portion, sir, we can talk to is the top

14  bit where you've laid out a table, and the table lays out a

15  comparison of the tiers and the pricing for Sony's subscription

16  service and Xbox's subscription services; right?

17  A.   That's correct.

18  Q.   And so for the PlayStation at this time a year and a half

19  or so ago there's PS Plus Essential, PS Plus Extra, and PS Plus

20  Premium; right?

21  A.   That's right.

22  Q.   And under the Xbox, the tiers are XBL Gold, which stands

23  for Xbox Live Gold; right?

24  A.   Correct.

25  Q.   Then there's XGP, which is Xbox Game Pass; right?

**STUART - DIRECT / WEINGARTEN**

1  **A.**   That's right.

2  **Q.**   And X, I think that says BP, but is it supposed to be XGP

3  Ultimate?

4  **A.**   That's correct.

5  **Q.**   Okay.  So it should be Xbox Game Pass Ultimate is the

6  final tier; right?

7  **A.**   Correct.

8  **Q.**   And for each of the tiers you've listed the price and

9  you've listed the features; right?

10 **A.**   That's correct.

11 **Q.**   And you wrote to Ms. Hood and Mr. Duff (as read):

12        "Wanted to send over my quick take on Sony's announce

13     of their Game Pass compete and subscription tiers."

14     Do you see that?

15 **A.**   Yes.

16 **Q.**   And you included an article, and you say (as read):

17        "I created the table below to detail the high-level

18     features within each tier and what it includes versus Xbox

19     today."

20     Do you see that?

21 **A.**   That's right.

22 **Q.**   Now, I won't read this part aloud and neither should you,

23 sir, but look under the table.  Do you see the part that says

24 "There is"?

25 **A.**   Yes.

1   Q.   That opportunity -- well, let's try it this way:  Take a

2   look at that word "opportunity," and then I want you to turn in

3   your investigational hearing transcript, which is at the very

4   beginning of your binder, to page 101 -- well, actually I can

5   do it -- maybe we can do it a little bit easier.  Sorry.

6        Let's stick at 1151.  Do you see the word "opportunity"?

7   A.   Yes.

8   Q.   The next sentence is about what that opportunity is;

9   right?

10  A.   That's right.

11  Q.   Okay.  And so it's ability to blank is the opportunity;

12  right?

13  A.   Yes.

14  Q.   Okay.  And this is based on a benchmarking of Xbox's

15  subscription service against the PlayStation subscription

16  service; right?

17  A.   Yes, based on value to the consumer.  I believe we have

18  "opportunity" here.

19  Q.   All right.  And you believed at the time you wrote this

20  that Xbox was providing a more compelling service; correct?

21  A.   I do.

22  Q.   And that's because there was more content on the Xbox

23  service and, therefore, more value for customers than the Sony

24  service?

25  A.   In addition to what I call out here, which is our

**STUART - DIRECT / WEINGARTEN**

1    first-party day and date strategy in addition to the games that

2    we have in service.

3    **Q.**   Okay.  So having first-party day and date go into Xbox's

4    subscription service is an advantage, in your view, versus

5    Sony's model?

6    **A.**   I believe it provides more value to the consumer.

7    **Q.**   And a more -- another reason for a consumer to engage with

8    or subscribe to Xbox's product; right?

9    **A.**   That's right.

10   **Q.**   And I think we've established this before, but having

11   high-quality titles, having key titles, that's important to

12   content subscriptions because that drives hours and engagement;

13   right?

14   **A.**   That's right.  You need quality content for people both to

15   subscribe and to want to stay in the service.

16   **Q.**   You can set that one aside.  Thank you, sir.

17        Now I want to talk a little bit about the two kinds of

18   Xboxes, the Xbox series consoles that are offered; right?  So

19   there's an Xbox Series X and there's an Xbox Series S; right?

20   **A.**   That's right.

21   **Q.**   And the X is priced at 499?

22   **A.**   Yes.

23   **Q.**   And the S is 299?

24   **A.**   That's correct.

25   **Q.**   Now the S is cheaper but the pricing strategy was to be an

```
 1   entry point into the Gen 9 console market; correct?
 2   A.   Less about an entry point Gen 9 or otherwise.  It's a
 3   cheaper box relative to what consumers may want to pay at that
 4   price point.
 5   Q.   Well, the function of going -- it's a -- let me strike
 6   that.
 7        So the generation -- the Xbox S is a Gen 9 console; right?
 8   A.   Gen 9 is kind of an inside baseball term.  In any event,
 9   the console also competes against other products in the market.
10   Q.   Okay.  Let me ask you to turn, please to page -- PX4380.
11   A.   (Witness examines document.)
12   Q.   Now -- yeah, go ahead.  Please, take your time.
13   A.   (Witness examines document.)  Okay.
14   Q.   Okay.  Plaintiff's Exhibit 4380 is another e-mail from you
15   and this one is to Ms. Hood, Mr. Nadella, Mr. Spencer, and to
16   Mr. Jerret West dated September 16, 2020; correct?
17   A.   That's right.
18        MR. WEINGARTEN:  I move to admit PX4380, Your Honor.
19        THE COURT:  Admitted.
20        (Trial Exhibit 4380 received in evidence.)
21   BY MR. WEINGARTEN:
22   Q.   Now, September of 2020 when this e-mail was sent, that's
23   around the time when the Xbox series consoles were going to
24   launch; right?
25   A.   That's right.
```

STUART - DIRECT / WEINGARTEN

1   Q.   And you're talking in this e-mail about some pricing news

2   that Sony had announced for the PlayStation 5; right?

3   A.   That's correct.

4   Q.   So Sony had put out some information about what their

5   Gen 9 console would be priced at; right?

6   A.   That's right.

7   Q.   And you are updating Microsoft's chief financial officer,

8   its chief executive officer, the gaming chief executive

9   officer, and others about the Sony pricing news; right?

10  A.   That's right.

11  Q.   And you are updating them about how the Xbox offering

12  compares on feature and price to the PlayStation offering;

13  right?

14  A.   That's right.

15  Q.   And if you look at the -- do you see where it says

16  "Relative to Xbox offering"?

17  A.   Yes.

18  Q.   Don't read it out loud.  I believe this has been redacted.

19       Look at the second bullet.

20  A.   Uh-huh.

21  Q.   "We will have the best."  Do you see that?

22  A.   Yes.

23  Q.   Read that to yourself.

24  A.   (Witness examines document.)  Yep.

25  Q.   Now that was an accurate description of the Series S price

1    point and pricing when you wrote that to Ms. Hood, Mr. Nadella,

2    and Mr. Spencer; right?

3    **A.**   That's right.   This is relative to what Sony had just

4    announced so I'm benchmarking it against that.

5    **Q.**   Okay.   And is it still your testimony that the Xbox S is

6    not a Generation 9 console?

7    **A.**   It's a Gen 9 console.

8    **Q.**   Okay.   So the S is a Gen 9 console?

9    **A.**   Yes.

10   **Q.**   Let's take a look, please, at PX4905 just a few tabs

11   further.

12   **A.**   (Witness examines document.)   Yes, I'm here.

13   **Q.**   So this is an e-mail from you to Mr. Spencer and others

14   from about two years later, August of 2022; right?

15   **A.**   That's correct.

16           **MR. WEINGARTEN:**   Move to admit PX4905.

17           **THE COURT:**   Admitted.

18       (Trial Exhibit 4905 received in evidence.)

19   **BY MR. WEINGARTEN:**

20   **Q.**   Now, here again, you're informing Mr. Spencer and some

21   others about some pricing moves from Sony; right?

22   **A.**   That's correct.

23   **Q.**   And you're talking about some foreign exchange effects and

24   other pricing differences between the Xbox X and the Sony

25   PlayStation 5; right?

1   **A.**   That's right.

2   **Q.**   And the Xbox S and the PlayStation 5; right?

3   **A.**   Correct.

4   **Q.**   Okay.  So, once again, two years after launch you're

5   informing leadership about the relative pricing of the Series X

6   and S versus the PlayStation 5; right?

7   **A.**   That's correct.

8   **Q.**   You can set that aside, please, sir.

9        Now I would like to talk to you about the Denali model.

10       The Denali model is the model for Microsoft's acquisition

11   of Activision; right?

12   **A.**   That's correct.

13   **Q.**   It's the model that was created and used to present

14   information to the Microsoft Board of Directors about the deal;

15   right?

16   **A.**   That's correct.

17   **Q.**   And the Denali model assumed that Activision's existing

18   businesses would continue to operate just as they were before

19   acquisition; right?

20   **A.**   We have an existing business assumption.  I wouldn't say

21   just as.  There's a line in there for that.

22   **Q.**   Okay.  So in the model there's a line that's an output

23   line for the existing Activision business; right?

24   **A.**   That's right.

25   **Q.**   And the model assumes for the existing business no major

1   changes in platform strategy, for example?

2   **A.**   That's correct.

3   **Q.**   Now, with respect to the ZeniMax deal model, that was also

4   a model that you created and owned and your team created and

5   owned; right?

6   **A.**   That's correct.

7   **Q.**   That model for ZeniMax also went to the board as part of

8   its consideration of the ZeniMax deal; right?

9   **A.**   That's correct.

10  **Q.**   And you made the same assumption with respect to the

11  ZeniMax model; namely, the ZeniMax existing business, if it was

12  met -- multiplatform, would continue as it was for the existing

13  business line; right?

14  **A.**   That's right.

15  **Q.**   So the ZeniMax model, like the Activision Denali model,

16  assumes that ZeniMax content will continue to be available on

17  Xbox and other platforms; right?

18  **A.**   We have an existing business line that continues, that's

19  right.

20  **Q.**   And that's the assumption in the existing business line

21  for both models; right?

22  **A.**   Yes.

23  **Q.**   And the model for ZeniMax assumed that there would be

24  non-Xbox platform revenue going forward for ZeniMax titles;

25  right?

1    **A.**   That's right.

2    **Q.**   So too for the Activision model; right?

3    **A.**   Correct.

4    **Q.**   Okay.  Now, at some point the model that gets presented to

5    the board of directors becomes what is called a final go/no go

6    model; right?

7    **A.**   That's right.

8    **Q.**   And the final go/no go is sort of the -- the model and the

9    output as they are when the final decision on whether to make

10   the acquisition is going to occur?

11   **A.**   Yes.  We make any final edits or adjustments since the

12   deal was approved to when the deal gets signed.

13   **Q.**   Okay.  And once the final go/no go version is set, fair to

14   say the Denali model is basically locked at that point;

15   correct?

16   **A.**   The valuation is set as a commitment.  The model obviously

17   changes over time, but the valuations, our commitment, that

18   gets locked at the final go/no go.

19   **Q.**   Okay.  So the model you can keep adjusting and using the

20   model as you need for your business needs?

21   **A.**   We don't change the core model that goes in the final

22   go/no go.  Likewise, we don't change the board deck.  We lock

23   the valuation and then move forward with the business.

24   **Q.**   Okay.  So, for example, in the case of Activision, after

25   the Denali model was set and the outputs and the commitments

**STUART - DIRECT / WEINGARTEN**

 1    were set, there came a time when the Activision negotiating

 2    team gave Microsoft some updated information about its

 3    financials; right?

 4    **A.**    That's right.

 5    **Q.**    And there was information about the financials that

 6    differed from the information that had been used to build the

 7    existing business Denali model; right?

 8    **A.**    We would get updates throughout the course that

 9    highlighted trends or changes in the business.

10    **Q.**    Do you remember a particular change that was of a greater

11    magnitude perhaps than some of the others?

12    **A.**    Not specifically, no.

13    **Q.**    Okay.  Let me refer you then -- would it help you refresh

14    your recollection if we looked at your deposition?

15    **A.**    Sure.

16    **Q.**    Okay.  Let's turn to your deposition, please.  We have a

17    lot of transcript there.  It's the smaller one I think, but

18    it's the one that says "Remote Videotaped Deposition," PX7040.

19    **A.**    All right.  Did you have a page for that one?

20    **Q.**    I do.  So in PX7040, can you please turn to little

21    page 39.  It's the transcript page 39.

22    **A.**    (Witness examines document.)

23    **Q.**    Actually, it's pages 38 and 39.  So when you get there,

24    read to yourself, please, page 38, line 19, through 39:3.  Take

25    your time.

1  **A.**  (Witness examines document.)  All right.  19 through

2  where?

3  **Q.**  Yep.  Little page 38, line 19, that starts "Do you

4  remember" and it ends with an answer on page 39 on the top.

5  Take a look at that and let me know when you've had a chance to

6  read it.

7  **A.**  (Witness examines document.)  Yes, I'm familiar with this.

8  **Q.**  Okay.  So does that refresh your recollection, sir, that

9  early in January 2022, the Activision negotiating team

10  communicated that it was going to be revising the Activision

11  financials in the manner that's described in that question and

12  answer?

13  **A.**  That's right.  They had submitted to us an updated

14  forecast for their business.

15  **Q.**  So in January 2022, before the deal was announced,

16  Activision sent over a revision and the revision was of that

17  magnitude that's described in page 38, line 22; right?

18  **A.**  That's right.

19  **Q.**  Not a small revision; correct?

20  **A.**  I would say it's relatively small when you're talking

21  about a ten-year model with terminal value in it.

22  **Q.**  Okay.

23  **A.**  This is specific to one title in the current year.

24  **Q.**  Okay.  And that revision of the financials was not

25  incorporated into the Denali deal model; right?

1   **A.**   That's correct.  The output of that was not extremely

2   meaningful to the valuation.

3   **Q.**   And because in part the deal model was locked so the

4   events, the change in assumptions did not need to be reflected?

5   **A.**   This specific change here, I did not deem it worthy to run

6   through the model, and we had the board model already

7   completed.

8   **Q.**   Okay.  So this one you didn't reflect in the model?

9   **A.**   We -- the board model was locked after this point.  We did

10  not go back and update things to the board.

11  **Q.**   And you didn't update before it got to the board with this

12  new information; right?

13  **A.**   That's correct.  Our commitment's to the valuation.

14  **Q.**   Now, you can put that aside.

15      I want to talk to you a little bit about ZeniMax.

16      Do you remember representing Xbox at an investor

17  conversation that the Jefferies Investment Bank hosted in

18  November of 2020?

19  **A.**   I do.

20  **Q.**   Okay.  That's shortly after Microsoft's acquisition of

21  ZeniMax was announced; right?

22  **A.**   That's correct.

23  **Q.**   And it's around the time that the new Xbox Gen 9 consoles

24  are launching; right?

25  **A.**   It's around the time that Series S and Series X launched,

1   that's right.

2   **Q.**   Okay.  And you were on a Q and A panel or interview on

3   a -- for an audience; right?

4   **A.**   It was an investor conference, that's right.

5   **Q.**   You were on a stage and you were asked questions?

6   **A.**   I don't recall if it was virtual or on stage, but I'm

7   asked questions.

8   **Q.**   Okay.  And when asked about ZeniMax content, you told the

9   audience that Microsoft Gaming did not have any intention of

10  just pulling all of the ZeniMax content off of Sony, Nintendo,

11  or otherwise; right?

12  **A.**   That's right.

13  **Q.**   And sometimes, just so the record's clear, people use the

14  word "ZeniMax" or they use the word "Bethesda" interchangeably

15  to refer to that company; right?

16  **A.**   That's right.

17  **Q.**   Because Bethesda is, I guess, technically the studio that

18  makes the content?

19  **A.**   One of the studios but the biggest one, yeah.

20  **Q.**   Okay.  If we use ZeniMax and Bethesda interchangeably, you

21  understand what we mean?

22  **A.**   Yes.

23  **Q.**   Okay.  And then you told the audience after you had told

24  them Microsoft was not going to be pulling any content away,

25  you said (as read):

1            "But what we want is we want that content in the long

2       run to be either first or better or best or pick your

3       differentiated experience on our platforms."

4       Do you remember telling the audience that?

5  **A.**   Can I just look at the transcript?  You said "any" and I

6  refer -- I think I said "all."  I just want to make sure I was

7  clear what you asked me.

8  **Q.**   Yeah, no.  Let's take a look.

9       So if you look in your binder at PX9192, that's the

10 transcript.

11 **A.**   (Witness examines document.)

12            **THE COURT:**  The last one.

13            **THE WITNESS:**  Sorry.  Just give me a second.

14            **MR. WEINGARTEN:**  It always is.

15                    (Pause in proceedings.)

16            **THE WITNESS:**  Thank you, Your Honor.

17       (Witness examines document.)  Okay.  I'm here.

18 **BY MR. WEINGARTEN:**

19 **Q.**   Okay.  So PX9192 is a transcript of a Microsoft

20 Corporation management presentation at a Jefferies Interactive

21 Entertainment Virtual Conference.  Do you see that?

22 **A.**   Yes.

23 **Q.**   And the transcript is of a conference event held on

24 November 12th, 2020, and you are listed as the company

25 participant; right?

1   **A.**   Correct.

2   **Q.**   Okay.  And you have no reason to doubt the accuracy of

3   this transcript; right?

4   **A.**   That's right.

5   **Q.**   Okay.

6           **MR. WEINGARTEN:**  Move to admit PX9192, Your Honor.

7           **THE COURT:**  Admitted.

8   (Trial Exhibit 9192 received in evidence.)

9   BY MR. WEINGARTEN:

10  **Q.**   Okay.  Let's take a look at page 014, please.

11  **A.**   (Witness examines document.)  Okay.

12  **Q.**   And if you look at the second paragraph, there's that

13  sentence about "In the long run is we don't have intentions of

14  just pulling all of Bethesda content" -- does that say off of?

15  **A.**   Out of.

16  **Q.**   -- "out of Sony or Nintendo or otherwise."

17  **A.**   Yes.  I said "all" there.  I think you said "any" when you

18  asked me the question.

19  **Q.**   I'm sorry.

20          Okay.  And then the next line was (as read):

21              "But what we want is we want that content in the long

22          run to be either first or better or best or pick your

23          differentiated experience on our platforms.  We want" --

24          "We will want Bethesda content to show up the best as on

25          our platforms."

1          Do you see that?

2     A.    I do.

3     Q.    And that's what you told the participants from the public

4     at the investor conference; right?

5     A.    That's right.

6     Q.    And I just want to ask you a couple of questions about

7     that.

8          So "first" could mean showing up first on a Microsoft

9     platform as compared to another platform; right?

10    A.    It could be, like what we've done with Starfield, that's

11    right.

12    Q.    And "better" could mean, for example, that the game has

13    better resolution on a Microsoft platform as opposed to a

14    non-Microsoft platform; right?

15    A.    I didn't mean that in this scenario, no.  I was looking

16    through the consumer lens of what "better" or "best" would

17    mean.

18    Q.    Well, having better resolution is better from a consumer

19    perspective when playing a game; right?

20    A.    Resolution is one thing.  Frame rate's another thing.

21    There are many things you can use the word "best" for.  I was

22    being pretty vague in my answers here pretty specifically.  We

23    hadn't had plans at this point.

24    Q.    Okay.  Let me -- "first" or "better" or "best" could also

25    refer to other characteristics or features of the content that

1  would be better on the Microsoft platform as opposed to the

2  non-Microsoft platform; right?

3  **A.**   I didn't define it when I was talking here.  Again, I was

4  being specifically vague at this point.  We had just closed the

5  acquisition and I was talking about experiences we -- things we

6  can do with ZeniMax.  I wasn't being specific one way or the

7  other.

8  **Q.**   I understand you didn't make specifics at the conference;

9  but as you understand it, when you used terms like "first,"

10  "better," or "best," some of that could be referring to timing

11  of when the content is released; right?

12  **A.**   Yeah.  If you're a consumer it could mean a lot of things.

13  It could mean resolution.  It could be timing.  It could be

14  some notion of downloadable content.  I wasn't referring to any

15  of those in this -- this conversation here.

16  **Q.**   You weren't referring to them explicitly, but that is the

17  meaning that you agree is implied in "first," "better," and

18  "best"; right?

19  **A.**   I think a consumer could read that in any way.  When I was

20  referencing it here, it's things like Starfield, how we're

21  bringing that to our platform or showing up in Game Pass is a

22  great experience for consumers.

23  **Q.**   Let me ask you, please, to look in your deposition at

24  page 257.

25  **A.**   Is it 7040?

1   **Q.**   Yes, sir?

2   **A.**   Okay.

3        (Witness examines document.)   Yes, I'm here.

4   **Q.**   Okay.   And if you look at page 257, starting at line 15

5   (as read):

6        **"QUESTION:**   Yeah.   When you say 'first on our platforms,'

7        that necessarily means first on our platforms as compared

8        to other platforms; right?

9        **"ANSWER:**   As a vague example, it could be, that's right.

10        Again, it's title by title.   So when I say 'first tier,'

11        it could be timing.   It could be at a certain place.

12        'Better' could be showing up in resolution, safety,

13        security.

14            "Again, I'm giving some very vague examples here of

15        what that could look like."

16        That was your testimony; right?

17   **A.**   That's right.

18   **Q.**   That was truthful and accurate; right?

19   **A.**   That's right.

20   **Q.**   Okay.   So "first," "better," "best" could include lots of

21   different kinds of features or timing or other things; right?

22   **A.**   Yes.   It could be many things as defined by whoever's

23   reading "first," "better," or "best."

24   **Q.**   Okay.   And then you said in your transcript of the

25   Jefferies conference (as read):

1              "Yes, that's not a point about being exclusive.

2       That's not a point about where being adjusting time and

3       content or road map; but if you think about something like

4       GP, if it shows up best in Game Pass, that's where we want

5       to see and we want to drive our Game Pass subscriber base

6       through that Bethesda pipeline."

7       Do you remember saying that?

8  **A.**    Yes.

9  **Q.**    And you also said at the conference to the public (as

10 read):

11             "So, again, I'm not announcing pulling content from

12      platforms one way or the other, but I suspect you'll

13      continue to see us shift towards a first or better or best

14      approach on our platforms."

15      Do you see that?

16 **A.**    I can go back.  I believe you, yes.

17 **Q.**    Do you remember saying that?

18 **A.**    Yes.

19 **Q.**    Okay.  And do you still believe that to be true as a

20 statement?

21 **A.**    I believe showing up in things like Game Pass, like I

22 said, is a great experience for customers.  It could be one of

23 the best if that's how they play.

24      Again, things like Starfield and Redfall did show up first

25 on Xbox so we're following through on the things I said there.

STUART - DIRECT / WEINGARTEN

1   Q.   And you were being vague, deliberately so, for the

2   audience.  You didn't want to make any announcements at that

3   conference; right?

4   A.   Correct.  When I'm talking to investors about long-range

5   planning when there's no plans, I wouldn't announce anything

6   specific.

7   Q.   But even though you were vague, you believe that there

8   would continue to be a shift to a first or better or best

9   approach on Microsoft platforms; right?

10  A.   Again, as evidenced by Starfield, we launched that

11  exclusively on our platform, that's an example of one of those

12  potentially.

13  Q.   And after the Jefferies conference, do you remember

14  talking or chatting with Mr. Spencer about your comments that

15  you made at the Jefferies conference?

16  A.   I do.

17  Q.   Let's look, please, at Plaintiff's Exhibit 4377.

18  A.   (Witness examines document.)  Okay.  I'm here.

19  Q.   4377 is in camera.  It's confidential so don't read any of

20  it out loud, please.

21       But this is a transcript of a chat between you and

22  Mr. Spencer dated November 17th, 2020.  Do you see that?

23  A.   That's right.

24       **MR. WEINGARTEN:**  And move to admit Plaintiff's

25  Exhibit 4377.

```
 1              THE COURT:  Admitted.

 2        (Trial Exhibit 4377 received in evidence.)

 3   BY MR. WEINGARTEN:

 4   Q.   So this is just a short period of time after the Jefferies

 5   conference; right?

 6   A.   That's right.

 7   Q.   Okay.  And Mr. Spencer on page 002 of PX4377 towards the

 8   bottom says that you're --

 9              MR. WEINGARTEN:  Can I read that one, "Your words sure

10   did"?

11                   (Pause in proceedings.)

12              MR. GOSTAN:  Yeah, you can read that.

13   BY MR. WEINGARTEN:

14   Q.   So Mr. Spencer says (as read):

15              "Your words sure did stir up a lot of stuff."

16        And then you responded, and I think we already did this in

17   public session, you wrote (as read):

18              "Wish we could just go out and say we are taking it

19        all exclusive at this point."

20        Mr. Spencer wrote back and said (as read):

21              "Yeah, we just can't say.  I think it was the first

22        and best that got people going."

23        And he continued (as read):

24              "First assumes there is a second on PS."

25        And you wrote (as read):
```

1              "That's right.  Needed to thread the needle versus

2         saying we don't intend to make any changes."

3         Do you see that?

4    A.   Yes.

5    Q.   That was your conversation with Mr. Spencer, right, after

6    the Jefferies conference?

7    A.   Yeah, that's right.

8    Q.   And when you said, "Wish we could just go out and say we

9    are taking it all exclusive at this point," "it all" means the

10   ZeniMax titles?

11   A.   Yes.  We aren't obviously able to say that, but that's

12   what I said here.

13   Q.   Okay.  And PS -- when Mr. Spencer writes "First assumes

14   there is a second on PS," you understand "PS" to mean

15   PlayStation?

16   A.   That's correct.

17   Q.   Okay.  Now, Mr. Spencer makes the ultimate decisions about

18   whether content that Microsoft owns is going to become

19   exclusive to Microsoft in any way; right?

20   A.   That's correct.

21   Q.   All right.  You can put that aside, please.

22        Let's take a look at Plaintiff's Exhibit 4376, please.

23   A.   (Witness examines document.)  Okay.  I'm here.

24   Q.   This is another short chat transcript.  This one is

25   between you and Mr. Matt Booty; right?

STUART - DIRECT / WEINGARTEN

```
 1   A.    That's right.
 2   Q.    Mr. Booty is the head of Microsoft's in-house game
 3   studios; right?
 4   A.    That's correct.
 5   Q.    Okay.  And those are sometimes called the first-party
 6   studios; right?
 7   A.    That's right.
 8   Q.    The date of this transcript is December 1st, 2020; right?
 9   A.    Yes.
10         MR. WEINGARTEN:  Move to admit Plaintiff's
11   Exhibit 4376, please.
12         THE COURT:  Admitted.
13      (Trial Exhibit 4376 received in evidence.)
14   BY MR. WEINGARTEN:
15   Q.    Now, Mr. Booty is writing to you about getting somebody's
16   perspective on exclusivity -- oh, strike that.
17      You write at the beginning of this chat (as read):
18          "Getting their perspective on exclusivity will be
19         fascinating.  Example, are they wanting to go a single
20         platform and deal with the huge fan backlash that they've
21         built over years?"
22      Do you see that?
23   A.    I do.
24   Q.    That's -- "their perspective" is referring to the
25   perspective of ZeniMax executives; right?
```

1   A.   I believe that's right.

2   Q.   Okay.  And you're talking there about getting the ZeniMax

3   executives' perspective on taking content exclusive; right?

4   A.   Yeah.  Part of the decision to do something like that that

5   Phil would make was get input from those making the games.

6   Q.   Uh-huh.  And Mr. Booty responds and you say "I like that

7   perspective."

8        And then Mr. Booty says (as read):

9            "The only wrinkle in that plan" --

10       MR. GOSTAN:  James, that part has been redacted.

11       MR. WEINGARTEN:  Oh.

12       MR. GOSTAN:  You can just not say the number.

13       MR. WEINGARTEN:  Okay.  Thank you for letting me know.

14   BY MR. WEINGARTEN:

15   Q.   (as read):

16           "The only wrinkle in that plan is that we have

17       blank" -- you see the number -- "units each on the

18       PlayStation for some titles there."

19       Do you see that?

20   A.   I do see that.

21   Q.   Okay.  And then Mr. Booty continues (as read):

22           "But the upside to XGP and console sales might offset

23       that."

24       Do you see that?

25   A.   I do see that.

1   **Q.**   So you understood Mr. Booty to be saying that taking some

2   content exclusive has a wrinkle because you lose sales on the

3   PlayStation platform; right?

4   **A.**   That's right.

5   **Q.**   But there's an upside to offset that loss and the upside

6   has two components, a component that benefits Game Pass; right?

7   **A.**   That's right.

8   **Q.**   And a component that benefits console sales; right?

9   **A.**   I see his comment there about that.  In our deal models we

10  don't reflect console sale change.

11  **Q.**   I understand.  In your response, though, to Mr. Booty was

12  (as read):

13          "Right.  That's the concern on valuation; but if we

14      can paint a higher XGP subgrowth, more Xbox units, and

15      more share could be an offset."

16      So you said, Right," those three things -- Xbox Game Pass

17  subscriber growth, more Xbox units, and more share -- could

18  offset the loss from taking some games exclusive; right?

19  **A.**   Yes.  My team and I do various scenario analysis of how to

20  think about valuation.  These are some of the options you could

21  pick.  I obviously don't pick all of them, but those are some

22  of the options.

23  **Q.**   Okay.  And actually you tell him some more good news.  You

24  say (as read):

25          "Due to cash flow discounting, we don't need to make

1          up that full AM in today's dollars."

2          And that "AM," that's a Microsoft term for accountability

3   margin; right?

4   **A.**    That's right.

5   **Q.**    That's like profit?

6   **A.**    Yes.

7   **Q.**    So the gaming business makes AM or profit?

8   **A.**    That's right.

9   **Q.**    Okay.  And so you're telling Mr. Booty that because the

10  valuation goes out, as you've told us now in court a few times,

11  ten years, you actually need fewer dollars today to make up for

12  some of those effects that are ten years in the future if you

13  take titles off; right?

14  **A.**    Potentially, but pulling things out of the model early in

15  the years has a much bigger impact on your cash flow discount.

16  **Q.**    Okay.  But according to what you told Mr. Booty is "Due to

17  cash flow discounting, we don't need to make up that full AM

18  with today's dollars"; right?

19  **A.**    That's right.  It's discounted over time.

20  **Q.**    And you're talking about the concern on valuation.  The

21  valuation you're referring to there, that's the commitment to

22  the board; right?

23  **A.**    That's right.  That's the number we have to hit.

24  **Q.**    And so even if you take an action or Microsoft Gaming

25  takes an action that could impact that valuation to the board,

1  there are other actions and strategies that Microsoft can

2  deploy to try to continue to hit that number; right?

3  **A.**   Yeah, there are various scenarios you can do to hit the

4  commitments over ten years.

5  **Q.**   Okay.  You can put that aside.

6     I have a couple more questions for you about hitting the

7  numbers.

8     Now, you're familiar with a Project Neutrino model?

9  **A.**   Yes.

10  **Q.**   And Neutrino was an analysis of scenarios around different

11  ZeniMax titles and options for exclusivity; right?

12  **A.**   I believe so, yes.

13  **Q.**   And Neutrino involved five different scenarios for ZeniMax

14  content; right?

15  **A.**   Yes.

16  **Q.**   Okay.  Let's please turn in your binder to PX1966.

17  **A.**   (Witness examines document.)  Yes, I'm here.

18  **Q.**   I'm sorry.  The type is small, but PX1966, you can see

19  it's a chat transcript; right?

20  **A.**   That's right.

21  **Q.**   And you can see it's dated February 9th, 2021; right?

22  **A.**   Correct.

23  **Q.**   And if you look at the initial participants, you can look

24  through there and you're one of them; right?

25  **A.**   That's right.

1   **Q.**   And Mr. Spencer is a participant; right?   Third line there

2   it says "Phil SP at Microsoft"?

3   **A.**   Yep, I see it.

4   **Q.**   Okay.   And the next e-mail over, Ms. Bond --

5   **A.**   Yep.

6   **Q.**   -- is a participant?

7        And several of the other leaders of the Microsoft Gaming

8   business; right?

9   **A.**   That's right.

10  **Q.**   Okay.   At some point in the chat there is a figure

11  attached; and if you look at page 008, it's a figure that says

12  five scenarios.   Do you see that?

13  **A.**   I do.

14  **Q.**   Okay.   And is this a summary of five potential scenarios

15  with respect to ZeniMax content after Microsoft completes its

16  acquisition of ZeniMax?

17  **A.**   That's right.   The marketing team had put together a few

18  scenarios of options to deal with the ZeniMax business.

19  **Q.**   And if you look, please, at PX1966-003, if you look at

20  the -- one, two, three, four, five -- sixth chat, it's got a

21  bold "Edited."   So I guess you edited it.   After you wrote it,

22  you kind of made a correction or something; right?

23  **A.**   Likely, yes.

24  **Q.**   If you look at the bold one that says "Edited," and you'll

25  say (as read):

1           "Will want to paint the picture of what we need to

2       believe to make number five work within the deal model

3       constraints.

4           "Example:  We are committed to X.  We're making a

5       change to the road map and still going to hit X through

6       these strategies."

7       Do you see that?

8   A.   That's right.  If we're going to hit the valuation, we

9   have to -- and there's a change to the road map, we still have

10  to make sure we make up for it.

11  Q.   So if one of the strategies that's presented in the

12  Neutrino -- well, strike that.  Let me ask you.

13      The five scenarios that we looked at at the back, those

14  are the Neutrino scenarios; right?

15  A.   I believe that's right.

16  Q.   So depending on what Neutrino scenario Microsoft Gaming

17  considers, that will have an impact on meeting the commitments

18  in the valuation for ZeniMax; right?

19  A.   That's right.

20  Q.   And you get a gap, a number that tells you, okay, here's

21  the commitment and if we do this strategy, here's the

22  shortfall; right?

23  A.   In a scenario analysis that's right.  Again, this was a

24  marketing team that put this together; but you're right on

25  the -- if there's a gap, you have to make up for it.

1   Q.   Right.  And if there's a gap, then one of your

2   responsibilities is to help the team think about, if they

3   implement the strategy, how to fill back up the gap, other ways

4   to get back to the valuation number; right?

5   A.   That's right.  That's a core part of my job.

6   Q.   Okay.  And in your chat you reference number five, and

7   that's number five of the five scenarios presented on page 008?

8   A.   That's right.

9   Q.   And the scenarios run from one to five.  One is fully

10  cross platform; right?

11  A.   Correct.

12  Q.   And it runs through various degrees of exclusivity to

13  five, Xbox focused; right?

14  A.   That's right.

15  Q.   So you're talking in this chat about what do we do if we

16  choose number five; right?

17  A.   Yes.  I'm reminding the team that if we choose any of the

18  scenarios and it has an impact on anything, we need to make

19  sure we hit the valuation.

20  Q.   Right.  And the picture here of the five scenarios, it

21  says -- it use the word "Adam."  Was "Adam" a code name for

22  ZeniMax?

23  A.   That's right.

24  Q.   Okay.  So when we see "Adam" there, we can understand that

25  to mean ZeniMax?

1    **A.**    Correct.

2    **Q.**    Okay.  Now, going back to the chat, there's quite a bit of

3    response to your chat about number five and still trying to hit

4    the valuation with other strategies; right?

5    **A.**    I can read through it if you'd like me to.

6    **Q.**    Well, there's just other chats that are -- take your --

7    take a minute, if you like, but those other chats down below,

8    they're responsive?

9    **A.**    Yeah, that's right.

10   **Q.**    Okay.  For example, Mr. West writes at 8:38 and 15 seconds

11   (as read):

12           "I think combining Tim and Sarah's point would be a

13           good way to respond to Phil's intuition.  There is

14           significant upside to number five.  We might see a huge AC

15           number on Game Pass for these tentpole releases."

16           Do you see that?

17   **A.**    I do.

18   **Q.**    That was one of the senior executive's responses to your

19   reminder about the valuation model and the commitments; right?

20   **A.**    Yeah.  It looks like he was giving his opinion on possible

21   scenarios there.

22   **Q.**    And was there a conversation about how some of the folks

23   at ZeniMax would respond to this idea if number five were

24   implemented?

25   **A.**    I don't know about directly.  We just talked about we

 1    wanted to get perspective from the team.  I don't recall a

 2    specific conversation about that.

 3    **Q.**   Okay.  Take a look -- turn to page 004, same document,

 4    please.  Take a look at the bottom two chats, please.

 5    **A.**   (Witness examines document.)

 6    **Q.**   So at 8:52 and 27 seconds you wrote (as read):

 7             "How does Zeni LT feel about these scenarios?  I

 8         think we know Todd's thoughts, but we have run into some

 9         leaders that don't want their IP cut from the potential

10         biggest base.  Not that this is a blocker but a

11         consideration."

12         Do you see that?

13    **A.**   I do.

14    **Q.**   And "Todd" there is referring to Todd Howard, the head of

15    Bethesda?

16    **A.**   That's right.

17    **Q.**   And the "potential biggest base" is referring to the

18    PlayStation?

19    **A.**   Yes.  They're the biggest base.

20    **Q.**   Okay.  And so you're asking in this chat, you're saying:

21    Let's figure out what the ZeniMax leadership team thinks about

22    these scenarios; right?

23    **A.**   That's what I'm saying, yeah.

24    **Q.**   And you're saying some folks might be on board, but you

25    have run into some leaders at ZeniMax who don't want their

1   games, their IP cut from Sony; right?

2   **A.**   That's right.

3   **Q.**   But your comment on that is their feelings about that are

4   not a blocker but they are a consideration?

5   **A.**   Yes, we should consider those that are making the games in

6   the decision that makes -- again, Phil makes the final call,

7   but he weighs many considerations for that.

8   **Q.**   Okay.  And then Mr. Booty writes to you at Tim Stuart, the

9   next e-mail -- the message down (as read):

10          "The meetings we have scheduled with Phil and plan to

11      have been with Robert are meant to start this discussion."

12      And "Robert" refers to the former head of ZeniMax who

13   passed away; right?

14   **A.**   That's correct.

15   **Q.**   And Mr. Booty says (as read):

16          "We have avoided talking about it to date to avoid

17      gun-jumping issues."

18      So do you have an understanding of what "gun-jumping

19   issues" means?

20   **A.**   Yes.

21   **Q.**   And that means that even though the deal is announced,

22   Microsoft executives aren't going to be talking to ZeniMax

23   executives about plans for ZeniMax content yet; right?

24   **A.**   Depending on timing, yes.  Until the deal closes, we are

25   not able to make changes to road map or business.

1   **Q.**   Okay.  And so you can't talk to the Zeni executives, or

2   Mr. Booty is saying "Let's be careful.  Let's not talk to the

3   ZeniMax executives yet, but we've got the meetings on the books

4   for when it's appropriate to talk to them."  Is that your

5   understanding of that?

6   **A.**   Yeah.  It appears Matt says "We have a meeting scheduled

7   with Phil."

8   **Q.**   And you are not -- this chat is not with the ZeniMax

9   people.  This is an internal Microsoft chat planning for the

10  ZeniMax meetings and what to do with ZeniMax; right?

11  **A.**   I believe that's right.  I don't believe I saw any ZeniMax

12  people on the invite.

13  **Q.**   I want you to look at -- please turn to page 006, please.

14  It's another message from you.  It's the second one from the

15  top.

16      Ms. Bond has an enthusiastic reaction to something.  She

17  says "Yes," and then you write at 9:01 and 47 seconds (as

18  read):

19          "Minecraft being on all platforms enabled its mass,

20      mass, mass market in my opinion, but" --

21              (Official Reporter clarification.)

22  **BY MR. WEINGARTEN:**

23  **Q.**   Your chat, Mr. Stuart, was, your message (as read):

24          "Minecraft being on all platforms enables its mass,

25      mass, mass market in my opinion, but that's the Minecraft

1          world.  I think it's different for these games."

2          Right?

3   A.    Correct.

4   Q.    And "these games" there means the ZeniMax titles; right?

5   A.    That's right.

6   Q.    And just to pull us back to where we started, you're

7   talking here about -- with the Gaming Leadership Team members

8   and senior executives about changes to ZeniMax's existing

9   multiplatform business; right?

10  A.    I don't believe it's about existing.  It looks like it's

11  about future titles.

12  Q.    Okay.  So you're talking about changes to what had been

13  projected in the deal model for future titles; right?

14  A.    If there's decisions that come out of this that impact the

15  deal model, that's correct.

16  Q.    And the deal model assumed that, while ZeniMax is

17  generally multiplatform, it's going to be multiplatform; right?

18  A.    The deal model assumed existing business goes forward.

19  Q.    And if existing business was multiplatform, it will go

20  forward multiplatform; right?

21  A.    Yeah, that's right.

22  Q.    Okay.  Now, these chats we're looking at, this is

23  February 9th, 2021.  Let's take a look please at PX1116.

24          MR. WEINGARTEN:  Oh, I'm sorry.  And can we please

25  move to admit PX1966.

1          **THE COURT:**  Admitted.

2          (Trial Exhibit 1966 received in evidence.)

3    **BY MR. WEINGARTEN:**

4    **Q.**   Now, let's look at PX1116.

5    **A.**   Yes.

6    **Q.**   Okay.  This is two weeks later; right?  The chat was

7    February 9th, 2021, and now we're looking at an e-mail from

8    February 23rd, 2021; right?

9    **A.**   That's right.

10   **Q.**   And it's an e-mail from you to Ms. Lawver and someone

11   named Kelly Huschka, H-U-S-C-H-K-A?

12   **A.**   Kelsey, that's right.

13   **Q.**   Oh, I'm sorry.  Kelsey.  My apologies.

14          **MR. WEINGARTEN:**  Please move to admit PX1116.

15          **THE COURT:**  Admitted.

16          (Trial Exhibit 1116 received in evidence.)

17          **MR. GOSTAN:**  This is marked confidential.

18          **MR. WEINGARTEN:**  I have numbers.  The numbers are the

19   problem; right?  Or is the whole thing?

20          **MR. GOSTAN:**  I think we have the whole thing marked as

21   confidential.

22          **MR. WEINGARTEN:**  Okay.  Okay.  Thank you for the

23   reminder.

24          Okay.  I will try to talk around it.

25   \\\

1    BY MR. WEINGARTEN:

2    Q.   Go to -- go to the second page of this e-mail chain,

3    please.  And do you see the bottom e-mail that starts off this

4    chain is from Mr. West?

5    A.   Yes.

6    Q.   And you're not on it, but the sentiment is expressed that

7    this was an excellent session.  Do you see that?

8    A.   I do.

9    Q.   Do you understand that to be a reference to at least part

10   of the session, the chat that we were looking at, whatever

11   meeting that was?

12   A.   I'm not sure if it's directly related to that, but I think

13   we could assume that.

14   Q.   Okay.  Mr. Booty says "Great work"; right?

15   A.   That's right.

16   Q.   And then you get added by a Mr. Murphy at the top e-mail

17   on page 2, and he's asking you -- he's telling you, he says (as

18   read):

19           "I added Tim to the thread because I want to recap

20       what I heard as the next steps."

21       Do you see that?

22   A.   Yes.

23   Q.   Okay.  And those next steps involve working with finance

24   to do some things; right?

25   A.   That's right.

STUART - DIRECT / WEINGARTEN

1  Q.   So look at the first bullet, work with finance to do those

2  things; right?

3  A.   Yes.

4  Q.   Okay.  And he wants to work with finance to expand a

5  timeline on the next bullet; right?

6  A.   That's right.

7  Q.   And he wants to understand the next step is providing more

8  clarity around an impact to something.  Do you see that third

9  bullet?

10  A.   That's right.

11  Q.   Okay.  So then at the bottom of his e-mail he asks you (as

12  read):

13          "Well, in the past I've worked with Kelsey and Jamie

14      L on this.  Does that work?"

15      So he's asking your permission there to reach out to

16  Ms. Huschka and Ms. Lawver; right?

17  A.   That's right.

18  Q.   Okay.  And if you go back to page 1, Mr. West confirms he

19  thinks Mr. Murphy got the right idea.  He says "Those were the

20  top lines for me"; right?

21  A.   Yeah, that's right.

22  Q.   He says there was a small thread of discussion on option

23  four as a hybrid, and he explains what option four could be;

24  right?

25  A.   That's right.

```
 1              MR. WEINGARTEN:  Can I read that one, Karen, "Taking

 2     all"?

 3              MR. GOSTAN:  Yeah.

 4     BY MR. WEINGARTEN:

 5     Q.   Okay.  So Mr. West says (as read):

 6              "Well, option four we discussed a little bit was

 7          taking all the new IP exclusive and delaying porting to

 8          the PS version for established IP linear games like a

 9          Fallout."

10          Do you see that?

11     A.   Yes.

12     Q.   Okay.  And then you write back (as read):

13              "Adding Jamie and Kelsey to run through the model" --

14          strike that.

15          Let me be very clear about that one.  (as read):

16              "Adding Jamie and Kelsey to run this through the

17          acquisition model."

18          So did you understand that there that you were adding

19     Ms. Lawver and Ms. Huschka because they were going to help work

20     on taking these scenarios and using the ZeniMax deal model as a

21     base to sort of run the scenarios and see what happens to the

22     valuation?

23     A.   That's right.  We have to start with our baseline

24     commitment.

25     Q.   So you start with the baseline model, alter it based on
```

 1  the conversations about the scenarios here for exclusivity, and

 2  see what happens; right?

 3  **A.**    Yeah.   I'd say it's a scenario analysis from the baseline

 4  model.

 5  **Q.**    Okay.   And you write (as read):

 6           "What we will need to prove out over the ten-year

 7      life of the model..."

 8      And you list some items there about what's going to

 9  change; right?   There's a decrease -- do you see that? -- in

10  something?

11  **A.**    That's right.

12  **Q.**    And then there's an increase in Game Pass.   Do you see

13  that?

14  **A.**    That's right.

15  **Q.**    And then there's going to be some margin impact, and you

16  write "Need to ensure we keep the model at," and there's that

17  number, don't say it; right?

18  **A.**    Correct.

19  **Q.**    Now, Ms. Lawver writes back to you on the 23rd.   She says

20  (as read):

21           "Kelsey has run the numbers.   Looks like we drop well

22      below blank but we're still reviewing."

23      Right?

24  **A.**    That's right.

25  **Q.**    That number there that we're not reading, that's your

1    understanding of the commitment; right?

2    **A.**    Correct.

3    **Q.**    From the ZeniMax model?

4    **A.**    Correct.

5    **Q.**    And so she says (as read):

6           "Once Kelsey and I have reviewed, do you want me to

7    find time to meet to discuss or would you prefer to handle

8    via e-mail?"

9           And you write back (as read):

10          "If it's material, yes, we should meet up to review."

11          And you offer to read through some things ahead of time;

12   right?

13   **A.**    That's correct.

14   **Q.**    And so the idea is they've run the scenario and there's a

15   material drop from the commitment; right?  Well, at least a

16   drop from the commitment?

17   **A.**    In this scenario analysis, it looks like they drop below

18   that commitment, yeah.

19   **Q.**    And so there's going to have to be some work done to

20   figure out ways that if that scenario is the scenario, to get

21   back to the commitment; right?

22   **A.**    That's right.  We always have to land the commitment to

23   the company.

24   **Q.**    And you believe -- and you believed at this time that

25   gaming could plan and work hard and be creative and figure out

1  ways to fill the gap to the commitment; right?

2  **A.**    In my job we run lots of scenarios, what it would take to

3  believe to fill gaps, that's right.

4  **Q.**    And ultimately the decision on whether to make a decision

5  that might bring the business below the commitment and a

6  decision about how to fill to get back to the commitment,

7  that's Mr. Spencer's decision; right?

8  **A.**    It's ultimately his call and the decision to make title

9  recommendations or changes.

10 **Q.**    Okay.  And do you recall that you discussed at the Gaming

11 Leadership Team this gap that this scenario could create to the

12 number we're not allowed to say; right?

13 **A.**    Yeah.  I mean, in my prior chat, we talked about keeping

14 that in mind as the core commitment.

15 **Q.**    Right.  And Starfield is planned to launch as an

16 exclusive; right?

17 **A.**    That's correct.

18 **Q.**    Starfield is a ZeniMax game; right?

19 **A.**    Yes.

20 **Q.**    But despite launching Starfield as an exclusive, you

21 believe that Microsoft Gaming can still meet its commitment to

22 the board that was set in the final ZeniMax model; right?

23 **A.**    Yeah.  The type of game that Starfield is gives me that

24 confidence, that's right.

25 **Q.**    And part of that is because the model is a ten-year model

1    and you have time to create some value over the ten years to

2    help get back to the number from the model; right?

3    **A.**    It's a true statement.  Changes we make to the model early

4    in a discounted cash flow are always more meaningful; but,

5    correct, we owe the total valuation of the model.

6    **Q.**    Right.  Because the valuation the board is told is a

7    ten-year plan?

8    **A.**    Plus terminal value, that's right.

9    **Q.**    I'm sorry, sir.  Go ahead.

10   **A.**    It's ten-year plus terminal value so it has existing value

11   past the life of the asset such as brand and IP.

12   **Q.**    Now, we've talked a little bit about some conversations

13   about making up this gap, but you don't remember specifically

14   discussing any of this modeling or the gap with Mr. Spencer;

15   right?

16   **A.**    Not specifically, no.

17   **Q.**    Okay.  And, again, we discussed this.  Part of your role,

18   and it's a fiduciary responsibility I think you said in the

19   past, is to remind Mr. Spencer about the commitments to the

20   board but he owns the decision; right?

21   **A.**    That's correct, and I don't need to remind him of the

22   commitment nor the number.

23   **Q.**    Understood.

24        And whatever decision-making process Mr. Spencer employs,

25   that's his process for making these kinds of decisions after he

 1  gets all the inputs from you about the commitment and the

 2  planning, et cetera; right?

 3  **A.**   Yes.  He weighs all the factors of consumers and GLT

 4  opinion and various other elements.

 5  **Q.**   And you don't recall any conversations with Mr. Spencer

 6  about taking titles exclusive from ZeniMax; right?

 7  **A.**   I don't recall any specifically.

 8  **Q.**   Let's take a look at some of the timing around maybe those

 9  decisions.  So please turn in your binder to PX4308.

10          **MR. WEINGARTEN:**  I apologize if I did not move to

11  admit PX1116.  I would move to admit it.

12          **THE COURT:**  You did.

13          **MR. WEINGARTEN:**  Oh, very good.  Thank you,

14  Your Honor.

15          **THE COURT:**  Do you want to admit 4308?

16          **MR. WEINGARTEN:**  Yes, please.

17          **THE COURT:**  Admitted.

18      (Trial Exhibit 4308 received in evidence.)

19          **MR. WEINGARTEN:**  Thank you.

20          **THE WITNESS:**  So we're at 14308?

21  **BY MR. WEINGARTEN:**

22  **Q.**   4308.

23  **A.**   Okay.  Thank you.

24  **Q.**   Thank you, sir.

25          Let me ask you this question, sir:  Do you remember that

1    there was a -- before you look at the document, do you remember

2    that there were periodic MBR meetings between ZeniMax and Xbox?

3    **A.**   That's right.

4    **Q.**   Okay.  And what does MBR mean?

5    **A.**   Monthly business review.

6    **Q.**   Okay.  And I recognize you're not on this e-mail, but do

7    you recall that there were regular MBR meetings between ZeniMax

8    and Xbox in 2021?

9    **A.**   That's likely.  I'm not in all of them, but I would assume

10   so.

11   **Q.**   Okay.  And do you remember that in November of 2021, the

12   Gaming Leadership Team or members from the leadership team

13   talked to ZeniMax leadership about the exclusivity of future

14   ZeniMax titles?

15   **A.**   That's correct.

16   **Q.**   And you don't remember a specific meeting, but you do

17   remember that Mr. Spencer did talk about some exclusivity

18   guidance to the ZeniMax folks; right?

19   **A.**   I believe at the time he gave some guidance in MBR, that's

20   right.

21   **Q.**   You don't remember the specifics of what Mr. Spencer

22   guided anyone about; right?

23   **A.**   I don't recall that I was in the meeting.  I may have been

24   watching chat.  So I don't recall the specifics of what the

25   words were.

1    **Q.**    Okay.  So to the extent there's an agenda and there was a

2    meeting about Phil's top of mind and it included guidance on

3    exclusivity of future titles, you do remember that there was

4    that kind of a meeting with Mr. Spencer, gaming leadership

5    folks, ZeniMax folks to talk about that; right?

6    **A.**    I assume they had a meeting.  I'm not on this mail and I

7    don't know that I was in the meeting.

8    **Q.**    But you do remember that in November of 2021, gaming

9    leadership did talk to ZeniMax leadership about exclusivity;

10   right?

11   **A.**    Yes.

12   **Q.**    Yeah.  Let's take a look, please, at PX4334.

13   **A.**    (Witness examines document.)

14   **Q.**    This is another chat transcript.  This is between you and

15   Ms. Jamie Lawver; right?

16   **A.**    That's right.

17   **Q.**    And this one is dated around the same time.  We're still

18   in November of 2021; right?

19   **A.**    Correct.

20          **MR. WEINGARTEN:**  Move to admit PX4334, please.

21          **THE COURT:**  Admitted.

22      (Trial Exhibit 4334 received in evidence.)

23   **BY MR. WEINGARTEN:**

24   **Q.**    Now, the chat starts off and you say (as read):

25          "Did we make an official decision on something going

```
 1        exclusive?"
 2        That's your question to Ms. Lawver; right?
 3   A.   That's correct.
 4   Q.   She says in response (as read):
 5            "Not that I'm aware of.  I thought that they" -- "I
 6        thought they were going to talk about..."
 7        And then she has a title there; right?
 8   A.   That's right.
 9   Q.   Let's not say the name of the title.
10        And you write (as read):
11            "They must have made the call."
12        Now, by "made the call," that means you were asking
13   Ms. Lawver about whether Mr. Spencer made a decision about
14   ZeniMax going exclusive; right?
15   A.   I was asking about specific titles, that's right.
16   Q.   So you were asking about whether Mr. Spencer had made a
17   decision about ZeniMax titles going exclusive; right?
18   A.   Correct.
19   Q.   And Ms. Lawver says (as read):
20            "I sent Jill a note."
21        Do you understand that to be Jill Braff?
22   A.   That's right.
23   Q.   And she was in charge of leading the project to integrate
24   ZeniMax and Microsoft Gaming; right?
25   A.    That's correct.
```

1   Q.   Now, Ms. Lawver writes back (as read):

2            "Per Jill, Phil did... to Jamie."

3        Jamie is Jamie Leder?

4   A.   Yes.

5   Q.   Jamie Leder is the head of ZeniMax at this time?

6   A.   Correct.

7   Q.   She writes (as read):

8            "Per Jill, Phil did... to Jamie but it wasn't widely

9        known so we wanted to talk about it here to clarify."

10       And you ask (as read):

11           "All games going forward?"

12       And she writes back (as read):

13           "Yes."

14       And you ask to clarify it again (as read):

15           "Not just new IP but All" -- all caps, A-L-L -- "ALL

16       games going forward?  Wow."

17       And Ms. Lawver writes (as read):

18           "Yes."

19       Do you see that?

20  A.   I do.

21  Q.   And you wrote "Wow" because that would be a very big

22  decision that was being communicated to you that Mr. Spencer

23  had made; right?

24  A.   I suppose so.

25  Q.   And then you note further down, you keep talking about

1    some more titles.  And look at -- look at the timestamp that is

2    21:36.  One, two, three, four, five, six chats up from the

3    bottom.  It starts with "I'm putting a few."  Do you see that?

4    **A.**    I do.

5    **Q.**    So you write to Ms. Lawver (as read):

6              "I'm putting a few of these things in chat just to

7         make sure they don't get too fixated on a specific number.

8         We will have AM issues in the deal model as we pull a huge

9         amount of PS units out of the model."

10        Do you see that?

11   **A.**    I do.

12   **Q.**    "PS" means PlayStation?

13   **A.**    That's right.

14   **Q.**    "AM" means accountability margin or profit?

15   **A.**    That's right.

16   **Q.**    And the "deal model" is the ZeniMax deal model; right?

17   **A.**    The board commitment, yes.

18   **Q.**    The board commitment.

19        So if this decision that's being communicated to you goes

20   through, your understanding is that that will create profit

21   issues in the board commitments because it entails pulling a

22   huge amount of PlayStation units out of the model; right?

23   **A.**    Yes.  Anytime you make a change to a model, you have to

24   have an offset somewhere.

25   **Q.**    Okay.  And then let's look, please, at PX4375.  Same day,

1    same time almost.  PX4375.

2    **A.**   (Witness examines document.)  Yes.

3    **Q.**   Okay.  This is another chat, and now this one is you to

4    Mr. Matt Booty; right?

5    **A.**   That's right.

6    **Q.**   Same day, November 10, 2021; right?

7    **A.**   Correct.

8    **Q.**   Right about the same time 21:00 and 12 hours?

9    **A.**   Yes.

10   **Q.**   Okay.  You write to Mr. Booty to start the chat (as read):

11          "Did we make an official decision on something going

12       exclusive?"

13       Do you see that?

14   **A.**   Yes.

15   **Q.**   This is basically at the same time you're chatting with

16   Ms. Lawver; right?

17   **A.**   That's right.

18   **Q.**   You're trying to understand what's going on; right?

19   **A.**   Correct.

20   **Q.**   Mr. Booty writes back (as read):

21          "Phil told them all titles going forward Xbox

22       exclusive."

23       And then a few conversations about Steam and an e-mail,

24   and then you write (as read):

25          "This is new IP I assume, not ALL games."

1    And then you put "all" in caps again; right?

2  **A.**   That's right.

3  **Q.**   And Mr. Booty says (as read):

4         "Nope.  All games."

5    And Mr. Booty says (as read):

6         "I wasn't in any of the discussions or on the

7    e-mails."

8    And you write (as read):

9         "Hmm, okay.  Thanks."

10   And Mr. Booty writes (as read):

11        "As I was saying, different from the deal model."

12   Do you see that?

13 **A.**   I do.

14 **Q.**   So Mr. Booty is confirming that he thinks Mr. Spencer has

15   made a big decision about all the ZeniMax titles; right?

16 **A.**   Yeah.  There's a few people saying they heard certain

17   things.  We've obviously, since the meeting, gone back and

18   clarified with Jill and Phil what the actual decision is.  So

19   this is me trying to understand what was discussed in this MBR.

20 **Q.**   Okay.  And Mr. Booty writes to you (as read):

21        "Has there been any official word on Redfall?"

22   And you write (as read):

23        "Phil hints to me that it's, quote/unquote, official,

24   but I haven't heard anything from them.  We need to have

25   that."

1        Do you see that?

2   **A.**   I do.

3   **Q.**   And that's -- when you say it's "quote/unquote, official,"

4   that's because if Mr. Spencer decides it's official even if it

5   hasn't gone out yet in a, quote/unquote, official manner;

6   right?

7   **A.**   I assume when Phil makes the call, that's the call and

8   there's various ways to communicate.

9   **Q.**   Okay.  You can put that aside, please, sir.

10            **MR. WEINGARTEN:**  I think I need to move to admit

11   PX4375.

12            **THE COURT:**  Yes, admitted.

13       (Trial Exhibit 4375 received in evidence.)

14            **MR. WEINGARTEN:**  Thank you.

15   **BY MR. WEINGARTEN:**

16   **Q.**   Let's talk a little bit about the Denali model.  We've

17   talked about ZeniMax.  Let's talk about Denali.

18       The Denali model includes some assumptions about platform

19   mix for Activision games; right?

20   **A.**   It does.

21   **Q.**   Platform mix, it's got assumptions about the revenue mix

22   for Activision from having games played on different consoles;

23   right?

24   **A.**   Yeah.  It includes mobile, PC, Nintendo, PlayStation.

25   **Q.**   So if X percent of Activision revenues come from playing

1   on -- playing Activision games on Xbox, the model says, great,

2   that's the X percent of Activision revenues that will play on

3   Xbox going forward; right?

4   **A.**   In the model, yes, we make assumptions about platform mix.

5   **Q.**   And if the model -- well, if Activision gets Y percent of

6   its revenues from having Activision games played on

7   PlayStation, the model assumes, okay, that Y percent to play

8   from PlayStation platform is going to carry forward; right?

9   **A.**   The model makes assumptions about platform mix, and we

10   keep an existing business line that reflects that going

11   forward.

12   **Q.**   Right.  So the share -- the mix of Activision revenues

13   between Xbox and PlayStation, the model holds that, whatever it

14   is, for the existing business and carries it forward?

15   **A.**   Yes, among other things.  Models have many assumptions

16   that go into them.

17   **Q.**   Sure.  Sure.

18        And the model, I think we've heard, does not model any

19   changes in console share as a result of Microsoft's Activision

20   acquisition; right?

21   **A.**   That's correct.

22   **Q.**   And because we buy it, our share of the console market is

23   going to jump up or go down or whatever; right?

24   **A.**   That's correct, no change.

25   **Q.**   Okay.  Now I'd like to introduce PX4341, please.  If you

1    can turn in your binder to PX4341.

2    **A.**   (Witness examines document.)  Yes, I'm here.

3    **Q.**   Okay.  The cover e-mail is less exciting, but read it if

4    you need to, but PX4341-005, that's a copy of the Activision

5    Blizzard presentation that went to Microsoft's Board of

6    Directors on January 16th, 2022; right?

7    **A.**   That's correct.

8    **Q.**   This is one of the final, if not the final, board

9    presentations about this deal; right?

10   **A.**   That's right.

11   **Q.**   Let's just take -- I want you to hold in mind what we were

12   talking about with revenue shares, but let's just take a quick

13   look through some of the document if we could, please.

14       Can you, please, turn to page 024 of PX4341?  Do you see

15   that?

16   **A.**   Yes.

17   **Q.**   And that's a slide titled "Activision Blizzard Value

18   Drivers."  Do you see that?

19   **A.**   I do.

20   **Q.**   Okay.  And you're telling the board here, no change to the

21   framework since your last review; but for our purposes, this is

22   a description to the board of what drives the valuation that

23   the model computes for Activision; right?

24   **A.**   That's correct.

25   **Q.**   The valuation has an existing business component and then

STUART - DIRECT - WEINGARTEN

1   it has a net synergies component; right?

2   A.   Correct.

3   Q.   The net synergies component has three subcomponents about

4   accelerating Game Pass, about extending the Xbox store into a

5   universal store, and some expansion of a Microsoft advertising

6   network; right?

7   A.   That's right.

8   Q.   And then at the bottom it says "Other" -- let me ask you

9   this:  And the existing business and the net synergies, those

10  got modeled and calculated; right?

11  A.   Correct.

12  Q.   And if you look at the next page, 025, that's the

13  calculations for those; right?

14  A.   Yes.

15  Q.   The categories line up existing, Game Pass, universal

16  store, advertising; right?

17  A.   That's right.

18  Q.   Now, back on the 024, at the bottom there's a little box

19  that says "Other Strategic Benefits," and that one says "Xbox

20  Console Ecosystem"; right?

21  A.   That's right.

22  Q.   And the strategic benefit to the console -- the Xbox

23  console ecosystem does include a shift among console revenue

24  mix; right?

25  A.   We didn't model any of those activities if that was one.

1    It could also be brand, customer enjoyments, many things that

2    go into the ecosystem, safety, security.

3    **Q.**   You didn't model it, but when you're telling the board and

4    the board is told that another strategic benefit is the Xbox

5    console ecosystem, that includes a shift among console revenues

6    for Activision; right?

7    **A.**   We didn't lay it out specifically to the board, no.

8    **Q.**   So let's take a look in your deposition, please, at

9    page 93.  I think that's PX7040, deposition page 93.

10   **A.**   Just a second.

11   **Q.**   Sorry.  I know it's a big binder.

12   **A.**   (Witness examines document.)  Okay.  I'm here.

13   **Q.**   So look on page 93 of the transcript at page 17 --

14   line 17, please (as read):

15       **"QUESTION:**  Does a strategic benefit to the Xbox console

16       ecosystem include any shift among console revenue mix?

17       **"ANSWER:**  By definition that is the console ecosystem.  So

18       I'm going to agree with your definition that that could be

19       one example."

20       Do you see that.

21   **A.**   I do.

22   **Q.**   That testimony was truthful and accurate when you gave it;

23   right?

24   **A.**   Correct.

25   **Q.**   And I also asked you (as read):

1    "QUESTION:  Does the strategic benefit of the deal to the

2    Xbox" -- it says "conceal" but I think we can agree it

3    means "console" -- "ecosystem include a shift in the mix

4    in terms of how many Xbox consoles are sold versus

5    non-Xbox consoles sold?

6    "ANSWER:  If you're asking about the console ecosystem,

7    there's a lot of things that go into that.  The console

8    ecosystem includes share.  In the model, we don't include

9    any assumptions around shift.  But if you're asking about

10   the Xbox console ecosystem and what is included in that,

11   it's share, yes."

12   That testimony was truthful and accurate; right?

13   A.   That's right.

14   Q.   Okay.  Now, let's take a look at the actual numbers that

15   were modeled.  I understand the console piece was not, but

16   let's look at this next page, PX4341-025.

17   A.   (Witness examines document.)  Okay.  I'm here.

18   Q.   That page discuss -- calculates all the values to

19   Microsoft that you modeled for the deal; right?

20   A.   That's correct.

21   Q.   Please do not say any of these numbers out loud, but the

22   first row is, again, that existing business row; right?

23   A.   Right.

24   Q.   And that is the continued sale of Activision Blizzard

25   portfolio on all the platforms:  Console, PC, mobile; right?

**STUART - DIRECT - WEINGARTEN**

1  **A.**  Correct.

2  **Q.**  And there's a value; right?

3  **A.**  That's right.

4  **Q.**  And that's half or so of the total value?

5  **A.**  Yes.

6  **Q.**  Okay.  The next one is the Game Pass.  Well, the next

7  three are the synergies; right?  Game Pass, store, advertising;

8  right?

9  **A.**  That's right.

10  **Q.**  And they make up the other half of the value to Microsoft;

11  right?

12  **A.**  Correct.

13  **Q.**  And Game Pass is that number on the far right in the

14  second row; right?

15  **A.**  That's right.

16  **Q.**  And that number -- I'm trying to do this -- well, that is

17  a majority or more of the total synergy number; right?

18  **A.**  Yes, that's fair.

19  **Q.**  But if you add up all this, there's two pieces.  There's

20  existing business and there's synergies; right?

21  **A.**  That's right.

22  **Q.**  And if you look at the synergies piece, the Game Pass

23  piece is a big majority of it; right?

24  **A.**  Within the synergies --

25  **Q.**  I'm sorry.

1   A.   -- right.

2   Q.   And within the synergies, the mobile store and the margin

3   and even if we throw in the PC store, that's a much smaller

4   piece of the synergies; right?

5   A.   As a percentage, yeah.

6   Q.   If we were just focusing on mobile synergies, we would

7   look at mobile store and maybe some of that margin piece;

8   right?

9   A.   That's right.  Just a reminder, it doesn't include the

10  mobile -- part of their business in the existing business line.

11  Q.   Right.  That's the existing business.  But the synergies

12  are about what new value is created from having these two

13  companies come together; right?

14  A.   That's correct.

15  Q.   And so a synergy is something that didn't exist before as

16  a value that thanks to these two companies coming together,

17  that's the new value that's created; right?

18  A.   Yeah, that's right.

19  Q.   Okay.  And so if we look at the mobile value, it's -- one

20  two, three -- the fourth and the fifth rows on that table;

21  right?

22  A.   That's right.

23  Q.   Okay.  And if you add those up, that is a relatively small

24  percentage compared to Game Pass of the total synergies; right?

25  A.   I would say it's a very large number but a small

 1  percentage relative to Game Pass.

 2  **Q.**   Right.  So the driver of the synergies is Game Pass;

 3  right?

 4  **A.**   The majority of synergies is Game Pass.

 5  **Q.**   More than -- more than two-thirds; right?

 6  **A.**   That's fair.

 7  **Q.**   Now, I understand from your previous testimony these

 8  values are commitments to the board; right?

 9  **A.**   The lower right-hand number is the commitment to the

10  board.

11  **Q.**   Okay.  So the very bottom lower right-hand number is the

12  commitment.

13      And how the gaming business operates within this framework

14  is a decision of the gaming business; correct?

15  **A.**   Knowing that things change over time, that's correct.

16  **Q.**   Okay.  And so the commitment is that -- that big number on

17  the bottom right; but with any acquisition, things can change,

18  strategies change, and your job is to help make sure they hit

19  that commitment even if all the details inside of it move

20  around; right?

21  **A.**   Yeah, but I wouldn't be so loose with that.  Any

22  acquisition is inherently risky, but fundamentally that's the

23  number we're committed to.

24          **THE COURT:**  Should we take a morning break or do you

25  want to finish?

 1          MR. WEINGARTEN:  I have not much longer, but maybe a

 2  break, Your Honor.

 3          THE COURT:  Okay.  All right.  Why don't we take our

 4  15-minute morning break.

 5          MR. WEINGARTEN:  Thank you.

 6              (Recess taken at 10:04 a.m.)

 7          (Proceedings resumed at 10:20 a.m.)

 8          THE CLERK:  Court is in session.

 9          THE COURT:  All right.  We are resuming the testimony

10  of Mr. Stuart.

11          MR. WEINGARTEN:  Thank you.

12      Lest I forget, move to admit, please, PX4341.

13          THE COURT:  Admitted.

14      (Trial Exhibit 4341 received in evidence.)

15          MR. WEINGARTEN:  Thank you, Your Honor.

16  BY MR. WEINGARTEN:

17  Q.   We're looking at, sir, PX4341 and we're on page 025;

18  right?

19  A.   Correct.

20  Q.   Okay.  We've been talking about the value to Microsoft

21  that the deal model calculated; right?

22  A.   That's correct.

23  Q.   Just a couple of quick questions to fill in some of these

24  synergies.

25      Now, the Game Pass synergy is described as accelerating

1  Game Pass subscriptions across console and PC; right?

2  **A.**   That's correct.

3  **Q.**   And the drivers of that acceleration are bringing

4  Activision content into Game Pass which pushes on certain

5  assumptions about users and engagement and hours, and that

6  drives the synergy?

7  **A.**   Correct.

8  **Q.**   Okay.  And the content that's put into the model to talk

9  about accelerating Game Pass, you and your team divide up the

10  Activision content into different tiers?

11  **A.**   That's right.

12  **Q.**   And so you categorize the content tier 1, tier 2, tier 3;

13  right?

14  **A.**   That's right.

15  **Q.**   And the tier 1 content is the kind of content that you and

16  your team estimate will generate the most hours of engagement

17  on Game Pass; is that fair?

18  **A.**   That's right.

19  **Q.**   And then if it generates the most hours, that will

20  generate revenues and profits and the synergy; right?

21  **A.**   That's right.  Hours played is highly correlated to

22  overall subscribers.

23  **Q.**   So you and your team divide up the future -- strike

24  that -- you divide up the titles and you categorize them by

25  tiers; right.

STUART - DIRECT - WEINGARTEN

1    **A.**   That's right.

2    **Q.**   Call of Duty is a tier 1 title in that model?

3    **A.**   That's right.

4    **Q.**   Is that the highest tier?

5    **A.**   I believe so.

6    **Q.**   Okay.  If there were a tier 1 plus, Call of Duty would be

7    in it; right?

8    **A.**   Yes.

9    **Q.**   Okay.  And when you talk about accelerating Game Pass,

10   that includes all the tiers of Game Pass?

11   **A.**   That's right.

12   **Q.**   So it includes Game Pass Ultimate, the cloud component, as

13   well?

14   **A.**   It includes Game Pass Ultimate, which includes PC and

15   console and access to cloud.

16   **Q.**   Okay.  Now, the mobile store synergy that we talked about,

17   that's the -- one, two, he three -- fourth row.  And the bold

18   number is the fourth one down there; right?

19   **A.**   That's correct.

20   **Q.**   That one says (as read):

21          "By building upon Activision Blizzard player

22          engagement to provide the foundation needed to scale our

23          Xbox store to mobile."

24          Now, does that calculation include an assumption about

25   breaking or getting past the Apple and Google app store

STUART - DIRECT - WEINGARTEN

1  duopoly?

2  **A.**   It assumes we're able to monetize a store on IOS and

3  Android.

4  **Q.**   Okay.  And there's certainly no guarantee that will

5  happen; right?

6  **A.**   I would say there's no guarantee.

7  **Q.**   Yeah.  And so the synergy there assumes that somehow

8  through regulation or through contractor something the Xbox

9  store is able to join the Apple store and the Google Play store

10  on the iPhone and the Android; right?

11  **A.**   It's important to note that what you're referencing is

12  called direct transactions through the store.  There's

13  scenarios where entitlements are purchased outside of IOS and

14  Android and we can access mobile content through our app.

15  **Q.**   So to the extent some of this may depend on make breaking

16  the duopoly, some of it may not, this number?

17  **A.**   This model didn't explicitly call that out.  It's a

18  scenario; but in the end, it's about entitlements and where

19  they're played.

20  **Q.**   Okay.  I want to talk to you some more about this idea of

21  shifting Activision revenues.

22      Now, on January 15th, 2022 -- that's just a few days

23  before the deal announcement; right?

24  **A.**   Yes.

25  **Q.**   That's a day or so before the final Microsoft Board

STUART - DIRECT - WEINGARTEN

1    meeting; right?

2    **A.**    I believe that's right.

3    **Q.**    There was a meeting on January 15th, 2022, to prepare for

4    the final board discussion?  Yes?

5    **A.**    That seems likely.

6    **Q.**    And Mr. Nadella attended that review?

7    **A.**    I don't know of a specific review.

8    **Q.**    Can you please turn -- do you think it would help you to

9    remember if we looked at some prior testimony?

10   **A.**    Yes.

11   **Q.**    Okay.  Let's please look at your deposition, page 201.

12   **A.**    7040-201?

13   **Q.**    Yes, sir.  The little numbers for the transcript page 201.

14   It's really page 200 to 201.

15   **A.**    Okay.

16          (Witness examines document.)  Okay.  I'm on 201.

17   **Q.**    Okay.  And take a look, read to yourself page 200, you

18   know, line 12, through 201:10 -- 201:17.  Just take a look

19   there.  Let me know when you've had a chance.

20   **A.**    (Witness examines document.)  Yes, I see it.

21   **Q.**    So having looked at that, does that refresh your

22   recollection about a January 15th meeting?

23   **A.**    I'm not doubting that there was a meeting.  I don't see

24   that it's January 15th and those -- but I don't doubt that a

25   meeting occurred.

1   Q.   Okay.  Well, let's -- let's do it this way:  Do you recall

2   that there was a meeting in early January to do final prep for

3   the board presentation; right?

4   A.   I have no reason to doubt that.  I'm just not recalling a

5   specific meeting back then.

6   Q.   And you do recall that coming out of that meeting, there

7   was an ask for some analysis related to Activision revenues;

8   right?

9   A.   Yes.

10   Q.   Okay.  And the particular ask for you and your team was to

11   do an outline of what would happen if there were a change in

12   the revenues that Activision earns on Sony; right?

13   A.   Correct.

14   Q.   So I'm not going to read the numbers out loud, but if you

15   look at page 200 of the transcript, lines 12 to 16, do you see

16   the change that's discussed in those lines there?

17   A.   I do.

18   Q.   And yes or no, that is the change that you were asked to

19   investigate and model; right?

20   A.   I believe that's right, yes.

21   Q.   Okay.  And so you were asked to take a look at and model

22   what would it mean if the revenue that Activision titles earned

23   on Sony PlayStation's declined in that way; right?

24   A.   I believe that's right, yes.

25   Q.   Okay.  And that presents a type of revenue risk to the

STUART - DIRECT - WEINGARTEN

1    model; right?

2    **A.**    That's correct.

3    **Q.**    And it's a revenue risk because if Activision's share of

4    money it gets from games played on PlayStation goes down, all

5    else equal, Activision revenues go down?

6    **A.**    All else equal, that's right.

7    **Q.**    Okay.  And so this exercise that you were asked to do was

8    about assuming Activision revenues from PlayStation decrease?

9    Yes?

10   **A.**    I believe it was an ask on a scenario to be prepared for

11   an eventuality if we had a question from the board.

12   **Q.**    Okay.  So you were wondering if some -- let me start over.

13          So the idea was the board might be interested in knowing

14   what would happen if revenue on Sony that Activision earns went

15   down, and the goal was let's outline and prepare and see the

16   answer; right?

17   **A.**    Yes, among other things.  We want to be prepared when we

18   go talk to the board about questions they may ask.

19   **Q.**    Okay.  And this work to investigate what happens if

20   Activision's revenues on Sony decrease, that's not part of the

21   Denali model; right?

22   **A.**    Correct.  This was an ask for a prep for the board.

23   **Q.**    So outside of the model process, there was a separate ask

24   and a separate modeling process to look at what would happen if

25   Activision revenue on Sony went down?

1    **A.**    I see the ask.  I don't recall the model output from that;

2    but, yes, that's correct.

3    **Q.**    We'll get there.

4         Could you please open your binder to PX1190?

5    **A.**    (Witness examines document.)  Yes, I'm here.

6    **Q.**    Okay.  So this is a chat transcript between you and

7    Ms. Lawver; right?

8    **A.**    That's correct.

9    **Q.**    It's dated January 15th, 2022; right?

10   **A.**    Correct.

11        **MR. WEINGARTEN:**  Move to admit PX1190, please.

12        **THE COURT:**  Admitted.

13        (Trial Exhibit 1190 received in evidence.)

14   **BY MR. WEINGARTEN:**

15   **Q.**    Ms. Lawver starts the chat with something about she will

16   check tonight, and then you inform her about two asks from the

17   Satya/Amy review just now, and you wrote (as read):

18        "Denali has sent over a new forecast based on lower

19        expectations.  Will need to put it into our FY and compare

20        against both their prior management forecast and our

21        current final model.  Will need a slide for the board

22        review on Sunday."

23        Do you see that ask?

24   **A.**    I do.

25   **Q.**    That actually relates to something you and I discussed, I

STUART - DIRECT - WEINGARTEN

1  think towards the beginning of the exam, about new numbers that

2  came over from Activision; right?

3  **A.**   I believe those are related, yeah.

4  **Q.**   Yeah.  So then the next ask is, you write to Ms. Lawver

5  (as read):

6          "An outline of what happens" -- don't read these

7          numbers -- "should Sony cancel any of their deals."

8          And then you presume a royalty split with Sony; right?

9  **A.**   Correct.

10 **Q.**   And then you say (as read):

11         "What happens if that split goes down to another kind

12         of split?"

13         Right?

14 **A.**   Yes.

15 **Q.**   And you tell Ms. Lawver how much revenue risk that is (as

16 read):

17         "... and how many XGP subs/Xbox mix would we need to

18         make up that gap?"

19         Do you see that?

20 **A.**   I do.

21 **Q.**   So you're telling Ms. Lawver here about the ask, and the

22 ask is:  What happens if revenue that Activision earns on Sony

23 declines; right?

24 **A.**   That's right.

25 **Q.**   A part -- the other -- so one part of the ask is:  Let's

1    calculate that; right?

2    **A.**   Correct.

3    **Q.**   That's the risk; right?

4    **A.**   This ask here is about the risk here, yes.

5    **Q.**   Right.  And then the second part of the calculation is:

6    Let's calculate how many Game Pass subs and how much revenue

7    would have to move over to Xbox to make up that gap; is that

8    right?

9    **A.**   That's right.  I wanted to make sure we kept the variables

10   of the offset within the deal model construct so we didn't

11   introduce other variables.

12   **Q.**   Okay.  Could you please turn in your binder to PX4319?

13   **A.**   (Witness examines document.)  Yes, I'm here.

14   **Q.**   Okay.  This is another chat between you and Ms. Lawver.

15   This one is dated January 14th.  So it's a day prior to the one

16   we just looked at; right?

17   **A.**   That's right.

18           **MR. WEINGARTEN:**  Move to admit PX4319, please.

19           **THE COURT:**  Admitted.

20       (Trial Exhibit 4319 received in evidence.)

21   **BY MR. WEINGARTEN:**

22   **Q.**   So I apologize for taking it out of order, but one is

23   January 14th, the other is January 15th.  But if you look at

24   this chat, this is all about preparing for that revenue mix

25   shift ask; right?

**A.**   It's a scenario analysis to go look at the impact of that,
that's right.

**Q.**   Okay.  Now you write in the third line down (as read):

> "How should we think through" -- and you give the
> split -- "if Call of Duty switches out of their
> PlayStation deal?  Risk to the model?"

And Ms. Lawver is trying to get some clarity.  She writes
(as read):

> "Meaning not launching or no marketing support?
> Either one puts risk to the model, but I think we have
> areas of opportunity not captured for other games."

Do you see that?

**A.**   I do.

**Q.**   And then you write your assumptions about how the revenues
might get risked; right?  It might -- the share might change;
right?

**A.**   That's right.

**Q.**   And Ms. Lawver writes (as read):

> "Yes, risk to model unless we think there are
> opportunities to push a larger percentage of customers to
> other platforms to make up for the delta."

Do you see that?

**A.**   I do.

**Q.**   And then you pick up on her point about pushing customers
to other platforms; right?

1    A.    I see that.

2    Q.    You wrote (as read):

3              "Got it.  Do we think I can say that there is margin

4        risk there but it can be offset with shift to Xbox in the

5        overall platform mix?"

6        Do you see that?

7    A.    I do.

8    Q.    Okay.  And Ms. Lawver writes back (as read):

9              "Yes, I think so.  That would be part of our goal

10       anyways I assume."

11       Right?

12   A.    Yes.  This is about revenue mix of Call of Duty, that's

13   right.

14   Q.    That's right.

15       So the idea is, if you assume that revenues that Call of

16   Duty earns on PlayStation go down, is there a way to make up

17   for that; right?

18   A.    Yeah.  That's our scenario, that's right.

19   Q.    Okay.

20           MR. WEINGARTEN:  If I haven't, PX1190, move to admit,

21   please.

22           THE COURT:  Yes, 4319 is admitted.

23           MR. WEINGARTEN:  Sorry, no.  1190.  I apologize,

24   Your Honor.

25           THE COURT:  Oh, 11 -- no, that's also admitted.

STUART - DIRECT - WEINGARTEN

1          MR. WEINGARTEN:  Thank you.  Sorry, Your Honor.

2   BY MR. WEINGARTEN:

3   Q.   Okay.  Let's take a look at what happened.  PX4358,

4   please.

5   A.   (Witness examines document.)

6   Q.   This is an e-mail from Ms. Lawver to you, and it includes

7   some folks from the Microsoft corporate development team who

8   were working on the Activision deal; right?

9   A.   That's correct.

10  Q.   We're back to January 15th and 4:42 p.m.; right?

11  A.   That's right.

12         MR. WEINGARTEN:  Move to admit PX4358, please.

13         THE COURT:  Admitted.

14      (Trial Exhibit 4358 received in evidence.)

15  BY MR. WEINGARTEN:

16  Q.   Okay.  Now, Ms. Lawver did the work; right?  She ran the

17  numbers?

18  A.   Yes.

19  Q.   Okay.  And she created a table that would help show how

20  many incremental subscribers Microsoft would need to get into

21  Game Pass or how much Activision revenue would need to shift to

22  Xbox console to make up for the assumed loss in Activision

23  revenue on Sony; right?

24  A.   Yeah.  This is an Excel goal seek to back into what you

25  need to believe to offset the questions being asked.

1  Q.   Okay.  And so Ms. Lawver writes (as read):

2           "This is based on prior board numbers.  Essentially

3       we would need either" --

4           MR. WEINGARTEN:  Can I read that, Karen, those

5  numbers?  The second sentence there, "Essentially we would need

6  either"?

7           MR. GOSTAN:  No.

8           MR. WEINGARTEN:  Okay. okay.

9  BY MR. WEINGARTEN:

10  Q.   "So essentially we would need either," and she gives a

11  number for additional engaged subscribers to Game Pass; right?

12  A.   Correct.

13  Q.   She gives a range; right?

14  A.   Yes.

15  Q.   Yes?

16  A.   Yes.

17  Q.   Okay.  Or a platform mix, and she writes "a percentage

18  from Microsoft to a percentage from Microsoft," but she -- do

19  you understand her to mean a percentage from Microsoft to a

20  percentage for Sony -- a percentage from Sony to a percentage

21  to Microsoft?

22  A.   This is the baseline model assumption of that number --

23  ah -- of that number to a new number on the Xbox platform.

24  Q.   I apologize.

25       So what she's saying in the second part of that sentence

1  is:  To make up for this lost revenue, we can do it if the

2  amount of Activision revenues goes from -- on Microsoft goes

3  from that first number to that second number?

4  **A.**   She's not making a claim if we can do it.  She's

5  highlighting what Excel reports that as the Goal Seek.

6  **Q.**   Right.  But mathematically?

7  **A.**   Just a math exercise, that's right.

8  **Q.**   Right.  But she's -- and the point of the math is, if you

9  assume the revenue that we earn off of Sony from Activision

10  goes down, then mathematically we can make it up if the amount

11  of revenue that we earn from Activision on Xbox goes up in this

12  manner?

13  **A.**   Yes.  I mean, you're saying we can make it up.  I would

14  just say we can decrease by one number and then Excel Goal Seek

15  and have an inverse of that number, yes.

16  **Q.**   Okay.  I mean, the point of the project was for her and

17  you to create scenarios to explain how to make up that

18  declining number of revenue; right?

19  **A.**   That was the point of the exercise, right.

20  **Q.**   Okay.  And I just want to be clear.

21      Do you see the part of her table -- it's one, two, three,

22  four, five, six, seven -- eight rows down, it says "Total

23  engaged subs needed"?

24  **A.**   Yes.

25  **Q.**   She calculates out this total number of engaged subs, and

1  then two up it says "Number incremental subs needed" -- strike

2  that -- "Number incremental subs to cover GM gap."  Do you see

3  that?

4  **A.**   That's right.

5  **Q.**   And so that number, "Number incremental subs needed to

6  cover GM gap," that's one way of covering the gap that the

7  assumption about losing revenue share on Sony causes; right?

8  **A.**   That's one of the ways and that's the number that she

9  reflects in her sentence above the chart.

10 **Q.**   Right.  Just to be clear, I think you had to explain this

11 to me before, this -- the numbers in that row going across,

12 that's not millions you need more each year; right?  It's like

13 growing; is that right?  It's not incremental to each year?

14 **A.**   You don't sum those across.  They are an individual number

15 in that year.

16 **Q.**   Okay.  So I'll use fake numbers so we don't violate

17 confidentiality.

18      So if I said in the first column 2 and the next column is

19 8, it's not saying, therefore, we needed to get 10 more people;

20 right?

21 **A.**   That's correct.  You need 8, yeah.

22 **Q.**   So by the end, to Goal Seek it out and win, you need that

23 number at the far right three rows up, that one?

24 **A.**   Did you say "win"?

25 **Q.**   No, I'm sorry.  To Goal Seek it out and make it up --

1  **A.**   That's correct.

2  **Q.**   -- you need that number at the far; right?

3        Okay.  So it's not incremental each year.  You've got to

4  go find that number of people?

5  **A.**   You have to -- well, fundamentally you have to acquire new

6  people.  You'll have churn out at the bottom of that, but

7  that's the number that has to exist every single year.

8  **Q.**   Okay.  Now, that's one view, right, using the subscribers?

9  Or she says, and then this is the platform mix table at the

10 bottom (as read):

11        "We can do it if we can shift Activision revenues to

12      be greater on Microsoft console."

13      Right?

14 **A.**   That's right.  Again, I wanted to keep the variables in

15 this question to the variables that are in the model.

16 **Q.**   Okay.  And so she's doing -- I'm looking at the platform

17 mix box there on her e-mail, and so she calculates out (as

18 read):

19        "Okay.  Let's" -- first row -- "revise Sony revenue."

20      So that means there's been a drop in revenue because of

21 this assumption that you've been asked to think about; right?

22 **A.**   That's right.

23 **Q.**   And then she says (as read):

24        "Okay.  If we drop it by that much, here's how much

25      Microsoft revenue we'd need to close the gap"; right?

1   **A.**   Correct.

2   **Q.**   And that adds up to some total Activision console revenue;

3   right?

4   **A.**   That's right.

5   **Q.**   And then it says (as read):

6           "Here's the platform mix we'd need."

7       So the percentage of Activision revenues that come from

8   the Sony platform and the percentage that come from the

9   Microsoft platform; right?

10  **A.**   That's right.

11  **Q.**   And that actually is the same straight across?  It doesn't

12  really change; right?

13  **A.**   I believe in this one you'd add those across.  They have

14  to be yearly numbers.

15  **Q.**   Right.  But the percentages don't change?  It's the same?

16  **A.**   That's correct, yeah.

17  **Q.**   Yeah.  And then she says -- and then she has a column

18  explaining what that change would be; right?  So if we can

19  increase Microsoft's share of the Activision revenues by that

20  number at the very bottom, we'll fill the gap?

21  **A.**   Yes, that's -- yeah, put in the Excel.

22  **Q.**   Let's please take a look at PX4359, please.

23  **A.**   (Witness examines document.)  Yes, I'm here.

24  **Q.**   Okay.  This is just more e-mails on the chain, and I'm

25  looking at your e-mail -- well, it's a chain between you and

1  Ms. Lawver and the corporate development people again; right?

2  **A.**   Yes.

3  **Q.**   And it's a little bit later in time on the 15th of

4  January 2022; right?

5  **A.**   That's right.

6         **MR. WEINGARTEN:**  Move to admit PX4359.

7         **THE COURT:**  Admitted.

8      (Trial Exhibit 4359 received in evidence.)

9  **BY MR. WEINGARTEN:**

10 **Q.**   So everybody's working hard because it's just an hour or

11 so later, and there is an update from Ms. Lawver with new

12 numbers; right?

13 **A.**   That's what it looks like, yes.

14 **Q.**   Second e-mail down you write (as read):

15         "This is great.  Should we make the model update for

16     the new board numbers and then run the below?"

17     And then you ask if people need to circle back with

18 Ms. Hood, and you say you'll circle back with Phil and Sarah.

19 Is that Mr. Spencer and Ms. Bond?

20 **A.**   That's right.

21 **Q.**   Okay.  There's another updated table from Ms. Lawver, but

22 the update hasn't changed the revenue platform mix shift;

23 right?  That hasn't changed?

24 **A.**   That's correct.

25 **Q.**   She sort of changed the subscriber numbers you'd need;

STUART - DIRECT - WEINGARTEN

1  right?

2  **A.**    It looks like the ramp on subscribers has changed, yes.

3  **Q.**    They actually -- she revised it and updated it and you

4  need slightly fewer incremental Game Pass subscribers to fill

5  the gap; right?

6  **A.**    These numbers are lower than the last chart, that's right.

7  **Q.**    And the interesting thing is -- well, strike that.

8        The Goal Seek here shows that you can do either of these

9  two things; right?  It's if you do this with Game Pass

10 subscribers or this with getting more Activision revenues on

11 the Microsoft platform; right?

12 **A.**    That's right.  This is just Goal Seek.

13 **Q.**    Right.  But in reality, you could do a combination of the

14 two; right?

15 **A.**    Sure.

16 **Q.**    So the more Game Pass subscribers to help fill the gap,

17 then the less console revenue mix shift you would need; right?

18 **A.**    Yes.  It's just Excel.  We can model very different

19 scenarios.

20 **Q.**    Right.  And, conversely, more revenue to Microsoft from

21 the Activision titles than fewer incremental Game Pass

22 subscribers are needed; right?

23 **A.**    That's right.

24 **Q.**    Now, fair to say that you were very busy during this time

25 period getting ready for this board meeting?

1    **A.**    Yes, fair.

2    **Q.**    And, yet, despite that, I believe when we talked about

3    this, you and I, previously, you remember talking about these

4    potential variables in the board meeting and talking about the

5    variance of potentially between the deal model assumptions and

6    this scenario of revenue risk; right?

7    **A.**    I believe my prior testimony if that's what I said, yes.

8    **Q.**    Okay.  And you remember something like that because it's

9    quite special to present to the board about something; right?

10   **A.**    I take the presentations of the board very seriously of

11   course.

12   **Q.**    Okay.  And so, again, this model, this work product that

13   came out of the Satya/Amy meeting, the goal of it that you

14   understood to be was if revenues that Activision earns from the

15   Sony platform go down, tell us what the numbers would have to

16   be on subscribers and on our own console revenues to make up

17   for it; right?

18   **A.**    Yeah, but I'd be specific and call it royalties not just

19   revenue.

20   **Q.**    Understood.

21       But it's about a revenue -- the impact is a revenue risk

22   from Activision games on Sony; right?

23   **A.**    That's correct.

24   **Q.**    Let's please look at PX4367.

25   **A.**    (Witness examines document.)  Yes, I'm here.

1    Q.   Okay.  You're in this chat with, again, it's Ms. Lawver

2    and some of the same corporate development folks who have been

3    on these e-mails; right?

4    A.   That's right.

5    Q.   You guys are working all the channels?  The e-mails?  The

6    chats?  It's busy?  Yes?

7    A.   Very busy.

8    Q.   Okay.  So this is dated January 15th as well.

9         MR. WEINGARTEN:  Move to admit PX4367.

10        THE COURT:  Admitted.

11        (Trial Exhibit 4367 received in evidence.)

12   BY MR. WEINGARTEN:

13   Q.   Now, start at the top.  You write (as read):

14        "I think we need the following:  I'll take a look at

15        the Q4 commentary and slide in the board review.  Jamie

16        will update the FY '22 and FY '23 model, put it as final

17        into the appendix of the deck.  We need to ensure we have

18        the final accretion/dilution with" -- and then you have

19        some numbers you're talking about.

20        And you're saying (as read):

21        "Let's update some things and put it into the

22        appendix."

23        Do you see that?

24   A.   Yes.

25   Q.   At the bottom of the chat you sent at 17:14 and 39

 1    seconds, it's like the last or second-to-last sentence, it says

 2    (as read):

 3              "This will be included in the appendix of the board

 4         deck.  Risk to financials on platform royalties.  Waiting

 5         on confirmation of redacted materials but assume the Call

 6         of Duty royalty rate moves from" -- and we have that

 7         amount -- "the scenario highlights where we would net out

 8         our model to offset that change, mix shift to Xbox

 9         Game Pass subscribers of approximately 2 million per

10         year" -- (vocal indication.)

11              MR. GOSTAN:  Don't say the numbers.

12              MR. WEINGARTEN:  Sorry.  My bad.

13    BY MR. WEINGARTEN:

14    Q.   (as read):

15    -- "or blank unit mix."

16         My apologies.  I don't know if anyone understood my

17    gobbledygook anyway.  I apologize for that.

18    A.   I see that.

19    Q.   Mix shift of users, and I apologize.

20         So at that point in time, as you're making the final board

21    deck, the number of mix shift to Xbox had actually declined to

22    that -- see where it says the number PT?

23    A.   I see that, yeah.

24    Q.   Okay.  So that number is even less than the one that

25    Ms. Lawver had calculated previously on some of the tables

1    we've seen; right?

2    **A.**   I believe that number is lower than the other number.

3    **Q.**   So even with a mix shift of just that number, that would

4    be enough in the Goal Seek to make up for the lost Activision

5    revenue; right?

6    **A.**   Related to this royalty discussion we're having.

7    **Q.**   Right.

8    **A.**   Yes.

9    **Q.**   And then you point out, as you and I were just discussing,

10   and actually, quote, "likely a combination of Xbox Game Pass

11   subscribers and mix shift"; right?

12   **A.**   Correct.

13   **Q.**   Okay.  Now, let's take -- did you believe that -- well,

14   strike that.

15       You believed that these numbers that we just talked about

16   represented reasonable numbers; right?

17   **A.**   What does "reasonable" mean?

18   **Q.**   Let me -- let's go to PX4472, please.

19           **MR. WEINGARTEN:**  And if I didn't admit it, move to

20   admit PX4467, please.

21           **THE COURT:**  It's already in evidence.

22   **BY MR. WEINGARTEN:**

23   **Q.**   PX4472, please.  This is an e-mail from you to Ms. Hood,

24   Mr. Spencer, Ms. Bond, other folks.  We're still on the 15th of

25   January, still the early evening; right?

STUART - DIRECT - WEINGARTEN

1   **A.**   Correct.

2   **Q.**   Okay.

3           **MR. WEINGARTEN:**  Move to admit PX4427.

4           **THE COURT:**  Admitted.

5       (Trial Exhibit 4472 received in evidence.)

6   **BY MR. WEINGARTEN:**

7   **Q.**   Okay.  And you're saying -- I think this is you giving the

8   update to the question that generated all this work; right?

9   **A.**   Yes, that's correct.

10  **Q.**   You're telling Ms. Hood and the others "Updating on the

11  key items from our SLT discussion yesterday"; right?

12  **A.**   That's right.

13  **Q.**   Okay.  A couple of different items there.  The third item,

14  risk to financials on platform royalties; right?

15  **A.**   Yes.

16  **Q.**   And you say (as read):

17          "Waiting on confirmation of redacted materials, but

18      this scenario assumes the Call of Duty royalty rate moves

19      from" --

20      And then you give the number; right?

21  **A.**   Correct.

22  **Q.**   And then it says (as read):

23      -- "scenario highlights where we would net out our

24      model to offset that change of" --

25      And that's a negative -- that's a number there, right, of

STUART - DIRECT - WEINGARTEN

1  dollars?

2  **A.**   That's correct.

3  **Q.**   And so what that's saying is:  If we assume the revenues

4  earned on Activision -- strike that -- if we assume the

5  Activision royalty revenues on PlayStation go down because of

6  that revenue split changing, it will hurt the model by that

7  much per year; right?

8  **A.**   That's right.

9  **Q.**   And if it hurts the model by that much per year, we

10  calculate that a mix shift to more Game Pass subscribers of

11  blank or a blank point mix shift towards Xbox and likely a

12  combination of the two would make up for it; right?

13  **A.**   That's correct.

14  **Q.**   And you write that both of those figures are reasonable;

15  right?

16  **A.**   That's right.  And in this context, I can believe the

17  outcome of that.  Whether it's likely or not or realistic is

18  different.  I'm saying they're within the range that I would

19  expect.

20  **Q.**   And you understood when you wrote "reasonable,"

21  "reasonable" means achievable?

22  **A.**   It means I could believe that as an outcome, my choices

23  would be unreasonable or reasonable and I chose reasonable.

24  **Q.**   But you understood "reasonable" to mean achievable in that

25  e-mail; right?

 1    **A.**    Yes.  They're in the realm of achievability.

 2              **MR. WEINGARTEN:**  Okay.  I have nothing further at this

 3    time, Your Honor.

 4              **THE COURT:**  Okay.

 5              **MR. WEINGARTEN:**  I'm very sorry about that slip.

 6                          **CROSS-EXAMINATION**

 7    **BY MR. GOSTAN:**

 8    **Q.**    Good morning, Mr. Stuart.

 9    **A.**    Good morning.

10    **Q.**    How long have you worked at Xbox for?

11    **A.**    21 years.

12    **Q.**    Is that most of your career?

13    **A.**    That is the entirety of my adult working career.

14    **Q.**    And you're the Xbox CFO; correct?

15    **A.**    That's correct.

16    **Q.**    How long have you been in that role for?

17    **A.**    About nine years.

18    **Q.**    And I think you testified to this, but you report

19    ultimately to Amy Hood and not to Phil Spencer?

20    **A.**    That's correct.

21    **Q.**    And why is that?

22    **A.**    Yeah, Microsoft we have a fiduciary responsibility as the

23    finance team to represent shareholders, represent the business,

24    and the finance team does not work for the business leader of

25    the various divisions.

1  Q.   So as part of your responsibility in providing that

2  information, do you look at the pricing of different Xbox

3  products?

4  A.   We do.

5  Q.   And I believe there's some testimony about the price of

6  Xbox Series X and Xbox Series S?

7  A.   That's correct.

8  Q.   And what are the prices of those?

9  A.   Series S is $299 and Series X is $499.

10 Q.   And of the different consoles up here, just focusing on

11 Series S, is the Series S most closely priced compared to any

12 of these up here?

13 A.   The series --

14 Q.   There's the Nintendo Switch.  Just -- you may not be able

15 to see that.

16 A.   Oh, I did not see that down there.

17 Q.   We've got the Nintendo Switch.  We've got the X and S, and

18 we've got the PlayStation 5.  And I'm asking for Series S,

19 which one is it most closely to?

20 A.   Thank you.  I didn't see the Switch.

21      It's most closely to Switch.

22 Q.   And do you look at Switch pricing when you're considering

23 the pricing of Xbox Series S?

24 A.   Yes.

25 Q.   And is that one of the reasons you set the price where you

**STUART - CROSS / GOSTAN**

1    guys did?

2    **A.**   Yes.  At that price point when you're considering playing

3    FIFA or Minecraft or many of the games across consoles, you

4    have to make sure you're priced relative to the competition in

5    the market.

6          **MR. GOSTAN:**  One second.  I forgot to give you your

7    documents.  Hold on.

8        May I approach, Your Honor?

9          **THE COURT:**  Yes.

10                      (Pause in proceedings.)

11   **BY MR. GOSTAN:**

12   **Q.**   Could you turn to RX1066, please?

13   **A.**   (Witness examines document.)

14         **MR. GOSTAN:**  Sorry about that, Your Honor.  I promise

15   I'm not going to waste any more time getting binders.

16         **THE COURT:**  That's okay.

17   **BY MR. GOSTAN:**

18   **Q.**   So can you turn to RX1066?

19   **A.**   Yes, I'm here.

20   **Q.**   And there was some questions about mobile and the

21   valuation and the strategy for the deal.

22       So can you just describe, just at a very high level, what

23   this e-mail is?

24   **A.**   Yeah.  This e-mail is referencing Activision Blizzard's

25   earnings from their Q1 in March of 2020, and it proceeds -- I

 1 | sent an e-mail out to the Gaming Leadership Team highlighting a

 2 | few of the key drivers, and then Matt Booty and myself had a

 3 | discussion after that.

 4 |         **MR. GOSTAN:**  Move to admit RX1066.

 5 |         **THE COURT:**  Admitted.

 6 |     (Trial Exhibit 1066 received in evidence.)

 7 | **BY MR. GOSTAN:**

 8 | **Q.**  So taking a look at that e-mail at the bottom --

 9 |         **MR. GOSTAN:**  And we can publish it, please.

10 |                 (Pause in proceedings.)

11 | **BY MR. GOSTAN:**

12 | **Q.**  If you take a look at the e-mail on the bottom, you said

13 | that's an earnings summary of Activision Blizzard?

14 | **A.**  That's right.

15 | **Q.**  And is this before you started negotiating with Activision

16 | Blizzard about a potential acquisition?

17 | **A.**  That's correct.

18 | **Q.**  I'd like you to take a look at the first couple of

19 | sentences.  It says (as read):

20 |         "Activision Blizzard ATVI announced its FY '21 Q1

21 |     financial results on May 4th.  ATVI beat analysts

22 |     expectation across revenue.  MAU" --

23 |     What did you understand "MAU" to mean?

24 | **A.**  That's monthly active users.

25 | **Q.**  (as read):

1        -- "and earnings citing strong performance across Call

2        of Duty Modern Warfare and War Zone."

3        Then it says (as read):

4           "CEO Bobby Kotick free-to-play in mobile as new entry

5        points to the franchise have helped triple monthly active

6        users to 150 million."

7        Do you see that?

8 **A.**    Yes.

9 **Q.**    Did you think that was a significant thing?

10 **A.**    Significant and very notable about how they're growing

11 their business.

12 **Q.**    And then you sent that around to the gaming leadership,

13 and Matt Booty sent you an e-mail back.  Can you remind us who

14 Matt Booty is?

15 **A.**    He's the head of Xbox Game Studios.

16 **Q.**    Is he in charge of developing games at Xbox?

17 **A.**    That's right.

18 **Q.**    And he wrote back to you (as read):

19           "The talk track about taking the big franchises to

20        mobile makes me feel way out of position.  Have to get

21        going there.  COD on mobile is going to dwarf console."

22        What did you understand him to mean there?

23 **A.**    Yeah, when we looked at Activision Blizzard's earnings in

24 this context, mobile was the primary growth of their monthly

25 active users.  We had tried a few times on our side to make

1    effort into mobile, but really to no success.  And what he's

2    referencing here is really the outlook of Call of Duty on

3    mobile, and that's going to be far bigger than what's on the

4    console.

5    **Q.**   And you write back (as read):

6          "Hundred percent right.  We'll get out of position on

7          this one if we keep our eyes on the console game only.

8          Don't want to be the oil company when the world shifts to

9          a hundred percent electric cars."

10   And what were you trying to say there?

11   **A.**   Yeah, back in May of 2021, I'm effectively agreeing with

12   him; and if we keep our eyes and our focus on the console space

13   only, we'll lack growth, we won't expand into more users like

14   its highlighted here, and we don't -- my point about the oil

15   company, when the world shifts to electric cars, is you just

16   don't want to be on a business model that's not going to exist

17   in the future.

18   **Q.**   We've heard a little bit about native mobile games for

19   streaming to mobile devices.  Can you just describe the

20   difference briefly?

21   **A.**   Yeah.  Native games are ones that are downloaded, you

22   know, directly to your phone.  Typically the IOS or Android app

23   stores would be examples of that.

24         Streaming would be used through a browser, streamed from

25   some cloud somewhere to a mobile endpoint.

1   Q.   And here, are you discussing native mobile games or

2   streaming to mobile devices?

3   A.   This is all native.  This is referencing the work they're

4   doing specifically on Call of Duty, but they've done it with

5   others.  This is all the native download.

6   Q.   And is it fair to say that one of the reasons you were

7   interested in acquiring Activision Blizzard is because of that

8   capability?

9   A.   Yeah.  One of the most important reasons and focus for our

10  growth is mobile users and mobile market.

11  Q.   And -- but Xbox does have streaming to mobile devices

12  right now; right?

13  A.   We do have something called Project xCloud, which streams

14  to mobile devices.

15  Q.   And in your view, has that been a successful business?

16  A.   We're still early.  I would say not successful to where we

17  want it to be.  It's not growing users and economics are still

18  not yet where we want them to be.

19  Q.   Does it generate a profit for Xbox?

20  A.   xCloud does not generate profit.

21  Q.   Is your understanding that the native mobile games that

22  Activision have do generate significant profits?

23  A.   They generate significant profit.

24  Q.   Okay.  You can put that document aside.

25       I want to move to Activision now, and I just want to ask

 1  you a few brief questions about what's going to happen if this

 2  deal goes through and Activision is acquired by Microsoft.

 3      Are you involved in the planning for integration of

 4  Activision into Xbox if the deal goes through?

 5  **A.**   Yes, I am.

 6  **Q.**   And are you familiar with the term "limited integration"?

 7  **A.**   I am.

 8  **Q.**   What does that mean at Microsoft?

 9  **A.**   Yeah, limited integration reflects how we think about an

10  acquired company.  The prior, you know, four or five

11  acquisitions we've done, ZeniMax included, are all limited

12  integration, which means we don't bring their org into our org,

13  in terms of org charts.  They typically stay on their own.

14  Healthcare.  They have their own compensation plan.  They stay

15  with their own real estate and facilities and operates

16  effectively like a separate entity.

17  **Q.**   And do they retain their own game developer talent as

18  well?

19  **A.**   That's right, they retain their own talent and development

20  scenarios.

21  **Q.**   And is the plan if you acquire Activision, to have it be a

22  limited integrated company?

23  **A.**   It is.  We would keep them limited integration.

24  **Q.**   So can you -- there was some discussion of -- there's been

25  a lot of discussion about Minecraft and there was also some

 1   discussion of your comments at the Jefferies meeting.

 2        Can you pull up PX9192?

 3   **A.**   From the big binder?

 4   **Q.**   Yes, from the big binder.

 5                    (Pause in proceedings.)

 6           **THE COURT:**  All right.  We'll have to proceed this

 7   way.

 8           **MR. GOSTAN:**  That's fine.  I'll just read slowly.

 9   **BY MR. GOSTAN:**

10   **Q.**   So can you pull up 9192 in your binder?

11   **A.**   Yes, I'm here.

12   **Q.**   And if you go to page 14014.

13   **A.**   (Witness examines document.)  Yes.

14   **Q.**   And you were asked some questions about some of your

15   quotes on there, but FTC's Counsel didn't read the quote at the

16   top.  I'm going -- I'd just like to read that to you and ask

17   what you're talking about there.

18        So at the top you say (as read):

19             "Yes, the goal hit here is, what I'll say, from a

20        cross-platform perspective.  Microsoft is a platform.

21        We're one of the first to really support Minecraft,

22        Roblox, Fortnite across platforms.  So we highly encourage

23        cross-platform play simply from this landscape of if it's

24        a good for the gaming ecosystem, it's good for us.

25        Classic rising tide lifts all boats."

1      What were you referring to there?

2  **A.**   Yeah, Microsoft in its DNA is a platform company.  Some of

3  the biggest games in the world -- I reference Minecraft,

4  Roblox, Fortnite, Call of Duty -- are strong across all

5  platforms, and those are the ones that have the biggest

6  communities of players, typically generate the most money and

7  most profit, and have the biggest impact across gaming.

8      In this case, around Minecraft, Roblox, or Fortnite, we

9  were the first -- one of the first ones to allow cross-platform

10  play.  So PlayStation users could play against Xbox users and

11  Switch users there as well.

12      And we allowed entitlements to roam, we allowed log-ins to

13  roam, which allows users to room across the device they choose

14  to play on.

15  **Q.**   And at the end you said (as read):

16          "It's good for the gaming ecosystem.  It's good for

17      us.  Classic riding tide lifts all boats."

18      What did you mean by that?

19  **A.**   Yeah, we operate in the gaming market and the gaming

20  market has many platforms, many devices, many users.  If the

21  gaming industry is growing and we are a player in that

22  industry, that's good for us.

23      So there are some decisions that we may make that are

24  potentially impactful to us; but if we believe that is good for

25  the gaming industry, we'll also make those calls.

1  **Q.**   And is it also profitable for Xbox to continue to have

2  games like Minecraft be multiplatform and cross platform?

3  **A.**   Absolutely.  The strength of a game like Minecraft comes

4  from that cross-network play.  If you, you know, removed one of

5  those platforms and one of those big user bases, not only --

6  not only would you have a massive brand impact, you would lose

7  a significant revenue stream that you just couldn't make up

8  for.

9  **Q.**   And Microsoft acquired Mojang, the studio that created

10  Minecraft; correct?

11  **A.**   That's right.

12  **Q.**   And you've kept Minecraft on multiple platforms; is that

13  right?

14  **A.**   That's right.

15  **Q.**   I'd like to take a look at another document.  This is a

16  confidential document so we'll have to talk a little bit around

17  it, but can you take a look at RX1137?

18  **A.**   (Witness examines document.)  Yes, I'm here.

19  **Q.**   And not really divulging the details of the e-mail, but

20  can you just say what this document is?

21  **A.**   This is an e-mail from myself to the Gaming leadership

22  team.  It's our financial results through the first seven

23  months of the year.  This happens to be January of FY '21.

24          **MR. GOSTAN:**  Move to put RX1137 into evidence, please.

25          **THE COURT:**  Admitted.

 1          (Trial Exhibit 1137 received in evidence.)

 2          **MR. GOSTAN:**  Thank you.

 3   **BY MR. GOSTAN:**

 4   **Q.**   And if you take a look at the second line of your e-mail,

 5   the second paragraph starts with "Favorability."  Can you just

 6   read that to yourself?

 7   **A.**   (Witness examines document.)  Yes.

 8   **Q.**   And can you just describe at a high level what you were

 9   discussing there?

10   **A.**   Yeah.  This is us exiting the holiday period, which is one

11   of our biggest sales periods of the year, and particularly

12   noteworthy that Minecraft had a very good holiday and

13   specifically on PC and Nintendo.  We saw a lot of new user

14   growth.  We saw solid monetization, and it was worth me calling

15   out to the Gaming Leadership Team that PC and Nintendo were

16   particularly strong coming out of the holiday.

17   **Q.**   Is Minecraft a significant revenue driver for Xbox?

18   **A.**   Yes.

19   **Q.**   Can you turn to page 67?

20   **A.**   (Witness examines document.)

21   **Q.**   And this is a slide deck that's attached to the e-mail.

22   Can you just explain what this slide deck is?

23   **A.**   Yeah.  This is a close deck that I put together with my

24   team every month, and it includes various summaries of revenue,

25   various key metrics in the business, and it walks through the

**STUART - CROSS / GOSTAN**

1    majority of our overall revenue streams.

2    Q.   Let me know when you're on the right page.

3    A.   Yes, I'm here.

4    Q.   Okay.  And what is this slide?

5    A.   This is a Minecraft-specific slide.  It's now a few years

6    old, but in FY '21 it reflects where Minecraft is generating

7    its revenue from and ultimately its gross margin.

8    Q.   And this is revenue you said for the first seven months of

9    the year?

10   A.   That's right.

11   Q.   Is there a place on this chart, without revealing the

12   numbers, where we can see the revenues that Minecraft generates

13   across different platforms?

14   A.   Yeah.  If you go to the -- it says "FY '21 year to date,"

15   the column that's in the middle, and then if you look at the

16   actual column, that's our year-to-date actuals.

17   Q.   And is Xbox one of the platforms that revenues reported

18   for?

19   A.   It is.

20   Q.   And how does that compare to some of the other platforms

21   on there?

22   A.   It is the smallest.

23   Q.   Okay.  And is PlayStation also on there?

24   A.   It is.

25   Q.   And how just at a high level, without giving the numbers,

**STUART - CROSS / GOSTAN**

1    how did the PlayStation revenues compare to Xbox?

2    **A.**    Roughly twice as big.

3    **Q.**    And Nintendo, is Nintendo on there as well?

4    **A.**    Correct.

5    **Q.**    And how does Nintendo compare to the other platforms?

6    **A.**    Roughly twice as big as PlayStation.

7    **Q.**    And so that would be four times as big as Xbox?

8    **A.**    Correct.

9    **Q.**    You're the CFO, not me, so I'll trust your math.

10   **A.**    It's four times as big as Xbox.

11   **Q.**    And also sales on mobile and PC as well?

12   **A.**    Yeah.  We highlight IOS and Android as well as our PC

13   platform sales.

14   **Q.**    Okay.  And if you go down to the bottom, there's net

15   revenue and gross margin.  Do you see that --

16   **A.**    Yes.

17   **Q.**    -- in the same column?

18   **A.**    Yep.

19   **Q.**    And what is gross margin?

20   **A.**    Gross margin is when we call -- when we think about taking

21   out, like, billing costs, you think about cost to serve, you

22   think about royalties that we would pay out for various

23   platforms and other things.  It's effectively the profit of

24   that revenue stream.

25   **Q.**    And if you compare the net revenue to the gross margin or

1  the profit number, what does that tell you about how profitable

2  Minecraft is?

3  **A.**   Minecraft is one of the most profitable, if not the most

4  profitable, IP that we have.

5  **Q.**   And is that consistent with -- generally when you're

6  looking at the profitability of first-party games, do they

7  generally have high-profitability margins?

8  **A.**   Generally speaking, that's right.  First-party games are

9  one of our highest profit revenue streams that we have.

10 **Q.**   And just comparing Minecraft to Activision Blizzard, are

11 they similar at all in sort of their financial breakdown?

12 **A.**   I would assume -- yes, I would assume they're similar,

13 both very large revenue streams and actively engaged.

14 **Q.**   So there's high revenue on PlayStation, for example, for

15 Activision games like Call of Duty?

16 **A.**   Yes, and as I would assume, much bigger than these

17 numbers.

18 **Q.**   And there's also Nintendo numbers on here, and isn't it --

19 is Call of Duty on Nintendo right now?

20 **A.**   No.

21 **Q.**   And -- but has Xbox entered into a contract to make Call

22 of Duty available on Nintendo?

23 **A.**   We have.

24 **Q.**   And you discussed previously with FTC's Counsel what would

25 happen if there was a shift in the revenue share from

**STUART - CROSS / GOSTAN**

1    PlayStation, if it went from one revenue split to another

2    revenue split for Call of Duty and how you'd have to make up

3    that.  Do you remember that?

4    **A.**   Yes.

5    **Q.**   And one of the things you talked about was a shift in

6    platforms?

7    **A.**   Yes.

8    **Q.**   Is it also possible that you could make up some of that

9    gap by putting Call of Duty on additional platforms?

10   **A.**   That's right.

11   **Q.**   And could one of those platforms be Nintendo?

12   **A.**   Yes.

13   **Q.**   A few final questions for you.

14        If this acquisition goes through, will Call of Duty be a

15   first-party game for Xbox?

16   **A.**   It will.

17   **Q.**   And when selling an Xbox first-party game, is it more

18   profitable to sell that game on Xbox or PlayStation?

19   **A.**   It can vary.  As we know, in our business we have a

20   console subsidy so we lose money when we sell a console on day

21   one; and depending on what that consumer does after that

22   console is bought, it can be, I'll say, profitable or not in

23   terms of different types of speed of profitability.

24        So the example here would be if someone is a Call of Duty

25   player and they buy just one copy of Call of Duty or even just

1  a couple copies of Call of Duty and they buy an Xbox with a

2  console subsidy, you may not be profitable on that user.  It

3  would take time to make that gap up.  So more game sales, many

4  years in some cases.

5       If a PlayStation user was a Call of Duty player only and

6  they bought one game on PlayStation, you are more profitable in

7  that scenario than it would be trying to sell a console subsidy

8  out of the gate in a few games.

9  **Q.**  Just to clarify, though, if it's more profitable to sell

10 games on PlayStation, why do you ever take games exclusive?

11 **A.**  Exclusivity is a part of our industry.  It's something we

12 need to support our brand and sell Xbox, and that's one of the

13 levers that we can pull to make that happen.

14 **Q.**  But does it make financial sense to make all games

15 exclusive?

16 **A.**  No.  For games, like you can see with Minecraft, if you

17 made that exclusive, for example, you'd have nowhere near the

18 success of that.  For games specifically like Call of Duty that

19 are highly multiplayer-based games, large communities, that

20 would not make sense to make it single platform.

21 **Q.**  So from a financial -- just so we have a clear record,

22 from a financial perspective, as Xbox CFO, do you think it

23 would make sense to take Call of Duty exclusive?

24 **A.**  No.

25 **Q.**  And Ms. Hood didn't ultimately get to testify today, but

1   if you tried to explain to Ms. Hood that it made financial

2   sense to take Call of Duty exclusive, how do you think she

3   would react to that?

4   **A.**   She would say probably that doesn't make sense and you

5   need to keep the existing business model running.

6           **MR. GOSTAN:**  No further questions.

7           **THE COURT:**  I have a couple questions.

8      You said the Nintendo, if Call of Duty goes there, that

9   will make some money; but I believe from earlier testimony, you

10  didn't run a model on that.

11          **THE WITNESS:**  No.  We did not run a financial model

12  specifically, no.

13          **THE COURT:**  Why not?

14          **THE WITNESS:**   In this example what we think about is

15  some of the Switch users that are there are brand new

16  customers, customers that wouldn't be on Xbox or PlayStation

17  but it represents an opportunity for us.  We didn't run it

18  specifically because it just wasn't one of the scenarios that

19  we looked at.

20                  (Pause in proceedings.)

21          **THE COURT:**  We didn't run it because we didn't look at

22  that scenario.  Okay.  So you didn't run it?

23          **THE WITNESS:**  We didn't run it, that's right.  We

24  didn't run that model, that's correct.

25          **THE COURT:**  So there isn't any -- you can't quantify

 1   it because you didn't look at it?

 2          THE WITNESS:  That's correct, yeah.

 3          THE COURT:  And then with respect to X Pass [sic], the

 4   day and date, what is the policy?  Like, what games go on

 5   there?  What games go on X Pass [sic]?

 6          THE WITNESS:  So Xbox Game Pass, when we say "day and

 7   date," is usually our first-party games, so games that are in,

 8   you know, the Xbox umbrella.  When they launch to the public,

 9   they'll launch at retail.  So think Best Buy, Wal-Mart, Target.

10   We'll launch them in our digital stores for sale 60 or $70, and

11   we'll also put them on that same day in the Game Pass

12   subscription service.

13      So a customer can decide if they want to buy if for 60 or

14   $70; or if they're a subscriber to Game Pass, they can play the

15   game that way on the same day it's released.

16          THE COURT:  And do you do that with all first-party

17   games?

18          THE WITNESS:  We do, that's correct, yeah.

19          THE COURT:  Okay.

20          MR. GOSTAN:  Nothing further.  Thank you.

21          THE COURT:  Mr. Weingarten?

22          MR. WEINGARTEN:  Nothing further, Your Honor.  Thank

23   you.

24          THE COURT:  Okay.  Thank you.  You are excused.

25                      (Witness excused.)

1          **THE COURT:**  Okay?  Do we have any further witnesses.

2          **MR. WEINGARTEN:**  I don't believe so, Your Honor.

3          **THE COURT:**  That was a rhetorical question.

4                         (Laughter)

5          **THE COURT:**  Okay.  All right.  Great.

6      So we are going to, then, take a break until 2:30 where

7   we'll do closing arguments.  I assume the FTC will go first.

8          However, I'd like you to take it sort of anticompetitive

9   harm by anticompetitive harm.  You sort of identified three

10  markets.  I mean, there's been overlap on things, but I guess

11  what I'm saying is I want someone from Microsoft up here too;

12  right?  So that we can have an engagement.

13         The other thing is, and it's wonderful that many people

14  have taken witnesses in this case, you do not -- if somebody

15  wants to get up and say something or take something back that

16  someone else says, that's all fine.  All right?  You guys have

17  been teams, and it's all right to have a team do the argument

18  as long as it doesn't get too chaotic.

19         **MR. WEINGARTEN:**  That's a great relief for someone

20  doing the argument.  Thank you.

21         **THE COURT:**  Yeah.  Okay.  Absolutely.  I just want to

22  get it right --

23         **MS. WILKINSON:**  We appreciate it, Your Honor.

24         **THE COURT:**  -- and so whatever helps me the most is

25  the best.

PROCEEDINGS

```
 1        All right.  We'll see you at 2:30 then.

 2             (Luncheon recess was taken at 11:18 a.m.)

 3   AFTERNOON SESSION                              2:28 p.m.

 4        THE CLERK:  Remain seated.  Come to order.  Court is

 5   now in session.

 6        THE COURT:  Okay.  Good afternoon.

 7        MS. WILKINSON:  Your Honor, may I correct one of my

 8   mistakes?  I entered RX4033, and it's not part of Ms. Hood's

 9   declaration.  So I'd like to withdraw that.  And then there

10   were several I should have entered and I did not.

11        THE COURT:  Okay.

12        MS. WILKINSON:  RX1186, RX1187, RX1128, RX1133,

13   RX1120, RX1119, RX1140, RX1154, RX1156, and RX3166.

14        THE COURT:  All right.  Admitted.

15     (Trial Exhibit 4033 withdrawn.)

16     (Trial Exhibits 1186, 1187, 1128, 1133, 1120, 1119,

17       1140, 1154, 1156, and 3166 received in evidence.)

18        THE COURT:  Okay.  Are we ready to proceed?

19        MR. WEINGARTEN:  Yes, Your Honor.

20        THE COURT:  All right.  Whoever wants to come up

21   first, but both sides at the same time, but we'll start with

22   the FTC.

23        MR. WEINGARTEN:  If Your Honor would like, I have

24   prepared remarks, but I'm happy to jump right into --

25        THE COURT:  Why don't you start with your prepared
```

1   then.  I'm sure I'll have some questions.

2          **MR. WEINGARTEN:**  Okay.  Certainly.

3                    **CLOSING ARGUMENT**

4          **MR. WEINGARTEN:**  Well, thank you, Your Honor, to you

5   and the staff for your time and attention this past week as we

6   have put on our evidence.

7          Last Thursday, we promised the Court that the evidence in

8   this hearing would show that the Federal Trade Commission has

9   raised substantial questions about this proposed transaction,

10  substantial questions about whether this transaction would

11  cause anticompetitive effects in multiple relevant markets.

12         And we promised Your Honor and the Court evidence that

13  would be sufficient to raise those questions; and although I

14  never want to take on a higher burden than I have to, I think

15  we've brought Your Honor evidence that shows the answer to even

16  those questions.  That's not what we're required to do here,

17  but we have brought Your Honor significant evidence about the

18  relevant markets that are at play, about the nature of

19  competition in those markets, the role of content in each of

20  those markets and, critically, about Microsoft's ability and

21  incentive to cause competitive harm in each of those markets if

22  this acquisition is completed.

23         Now, all the evidence has shown, Your Honor, that Call of

24  Duty and AAA games in particular and even some of the other

25  Activision franchises drive gamers.  That is the nature of this

**CLOSING ARGUMENTS**

1  transaction.  It is the nature of the vast majority of the

2  synergies that Microsoft projects coming out of this

3  transaction.

4        **THE COURT:**  You mean the content is critical?

5        **MR. WEINGARTEN:**  Content is critical, Judge.  Content

6  is critical.

7      We looked this morning at the synergies figures and

8  there's an existing business line and there's the synergies

9  lines, and the majority driver by far of the synergies from

10  Microsoft comes from driving users to engage and join Game Pass

11  because they understand the value of this content.

12      Now, we've also heard, Your Honor, quite a bit about

13  decisions involving ZeniMax.  Why do we bring all of that

14  evidence about ZeniMax to Your Honor?

15      That evidence, Your Honor, is evidence of Microsoft's

16  incentives when it comes to valuable content.

17        **THE COURT:**  Well, so let's talk about ZeniMax.  So

18  which ZeniMax title is comparable to Call of Duty in that when

19  it was acquired by Microsoft, it was a multiplatform

20  multiplayer game?

21        **MR. WEINGARTEN:**  The best example of the three or four

22  that they've talked about bringing exclusive I think is the

23  Elder Scrolls franchise.  They'll tell you it's not comparable

24  because it's an expansion pack or it's a different kind of a

25  title, but that one, we think, is one of the most like Call of

 1   Duty.

 2       Now, I will say --

 3       **THE COURT:**  Well, so then -- so that was ZeniMax, and

 4   it's currently -- there's Elder Scrolls 6 I think we heard is

 5   coming out?

 6       **MR. WEINGARTEN:**  It is to come.  It has not yet

 7   launched.  Mr. Spencer testified on our examination that they

 8   have announced that it will be exclusive.

 9       But I want to be very clear.  Trying to find analogies and

10   categories of which game is like the other is not going to be

11   the issue before this Court.  One can always create a category

12   of one.  I think lawyers are exceptional at distinguishing.

13       The issue is:  If there is a category of one, it's because

14   Call of Duty is so exceptionally valuable and it's so unique

15   because it's every year and it drives so much revenue.

16       And whether a title from ZeniMax is exactly like it or not

17   on some dimension, what the ZeniMax experience shows is that if

18   Microsoft, as a platform owner, controls the content, it will

19   use that content to the benefit of its own platforms.

20       **THE COURT:**  Well, it will use that content in the way

21   to make the most money.

22       **MR. WEINGARTEN:**  Correct.

23       **THE COURT:**  Yes.

24       **MR. WEINGARTEN:**  Yes.  And our case does not require

25   any more complicated theory of behavior than that.

1    If Your Honor concludes that Microsoft is a

2  profit-maximizing corporation and will use valuable content to

3  aid its shareholders, which it's right insofar as that goes,

4  then the evidence that we have shown is, the incentives are to

5  use that content to benefit its platforms and in doing so, it

6  will harm competition because it will take that content and

7  make it day and date on --

8        THE COURT:  How does that -- how does that harm

9  consumers?

10        MR. WEINGARTEN:  So the consumer, Your Honor, instead

11  of having Mr. Kotick at an independent Activision and deploy

12  his platform-agnostic philosophy that he talked about on the

13  stand on direct, Mr. Kotick would bring his content everywhere

14  gamers can be found.  He wants them playing all of his content

15  wherever.

16    Now the consumer, if the deal goes through, has to find at

17  least some content, some of it, only on the Game Pass.

18        THE COURT:  Oh, you don't mean just day and date.  You

19  mean day and date and exclusive.

20        MR. WEINGARTEN:  We mean day and date and exclusive --

21        THE COURT:  Right.

22        MR. WEINGARTEN:  -- but also even day and date is a

23  type of exclusivity because they won't give it day and date

24  necessarily to anyone else; right?  So having the ability to

25  say "We've launched the game, it's come out on the console, and

1   on the same day it's come to Game Pass," I don't think there's

2   any guarantee, nor can there be, of a day and date to every

3   other possible --

4           THE COURT:  Like Sony does with Activision; right?  I

5   think we heard testimony as to that --

6           MR. WEINGARTEN:  Yes.

7           THE COURT:  -- that Activision releases games not

8   equally, not in parity.

9           MR. WEINGARTEN:  Right.

10          THE COURT:  They take money --

11          MR. WEINGARTEN:  Yes.

12          THE COURT:  -- from other platforms and delay.

13          MR. WEINGARTEN:  That's right.

14          THE COURT:  Yes.

15          MR. WEINGARTEN:  And there is -- again, there is a

16  difference between exclusivities that are pro-competitive and

17  exclusivities that are not pro-competitive, that are

18  anticompetitive.  So this case is not about saying all

19  exclusivities are bad.  That is also a red herring and not the

20  FTC's theory.

21      If Sony says to Activision "Here's money and we'll help

22  you develop a game or use this money to make something

23  interesting or neat and the cost of us giving you the money,

24  the *quid pro quo* is let us have first access for a period of

25  time or exclusive access to the neat new thing you've created

 1  for gamers," that's pro-competitive.  That money was used to

 2  make something that the consumer or the gamer wants to play and

 3  enjoy.

 4      The difference, Your Honor, is if you acquire the content,

 5  you're not necessarily doing any new investment and you're

 6  cutting off that entire process of competition and saying:  Now

 7  the game is available only on our platform or certain aspects

 8  of it are only available.

 9          THE COURT:  Why don't we start, why don't you sort of

10  be a little bit more precise and tell me exactly what is the

11  harm to consumer?  Like, what they are.  Maybe tell me what

12  they are, and then let's evaluate each one.

13          MR. WEINGARTEN:  Okay.  So the harms to consumers are

14  very similar across all of the markets that we've alleged.

15      On the one hand, there's a reduction of choice.

16          THE COURT:  No, no, no.  So let's start with -- let's

17  start with the platform market then; right?  That you have --

18  Professor Lee has the Generation 9 --

19          MR. WEINGARTEN:  Yes.

20          THE COURT:  -- console market.

21      Okay.  So if the merger goes forward, what is the -- how

22  may that substantially lessen competition in a way that harms

23  consumers?

24          MR. WEINGARTEN:  Right.  So if the merger goes forward

25  and if you believe that Microsoft has the incentive to use the

 1  content to advantage its own platform, then there will be

 2  content, there will be timing issues, there will be

 3  exclusivities that benefit only the Xbox and not the

 4  PlayStation.

 5      **THE COURT:**  Okay.  So now let's break that down.  What

 6  is the evidence -- aren't we just talking about Call of Duty?

 7  I mean, otherwise, then why -- then Sony just acquired another

 8  publisher.  They've shown they make a lot of stuff exclusive;

 9  right?  So it -- you're saying -- and you told me Call of Duty

10  is a one, a different.  This case has really always been about

11  Call of Duty and how that's going to drive.  So just play that

12  out precisely.

13      **MR. WEINGARTEN:**  Well, I'm -- I am slightly hesitant

14  only because they do have some other pretty exceptional

15  franchises at Activision, like the Diablo franchise we heard

16  about, and Professor Lee models some of the harms that come

17  from the Diablo franchise as well in his report, but there is

18  no question Call of Duty is an exceptional asset.

19      **THE COURT:**  Let me ask you this:  If Sony actually had

20  an agreement with Microsoft, the ten-year, to keep Call of Duty

21  and future versions of Call of Duty on PlayStation and future

22  versions of PlayStation, would we be here?

23      **MR. WEINGARTEN:**  Well, we might be here because we

24  would need to evaluate that agreement and understand all of the

25  facts.

**CLOSING ARGUMENTS**

1        **THE COURT:**  Let's say it's an agreement and they're

2  going to abide by it and, therefore, Call of Duty will be on

3  PlayStation, all the iterations, from now for ten years, would

4  we be here?

5        **MR. WEINGARTEN:**  I think we would still be -- we would

6  still have had an investigation.

7        **THE COURT:**  Well, that's --

8        **MR. WEINGARTEN:**  We would still have had --

9        **THE COURT:**  Good.  That's good.  You should do that,

10  but here on a preliminary injunction motion --

11        **MR. WEINGARTEN:**  I think -- well, it -- I don't want

12  to evade the hypothetical, Judge, but we would be here because

13  of concerns about the other markets.  That's what my colleague

14  is telling me.

15                        (Laughter)

16        **THE COURT:**  Okay.  Outside the platform market.

17        **MR. WEINGARTEN:**  Outside of the platform market.

18        **THE COURT:**  Okay.  All right.  That's fair.  That's

19  fair.  I understand that.  But that -- okay.

20      So the console market, then, it really comes down to Call

21  of Duty and the concern that Microsoft will leverage it, will

22  foreclose it, or partially foreclose it in a way that will --

23  that people who played it on PlayStation will now have to play

24  it on Microsoft.

25        **MR. WEINGARTEN:**  Or get -- I don't want to just give

 1   into the full foreclosure theory.  That's another artificially

 2   high burden that the Defendants have tried to put on the

 3   government.

 4        Yes, one theory is they might have to -- the PlayStation

 5   user just has to go get an Xbox.  That's one theory.

 6        The other types of harm, though, arise from all the myriad

 7   ways in which platform holders or owners contract to use the

 8   content to push their platforms.

 9           THE COURT:  Okay.  So let's stop.  Let's start with

10   full foreclosure -- right? -- which is what one of the things

11   that Professor Lee focused on.  So what is the actual -- and we

12   heard a lot about his input into his model and the 20 percent

13   shift, I guess.

14        What data was he looking at?  And I have in front of me

15   all of -- his declaration.  What data was he looking at that he

16   came up with that 20 percent figure?

17           MR. WEINGARTEN:  I'm going to phone a friend,

18   Your Honor.

19           THE COURT:  Yes, you may phone a friend, absolutely,

20   and the friend can even speak.

21                     (Pause in proceedings.)

22           MR. WEINGARTEN:  This is my colleague Merrick Pastore,

23   Your Honor.

24           THE COURT:  Yes.

25           MR. PASTORE:  Sorry.  Could you please repeat the

1    question?

2         **THE COURT:**  Well, I want to know what data, actual

3    data, was he looking at.  And I'll just tell you, Dr. Bailey

4    actually looked at real-world, this is what is happening data.

5    Did he analyze that data?

6         **MR. PASTORE:**  Sure.  Well, Dr. Lee also analyzed

7    real-world data, Your Honor.

8         To look at the share shift, Dr. Lee had to look backwards

9    to see in Generation 8, which you have a lot of data for, how

10   various Call of Duty games may have affected that competition

11   if they had been taken away.

12        The reason you do that is because that analysis is

13   backward looking.  You know, there's not much data for

14   Generation 9, especially because of the supply shortages that

15   happened.

16        **THE COURT:**  Okay.  So what is the generation data that

17   he looked at?  What is it that he looked at?

18        **MR. PASTORE:**  He looked at both generations so --

19        **THE COURT:**  No, no, no.  Yeah, but what about -- what

20   is the data, the generation data, what is it that it shows?

21        **MR. PASTORE:**  Sales data.

22        **THE COURT:**  Sales data.

23        **MR. PASTORE:**  Sales data for Generation 8.

24        **THE COURT:**  Sales data of just the number of

25   PlayStations and Xboxes sold?

**CLOSING ARGUMENTS**

1      **MR. PASTORE:**  Per-unit sales data for games.

2      **THE COURT:**  Okay.  But -- and how from that did he

3 extract the people -- the players that would leave PlayStation

4 or maybe they'd keep their PlayStation but the next iteration

5 that came out, they would buy an Xbox?  That's what he's

6 saying; right?

7      **MR. PASTORE:**  Well, he also used the same telemetry

8 data that Dr. Bailey looked at; but in addition, you know, he

9 used the per-unit game sales.  And I think, you know --

10      **THE COURT:**  Where in his report do I see how he used

11 that same data that Dr. Bailey looked at?

12      **MR. PASTORE:**  I don't have the report in front of me.

13 If one of my colleagues could give it to me.

14      (Pause in proceedings.)

15      **MR. PASTORE:**  Could you repeat the question one more

16 time?

17      **THE COURT:**  Well, I'll just say Dr. Bailey writes

18 62 percent of all PlayStation owners don't play Call of Duty at

19 all so they're not going to move.  They're not -- the

20 foreclosure won't affect them; right?

21      **MR. PASTORE:**  62 percent of all PlayStation users do

22 not play Call of Duty at all?

23      **THE COURT:**  Right.

24    And then of those that do, most don't play very often.

25 Let's see if I can find it.

**CLOSING ARGUMENTS**

1    Can you direct me to -- do you know what slide I'm

2  referring to?

3         **MS. WILKINSON:**  I do, Your Honor, in theory, but let

4  me take a moment to look for that.

5                    (Pause in proceedings.)

6         **THE COURT:**  I think it was Slide 15.  I'm not going to

7  give you numbers, I guess.  Maybe we talked about that

8  62 percent before.

9    But it would be -- well, if you look at Slide 15, it's not

10  that many PlayStation players who play a lot of Call of Duty a

11  year.

12         **MR. PASTORE:**  I'm sorry, Your Honor.  I do not have

13  the slides in front of me.

14         **MS. WILKINSON:**  Here you go.

15         **THE COURT:**  I'm sure that somebody does there.

16    And so I'm trying to get how you get to that those people

17  will buy an Xbox because Call of Duty is so important to them.

18         **MR. PASTORE:**  Yes, Your Honor.

19         **THE COURT:**  How do you decide that Call of Duty is so

20  important to them?  It is to some people.

21         **MR. PASTORE:**  Yes.

22         **THE COURT:**  Some.

23         **MR. PASTORE:**  Some.

24         **THE COURT:**  But how does he figure out that that -- to

25  get to that percentage number that they would actually do the

 1   Xbox?  What data is he relying on?

 2        **MR. PASTORE:**  Well, I'd encourage Your Honor to look

 3   at the declaration of Mr. Jim Ryan in his testimony where he's

 4   very clear about the financial impact that Call of Duty has on

 5   the PlayStation platform.

 6        **THE COURT:**  That's not my question.  My question is

 7   how your expert, Dr. Lee -- he did a foreclosure model --

 8        **MR. PASTORE:**  Yes.

 9        **THE COURT:**  -- right?  And the foreclosure model

10   inputted that 20 percent number.

11        **MR. PASTORE:**  Yes.

12        **THE COURT:**  -- which represented the share -- another

13   number.  Not all PlayStation users; right?

14        **MR. PASTORE:**  Yes.

15        **THE COURT:**  Yeah.

16        **MR. PASTORE:**  Sorry.  Sorry if I misunderstood your

17   question.  I think I get it now.

18        So that 20 percent number -- I'm sorry -- that 20 percent

19   comes from two main inputs.  The first is the LTV, the

20   five-year expected lifetime revenue of a new Xbox owner.  And

21   as we presented to Your Honor, you know, that LTV is for the

22   average Xbox user.  I'm being careful with the numbers here.

23        And as we showed, Your Honor, through, I think, a

24   demonstrative, if you remember, with the different colors, Call

25   of Duty games compared to the average AAA title, they sell

1    quite a lot.  They come out every year around October or

2    November, and they're at the top of the charts.  Even Call of

3    Duty Vanguard, which Activision has time and time again said it

4    was a disappointment, that was the number one selling game the

5    year it came out.  That's a disappointment for them.  That's --

6    still for every other company that's a huge win.

7         THE COURT:  I'm just saying people who only play Call

8    of Duty, let's say 20 hours a year, are they included in that

9    20 percent figure?  You can point me to where in his report I

10   should look.

11        MR. AKLEMAN:  Jim Akleman on behalf of the Government.

12   So his report is quite long and it's actually helpful if

13   Dr. Lee can explain it himself, but we'll try to do our best to

14   explain economic evidence to you.

15   So if you look at Footnote 806 of his report, which is --

16   it's on page 210 of PX5000, Dr. Lee explains some of the -- how

17   he has sort of got to this rate of people that start using --

18   that might switch; right?

19   So he looks at the universe of people that play Call of

20   Duty and used a variety of data from, my understanding is, both

21   from the Gen 8 share model -- remember, Dr. Lee went back and

22   looked at how gamers actually behaved in response to changes

23   under whole generation --

24        THE COURT:  Correct me if I'm wrong, that Footnote 806

25   assumes the 20 percent number.  I'm trying to figure out how

 1  you get to the 20 percent number.

 2       **MR. AKLEMAN:**  So I don't think it's -- respectfully, I

 3  don't think it's correct to say he assumed that it was

 4  20 percent.  The 20 percent is based on the inferences that

 5  were drawn both from the prior generation, the share model,

 6  which looked at how people behaved in Gen 8, and then you

 7  applied that behavior to Gen 9 to try to predict what people

 8  would do in Gen 9.

 9       And the reason is because we don't have a ton of data of

10  Gen 9 today; right?  So the 20 percent conversion rate, that's

11  actually applied in his second model, which his foreclosure

12  model.

13       **THE COURT:**  Right.

14       **MR. AKLEMAN:**  And that's intended to predict whether

15  Microsoft would actually have the incentive to withhold -- and

16  I apologize, I hope I'm not saying anything confidential.

17       The idea is that would be intended to predict whether

18  Microsoft would actually withhold data.  So, again, he used the

19  modeling of what happened in the past to help predict what

20  would happen in the future.

21       **THE COURT:**  I understand that.

22       **MR. AKLEMAN:**  It's not just based on, for example,

23  just guessing what the number is.

24       **THE COURT:**  No, I understand.  I'm just trying to

25  figure out what was the data that was in that -- that model;

1    right?

2        Because, for example, Dr. Bailey showed evidence that the

3    number of PlayStation Call of Duty users that play a lot is

4    actually a pretty small number versus all PlayStation users;

5    right?  So --

6            MR. AKLEMAN:  Right.  So --

7            THE COURT:  And also in terms of revenue, it's not the

8    biggest revenue driver for PlayStation.

9            MR. AKLEMAN:  You're saying Call of Duty is not the

10   biggest revenue driver on PlayStation?

11           THE COURT:  Right.

12           MR. AKLEMAN:  So I think this is what's tricky about

13   this case, is that you have to look at the specific data for

14   each game.  You can't just say "I need either the largest game

15   or" -- like, you actually have to calculate, which is what

16   we've tried to present, you have to actually calculate what the

17   effect of withholding that game would be.  That's -- that's

18   really -- we can't just say this is the largest game or --

19           THE COURT:  No.  I guess maybe you can just tell me in

20   sort of plain English why would those -- that particular

21   20 percent number buy the Xbox?  Like, what is it about Call of

22   Duty that they would abandon their console of choice and buy

23   the Xbox?

24           MR. AKLEMAN:  So the way to think about this --

25   right? -- is that a consumer -- and, again, I'm not an

1  economist, but I'll do my best here -- a consumer, let's say

2  they spend $70 on Call of Duty; right?  There is a surplus

3  that's associated with that.  Like, if someone is spending $70

4  on Call of Duty, they likely value it a much more than $70, and

5  so that value that they ascribe to having the ability to play

6  Call of Duty or another Activision game, to be clear, like

7  Diablo as we heard testimony about yesterday is quite vague,

8  that loss surplus, the benefit that they would get from having

9  a game that they really like, so once they lose that because

10 they no longer have access to the game on the platform, they

11 then have to make a choice; right?

12      And so one of their choices is they can just forego that

13 benefit that they would have kept and they just lose that, and

14 so that's actually harm that would result from the transaction.

15      Another possibility that it can do is maybe they already

16 own another console, in which case they might just go buy, if

17 they -- if they're, for example, the rare number of people who

18 are multihomers on Xbox and PlayStation, they can just go and

19 buy on the other console.  So there's not as much harm there.

20      And then, finally, the other option is -- well, there are

21 a few more, but just for simplification -- finally, they could

22 go and they could spend $500 on an Xbox if they really, really

23 value Call of Duty, and they -- then they get access to Call of

24 Duty again on the platform that they didn't sort of intend to

25 choose.

1          And just to sort of bring it back, that results in a share

2    shift from -- we heard a bunch of numbers.  I don't know which

3    ones are confidential and which ones are not -- that results in

4    a share shift from PlayStation to Xbox.

5          And then this one is a little bit out of my depth, but my

6    understanding is that you can then use that share shift to

7    impute a -- a price change -- an implied price change.

8          **THE COURT:**  I understand that.  How do you figure out

9    between -- you say, well, those who don't switch, who don't --

10   who forego buying the Xbox and playing Call of Duty are harmed.

11   True.  True.  But you're using that to get to the foreclosure

12   incentive; right?

13         So what I need to know is:  How do you calculate the

14   number of people that were -- because it has to be enough

15   people, you have to show enough people would switch to Xbox

16   such that Microsoft would have the economic incentive to

17   foreclose.  If everyone would just give up on Call of Duty,

18   then they don't have the economic incentive to foreclose --

19   right? -- because it would actually cost them money.

20         So how do you figure out how many people would just give

21   up and how many people would then actually buy the Xbox?

22         **MR. AKLEMAN:**  So that's based on -- and I'm not an

23   economist, again, but that's based on looking at the behavior

24   of players based on, for example, past exclusivity and looking

25   also at the sales behavior of Call of Duty, looking -- trying

1    to figure out that -- remember that surplus that I was talking

2    about earlier? -- trying to figure out exactly how much they

3    value that.  Because once you understand how much sort of the

4    average -- it's not really the average, but how much that

5    certain set of consumers --

6          **THE COURT:**  It's not the average; right?  It's the

7    exceptional consumer.

8          **MR. AKLEMAN:**  Exactly, right.

9        So the people that are actually going to switch, that's

10   sort of the top end of the people that play Call of Duty.  So

11   it's people that value it exceptionally highly; right?

12       But some people that are sort of on the lower end, they're

13   just -- they may not do anything; right?  They may just stop

14   playing it because they don't sort of value it enough to

15   switch, and that's sort of -- that's the math exercise that's

16   going on here and that's what Dr. Lee, who I'm sure could

17   explain this much more ably than I could, has calculated.

18         **THE COURT:**  So you're saying that was based, then --

19   for example, Dr. Bailey showed us data as to the number of

20   hours of played on Call of Duty; right?  You would expect that

21   someone only plays 10 hours a year less likely to switch than

22   someone who plays 200 hours a year.

23         **MR. AKLEMAN:**  Right.  The -- I think the data that --

24   as I understand it, the data that Dr. Bailey was presenting are

25   more along the lines of inputs into the actual modeling that

1    Dr. Lee did; right?  So I don't -- I don't know what the exact

2    number is, but I guess I don't personally dispute whatever the

3    telemetry data shows about how much people play Call of Duty.

4         But you can't just stop there.  Then you have to go and

5    figure out:  What does that tell me about the actual behavior

6    of people that are playing the game?  How many of them --

7    remember -- I apologize -- it's how many of those people are

8    actually going to switch --

9              THE COURT:  Yes.

10             MR. AKLEMAN:  -- because they value it exceptionally

11   highly?

12        So, for example, the people -- I haven't looked at them --

13   this calculation myself, but I would imagine that the people

14   that play a lot more are far more likely to switch than those

15   people that don't -- that don't play very often.  So that's --

16   that's telemetry data, that's an input into the foreclosure

17   calculation, but it's not -- you can't just look at that data

18   and kind of --

19             THE COURT:  No, no, no.  That's what I'm trying to

20   confirm, that it was, in fact, input into Dr. Lee's foreclosure

21   model.

22                     (Pause in proceedings.)

23             MR. AKLEMAN:  That's correct, yes.  He used telemetry

24   data.  I apologize.  Was that just the question?

25             THE COURT:  Well, no, that's okay.

**CLOSING ARGUMENTS**

1    Did you want to say something, Ms. Wilkinson?

2        **MS. WILKINSON:**  I do, Your Honor.  I'm not an

3    economist, but I think I can explain it.

4        This 20 percent is an input, as you're suggesting.  It

5    doesn't come out of the model like the 5.5 percent share shift

6    does.  That 20 percent he came up with as an estimate.  There

7    is no basis, he doesn't calculate it from another model or

8    another --

9        **THE COURT:**  I thought it came from the share/demand

10   model.

11       **MS. WILKINSON:**  No.  He used that model first.

12   Dr. Carlton told him what was wrong, and he explained in his

13   rebuttal report, no, they're separate.  They're just kind of a

14   check on the outputs, not on the inputs.

15       And he doesn't have any basis to show --

16       **MR. PASTORE:**  I want --

17       **THE COURT:**  It was a check on the output because it

18   was higher.  It was 8.9 percent so, therefore, the 5.5 percent

19   share shift is conservative.

20       **MS. WILKINSON:**  Right, but not the input of the

21   20 percent.  That goes to exactly your question, which is:  How

22   many people convert?  Not how many people want Call of Duty

23   but, to your point, how many people would actually go buy the

24   Xbox?  And he makes that number up.

25       And you -- I think I tried to point out during my

1   examination, but if you look at PX5001 on page 76, he shows a

2   chart, because that is an input, of how if you change that

3   input, you get a totally different answer.

4          THE COURT:  No, I remember that.  I'm just --

5          MS. WILKINSON:  But that's what I'm saying, is he's

6   not -- he doesn't say that he can point to a calculation that

7   he did to get the 20 percent.  I thought that's what you were

8   asking.

9          THE COURT:  That is what I'm asking.  So maybe you can

10  show me where --

11         MR. PASTORE:  Sorry.  I'm sorry for --

12         THE COURT:  -- how you calculate -- no, that's okay --

13  how you calculate that.  I know you probably didn't even expect

14  to be up here, and you're doing great.

15         MR. PASTORE:  I appreciate that.

16                  (Laughter)

17         MR. PASTORE:  Your Honor, I really appreciate that.

18  Thank you.

19     No, I didn't expect to be up here, but I also can try to

20  help you understand --

21         THE COURT:  Yeah, no, I'm glad.

22         MR. PASTORE:  -- how we get here.

23     I just -- the reason I jumped in is because Dr. Lee did

24  not just make up the 20 percent.

25         THE COURT:  Okay.  So show me in the report where I

 1  can read where it came from.

 2         **MR. PASTORE:**  Given that it's a very long report, I'm

 3  looking to my colleagues for a little bit of help on the exact

 4  page number, but --

 5         **THE COURT:**  Okay.  Well, maybe -- so why don't we look

 6  at.  So that's a question that I have because that 20 percent

 7  figure is sort of critical -- right? -- to your argument, which

 8  is notwithstanding everything Microsoft said, notwithstanding

 9  the agreement that they offered, notwithstanding their

10  agreement with Nintendo, they have an economic incentive to

11  make Call of Duty exclusive.

12         **MR. PASTORE:**  Yes.

13         **THE COURT:**  And as we all agree, that's what they want

14  to do, make money, and, therefore, they -- there's a likelihood

15  that they would do that.  So that's why I'm honing in on that.

16         **MR. PASTORE:**  Yes, no, I totally appreciate that.  I

17  think I'll go back and get the exact answer; but from my --

18  and, again, I'm not an economist.  I try my best.  I did my

19  undergraduate in economics so I have a little bit of an

20  understanding.

21         **THE COURT:**  Well, you're ahead of me then.

22         **MR. PASTORE:**  But I'm not near -- I'm nowhere close to

23  Dr. Lee -- to Professor Lee.

24      But the 20 percent -- first of all, you know, we found a

25  range, 15 to 25 percent.  So the 20 percent is in the middle of

 1   that range.

 2          **THE COURT:**  Right.  But --

 3          **MR. PASTORE:**  Sorry.

 4          **THE COURT:**  -- we saw that if it's 15 percent, the

 5   same incentive is not there --

 6          **MR. PASTORE:**  Let me explain that very quickly.

 7          **THE COURT:**  -- potentially.  Potentially.

 8          **MR. PASTORE:**  So two main inputs go into finding this

 9   20 percent.  The first I think I mentioned a bit earlier, which

10   was the LTV, the five-year calculation of your average Xbox

11   user, which Microsoft uses in the ordinary course.  This is

12   their numbers.  They calculate this.

13       And the other main input is the share shift.  Sorry.  I'm

14   so sorry.  The other main input is the share shift, that we use

15   Generation 8 data to approximate.

16       Now, economics is, unfortunately -- you know, it's -- we

17   do the best with the data we have.  And in this case to try to

18   look at what exclusivity might do, looking for this point, the

19   share shift point, looking back on Generation 8 data, you have

20   a much larger set.  You have about seven years of data from

21   last generation where Call of Duty, as you saw in the graph,

22   was a very, very popular game.

23       So understanding that it might -- at first blush, it might

24   be, "Oh, why are you looking at Generation 8 data here and

25   Generation 9 data here," for this one input, this expected

1  potential share shift, that's where we look at data.

2      **THE COURT:**  And when you're looking at the generation

3  day data, are you looking at how many hours people play Call of

4  Duty in a year to come up with that share shift?

5      **MR. PASTORE:**  Well, I believe it's unit sales data,

6  which, you know, if you buy Call of Duty, that's $70, $60.

7      **THE COURT:**  Yeah, but we know that some people play

8  5 hours a year and some people play 200 hours a year, and

9  you're not going to tell me that someone that plays 5 hours a

10  year is likely to buy that Xbox just because Call of Duty is

11  exclusive to Xbox; right?

12      **MR. PASTORE:**  Yeah, that's fair enough.

13      And I do want to emphasize that the 8.9 I think -- I

14  don't -- sorry.

15      **THE COURT:**  No, that was --

16      **MR. PASTORE:**  Is that public?  I'm sorry.

17      That number --

18      **THE COURT:**  It's all hypothetical.

19      **MR. PASTORE:**  Yeah, see, this is only one

20  consideration.  And just to -- I'm sorry to zoom out for a

21  second, but Dr. Lee, you know, these are -- Professor Lee,

22  these are very big reports.  These quantitative models are one

23  of the things that he's looking at along with qualitative

24  evidence, along with other, you know, Microsoft normal course

25  documents that they look at for share shift.

 1          **THE COURT:**  We'll get that, but my question is about

 2    this foreclosure --

 3          **MR. PASTORE:**  Yes.

 4          **THE COURT:**  -- model; right?  Right?  Because that's

 5    important to Microsoft having the economic incentive.

 6          **MR. PASTORE:**  Of course.

 7          **THE COURT:**  That's a mathematical calculation.

 8          **MR. PASTORE:**  Yes.

 9          **THE COURT:**  It makes more sense to take Call of Duty

10    exclusive than it does to leave it on all the platforms; right?

11          **MR. PASTORE:**  Yes.

12          **THE COURT:**  I mean, that's -- that's the nub of it.

13          **MR. PASTORE:**  Yes.  And just what I'm trying to get

14    across is, even though we have this 8.9 percent, that's just

15    one of the percentages he looks at.  You know, we see other

16    share shift figures from Microsoft documents that are

17    consistent with this number.  They're a little lower but, you

18    know, with -- with the impact of Call of Duty, you know, its

19    sales, its popularity, I know that --

20          **THE COURT:**  It is very popular?

21          **MR. PASTORE:**  Yes.

22          **THE COURT:**  It's sold a lot.  A lot of people buy

23    games and they play them once or twice, and then they never

24    play them again; right?  They play them with their friend and

25    then they never play them again.

1    So I guess I'm trying to figure out -- maybe I'm wrong

2    about that, but I'm looking at the data that Dr. Bailey said,

3    that a lot of people don't buy it and don't play it very much.

4        MR. PASTORE:  Yes.  Yeah, and just, again, to consider

5    back to Mr. Jim Ryan's declaration where he discusses, you

6    know, how big Call of Duty is on the PlayStation -- is this

7    public?

8        No.  So sorry.  So I would want to turn Your Honor's

9    attention to paragraph 28 of Mr. Ryan's declaration about the

10   fourth sentence where it starts "In 2021."  I won't say

11   anything below -- after that.

12                   (Pause in proceedings.)

13       THE COURT:  What's the RX number?

14       MR. PASTORE:  Do you know?  It's PX8001, Your Honor.

15       THE COURT:  Oh, it's not in this one.

16       MR. WEINGARTEN:  So, Your Honor, I think --

17       THE COURT:  Is what he's saying based on the number of

18   hours played?  That's all I'm asking.  I'm just wondering.

19       MR. WEINGARTEN:  Paragraph 28 looks -- are you asking

20   about -- when you say "he," Your Honor, do you mean Mr. Ryan or

21   Dr. Lee?

22       THE COURT:  You're relying on Mr. Ryan now.  He's

23   telling me to look at paragraph 28 of Mr. Ryan.

24       MR. WEINGARTEN:  Mr. Ryan paragraph 28 is about hours.

25       MR. PASTORE:  It's about --

 1          THE COURT:  Okay.

 2          MR. WEINGARTEN:  And then I just want to direct your

 3    attention --

 4          THE COURT:  But can I -- can I ask you, then, about

 5    Dr. Bailey's demonstrative?  I didn't hear any dispute with

 6    that.  Is that accurate?

 7          MR. ANSALDO:  Which demonstrative, Your Honor?

 8       Alex Ansaldo for the Federal Trade Commission.

 9          THE COURT:  Number --

10          MS. WILKINSON:  I think you said 15, Your Honor.

11          MR. ANSALDO:  Number 15?

12          MS. WILKINSON:  Uh-huh.

13          MR. ANSALDO:  I don't think we have a specific dispute

14    with the information in this demonstrative.

15          THE COURT:  Okay.

16          MR. ANSALDO:  I think Dr. Bailey acknowledged, as

17    Professor Lee showed, that the more that the gamers spent --

18    more time gamers spend on a game, so that people that are to

19    the right of that chart spend a lot more money than the people

20    that are in the middle or to the left of that chart --

21          THE COURT:  Right.  No, but --

22          MR. ANSALDO:  -- in that game.

23          THE COURT:  Yeah.

24          MR. ANSALDO:  And there was one other thing I wanted

25    to address.  This is in this next -- it's on Demonstrative 17,

 1   which is confidential.

 2        **THE COURT:**  Yes.

 3        **MR. ANSALDO:**  This demonstrative shows -- or purports

 4   to show the average spend per gamer, not the total value of

 5   that whole population of gamers to the platform.

 6        **THE COURT:**  Yes.

 7        **MR. ANSALDO:**  So there are many more Call of Duty

 8   gamers than there are of the games that are to the left of it

 9   in this chart.  So this chart doesn't accurately reflect the

10   total value of the franchise to a platform.

11        **THE COURT:**  That's the money spend?  Oh, but it

12   doesn't include the platform purchase.

13        **MR. ANSALDO:**  Well, it doesn't tell you how many --

14   how many gamers there are playing that game.  So this chart was

15   based on Dr. Bailey's cutoff of 50 hours per year as a

16   franchise gamer and it's the average of those gamers.

17        **MS. WILKINSON:**  Your Honor, to be clear, it's the

18   money spent, though, as you're pointing out.  It's not the

19   hours spent.  There's a minimum, but that can't tell you how

20   many hours the Call of Duty players play and it doesn't fold

21   into what you're asking, which is:  How do you determine which

22   of those people who play more will actually switch?

23        And I don't -- I mean, we've asked Doctor -- or

24   Professor Lee in his deposition.  We've read his reports.  We

25   don't see any calculations there.

 1          **THE COURT:**  Do you have something in his deposition

 2    that you -- you're not going to do that, but why don't you look

 3    while you're there.  Everybody has big teams.  Find me where in

 4    his deposition you say I can look to see that there is --

 5          **MS. WILKINSON:**  Yes.  It might not surprise you --

 6          **THE COURT:**  You say --

 7          **MS. WILKINSON:**  -- that he was not -- he gave long

 8    answers and it was sometimes hard to --

 9          **THE COURT:**  You just told me --

10          **MS. WILKINSON:**  Yes.

11          **THE COURT:**  -- that in his deposition you asked.

12          **MS. WILKINSON:**  No.  I said we don't have any answers

13    for that.  We tried.  We don't have any answers.

14          **THE COURT:**  You can even point to me to where you

15    tried.

16          **MR. WEINGARTEN:**  If I may, Your Honor.

17          **THE COURT:**  Yes.

18          **MR. WEINGARTEN:**  I apologize.  It took some time.

19    Dr. Lee's reply report, paragraph 207, Dr. Lee in the reply

20    report says:  Professor Carlton's first critique is that the

21    Xbox conversion rate that I use is too high.  I believe that is

22    directly responsive.  The Xbox conversion rate is the

23    20 percent, and he says the first critique is that it is too

24    high but this critique is flawed and rests upon the incorrect

25    assumptions as follows:

 1        Paragraph 208 and Footnote 233, I believe, are where

 2   Dr. Lee shows the support for the 20 percent.  What I suspect

 3   is tripping everybody, potentially, respectfully, up is that

 4   the 20 percent conversion rate seems to be calculated and

 5   converted into an equivalent percentage points of people who

 6   are new to the Xbox.

 7        So he says (as read):

 8            "The 20 percent conversion rate that I used by

 9        showing the foreclosure of Call of Duty '25 from

10        PlayStation results in an increase of NTX users that's new

11        to Xbox users equivalent to 5.5 percentage points of the

12        sales."

13   So I think --

14        MS. WILKINSON:  That is --

15        MR. WEINGARTEN:  Well, I don't -- the scoffing --

16        MS. WILKINSON:  I think, Mr. Weingarten, he's saying

17   "I put 20 percent into the model" --

18        MR. WEINGARTEN:  No.

19        MS. WILKINSON:  -- "and it produced 5.5 percentage

20   share change."  He's not saying the model produced 20 percent.

21        MR. WEINGARTEN:  I --

22        THE COURT:  Okay.  All right.  I see.  You're

23   directing me to those paragraphs and to --

24        MR. WEINGARTEN:  Footnote 233.

25        THE COURT:  Footnote 233.  Thank you.  That's what I

 1   wanted to know.

 2          **MR. WEINGARTEN:**  Thank you.

 3          **THE COURT:**  Great.

 4          **MR. PASTORE:**  Thank you.

 5          **THE COURT:**  Okay.  So I think I under -- so then let's

 6   also talk about the relevant market, then, for the Gen 9.

 7          And I guess where I'm struggling there is because you can

 8   play a lot of these games on the PC and the Nintendo console,

 9   and so can you give me a case in which a relevant market didn't

10   include something like an input -- I guess we call the game an

11   input here, I don't know -- that they're playing?  Like, I can

12   play, not yet, on -- maybe never you would say, on the

13   Nintendo, but I can play on my PlayStation, my PC, and my Xbox

14   simultaneously anywhere in the world against each other but,

15   yet, you say that PC is not part of the market.

16          **MR. WEINGARTEN:**  Very -- this one is pretty

17   straightforward, although my colleagues will jump up if I screw

18   this one up.

19          The question is the consumer's choice and the set of

20   products that the consumer can reasonably substitute.  The

21   consumer in this example is looking for a video game console in

22   our hypothetical monopolist test; right?

23          The hypothetical monopolist owns the Switch and the

24   PlayStation and the Xbox, and our consumer goes to buy one of

25   those things.  We're talking about the broader video game

 1  market here.  It doesn't include PCs, and I'll explain why.

 2     The hypothetical monopolist says:  I'm going to take the

 3  price up 5 percent from $500 to whatever 5 percent of that,

 4  10 percent, 550.  Our hypothetical consumer does not say:

 5  Fine.  I'm not going to pay your 550 by going off to buy a

 6  $1500 PC.

 7          THE COURT:  What if they already have the PC?

 8          MR. WEINGARTEN:  If they already have a PC?

 9          THE COURT:  Yeah.  They don't have to buy it.  In

10  other words -- in other words, why isn't -- everybody,

11  particularly in 2023, and I would also guess that particularly

12  with people who play Call of Duty, are likely to already own a

13  PC; right?  I mean --

14          MR. WEINGARTEN:  Right, although I -- yes.  Yes,

15  and --

16          THE COURT:  So they don't have to buy one.

17          MR. WEINGARTEN:  Right.  So the question, though, is

18  twofold on that.  One is, the gaming PC is a special kind of

19  PC.  It is not a run-of-the-mill PC.  A run-of-the-mill that

20  you go and you get the bargain-basement $200, $400, $500 PC is

21  not a gaming PC.

22          THE COURT:  I get that, but -- and maybe I'm biased in

23  the world that I live in -- right? -- and the world we've all

24  lived in during the pandemic where everybody went home,

25  everybody did their work from home, and nobody did it on a

1    bargain-basement PC.  Everybody had a 1000, $1500 PC.

2       Do we have --

3       **MR. WEINGARTEN:**  The test is asking about the purchase

4    decision.  So we're assuming someone is looking to buy this

5    console, and will they be able to defeat the price of the

6    console by making an alternate purchase.  It's not defeat the

7    price because you don't really need the product because you

8    already have something.

9       **THE COURT:**  So I understand that.  I'm just in real

10   world I'm trying to figure out how that works.  Like, why

11   doesn't the existence of being able to play on the PC, which

12   you already have, maybe not quite the same quality I think you

13   would say, but you already have, why wouldn't that have some

14   sort of influence and downward pressure on the price of the

15   Xbox?

16      Because you raise it to -- I know the snip is a low

17   number, but you raise it to a thousand dollars, "Hey, forget

18   it.  I'm going to play on the PC that I already have."

19      **MR. WEINGARTEN:**  Right.  So for any given market, if

20   we assume that the price increase is vast, almost anything can

21   be added in as a substitute, and so that's why the test focuses

22   more narrowly.  You could say:  Why aren't, you know, $500

23   Italian shoes a substitute for $20 Tevas?

24      **THE COURT:**  Right.  It's the significantly small.

25      **MR. WEINGARTEN:**  That's why we do that, because

 1  everything eventually becomes a substitute if the price goes

 2  through the roof.   I think my colleagues will nod if I say

 3  "Cellophane Fallacy."  Are some of them nodding?  Maybe some of

 4  them are nodding.

 5      But there's a case about this where if you take the price

 6  so high that airline tickets -- or instead of competing among

 7  airlines, you said, actually, buses are in the market because

 8  if I took the prices of buses up to 500 bucks a ticket, they'd

 9  compete with airlines.

10      **THE COURT:**  So we'll stick to the small percentage.

11  I guess are you saying that as a matter of economics, you can't

12  take into account the fact that somebody may already own the

13  particular platform that they need?

14      **MR. WEINGARTEN:**  I think as a matter of economics,

15  again, the point is the purchasing decision and whether, for

16  the purposes of the hypothetical monopolist test, can a product

17  outside our proposed market constrain this hypothetical

18  monopolist.  That's -- it's a construct, but that's the

19  construct.

20      **THE COURT:**  Right.

21      **MR. WEINGARTEN:**  And so the hypothetical monopolist

22  who owns all three consoles in the broader console market, is

23  that hypothetical monopolist going to be unable to raise prices

24  in a small but significantly significant way for a period of

25  time because there's a PC that costs $1500?  No.

1    **THE COURT:**  No, not if they have to buy the PC.  But

2    what if -- again, I'm sorry to go back, and that's what I'm

3    struggling with.  I get it --

4       **MR. WEINGARTEN:**  I understand, Your Honor.

5       **THE COURT:**  -- if you had to buy it, that makes

6    perfectly good sense, if it was a different high-end console up

7    there, but we're talking about something that, maybe we're just

8    in unique land, that people own.

9       **MR. WEINGARTEN:**  I think the question here is:  It's

10   not about an actual purchase decision; right?  Of course,

11   Your Honor, if someone owns a PC already, they can do the game.

12   They don't even need the console in theory.

13      But I'm being told if they already own a PC and a

14   console...  So if they already own it, but that's not -- the

15   question is not what is the actual purchase decision for

16   someone who owns it.  The question is:  How can we tell if some

17   products are reasonable substitutes for each other?  And the

18   way we can tell is we start drawing circles around the

19   products; and when we get to a circle where the price of those

20   products can be increased and something outside the circle

21   won't constrain it, we've got a circle that's a good relative

22   market to think about effects.

23      **THE COURT:**  No, I understand that.  I guess I'm just

24   trying to say but why?  Why can we not consider the fact

25   somebody -- are you just telling me just -- and I'm not the

 1   economic expert so I -- I'm sorry, if I come across as dense.

 2        I'm -- just as a practical matter, it just seems to me,

 3   that if you have a PC and you can play the games on the PC,

 4   that's going to have some constraint on the console prices

 5   because the people making the console knows as soon as we go up

 6   a little bit, that may make some people just say "Forget it.

 7   I'm not going to buy that new console.  I'm just going to play

 8   on the PC that I already own."

 9        **MR. WEINGARTEN:**  I have two answers; one law, one

10   fact.  The law answer is:  I think the way the test has been

11   defined is the way I've been trying to state it under the law

12   of how the courts think about a hypothetical monopolist test.

13   So I'm comfortable about that, although that may be a copout.

14   But I'm not an economist either.  I just do what the Courts of

15   Appeals and the District Courts tell me.

16        On the facts, the way I'm confident that the example

17   Your Honor is putting forward is not how we should think about

18   is that we have seen no evidence that Microsoft is benchmarking

19   the Xbox against a gaming PC in terms of price or even

20   performance.

21        There was no evidence by the Defense that Microsoft when

22   it was launching the X and S said, "How much do high-end gaming

23   PCs cost?  1500?  We can price at 1499."  There is no evidence

24   of that whatsoever, and so we feel confident that the close

25   competition that matters is among the Xbox and the PlayStation.

1          **THE COURT:**  So that, I agree.  We haven't seen it.

2  And I'm -- I'm confident what you say as to the law, but can

3  you give me a case in which the law has said that in facts

4  similar to this?  In other words, I think we're in a very

5  unique industry here and situation, and that's why maybe the

6  law hasn't addressed it.

7          **MR. WEINGARTEN:**  Respectfully, I agree we're in a

8  unique situation; but, on the other hand, I'm fairly confident

9  this is not the first time that there's been a series of

10 products and then there's sort of an ultra-luxury version that

11 someone has claimed competes and, therefore, should be in the

12 market, and I will find you --

13         **THE COURT:**  An ultra-luxury version that most people

14 already -- most people that play the game or do whatever

15 already own so they don't have to purchase it.

16         **MR. WEINGARTEN:**  Right.  I am told, Your Honor, that I

17 should mention the *Whole Foods* case.

18         **THE COURT:**  Okay.

19         **MR. WEINGARTEN:**  So that is D.C. Circuit 2008.

20         **THE COURT:**  The whole paycheck.

21         **MR. WEINGARTEN:**  I'll get you -- can we get an F.2nd

22 cite on there?

23      The *Whole Foods* case, Your Honor.  It's in our reply in

24 support of the preliminary injunction motion.

25         **THE COURT:**  Okay.  I can look there.

1          MS. WILKINSON:  Your Honor, may I dress that when

2     you're ready?

3          THE COURT:  Of course.

4          MS. WILKINSON:  First of all, the reason you're asking

5     your question is because you're right, we're not a horizontal

6     merger case.  That's what that test is designed for.

7          Think of it, if you had all of these consoles in the same

8     market and Sony and Nintendo were merging.  You want to see is

9     it going to get more concentrated or less and you're going to

10    see if they actually are competitors to see if they would

11    substitute.

12         Here, because it's a vertical merger, you're looking to

13    see where would they play the game if they lose the game.  Not

14    the console.  The game.  So it is relevant to what you're

15    asking is:  Would they go play it somewhere else and can they

16    get access to it elsewhere?

17         So they're trying to use a horizontal merger test to have

18    you calculate something in a vertical merger.  If you look at

19    the cases, you'll see that they will mention that test and say

20    "But that's not really applicable in a vertical merger test,"

21    because that's not the question being asked.

22         THE COURT:  We don't even have very many vertical

23    merger cases.

24         MS. WILKINSON:  Right.

25         THE COURT:  All right.  Okay.  I'll go back and look

CLOSING ARGUMENTS

 1  at that case.

 2       MR. WEINGARTEN:  We'll just respectfully say if

 3  Your Honor looks to our conclusions of law, I feel very

 4  confident that there is no categorical distinction in the law

 5  of the kind that counsel is drawing; that this test is only

 6  applicable in a horizontal context.

 7       THE COURT:  The test actually, though, for product

 8  markets, I do think there's case law that says it's sort of

 9  very fact specific, detailed and there is no one test

10  necessarily of that.

11       MR. WEINGARTEN:  Correct, but I just want to put a pin

12  in counsel's assertion that the HMT is not applicable in a

13  vertical merger.  That is not the law as we understand it --

14       THE COURT:  Okay.

15       MR. WEINGARTEN:  -- and I direct Your Honor

16  respectfully to our conclusions.

17       THE COURT:  Let me, then, ask you about Nintendo, and

18  I'm trying to figure out why Xbox offered that Xbox S at that

19  price point --

20       MR. WEINGARTEN:  So --

21       THE COURT:  -- but for the Switch.

22       MR. WEINGARTEN:  So, Your Honor, that's what I was

23  driving at, respectfully, with my questions to Mr. Stuart this

24  morning.

25       This one is 299, the X -- or S, the Switch is 299, and I

**CLOSING ARGUMENTS**

 1   think Your Honor asked a question:  Seems like they're aimed at

 2   each other.

 3       Now the questions and the testimony, in particular from

 4   Mr. Stuart, demonstrated that at launch and even two years

 5   later the price benchmark for the S was other Generation 9

 6   consoles, and the strategy was:  Let's get people into the

 7   Gen 9 console market in an entry-point level.  Not let's steal

 8   share from Switch.

 9       No documents about that and nothing from the defense on

10   cross of Mr. Stuart.  They asked him about it, but no

11   documentary evidence; whereas --

12           **THE COURT:**  Why are those two things inconsistent?

13           **MR. WEINGARTEN:**  It doesn't necessarily have to be

14   inconsistent, Your Honor, but the strategy for the S in terms

15   of pricing was about getting an entry-level Gen 9 console.

16           **THE COURT:**  That's because when they go to Best Buy

17   and it's on the shelf --

18           **MR. WEINGARTEN:**  Right.

19           **THE COURT:**  -- and we have got the PlayStation, the X,

20   the S, and the Nintendo Switch, probably -- I don't know, we

21   didn't hear any testimony about where it would be in

22   Best Buy -- and I'm looking at the Switch, but, look, I can get

23   this entry into the Gen 9; right?

24           **MR. WEINGARTEN:**  Yeah, I hear you on that one,

25   Your Honor.

 1          **THE COURT:**  Yeah.

 2          **MR. WEINGARTEN:**  Again, it's noteworthy that when they

 3    were pricing it, in their own documents you didn't see that.

 4    So in November of 2020 when Microsoft is pricing it, I believe

 5    the only evidence in the case on this is the evidence that we

 6    put in this morning, that they didn't say "Let's triangulate

 7    along the Switch."  They said, "How do we get people into our

 8    Gen 9 console world?  And we'll do that with this entry-level

 9    price point."

10          Like even if, Your Honor, there is some substitution

11    between the Switch at 299 and the S on the margins, we don't

12    think that's enough to defeat the market we've put forward

13    because of both the HMT, which we talked about, and all the

14    qualitative evidence about the competition and the Gen 9

15    console world X Switch.

16          And even if Your Honor was compelled to think, well,

17    because of that pricing, all of these are in a market, we're

18    still okay because --

19          **THE COURT:**  I understand that argument.  Okay.

20          Did you want to respond on the Nintendo?

21          **MS. WILKINSON:**  I mean, Your Honor has it.  People do

22    go into the store and they make one choice, and it is a

23    competitor.  They have -- obviously Nintendo has some different

24    features, as you heard Mr. Kotick admit that he didn't quite

25    see as benefits, but the price is one of the most important

1    things that consumers look at so it doesn't --

2            **THE COURT:**  One thing.

3            **MS. WILKINSON:**  One thing, but it is, as you say,

4    important to say, "Oh, I could get this newer console for 299."

5    And the fact that they're also priced off of the other devices

6    doesn't mean they're not a competitor for Nintendo.  Both can

7    be true.

8            **MR. WEINGARTEN:**  If I might add, one of the tricky

9    things, and I think it's something that Defense Counsel is

10   seizing upon here, is that competition is a pretty amorphous

11   concept.  Lots of things compete and the function of the test

12   that the Courts of Appeals and the District Courts have derived

13   is to try and get down to what competition matters.

14       So in some sense, lots of things are competing all the

15   time in this space.  You can play video games on your phone.

16   You can play a video game on the console.  You can play -- what

17   matters is:  Where is the locus of competition that the effects

18   of this deal will be felt?

19       That's why we do all these tests and look at *Brown Shoe*

20   factors, to try and figure out.  So it is not sufficient to say

21   in a lay term or in a sort of casual term, there's competition,

22   people can walk into a store and see it.  We're trying to get

23   to something a little bit more precise -- understanding that

24   these are complex questions and neither the economics nor the

25   law is clear -- trying to get to something so we can understand

1   the effects of this transaction.

2       So I would just -- the casual idea that someone can walk

3   around and pick up one or the other, we can do better than

4   that, and the evidence that we've brought forward is better

5   than that, both on the HMT and all of the qualitative evidence

6   from pretty much from every witness in the case, that the

7   Switch is not the same as the Gen 9 consoles.

8       **THE COURT:**  It is not the same.  In many ways it's

9   better; right?  Because you can actually still hook it up to

10  your TV and take it on the airplane.

11      **MR. WEINGARTEN:**  So that's another point.  It's a 299

12  price point, and I think Your Honor got at this.  Nobody is

13  going to confuse paying 299 for a box that has no screen with

14  paying 299 for the portable screen.

15      So to say that they're competitors because of the price,

16  they don't do the same thing.  That's -- the price is one

17  dimension of their competition; but among critical other

18  dimensions, including Mr. Spencer's testimony that they are

19  radically different form factors, the price is one piece.  But

20  I would hate to say because they have a similar price, the box

21  that needs a TV is going to be someone's choice when they go to

22  the store and they have a portable device.

23      **THE COURT:**  Well, which also can use a TV and play the

24  same games, many of the same games.

25      **MR. WEINGARTEN:**  I would direct -- respectfully on

1   that point, I would direct Your Honor to the charts.  There's

2   bar charts in Dr. Lee's report.  The content is quite

3   dissimilar between the Switch and the others.

4       Nintendo's whole strategy is about having Mario and Zelda

5   and the Family Friendly.  Are there overlaps?  Of course, but

6   very different content and consumer profile.

7       And I'll just -- not to belabor it, probably too late,

8   rather than taking our word for it, the best people who would

9   know what consumers think about and are looking to buy are

10  probably the folks at Microsoft who were setting the price when

11  the thing launched, and they didn't look at the Switch.  So

12  that's, in our view, extremely probative.

13      **THE COURT:**  What do you say to that, that there isn't

14  any evidence with respect to the S and the Switch pricing?

15      **MS. WILKINSON:**  That is both, Your Honor, that they --

16  it can do -- or you can look at it either way.  They both can

17  do the same thing, and there's a lot of overlapping games,

18  which I'm talking about -- I mean, which are on this chart I

19  want to refer you to; and as you point out, the Nintendo can do

20  more because you can take it with you.  But there are also

21  pricing offputs in the market to look like it's an alternative

22  to these more expensive devices.  So it's doing both.

23      **THE COURT:**  Well, no, I understand that argument.

24  What Mr. Weingarten is saying is that there isn't any evidence

25  to support that argument.

 1          **MS. WILKINSON:**  I don't think -- I don't think the

 2   fact that they are pricing it off of this and they're not

 3   saying there's actually a price comparison to these.  You heard

 4   that testimony.  When you look at the documents from the

 5   internal documents, it's not true that they don't compare

 6   those.  They do compare them.

 7          **THE COURT:**  Well, good.  You can point those out in

 8   your --

 9          **MS. WILKINSON:**  And most importantly I think,

10   Your Honor, on Dr. Bailey's charts on paragraph 88, which come

11   from her report at 71 and 72, it shows all the similar games

12   available on Xbox and Nintendo, and Counsel's just wrong.  The

13   most popular games are on both.

14      You heard many people, including Mr. Kotick, say the

15   free-to-play games are the most popular games:  Fortnite, then

16   one of the popular games that's pay-to-play is FIFA, Minecraft,

17   Apex Legends, NBA 2K22, Rocket League, Overwatch 2.  You can go

18   down this list and you can see that there are -- these are on

19   both devices.

20      So your point that, you know, can people play most of

21   these games, they can.  Do they also have another set of

22   choices on Nintendo?  Of course they do just like they do on

23   PlayStation.

24          **THE COURT:**  I think there was evidence that -- I won't

25   say the numbers, I don't know -- from Dr. Lee, though, that a

 1 | lot of Nintendos were exclusive to Nintendo.

 2 |      **MS. WILKINSON:**  Like PlayStation.  Like PlayStation.

 3 | They have many more -- both products have many more exclusives

 4 | than the Xbox.

 5 |      **THE COURT:**  But they weren't similar to PlayStation.

 6 |      **MR. WEINGARTEN:**  Yes.  I mean, it has clearly been a

 7 | part -- I don't know if there's evidence on this in this

 8 | case -- but a part of the Nintendo strategy that you go for

 9 | Zelda and Mario, there's only one place to find Zelda and

10 | Mario.  The Nintendo.

11 |     I just want to add, Your Honor, if we're talking about

12 | locus of competition and what matters, even if you look at

13 | Dr. Bailey's demonstrative, for the purposes of this case

14 | there's no dispute that Call of Duty, Modern Warfare 2, and

15 | even the Sony God of War Ragnarök, the games that are driving

16 | the competition that we care about because of the merger and

17 | why we're here, those don't get played on Switch.  That just

18 | can't be, and that was pretty indisputable testimony as well.

19 |      **MS. WILKINSON:**  If he's referring to Call of Duty,

20 | Your Honor, we know that it was on the Nintendo devices

21 | previously.

22 |      **MR. WEINGARTEN:**  Many moons ago and many generations

23 | of all Call of Duty ago.

24 |      **THE COURT:**  Okay.  All right.

25 |      **MS. WILKINSON:**  Your Honor, can I clarify one issue

 1    that Counsel raised with you?

 2          **THE COURT:**  Yes.

 3          **MS. WILKINSON:**  When you were asking about ZeniMax and

 4    asked him to find a game that was most similar to Xbox, he

 5    mentioned Elder Scrolls.  That is incorrect.  There are two

 6    Elder Scrolls games.  One is online.  It's called Elder Scrolls

 7    online.  That is a multiplayer game.  It is on PlayStation

 8    today.  Microsoft has published new add-ons and separate games.

 9    That is available.

10          The game he's talking about, Elder Scrolls 16 that's

11    coming out right now that, you know, projected release is 2026,

12    that's a single-player game.  So it is not anywhere similar to

13    Call of Duty, which, as you know, is multiplayer and

14    multiplatform.  So the one version of Elder Scrolls that is

15    similar is on PlayStation and always has been, at least for

16    these recent games.

17          **MR. WEINGARTEN:**  There, I just want to -- I think this

18    is going to be a major point, it has been throughout the

19    briefing, which games are like Call of Duty, which games are

20    not like Call of Duty, and the briefing I thought joined the

21    issue quite well.

22          There are only a handful of titles in the history of the

23    gaming, as far as I understand it, that are multiplayer, cross

24    play, existing, and this might be the only one that's been the

25    subject of an acquisition in the last 20 years.

 1          So what we can show you is incentives and what the

 2     incentives look like, and what we can show you is all the

 3     evidence we brought about what Microsoft as a platform owner

 4     will do, but the game -- the case, respectfully, is not going

 5     to be decided on comparing multiplayer/non-multiplayer.  The

 6     case is going to be decided on understanding the economic

 7     incentives.

 8          **THE COURT:**  Well, but we don't know have -- there's

 9     economic incentives.  Those economic incentives include your

10     brand; right?

11          **MR. WEINGARTEN:**  Yes.

12          **THE COURT:**  And if I recall when I asked Dr. Lee as to

13     whether his foreclosure model took into account the potential,

14     I think we all -- reputational harm; right?  You've talked

15     about how -- and you point to Mr. Ryan and the loyalty of this

16     Call of Duty gamers, if their platform, preferred platform, is

17     taken away from them, there's going to be harm.

18          Like, we have whole trademark cases that are just about

19     reputational harm.  So how does that factor in there into your

20     argument that Microsoft will, nonetheless, take it or is likely

21     to I should -- or has the incentive to take it exclusive?

22          **MR. WEINGARTEN:**  So three things on that, Your Honor.

23     One is, it's a limitation of the model that you can't quantify

24     that kind of brand harm, and I think Dr. Lee also testified

25     that there are unquantifiable benefits as well.  So the model

**CLOSING ARGUMENTS**

 1   misses some costs that are hard to quantify and misses some

 2   benefits that are hard to quantify.

 3        Number two, we saw what Microsoft faced with reputational

 4   harm in the ZeniMax case, and the Court heard Mr. Hines'

 5   apologies.

 6        **THE COURT:**  No.  I'm sorry, you just told me you can't

 7   think of another multiplayer, multiplatform game --

 8        **MR. WEINGARTEN:**  Right.

 9        **THE COURT:**  -- that was acquired, so actually we just

10   don't have anything to compare to.

11        **MR. WEINGARTEN:**  So then I'll go to number three,

12   which is:  Would there be incredibly damaging reputational harm

13   if the game were yanked from PlayStation; right?

14        So two thoughts on that.  One is, harm to whom?  If people

15   really want to play the game, they will still go to Xbox to

16   play it.  They might grumble and be mad; but, you know, it's --

17   no one has proposed a theory that they'll just throw down their

18   controllers and stop playing altogether.

19        **THE COURT:**  You don't think a boycott is possible?

20        **MR. WEINGARTEN:**  I don't know.

21        **THE COURT:**  You certainly see now I'm going way beyond

22   the evidence, but we certainly see consumers doing that; right?

23        **MR. WEINGARTEN:**  I don't -- I don't know and it's

24   beyond the evidence.

25        But, more realistically, that's some sort of full

 1    foreclosure world that the Defense keeps wanting to paint us

 2    into.  But what about a world where Microsoft offers the best

 3    new Christmas character to play on Christmas in Call of Duty

 4    but it's only on Xbox?  Or --

 5           THE COURT:  Okay.  And where is the analysis that I

 6    can say that that financial incentive enough would be -- would

 7    be enough to make them do that; right?  That's just not there.

 8        And what players?  Like, who?  Like, what percentage of

 9    the players that are out there would actually buy the Xbox so

10    they can get this Christmas character; right?

11           MR. WEINGARTEN:  Right.  So a couple of thoughts

12    there, Your Honor, respectfully.

13        One is, my least favorite answer in this venue is that's

14    part of what part three administrative proceeding may be

15    forced, that we have a chance to figure this out because it is

16    super-complicated.

17        My next better answer, given the venue we're in, is:  It's

18    impossible and not really -- I don't think we could model

19    partial foreclosure because the methods of competition are so

20    myriad.  It's infinite, as I think what we heard from

21    Mr. Kotick and from Sony, the co-promotion, the co-marketing,

22    there are infinite ways to make your content or your platform

23    seem valuable by investing in unique content.

24        But I respectfully don't think the answer can be to say:

25    Well, we'll throw up our hands and we can't figure it out.  I

1  think the answer is:  Given all this behavior that we see in

2  the marketplace with competition for co-promotes and

3  co-marketing and Christmas players and all these things, will

4  Microsoft have an incentive to change the rules of the game or

5  slant those agreements or slant the promotions that matter

6  towards itself?

7       And all one has to believe to believe that is that they

8  are a profit-maximizing company; and if that's true, then have

9  we demonstrated a probability, we don't have to demonstrate a

10 certainty, but a probability that there's going to be a

11 lessening of competition?

12      That's -- that's the best answer I can give you because

13 there is no way to model, in a purely quantitative form, all

14 the myriad methods of competition and, on the flip side of

15 that, harm to competition.

16           **THE COURT:**  Okay.  And we're talking about Call of

17 Duty.

18           **MR. WEINGARTEN:**  We are, Your Honor.

19           **THE COURT:**  Right?  We're talking about -- I mean,

20 it's -- okay.  We'll get to that *Illumina* case, which is so

21 different in so many ways.  We're talking about a video game, a

22 shooter.  I think we saw an exhibit where it was the genre is a

23 shooter video game; that all this is for a shooter video game,

24 that we're concerned about the competition for this one shooter

25 video game.

1    **MR. WEINGARTEN:** I will -- in all candor, I completely

2    understand where Your Honor is coming from.  On the other hand,

3    our responsibility over on this side of the room -- and the

4    Government is not to make a value judgment about the market,

5    it's to protect competition in the market and --

6              **THE COURT:** How big is the market?  I guess --

7              **MR. WEINGARTEN:** Billions, billions of dollars.

8              **THE COURT:** Of the game.  But of the people that care

9    so much that they would actually switch, buy an Xbox that they

10   wouldn't otherwise buy.

11             **MR. WEINGARTEN:** So we're back to -- I don't want to

12   go back to --

13             **THE COURT:** That's okay.  I understand.  I understand

14   what you're saying.

15             **MR. WEINGARTEN:** -- but --

16             **THE COURT:** I appreciate your candor.  I do.

17             **MR. WEINGARTEN:** -- it's not about just switching.

18   The harm to the PlayStation person -- right? -- who has Call of

19   Duty and they wake up after this deal closes and there's some

20   new character that's only on Xbox, it's not:  Is that person

21   going to switch?  It's:  Has that person's experience, has the

22   value that they paid for been degraded in some way?  They paid

23   499 for a PlayStation.  Now because of this loss of ability to

24   have this cool thing, is it worth 488.50?

25             **THE COURT:** What do you say, though, to Mr. Ryan --

```
 1              MR. WEINGARTEN:  Yes.

 2          THE COURT:  -- who said that -- what is it? -- Star

 3   whatever --

 4          MS. WILKINSON:  Starfield.

 5          THE COURT:  -- that there was nothing anticompetitive

 6   about Microsoft making that exclusive?  Under what you just

 7   said to me, that is anticompetitive.

 8          MR. WEINGARTEN:  So there's a distinction between

 9   making an investment and figuring out how to make that

10   investment and helping a game develop and not, but I don't know

11   the basis for why Mr. Ryan was less upset about that one than

12   Call of Duty because --

13          THE COURT:  Because he does the same thing.

14          MR. WEINGARTEN:  They do.  They do.

15                        (Laughter)

16          MR. WEINGARTEN:  And it is part of the -- Mr. Nadella

17   came, and Mr. Nadella said that's how the market is here;

18   right?  It's all about exclusives.  Everybody's doing it.

19   Microsoft may be more made because, despite $70 billion, they

20   claim they don't have enough money to sort of compete with Sony

21   on these exclusives.

22       That's the market.  It has benefits for players.  I assume

23   if you're a video game player, ultimately if everybody's in a

24   kind of arms race with each other to get the content and make

25   it neat for their platform or their console, gamers benefit
```

 1  because now there's more neat things to play.

 2      The concern here is, if you take away that competition and

 3  now instead of people competing for the neat things to play, if

 4  you want at least some of these neat things, you got to go to

 5  the Xbox.

 6          THE COURT:  Okay.  So then I think -- did you want to

 7  say something?

 8          MS. WILKINSON:  No.

 9          THE COURT:  I think, then, that brings us right smack

10  into the agreements then or at least the Nintendo and the offer

11  to Sony; right?

12          MR. WEINGARTEN:  Yes, although I got a note, if I may.

13  I apologize.

14          THE COURT:  Of course.

15          MR. WEINGARTEN:  I am reminded a good real-world

16  example, more extreme than my example of all the myriad

17  competition, Stadia.  Google is a very large and successful

18  technology company.  Mr. Zimring came.  He testified they spent

19  a lot of money.  They thought they got it right.  They just

20  didn't have the content; and so because they didn't have the

21  content, that service died.

22      And then a consumer is deprived of that choice.  That will

23  never be a choice for a consumer now to say "I want to play

24  video game X on Stadia."  And that is another kind of concern

25  or harm that can happen.  It's about innovation even the future

1  products we haven't even thought about yet.

2      I just want to make sure I got that in.  Thank you.

3          **MS. WILKINSON:**  Can I address that, Your Honor?

4          **THE COURT:**  Okay.

5          **MS. WILKINSON:**  That was before this transaction and

6  Activision decided not to put its content on Stadia or allow

7  it.  So now that, even when Activision is independent and they

8  make a decision not to put their content on certain platforms,

9  that's an answer to --

10         **THE COURT:**  No, no, he's making a different point,

11 which is what he's saying is the concern -- the concern here is

12 that there will be less incentive for innovation.  That's what

13 he's saying.

14         **MR. WEINGARTEN:**  I'm not suggesting that there was --

15 I'm not suggesting that there was a violation.  I'm just

16 suggesting it's an example of how content and making sure that

17 content is available across platforms is important and gives

18 choice.

19         **MS. WILKINSON:**  I don't think anyone feels sorry for

20 Google because they decided not to put more money into Stadia.

21 That's their decision.

22         **THE COURT:**  No, yeah, that's not what he's saying.

23 He's talking about the --

24         **MS. WILKINSON:**  That doesn't mean there's lots of

25 incentives for people to develop content.  And you heard about

1   Game Pass, which is another incentive to --

2          **THE COURT:**  We'll get there.  I want to -- like, I'm

3   trying to divide it into two actually, the two markets.  And

4   now we're on the console market and then we'll get to the --

5   because they've been joined together by the FTC -- the cloud

6   and the subscription market.

7          But with respect to the console market, we have proposed

8   agreements; right?  We have --

9              **MR. WEINGARTEN:**  We have Nintendo.

10         **THE COURT:**  And a proposed agreement to Sony.

11             **MR. WEINGARTEN:**  That's right.

12         **THE COURT:**  And those were not evaluated by Dr. Lee.

13             **MR. WEINGARTEN:**  No.  No, and quite properly, in fact,

14   I think.  And you saw what happened when Dr. Carlton tried to

15   attempt to evaluate them; right?  We saw that it ran quickly

16   into some sort of legal analysis and his --

17         **THE COURT:**  No.  I guess more I'm saying I'm thinking

18   about the *AT&T* case --

19             **MR. WEINGARTEN:**  Okay.

20         **THE COURT:**  -- from the D.C. Circuit --

21             **MR. WEINGARTEN:**  Yeah.

22         **THE COURT:**  -- in which that's the closest thing I

23   think we have to a Court of Appeals case addressing the impact

24   of proposed agreements to address concerns raised by

25   regulators.

**CLOSING ARGUMENTS**

 1    And there I actually do think it was Dr. Carlton who was

 2   in that case, another -- anyway, the district court discounted

 3   the FTC's expert's opinion because the expert did not take into

 4   account the agreement.

 5         **MR. WEINGARTEN:**  Right.  There's a myriad of ways that

 6   this agreement does not save this deal.  One --

 7         **THE COURT:**  Okay.  But so can we just, from a legal

 8   point of view, because your brief in support of preliminary

 9   injunction I think was a little broad and that it claimed they

10   essentially couldn't be considered or relevant, and I'm not

11   prepared to go there based on the law; but if you want to try

12   to persuade me, that's fine.

13         **MR. WEINGARTEN:**  Well, I may try with your patience,

14   Your Honor.

15    So a couple of things.  One, who bears the burden of

16   persuasion and production as to these agreements?  Clearly the

17   Defendants have to.  I can't come forward and poke holes in

18   things that I didn't create.  It's up to them to explain why

19   these deals should save the bigger deal.  Okay?

20    At this phase in a 13(b) proceeding we're really only

21   evaluating the Government's prima facie case, and so that's the

22   basis for us saying that's irrelevant then.  We're here to see

23   if we raise substantial questions.  We don't even get to these

24   other kinds of issues about remedies.  That's one answer.

25         **THE COURT:**  Well, so, I read the *Illumina* case, and

1    there the Commission relied on a Supreme Court case to call

2    what *Illumina* was proposing a proposed remedy, but that Supreme

3    Court case was a case that was a remedy case after a finding of

4    a Section 7 violation.

5        So it actually didn't answer the question of when you're

6    trying to decide even a 13(b), whether there's a likelihood of

7    showing substantial competitive harm where the agreement goes.

8        But I understand that the Commission decided not that you

9    couldn't consider it -- although that was not a preliminary

10   injunction, that was a permanent injunction case -- but that it

11   didn't factor into the prima facie case and that the Defendant

12   would have the burden.  Is that your position, that it --

13           **MR. WEINGARTEN:**  Yes.

14           **THE COURT:**  -- can be considered but the Defendant

15   raises it after you meet your burden?

16           **MR. WEINGARTEN:**  Yeah.  It is in the nature of the

17   evidence, like many other civil case context, that it has to be

18   the Defendants' burden of production and persuasion and,

19   therefore, it shouldn't be part of our prima facie case.  We

20   come with our burden and they come with theirs.

21       And then when you overlay the 13(b), why we're all here

22   and the special standards that apply, that's when that part,

23   the Defendants' burden should, frankly, drop away because we're

24   not here to make that decision.

25       I will also add, to the extent that the Defendants have

 1  brought these agreements forward, and Your Honor is inclined to

 2  consider them, we have heard zero evidence that they remedy

 3  these deals, they remedy the bigger picture here.

 4      We heard from Ms. Bond that she negotiated and signed one.

 5  We heard from the Defendants that a person at Microsoft named

 6  Lori Wright signed another or two.  She never came.  We heard

 7  that these deals will be important and will matter.

 8      We never heard any analysis of the competitive effects of

 9  these deals.  We never heard anyone from a third party with

10  whom they signed these deals come and say this deal is

11  magnificent and here's --

12      THE COURT:  Well, Nvidia, Mr. Eisler said that he was

13  satisfied with it.

14      MR. WEINGARTEN:  He was satisfied.  He was also

15  satisfied with the side agreement to the side agreement that

16  they got.

17      THE COURT:  Well, he was because he actually said it

18  would reduce his costs.

19      MR. WEINGARTEN:  Yes.

20      THE COURT:  Won't that enable them to better compete

21  with Microsoft's xCloud?

22      MR. WEINGARTEN:  It might indeed, and --

23      THE COURT:  That's pro-competitive; right?

24      MR. WEINGARTEN:  Well, one wonders why that second

25  deal was added to the pot.  And we heard about a series of

 1   concerns of Nvidia about signing the deal, but they signed it

 2   nonetheless.

 3        And there is a deal for Windows servers, I won't get into

 4   it, but there is testimony about the role of that deal in sort

 5   of sweetening the pot there.

 6        **THE COURT:**  It definitely sweetened the pot.  I think

 7   there's an inference to be drawn without it, it wouldn't have

 8   happened; right?

 9             **MR. WEINGARTEN:**  Right.

10        **THE COURT:**  Sure.

11        **MR. WEINGARTEN:**  We have not heard sufficient evidence

12   about whether -- I'll take that.  Thanks.

13        **THE COURT:**  Let me turn first to Ms. Wilkinson.

14        Do you agree or accept there is some logic to it that the

15   agreements don't go into the prima facie case but they go

16   into -- I know, Mr. Sunshine.  You haven't spoken this entire

17   hearing.

18             **MS. WILKINSON:**  They can both speak, Your Honor.  I

19   will step aside so they can both speak, but I would like

20   Mr. Kilaru --

21        **THE COURT:**  Okay.  It's a legal question, sure.

22        **MR. KILARU:**  Your Honor, we don't agree with that,

23   that it just goes into the prima facie -- that it's not part of

24   the prima facie case.

25        I think in addition to *AT&T*, there's two very recent

 1   decisions that speak to this.  So the first -- and we'll make

 2   sure these are in the conclusions of law -- but one of them is

 3   the *FTC vs.* -- and I'm not going to be able to pronounce this,

 4   but I think it's *RAG*, R-A-G, *Stiftung* case where divesture was

 5   considered as part of the FTC's prima facie case.

 6           **THE COURT:**  Well, where divesture was offered by the

 7   Defendant?

 8           **MR. KILARU:**  Yes.

 9           **THE COURT:**  I see.

10           **MR. KILARU:**  And then there's also the very recent

11   *United Health Group* case, which was both a horizontal and a

12   vertical case, that there were structural guarantees,

13   firewalls, consumer contracts, that kind of thing, that the

14   Defendants offered up.  And the Court considered those in terms

15   of deciding whether the transaction was anticompetitive on I

16   think the very logical theory that you shouldn't evaluate

17   competitive effects in a world that will never exist.

18           **THE COURT:**  They considered them in the first step on

19   the prime fascia case?

20           **MR. KILARU:**  Yes.

21           **THE COURT:**  The AL -- were those Commission cases or

22   ALJ cases?

23           **MR. KILARU:**  The first was a Commission case.  The

24   second was a DOJ case.

25           **THE COURT:**  Do you want to -- are you familiar with

 1    those, Mr. Weingarten?

 2             MR. WEINGARTEN:  I'm familiar with *RAG-Stiftung*?  I

 3    litigated it.

 4             THE COURT:  Oh.

 5             MR. WEINGARTEN:  So in that case, it's a bit

 6    different.  This was a fully proposed divestiture.  This is two

 7    chemical companies that want to merge, and they said:  We can

 8    solve the FTC's concern by selling one of our factories.  Fully

 9    vetted.  Fully discussed.  We rejected the idea, and we

10    litigated on a full record of analysis and evidence about

11    whether it would solve the problem.

12        That is not the situation that is in front of, Your Honor,

13    with --

14             THE COURT:  Well, so that's different, though, than

15    the legal question.  That's sort of saying:  Okay.  Fine.  You

16    can put it in your prime fascia case, but the evidence isn't

17    sufficient to defeat us making our prima facie case.  That's

18    separate from saying it can't be considered.

19             MR. WEINGARTEN:  And I don't want to concede.  I want

20    to go back and check on whether that was not in the prima facie

21    case.

22             THE COURT:  You'll have your chance.

23             MR. WEINGARTEN:  Thank you.

24             THE COURT:  Did you want to say something,

25    Mr. Sunshine?

1    **MR. SUNSHINE:**  Thank you.  It's great, five days in

2    and finally I'm up here.

3        No, I agree with Mr. Kilaru of course, but I would add two

4    cases to Your Honor's consideration.  One is the *Arch Coal* case

5    and the other is the *Libby* case.  Both deal directly with this

6    question, Your Honor, about how the modifications to a

7    transaction affect the ability of how a Court should analyze

8    it.

9        And basically what both those courts say, that if there is

10   a deal that's already present that has modified the world going

11   forward, that's the job of the -- of the Government to prove

12   that in that world, competition will be lessened.  It's not --

13   you know, I know the FTC would like the standard to be that

14   there's a burden on remedy, but that's not what the law is.

15       And here, what I think is even better than in the *AT&T*

16   *Time Warner* case, which were just agreements that we would

17   arbitrate, here we have a signed agreement with Nintendo and we

18   have, you know, the offer of an agreement, which precisely

19   solves the harm that's alleged by the FTC.  It's access to Call

20   of Duty after 2025.

21       And these contracts deal precisely with that question, and

22   so the job, I think, for the FTC is to try to prove to

23   Your Honor that in that modified world that's going to go

24   forward in the but-for transaction, that they can satisfy their

25   burden.

1          MR. WEINGARTEN:  I want to make a very critical

2    factual distinction on those cases, Judge.

3          THE COURT:  Yes.

4          MR. WEINGARTEN:  As I mentioned with *RAG-Stiftung*, and

5    as I want to raise with respect to *Arch Coal* and the others,

6    there is a very big difference between a remedy that is a full

7    divesture selling a factory, selling -- if they want to sell

8    Activision and keep King, they can put that on the table in a

9    proper proceeding, but a full divesture and what we call a

10   behavioral remedy; that is, a contractual agreement of some

11   kind that is designed to address that harm.

12        And I will say I don't -- the burden in the circumstance

13   of a full divesture is probably, for all practical purposes, in

14   the wash a little bit because the factory is either sold or

15   it's not and you analyze it.

16        Here, we have incredibly complex agreements.  Defendants

17   entered them into evidence.  They have complicated provisions.

18   Some are proposals.  Some are agreed.  We have testimony,

19   including from Nintendo, that they don't even really understand

20   the meaning of some of these provisions.

21        We have testimony from Nvidia that there are provisions in

22   there that make them nervous, including 7.4 in the Nvidia

23   agreement.

24        And the burden cannot be on the government to do a

25   complete legal analysis, offer up a legal expert, which would

 1   tread on the Court's province anyway, to complain why these are

 2   not guarantees.

 3        Now, that seems to me a burden that's properly on the

 4   Defense to show why they are, in Dr. Carlton's word, a, quote,

 5   "guarantee."  They have not done that.  The evidence is just

 6   not in the record at all.

 7             **MR. SUNSHINE:**  Your Honor, where I part from my

 8   colleague from the FTC, in the talk about a complete

 9   divestiture, if this was a horizontal deal where we were

10   worried about direct competition between two products, I

11   understand the argument about a divestiture.

12        This is a vertical case where the harm that's alleged is

13   denial of access to Call of Duty, and so the remedy that's

14   being proposed, granted there are kind of factual questions

15   that you could argue about some of these terms, but at core,

16   it's a question about access to Call of Duty and that

17   completely solves the problems in this market as alleged by the

18   FTC.

19             **MR. WEINGARTEN:**  I'm just going to take issue once

20   more with the words "completely solves," "guarantee."  We saw

21   what happened.  Dr. Carlton came and said "guarantee" and could

22   not --

23             **THE COURT:**  Dr. -- I agreed with the cross was very

24   good.  It's stricken.  It has no -- no evidentiary value in

25   terms of whether it's guaranteed.  I agree, the agreements are

**CLOSING ARGUMENTS**

1  there and we have the testimony from the third parties and from

2  Microsoft.

3          **MR. WEINGARTEN:**  And I think that, Your Honor, it is

4  not appropriate, I don't mean that in any sort of bad way, but

5  for the Defense to foist the agreements on the Court and say:

6  Here are these very complicated agreements.  Take our word for

7  it, they're guarantees.  And you at one point, Your Honor,

8  said:  That's really a question for me about a legal issue of

9  the agreements.

10          But this case does not require and should not require

11  Your Honor to parse all the agreements, figure out what the

12  loopholes are, figure out if they're still worth doing.  That,

13  with respect, should have come in the form of a full-remedy

14  proposal to the Commission and could have been evaluated and

15  worked on, et cetera.

16          **THE COURT:**  Well, that's a different matter.  If you

17  guys want to sit down and do that, more power to you.

18          **MR. WEINGARTEN:**  I also want to add the issue here is

19  not just about Call of Duty comes to Nintendo or, you know,

20  we've reached agreements.  It's about the quality of the

21  access.  I think we've made that point in spades with the

22  Nintendo agreement.

23          **THE COURT:**  Well, okay.

24          **MS. WILKINSON:**  Can I address the partial foreclosure,

25  which I think is what he's talking about?

```
 1            THE COURT:  Yes.

 2            MS. WILKINSON:  And, first, I think it's very

 3    inappropriate to suggest that if you -- this went back to part

 4    three, they could develop the case more.  Discovery is closed

 5    and Counsel knows that.  We developed this whole case so we

 6    could be lucky enough to get here, Your Honor, in front of you

 7    and have a federal court decide this; and one of the agreements

 8    we had with the FTC --

 9            THE COURT:  I know you actually didn't want to be in

10    front of me.

11            MS. WILKINSON:  No, that's not true, Your Honor.  We

12    wanted to be.

13            THE COURT:  I saw those e-mails.

14                           (Laughter)

15            MS. WILKINSON:  I think we wrote them very self -- you

16    know --

17            THE COURT:  It's okay.

18            MS. WILKINSON:  -- we thought you would read them.  We

19    said she's fantastic.

20            THE COURT:  It's quite all right.

21            MS. WILKINSON:  We wanted a quick hearing and you gave

22    it to us.

23        But it is really unfair for the FTC, who had an agreement

24    with us and knows that there will be no more discovery, there

25    will be no more analysis if we have to go in front of
```

**CLOSING ARGUMENTS**

1   Judge Chapel.

2        But the real question is, they do have the burden of doing

3   a partial foreclosure analysis if that's their claim and it's

4   an easy but wrong answer to see they can't do it.  There are

5   examples out there.  They could have looked at what happened

6   when we took Ghost Loop exclusive.  They could have -- or they

7   think they got a lesser game.

8        Final Fantasy 6, we just lost part of that game because

9   this year it didn't go on Xbox.  It did last year.  They could

10  look at Minecraft, as they pointed out, where we didn't have an

11  update for the PlayStation 5.

12       So there are many ways.  I'm not, as everyone has been

13  saying, an economist but that is their job to figure that out

14  and to say:  You want to stop a $69 billion transaction, but

15  you can't figure out what the harm will be?

16       I think that answers the question.  I mean, if they can't

17  figure out what the harm is, what they're turning to you or to

18  us to say, "You should figure it out.  It's too hard"?

19       I mean, no witness said there was going to be partial

20  foreclosure.  No one said that.  No one had any examples of it.

21  And if it's a partial exclusivity, as you said and as

22  Mr. Nadella said, "I thought the best," that's the world we

23  live in because Sony is the market leader and that's what they

24  do.

25       So there are partial -- if that's what they want to call

1  partial foreclosures, that's happening all the time with these

2  partial exclusivity or timed exclusivity arrangements, and that

3  is part of competition.  It's not part of anticompetitive

4  behavior.

5       MR. WEINGARTEN:  On the partial foreclosure, in terms

6  of evidence, I would respectfully point Your Honor to

7  Mr. Stuart's testimony this morning.  He had some words to say

8  about partial foreclosure, I believe, and I believe Mr. Ryan

9  had some words to say about that in his testimony.

10      So the idea that we have not put forward evidence of

11  partial foreclosure I think is incorrect.  We are not

12  suggesting that we have shirked our burden, not suggesting that

13  the Court or the Defendants are supposed to show that burden

14  for us.

15      We think we have adequately put in -- more than adequately

16  put in enough evidence to raise a substantial question about

17  whether there would be partial foreclosure given the

18  incentives.

19      And, again, Defendants always want to conflate this to:

20  Has the government shown that X will happen, that X is a

21  guarantee to happen?  We are talking about the future.

22      The Supreme Court in *Philadelphia National* said, "We're

23  talking about probabilities here, not certainties."  So we will

24  not accept a burden that we must and will show -- we are going

25  to talk about probabilities and show Your Honor there's a

 1   probability of a substantial lessening of competition.

 2       I'm getting some notes.  One is, the merger is permanent,

 3   Judge.  I don't want -- we know Your Honor won't be scared off

 4   because of the size of the deal from making the right ruling,

 5   but the merger is permanent.  Once they decide to merge and

 6   they come together, we've heard about the harms, for example,

 7   to Sony in terms of optimization.

 8       THE COURT:  Well, it's not the harm to Sony we care

 9   about.  It's the harm to the consumers.

10       But let me -- Ms. Knox, do you need a break?

11       THE OFFICIAL REPORTER:  Yes.

12       THE COURT:  Ms. Knox needs to take a break so why

13   don't we resume at -- I didn't mean to cut you off but --

14       MR. WEINGARTEN:  No, I understand.

15       THE COURT:  And, actually, when we come back just so

16   you can prepare, let's start talking about that Xbox cloud

17   market.  I think it's different there.

18       Okay.  Thank you.  We'll resume at 4:00 o'clock.

19       THE CLERK:  No.  4:00?  That would only be four

20   minutes.

21       THE COURT:  Okay.  4:05.

22       THE CLERK:  4:05.

23                   (Recess taken at 3:57 p.m.)

24               (Proceedings resumed at 4:09 p.m.)

25       THE CLERK:  Remain seated.  Come to order.

 1          **THE COURT:**  Okay.  We're going to resume.

 2          **MR. WEINGARTEN:**  One procedural and one substantive

 3   housekeeping, Your Honor.

 4          **THE COURT:**  Yes.

 5          **MR. WEINGARTEN:**  One procedural, we did have slides in

 6   anticipation of a more traditional closing.  May I hand those

 7   up?

 8          **THE COURT:**  Please.

 9          **MR. WEINGARTEN:**  Okay.  Thank you.  There's a copy for

10   the Defendants.

11          One substantive housekeeping.  We are not here to protect

12   Sony.  We are here to protect consumers.  And so when I

13   mentioned the dev kits, the development kits -- right? -- if

14   this deal goes forward and Sony delays shipping development

15   kits to an Activision that is owned by Microsoft, I don't care

16   that it hurts Sony so much as I care that then Sony is delayed

17   in developing a game that the consumers can play.

18          **THE COURT:**  Yes, but Sony currently has Microsoft's --

19   I mean, they ship dev kits to Microsoft.

20          **MR. WEINGARTEN:**  They do.  I understand they delay a

21   little bit because of --

22          **THE COURT:**  All of them?  I know there was testimony

23   with respect to ZeniMax.  There was no testimony as to the

24   other titles.

25          **MR. WEINGARTEN:**  Right.  That one I don't know.  I'm

 1   making an inference based on the testimony we heard, but I

 2   don't know.  But the testimony I think we did hear was there is

 3   a hesitancy to share.

 4       No, go ahead.  My colleague Meredith Levert.

 5           **MS. LEVERT:**  Good afternoon, Your Honor.  Meredith

 6   Levert for the FTC.

 7       We can put this in the findings of fact for you, but there

 8   is some testimony in Mr. Ryan's deposition that talks about

 9   their delay in giving development kits also for Minecraft, and

10   the reason for that being their concern about sharing extremely

11   sensitive information with their primary competitor.  So we'll

12   point you to that in the findings of fact.

13           **THE COURT:**  Okay.  So there's testimony that it's all

14   titles they delay?

15           **MS. LEVERT:**  That is my understanding, titles from

16   Mojang, which was acquired by Microsoft in 2014, and that would

17   be Minecraft and the more recent titles that are from ZeniMax.

18           **THE COURT:**  No, I know, he -- I remember his testimony

19   as to the ZeniMax, or maybe it actually was Mr. Spencer's

20   testimony as to the ZeniMax actually.

21           **MS. LEVERT:**  I think it was, yes.

22           **THE COURT:**  Yeah.

23           **MR. WEINGARTEN:**  So --

24           **THE COURT:**  Okay.  Actually, so that's a point.

25       And so let me ask Ms. Wilkinson about that.

1     **MS. WILKINSON:**  I believe, but I haven't looked back,

2  that it is only by Minecraft, Your Honor.  I don't think it's

3  about others.

4     And as you know, that the original Minecraft game has

5  not -- there's not a new PS5 version, but the other Minecraft

6  games are on Minecraft Legends and Minecraft Dungeons.  Excuse

7  me.

8     But the withholding of the dev kits is their decision.  I

9  mean, that is -- this is not because they're getting harmed.

10  What they don't want to share, which they're perfectly allowed

11  to, they think that that's some kind of information that Xbox

12  can use against them so they gave them to them later, but that

13  is their decision.  That is not a harm we are causing.

14     **THE COURT:**  I mean, Microsoft provides dev kits to

15  Sony and we didn't have any testimony that they delay giving it

16  to them.  I guess you would say PlayStation is the more popular

17  game because it's the better console, and so that's why they

18  don't delay, because they have nothing to hide.

19     **MR. WEINGARTEN:**  Well, Your Honor, I was going to say

20  actually I don't think we have testimony either way on the

21  issue with respect to how Microsoft understands its dev kits.

22  So I just don't know on the record, Your Honor.

23     **MS. WILKINSON:**  But it was -- Mr. Ryan was clear.  It

24  was his choice, Your Honor, and that is, again, a business

25  strategy he can pursue; but as the market leader, to say that

 1   somehow because he doesn't want to get those games onto his

 2   platform at the same time because he's making a strategic

 3   judgment that Xbox should not see those dev kits too early,

 4   that's fine, but he's making the decision for those consumers,

 5   not Xbox.

 6        And that's why we say they are protecting Sony and not the

 7   consumers because Sony is making that decision for their own

 8   consumers, and maybe that's one of the reasons that, you know,

 9   they have twice as many players, I don't know, but that's not a

10   behavior that is caused by us --

11             MR. WEINGARTEN:  Well --

12             MS. WILKINSON:  -- and certainly not a competitive

13   harm.

14             MR. WEINGARTEN:  Well, I think that the standard that

15   Ms. Wilkinson is applying is more like the sort of causal chain

16   that applies for traditional tort; right?  You stepped in and

17   you caused this harm yourself.

18        We're talking about harms to the marketplace, and a

19   competitive or strategic response does not nullify the harm.

20   If the fact that Microsoft qua platform owns Activision means

21   that a rational competitive response is "I can't give you my

22   dev kits for Activision games," that doesn't excuse or mitigate

23   the competitive harm like it would if we were in a tort case

24   talking about --

25             THE COURT:  How do I know that's a rational

 1  competitive response as opposed to a response that delays

 2  Microsoft's ability to have the games and so it gives

 3  PlayStation the opportunity to have them on their platform

 4  first?

 5          MR. WEINGARTEN:  Well, because in the hypothetical

 6  where the merger has taken place, Xbox has the games.  They own

 7  Activision.  So Sony's only hurting itself --

 8          THE COURT:  Its own self.

 9          MR. WEINGARTEN:  -- because it's not giving the dev

10  kits.  So the only reason it would hurt itself by not getting

11  the dev kits out there and getting the games developed is

12  because it's worried about what would happen if it gave up the

13  secret sauce on console.

14      And, again, the point is not the harm to Sony; it's that

15  the consuming public who loves these games, if you have a

16  PlayStation, now your game's later all else equal.

17      And I also -- I just want to point to Your Honor, we

18  were -- Ms. Wilkinson said no evidence of partial foreclosure,

19  two pieces of evidence.

20      One, Mr. Stuart this morning, I ticked with him a list of

21  partial foreclosure possibilities:  Resolution, securities,

22  optimization.

23      The second piece of evidence, paragraph 35, PX8001,

24  Mr. Ryan's declaration (as read):

25          "Even making Call of Duty partially exclusive could

1    cause substantial switching from PlayStation to Xbox."

2        And then he has quantitative evidence cited.

3        **MS. WILKINSON:**  Your Honor, first of all, we're, I

4    think, using the terms the wrong way.  There's "withholding"

5    and then there's "foreclosure."

6        And if we're talking about the dev kits, we have an

7    example before the transaction.  We have Minecraft, as

8    I believe Mr. Ryan said, and I'm double-checking his

9    deposition, and I know it was his choice, and so he did not say

10   this was a competitive harm.

11       If that's a partial withholding, I will call it, that

12   would be another easy thing for them to have measured to see.

13   You certainly can see the market, and Xbox has not gained any

14   market share on Sony since that happened with Minecraft.  They

15   have been behind and been third in the marketplace for years.

16       So by suggesting what they are what I would call a

17   possibility, anyone can dream up possibilities, and that's

18   literally what they're doing.  They're giving you a list of

19   possibilities.

20       You don't have to find certainty but you have to find

21   probabilities, and that's when they need to provide evidence to

22   you; and just dreaming up what could happen when there isn't

23   evidence that that happened -- by Mr. Weingarten calling the

24   list with Mr. Stuart today foreclosure, he didn't say that was

25   foreclosure.

1        **THE COURT:**  No, I understand.  I remember the

2  testimony.

3      Okay.  Let's move on to Game Pass and cloud.  So sort of

4  just spell out your theory there.

5        **MR. WEINGARTEN:**  Okay.  Quite simply, Your Honor, the

6  traditional market is consoles.  The next big things that have

7  developed are a multigame library subscription market and

8  cloud.  Subscription is more developed than cloud at this

9  point.  The subscription service, I hesitate with analogies,

10  but like Netflix is the idea:  You pay a monthly fee, you get

11  access to a library of games.  The some services are just the

12  library.

13      I'll point you to -- I think we reproduced it in the

14  slides I gave you, but probably you've seen it many times --

15  Figure 22 -- oh, Slide 14 that I gave you, Your Honor.

16      Thank you.

17      This is reproduced from Dr. Lee's report.  Some services

18  or products are just a library.  Some of them are a library and

19  a cloud like Xbox Ultimate; right?  You get the library and you

20  get to stream the library over the cloud.  And some are just a

21  cloud.

22      These markets are emergent against subscription is more

23  established.  The locus of competition is fierce in both.  The

24  axis of competition is price and its content.  And we've seen

25  from Microsoft documents their emphasis on cloud, the emphasis

 1  on subscription.  Game Pass is a strategic driver for

 2  Microsoft's gaming business.  I think the evidence has been

 3  very clear about that.

 4      The evidence is also clear that the effect of this

 5  transaction on Microsoft's ability to turbocharge Game Pass and

 6  leave -- I think there's a document from Mr. Spencer -- leave

 7  Google, leave Amazon -- right? -- everybody in the dust and

 8  build the content moat around Microsoft's Game Pass is in the

 9  record and compelling.

10      And there is a concern that if you take this content, you

11  use it to advantage your own platform, the consumer is harmed

12  because then the consumer doesn't have the benefit of

13  Mr. Kotick's platform agnosticism.  The consumer says "If I

14  want Call of Duty, now I have to get the Game Pass; and if I

15  want this one, I have to get the other service."  And maybe the

16  titles come out at different times, as opposed to Mr. Kotick's

17  world currently, I'll put the content wherever I can so players

18  can play it.

19          THE COURT:  But he's not putting it on PlayStation,

20  Sony's, or Microsoft's subscription services.

21          MR. WEINGARTEN:  He is on PlayStation Plus.  He is on

22  PlayStation Plus, at least in some titles.  And he was on

23  GeForce NOW for two and a half years.  I'm sure we're going to

24  join issue on the future and what it holds for Activision

25  standalone.

1    I will go back to the theme, Your Honor, of to believe

2   that Activision will put its content on more subscription

3   services and other cloud services is simply to believe they

4   will follow the money and act in their shareholders' best

5   interests.

6    To believe the Defense world that Activision on its own

7   will never, ever go into any of these other services is to

8   believe that Mr. Kotick's, respectfully, idiosyncratic view

9   will prevail over his need to maximize value for his

10  shareholders.

11   And, by the way, in testimony he explained very clearly he

12  will maximize value for shareholders.  And in response to

13  Your Honor's questions, he couldn't prevaricate.  If that's

14  where the users are, he's going there.

15   So the harm here, we think, is substantial in locking up

16  Activision content.  I'm using terms like "locking up," but

17  there's also partial foreclosures and all of this area too.

18   But the harm is we end up in a world where instead of

19  having content available and new cloud services join and they

20  figure out a better way and they get Activision content or they

21  figure out how to share economics, it's all just with that,

22  it's all just Game Pass.  And maybe Sony has PlayStation Plus

23  and we live in a world where those two suck up all the content

24  and that's it.

25       **THE COURT:**  Well, what happens to Nvidia?

1        **MR. WEINGARTEN:**  So we hope Nvidia can survive.  We

2    want the competition to be robust; but in a world where -- I'm

3    not here to predict the future about Nvidia's ultimate

4    survival, but in a world where we have a content arms race and

5    everybody starts buying up all the content and you end up with

6    one or two or three dominant platforms in cloud or

7    subscription, that is a less pro-competitive world than let a

8    thousand flowers bloom and let the content flow and let people

9    figure out arrangements that will bring consumers more of the

10   content in more ways.

11       That's a little highfalutin, but the evidence has, I

12   think, established the concern and has raised substantial

13   questions about the concern.

14       I will point Your Honor to pages 59 and 60 of the slides.

15   Mr. Spencer -- we have documents in the case that Mr. Spencer

16   was worried about a domino effect; that if somebody buys this

17   content, the next person has to buy the next content, and the

18   arms race or the domino effect continues and we end up in a

19   world that is less pro consumer with less choice.

20       I will dial it back from the highfalutin a little bit, and

21   I will say we have seen the evidence in Microsoft's own

22   documents.  The emphasis on Game Pass, the value of content,

23   the fact that content leads to subscribers, leads to scale,

24   that's over and over again we saw in the documents and the

25   testimony from Microsoft's executives.

 1    And I will prebut a little by saying we've heard a lot

 2   from Defendants "It's just a feature.  It's not a market.  You

 3   know, subscription is another way just to buy the same old

 4   game.  Cloud is just a feature."  Ms. Bond testified you use it

 5   because you don't want to wait for, like, a load-up time on

 6   your computer or on your Xbox.

 7    I think we have heard more than ample evidence to rebut

 8   that.  They price it like its own product.  They price it

 9   against other competitors like a product.  Microsoft offers the

10   cloud, totally apart from the console, on Samsung TVs.

11    We heard from Mr. Nadella.  His testimony was robust in

12   favor of the idea that the cloud is the future and not just

13   some feature.

14    I'll pause there.

15    **MS. WILKINSON:**  Your Honor, I'm going to start with

16   Ms. Bond's evidence.  She gave evidence about what the cloud is

17   used for, and I want to call it cloud streaming because, as

18   Mr. Nadella pointed out yesterday, "cloud" to him is a much

19   broader category and that includes all kinds of gaming.

20    And when you think about that when someone's playing a

21   multiplayer game, kind of the backroom -- right? -- work that

22   is done so they can communicate in the cloud generally, that's

23   very different than what you're asking about, which is cloud

24   streaming.

25    Just that service of taking that game that's on the

 1  console and for Xbox in Game Pass and streaming it either to

 2  the console again, as Ms. Bond told you, or onto another

 3  device.  That -- everyone said that that was not an

 4  economically viable model right now.  Everyone, including

 5  Mr. Ryan.

 6        **THE COURT:**  Maybe right now, but growing.  And, I

 7  mean, I think -- I don't know.  I'm not an expert on this.

 8  But, you know, we don't have DVDs anymore; right?

 9        **MS. WILKINSON:**  Right.

10        **THE COURT:**  And that's the way it's going, and those

11  consoles are going to disappear eventually; right?  And so the

12  cloud -- and so what the FTC's concern is about the future.  It

13  may not be here right now.

14        **MS. WILKINSON:**  But many startups have folded when

15  they thought there was a market when there wasn't yet.  The

16  fact that it may someday develop, I think Mr. Kotick made the

17  argument that it may not at all because it's going to be easier

18  to develop the native games for mobile because they're going to

19  be so powerful.

20     So people have different opinions.  To speculate when it's

21  going to happen, I don't think any of us are qualified to say

22  when some new technical, you know, way to stream games will

23  actually be economically successful and attractive to

24  consumers.

25        **THE COURT:**  Okay.  But so what's -- and I have to --

 1    we all have to remember to slow down for Ms. Knox.

 2              **MR. WEINGARTEN:**  Apologies.

 3              **THE COURT:**  I think we nearly killed her before.

 4                        (Laughter)

 5              **THE COURT:**  But so what are you saying with respect to

 6    their cloud argument, is that nothing -- that the merger is

 7    pro-competitive?  That -- just what is it?  Other than to say

 8    you're not saying it's a -- like, yeah, what is it that you're

 9    saying?

10              **MS. WILKINSON:**  It is a feature and in Xbox, which is

11    what's at issue, it is only offered with the Game Pass, that

12    you can't buy it as a separate product.

13         But we only have three charts, Your Honor, but one is the

14    one I made yesterday -- the other day with Mr. Lee, which is

15    you can just look at this picture and the entire merger is

16    pro-competitive because it's expanding output.

17         He didn't -- he couldn't answer the key question you and I

18    asked him, which is:  Is it likely that PlayStation will or

19    will not have Xbox?

20         But if you look down the rest, today you have Call of Duty

21    on Xbox, PlayStation, and PC.  With the merger, you're going to

22    have it with all these other streaming services.  So if that is

23    a market, they're all going to have the ability to stream the

24    game, which they don't have today, which is the test.

25              **THE COURT:**  Okay.  So that's what I -- so I get when

 1   you brought the case, that wasn't there; right?  In substance

 2   you won and you got what you wanted and you forced them to go

 3   out and enter into these agreements.  And maybe it also helped

 4   that they at least seemed to be less bullish on cloud, but they

 5   went out and they signed these agreements now with Nvidia to

 6   give them Activision's content.  How is that not good for

 7   consumers?

 8           MR. WEINGARTEN:  So a couple of points.  We have

 9   testimony from Mr. Zimring and from Nvidia about the

10   profitability and the future of cloud so I want to point

11   Your Honor there.  If there's any concern about the future,

12   this is not a dream state.

13       On the agreements point, we, again, have evidence that

14   there are agreements.  We do not have any evidence from

15   Defendants of anything beyond the fact that there are

16   agreements.

17       We learned, if we can make the negative inference,

18   I guess, from Dr. Carlton, he doesn't know where Ubitus is

19   headquartered.  It's Hong Kong.  Boosteroid is in Eastern

20   Europe.

21       So the Defendants have not even shown Your Honor that

22   entering these agreements will have any pro-competitive effect

23   in the United States of America.

24           THE COURT:  Can I stop you for a second?

25           MR. WEINGARTEN:  Yes.

CLOSING ARGUMENTS

```
 1          THE COURT:  Why would Nvidia --
 2          MR. WEINGARTEN:  Yes.
 3          THE COURT:  -- do what they did and say what they
 4   said?  Because they're a competitor to Microsoft in cloud --
 5          MR. WEINGARTEN:  Yes.
 6          THE COURT:  -- gaming.  So why did they do it then?
 7          MR. WEINGARTEN:  Do it meaning switch to support the
 8   merger?
 9          THE COURT:  Yes.
10          MR. WEINGARTEN:  Yes, okay.  A couple of reasons.
11   One, they got a deal that they had been wanting for a long time
12   on Microsoft's own content.  Now, that doesn't count under the
13   law because it's not merger specific.  That's a deal that could
14   have been achieved any day whether we were here or not, whether
15   Microsoft were buying Activision or not, but it was a
16   sweetener.  They got that deal.
17          They got the Windows addendum.  Another sweetener.
18          They also testified, Mr. Eisler, that they have concerns
19   about their deal on the Activision content.  Okay?  They have
20   concerns about that part of the deal, and this goes back to
21   what we were talking about before about whose burden is it to
22   bring forward persuasion and production on what these
23   agreements actually mean.
24          And I want to be very clear with Nvidia.  Whether the
25   Activision deal goes through or not, they get the Microsoft
```

 1   content that they've coveted for quite a while.  That means

 2   it's not merger specific, so it's not part of the competitive

 3   analysis, but it sure does mean that Nvidia had a healthy

 4   incentive to sign the agreement they signed and support the

 5   deal because whatever happens, they now have that Microsoft

 6   content.

 7        I will also note part of the problem with having the

 8   Defendants run around signing deals in this fashion is they are

 9   picking -- let's assume the deals are fantastic for a moment --

10   they are picking the winners and the losers.  There's no deal

11   between Microsoft and Google for cloud.  There's no deal

12   between Microsoft and Amazon for Amazon's cloud multigame

13   library service.  So now we're saying, according to Defendants:

14   Don't worry, we've picked some competitors inside the U.S. and

15   out.  Bracket, outside the U.S. shouldn't even count.  We'll

16   pick the winners and the losers and then we'll come to court

17   and say, "Well, we picked some winners and, therefore, we're

18   being pro-competitive.

19        And the fact is there is no evidentiary record for

20   Your Honor to even begin to weigh their claims that they have

21   remedied the concerns.

22             THE COURT:  Well, but in the but-for world there's no

23   agreements.  There's no agreement with Amazon.  There's no

24   agreement with Google.  There's no agreement with Nvidia, and

25   maybe Nvidia then doesn't survive.

 1          **MR. WEINGARTEN:**  I would submit --

 2          **THE COURT:**  Well, no, we're not going to go there.

 3    That's not a failing company.

 4          **MR. WEINGARTEN:**  No, no, and I don't mean to imply

 5    anything about Nvidia's abilities or anything like that.

 6       So I would submit, at best, when Ms. Wilkinson did her

 7    chart with Dr. Lee -- Professor Lee, question marks at best

 8    about how this content may or may not get to Ubitus,

 9    Boosteroid, Nvidia.

10       I would submit in the but-for world, because of the

11    testimony we heard from Mr. Kotick and what we know about

12    incentives to put content on platforms, question marks as well.

13       So we are dealing with a world of future.  It's

14    probabilities as Ms. Wilkinson properly said.  Question marks

15    all around; but the question is:  Have we raised enough

16    questions to merit further inspection of this deal and have we

17    raised further questions, given all the documentary evidence

18    and testimony about the role of AAA content in driving scale,

19    subscribers, and a moat -- Microsoft's executive's word -- a

20    moat around Game Pass?

21       So I think that's where we land on that.  Even if I can

22    see at best, I think it's question marks everywhere and we

23    still carry our burden.

24          **MS. WILKINSON:**  Well, Your Honor, he may want to

25    testify again for his expert, but the expert said these things.

 1   That's who they presented.  He didn't like what he had to say,

 2   but I gave him every chance to answer those questions as did

 3   you.

 4           **MR. WEINGARTEN:**  I can say --

 5           **MS. WILKINSON:**  You asked him -- excuse me.

 6       You asked him three different times to try and get him to

 7   answer on Call of Duty whether he even did the analysis.  He

 8   said no.  When he knows he wants a question mark, we put it

 9   there.

10       He did not say it was uncertain and, therefore, couldn't

11   be probable.  He agreed that in every one -- that with every

12   one of those other organizations, that it would be likely with

13   the merger that that would -- that content would be distributed

14   by those folks.

15           **THE COURT:**  Well, respectfully, Professor Lee is not

16   an expert on that; right?  He doesn't read contracts and those

17   things.  Same thing goes with Dr. Carlton.  So I don't -- I

18   mean, I look at his economic analysis, but with respect to -- I

19   mean --

20           **MS. WILKINSON:**  I think that's a different issue,

21   Your Honor, you're right, but he was in the business of saying

22   what's going to happen in the but-for world and what's going to

23   happen with the merger -- again, not certainty but

24   probabilities -- and he couldn't say.  That's why he was called

25   as an expert, to say exactly that.

 1        Now, when you put the contracts down, these are
 2   sophisticated parties.  Nvidia is a trillion-dollar company.
 3   They had lawyers on the other side.  These are not complicated
 4   agreements.  In fact, you heard Mr. Spencer say and Mr. Ryan,
 5   that normally with publishing, they have general publishing
 6   agreements.  They don't even come to a different agreement for
 7   a specific game.

 8        The only reason there are specific agreements here is
 9   because the regulator complained.  And so now because the
10   regulator raises issues, they're basically saying "You did what
11   we wanted but we don't like the way you did it, and you have to
12   prove to us somehow that a contract" -- which should be
13   presumed to be in the best interests of both parties, which
14   whether it's sweetened or not, that's how competition and
15   capitalism is supposed to work.

16        If that's how we get them to distribute Call of Duty, so
17   what?  People and companies come to those agreements all the
18   time.  The question is:  What is the output through those
19   agreements?  And there's no dispute that these games are
20   going -- that Call of Duty is going to be on these services if
21   the transaction goes through.

22        So you asked and I asked every one of our executives
23   whether they would honor these contracts.  They said it in open
24   court, they said it to you under oath, and they've said it for
25   the last year.

```
 1        Do we honestly -- are they honestly suggesting that they

 2   weren't credible?  That they're going to get up in a public

 3   courtroom in front of you and lie about whether they would

 4   honor these contracts?  I mean it's absolutely absurd, it

 5   really is, to suggest that Satya Nadella got up in your

 6   courtroom and said he would honor -- in fact, he doesn't even

 7   like exclusives.  He would like his content to be everywhere,

 8   by the way, which has been incredibly successful.

 9        THE COURT:  He was clear that it was Mr. Spencer's

10   domain.

11        MS. WILKINSON:  And Mr. Spencer said the same thing.

12   It's in his interest.  Again, it's not because everyone is a

13   saint.  It's because it makes economic sense and reputational

14   sense to put that content on these different platforms.

15        And why does it?  You -- remember, they offered this to

16   Sony the day after the deal.  So it's not just for the

17   regulators.  It was easy for Xbox and Microsoft to do because

18   it was consistent with their business strategy.

19        So it wasn't asking them to do something that they hadn't

20   thought about.  In fact, they didn't own the content.  I

21   thought Ms. Bond was pretty clear, it made a lot of sense to

22   say:  Why don't you usually -- why did you -- you didn't do

23   this before.  Well, we didn't own the content.  Most people

24   don't contract for things they don't own.

25        They had told these folks they would do it; and then when
```

 1   the regulators raised issues, they did it.  There's nothing

 2   that was pointed out about these contracts.  They're ten --

 3   some of them, as you know, with the Sony offer, ten-year

 4   contracts.  And we heard undisputed evidence that there's

 5   nothing like that in this industry.  It was unusual so there

 6   would be no dispute here that that content would stay on

 7   PlayStation.

 8        And you heard through Ms. Hood's declaration and everyone

 9   else they need those revenues.  It makes sense.

10            THE COURT:  On the console.

11            MS. WILKINSON:  Yes.

12            THE COURT:  It would stay on PlayStation on the

13   console.

14            MS. WILKINSON:  Right.  And it makes sense for them to

15   distribute as many ways as they can because if people play

16   their games, they make money.

17            MR. WEINGARTEN:  I have a couple of points there,

18   Your Honor.

19        So one is, I have no idea what Ms. Wilkinson is talking

20   about when she says we told them to go make these deals and now

21   we're complaining about the deals.  That is not how the process

22   has unfolded.

23            THE COURT:  It's not evidence in the hearing.

24            MR. WEINGARTEN:  We want to make very clear what we

25   are not alleging.  I'm not alleging that Microsoft or the

 1   theory of the case is not that Microsoft will breach or that

 2   Mr. Nadella is committing perjury.  That is not our theory of

 3   the case.

 4       However, if one is going to propose, like Defendants have,

 5   a complicated set of remedial contracts, behavioral remedies in

 6   antitrust parlance, those contracts are only as good as their

 7   terms.  And we have had undisputed testimony in this case from

 8   at least two of the third parties who signed those contracts

 9   about their concerns with the terms, Mr. Singer and Mr. Eisler.

10   Both gave undisputed testimony that they had concerns about the

11   terms.

12           THE COURT:  Mr. -- I read through -- I read

13   Mr. Singer's whole deposition.  I -- he just didn't know the

14   terms.

15           MR. WEINGARTEN:  He's the primary negotiator for

16   Nintendo, and there you have it.

17           THE COURT:  Well, what I read in the -- in the

18   transcript was that there was a representation by a lawyer that

19   he was, but he didn't say anything in that -- in that -- I

20   can't -- I can't -- I think that's over-arguing to say that he

21   said he had concerns with the terms.  He didn't know the terms.

22           MR. WEINGARTEN:  I will --

23           THE COURT:  Or he couldn't -- no, I don't -- I don't

24   think so.  They did sign it, and it is Nintendo.  It's not some

25   little --

 1            MR. WEINGARTEN:  They did sign it, Your Honor.

 2            THE COURT:  -- startup.

 3            MR. WEINGARTEN:  They did sign it, Your Honor.

 4            THE COURT:  Yes.

 5            MR. WEINGARTEN:  I will also say that's -- Dr. Carlton

 6    made the argument in his report that if you sign it, it must be

 7    because you think it's ironclad and the greatest deal on earth.

 8         I will also submit you sign it because it's an option;

 9    right?  This is fantastic, from Nintendo's perspective, to have

10    at least this option now, and that's great for them; but does

11    that mean, again, that it's a guarantee and that it remedies

12    all of the harms?

13            THE COURT:  Well, why does it have to be a guarantee?

14            MR. WEINGARTEN:  Well, if it's not a guarantee, then

15    it's not offsetting the anticompetitive concerns.

16         And we have no evidence about what they do anyway.  I

17    thought Defendants would come, frankly, and bring Your Honor

18    and say "We've run the numbers.  If we sign these deals, X

19    million more people will get the game."  We were told, in fact,

20    they ran no numbers.  Okay?

21         We were told that there was no analysis for these

22    apparently amazing deals that -- we were either told it's easy

23    to get to and there's a standard agreement, but these are pages

24    and pages long and outside the standard agreement depending on

25    what day we heard from the Defendants, but we have no analysis

 1   and no record for Your Honor to assess the alleged

 2   pro-competitive benefits.

 3        And the concern also is that Microsoft in going around and

 4   signing these deals, they're setting the terms of market

 5   competition on their own; right?  They're off saying "Now

 6   assume we've got this content.  Here are these terms."

 7        And I'll note again, no terms with Google.  No terms with

 8   Amazon.  So they're picking and choosing, and then they're

 9   putting the agreements in and saying "Just the bear fact of the

10   agreement with no analysis suffices."  That cannot be correct.

11   It cannot be correct.

12        **MS. WILKINSON:**  Your Honor, we know these parties know

13   how to say no because Sony has refused thus far to say no.

14        **THE COURT:**  Can you address -- the point that was made

15   throughout the hearing was that no financial analysis was done,

16   which seems odd; right?

17        **MS. WILKINSON:**  It does, I think, if you don't

18   understand the business, with all respect.  They put games on

19   other people's platforms and on their own all the time.  That's

20   why they have that general publishing agreement.  They don't do

21   a big financial analysis because they know what the split will

22   be in the revenue; and if the game is a game that they want,

23   they don't -- they don't sign a new contract for every single

24   game that comes up.  So they don't do a financial analysis

25   every time they put a game on.  If you were to look through

 1  their files beyond for other games, they don't produce a

 2  financial analysis every time.

 3      THE COURT:  Right, but this is Call of Duty and

 4  they've signed an agreement to put it on Nintendo; right?  And

 5  that will --

 6      MS. WILKINSON:  There's no downside, Your Honor.  How

 7  could it be anything but beneficial to them when they can get

 8  the game on one of the biggest and most successful platforms

 9  there is?

10     So they know from what they've done in the past for these

11  big popular games how successful they are, and they already

12  know how Call of Duty does on other platforms.  So they --

13      THE COURT:  But how do they know that the people that

14  then -- when Call of Duty is available on the Switch, that they

15  won't then leave Xbox?

16     See, when Xbox -- when you buy your Call of Duty on Xbox,

17  Microsoft gets a hundred percent; but when you buy it on

18  Nintendo, they get less because they have to share it with

19  Nintendo.

20      MS. WILKINSON:  Right.

21      THE COURT:  So --

22      MS. WILKINSON:  That's true.

23      THE COURT:  -- to the extent that it extends to new

24  people, that's true, but there was no analysis done --

25  right? -- with respect to the de-val and all that and whether

 1   it would create a gap and all that to extend that to Nintendo

 2   because if your argument's correct and Nintendo is a substitute

 3   and should be part of the market, it's going to take some of

 4   those sales away from the Xbox.

 5        **MS. WILKINSON:**  Right, but it's also gaining one, the

 6   people who have Nintendo and aren't playing Call of Duty right

 7   now because they don't have it.

 8        And you heard Mr. Kotick, Mr. Spencer, Mr. Nadella tell

 9   you they're more successful when they put it on more platforms.

10   This is why they can't find an example of another existing

11   multiplatform, multiplayer game that anyone would take off the

12   platforms.  It doesn't make sense.  It makes more sense, like

13   Minecraft.  Look what they do.  They have it on 20 different

14   platforms.  Under what you're suggesting, they should have a

15   financial analysis every time to see whether they lose gamers

16   or not.

17        **THE COURT:**  That's not my suggestion.  It was the

18   FTC's.  I'm just asking you to respond.

19        **MS. WILKINSON:**  Right.  There's -- there's not that

20   kind of financial analysis done when there's upside for them by

21   getting as many gamers to play and play with each other as

22   possible.  And they believe that's successful not because

23   they've just seen it; but I think as Microsoft, as you heard,

24   that's kind of in their culture, that they've been quite

25   successful with their other software products by putting them

 1   on as many platforms as possible.  Minecraft is one of the most

 2   successful games, and you've seen the data in the sealed

 3   documents, because it's on so many platforms.

 4        So there was no need to figure out whether -- they've

 5   already figured out that staying on the PS5 is, you know, very

 6   positive when they did the entire valuation and they figured

 7   out how much revenue they would get and would get for the next

 8   five to ten years depending on the outlook from those revenues.

 9        So why would they think they're not going to -- and maybe

10   they'd lose some gamers.  As you say, some of these people own

11   multiple devices already, but why would they think they need to

12   do an in-depth analysis to say if they make it available to

13   140 million more gamers, they won't get additional revenue?

14   Plus they get the endgame spend; right?

15        **MR. WEINGARTEN:**  I hear a lot of argument and a lot of

16   pivot to Minecraft but no evidence, and I'm not suggesting --

17   put it this way:  I think Mr. Stuart was credible in the sense

18   that he does a lot of analysis and a lot of scenario planning.

19   And to suggest that there is no analysis or scenario planning

20   because this is just putting a title on another platform is

21   directly at odds with defense's other argument that these are

22   world-creating amazing agreements that are unprecedentedly

23   large.

24        **THE COURT:**  So then what is the inference that you're

25   asking me to draw.

1    **MR. WEINGARTEN:**  The inference I'm asking you to draw

2    is that there is no evidence that these have any

3    pro-competitive effect whatsoever in the marketplace.

4        **THE COURT:**  Wait a minute.  How can putting

5    Activision's content on Nvidia's cloud -- how is that not a

6    positive for consumers?

7        **MR. WEINGARTEN:**  It could be and it would be, but we

8    don't know because we also have not had any evidence that that

9    is what will result from this agreement.  In fact, we've had

10   evidence from Nvidia they have concerns about the agreement.

11       But I also want to point out, Judge, this was an issue we

12   briefed, we sought discovery about all these agreements and we

13   were shielded.  The discovery was shielded under privilege.

14       **THE COURT:**  I'm just going to stop you there because,

15   I mean, again, now we're in unique land and the problem is that

16   we are on this compressed; right?  If this had been brought to

17   me or some other judge closer in time to when you filed your

18   complaint and you filed your preliminary injunction motion,

19   then we would have had time to do that.

20       I would never have said, "You're held to what happens in

21   this administrative proceeding."  I would have adjudicated all

22   those things; but because -- I'm sure you had good reasons --

23   it was done this late, we didn't have that opportunity.

24       So I don't know what happened in there, and don't tell me

25   because it's not going to make any difference in my decision.

1   I have the evidence that's in front of me, and I -- and that's

2   it, and I can draw an inference from the lack of evidence.

3   That's why I asked you what it is, but --

4        MR. WEINGARTEN:  I will say it is not about wishing we

5   had a motion to compel process that had been seen through.  I'm

6   actually not challenging the assertion of the privilege.  If

7   they told us, which they did, "We did a lot -- if we did any

8   analyses, they were with lawyers, they were about understanding

9   legal implications of the agreements," fine.  That sounds like

10  a plausible privilege claim.

11       But I can't then also have a Defendant show up and give

12  half the poker cards over and say "Actually, we think they're

13  really super pro-competitive" while withholding the actual

14  analysis I need to understand it or contest it.

15       THE COURT:  Well, I think they're saying they're not

16  withholding anything.

17       MR. WEINGARTEN:  There's just nothing.  Okay.  Well,

18  then --

19       THE COURT:  That's what Mr. Stuart says, there's just

20  nothing.

21       MR. WEINGARTEN:  So I would take from the inference

22  that there's just nothing, that there's no great effect to

23  these agreements because if there were any material effect,

24  there must have been a model or a discussion.  The evidence in

25  the record is that some of these were hastily agreed to:

 1   Ubitus, Boosteroid.

 2        Some other evidence in the record -- Mr. Eisler's

 3   deposition Mr. Fisher's -- is that they were hastily agreed to

 4   on the eve of other regulatory proceedings for a press

 5   conference.

 6        I think the inference that can be drawn is they were

 7   hastily agreed to and that there can be no inference of

 8   pro-competitive effect from that circumstance.

 9             THE COURT:  Well, why?  I mean, they were hastily

10   agreed to in response to regulatory concerns, no question;

11   right?

12             MR. WEINGARTEN:  Correct.

13             THE COURT:  No question.  They're not arguing anything

14   different.  They agree.

15             MR. WEINGARTEN:  Right.

16             THE COURT:  That's why I say in many ways you won

17   because you and the other regulators have forced them.  Now,

18   whether it's sufficient or not is a different matter, but you

19   did get them to -- at least they say they were committed all

20   along, but you got them to do something earlier.

21             MR. WEINGARTEN:  And I'm not being facetious in saying

22   this.  If we had felt like we had won, I would declare victory

23   and go home.  I don't think we won because that is not, first

24   of all, how the process is supposed to unfold.

25        Second of all, we have no evidence of what the effects of

1   these agreements will be so I cannot declare victory on behalf

2   of consumers.

3       I have the same thing that you have, Your Honor, evidence

4   that there are agreements.  Nothing more.  That's it.  And if

5   Ms. Wilkinson were right, that this was Microsoft's master

6   plan -- and I agree it's not, it's regulatory -- it's not in

7   the deal model.  The deal model is all about Microsoft's

8   products and services so that's what I have to look at.

9       And I have no evidence -- and, respectfully, neither does

10  the Court -- that these agreements are going to engage in any

11  pro-competitive benefit for anyone.  Reminder, some of them

12  involve companies in Hong Kong, Eastern Europe.  They're not

13  even in the market, so it is --

14      **THE COURT:**  Well, it depends on the market.  I mean,

15  and we didn't even get into that.

16      And I don't know for cloud, is someone sitting in the

17  United States can't download or can't use those services?

18      **MR. WEINGARTEN:**  I don't know; right?  As a

19  theoretical matter, can someone go on the internet?  Maybe but,

20  again, there's no evidence from the Defendants.

21      **THE COURT:**  Well, no, no, no, but you initially have

22  to tell me the relevant market.

23      **MR. WEINGARTEN:**  Yes.

24      **THE COURT:**  So tell me why the cloud gaming company in

25  Hong Kong is not part of the relevant market.

1          **MR. WEINGARTEN:**  Two reasons.  One is a lack of

2    evidence.  I don't know if their terms allow people in the

3    United States to download this and no one in this case does.

4    There's -- I don't think there's anything in the record that

5    they even do business here.  Literally, I don't think Ms. Bond

6    was asked.  I don't think she knew.  Nobody knows.  So that's

7    one.

8          Two is, latency.  I would posit I don't know where their

9    servers are and, for goodness sake, if they're in Hong Kong

10   with a server, I would argue that a product in Hong Kong is not

11   a reasonable substitute for a cloud service in the United

12   States.

13         **THE COURT:**  That's probably true.  With respect to

14   cloud streaming, I think that's true.

15         **MR. WEINGARTEN:**  One more on this, Judge.  The

16   antitrust law requires verification of the benefits.

17         I apologize.  I'm supposed to slow down.  Okay.

18         One of the requirements if you're going to present as a

19   Defendant a pro-competitive benefit, is that it has to be

20   verified.  We have to verify what these benefits will be.

21   Quantification, something.  That's not an FTC thing.  That's a

22   legal test.  It's in the horizontal merger guidelines, which is

23   an FTC thing, but also in the court -- in the case law,

24   I believe.

25         No one from the defense evidence has verified them.

1  Dr. Carlton, we talked to him, did not verify very clearly.

2  Dr. Bailey testified she didn't know about the consumer welfare

3  effects of any of these terms.

4      So I don't -- there is no verification.  It's another more

5  doctrinal version of the argument I've been making.  Absent

6  verification, they are a nothing, respectfully.

7          THE COURT:  All right.

8          MS. WILKINSON:  Your Honor, they are part of the deal

9  and part of the output; but if you -- I'm going to take what

10  counsel just said.  He now said the deal model is the only

11  thing that shows.  Yes, it shows an analysis of keeping COD on

12  PlayStation.  So we already have that that's going to happen.

13      And he said, "Well, why don't you have more financial

14  analysis or way of measuring it?"  We have a way of measuring

15  it.  We also have Minecraft that's on Play -- which we heard

16  from Mr. Stuart this morning is more successful or generates

17  more revenue on the other platforms than it does on Xbox.

18      So there is a base analysis, and the fact that this is

19  increasing output further and wasn't part of the model, it was

20  part of the plan, and the fact that it is going to generate

21  more gamers, there's no question that it's pro-competitive.

22      I don't even understand.  You said it yourself:  How could

23  it be that if more consumers are going to get access to it,

24  it's not beneficial?  I mean, it's -- what do you call it? --

25  the benefits are just increasing output as, you know, as part

**CLOSING ARGUMENTS**

1   of the deal?  Either way, more consumers are going to get the

2   game and that's good for gamers, but it's also good for

3   Microsoft.

4             **THE COURT:**  Can I ask you about the X -- the X Pass?

5             **MR. WEINGARTEN:**  The Game Pass?

6             **THE COURT:**  Game Pass.  Game Pass.

7             **MR. WEINGARTEN:**  Yes, ma'am.

8             **THE COURT:**  I do think that is not clear that Call of

9   Duty may be on Game Pass and not on PlayStation Plus.

10            **MR. WEINGARTEN:**  Correct.  And Mr. Ryan had testimony

11  that the terms --

12            **THE COURT:**  That I read and --

13            **MR. WEINGARTEN:**  -- and the offer are --

14            **THE COURT:**  -- that I understand.  That I understand.

15     But explain to me why.  Let's say, because as I understood

16  Mr. Ryan, for example -- I keep calling it the Thor game

17  because I can't remember.

18            **MS. WILKINSON:**  God of War.

19            **THE COURT:**  God of War.  Is that on PlayStation Plus?

20            **MR. WEINGARTEN:**  Yes.  I actually don't know.

21     Is God of War -- I'm getting head nods.  Yes.

22            **THE COURT:**  Yes?  Yes.

23            **MS. WILKINSON:**  Not day and date.

24            **MR. WEINGARTEN:**  Okay.

25            **THE COURT:**  Not day and date.

1          **MS. WILKINSON:**  I don't know if it's an older catalog

2     game, but not day and date.

3          **THE COURT:**  But anyway, he testified they see it a

4     little differently and it's more like a catalog.  And if Call

5     of Duty were on Game Pass but not on PlayStation Plus, wouldn't

6     that just incentivize Sony to up their game, so to speak, on

7     the PlayStation Plus?  To improve the content?  To maybe make

8     stuff available more immediately?  In other words, it would

9     increase competition at opposed to decrease competition.

10         **MR. WEINGARTEN:**  Well --

11         **THE COURT:**  Because it's not available on

12    PlayStation Plus right now.  So unlike the console, it's not

13    taking anything away from anybody.  Nobody has the ability

14    right now to pay just a subscription and get Call of Duty.

15         **MR. WEINGARTEN:**  So I guess a couple of things.  One,

16    they might.  There might be agreements; right?  This is the

17    likelihood of Mr. Kotick bringing his content to other places.

18    There are possible future agreements so Sony could say to

19    Activision "We've got to have it.  Here is the offer," and they

20    reach terms.

21         If this deal goes through that Microsoft proposes, that

22    terminates for all time -- right? -- the ability of an

23    independent Activision to ever reach an agreement with Sony.

24    So I just want to be clear about the but-for world and the

25    world we are in if this deal goes through.

1      Another point I'll make to Your Honor is, if the response

2  from Sony -- if this deal goes through, hypothetically, Sony's

3  response is "We got to go buy another big developer of content

4  and keep adding content," and it's the domino effect from

5  Mr. Spencer's e-mail.

6      We will have in our conclusions of law the case law that

7  that is an aggravating, not a mitigating factor.

8          THE COURT:  No, no, no.  I'm not saying -- I'm just

9  saying with their own content that they already have --

10         MR. WEINGARTEN:  Yes.

11         THE COURT:  -- to make it available at the same time

12  that they release the games.

13         MR. WEINGARTEN:  Possible, but a non-problematic or a

14  less problematic, from the antitrust law perspective way to

15  achieve that, would be if Game Pass loves Activision content,

16  reach a deal short of a merger, and pay them.  And if they work

17  out that deal and Sony says in response, "Gosh, we need our own

18  deal or we need to change how we operate," that's good

19  competition.

20      But taking Activision content 100 percent in-house and

21  foreclosing for all time a future deal between Activision and

22  PlayStation, or who knows what as to be invented subscription

23  service, that is anticompetitive.

24         THE COURT:  But how -- how -- again, and play that out

25  how the consumer is harmed.  Because I still don't understand

 1   why Sony, then, just won't make their PlayStation Plus better.

 2        And, again, how many people -- you're only going to pay

 3   for the subscription to Call of Duty, the $15 a month or the $8

 4   a month, if you like the other mix on the games because

 5   otherwise it's cheaper to just pay -- right?  This is why I

 6   actually am trying to figure out the market.

 7             MS. WILKINSON:  Your Honor, that isn't quite right

 8   because, remember, to -- unless they're playing by themselves,

 9   they still have to subscribe for the multiplayer monthly fee.

10   So it's not like you either buy it for $70 and you have no more

11   fees.  You still have to pay monthly to play it either on

12   PlayStation or Xbox.

13        There -- we showed you, we didn't spend much time on it,

14   there's four subscriptions --

15             THE COURT:  Yes.

16             MS. WILKINSON:  -- and the first one is just for

17   multiplayer.

18             THE COURT:  So you can't do multiplayer without a

19   subscription?

20             MS. WILKINSON:  Without a monthly subscription.

21             THE COURT:  Both?  Both?

22             MS. WILKINSON:  Yes.

23             MR. WEINGARTEN:  So turning back to your question, why

24   doesn't Sony just do it, I don't know.

25             THE COURT:  Can I just stop one second?

1          **MR. WEINGARTEN:**  Sorry, Your Honor.  Yes.

2          **THE COURT:**  But in terms of if you have a PlayStation

3    to play multiplayer, is that in the agreement that was offered?

4    Does that agreement include that the people on PlayStation will

5    still always be able to have that option to do the multiplayer?

6          **MS. WILKINSON:**  That's up to them because it's the

7    consumer who buys that.  It wouldn't -- Xbox would not stop

8    PlayStation 5 players from being multiplayer because that's

9    what you purchase on the PlayStation website.

10          **THE COURT:**  Okay.

11          **MR. WEINGARTEN:**  Reminder about Mr. Ryan's concerns

12    about the whole offer on PlayStation Plus in response to that.

13          **THE COURT:**  No, no, I understand that.

14          **MR. WEINGARTEN:**  Okay.

15          **THE COURT:**  That's a different -- that's a different

16    issue.

17          **MR. WEINGARTEN:**  On why doesn't Sony put their games

18    day and date, I don't know.  I don't think we have a lot of

19    record evidence about why.

20          I'll get a snort from the defense bar; but as a regulator,

21    a law enforcer, I am agnostic if they have a competitive

22    strategy that they think helps them invest and make good

23    competition in various markets, but it is not an adequate

24    response by Defendants to buying this content to say, "Good.

25    Now Sony will do the same thing we want to do and build a

 1  walled garden of their own."  There's case law that's not the

 2  right thing to do.

 3      Also, again, there's no evidence that that is a benefit.

 4  We don't know.  The Defendants, if they were to posit that as a

 5  benefit, good, everybody builds walled gardens and we all buy

 6  content and day and date is better.  We have no evidence that's

 7  true so we just don't want to interrupt the flow of how the

 8  competition is currently working.

 9          THE COURT:  And it all comes down, again, to Call of

10  Duty.

11          MR. WEINGARTEN:  I keep hesitating slightly.

12          THE COURT:  Yeah, but, I mean, that's where the

13  evidence is; right?  That's the driver because there are

14  acquisitions that happen, there are games that happen, and

15  we're here because of Call of Duty.  I just want to be clear so

16  I know what to focus on.

17          MR. WEINGARTEN:  No question, it is critically

18  important and it's the driver of the revenues.  I only hesitate

19  because they just have some really other great franchises that

20  are huge.

21          THE COURT:  As do -- you know, as does Warner Brothers

22  have the number one game, at least it was, earlier this year --

23  right? -- of Hogwarts.  Like, you just don't know.  And there

24  are lots of other games.

25      I mean, the other thing I'm just struggling a little bit

1    with -- and you can help me -- is this industry is very

2    different in that it's amorphous and it changes all the time

3    and it's completely dynamic, and what video game -- I know Call

4    of Duty has had enduring but other games have -- come and go

5    just like MySpace or TV shows or whatever, and I'm trying to

6    figure out why --

7              MR. WEINGARTEN:  So --

8         THE COURT:  -- why the emphasis is just so much on

9    Call of Duty.  I mean, isn't there an argument that that will

10   force someone to come up with another good annual game or some

11   other thing?  I mean, after all, Mr. Kotick started from

12   essentially nothing, but he was able to do it; right?

13        MR. WEINGARTEN:  So taking your last point first, I'm

14   sure that Call of Duty being great inspires people to try to be

15   the next Call of Duty.  We don't need this merger to do that.

16   So Call of Duty existing in the universe on its own already

17   accomplishes that.

18        THE COURT:  No, no.  Yeah, I'm getting more whether

19   there is an anticompetitive effect.

20        MR. WEINGARTEN:  Right.  So Microsoft buys the Call of

21   Duty.  Why do we care?  Yes, because it is unique in so many

22   ways.  It is every year.  A lot of these games, they don't do

23   every year a title.  Not only is it every year, it's number one

24   every year.  And the one disappointment Mr. Kotick pointed to

25   was still number one.  It's a heck of a disappointment.

1    So it is unique.  And the modeling that we saw from

2    Microsoft shows how unique it is.  Now, that model is not just

3    Call of Duty; right?  They modeled all the content.  But it is

4    a huge number.  It is a hugely popular game.  It has revenue

5    generation that is off the charts year after year.

6    So that's why -- that is part of why we're here, for sure,

7    Your Honor.  If they were buying a much smaller game, we

8    probably would have made a regulatory law enforcement judgment

9    to spend resources elsewhere, but here we are because it is

10   incredibly powerful.

11   And I'll take it back down from the 50,000-foot to the

12   evidence.  We have seen from the testimony, the documents about

13   Microsoft strategy, about the role of AAA, the role of content

14   in every single one of these markets how essential content is,

15   and it's something that I believe Your Honor and I were talking

16   about way at the beginning of session that content is key.

17   And this is key content and it is a game that gamers want

18   to play.  And that incentive, once you own the game that gamers

19   want to play, means you're going to put it where you can drive

20   users to play it with you.

21           THE COURT:  Some gamers want to play.

22           MR. WEINGARTEN:  Sure.  Sure.

23           THE COURT:  Right?

24           MR. WEINGARTEN:  Enough to make --

25           THE COURT:  It's a minority.

1    **MR. WEINGARTEN:**  But enough to make billions of

2    dollars in revenue.  So almost any product, I'm -- not

3    everybody drinks Coca Cola, but if Coke and Pepsi merged, we'd

4    be here; right?  So not everybody --

5         **THE COURT:**  Hopefully not here.

6                       (Laughter)

7         **MR. WEINGARTEN:**  Apologies.

8    But if not everybody uses it, but our concern is with the

9    consumers who do and may one day want to use it.

10        **MS. WILKINSON:**  Your Honor, it's not an essential

11   input.  There's a big difference between it being necessary,

12   which is what the case law says, and being the popular, you

13   know, enduring, wonderfully successful game.  No one disputes

14   that.

15   It's one piece of content.  There's no case that says one

16   piece of content will tip a market; or if one competitor gets

17   it, you know, there won't -- there will be harm to competition.

18   And you can think about it.  If we go back to the old days

19   when some of us only watched three networks, there's much more

20   content now -- right? -- because there's these subscription

21   services.  More content has been generated, to your point, to

22   go back and forth.  There are enduring franchises.  Everyone

23   would like to own the Bond franchise, I'm sure, in the

24   streaming world but only one company owns it now.  It doesn't

25   mean all these other competitors aren't successful.

1    The same with *Seinfeld*.  Name your favorite show.  There

2    are certain types of content or individual pieces of content

3    that are extraordinarily popular, but Sony has many of those

4    too, like God of War, my favorite.

5        **THE COURT:**  But did Sony develop God of War itself?

6        **MS. WILKINSON:**  Yes, as far as I understand it.

7        **THE COURT:**  I think that's their point.

8        **MS. WILKINSON:**  Here is?

9        **THE COURT:**  We wouldn't be here if Microsoft had

10   created Call of Duty.  It's the purchasing it; right?  That the

11   argument is and the theory behind the antitrust laws and the

12   whole case is that -- and, yeah, the whole theory behind

13   Section 7 is that we don't benefit from just buying up each

14   other.  We benefit from keeping things separate and, therefore,

15   incentivizing people to create themselves.

16       **MS. WILKINSON:**  That's not true.  We want smaller

17   folks to create content; right?  And the fact that someone

18   purchases -- and they're not small anymore, Activision, but, as

19   you say they were originally.

20       The fact that they produced popular content and someone

21   else wants to buy to distribute it and then someone else wants

22   to make more content, I mean, that's the art that's going on

23   whether it's movies, gaming, or television.  And no one says if

24   you don't have this one game or this one television program or

25   movie, you can't compete.

1    I mean it's kind of -- it's an odd suggestion.  It's not

2  the type of essential input, you know, that you need a widget

3  and the widget seller -- you're buying the widget seller so

4  nobody else can purchase those widgets.

5    Whether PlayStation created its games, it also contracts

6  for them.  Final Fantasy XVI, as someone pointed out to me,

7  it's called XVI for a reason.  It's been out there for a long

8  time and it's been very successful.  You don't have to have an

9  exact replacement.  No consumer is entitled to have the exact

10  piece of content they want.

11    But in this case there's lots of competitors.  As you

12  said, this is a small part of the market.  It's incredibly, you

13  know, successful.  I don't think that -- I know that doesn't

14  equate to being essential and something that one party cannot

15  own, especially in light of the promises and contracts that

16  they're going to distribute far and wide, and that all of the

17  documents, Your Honor, every piece of evidence, everyone who

18  came here, whether it was from Microsoft and Activision or from

19  Mr. Kotick, said it makes sense to keep it on multiple

20  platforms.

21    And counsel has not pointed to one piece of evidence, one

22  document, that says Microsoft was thinking about holding it

23  back.  Nobody did that analysis.  Nobody asked for that.  And,

24  again, why didn't they do that financial analysis?  Because it

25  doesn't make any sense to them economically and based on their

 1   good business judgment.

 2          MR. WEINGARTEN:  All right.  I have quite a bit there.

 3   If I may, Your Honor, just very briefly.

 4          THE COURT:  Okay.

 5          MR. WEINGARTEN:  If we had that document, Judge, I

 6   don't think we would have had to file the case at all if the

 7   document was "We're going to hold it back and exclude and be

 8   anticompetitive."

 9       I also think we have not had full access to whatever they

10   may have claimed privilege over in their very --

11          THE COURT:  I'm not --

12          MR. WEINGARTEN:  No, but I think it's unfair for

13   counsel to point to evidence of absence as saying, "Oh, well

14   that means it didn't exist or didn't happen."  But I'll move

15   on.

16       The case law does not require that we show something as a

17   must have.  The scarcity and the need for this content is why

18   they shelled out 8 billion or 7 and a half billion for ZeniMax

19   and $70 billion now.

20          THE COURT:  But not -- not just for Call of Duty.

21          MR. WEINGARTEN:  No.  But we seem to be going back and

22   forth on they're getting some other things, but I think

23   Microsoft's model has been very clear and the documents about

24   using the Call of Duty franchise to drive subscribers and

25   scale.

```
 1          I also want to say, when Defense Counsel says "It's just
 2    like Seinfeld or a TV show being on one subscription service or
 3    another," Mr. Kotick came and he had a warning about that
 4    world.  His testimony was he hates that world.  He said he came
 5    from Los Angeles and that world has been death for creators.
 6          THE COURT:  Which is why he won't put the games on
 7    Game Pass or up in the cloud?
 8          MR. WEINGARTEN:  Right.
 9          THE COURT:  Right?  So I don't --
10          MR. WEINGARTEN:  But --
11          THE COURT:  I mean, you point that out and that
12    suggests --
13          MR. WEINGARTEN:  No, but I --
14          THE COURT:  -- without the merger, then people aren't
15    going to have it available to get it by subscription.
16          MR. WEINGARTEN:  Or -- I have the nuance, if I may,
17    Your Honor -- or he reaches deals with everybody and gets paid
18    by everybody instead of just getting in one subscription
19    service.  So instead of Seinfeld just being on Netflix, or
20    wherever it is, the people who own Seinfeld reach their deal
21    with Netflix and Peacock and Disney Plus and we have more
22    access instead of the walled garden.
23          So Mr. Kotick is, I think, savvy about his own business.
24    He said he hates the world that Ms. Wilkinson just said is
25    where they're going.
```

1          **THE COURT:**  Okay.  Can we go to the balance of the

2    equities, which we get to if there's showing of a likelihood of

3    success?

4         And *Warner* is the Ninth Circuit case -- right? -- that I

5    look at and sense that.  And we know that private equities,

6    while they can be considered, they can't alone counter-show --

7    or justify denial of a preliminary injunction.

8                          (Pause in proceedings.)

9          **THE COURT:**  *Warner* then said if the record is

10   conflicting on the anticompetitive effects, the public

11   entity -- the public equities there, including beneficial

12   economic effects and -- or if -- sorry -- you know what *Warner*

13   says.

14        But what I want to get to is *Warner* then said there, even

15   though we have conflicting evidence so we can't say that the

16   public equities include these beneficial economic effects or

17   advantages for a consumer if we stop the merger now because

18   there's conflicting evidence, there was a different public

19   equity there which was if the merger happened, it was going to

20   be very difficult to divest.

21         **MR. WEINGARTEN:**  Uh-huh.

22         **THE COURT:**  Right?  It was going to be very -- and

23   here, my understanding is it's going to be a parent-sub

24   relationship.  And so really the only question here is, as you

25   said, is to stop the merger.

1      We know there are some private equities.  They've been

2   publicly stated.  That's why we're here in such a rush.  And so

3   then what is the countervailing public equity that you would

4   point to?

5         MR. WEINGARTEN:  Sure.  The fact that Defendants say

6   they will keep Activision as one of their limited enterprises

7   and somewhat at or removed from Microsoft is not the same as a

8   hold separate.  So the harm will start the day the deal closes

9   and it will start that day because that is the day Mr. Ryan,

10  and anyone else who makes content for platforms, will start

11  looking a different way at Activision and sharing proprietary

12  information about their platform.

13        So it's not just about Sony, although we have the evidence

14  from Sony, who's going to contact Activision and say, "Great.

15  Here is my new platform.  Can we optimize Call of Duty for this

16  new platform that's going to do six new things?  That would be

17  great if we worked together" the day after the merger because

18  that info goes to Microsoft.

19        The harms do start, Your Honor, immediately.  This is not

20  coal factories.  This is intellectual work and it's about

21  partnerships.  And so there is one public equity that starts

22  right away.

23        I would also say -- we'll put it in our conclusions of

24  law -- the private equity, their interest in simply doing their

25  deal, which I know is very important to the Defendants, cannot

 1 outweigh the public's interests in ensuring a full

 2 adjudication.

 3          THE COURT:  No, no.  That's what I said.

 4          MR. WEINGARTEN:  Yeah.

 5          THE COURT:  However, *Warner* recognized that there's

 6 still -- that they're not irrelevant.  They're not irrelevant

 7 and you still have to identify some public equity.

 8          MR. WEINGARTEN:  Yes.

 9          THE COURT:  I know you have, but I'm just looking

10 right at *Warner*; right?

11          MR. WEINGARTEN:  Yes.

12          THE COURT:  Yeah.

13          MR. WEINGARTEN:  So the public equity, Judge, is that

14 the harms in this case start immediately.

15          THE COURT:  Okay.

16          MS. WILKINSON:  I want to address that.  That's just

17 not true with Call of Duty.

18     As you know, there is a contract that's going through the

19 end of 2024, that came into evidence, to ensure that Call of

20 Duty stays on PlayStation till at least then.

21          THE COURT:  Yeah.  So that's --

22          MS. WILKINSON:  Even if Sony doesn't accept our

23 offer -- and, again, I just want to say, Your Honor, how can it

24 be withholding when they don't want to agree with us?

25          THE COURT:  Okay.

 1          **MS. WILKINSON:**  But regardless of what Microsoft

 2   wants, there's indisputable evidence that they follow their

 3   contracts when they acquire studios.  The government proved

 4   that for us.

 5          **THE COURT:**  Yeah, what about that?  I mean --

 6          **MR. WEINGARTEN:**  I'm not sure I follow the point even.

 7          **MS. WILKINSON:**  They made a big deal -- I'm sorry,

 8   Your Honor.

 9          **THE COURT:**  No dev needs to be sent over to Microsoft.

10   Call of Duty that's being released in November will be released

11   on PlayStation.

12          **MR. WEINGARTEN:**  Yes.

13          **THE COURT:**  So your August 2nd hearing can go forward.

14   Nothing is going to happen, at least that I -- I mean, I guess

15   what I'm saying is, you guys should address it in your

16   submissions to tomorrow.

17          **MR. WEINGARTEN:**  I would also -- there is -- it is not

18   static.  This is not just about, "Oh, let's wait for the next

19   contract negotiation."  Microsoft is hard at work on its next

20   console.  PlayStation is hard at work on its next console.  And

21   the record evidence is that these conversations about

22   optimizing for a new generation take place years before.

23          **THE COURT:**  I don't know.  That's why I'm saying just

24   point it out in your -- in your submissions.

25       Okay.  So appreciate the argument.

 1    So tomorrow, as I said, I've given you this time deadline

 2  because I want to save your holiday weekend; but by 5:00 p.m.

 3  tomorrow, your proposed findings of fact and conclusions of

 4  law, which may be submitted under seal, along with a Word

 5  version e-mailed to Ms. Means.

 6    And then if you could by Monday at noon, just submit a

 7  joint appendix of exhibits that were admitted into evidence.

 8  And, if possible, as well as a new share file with just those

 9  exhibits.  That way I know I have them all that way.  I don't

10  think that should be too much work there.  I'm sure you could

11  use ChatGBT to create your appendix.

12                         (Laughter)

13         **MR. WEINGARTEN:**  We will not --

14         **THE COURT:**  You, Microsoft.

15         **MS. WILKINSON:**  I'm not going to say anything,

16  Your Honor.

17         **MR. WEINGARTEN:**  We will not be doing that.

18    My colleague has a quick logistical question, please.

19         **MS. FLEURY:**  Thank you, Your Honor.

20    I just have a quick question about when the actual date to

21  file the public version of the filings that we'll be submitting

22  to Your Honor next Friday?  We had talked to Defendants and a

23  date to offer --

24         **THE COURT:**  By next Friday, you mean tomorrow?

25         **MS. FLEURY:**  Right.  So we're submitting --

 1          **THE COURT:**  Oh, the non --

 2          **MS. FLEURY:**  -- the nonpublic versions --

 3          **THE COURT:**  Yes.

 4          **MS. FLEURY:**  -- of our findings of fact and

 5     conclusions of law by tomorrow.

 6          **THE COURT:**  What would you like?  When do you think

 7     you can get your -- knowing that we have a holiday.

 8          **MS. FLEURY:**  We discussed and floated July 12th as a

 9     potential date, assuming that works for Your Honor's schedule.

10          **THE COURT:**  Could you do the 7th?  No?  Is that too

11     hard?

12          **MR. WEINGARTEN:**  This is the lifting of just doing all

13     the redacting and the sealings.

14          **MS. FLEURY:**  Right, and reaching out to the third

15     parties.

16          **THE COURT:**  And no Sharpies.

17          **MS. FLEURY:**  All the evidence -- yes.  In light of the

18     holiday next week, we were floating that idea.  We could get it

19     done earlier, but that was what we were discussing with Defense

20     counsel.

21          **THE COURT:**  I don't know.  What do you think?

22          **MS. WILKINSON:**  Your Honor, if we --

23          **THE COURT:**  So the findings of fact and conclusions of

24     law that you initially submitted, redacted versions are on the

25     docket?

1      **MS. WILKINSON:**  Yes.

2      **THE COURT:**  Okay.  The 12th is fine.

3      **MS. FLEURY:**  Thank you, Your Honor.

4      **MS. WILKINSON:**  We just don't want that to slow down

5  your opinion, and you've been generous with your time and we

6  realize that, but --

7      **THE COURT:**  No, that won't -- let me tell you, what I

8  decide, I don't know when I'm going to get it out, but

9  obviously I'm mindful.  So don't expect, you know, for the

10 judges that take two or three months on these to get the same

11 work product.  I'm sorry.

12     **MS. WILKINSON:**  Appreciate it.

13     **THE COURT:**  I'll file my order under seal, and then

14 I'll ask you to provide me jointly with your proposed

15 redactions.  Also try to write it in a way that we don't need

16 so many redactions.

17     Frankly, and someone -- someone may very well appeal.  I

18 leave it on you to tell the Ninth Circuit where in the record

19 those kinds of things.  That will help speed things up quite a

20 bit.

21     Lastly, I do want to congratulate the parties on your

22 presentation and your civility.  It was pretty extraordinary.

23 I don't get to see this level of advocacy very well.  You were

24 on tight deadlines.  I was pretty, you know, demanding in terms

25 of documents and things.  You all met them.

 1    Everyone -- I especially want to -- the FTC, because I'm a

 2  government employee, you don't have quite the same resources

 3  they do and yet your team was able to keep up with that in

 4  terms of that presentation, and I'm very much appreciative of

 5  both sides.

 6    Yeah, I'm going to do my best.  It's hard, that's all I

 7  can say, but I very much appreciate the presentation that

 8  everyone did and I also appreciate how both sides gave many

 9  attorneys the opportunities to take witnesses.  I think that

10  was to your benefit and to your clients' benefits because it

11  enabled the presentations, I think, to be better because you

12  were sharing that.  So spread that word.

13    Okay.  All right.

14        MS. WILKINSON:  Thank you very much, Your Honor.

15        THE COURT:  Yes?

16        MS. FLEURY:  I do have one housekeeping matter.

17        THE COURT:  Of course.

18        MS. FLEURY:  I'm sorry to end on that note.

19        THE COURT:  That's all right.

20        MS. FLEURY:  We had several sealed portions of videos

21  that I wanted to make sure both that Your Honor has them and

22  has access to them, and I also wanted to move to admit the clip

23  reports for some of those videos and the underlying material.

24  It's really just the actual clip reports that we thought would

25  be helpful to have numbers admitted into the record.

1     **THE COURT:**  Okay.  I did read the transcripts in full.

2     So I read them all of Mr. Singer, Mr. Eisler, Mr. Fisher.

3     **MS. FLEURY:**  And it's Mr. Fisher and Mr. Eisler as

4     well as the Ryan -- Mr. Ryan's sealed clip report that we were

5     hoping to just admit into evidence quickly.

6     **THE COURT:**  Sure.

7     **MS. FLEURY:**  So the -- Mr. Ryan's sealed clip report

8     is PX3378.

9         Mr. Fisher's sealed clip report is PX3379.

10        Then Mr. Fisher's public clip report is PX3380.

11        Then Mr. Eisler's sealed clip report is PX3381.

12        And then Mr's. Eisler public clip report is PX3382.

13        And the Mr. Fisher full deposition transcript is PX7062.

14    **THE COURT:**  All of those exhibits are admitted.

15        (Trial Exhibits 3378, 3379, 3380, 3381, 3382, and 7062

16         received in evidence.)

17    **MS. FLEURY:**  Thank you, Your Honor.

18    **MR. WEINGARTEN:**  Thank you, Your Honor.

19    **THE COURT:**  All right.  Thank you.

20            (Proceedings adjourned at 5:19 p.m.)

21                      ---oOo---

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Thursday, June 29, 2023

8

9

10

11     _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
            United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25