1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7  FEDERAL TRADE COMMISSION,                     Case No.  23-cv-02880-JSC

8              Plaintiff,

9        v.                                      **PRELIMINARY INJUNCTION OPINION**

10  MICROSOFT CORPORATION, et al.,               **REDACTED VERSION**

11              Defendants.

12

13        In December 2022, the FTC initiated an administrative action to block Microsoft's

14  proposed acquisition of Activision—publisher of the first-person shooter video-game franchise

15  *Call of Duty*, among other popular video games.  The gist of the FTC's complaint is *Call of Duty*

16  is so popular, and such an important supply for any video game platform, that the combined firm

17  is probably going to foreclose it from its rivals for its own economic benefit to consumers'

18  detriment.  Discovery in the administrative action has closed, and trial before an FTC judge is

19  scheduled to commence on August 2, 2023.

20        Four weeks ago, the FTC filed this action to preliminarily enjoin the merger pending

21  completion of the FTC administrative action.  Because the merger has a July 18 termination date,

22  expedited proceedings were commenced.  After considering the parties' voluminous pre-and-post

23  hearing writing submissions, and having held a five-day evidentiary hearing, the Court DENIES

24  the motion for preliminary injunction.  The FTC has not shown it is likely to succeed on its

25  assertion the combined firm will probably pull *Call of Duty* from Sony PlayStation, or that its

26  ownership of Activision content will substantially lessen competition in the video game library

27  subscription and cloud gaming markets.

28

United States District Court
Northern District of California

**BACKGROUND**

The video gaming industry represents the fastest growing form of media and entertainment with revenues larger than the film, music, and print industries.  The industry consists of several components.  The three billion worldwide gamers.  The videogame developers who create the games.  The videogame publishers who release the games.  And the companies that make the devices on which gamers play the games.  This action involves a merger between Activision—the developer of the *Call of Duty* video game franchise—and Microsoft—a game developer, publisher, and the manufacturer of the Xbox game console.

**A.      The Parties**

Microsoft made $198 billion in revenue in 2022.  (PX9050-043.[1])  Gaming is part of Microsoft's More Personal Computing division.  (PX9050-014.)  Its gaming business includes Xbox, Xbox Game Pass (a gaming subscription service), and Xbox Cloud Gaming.  (PX9050-014.)  Microsoft publishes video games through Xbox Game Studios, comprising 23 game development studios, including nine studios that were included in Microsoft's acquisition of ZeniMax Media Inc., announced in September 2020 and finalized in March 2021.  (Dkt. No. 226-2, Lee Decl. at ¶ 14; PX0003 at 086-087 (detailing Microsoft acquisitions of gaming studios); PX1527-002.)

Activision, a publicly traded corporation, earned $7.5 billion in revenue in 2022. (PX9388-040 (Activision 10-K 2022).)  "Activision develops and publishes video games for consoles, PCs and mobile devices.  Microsoft often refers to Activision, along with EA [Electronic Arts], Take-Two Interactive Software, Inc., and Ubisoft, as one of the 'Big 4' independent video game publishers."  (Dkt. No. 226-2, Lee Decl. at ¶ 19.)  "Activision's most successful video game franchise is *Call of Duty*, a first-person shooter video game series playable on video game consoles and PCs.  "Activision also produces other popular video games for consoles, including games from the *Diablo*, *Overwatch*, *Crash Bandicoot*, and *Tony Hawk* franchises, as well as video

---

[1] Exhibit citations are to the exhibit number and the page number associated with the exhibit number.  For hearing testimony, the Court has endeavored to include citations to the associated docket number. Other record citations are to material in the Electronic Case File ("ECF") with pinpoint citations to the ECF-generated page numbers at the top of the documents.

games for other devices, including games from the *Candy Crush* (for mobile devices) and *Warcraft* (for PC) franchises."  (Dkt. No. 226-2, Lee Decl. at ¶ 21.)

### B.     The Proposed Merger

On January 18, 2022, Microsoft announced an agreement to acquire Activision for $68.7 billion—one of the largest, if not the largest, tech industry mergers.  The agreement provides, among other things, either party may terminate the merger agreement if the transaction has not closed by July 18, 2023.  (PX0083-088.)  If the agreement is terminated because it has not closed, Microsoft may have to pay Activision a $3 billion termination fee.  (PX0083-091, Sec. 8(c).)  Following the merger, "[Activision Blizzard] will continue as the surviving corporation of the Merger and a Subsidiary of Parent [Microsoft]." (PX00083-024; *see also* RX5058 (Hood Decl.) at ¶ 6 (discussing Microsoft's plan to maintain Activision as a limited-integration studio).

### C.     The Video Game Industry

Video gaming generates hundreds of billions of dollars of revenue a year and is projected to grow substantially in the future.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 404:12–16; Dkt. No. 285, 6/28/23 Tr. (Kotick) at 710:16–17 ("[T]he business has evolved to be what's today probably a $130 billion-a-year industry.").)  Gaming grew to record high levels during the global pandemic, with people seeking at-home entertainment options more than ever before.  (RX3136; Dkt. No. 285, 6/28/23 Tr. (Bailey) at 789:16–22.)

#### 1.     Gaming Platforms

Video games are available to play across a wide range of platforms, including mobile, PC, and console.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 404:6–405:3 (discussing RX3166-003); *see also* Dkt. No. 284, 6/27/23 Tr. (Bailey) at 661:3–23.)  Games can be played on general purpose PCs or gaming PCs, but gaming PCs typically have more advanced hardware to allow them to play more computationally demanding games.  (PX8001 (Ryan Decl.) at ¶ 15.)  Conversely, games played on mobile have lower graphics and are less sophisticated than games played on consoles or gaming PCs.  (PX0003-073.)  The three primary console makers are Microsoft (Xbox Series X|S), Sony (PlayStation 5), and Nintendo (Switch).  (PX1777-008; Dkt. No. 226-2, Lee Decl. at ¶ 13.)

United States District Court
Northern District of California

### a.      Console Gaming

Video game consoles are consumer devices designed for, and whose primary use is, to play video games.  (PX8001 (Ryan Decl.) at ¶ 10.)



While consoles were once the predominant form of home gaming, they now represent a smaller share of video game revenue than either mobile or PC.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 127:16-128:1; RX3166-003.)

### b.    Mobile Gaming

Most gamers today play on mobile devices, which is also the fastest growing segment as the technical capabilities of mobile devices increase.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 127:24–128:1; Dkt. No. 283, 6/23/23 Tr. (Spencer) at 392:5–6, 392:10–12, 404:11, 404:21-22; Dkt. No. 285, 6/28/23 Tr. (Kotick) at 712:1-12, 732:4-20; *id.* at 712:8-9 ("And so today the bulk of games are played on phones . . . ."); Dkt. No. 284, 6/27/23 Tr. (Bailey) at 661:6–23; *see also* RX5058 (Hood Decl.) at ¶ 14 ("$113 billion of the game industry's total revenues of $210 billion came from mobile gaming in 2020").)  Growth in mobile gaming is expected to continue, as microprocessors equivalent to those used in past video game consoles are increasingly becoming more powerful and incorporated into phones.  (*See, e.g.*, Dkt. No. 285, 6/28/23 Tr. (Kotick) at 720:7-11 (explaining mobile is "the biggest part of the market").)

### c.    PC Gaming

After mobile, PC gaming is the next largest source of video game revenue.  (Dkt. No. 284, 6/27/23 Tr. (Bailey) at 661:11-12.) ████████████████████████████████

1

2

3

4

5

### d.      Cross-Platform Play

Games can be single-player or multi-player. Single-player games are normally story-driven, and other characters in the game are computations in the game rather than real people.  In multiplayer games, players are matched with other people of similar skill level, and players interact in real time.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 134:5-19.)  Gamers can now play certain multiplayer games across platforms.  For example, a gamer on PlayStation can now play many games with other gamers playing on another platform, like Nintendo or Xbox or PC.  That mode of play is referred to as "cross-platform" gaming or "cross-play."  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 135:7-17.)  In most multiplayer games, a gamer selects multiplayer game mode, the game matches the gamer with other gamers, and the gamers are then placed in a lobby and either enter the game or are placed in teams.  (*See* Dkt. No. 282, 6/22/23 Tr. (Bond), at 134:5-19; Dkt. No. 284, 6/27/23 Tr. (Bailey) at 669:24-670:4, 672:2-7.)  Cross-play makes games more valuable to consumers because they can play the game with friends and access larger lobbies of players. (*See, e.g.*, Dkt. No. 284, 6/27/23 Tr. (Bailey) at 669:22-670:4; Dkt. No. 285, 6/28/23 Tr. (Kotick), at 716:5–8; *see also id.* at 713:23-714:10 ("[T]he big evolution of the industry has been this transformation to the social experience."), 715:18-24.)  Many of the most popular multiplayer titles (*e.g.*, *Fortnite, PUBG*, *Call of Duty*, and *Minecraft*) allow gamers to cross-play between at least PC and console.  (*See, e.g.*, Dkt. No. 282, 6/22/23 Tr. (Bond) at 152:18-153:2 (*Call of Duty*).)

### 2.      Gaming Content

A game publisher brings games to market and sometimes provides funding to the game developer to do so.  (PX7014 (Booty Investigational Hearing "IH" Tr. at 28:5-15.)  A developer creates the assets for a game, including writing the code and designing the art.  (Dkt. No. 282, 6/22/23 Tr. (Booty) at 50:14-19; PX7014 (Booty IH Tr.) at 28:5-15.)  First-party content is created

United States District Court
Northern District of California

and developed by a console manufacturer at an in-house studio.  (Dkt. No. 282, 6/22/23 Tr.
(Booty) at 50:25-51:2; Dkt. No. 226-2, Lee Decl. at ¶ 15; PX7014 (Booty IH Tr.) at 58:20–59:9.)
Microsoft's first-party content is created at Xbox Game Studios. (PX9050-015; PX0003-016.)
Some of Microsoft's first-party franchises include *DOOM*, *Forza*, *Gears of War*, *Halo*, *Minecraft*,
and *The Elder Scrolls*. (PX9252-001.)

Third-party content refers to games independently developed and published by a third-party publisher.  (Dkt. No. 282, 6/22/23 Tr. (Booty) at 51:6-8; Dkt. No. 226-2, Lee Decl. at ¶ 15; PX8001 (Ryan Decl.) at ¶ 5; PX0003-016.)  Occasionally, console manufacturers will publish titles developed by a third-party development studio, known as second-party games.  (PX8001 (Ryan Decl.) at ¶ 5; PX7003 (Bond IH Tr.) at 152:2-10; PX0003-016.)  Console manufacturers typically negotiate publisher license agreements with game publishers setting the terms for any titles the console manufacturer ships from the publisher.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 420:11-421:2.)  For second- or third- party developers, console manufacturers create development kits for those second- or -third- party developers to use to ensure the game will run on the console. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 156:7-17.)

Both consumers and industry participants acknowledge content drives sales.  ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████

### a.     AAA Content

"AAA" content is an industry term and can be synonymous with "a tentpole title, a marquee title, a big blockbuster title" that has a high development budget and high expectations for sales.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 147:20-148:2 ("[AAA] tends to imply a game of a certain size and scope, a certain level of investment put into the game"); ████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████ Activision CEO Bobby
Kotick concluded sustaining AAA games requires broad and deep capabilities, and even then, a
AAA title is not guaranteed (though Mr. Kotick admits Activision has the capability to release a
AAA game every single year).  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 43:14-22.)

### b. Exclusive Content

Each of the three major console companies is also a vertically integrated first-party game
developer and publisher.  And while each has a collection of platform-exclusive titles, "the
Nintendo Switch, the PlayStation, they both have significantly higher number of exclusive games
on their platform than Xbox does."  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 346:25–347:2; *see*

*also id.*, 6/23/23 Tr. (Spencer) at 440:24-441:4 (exclusives are "an established part of the console business, the video game business, and Sony and Nintendo are very strong with their exclusive games.").)

1

2

3

In addition to exclusivity, Sony also uses its market power to extract other preferential treatment from third-party game developers, including earlier release dates, exclusive marketing agreements, and exclusive in-game content.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 162:1–4, 186:5–8.)

### c.    Activision Content

### i.    Call of Duty

The *Call of Duty* games are first-person shooter games based on "military conflict through history."  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 712:21-713:9; Dkt. No. 282, 6/22/23 Tr. (Bond) at

1   152:18-23; Dkt. No. 282, 6/22/23 Tr. (Hines) at 112:10-20.) ███████████████

2   ████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████

10       *Call of Duty* games have been continuously available on both PlayStation and Xbox

11   consoles since 2003.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 714:12-715:12, 720:1-6.)  Activision

12   typically releases a new buy-to-play *Call of Duty* game every year.  (Dkt. No. 285, 6/28/23 Tr.

13   (Kotick) at 736:12-18 (*Call of Duty* released every year); Dkt. No. 282, Tr. (Bond) at 128:23-25

14   (games cost $70).) ████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████

22       The latest annual *Call of Duty* titles are playable across platforms via a cross-play feature.

23   (Dkt. No. 282, 6/22/23 Tr. (Bond) at 152:18-153:2.)  The introduction of cross-play to *Call of*

24   *Duty* has significantly improved players' experience; the game's online multiplayer functionality

25   thrives on a large and active player base, and cross-play has increased the number of available

26   players.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 716:5-8 (explaining cross-play "expands the

27   market and also makes you -- let's say you have a group of friends, not everybody's going to have

28   the same device so it gives you the opportunity to be able to play with your friends").).

United States District Court
Northern District of California

1    Activision also develops and publishes free-to-play versions of *Call of Duty* called *Call of*

2    *Duty: Warzone*—available on PlayStation, Xbox, and Windows PC—and *Call of Duty: Mobile*

3    ("*COD: Mobile*")—available on iOS and Android mobile devices—which it monetizes through

4    optional in-game microtransactions.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 153:3-15; *see also* Dkt.

5    No. 285, 6/28/23 Tr. (Kotick) at 720:3-11.)  "Half of [the *Call of Duty* franchise's] monthly active

6    players play on phones."  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 716:17-21; *see also id.* at 719:2-6

7    ("[T]he bulk of players [in the *Call of Duty* franchise] are playing on phones.").)  Recently, *COD:*

8    *Mobile* reached 150 million monthly annual users.  (Dkt. No. 286, 6/29/23 Tr. (Stuart) at 1033:3-

9    6.)  Cross-play also exists in the free-to-play *Call of Duty: Warzone*.  (*See* Dkt. No. 285, 6/28/23

10   Tr. (Kotick) at 719:7-720:2 (noting the free-to-play Warzone is playable on PlayStation, PC, and

11   Xbox).)  *Call of Duty: Warzone* will be available on mobile this fall, and like the console and PC

12   versions, it will be available as a multiplayer game across mobile devices.  (*See* Dkt. No. 285,

13   6/28/23 Tr. (Kotick) at 720:1-10; 721:9-13.)

14   　　*Call of Duty* is not currently available on the Nintendo Switch.  (Dkt. No. 285, 6/28/23 Tr.

15   (Kotick) at 768:8-13.)  It is also not currently available on any cloud gaming services or

16   multigame game subscription libraries upon release.  (Dkt. No. 285, 6/28/23, Tr. (Kotick) at

17   734:2-5, 731:12-14.)

18   　　　　　　　　　　**ii.    Other Activision Content**

19   　　King's *Candy Crush* franchise consists of casual, free-to-play puzzle games made for

20   mobile devices.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 725:25-726:6.)  ████████████

21   ████████████████████████████████████████████████

22   ████████████  King primarily monetizes *Candy Crush* through optional in-game

23   microtransactions, and also generates revenue through in-game advertising placements.  (Dkt. No.

24   285, 6/28/23 Tr. (Kotick) at 726:24-727:4.)

25   　　Blizzard's popular *World of Warcraft* franchise principally consists of a massively-

26   multiplayer-online fantasy role-playing game, and related expansions and content released over

27   the course of the past 20 years.  (*See* Dkt. No. 285, 6/28/23 Tr. (Kotick) at 730:1-18.)  Blizzard

28   makes *World of Warcraft* available for PCs on a subscription-based model.  (*See, e.g.*, Dkt. No.

United States District Court
Northern District of California

12

285, 6/28/23 Tr. (Kotick) at 730:1-7.) 

Indeed, the only Activision titles made available on multigame subscription services have been back-catalog games offered for a limited period of time, often for promotional purposes, rather than new games made available day and date.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 774:9-24; *see also* Dkt. No. 285, 6/28/23 Tr. (Kotick) at 747:3-10, 750:10-13 (acknowledging occasional placement of "a very old catalog title for a short period of time" on subscription services).)

### 3.      Access to Gaming Content

Gamers can access games through a growing variety of payment and distribution models. The diversity of payment and distribution models has increased the accessibility of games and expanded gamer choice.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 392:24-393:10.)  Most gamers obtain entitlements to access and play console games via the "buy-to-play" model of purchasing the games in the form of a cartridge, DVD or Blu-Ray disc, or digital download for an upfront price (*e.g.*, $70) and adding them to their own libraries.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 128:23-25, 138:2-20.)

### a.      Multi-Game Content Subscription Services

1    With multigame subscription offerings, gamers pay a flat monthly fee to access a library of

2  games.  In the case of most subscription offerings, subscribers download the games they want to

3  play to their devices (just as they would a buy-to-play game), and then play them using those

4  devices.  With some services, gamers can stream games while waiting for the game to download

5  or try out a game before downloading.  (Dkt. No. 282, 6/22/23 Tr. (Hines) at 92:23-93:5; Dkt. No.

6  282, 6/22/23 Tr. (Bond) at 145:12-146:7; *see also* Dkt. No. 285, 6/28/23 Tr. (Bailey) at 790:21-

7  791:9 (telemetry data show xCloud is "largely [used to] play[] one game they never played before

8  and not playing it ever again," which is "exactly consistent with" gamers using xCloud while the

9  game downloads).)

10    In 2017, Xbox launched Game Pass, one of the first multigame subscription offerings.

11  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 140:15-23.)  Subscribers can access a broad catalog of games

12  for a set monthly fee of $9.99 (or $14.99 for the Game Pass Ultimate tier) instead of purchasing

13  the games outright (for $70 per game).  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 137:23-138:1;

14  RX5044-001.) ███████████████████████████████████████████████████

15  ███████████████████  To make Game Pass more attractive, Xbox includes all games developed by its

16  studios (first-party games) in Game Pass the day of release ("day-and-date").  (Dkt. No. 286,

17  6/29/23 Tr. (Stuart) at 1047:6-15; Dkt. No. 282, 6/22/23 Tr. (Bond) at 139:6-7; ████████████

18  █████████████████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████

21  ██████████████████████████████████████████████████

22    Aside from Game Pass, Microsoft also offers Xbox Live Gold, which provides subscribers

23  with access to online, multiplayer games and a limited selection of downloadable games each

24  month among other benefits, such as audio and visual communications and certain discounts.

25  (PX0003-018; Dkt. No. 282, 6/22/23 Tr. (Bond) at 136:18-24.)  Xbox Live Gold does not provide

26  subscribers with access to the vast library of games subscribers of Xbox Game Pass for PC or

27  Console and Game Pass Ultimate receive.  (PX0003-018.)

28



██████████████████████████████████████████████████████████████████

████████████████        For example, Activision does not allow, and has no plans to allow, its games in multigame subscription libraries upon release.  (*See* Dkt. No. 285, 6/28/23 Tr. (Kotick), at 731:12-14 ("In our current long-range plan, we don't have any revenues that are being generated from a multigame subscription service"); Dkt. No. 285, 6/28/23 Tr. (Kotick) at 746:19-21 ("I would say it's just not something that we do have any plans to do or have ever done . . . .").  This "philosophical aversion" to subscription services arises from concerns that multigame subscriptions would "degrade the economics" of Activision's buy-to-play business model, are "inconsistent with the idea of starting out with free-to-play as the way that you build game universes and franchises," and possibly could lead to substantial cannibalization.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 729:3-16, 743:22-24; *see also id.* at 744:8-11 (explaining "cannibalization would play a role" in a decision not to place games in a multigame subscription).)

Activision only rarely allows even its older back-catalog titles to be included in subscription services for brief periods of time.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 747:3-10, 750:10-13 (acknowledging occasional placement of "a very old catalog title for a short period of time" on subscription services); ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

### b.    Cloud Gaming Subscription Services

Cloud gaming (also known as cloud game "streaming") is a potential alternative delivery mechanism to downloading native games for play onto hardware.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 131:20-132:5; PX7060 (Eisler Dep. Tr.) at 29:12-19.) ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████    ███████████████

United States District Court
Northern District of California

1   ████████████████████████████████████████████████████████

2   ████████████████████████████████████████   It enables gamers to begin playing a

3   game in seconds, rather than waiting for games to download or update, and streaming rather than

4   downloading avoids burdening the storage limits on a gaming device.

5   (https://support.xbox.com/en-US/help/games-apps/cloud-gaming/playing-console-game-from-

6   cloud-versus-installing ("You can start playing a game in seconds. There's no waiting for games

7   to finish installing or updating . . . download times or storage limits aren't a factor."); PX8000

8   (Eisler Decl.) at ¶ 17.)  However, the technology and economics of cloud gaming remain

9   challenging, particularly for latency-sensitive multiplayer games.  Due to those latency issues,

10  users sometimes experience a stuttering effect or lags in gameplay.  (Dkt. No. 282, 6/22/23 Tr.

11  (Bond) at 145:6-11; Dkt. No. 283, 6/23/23 Tr. (Spencer) at 395:10-16; PX7060 (Eisler Dep. Tr.) at

12  47:05-47:23.)  Cloud gaming is also limited in its ability to replicate controller functions for

13  console games streamed to mobile devices.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 395:23-396:7;

14  Dkt. No. 285, 6/28/23 Tr. (Kotick) at 733:15-21.)

15         In 2020, Microsoft added cloud gaming to its top-tier multi-game content library

16  subscription service offering, Xbox Game Pass Ultimate.  (PX9091 at 001-006.)  Xbox Cloud

17  Gaming (also referred to as xCloud) enables Xbox Game Pass Ultimate subscribers to stream

18  certain games, as opposed to downloading games locally, and then to play those games on the

19  device most convenient to them, including consoles, Windows PCs, tablets, and mobile phones.

20  (PX0003 at 018.)  Microsoft also offers free access to Xbox Cloud Gaming for Epic Games'

21  *Fortnite*.  (PX0003 at 019.)  ████████████████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████████████████

24         As Microsoft Gaming CEO Phil Spencer testified, Microsoft's xCloud strategy is to allow

25  those who want to play Microsoft games on their mobile phones to "have access to those through

26  streaming," allowing Microsoft to "find a significant number of customers given the installed base

27  of people playing games on mobile phones."  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 393:16-

28  394:6.)  However, as a result of technical limitations, a large majority of Xbox Cloud Gaming

United States District Court
Northern District of California

users report relying on the service primarily to play a game while it is being downloaded to play natively on Xbox.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 145:12-146:7; Dkt. No. 283, 6/23/23 Tr. (Spencer) at 394:23-396:7; *see also* Dkt. No. 285, 6/28/23 Tr. (Bailey) at 790:4-791:9 (telemetry data show xCloud is "largely [used to] play[] one game they never played before and not playing it ever again," which is "exactly consistent with" gamers using xCloud while the game downloads).)

### D.    Microsoft's Post-Complaint Agreements

Two months after the FTC filed its complaint, Xbox and Nintendo entered a ten-year agreement to bring future *Call of Duty* titles to Switch (and any successor Nintendo consoles) after the merger closes.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16 Microsoft

17 executives have nonetheless committed publicly and under oath in court to continue to sell *Call of*

18 *Duty* to Sony.  (Dkt. No. 285, 6/28/23 Tr. (Nadella) at 853:9-11 (Q: "Let me ask you here today,

19 Mr. Nadella, will you commit to continuing to ship *Call of Duty* on the Sony PlayStation?" . . . A:

20 "A hundred percent."); Dkt. No. 283, 6/23/23 Tr. (Spencer) at 367:18-24, 368:4-10, 429:21-22,

21 429:25-430:1 ("my commitment is and my testimony is, to use that word, that we will continue to

22 ship Call of -- future versions of *Call of Duty* on Sony's PlayStation platform").)

23 **PROCEDURAL HISTORY**

24 On February 1, 2022, Microsoft reported the planned merger to the FTC, as required by the

25 Hart-Scott-Rodino Antitrust Improvements Act ("HSR Act").  The FTC thereafter commenced an

26 11-month investigation, requiring Microsoft and Activision to produce nearly 3 million documents

27 and sit for 15 investigational hearings.  The waiting period under the HSR Act which prevents the

28 parties from closing the transaction was extended by agreement with the FTC until November 21,

1    2022, and the parties thereafter agreed voluntarily to delay closing until December 12, 2022.

2          On December 8, 2022, the FTC filed an administrative complaint against the merger,

3    alleging it violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15

4    U.S.C. § 45.  *See* Part 3 Complaint, In the Matter of Microsoft/Activision, No. 9412 (F.T.C. Dec.

5    8, 2022).  Fact discovery in the FTC administrative proceeding, which included production of

6    nearly 1 million documents and 30 depositions, closed on April 7, 2023, followed by expert

7    discovery.  An evidentiary hearing before an administrative law judge (ALJ) is scheduled to begin

8    on August 2, 2023.  (Dkt. No. 1, Complaint at ¶ 16.)

9          Although the Agreement allows either party to terminate the merger agreement if the

10   transaction has not closed by July 18, 2023, and appears to obligate Microsoft to pay Activision a

11   termination fee of $3 billion, the FTC did not file this action to preliminarily enjoin the merger

12   until June 12, 2023—less than six weeks before the termination date.[2]  (Dkt. Nos. 1, 7;

13   PX0083091, Sec. 8(c).)  The Court related this action to a pending private antitrust action seeking

14   to stop the merger. (Dkt. No. 21; *see Demartini et al. v. Microsoft Corp.*, No. 22-08991-JSC.[3])

15   The FTC filed an emergency motion for a temporary restraining order (TRO) with their

16   Complaint, arguing Microsoft intended to proceed with the merger as soon as June 16, 2023, and

17   would not stipulate to a TRO unless the FTC filed in the United States District Court for the

18   District of Columbia, rather than the Northern District of California where the FTC indicated it

19   intended to file because this Court was already overseeing the *Demartini* action.  (Dkt. No. 12-3 at

20   10-11.)  The Court granted the FTC's motion for a temporary restraining order and set an

21   evidentiary hearing on the preliminary injunction motion to commence the following week.  (Dkt.

22   No. 37.)  The five-day evidentiary hearing commenced on June 22, 2023 and was completed on

23   June 29, 2023.  The action proceeded on an expedited basis given the Agreement's impending

24

25   ───────────────────

26   [3] Shortly after the FTC filed its administrative complaint, a group of *Call of Duty* players filed
     their own action in this Court to stop the merger pursuant to Clayton Act, Sections 7 and 16.
27   *Demartini et al. v. Microsoft Corp.*, No. 22-08991-JSC.  In that action, Microsoft stipulated on the
     record that the acquisition would not close before May 22, 2023.  (Dkt. No. 193 at 87:2-12.)
28

United States District Court
Northern District of California

termination date.  *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984) (ordering expedited proceedings "[b]ecause undue delay could force the parties to abandon the proposed merger").

## LEGAL FRAMEWORK

Section 7 of the Clayton Act prohibits mergers and acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.  "Because § 7 of the Clayton Act bars mergers whose effect 'may be substantially to lessen competition, or to tend to create a monopoly,' 15 U.S.C. § 18, judicial analysis necessarily focuses on 'probabilities, not certainties. This 'requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their incipiency.'" *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (citations omitted). Thus, "[i]t is well established that a section 7 violation is proven upon a showing of reasonable probability of anticompetitive effect."  *Warner*, 742 F.2d at 1160.

Section 7 claims challenging horizontal mergers are generally analyzed under a "'burden-shifting framework.'  The plaintiff must first establish a prima facie case that a merger is anticompetitive. The burden then shifts to the defendant to rebut the prima facie case." *Saint Alphonsus*, 778 F.3d at 783 (citations omitted).  The Ninth Circuit Court of Appeals has not addressed whether this burden shifting framework applies in vertical merger cases such as this. Indeed, "[t]here is a dearth of modern judicial precedent on vertical mergers and a multiplicity of contemporary viewpoints about how they might optimally be adjudicated and enforced.[4]" *United States v. AT&T, Inc.*, 916 F.3d 1029, 1037 (D.C. Cir. 2019).  In *AT&T*, the only court of appeals decision addressing a vertical merger in decades, the court found the burden-shifting framework

---

[4]"[A] dearth of authority that is unsurprising, considering that the Antitrust Division apparently has not tried a vertical merger case to decision in *four* decades!"  *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 193–94 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) (emphasis in original).

United States District Court
Northern District of California

applied, but "unlike horizontal mergers, the government cannot use a short cut to establish a presumption of anticompetitive effect through statistics about the change in market concentration, because vertical mergers produce no immediate change in the relevant market share." *Id*. at 1032. In vertical merger cases, "the government must make a fact-specific showing that the proposed merger is likely to be anticompetitive. Once the prima facie case is established, the burden shifts to the defendant to present evidence that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition, or to sufficiently discredit the evidence underlying the prima facie case." *Id*. (cleaned up).

## PRELIMINARY INJUNCTION

Section 13(b) of the Federal Trade Commission Act provides "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest . . . a preliminary injunction may be granted . . . ." 15 U.S.C. § 53(b). "In determining whether to grant a preliminary injunction under section 13(b), a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities." *Warner*, 742 F.2d at 1160 (citing *FTC v. Simeon Management Corp.*, 532 F.2d 708, 713–14 (9th Cir. 1976)).

To satisfy the first prong, the FTC must "raise questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Warner*, 742 F.2d at 1162 (citations omitted). In evaluating likelihood of success on the merits, the court must exercise its "'independent judgment' and evaluat[e] the FTC's case and evidence on the merits." *See FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2022 WL 16637996, at *5 (N.D. Cal. Nov. 2, 2022). Courts require such a rigorous analysis because "the issuance of a preliminary injunction prior to a full trial on the merits is an extraordinary and drastic remedy. This is particularly true in the acquisition and merger context, because, as a result of the short life-span of most tender offers, the issuance of a preliminary injunction blocking an acquisition or merger may prevent the transaction from ever being consummated." *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980) (cleaned up); *see also Warner*, 742 F.2d at 1165 (9th

United States District Court
Northern District of California

Cir. 1984) (ordering expedited proceedings "[b]ecause undue delay could force the parties to abandon the proposed merger."). However, the Court does not resolve conflicts in the evidence—the question is simply whether the FTC "has met its burden of showing a likelihood of success on the merits." *Warner*, 742 F.2d at 1164.

The parties sharply dispute in which forum "the Commission's likelihood of ultimate success," 15 U.S.C. § 53(b), should be measured. This question appears not to have been squarely addressed by any court other than in *Meta*, 2022 WL 16637996, at *4-6. In *Meta*, the court held "Section 13(b)'s 'likelihood of ultimate success' inquiry to mean the likelihood of the FTC's success on the merits in the underlying administrative proceedings, as opposed to success following a Commission hearing, the development of an administrative record, and appeal before an unspecified Court of Appeals." *Id*. at *6. The Court is persuaded by the *Meta* court's analysis of this issue and adopts it here—the relevant forum for the question of likelihood of success is before the ALJ in the administrative proceedings.

## ANALYSIS

## I.   RELEVANT MARKET

The first step in analyzing a Section 7 merger challenge is to determine the relevant market. *United States v. Marine Bancorporation, Inc*., 418 U.S. 602, 619 (1974) (citing *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957)); *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) ("A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'"). The relevant market for antitrust purposes is determined by (1) the relevant product market and (2) the relevant geographic market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).

### A.   Product Market

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* at 325. That is, "when one product is a reasonable substitute for the other, it is to be included in the same relevant product market even though the products themselves are not the same. A product is construed to be a 'reasonable substitute' for another when the demand for it

23

increases in response to an increase in the price for the other." *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998); *see also Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). The definition of the relevant market is "basically a fact question dependent upon the special characteristics of the industry involved." *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982). The overarching goal of market definition is to "recognize competition where, in fact, competition exists." *Brown Shoe*, 370 U.S. at 326; *see also Cardinal Health*, 12 F. Supp. 2d at 46 ("Because the ability of customers to turn to other suppliers restrains a firm from raising prices above the competitive level, the definition of the "relevant market" rests on a determination of available substitutes."). "The FTC bears the burden of proof and persuasion in defining the relevant market." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 119 (D.D.C. 2004), *appeal dismissed*, No. 04-5291, 2004 WL 2066879 (D.C. Cir. Sept. 15, 2004).

There is "no requirement to use any specific methodology in defining the relevant market." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 482 (9th Cir. 2021). "[C]ourts have determined relevant antitrust markets using, for example, only the *Brown Shoe* factors, or a combination of the *Brown Shoe* factors and the HMT.[5]" *Meta*, 2023 WL 2346238, at *9 (collecting cases). *Brown Shoe* factors are "practical indicia [such] as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325.

The FTC contends the *Brown Shoe* factors establish four relevant antitrust markets: (1) high performance consoles (Xbox and Sony PlayStation); (2) multigame content library

---

[5] The HMT is a common quantitative metric used by parties and courts to determine relevant markets. *See* U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines ("2010 Merger Guidelines") § 4 (2010); *see also United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011) ("An analytical method often used by courts to define a relevant market is to ask hypothetically whether it would be profitable to have a monopoly over a given set of substitutable products. If so, those products may constitute a relevant market."). Defendants insist the HMT does not apply to vertical mergers. The Court need not decide this issue as it accepts, without deciding, the FTC's definition of the relevant markets here.

United States District Court
Northern District of California

subscription services; (3) cloud gaming; and (4) a combined library subscription services and cloud gaming market.

### 1.     The Console Market

The FTC's primary market is the "high-performance console market" which it defines as Xbox and PlayStation Generation 9 (Gen 9) consoles.

#### a.     The Console Market and Nintendo Switch

The FTC seeks to limit the console market to Gen 9 consoles Xbox X|S and the PlayStation 5, and exclude the Nintendo Switch. ██████████████████

████████████████████████

██████████████████████████████

████████████████████████████

██████████████████████████

████████████████████████████

████████████████████████████

████████████████████████

████████████████████████

██████████████████████

██████████████████████████

██████████████████████████

████████████████████

████████████████████████████

████████████████████████

███████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16   The FTC insists the Nintendo Switch's pricing, performance, and content make it an

17   improper substitute at least for purposes of its preliminary injunction motion.  As to pricing, yes,

18   the Xbox Series X and PlayStation 5 are priced the same and a couple of hundred dollars higher

19   than the Switch; however, Xbox set the price of its entry-level Series S to compete with the

20   Switch.  (Dkt. No. 286, 6/29/23 Tr. (Stuart) at 1030:5-1031:5 (Q. "And do you look at Switch

21   pricing when you're considering the pricing of Xbox Series S?" A. "Yes." Q. "And is that one of

22   the reasons you set the price where you guys did?" A. "Yes.").)

23   And, there are functionality differences between the Switch and the PlayStation and Xbox

24   consoles—the Switch is portable, and it has its own screen and less powerful hardware.  However,

25   neither the FTC nor its expert consider the extent to which the Switch's differentiated features

26   including its price, portability, and battery are factors the customer balances when deciding which

27   console to purchase.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 436:6-437:4 (describing how

28   Nintendo made "technical decisions to enable an experience that they thought their customers

1 would want to have, and it's the best selling console right now in the market.  So when I—when

2 people try to tell me it's not competition—competitive, for any number of reasons, I don't believe

3 that because I just look at what's selling.").)

4     Finally, yes, there are content differences between the Switch and PlayStation, but many of

5 the most popular games on PlayStation and Xbox consoles are also available on the Switch,

6 including *Fortnite*, *Minecraft*, *Rocket League*, *Lego Star Wars*, *Fall Guys*, and the *FIFA*, *MLB The*

7 *Show*, and *NBA 2K franchises*.  (Dkt. No. 285, 6/28/23 Tr. (Bailey) at 782:5-783:10; *see* RX5055-

8 074 (Bailey Report) at ¶ 88.)  Although some popular Xbox and PlayStation games are not

9 available on the Switch, many of those titles are platform exclusives ████████████████████

10 ████████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████████

12 ████████████████████

13     "It doesn't matter whether [Nintendo's] products are fully interchangeable with those of its

14 competitors because perfect fungibility isn't required."  *Gorlick Distrib. Ctrs., LLC v. Car Sound*

15 *Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013) (citing *United States v. E.I. du Pont de*

16 *Nemours & Co*., 351 U.S. 377, 394 (1956)).  If this were the requirement, "only physically

17 identical products would be a part of the market."  *E.I. du Pont*, 351 U.S. at 394.  "Instead,

18 products must be reasonably interchangeable, such that there is cross-elasticity of demand."

19 *Gorlick*, 723 F.3d at 1025 (citing *Brown Shoe*, 370 U.S. at 325).  "The goal of market definition

20 here is to define the boundaries of the competition within which foreclosure or disadvantaging of a

21 participant is likely to reduce innovation, delay rivals' entry, and raise price or reduce variety or

22 quality of the ensuing goods. The relevant market will encompass those firms whose presence

23 drives this competition and whose foreclosure or disadvantaging may thwart it."  In the Matter of

24 Illumina, Inc. and Grail, Inc., No. 9401, 2023 WL 2823393, at *20 (F.T.C. Mar. 31, 2023).

25     If the Court was the final decisionmaker on the merits, it would likely find Nintendo

26 Switch part of the relevant market.  But it is not.  Instead, on a 13(b) preliminary injunction, the

27 FTC need only make a "tenable showing that the relevant market" is Gen 9 consoles.  *See Warner*,

28 742 F.2d at 1164.  Given the plethora of internal industry documents and the acknowledged

1    differences, the FTC has met its preliminary injunction burden to show the Switch is not included

2    in the relevant market.

3                   **b.**      **The Console Market does not include PCs**

4        The FTC insists, and the Court agrees, the console market does not include PCs. ███████

5 ██████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████

9 ██████████████████████████████████████████████████████████

10 ████████████████ That customers may "cross-shop" between consoles and PCs does not

11 demonstrate "reasonable interchangeability of use or the cross-elasticity of demand between the

12 product itself and substitutes for it." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1040, 1043

13 (D.C. Cir. 2008).

14                **2.**      **Multigame Content Library Subscription Services and Cloud Gaming**

15                     **Markets**

       As to the FTC's additional markets of the multigame content library subscription services

16 and cloud gaming, while the Court questions whether—as Defendants posit—these are simply

17 alternative ways of playing console, PC, and mobile games, the Court assumes without deciding

18 they are each their own product market when considered singly or in combination.

19      **B.**      **Geographic Market**

20        The product market, the relevant geographic market must "correspond to the commercial

21 realities of the industry and be economically significant." *Brown Shoe*, 370 U.S. at 336.  The

22 geographic market encompasses the "area to which consumers can practically turn for alternative

23 sources of the product and in which the antitrust defendants face competition." *FTC v. Cardinal*

24 *Health, Inc.*, 12 F.Supp.2d 34, 49 (D.D.C. 1998).

25                **1.**      **The Console Market**

26        The FTC, relying largely on Dr. Lee's analysis, insists the relevant market is the United

27 States because (1) game prices and releases vary country-by-country; and (2) gamer preferences

28

United States District Court
Northern District of California



and behavior vary country-by-country and inform market participants' strategic decision.

Cumulatively, this evidence suggests the relevant market for competition is the United States.

Defendants' arguments in favor of a geographic market beyond the United States are unpersuasive.

The geographic market is both the area "in which the seller operates, *and* to which the

purchaser can practically turn for supplies." *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 308

(D.D.C. 2020) (emphasis added).  While there is no dispute consoles are sold in markets outside

the United States, there is no evidence to suggest US consumers seeking to purchase a console

would look outside the United States to do so.

### 1. Multigame Content Library Subscription Services and Cloud Gaming Markets

The market for multigame content library subscription services and cloud gaming is a

closer question; however, the Court will assume without deciding the geographic market is the

United States for these markets as well.

## II. EFFECT ON COMPETITION

Section 7 vests courts with the "uncertain task" of making a prediction about the future.

*See United States v. Baker Hughes, Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990).  For this reason, the

"allocation of the burdens of proof" assumes particular importance.  *Id.*  In a horizontal merger

case, "the government can establish its prima facie case simply by showing that the merger would

produce a firm controlling an undue percentage share of the relevant market, and would result in a

significant increase in the concentration of firms in that market," typically "by presenting market-

share statistics," *United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 130 (D.D.C. 2022),

*appeal dismissed*, No. 22-5301, 2023 WL 2717667 (D.C. Cir. Mar. 27, 2023) (cleaned up), which

"triggers a presumption that the merger will substantially lessen competition," *AT&T*, 310 F.

Supp. 3d at 192 (cleaned up).  For a vertical merger, such as the Microsoft/Activision merger,

"there is no short-cut way to establish anticompetitive effects, as there is with horizontal mergers."

*Id.* at 192 (cleaned up).  This is in part because "many vertical mergers create vertical integration

efficiencies between purchasers and sellers."  *Id.* at 193; *see also Nat'l Fuel Gas Supply Corp. v.

FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) ("vertical integration creates efficiencies for

consumers"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust

Principles and Their Application*, ¶ 755c (online ed. May 2023) ("Vertical integration is

ubiquitous in our economy and virtually never poses a threat to competition when undertaken

unilaterally and in competitive markets."); Dkt. No. 226-2, Lee Decl. at ¶ 58 ("Unlike in an

analysis of a horizontal merger, there is no established screen or presumption of harm based on market shares or concentration for the purposes of evaluating the competitive effects of a vertical merger.").

So, with this proposed vertical merger, the outcome "turn[s] on whether, notwithstanding the proposed merger's conceded procompetitive effects, the [g]overnment has met its burden of establishing, through 'case-specific evidence,' that the merger of [Microsoft] and [Activision], at this time and in this remarkably dynamic industry, is likely to substantially lessen competition in the manner it predicts." *See AT&T*, 916 F.3d at 1037. "Once the prima facie case is established, the burden shifts to the defendant to present evidence that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition, or to sufficiently discredit the evidence underlying the prima facie case. Upon such rebuttal, the burden of producing additional evidence of anticompetitive effects shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times." *Id*. at 1032 (cleaned up). "In assessing the Government's Section 7 case, the court must engage in a comprehensive inquiry into the 'future competitive conditions in a given market, keeping in mind that the Clayton Act protects competition, rather than any particular competitor." *AT&T*, 310 F. Supp. 3d at 190 (cleaned up) (citation omitted).

### A.     The FTC's Theory

"The primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a 'clog on competition which deprives rivals of a fair opportunity to compete.'" *Brown Shoe*, 370 U.S. at 323-24. The FTC insists the combined firm may deprive rivals—primarily Sony—of a fair opportunity to compete in the above-defined markets by foreclosing an essential supply—*Call of Duty*. In other words, *Call of Duty* is so popular, and has such a loyal and dedicated following, competition will be substantially lessened in the console, content library subscription, and cloud gaming markets unless Microsoft's rivals have at least equal access to this particular video game.

The FTC argues it can establish this potential anticompetitive effect of the merger through

1   two alternative, but overlapping tests.  First, by showing the transaction is likely to give the

2   merged firm the ability and incentive to foreclose *Call of Duty* from its rivals.  (Dkt. No. 291-2,

3   FTC's Final Proposed Findings of Fact and Conclusions of Law (FTC's Findings and

4   Conclusions) at p. 180 ¶ 87.)  Second, through examining the *Brown Shoe* factors, such as share of

5   the market foreclosed, the nature and purpose of the transaction, barriers to entry, whether the

6   merger will eliminate potential competition by one of the merging parties, and the degree of

7   market power that would be possessed by the merged enterprise as shown by the number and

8   strength of competing suppliers and purchasers.  (*Id.* at ¶ 88 (quoting *Brown Shoe*, 370 U.S. at

9   328-34); *see Illumina*, 2023 WL 2823393, at *32.)

**B.      Ability and Incentive to Foreclose**

11          As a threshold matter, the FTC contends it need only show the transaction is "likely to

12   increase the ability and/or incentive of the merged firm to foreclose rivals."  (Dkt. No. 291-2,

13   FTC's Findings and Conclusions at p. 181 ¶ 90.)  For support, it cites its own March 2023 decision

14   in *Illumina*, 2023 WL 2823393, at *33.  *Illumina* reasons:

> [t]o harm competition, a merger need only create or augment either
> the combined firm's ability or its incentive to harm competition. ***It
> need not do both.*** Requiring a plaintiff to show an increase to both
> the ability and the incentive to foreclose would per se exempt from
> the Clayton Act's purview any transaction that involves the
> acquisition of a monopoly provider of inputs to adjacent markets.

18   2023 WL 2823393, at *38 (cleaned up) (emphasis added).  *Illumina*, however, provides no

19   authority for this proposition, nor could it.  Under Section 7, the government must show a

20   "reasonable *probability* of anticompetitive effect."  *Warner*, 742 F.2d at 1160 (emphasis added).

21   If there is no incentive to foreclose, then there is no probability of foreclosure and the alleged

22   concomitant anticompetitive effect.  Likewise, if there is no ability, then a party's incentive to

23   foreclose is irrelevant.  Indeed, the FTC's expert, Dr. Lee, analyzed the anticompetitive effects of

24   the merger based on ability *and* incentive.  (Dkt. No. 226-2, Lee Decl. at ¶ 87 ("I evaluate whether

25   the Merged Entity would have the *ability* and *economic incentive* to foreclose Microsoft's rivals

26   from Activision content in the two Consoles Markets").

1   The FTC also appears to contend it need only show the combined firm would have a

2   greater ability and incentive to foreclose *Call of Duty* from its rivals than an independent

3   Activision. (Dkt. No. 291-2, FTC's Findings and Conclusions at p. 181 ¶ 90.) This assertion,

4   however, ignores the text of Section 7 which forbids mergers which may "substantially . . . lessen

5   competition." 15 U.S.C. § 18. It is not enough that a merger might lessen competition—the FTC

6   must show the merger will probably *substantially* lessen competition. That the combined firm has

7   more of an incentive than an independent Activision says nothing about whether the combination

8   will "substantially" lessen competition. *See UnitedHealth Grp.*, 630 F. Supp. 3d at 133 ("By

9   requiring that [the defendant] prove that the divestiture would preserve exactly the same level of

10  competition that existed before the merger, the Government's proposed standard would effectively

11  erase the word 'substantially' from Section 7").

12      Thus, to establish a likelihood of success on its ability and incentive foreclosure theory, the

13  FTC must show the combined firm (1) has the ability to withhold *Call of Duty*, (2) has the

14  incentive to withhold *Call of Duty* from its rivals, and (3) competition would probably be

15  substantially lessened as a result of the withholding.

16          **1.      Ability to Foreclose**

17      The Court accepts the combined firm would have the ability to foreclose because it would

18  own the *Call of Duty* franchise.

19          **2.      Incentive to Foreclose and the Resulting Lessening of Competition**

20              **a.      High Performance Console Market**

21      The Court finds the FTC has not shown a likelihood of success on its claim the combined

22  firm would have an incentive to, and thus probably would, foreclose *Call of Duty* from Sony

23  PlayStation.

24                  **i.      No Incentive to Foreclose *Call of Duty***

25      ***First***, immediately upon the merger's announcement, Microsoft committed to maintain

26  *Call of Duty* on its existing platforms and even expand its availability. The day after the merger

27  announcement, Microsoft's Satya Nadella and Phil Spencer spoke with Sony CEO Kenichiro

28  Yoshida to emphasize Microsoft's commitment to enter a new agreement to extend Activision's

United States District Court
Northern District of California

33

obligation to ship *Call of Duty* at parity on PlayStation.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 418:16-419:16, 443:18-20; RX2172; Dkt. No. 285, 6/28/23 Tr. (Nadella) at 852:23-853:8.)  The next day, Sony PlayStation CEO Jim Ryan wrote his mentor about the proposed merger: "It's not an xbox exclusivity play at all.  they're thinking bigger than that, and they have the cash to make moves like this.  I've spent a fair bit of time with both Phil and Bobby over the past day.  I'm pretty sure we will continue to see COD on PS for many years to come."  (RX2064-001.) ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

Microsoft also contacted its competitor Valve—the company that runs the leading PC game store, Steam.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 172:18-19, 173:16-19.)  Xbox sent Valve a signed letter agreement committing to make *Call of Duty* available on Steam for ten years. (RX1184.)  Valve did not sign the deal because they "believe strongly that they should earn the business of their—the developers who put on their platform day in and day out, and so they told us that they had had no need to sign that agreement and that they believed us when we said that we would continue to provide [*Call of Duty*] on Steam."  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 175:16-20.)

Microsoft even took steps to expand *Call of Duty* to non-Microsoft platforms. On the day of the merger's announcement, Microsoft called the head of Nintendo North America, Doug Bowser, and Nintendo's lead for partnerships, Steve Singer, to discuss a partnership to bring *Call of Duty* to the Switch.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 167:24-169:18.)  Those discussions led to an inked deal to bring *Call of Duty* to the Switch.  All of this conduct is inconsistent with an intent to foreclose.

***Second***, the deal plan evaluation model presented to the Microsoft Board of Directors to justify the Activision purchase price relies on PlayStation sales and other non-Microsoft platforms post-acquisition. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

1

2

3

4

5

6

7

8 ███████████████████████████ This valuation is also inconsistent

9 with an incentive to foreclose.

10     *Third*, the deal plan evaluation model reflects access to mobile content was a critical factor

11 weighing in favor of the deal. ████████████████████████

12

13

14

15

16

17

18

19

20

21

22 ██████████████████████ Microsoft's keen interest in Activision's mobile

23 content suggests the combined firm is not incentivized to withhold *Call of Duty* merely to aid the

24 shrinking console market.

25     *Fourth*, Microsoft witnesses consistently testified there are no plans to make *Call of Duty*

26 exclusive to the Xbox.  Mr. Nadella testified he would "[a] hundred percent" "commit to

27 continuing to ship *Call of Duty* on the Sony PlayStation."  (Dkt. No. 285, 6/28/23 Tr. (Nadella)

28 853:9-11.)  Mr. Spencer testified "my commitment is and my testimony is, to use that word, that

1   we will continue to ship Call of -- future versions of *Call of Duty* on Sony's PlayStation platform."

2   (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 367:18-24, 368:4-10, 429:21-22, 429:25-430:1.)

3   **Fifth**, there are no internal documents, emails, or chats contradicting Microsoft's stated

4   intent not to make *Call of Duty* exclusive to Xbox consoles.  Despite the completion of extensive

5   discovery in the FTC administrative proceeding, including production of nearly 1 million

6   documents and 30 depositions, the FTC has not identified a single document which contradicts

7   Microsoft's publicly-stated commitment to make *Call of Duty* available on PlayStation (and

8   Nintendo Switch).  (RX5056 (Carlton Report at ¶ 127.)  The public commitment to keep *Call of*

9   *Duty* multiplatform, and the absence of any documents contradicting those words, strongly

10  suggests the combined firm probably will not withhold *Call of Duty* from PlayStation.

11  **Sixth**, *Call of Duty's* cross-platform play is critical to its financial success.  (Dkt. No. 286,

12  6/29/23 Tr. (Stuart) at 1039 ("Q. And is it also profitable for Xbox to continue to have games like

13  *Minecraft* be multiplatform and cross platform? A. Absolutely. The strength of a game like

14  *Minecraft* comes from that cross-network play. If you, you know, removed one of those platforms

15  and one of those big user bases, not only – not only would you have a massive brand impact, you

16  would lose a significant revenue stream that you just couldn't make up for."); Dkt. No. 285,

17  6/28/23 Tr. (Kotick) at 715:18-24 ("Well, if you think about like from a business perspective and

18  from a consumer perspective, one of the most important things is building communities of players,

19  especially now that you have the ability to compete and socialize. And so our view has always

20  been that you want to create your content for as many platforms as possible and build your

21  audiences to be as big as possible.").)  Cross-play thus creates an incentive to leave *Call of Duty*

22  on PlayStation.

23  **Seventh**, Microsoft anticipates irreparable reputational harm if it forecloses *Call of Duty*

24  from PlayStation.  Mr. Spencer testified: "[u]s pulling *Call of Duty* from PlayStation in my view

25  would create irreparable harm to the Xbox brand after me in so many public places, including

26  here, talking about and committing to us not pulling Call of Duty from PlayStation."  (Dkt. No.

27  283, 6/23/23 Tr. (Spencer) at 367:11–15).  Activision CEO Bobby Kotick confirmed Microsoft's

28  concerns are not unfounded: "if we were to remove *Call of Duty* from PlayStation, it would have

36

1   very serious reputational – it would cause reputational damage to the company."  (Dkt. No. 285,

2   6/28/23 Tr. (Kotick), at 725:4-7); *see also id*. at 715:18-24 ("Well, you would alienate" gamers

3   "and you would have a revolt if you were to remove the game from one platform."); *id*. at 727:17-

4   22 (explaining if a degraded *Call of Duty* experience were offered on other platforms "you would

5   have vitriol from gamers that would be well deserved, and  . . . that would be very vocal and also

6   cause reputational damage to the company").)  "[I]n assessing [Microsoft's] post-merger

7   incentives, the Court must consider the financial and reputational costs to [Microsoft] if it were to

8   breach or water down its firewall policies*." See UnitedHealth Grp.*, 630 F. Supp. 3d 118; *see also*

9   *AT&T*, 916 F.3d at 1040 (D.C. Cir. 2019) ("Turner [Broadcasting] would not be willing to accept

10  the 'catastrophic' affiliate fee and advertising losses associated with a long-term blackout.").  Why

11  would Microsoft risk that brand reputational harm?  Especially since the video game console

12  market is shrinking—not growing; it is not the future of video gaming.  (RX 5055-010.)

13       **Eighth**, the FTC has not identified any instance in which an established multiplayer, multi-

14  platform game with cross-play, that is, a game that shares *Call of Duty's* characteristics, has been

15  withdrawn from millions of gamers and made exclusive.  (RX5056 (Carlton Report) at ¶ 15.)  To

16  the contrary, Microsoft's 2014 acquisition of Mojang, the developer of the hugely popular

17  *Minecraft* franchise, exemplifies how a console seller (and Microsoft in particular) behaves when

18  acquiring a hugely popular multiplayer cross-platform game.  *Minecraft* is one of the most

19  successful games of all time, and is Microsoft's largest game by revenue.  (Dkt. No. 283, 6/23/23

20  Tr. (Spencer) at 362:24-25; RX5058-005 (Hood Decl.) at ¶ 11.)  It includes a popular multiplayer

21  mode and has produced a large community across platforms.  (Dkt. No. 282, 6/22/23 Tr. (Booty)

22  77:23–78:1.)  At the time of the Mojang acquisition, *Minecraft* was available on Xbox,

23  PlayStation, and PC.  (*Id*. at 78:2–7.)  While Microsoft had the ability to make *Minecraft*

24  exclusive, it continued to ship *Minecraft* on all those same platforms post-acquisition and made

25  subsequent games in the franchise (*e.g.*, *Minecraft: Dungeons* and *Minecraft: Legends*) available

26  for Nintendo consoles and even Sony's subscription service, PlayStation Plus.  (*Id*. at 78:11-79:4;

27  6/23/2023 (Spencer) at 421:8-423:1; RX3156.)  Xbox CFO Tim Stuart explained the decision to

28  ship *Minecraft* on "all platforms" enabled "its mass, mass, mass market" appeal.  (Dkt. No. 286,

1   6/29/23 Tr. (Stuart) at 976:13-977:5.)  The decision was dictated by the economics and the desire

2   not to break up existing gamer communities.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 365:13-15

3   ("[I]f we were to acquire something that has found customer love, users, business on another

4   platform, we want to nurture and grow that for the games that we're building"); *id.* at 362:24-

5   363:5 (*Minecraft* "has reached a financial level of success where it's – it's a significant profit

6   driver for us given that it's shipping on all the platforms. So if you can get a game that's at that

7   level of hit and that level of business, the size of the business, our job is to maintain and grow

8   that."); RX1137.)

9       All of the above evidence points to no incentive to foreclose *Call of Duty*—a 20-year

10  multi-platform franchise—from Sony PlayStation.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

1   The FTC disputes this written offer has any relevance to its *prima facie* burden.  It

2   contends Microsoft's binding offer is a "proposed remedy" that may not be considered until the

3   remedy phase, that is, after a Section 7 liability finding.  As support, it again relies on its own

4   2023 *Illumina* decision.  There, relying on *E.I. du Pont*, 366 U.S. at 334, the Commission held

5   such agreements are "proposed remedies," and that the defendants bear the burden of proving "the

6   offered remedy would actually be effective."  So, the FTC claims it does not have to account for

7   any agreements in its *prima facie* showing.  Illumina, Inc. & Grail, Inc., 2023 WL 2823393, at

8   *49-50.  But *E.I. du Pont* does not support the Commission's holding.  It involved a remedy

9   proposed *after* a finding of a Section 7 violation. The Court held: "once the Government has

10  successfully borne the considerable burden of establishing a violation of law, all doubts as to the

11  remedy are to be resolved in its favor." *E.I. du Pont*, 366 U.S. at 334.  *E.I. du Pont* says nothing

12  about whether the merger-challenging plaintiff must address offered and executed agreements

13  made before any liability trial, let alone liability finding; that is, whether the FTC must address the

14  circumstances surrounding the merger as they actually exist.  The caselaw that directly addresses

15  the issue contradicts the FTC's position.  *See AT&T*, 916 F.3d at 1041; *UnitedHealth Grp.*, 2022

16  WL 4365867 at *15-24; *FTC v. Arch Coal, Inc.*, No. 04-00534, Dkt. No. 67 (D.D.C. July 7, 2004).

17  Next, the FTC insists Microsoft's offer is simply insufficient.  In so arguing, it relies

18  exclusively on PlayStation CEO Ryan's testimony. (Dkt. No. 291-2, FTC's Findings of Fact and

19  Conclusions of Law at pp. 159-160 ¶¶ 787-796.)  The FTC's heavy reliance on Mr. Ryan's

20  testimony is unpersuasive.  Sony opposes the merger; its opposition is understandable.  Before the

21  merger Sony paid Activision for exclusive marketing rights that allowed Sony to market *Call of*

22  *Duty* on PlayStation, but restricted Xbox's ability to do the same.  (Dkt. No. 282, 6/22/23 Tr.

23  (Bond) at 162:19-165:8.)  After the merger, the combined firm presumably will not agree to such

24  restrictions.  Before the merger, a consumer wanting to play a *Call of Duty* console game had to

25  buy a PlayStation or an Xbox.  After the merger, consumers can utilize the cloud to play on the

26  device of choice, including, it is intended, on the Nintendo Switch.  Perhaps bad for Sony.  But

27  good for *Call of Duty* gamers and future gamers.

28



### ii.    The FTC's Incentive Evidence is Insufficient

Notwithstanding the overwhelming evidence of the combined firm's lack of incentive to pull *Call of Duty* from PlayStation, the FTC insists it is probable the combined firm will do so because it is in its financial interests.

### a.    Professor Lee's Opinion

The lynchpin of the FTC's argument is the expert opinion of Professor Robin Lee, an economist.  Prof. Lee opines the economic benefits of making *Call of Duty* exclusive to Xbox outweigh the costs.  In particular, he concludes removing *Call of Duty* from PlayStation would result in a 5.5% increase in Xbox's share of the Gen 9 console market. (Dkt. No. 226-2, Lee Decl. ¶ 106.)

Prof. Lee's opinion does not dispute the evidence of Microsoft's lack of an economic incentive.  His Vertical Foreclosure model depends on two key quantitative inputs: "the customer lifetime value ('LTV') of purchasers of Xbox consoles and the 'Xbox conversion rate.'"  (*Id.* at ¶ 103.)  Looking at the conversion rate, Prof. Lee uses projected sales data to calculate the number of expected PlayStation purchasers of *Call of Duty* (2025 version) who would instead choose to play *Call of Duty* 2025 on Xbox consoles if not available on PlayStation.  From this number he excludes PlayStation owners (1) who already own an Xbox, or (2) would choose to play *Call of Duty* 2025 on PC if not available on PlayStation.  The conversion rate is the fraction of remaining

1     purchasers—"affected users"—that would purchase an Xbox console to play *Call of Duty* 2025 if

2     it was not available on PlayStation.  (Dkt. No. 226-2, Lee Decl. at ¶¶ 101, 103, 106.)

3           Prof. Lee's Vertical Foreclosure model *assumes* a conversion rate of 20%.  (Dkt. No. 284,

4     6/27/23 Tr. (Lee) at 559:2-14 ("So with that subset of users I'm assuming 20 percent of them

5     would purchase a new Xbox[].")*; id.* at 560:2-4 (agrees the 20% rate was not computed but instead

6     was just inputted into the model).)  So, the 20% figure is not based on evidence—it is an assumed

7     input.  Accepting Prof. Lee's LTV of 40%, even lowering the conversion rate just a bit, to say

8     17.5%, means Prof. Lee's model estimates it would **not** be profitable to withhold *Call of Duty*

9     from PlayStation; that is, the costs in lost PlayStation *Call of Duty* sales outweigh the benefits of

10    more Xbox console sales.  This relationship is reflected in Figure 11 from Prof. Lee's report

11    reproduced below:



21          Prof. Lee attempts to defend the reasonableness of his 20% assumption by identifying

22    evidence he contends supports his model's output—the 5.5% share shift.  In other words, the 20%

23    assumption must be correct because other evidence supports the model's result. In his direct

24    testimony Prof. Lee identified two pieces of support: (1) an internal 2019 Microsoft strategy

25    memo regarding a potential acquisition, and (2) his share model output.  (Dkt. No. 226-2 ¶ 106.)

26    Neither supports his 20% conversion rate assumption.

27          First, the Microsoft memo states in a parenthetical: "an exclusive AAA release accounts

28    for a 2-4% console share shift in the US and a 1-3% shift worldwide."  (PX1136-004).  Prof. Lee's

United States District Court
Northern District of California

1   reliance on this memo snippet is misplaced.  What—if any—data is behind the statement?  Who

2   came up with those figures? How were they measuring share shift?  Shift from what console(s) to

3   what console(s)?  And, were those numbers addressing a new first-party game being released

4   exclusively?  Or was the author discussing taking a long-standing multiplatform cross-play game,

5   like *Call of Duty,* exclusive.  Prof. Lee does not know.  Further, only the global share shift matters

6   in Prof. Lee's model.  The memo snippet, for whatever it is worth, posits a 1% to 3% share shift

7   globally.  Prof. Lee testified a 2% share shift would **not** make it economically beneficial to make

8   *Call of Duty* exclusive to Xbox consoles; thus, the slide does not support Prof. Lee's 20%

9   conversion rate input. (Dkt. No. 284, 6/27/23 Tr. (Lee) at 581:1-7.)[6]

10          Second, Prof. Lee points to his share model. (Dkt. No. 226-2, Lee Decl. at ¶ 106.)  He says

11   this model results in an 8.6% share shift; therefore, the more conservative 5.5% share shift output

12   from his Vertical Foreclosure model is reasonable. But the share model output is also flawed.  As

13   a preliminary matter, it is based on Gen 8 console data from only the United States, rather than

14   global Gen 9 data.  But putting that aside, as Dr. Carlton observed, Prof. Lee's share model

15   "ignores the presence of non-exclusive games in influencing console choice" even though Prof.

16   Lee acknowledges non-exclusive games do influence console choice.  (Dkt. No. 294-2, Carlton

17   Decl. at ¶¶ 26-27.)  Prof. Lee's reply report's attempt to fix this error fails because he again

18   accords no value to non-exclusive games in consumer choice.  (*Id.* at ¶¶ 29-30.)  Further, Dr.

19   Carlton also contends Prof. Lee's share model assumes every lost PlayStation 4 results in an

20   additional Xbox sale, even though consumers may choose a different device to play *Call of Duty*

21   (PC, mobile, cloud) or to not play *Call of Duty* on any device at all.  (*Id.* at ¶¶ 32-34.)  When Dr.

22   Carlton corrects for this error, Prof. Lee's share model is between 1% and 54% of what Prof. Lee

23   predicts and thus does not support his critical 20% conversion rate.  (*Id.* at ¶ 35.)

---

[6] Undaunted, Prof. Lee insists even the 2-3% share shift is consistent with his 5.5% estimate because *Call of Duty* has such high sales compared to other AAA titles, so *Call of Duty's* share shift will be higher.  (Dkt. No.226-2, Lee Decl. at ¶¶ 32, 104; Dkt. No. 291-2, FTC's Findings and Conclusions at pp. 100-101 ¶ 499.)  That circular assertion, however, relies upon his share model which, discussed next, is flawed.

1  And what does Prof. Lee say about Dr. Carlton's criticism?  Nothing in his direct

2  testimony.  (*See* Dkt. No. 262-2, Lee Decl.)  At the evidentiary hearing on re-direct?  Nothing.

3  (Dkt. No. 284, 6/27/23 Tr. (Lee) at 615:9-651:22.)  And when the FTC cross-examined Dr.

4  Carlton on his written direct testimony?  Again, nothing.  (Dkt. No. 285, 6/28/23 Tr. (Carlton) at

5  855:6-898:1.)  The FTC chose not to challenge, or even address, Dr. Carlton's identification of

6  material flaws in Prof. Lee's share model.  The criticism thus stands unscathed—and persuasive.

7  So, the share model does not justify Prof. Lee's reliance on the strategy memo snippet reporting

8  console shares move 1% to 3% globally with exclusive AAA content.

22  But Prof. Lee's assumption as to what

23  was being measured was wrong.  The slide does not support his conversion rate.  In any event,

24  before Prof. Lee could persuasively opine the "pivotal" conversion rate is supported by a survey

25  result, he would need to be familiar with the survey and its design.  As his testimony showed, he

26  was not.

27  Dr. Lee's opinion suffers from several additional weaknesses.  It fails to consider

28  Microsoft's agreement with Nintendo and the cloud streaming services to provide ongoing access

43

to *Call of Duty*—all of which will increase access.  It also fails to consider Microsoft's offer to Sony. Nor did he consider any reputational harm to Microsoft from pulling *Call of Duty* from millions of players.  Regardless, for the reasons explained, his opinion does not show the combined firm will probably have an economic incentive to withhold *Call of Duty* from PlayStation.  He simply assumed a concession rate for his model that would make exclusivity profitable, but there is no evidence to support that assumption.

### b.     ZeniMax

While the FTC asserts Microsoft's 2014 *Minecraft* acquisition is not relevant to how it will treat *Call of Duty*, it insists Microsoft's 2021 acquisition of ZeniMax is predictive of how the combined firm will behave.  Specifically, although Microsoft's deal valuation shared with the Board of Directors contemplated keeping ZeniMax content multiplatform, it later decided to make two new ZeniMax titles—*Starfield* and *Redfall*—exclusive.  Agreed this evidence shows Microsoft's deal valuation for the Activision acquisition is not dispositive of the incentive question.  But it does not dispute the evidence that Microsoft does not have an incentive to withdraw *Call of Duty* from PlayStation. Neither *Starfield* nor *Redfall* are remotely similar to *Call of Duty*. *Starfield* is a role-playing game that has not been released.  *Redfall* is a first-person shooter game that was only released in May 2023.

The question is whether it makes financial sense to wrest *Call of Duty* from PlayStation.

### c.   Effect on Innovation

The FTC also insists the merger will decrease innovation because game developers and publishers will not want to work with Microsoft.  But the only evidence the FTC identifies is Sony's reluctance to share its intellectual property with Microsoft and provide development kits for its consoles.  But this is not merger-specific and it fails to account for all the other developers who might now be incentivized to collaborate with Xbox or one of its studios like Activision or Bethesda.  *Cf. UnitedHealth Grp.*, 650 F. Supp. 3d at 151 ("The Government did not call a single rival payer to offer corporate testimony that it would innovate less or compete less aggressively if the proposed merger goes through. Nor did any of the rival payer employees who did testify support the Government's theory.")  Protecting Sony's decision to delay collaboration with Microsoft and therefore PlayStation users' access to Microsoft's content is not pro-competitive.

### d.   Partial Foreclosure

Finally, in its reply brief in support of its preliminary injunction motion (but not its original moving papers), and throughout the evidentiary hearing, the FTC alluded to the possibility of partial foreclosure.  Partial foreclosure might involve releasing *Call of Duty* later on PlayStation than Xbox, or having a *Call of Duty* Christmas character in the Xbox version, but not the PlayStation version.  (*See* Dkt. No. 286, 6/29/23 Tr. (Closing) at 1100:2-4, 1100:17-23.)  Or it could be technologically degrading the players' experience on one console versus another. (PX5000-181 (Lee Report) at ¶ 477.)

But the FTC has no expert testimony to support a finding the combined firm would have the incentive to engage in such conduct.  Prof. Lee did not engage in any quantitative analysis of partial foreclosure.  Anyway, under the FTC's theory, the goals of full and partial foreclosure are the same: move enough PlayStation users to Xbox such that the benefits to the combined firm outweigh the costs.  If the FTC has not shown a financial incentive to engage in full foreclosure, then it has not shown a financial incentive to engage in partial foreclosure.

Moreover, Mr. Kotick testified he was unaware of a developer intentionally developing a "subpar game for one platform versus another." (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 728:2–6.) Such conduct would obviously draw "vitriol from gamers that would be well deserved," and

would "cause reputational damage to the company." (*Id.* at 727:20–22.)  Consistent with that testimony, the record does not include any evidence Microsoft has engaged in such conduct in the past—even with Sony. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ The FTC's partial foreclosure theory fails.

\*\*\*

In sum, the FTC has not shown a likelihood of success on its theory the merger may substantially lessen competition in the Gen 9 console market because the combined firm will have the ability and incentive to foreclose *Call of Duty* from PlayStation.  While it is possible, *Call of Duty's* long history as a highly popular, multiplatform cross-play game make that result not probable.  The Court has focused on *Call of Duty*, rather than other Activision AAA content, because the FTC's evidence focused on this one game.  While other games, such as *Diablo*, are certainly popular, the FTC did not offer evidence that if *Call of Duty* remains multiplatform in the console market, making *Diablo* or other Activision titles exclusive to Xbox would probably substantially lessen competition in that market.

### b.    The Remaining Markets

For purposes of the library subscriptions services market and the cloud streaming market, which Dr. Lee refers to collectively as the "Gaming Services Market," the FTC contends the merger will probably have anticompetitive effects because Microsoft would (1) have a greater economic incentive to engage in foreclosure than an independent Activision; and (2) "would likely have the economic incentive to engage in foreclosure." (Dkt. No. 226-2 at ¶¶ 7, 189).

As a threshold matter, the question is not whether Microsoft following the merger is more likely to engage in foreclosure than an independent Activision.  The question is whether "the proposed merger is likely to substantially lessen competition, which encompasses a concept of 'reasonable probability.'" *AT&T*, 916 F.3d at 1032.  As Microsoft notes, "a vertically integrated firm's incentives are *always* more complex in that respect than the standalone incentives of its components.  In other words, if this merger could be condemned simply because the combined company would derive *some* economic benefit from withholding, *any* vertical merger could be

United States District Court
Northern District of California

1   condemned on the same ground, despite the indisputable pro-competitive effects of many vertical

2   mergers." (Dkt. No. 292-2, COL at ¶ 152 (emphasis in original).)   Accordingly, to prevail on its

3   preliminary injunction motion, the FTC must demonstrate a likelihood of success on its assertion

4   there is a reasonable probability the proposed merger will substantially lessen competition in the

5   library subscription services market and cloud streaming market.

6                                    **(i)       Library Subscription Services Market**

7          The FTC argues Xbox will include *Call of Duty* in its Game Pass library subscription

8   service, but refuse to include it in rival services.  This exclusion, it contends, will lessen

9   competition in that market and make it likely Xbox will increase the Game Pass price.  (Dkt. No.

10  291-2, FTC's Findings and Conclusions at p. 138 ¶¶ 659, 661.)

11         It is undisputed the combined firm has significant financial incentives to include *Call of

12  Duty* in Game Pass.  (*See* PX1763-013; PX2138-001.)  The Court accepts for preliminary

13  injunction purposes it is likely *Call of Duty* will be offered exclusively on Game Pass, and not

14  offered on rival subscription services.  The countervailing incentives that exist in the console

15  market—longstanding multiplatform availability, cross-play, historically high revenue from games

16  sold—do not apply to the subscription market since *Call of Duty* is not and never has been offered

17  (in any significant sense) on a multigame library subscription service.  (Dkt. No. 285, 6/28/23 Tr.

18  (Kotick) at 731:5-7.)  But the record does not support a finding of a serious question as to whether

19  *Call of Duty* Game Pass exclusivity will probably substantially lessen competition in the

20  subscription services market.

21         First, the merger has the procompetitive effect of expanding access to *Call of Duty*.

22  Adding *Call of Duty* to Game Pass gives consumers a new, lower cost way to play the game day

23  and date. (RX3166-016.)  Further, Dr. Carlton explains how adding *Call of Duty*, and Activision

24  content in general, will actually lower costs for many game consumers and harm none.  (RX5056

25  (Carlton Report) at ¶¶ 141-142.)  Dr. Carlton also opines "the merger can be expected to result in

26  an increased incentive to invest in game development than would occur otherwise" because

27  "adding [*Call of Duty*] to Game Pass will result in an increase in the number of Game Pass users,

28  [and] that increase gives Microsoft more incentive to invest in other games, not just Activision

games." (*Id* .at ¶ 144); *see Chi. Pro. Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output."); *FTC v. Univ. Health, Inc*., 938 F.2d 1206, 1222 (11th Cir. 1991) ("[W]hether an acquisition would yield significant efficiencies is an important consideration in predicting whether the acquisition would substantially lessen competition.").

Second, the FTC does not identify evidence that disputes these procompetitive effects. Prof. Lee admits "Exclusivity can have both pro and anticompetitive effects." (Dkt. No. 284, 6/27/23 Tr. (Lee) at 603:8; *see* Dkt. No. 226-2, Lee Decl. at ¶¶ 113, 132.) Yet he did not perform any quantitative analysis to estimate whether adding *Call of Duty* to Game Pass, and not other subscription services, will injure competition. Will some people subscribe to Game Pass because of *Call of Duty*? Yes. But there is no analysis of how many, or how it will affect competition with Game Pass competitors such as Amazon, Electronic Arts, Ubisoft and Sony. (Dkt. No. 284, 6/27/23 Tr. (Lee) at 638:11–15 (Lee testifying cloud gaming and content library services are "both relatively nascent and new compared to consoles, and the lack of really good data for these services made it very difficult to perform something that I would view as reliable that's quantitative for those markets."); RX5056 (Carlton Report) at ¶ 138.)

The FTC's primary argument appears to be that even without the merger, Activision will contract to put its content, including *Call of Duty*, on subscription services. The record evidence is to the contrary. Activision believes it is not in its financial interest to do so because it would cannibalize individual sales. (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 744:10-11.) Kotick cannot imagine a subscription service agreeing to the financial terms Activision would require to make it a financial win for Activision. (*Id.* at 752:17-19, 752:8-11.) ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Consistent with Mr. Kotick's testimony, in 2020 Xbox attempted to negotiate placing certain Activision titles on Game Pass. Activision refused. (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 751:1-8.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And Activision has no plans to put its

content on a game library subscription service.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 729:3-7, 746:19-21.)  The FTC does not offer any explanation, let alone evidence, as to why it would be financially beneficial for Activision to change its long-held stance on subscription services.

In sum, the FTC has not raised serious questions on whether the merger will probably substantially lessen competition in the game library subscription services market.

### (ii)     Cloud Streaming Market

The FTC has also failed to show a likelihood of success on its claim the merger will probably lessen competition in the cloud gaming market because the combined firm will foreclose Activision's content, including *Call of Duty*, from cloud-gaming competitors.  This argument is foreclosed by Microsoft's post-FTC complaint agreements with five cloud-streaming providers.  Before the merger, there is no access to Activision's content on cloud-streaming services.  After the merger, *several* of Microsoft's cloud-streaming competitors will—for the first time—have access to this content.  The merger will enhance, not lessen, competition in the cloud-streaming market.

At trial the FTC argued that the cloud-streaming competitors based outside the United States should not be considered because their servers are likely outside the United States and thus their cloud services are not effective for United States consumers.  But the FTC is merely guessing; Microsoft has offered evidence that "Boosteroid (a Ukrainian company) has gaming servers in Pennsylvania, North Carolina, Texas, Illinois, Florida, Washington."  (Dkt. No. 292-2, Defendants' Findings of Fact and Conclusions of Law (Defs' Findings and Conclusions) p. 138 ¶ 163.)  ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

The FTC's response, again, is that an independent Activision would agree to put its content on cloud-gaming services.  But, again, it offers no quantitative evidence to support this bald

United States District Court
Northern District of California

assertion; Prof. Lee did not model the cloud gaming market.  And, the fact is, Activision content is not currently on any cloud-streaming service.  And it is not likely to be available absent the merger.  (*See* Dkt. No. 285, 6/28/23 Tr. (Kotick) at 731:15–18; *id.* at 753:13–15.)  Activision previously pulled *Call of Duty* from GeForce NOW following beta testing.  (*Id.* at 754:1-5.)  And it has not been on a cloud-streaming service since.  The FTC has not shown it is likely an independent Activision would do what Microsoft has agreed to do by contract  *See Tenneco, Inc. v. FTC*, 689 F.2d 346, 354 (2d Cir. 1982) (rejecting the FTC's "unsupported speculation" "Tenneco would have entered the market . . . absent its acquisition of Monroe"); *Fruehauf Corp. v. FTC*, 603 F.2d 345, 355 (2d Cir. 1979) (rejecting the FTC's theory of anticompetitive effects as "based on speculation rather than fact").

Finally, the FTC argues the cloud-streaming agreements are irrelevant to its *prima facie* showing as they are mere "proposed remedies."  The Court's analysis as to the Sony proposal, *infra* at Section II.B.2.a.i, applies equally to the cloud-streaming agreements.  Indeed, it has even more force here where the competitor—Nvidia and others—have actually entered into the agreements.  The Court cannot ignore this factual reality.  The combined firm will probably not have an incentive to breach these agreements and make Activision content exclusive to xCloud.

### 3.    FTC's *Brown Shoe* Foreclosure Theory

Alternatively, the FTC argues that it has established a likelihood of success on its theory that under "the *Brown Shoe* functional liability factors," the proposed merger's "very nature and purpose" is anticompetitive, there is a "trend toward concentration in the industry," and the merger would "increase entry barriers in the Relevant Markets."  (Dkt. No. 291-2, FTC's Findings and Conclusions at pp. 181-182 ¶¶ 95-99 (citing *Brown Shoe*, 370 U.S. 294 at 329–30.)  As an initial matter, the FTC made no reference to this theory in its opening statement or closing argument.  Nor is it discussed by Dr. Lee's expert report; he addressed only Microsoft's ability and incentive to foreclose.

As to the theory's merits, the FTC does not make any new arguments not considered above.  The FTC maintains the "[p]roposed Acquisition's purpose is to transform an independent, 'platform-agnostic' source of supply into a captive one controlled exclusively by Microsoft," (*Id.*

United States District Court
Northern District of California

at pp. 181-182 ¶ 95), but this would be true in any vertical merger and does not explain why it demonstrates an anticompetitive purpose.  Likewise, while the FTC argues Microsoft's "past conduct following similar transactions also demonstrates its likely anticompetitive nature," presumably referring to the ZeniMax acquisition, this ignores the Mojang/*Minecraft* acquisition.  (*Id*.)  To the extent the FTC relies on a "trend toward further concentration in the industry" (*Id.* at p. 182 ¶ 96), it fails to explain how this trend is anticompetitive here—Microsoft's investment in game developers and publishers allows for increased innovation in content and Microsoft has prioritized a "content pipeline."  (PX1154-001.)

***

In sum, the FTC has not raised serious questions regarding whether the proposed merger is likely to substantially lessen competition in the console, library subscription services, or cloud gaming markets.  As such, the FTC has not demonstrated a likelihood of ultimate success as to its Section 7 claim based on a vertical foreclosure theory.

## III.    BALANCING OF THE EQUITIES

Because the FTC has not demonstrated a likelihood of ultimate success on the merits, the Court need not proceed to the balance of equities question.  *See United States v. Siemens Corp*., 621 F.2d 499, 506 (2d Cir. 1980).  The Court finds, however, that even if the FTC had met its burden, the balance of equities do not fall in its favor.  The FTC correctly notes private equities, such as the potential skuttling of the merger if it does not close by July 18, "cannot on its own overcome the public equities that favor the FTC."  *FTC v. Wilh. Wilheslmsen Holding ASA*, 341 F. Supp. 3d 27, 73-74 (D.D.C. 2018); *see also Warner*, 742 F.2d at 1165 ("When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone does not justify denial of a preliminary injunction").

But the balancing of equities is not a pointless exercise.  In *Warner*, for example, the Ninth Circuit observed "public equities may include beneficial economic effects and pro-competitive advantages for consumers."  *Id.* at 1165 (cleaned up). Because in that case the record contained "conflicting evidence on the anticompetitive effects of the merger," the Ninth Circuit held it was unclear whether those public equities supported the grant or denial of the preliminary injunction.

*Id.* It nonetheless held the public equities outweighed the private because the Commission would be denied effective relief if it ultimately prevailed and ordered divestiture. The court reasoned: "Since the proposed joint venture calls for Polygram to dismantle its distribution operations, it would be exceedingly difficult for Polygram to revive the operations to comply with a divestiture order." *Id.*

Here, at best "the record contains conflicting evidence on the anticompetitive effects of the merger"; thus, the FTC cannot point to beneficial economic effects as a public equity. *Id.* Moreover, the administrative trial before the ALJ commences on August 2, in just a few weeks. By pre-existing contract, *Call of Duty* will remain on PlayStation through the end of 2024. There will be no foreclosure of *Call of Duty* pending the ALJ's decision. Gamers will be able to play just as they always have.

The FTC insists the difficulty in ordering post-acquisition divestiture is the public equity that prevails. (Dkt. No. 291-2, FTC's Findings and Conclusions at p. 194-195 ¶ 153.) But it does not cite anything specific about this merger to support that assertion. It is a vertical acquisition. Microsoft and Activision will act as parent and subsidiary. There is no planned dismantling of operations, as in *Warner.* What exactly about the merger would make it difficult to order an effective divestiture? The FTC does not say. Its argument, at bottom, is the equities always weigh in favor of a preliminary injunction. But that argument ignores the law. So, the balance of equities is a separate, independent reason the FTC's motion must be denied.

## CONCLUSION

Microsoft's acquisition of Activision has been described as the largest in tech history. It deserves scrutiny. That scrutiny has paid off: Microsoft has committed in writing, in public, and in court to keep *Call of Duty* on PlayStation for 10 years on parity with Xbox. It made an agreement with Nintendo to bring *Call of Duty* to Switch. And it entered several agreements to for the first time bring Activision's content to several cloud gaming services.

This Court's responsibility in this case is narrow. It is to decide if, notwithstanding these current circumstances, the merger should be halted—perhaps even terminated—pending resolution of the FTC administrative action. For the reasons explained, the Court finds the FTC has not

1    shown a likelihood it will prevail on its claim this particular vertical merger in this specific

2    industry may substantially lessen competition.  To the contrary, the record evidence points to more

3    consumer access to *Call of Duty* and other Activision content.  The motion for a preliminary

4    injunction is therefore DENIED.

5          This Opinion constitutes the findings of fact and conclusions of law required by Federal

6    Rule of Civil Procedure 52.  Given the compressed time the Court had to issue a written opinion in

7    light of the impending termination date, there will likely be errors in the citations.  And, for the

8    same reason, the Opinion does not address every argument the FTC makes in its 196-page post-

9    trial submission, nor cite every piece of evidence supporting the Court's findings.  Because the

10   decision on the FTC's request for a preliminary injunction "effectively terminate[s] the litigation

11   and constitute[s] a final order," this case is DISMISSED.  *See FTC v. Hackensack Meridian*

12   *Health, Inc.*, 30 F.4th 160, 165 n.2 (3d Cir. 2022).  The Court **MODIFIES** its temporary

13   restraining order such that the temporary restraining order will **dissolve at 11:59 p.m. on July 14,**

14   **2023** unless the FTC obtains a stay pending appeal from the Ninth Circuit Court of Appeals.

15         This Opinion is filed under seal.  At the same time it is filed, the Court will file a redacted

16   version under seal.  In an abundance of caution, it is overly redacted.  The parties shall meet and

17   confer with the non-parties, and on or before July 18, 2023, submit a new proposed redacted

18   version of this Opinion.

19         **IT IS SO ORDERED.**

20   Dated: July 10, 2023

21

22                                                    JACQUELINE SCOTT CORLEY

23

24

25

26

27

28