Beth Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Kieran Gostin (*pro hac vice*)
James Rosenthal (*pro hac vice*)
Grace Hill (*pro hac vice*)
Anastasia M. Pastan (*pro hac vice*)
Sarah Neuman (*pro hac vice*)
WILKINSON STEKLOFF LLP
2001 M Street, N.W., 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
jrosenthal@wilkinsonstekloff.com
ghill@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com

Bambo Obaro
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3083
Facsimile: (650) 802-3100
bambo.obaro@weil.com

*Counsel for Microsoft Corp.*

[Additional Counsel Identified on Signature Page]

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>*Plaintiff*,<br><br>v.<br><br>MICROSOFT CORP. and<br>ACTIVISION BLIZZARD, INC.,<br><br>*Defendants*. | Case No. 3:23-cv-02880-JSC<br><br>**DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Hon. Jacqueline Scott Corley<br><br>Date: June 22, 2023<br><br>Time: 8:30 a.m.<br><br>Courtroom: 8 – 19th Floor |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

PROPOSED FINDINGS OF FACT ...................................................................................4

I.    The Merging Parties and the Proposed Transaction. ...........................................4

II.   The Gaming Industry Is Dynamic and Highly Competitive. ...............................8

    A.    Gamers Today Can Choose From More Games than Ever Before...................9

    B.    Gamers Can Play on Many Different Platforms. .............................................10

        1.    While gamers can play on mobile, PC, and consoles, mobile is quickly becoming most important. ......................................................10

        2.    Gamers can play the same games on different platforms. ...................13

    C.    Gamers Can Access Games Through Various Payment and Distribution Models. ......................................................................................15

        1.    Buy-to-play and free-to-play models. .................................................15

        2.    Subscription models. ...........................................................................17

        3.    Cloud gaming. .....................................................................................20

III.  Xbox and Activision Both Face Intense Competition. ......................................24

    A.    Xbox Has a Negligible Presence in Mobile, the Fastest Growing Gaming Segment....................................................................................24

    B.    Xbox Has Lost the Console Wars, and Its Rivals Are Positioned to Continue to Dominate, Including by Leveraging Exclusive Content. ............26

        1.    Xbox has consistently ranked third in consoles behind PlayStation and Nintendo. .................................................................26

        2.    Building on their leading consoles, PlayStation and Nintendo rely heavily on exclusive gaming content...........................................29

        3.    Xbox approaches exclusivity on a case-by-case basis.......................31

            a.    Minecraft.................................................................................32

            b.    Microsoft's history of cross-platform game development................................................................................34

            c.    ZeniMax.................................................................................35

    C.    Activision's Content Faces Intense and Growing Competition......................37

        1.    Activision has three core video game franchises. ...............................38

2. Activision has popular mobile games and the necessary experience and expertise to expand mobile content. ..........................39

3. Activision's games face significant competition. ...............................41

4. Activision's commercial success depends on distributing its content broadly.................................................................................42

IV. The Transaction Will Provide Xbox with a Position in Mobile and Expand Choice for Gamers and Developers. ........................................................43

A. Xbox's Primary Rationale for the Deal Is to Improve Its Mobile Presence. ......................................................................................44

B. The Transaction Will Give Gamers More Choices than Would Be Available Absent the Deal. ...................................................................45

1. The economics of the transaction depend on maintaining broad access to Activision games, including on PlayStation.........................46

2. Xbox has offered Sony a ten-year deal to keep Call of Duty on PlayStation—that Sony has refused....................................................50

3. Xbox has made a number of commitments to maintain and expand access to Activision Games after the Transaction.................54

a. Xbox will add Activision games to the Game Pass subscription service................................................................55

b. Xbox will bring Call of Duty to Nintendo Switch.................57

c. Xbox will maintain access to Call of Duty for PC gamers. ......................................................................................58

d. Xbox has made contractual and regulatory commitments to stream Activision content on third-party cloud gaming services..................................................59

e. These procompetitive contracts, which expand access to Activision's content, would not exist in the but-for world. ......................................................................................60

4. Even withholding Activision content would not foreclose PlayStation because Activision's content is not essential for platform competition.................................................................63

C. Xbox Will Operate Activision as a Limited-Integration Studio. ...................66

V. Numerous Foreign Antitrust Authorities Have Approved the Transaction. ...............66

VI. Professor Lee's Analysis of the Transaction and Its Impact on Competition Is Flawed and Does not Support the FTC's Claims.........................................................67

A.   Professor Lee's demand or "share" model is flawed and irrelevant to the analysis. ..................................................................68

B.   Professor Lee's foreclosure analysis exaggerates Microsoft's incentive to foreclose. ..................................................................70

C.   Professor Lee does not show that the transaction would harm competition between any platforms. ..................................73

VII.   The Transaction Would Produce Significant Pro-Competitive Benefits. ..................74

PROPOSED CONCLUSIONS OF LAW ..................................................................76

I.   Legal Standard ..................................................................76

A.   Section 7 of the Clayton Act ..................................................................76

B.   Preliminary Injunction Standard ..................................................................79

1.   Likelihood of ultimate success ..................................................................79

2.   Balance of the equities ..................................................................82

II.   The FTC Has Failed to Show That It Is Likely to Succeed on the Merits. ..................83

A.   The FTC Has Failed to Identify a Proper Relevant Antitrust Market. ..................83

1.   "High-performance consoles" are not a relevant product market. ..................................................................85

a.   The console market must include Nintendo ..................85

b.   PC gaming competes with consoles. ..................................92

2.   Multigame subscription services are not a relevant product market. ..................................................................93

3.   Cloud gaming subscription services are not a relevant product market. ..................................................................95

4.   The combination of multigame subscription services and cloud gaming subscription services are not a coherent or relevant product market. ..................................................................98

5.   The relevant geographic market is global. ..................................99

B.   The FTC Has Failed to Show that the Proposed Merger Is Substantially Likely to Lessen Competition. ..................100

1.   The FTC has failed to show that the merger is likely to result in total foreclosure in the console market. ..................102

a.   Xbox has no incentive or ability to withhold *Call of Duty* from its rivals. ..................................................102

(i)      **Microsoft has made clear its intention to continue to make *Call of Duty* available on rival platforms.** ..........................................................102

(ii)     **Xbox has no incentive to withhold *Call of Duty* in light of the highly competitive marketplace.** ...............................................105

(iii)    **Microsoft's acquisition of *Minecraft* and its decision to continue making the game available to Sony underscores its strong incentives to make *Call of Duty* available to other console providers.** ..........................................110

(iv)    **The FTC's console foreclosure theory is based on flawed economic analysis and is without merit.** .........................................................113

b.    The FTC has not shown that withholding *Call of Duty* would harm competition. .........................................................120

2.    The FTC has failed to show that the merger is likely to result in partial foreclosure in the console market. ...........................................130

3.    The FTC has failed to show that the merger is likely to substantially lessen competition in the putative content library or cloud gaming subscription service markets. ..................................131

a.    The FTC applies the wrong legal standard. .........................132

b.    The FTC's case rests on multiple layers of implausible speculation. .........................................................................134

c.    The FTC and its expert fail to account for Microsoft's agreements to make *Call of Duty* available to cloud platforms. .......................................................................138

III.    The Equities Weigh Against a Preliminary Injunction. .............................142

CONCLUSION ...........................................................................................147

The Federal Trade Commission ("FTC" or the "Commission") has failed to demonstrate that it is likely to succeed on its claim that the proposed merger between Microsoft Corporation ("Microsoft") and Activision Blizzard, Inc. ("Activision") is likely substantially to lessen competition. 15 U.S.C. § 18. Further, the balance of the equities and the public and private interests weigh against preliminarily enjoining the merger. Accordingly, the FTC's Motion for a Preliminary Injunction is **DENIED** and the case is **DISMISSED**.

## <u>INTRODUCTION</u>

The evidence at this hearing has confirmed what Microsoft said the day it announced the purchase of Activision: This transaction will increase access to Activision's popular games and make the gaming industry more competitive. Microsoft's valuation documents and deal model, as well as its position as a low-share player in gaming, confirm that withholding Activision content from other platforms would hollow out the value and brand loyalty of the company Microsoft is spending nearly $70 billion to acquire. Microsoft further demonstrated its commitment to expand access to Activision content by entering binding, ten-year agreements to bring *Call of Duty* to six new platforms, and making a similar, ten-year offer to Sony ██████ ███████████████████. And to remove any doubt, the CEO of Microsoft and the CEO of Xbox committed to the Court in unequivocal, sworn testimony that Xbox would continue to ship *Call of Duty* to Sony and would honor its commitments to make *Call of Duty* available on Nintendo for the first time in a decade, on Nvidia for the first time in years, and on other cloud gaming services for the first time ever.

The simple truth is that Xbox's basic economics confirm that increasing access to *Call of Duty* is the only rational decision. By all accounts, the only time an existing multiplayer, multiplatform game has been acquired is when Microsoft purchased Mojang, the publisher of *Minecraft*. Since then, Xbox has expanded access to *Minecraft* because doing so is good not just for gamers, but for Microsoft's bottom line. At the time of the acquisition, through today, Xbox has been one of the smallest platform revenue sources for *Minecraft*, generating roughly a quarter of the revenue of PlayStation and the Nintendo Switch. 6/29/23 Tr. (Stuart), at 1041:11–

1  1042:10. These undisputed facts confirm it "makes no economic sense and no strategic sense" to

2  take *Call of Duty* exclusive, 6/28/23 Tr. (Nadella), at 852:14, and explain why Microsoft has not

3  and need not run economic analyses to determine whether expanding access to other platforms is

4  in its interests. Xbox's future is not about winning the console wars, but "becom[ing] a fantastic

5  first-class publisher." 6/28/23 Tr. (Nadella), at 852:17. As its actions show, Xbox is committed

6  not just to bringing *Call of Duty* to other consoles, but to other companies like Nvidia that are

7  testing new business models that may or may not find stable ground. The idea that such

8  sophisticated and successful businesses are out to do Microsoft a favor by signing incomplete or

9  one-sided contracts does not comport with the record or reality.

10      Indeed, the only apparent victims of foreclosure that the FTC has been able to name in

11  this case are Sony (on console), Google (on cloud), and Amazon (for the first time in closing

12  argument). It is hard to understand why the FTC has filed a lawsuit to protect other large

13  technology companies who have taken different strategic approaches to gaming—especially

14  Sony, who has an exclusive content library that dwarfs Microsoft's by eight to one and seems

15  focused on preserving the $70-per-game business model.

16      That approach is particularly unsound in the area of cloud gaming. As Xbox's own

17  experience shows, it is unclear whether cloud gaming will gain traction at all, relative to other

18  business models like mobile gaming or free-to-play gaming. 6/28/23 Tr. (Kotick), at 731:15–

19  732:20. But even setting that aside, it is undisputed that *Call of Duty* is on zero cloud services

20  today, as Activision's CEO made clear at trial that the company had no plans to allow *Call of

21  Duty* to be carried by cloud providers. 6/28/23 Tr. (Kotick), at 734:2–5. By contrast, *Call of Duty*

22  will be on at least six when the merger closes. Tellingly, the supposed victims of the cloud

23  foreclosure theory proffered by the FTC—the cloud gaming providers themselves—support the

24  merger because they recognize it will give them access to Activision content they would not

25  otherwise be able to obtain.

26      In short, the FTC's speculation about what the future may hold is no substitute for what

27  the record in this case clearly contains: evidence that the transaction will certainly bring *Call of*

28

*Duty* to more places—and give gamers more choices on how to play it—than today. It turns antitrust law on its head to condemn a deal in which a low-share player seeks to improve its market position by increasing its competitors' access:



| More Access to *COD* | | | |
|---|---|---|---|
| | Today | With Merger | Without Merger |
| XBOX | ✔ | ✔ | ✔ |
| PlayStation | ✔ | ? | ✔ |
| PC | ✔ | ✔ | ✔ |
| Nintendo | ✖ | ✔ | ? |
| XBOX GAME PASS | ✖ | ✔ | ? |
| GEFORCE | ✖ | ✔ | ? |
| BOOSTEROID | ✖ | ✔ | ? |
| ubitus | ✖ | ✔ | ? |
| nware | ✖ | ✔ | ? |
| EE | ✖ | ✔ | ? |

6/27/28 Tr. (Lee), at 608:24–609:6, 611:13–612:2.

It is likewise unsound to stop a $69 billion transaction in order to prevent the third-place console maker from acquiring a single game title. Defendants are aware of no case in history where a Court has enjoined a merger on the theory that a single piece of entertainment content can upend a highly dynamic and growing industry, particularly given the unpredictability of how that industry would unfold. This case is a particularly poor place to start, given that the FTC has raised no concerns in the market that actually motivated this deal—mobile—and it has scant evidence in any of the other markets it claimed. Indeed, the main witness the FTC brought to court was an expert who did not even purport to provide economic analysis of most of the alleged markets at issue in this case, including subscription and cloud.

Even if the merits were a close call, the equities cut sharply against injunctive relief. The merger agreement expires on July 18, 2023, and Activision's CEO testified unequivocally that the deal will fall apart if an injunction is granted. An injunction would thus not only harm

1  Microsoft and Activision, but also deprive the public of the immediate, pro-competitive effects

2  of this merger. And for no good reason. The FTC claimed in closing that the reason to block this

3  merger is that Sony Interactive Entertainment CEO Jim Ryan will not know what to do on the

4  day the deal closes. But Sony will have access to Call of Duty at least through 2024 based on

5  Activision's existing contract. And as Xbox's CFO testified, Activision will be held as a limited-

6  integration studio, making it possible to divest the company if the FTC were to issue (and a

7  Court of Appeals affirm) an order to unwind the merger. Thus, the options here are to

8  irrevocably kill the transaction and the pro-competitive benefits that will spring from it, or to

9  allow the parties to close their deal while preserving the FTC's ability to pursue (if it so chooses)

10  administrative remedies.

11      In the end, the FTC is asking this Court to do something extraordinary—be the first Court

12  in history to enjoin a vertical transaction under Section 13(b). And the FTC bases that request on

13  a record that shows that Microsoft's incentive and intent is to make the marketplace more

14  competitive, rather than less. The FTC has the burden of proving that the transaction will give

15  Microsoft the incentive and ability to harm competition in a well-defined antitrust market. It has

16  not come close.

17  ## PROPOSED FINDINGS OF FACT

18  **I.      The Merging Parties and the Proposed Transaction.**

19      1.      Microsoft is a publicly traded corporation organized under Washington law and

20  headquartered in Redmond, Washington. PX0083, at 5, 92.

21      2.      Microsoft competes in gaming through its Xbox division. 6/22/23 Tr. (Bond), at

22  126:1–4; 6/28/23 Tr. (Nadella), at 824:25–825:10.

23      3.      Xbox manufactures dedicated gaming consoles, including the Xbox Series X and

24  S— which have an estimated retail price of $499 and $299, respectively—and distributes video

25  games via the Xbox Store and Microsoft Store. Lee Decl. ¶ 12; Lee Report ¶ 98; 6/28/23 Tr.

26  (Nadella), at 827:18–828:1.

27

28

4.      Xbox also develops and publishes games for play on its Xbox consoles, personal computers ("PCs"), and mobile devices, as well as for play on third-party consoles, including the Sony PlayStation and Nintendo Switch. *E.g.*, 6/22/23 Tr. (Booty), at 78:11–16; 6/23/23 Tr. (Spencer), at 428:4–8.

5.      Xbox offers a multigame subscription service, called "Game Pass," that provides subscribers with access to a library of more than 500 games for a single monthly fee. 6/22/23 (Bond), at 137:20–138:9. The Game Pass Ultimate tier includes features like Xbox Cloud Gaming, or xCloud, which allows users to stream certain console games available on Game Pass, including while downloading native versions of the games to an Xbox console. 6/22/23 Tr. (Bond), at 146:17–24, 192:25–193:3.

6.      Activision is a publicly traded corporation organized under Delaware law and headquartered in Santa Monica, California. PX0083, at 5, 93.

7.      Activision is a global developer and publisher of video games that are available on dedicated gaming consoles, PCs, and mobile devices. Activision comprises three business units, each of which develops and publishes video game content: Activision Publishing, Inc., Blizzard Entertainment, Inc. ("Blizzard"), and King Digital Entertainment ("King"). RX3166, at 10.

8.      Activision also owns and operates a PC gaming platform, Battle.net, which serves as a distribution outlet and social platform for Activision's PC titles. RX5055, at 20.

9.      On January 18, 2022, Microsoft announced an agreement to acquire Activision for $68.7 billion. That agreement provides, among other things, that either party may terminate the merger agreement if the transaction has not closed by July 18, 2023. PX0083, at 88. If the agreement is terminated, Microsoft is obligated to pay Activision a termination fee of $3 billion. *Id.* at 91; *see also* RX5058 (Hood Decl.), ¶ 6 n.2.

10.      The planned merger was reported to the FTC, as required under the Hart-Scott-Rodino Antitrust Improvements Act ("HSR Act"), on February 1, 2022. The FTC thereafter commenced an 11-month investigation, requiring Defendants to produce nearly 3 million

1   documents and sit for 15 investigational hearings. The waiting period under the HSR Act that

2   prevents the parties from closing the transaction ████████████████████████████

3   ████████████████████████████████████████████████████████████████████

4   ██████.

5         11.     On December 8, 2022, the FTC filed an administrative complaint challenging the

6   merger, alleging that it violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of

7   the FTC Act, 15 U.S.C. § 45. *See* Part 3 Complaint, *In the Matter of Microsoft/Activision*, No.

8   9412 (F.T.C. Dec. 8, 2022). Defendants produced an additional nearly 1 million documents and

9   sat for more than 30 depositions during discovery in the administrative proceeding.

10         12.     In its administrative proceeding, the FTC scheduled a hearing on the complaint

11   for August 2, 2023—a date that is after the July 18 merger termination date—despite the fact that

12   the FTC is permitted under its rules to set an earlier date and usually does so in unconsummated

13   mergers. Scheduling Order, *In the Matter of Microsoft/Activision*, No. 9412 (F.T.C. Jan. 4,

14   2023). The FTC also did not follow its standard practice of filing, at the same time as its

15   administrative complaint, a preliminary injunction action in federal court pursuant to Section

16   13(b) of the FTC Act, 15 U.S.C. § 53(b).

17         13.     On June 12, 2023, six weeks before the merger agreement could be terminated,

18   the FTC filed this action, seeking a temporary restraining order and preliminary injunction

19   barring the acquisition pending a trial before a hearing, decision, and appeal of the FTC's

20   administrative complaint. Dkt. 1.

21         14.     The FTC alleges that Xbox will withhold access to Activision games in four

22   putative relevant "markets": (1) high-performance consoles, (2) multigame content library

23   subscription services, (3) cloud gaming subscription services, and (4) a combined multigame and

24   cloud gaming subscription services market. The FTC defines the high-performance console

25   market to include only Xbox and Sony PlayStation. The FTC defines the geographic market as

26   the United States. The FTC claims that withholding Activision content will result in foreclosure

27   that "is reasonably likely to substantially lessen competition in the Relevant Markets." Dkt. 1

28

1   ¶ 131. The FTC makes no allegations of harm to competition in any game publishing or

2   distribution market, or any market involving mobile gaming. *E.g.*, Dkt. 1 ¶¶ 10, 68–70.

3         15.    If the Court grants a preliminary injunction that prevents the transaction from

4   closing, it would derail the deal entirely. 6/28/23 Tr. (Kotick), at 734:21–22 (explaining that "if

5   the preliminary injunction is granted" Activision's Board of Directors does not "see how the deal

6   could continue"). The FTC administrative process ordinarily takes years to resolve—and

7   certainly cannot be resolved before the merger's July 18, 2023 termination date. As just one

8   example, in the most recent administrative challenge to a merger, *In the Matter of Illumina, Inc.,*

9   *and Grail, Inc.*, 201 F.T.C. 0144 (2023), it took over 19 months from the time of the

10  administrative trial (August 24, 2021) to when the Commission issued its opinion (April 3,

11  2023). The matter is now on a "fast-track" appeal (timing the FTC opposed) before the Fifth

12  Circuit, but the case has yet to be argued. If the same timing holds in this case, even if the

13  administrative proceeding begins on August 2, 2023 as scheduled, it is unlikely that the ALJ

14  would issue his "recommendation" to the Commission before early 2024, and the overall

15  proceeding would not be resolved before 2026. *Illumina, Inc. v. FTC*, No. 23-60167 (5th Cir.).

16        16.    This Court held a five-day evidentiary hearing, during which the FTC examined

17  the highest-ranking leaders at Microsoft and Xbox, the CEO of Activision, and representatives

18  from other companies in the industry and economic experts. Over the course of the hearing, the

19  Court admitted into evidence roughly 300 exhibits, including 148 exhibits attached to the written

20  direct testimony of the FTC's expert.

21        17.    At 4:52 PM on June 29, while the Court was hearing closing arguments, the FTC

22  disclosed that it would be relying upon an additional 208 documents in its proposed findings of

23  fact and conclusions of law, plus an unstated number of public source documents that were not

24  admitted into evidence throughout the evidentiary hearing—contrary to the FTC's in-court

25  representations that its reliance on extra-record documents would be limited to "discrete issues"

26  that are "just from the PI record." 6/28/23 Tr., at 704:15–705:2. The FTC relies on those newly

27  disclosed documents in its findings of fact, notwithstanding its decision not to introduce those

28

1   documents during the five-day evidentiary hearing when it had the opportunity to question high-

2   ranking Microsoft and Xbox executives about them.

3   **II.     The Gaming Industry Is Dynamic and Highly Competitive.**

4          18.     Gaming is a highly dynamic and competitive industry, 6/23/23 Tr. (Spencer), at

5   390:8–9, PX7060 (Eisler Dep. Tr.), at 187:21–24, and the fastest growing portion of the media

6   and entertainment sector. Gaming is larger in revenue than TV, home video (including

7   streaming), cinema, music, books or newspapers, and magazines, 6/23/23 Tr. (Spencer), at

8   391:19–20; 6/28/23 Tr. (Kotick), at 710:8–21; RX3166, at 2.

9          19.     There are roughly 3 billion gamers around the world. 6/22/23 Tr. (Bond), at

10   127:20–128:1. Gaming is growing in "every economic strata and in every country in the world"

11   in large part due to increased accessibility to free games on mobile phones. *See* 6/28/23 Tr.

12   (Kotick), at 712:1–18 (testifying that mobile phones "really democratized the opportunity for

13   game play."). By 2030, roughly half of the global population (4.5 billion) is expected to

14   participate in the gaming industry. RX3166, at 2.

15          20.     Gaming generates hundreds of billions of dollars of revenue a year and is

16   projected to grow substantially in the future. 6/23/23 Tr. (Spencer), at 404:12–16; 6/28/23 Tr.

17   (Kotick), at 710:16–17 ("[T]he business has evolved to be what's today probably a $130 billion-

18   a-year industry."). Gaming grew to record high levels during the global pandemic, with people

19   seeking at-home entertainment options more than ever before. RX3136; 6/28/23 Tr. (Bailey), at

20   789:16–22.

21          21.     The gaming sector is highly fragmented, and includes traditional participants

22   (*e.g.*, Sony, Nintendo, Tencent, Valve), new entrants (*e.g.*, Amazon, Mediatonic, Moon Studios,

23   Purple Lamp, Hello Games) and new services (*e.g.*, the gaming offerings of Amazon, Apple,

24   Google, Netflix, and Nvidia). *See, e.g.*, 6/27/23 Tr. (Bailey), at 655:9–12; RX5055, at 7 ex. 1.

25          22.     Microsoft and Activision are just two companies in the highly competitive and

26   diverse gaming industry. Microsoft is the number three console manufacturer (of three), behind

27   Sony and Nintendo. 6/22/23 Tr. (Bond), at 129:3–4 ("Xbox is the third largest console player,

28

1   the smallest; and console is also the smallest part of the industry."); 6/23/23 Tr. (Spencer), at

2   295:2–10 ("If you look at our market share in the console space over the last 20-plus years, we're

3   in third place. We've remained in third place for quite a while . . . . [W]e're behind Sony and

4   Nintendo in console share globally."); 6/28/23 Tr. (Bailey), at 783:21–784:2 ("So what I'm

5   showing here are three ways to measure console shares by revenue, by units, or by installed base;

6   and no matter which metric we use, Xbox is the third place console."). Likewise, Activision is

7   just one of dozens of significant game publishers, smaller than Electronic Arts, Take Two, and

8   others. 6/27/23 Tr. (Bailey), at 663:10–23; RX5055, at 23 ex. 15; RX1141, at 16, 19.

9        **A.   Gamers Today Can Choose From More Games than Ever Before.**

10       23.   The gaming market is dynamic, spanning across different cultures, languages, age

11   groups, and genres. Game developers are constantly creating new titles, ranging from small

12   puzzle games like *Human: Fall Flat* to blockbuster action titles like *God of War: Ragnarök*.

13   6/22/23 Tr. (Bond), at 139:16–140:7.

14       24.   Gamers play roughly 3,500 different games on Microsoft's gaming platform.

15   Wright Stip. (Dkt. 228), at 5; *see also* RX5055, at 10.

16       25.   Certain game franchises release new titles every year, including Activision's *Call*

17   *of Duty* ("*COD*"). *See* 6/28/23 Tr. (Kotick), at 736:13–19; *see also id.* 713:5–9 (discussing

18   importance of sequels); RX5055, at 50.

19       26.   Studios both large and small develop popular games. Many popular games are

20   unexpected breakout successes developed by small independent studios. *See, e.g.*, 6/22/23 Tr.

21   (Bond), at 149:4–5 ("[E]very year there's a game that becomes wildly successful and popular

22   that comes from a tiny team."). For example, *Among Us* was developed by a studio with only

23   four employees, yet became "wildly popular." 6/22/23 Tr. (Bond), at 149:9–11. Many other

24   successful games such as *Fortnite*, *Player Unknown's Battlegrounds ("PUBG")*, and *Vampire*

25   *Survivors* were launched by small independent studios with relatively small development and

26   marketing budgets. *E.g.*, 6/22/23 Tr. (Bond), at 148:25–149:14.

27

28

27.    The vertically integrated console makers also produce hit games. One of the most acclaimed games of 2022 was Sony's exclusive *God of War: Ragnarök*. RX5055, at 39–43 & ex. 27. Similarly, Naughty Dog, a subsidiary of Sony, published the PlayStation exclusive *The Last of Us*, an "incredibly successful[]" game that has been "turn[ed] . . . into one of the most successful TV shows of all time." 6/28/23 Tr. (Kotick), at 723:13–21.

28.    Although major gaming companies often invest millions of dollars trying to create the next big hit, investment and reputation does not always guarantee success. 6/22/23 Tr. (Hines), at 111:11–14; 6/22/23 Tr. (Booty), at 73:9–13. Every year, there are highly anticipated and well-funded games that are unsuccessful, including games in previously-successful franchises, like Xbox's *Halo*. 6/22/23 Tr. (Booty), at 111:11–14. For example, Activision's *Call of Duty: Vanguard* (released in 2021) was widely regarded as a critical and financial flop despite high expectations, a large budget, and affiliation with the popular *Call of Duty* franchise.[1] 6/28/23 Tr. (Kotick), at 739:22-740:4. More recently, the much-anticipated Xbox and PC-exclusive *Redfall* was considered a disappointment. 6/22/23 Tr. (Hines), at 111:15–112:4.

29.    For any platform to be successful, it is important that it offer gamers a variety of games. No single game drives platform success. 6/22/23 Tr. (Bond), at 128:3–20, 147:8–12, 154:9–10; 6/22/23 Tr. (Booty), at 80:23-81:4 ("[W]hile content is absolutely important to a strategy, it is -- it really isn't a durable advantage"); *see also* 6/27/23 Tr. (Bailey), at 665:2–12, 666:12–17.

**B.    Gamers Can Play on Many Different Platforms.**

**1.    While gamers can play on mobile, PC, and consoles, mobile is quickly becoming most important.**

30.    Games are available to play across a wide range of platforms, including mobile, PC, and console. *E.g.*, 6/23/23 Tr. (Spencer), at 404:6–405:3 (discussing RX3166, at 3); 6/27/23 Tr. (Bailey), at 661:3–23.

---

[1] Jade King, "Halo Infinite Didn't Deserve To Be A Failure" TheGamer (Jan. 22, 2023), https://www.thegamer.com/halo-infinite-failure-campaign-multiplayer-343-industries/.

1    31.   Over the past few decades, the gaming industry has changed dramatically.

2  Gamers used to play video games primarily in arcades. In later years, they purchased individual

3  game cartridges or discs to play on consoles in their homes. Now, gamers can download games

4  directly to their consoles, and play games on PC and mobile devices. 6/22/23 Tr. (Bond), at

5  127:14–19, 138:10–12; 6/28/23 Tr. (Kotick), at 712:5–10.

6    32.   The three major gaming consoles today are Sony PlayStation, Nintendo Switch,

7  and Microsoft Xbox. 6/23/23 Tr. (Spencer), at 434:5–21 (discussing RX5046, at 2). While

8  consoles used to be the predominant form of home gaming, they now represent a smaller share of

9  video game revenue than mobile and PC. 6/22/23 Tr. (Bond), at 127:16–128:1; RX3166, at 3.

10    33.   Most gamers today play on mobile devices, which is also the fastest growing

11  segment as the technical capabilities of mobile devices increase. 6/22/23 Tr. (Bond), at 127:24–

12  128:1; 6/23/23 Tr. (Spencer), at 392:5–6, 392:10–12, 404:11, 404:21–22; 6/28/23 Tr. (Kotick), at

13  712:1–12, 732:4–20; 6/28/23 Tr. (Kotick), at 712:8–9 ("And so today the bulk of games are

14  played on phones . . . ."); 6/27/23 Tr. (Bailey), at 661:6–23; *see also* RX5058 (Hood Decl.), ¶ 14

15  ("$113 billion of the game industry's total revenues of $210 billion came from mobile gaming in

16  2020").

17    34.   By contrast, console has shrunk in importance and will continue to do so. *See,*

18  *e.g.*, 6/28/23 Tr. (Kotick), at 712:11–18; 6/27/23 Tr. (Bailey), at 661:19–23 ("All of the gaming

19

20

21

22

23

24

25

26

27

28

1  is growing, but mobile is growing the fastest so, as a result, both PC gaming and console gaming

2  are shrinking as a percent.").



RX5055, at 10 ex. 3.

35.      Gamers today spend far more hours gaming on Android and Apple iOS mobile

devices than on any other platform. Growth in mobile gaming is expected to continue, as phones

are increasingly becoming more powerful with the incorporation of microprocessors that are

equivalent to those that have been used in past dedicated video game consoles. *See, e.g.*, 6/28/23

Tr. (Kotick), at 720:7–11 (explaining that mobile is "the biggest part of the market").

36.      After mobile, PC gaming is the next largest source of video game revenue.

6/27/23 Tr. (Bailey), at 661:11–12. Jim Ryan referred to PC gaming as "a very direct competitor

to the PlayStation platform." PX7053 (Ryan Dep. Tr. Vol. I), at 112:17–22. In fact, "Sony delays

the launch of their games on PC because they're trying to drive people to buy a PlayStation."

6/23/23 Tr. (Spencer), at 363:20–22; *see also* RX5055, ¶ 91; 6/28/23 Tr. (Bailey), at 786:13-

787:4.

## 2. Gamers can play the same games on different platforms.

37.     Many of the most-played games are available on multiple platforms, including different consoles, PC, and mobile. For example, platform access to the *Minecraft* franchise has expanded to over twenty devices, including all three consoles, PC, phones, and Amazon Kindles. 6/22/23 Tr. (Booty), at 78:11–16; RX5058 (Hood Decl.), ¶ 11.

38.     Likewise, the best-selling games for Xbox and PlayStation are also sold on Nintendo. 6/28/23 Tr. (Bailey), at 782:19–783:10.

39.     Nearly all of the best-selling games for Xbox and PlayStation are also sold for PC. In 2022, for example, all of the top 15 Xbox titles and all of the top 15 PlayStation titles were available on PC. 6/28/23 Tr. (Bailey), at 784:12–20.

*See* RX5055, at 21–22 exs. 12–13.

40.     Gamers can now play certain multiplayer games across platforms. For example, a gamer on PlayStation can now play many games with other gamers playing on another platform, like Nintendo or Xbox or PC. That mode of play is referred to as "cross-platform" gaming or "cross-play." 6/22/23 Tr. (Bond), at 135:7–17.

41.     In most multiplayer games, a gamer selects multiplayer game mode, the game matches the gamer with other gamers, and the gamers are then placed in a lobby and either enter

1   the game or are placed in teams. *See* 6/22/23 Tr. (Bond), at 134:5–19; 6/27/23 Tr. (Bailey), at

2   669:24–670:4, 672:2–7.

3       42.   Cross-play leads to material and measurable improvements in the quality of

4   gamers' user experience. Because games with cross-play increase the number of gamers

5   available to partner with, cross-play enhances the value of a game, including by more effectively

6   and quickly matching comparably skilled gamers. In addition, cross-play makes games more

7   valuable to consumers because they can play the game with friends and access larger lobbies of

8   players. *See, e.g.*, 6/27/23 Tr. (Bailey), at 669:22–670:4; 6/28/23 Tr. (Kotick), at 716:5–8; *see*

9   *also id.* at 713:23–714:10 ("[T]he big evolution of the industry has been this transformation to

10  the social experience."), 715:18–24.

11      43.   Many of the most popular multiplayer titles (*e.g.*, *Fortnite, PUBG*, *Call of Duty*,

12  and *Minecraft*) allow gamers to cross-play between at least PC and console. *E.g.*, 6/22/23 Tr.

13  (Bond), at 152:18–153:2 (*Call of Duty*). Xbox was "one of the first . . . to allow cross-platform

14  play." *See* 6/29/23 Tr. (Stuart), at 1038:8–11.

15      44.   A significant appeal of *Call of Duty* is that it has a multiplayer mode that permits

16  cross-play by groups across different platforms, including PlayStation. *See* 6/28/23 Tr. (Kotick),

17  at 715:25–716:8. Cross-play also exists in the free-to-play *Call of Duty: Warzone*. *See* 6/28/23

18  Tr. (Kotick), at 719:7–720:2 (noting that the free-to-play Warzone is playable on PlayStation,

19  PC, and Xbox, and will soon be available on mobile).

20      45.   The introduction of cross-play to *Call of Duty* has significantly improved players'

21  experience; the game's online multiplayer functionality thrives on a large and active player base,

22  and cross-play has increased the number of available players. *See* 6/28/23 Tr. (Kotick), at 716:5–

23  8 (explaining that cross-play "expands the market and also makes you -- let's say you have a

24  group of friends, not everybody's going to have the same device so it gives you the opportunity

25  to be able to play with your friends"). With a larger pool of available players, matches can be

26  more evenly populated in terms of skill level, resulting in quicker and more competitive

27  matchmaking, and ultimately improving players' gaming experience. *See, e.g.*, 6/27/23 Tr.

28

1  (Bailey), at 670:1–4 ("[W]hen you are matched with players with similar skills as you have . . .

2  [i]t matters for the enjoyability of those games.").

3       46.    Notably, the introduction of cross-play and its significance to *Call of Duty* gamers

4  has also prompted Activision to eliminate any material differences between gameplay on Xbox

5  and PlayStation. *See* PX2157, at 3, 13. Before cross-play became popular on *Call of Duty*,

6  Activision had offered or ████████████████ certain feature and content advantages for *Call*

7  *of Duty* on PlayStation—*e.g.*, map packs and timed-exclusive game modes—███████████

8  ████████████████████████ *See* PX2157, at 3, 13. However, ████████████

9  ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ██████████████████████ *See* PX2157, at 3, 13; RX0020.

12      47.    Removing *Call of Duty* from PlayStation would dramatically shrink the

13 community of potential gamers, making the gaming experience worse for anyone remaining. *See*

14 6/28/23 Tr. (Kotick), at 716:12-21 ("[Y]ou would have a revolt if you were to remove the game

15 from one platform."); *see also* 6/28/23 Tr. (Kotick), at 719:4–6 (suggesting that twice as many

16 *Call of Duty* gamers play on PlayStation than on Xbox); 6/23/23 Tr. (Spencer), at 366:4–367:15.

17

18     **C.**    **Gamers Can Access Games Through Various Payment and Distribution Models.**

19      48.    Gamers can access games through a growing variety of payment and distribution

20 models. The diversity of payment and distribution models has increased the accessibility of

21 games and expanded gamer choice. 6/23/23 Tr. (Spencer), at 392:24–393:10.

22     **1.**    **Buy-to-play and free-to-play models.**

23      49.    Most gamers obtain entitlements to access and play console games via the "buy-

24 to-play" model of purchasing the games in the form of a cartridge, DVD or Blu-Ray disc, or

25 digital download for an upfront price (*e.g.*, $70) and adding them to their own libraries. 6/22/23

26 Tr. (Bond), at 128:23–25, 138:2–20.

27

28

1    50.    Today, however, mobile gaming is the largest and fastest-growing segment of the

2    gaming industry. 6/23/23 Tr. (Spencer), at 392:7–12, 404:12–22; 6/27/23 Tr. (Bailey), at 661:3–

3    23; RX5058 (Hood Decl.), ¶ 14.

4    51.    As mobile gaming has grown more popular, the "free-to-play," or "F2P," model

5    has grown with it. With F2P, games are downloaded for free but are then monetized through in-

6    game purchases or in-game advertising. The free-to-play model is now found on PC and console

7    as well. *E.g.*, 6/22/23 Tr. (Bond), at 153:3–10; 6/23/23 Tr. (Spencer), at 398:5–399:4; *see also*

8    6/28/23 Tr. (Kotick), at 719:13–15 ("[O]ur main focus as a company is making sure that each

9    one of our games is first available free on as many formats as we can create").

10   52.    Free-to-play is a rapidly growing business model in the industry today, and there

11   are thousands of free-to-play games available, particularly on mobile. 6/23/23 Tr. (Spencer), at

12   398:8–13 ("All the mobile games are FTP"), 404:11–22; 6/28/23 Tr. (Kotick), at 719:9–15

13   (explaining that "the way you build big communities of players is make the games available for

14   free" and that Activision makes sure its games are "first available free on as many formats as [it]

15   can create"). Free-to-play games like *Fortnite* and *Apex Legends* (among many others) have

16   become some of the most popular games in the industry and generate substantial revenues even

17   though the initial entitlement is free. RX5055, at 58–59 ex. 37. Only about 2 percent of players

18   of free-to-play games actually make in-app payments. 6/28/23 Tr. (Kotick), at 726:24–727:4

19   ("So in the case of a game like Candy Crush, maybe 2 percent of the 150 million monthly active

20   users pay for the game").

21   53.    Free-to-play games have allowed small independent companies to grow quickly.

22   For example, Epic Games "was a small indy [*sic*] studio," but the launch of its free-to-play

23   *Fortnite* game made Epic a "huge success." *See* 6/22/23 Tr. (Bond), at 149:3–8; *see also*

24   RX5055, at 8 (explaining that *Fortnite* "had a small initial development budget of ~$300,000"

25   and has been ████████████████████████████████████████████████████

26   ████████████████████).

27

28

1            **2.    Subscription models.**

2        54.    Subscription models are an example of innovation in game payment. With

3    multigame subscription offerings, gamers pay a flat monthly fee to access a library of games. In

4    the case of most subscription offerings, subscribers download the games they want to play to

5    their devices (just as they would a buy-to-play game), and then play them using those devices.

6    With some services, gamers can stream games while waiting for the game to download or try out

7    a game before downloading. 6/22/23 Tr. (Hines), at 92:23–93:5; 6/22/23 Tr. (Bond), at 145:12–

8    146:7; *see also* 6/28/23 Tr. (Bailey), at 790:21–791:9 (telemetry data show xCloud is "largely

9    [used to] play[] one game they never played before and not playing it ever again," which is

10    "exactly consistent with" gamers using xCloud while the game downloads).

11        55.    Sony and Xbox offer their users the option of accessing games through

12    subscriptions, but with quite different strategies. *See* 6/22/23 Tr. (Bond), at 146:17–24, 192:25–

13    193:3; 6/23/23 Tr. (Spencer), at 421:21–23; RX7053 (Ryan Dep. Tr. Vol I), at 260:6–21.

14        56.    In 2017, Xbox launched Game Pass, one of the first multigame subscription

15    offerings. 6/22/23 Tr. (Bond), at 140:15–23. The value proposition behind Game Pass was

16    relatively straightforward: subscribers could access a broad catalog of games for a set monthly

17    fee of $9.99 (or $14.99 for the Game Pass Ultimate tier) instead of purchasing the games outright

18    (for $70 per game). 6/22/23 Tr. (Bond), at 137:23–138:1; RX5044. To make Game Pass more

19    attractive, Xbox includes all games developed by its studios (known as "first-party games") in

20    Game Pass the day of release ("day-and-date"). 6/29/23 Tr. (Stuart) at 1047:6–15; 6/22/23 Tr.

21    (Bond), at 139:6–7; Carlton Decl. ¶ 16 n.10 ("Microsoft has a policy of putting all of its first-

22    party games on Xbox Game Pass on the game's launch date.").

23        57.    The Game Pass portfolio includes all first-party Xbox games, as well as a

24    carefully curated and constantly evolving portfolio of third-party games. In developing this

25    library, Xbox includes on Game Pass a variety of genres, including "puzzle games, sports game,

26    action games, adventure games" that span "the while breadth and depth of . . . play style . . . ,

27    mood and moment, age." 6/22/23 Tr. (Bond), at 139:23–140:1. Xbox "work[s] really hard to

28

- 17 -
DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT
(NO. 3:23-CV-02880-JSC)

1   span geographically," including "different cultures, different languages to make sure . . . we're

2   creating something that[ has] really broad appeal." 6/22/23 Tr. (Bond), at 140:2–140:7; *see*

3   6/29/23 Tr. (Stuart), at 945:14–15 ("You need quality content for people both to subscribe and to

4   want to stay in the service.").

5        58.    Game Pass benefits lesser-known games by giving them wider exposure. *See*

6   6/23/23 Tr. (Spencer), at 300:11–18. For example, Microsoft gaming executive Sarah Bond

7   testified:

8        [W]ith the game *Human:Fall Flat*, 60 percent of people who played it had never
         played a puzzle game before when it was in Game Pass and 40 percent of that 60
9        percent actually went on and bought another puzzle game outside of Game Pass
         once they figured out that they loved puzzle games.
10

11  6/22/23 Tr. (Bond), at 141:6–12; *see also id.* at 139:9, 142:7–16 ("[D]evelopers love it because it

12  helps them be discovered.").

13       59.    Xbox simultaneously offers most of its first-party games as buy-to-play and on its

14  Game Pass subscription offering, Sony does not. Even though Sony releases some of the most

15  popular first-party games each year, Sony has affirmatively decided not to add any of its new

16  first-party content to subscription service day-and-date. 6/23/23 Tr. (Spencer), at 428:4–20; *see*

17  *also* PX7053 (Ryan Dep. Tr. Vol. 1), at 205:06–25.

18       60.    Despite choosing not to invest in the growth of PlayStation Plus and excluding

19  current first-party content from the service, Ryan revealed that PlayStation Plus has

20  approximately 50 million subscribers, which is far larger than Game Pass. PX7053 (Ryan Dep.

21  Tr. Vol. I), at 259:19–260:9 (comparing 50 million PlayStation Plus subscribers to Microsoft's

22  announcement of 25 million Game Pass subscribers when speaking to investors); *id.* at 260:19–

23  261:19 (Sony has a "strong and healthy PlayStation Plus subscription business."). Subscribership

24  to PlayStation Plus would likely increase substantially if Sony added its vast catalog of hit first-

25  party games to PlayStation Plus day-and-date. PX7053 (Ryan Dep. Tr. Vol. I), at 205:6–25

26  (calling the fact that Sony has no day-and-date games in its subscription service a "strategy

27

28

1    decision," and acknowledging that Xbox has made a different decision, which is just as "regular

2    matter of strategy and competition.").

3        61.    Some subscription services offer access to online multiplayer gameplay along

4    with other benefits, such as additional game save storage and access to a limited number of

5    catalog titles each month for free. 6/28/28 Tr. (Kotick), at 729:8–10, 730:1–18 (discussing *World

6    of Warcraft* subscription); PX7053 (Ryan Dep. Tr. Vol. I), at 17:04-17:08. Still others are

7    limited to the games of a single publisher, like EA's subscription service, EA Play, which offers

8    a rotating multigame catalog of EA games and features limited trials of new games to help

9    promote new releases. *E.g.*, Lee Decl. ¶ 17.

10        62.    The idea that subscription services will replace buy-to-play games has no current

11    basis in reality. Game Pass had more than 25 million subscribers as of January 2022, *see*

12    PX9102, and it is not clear that the model will in fact take over the industry. Indeed, Sony

13    refuses to provide new content in its subscription, confident that traditional buy-to-play sales are

14    better for its bottom line. PX7053 (Ryan Dep. Tr. Vol. I), at 205:6–25.

15        63.    Like Sony, publishers of popular games that generate significant buy-to-play

16    revenues are reluctant to allow their games to be included in subscription services upon release

17    because of the significant cannibalization of buy-to-play revenues that can occur. *See* PX7053

18    (Ryan Dep. Tr. Vol. I), at 258:10–258:14.

19        64.    Activision does not allow, and has no plans to allow, its games to be put in

20    multigame subscription libraries upon release. *See* 6/28/23 Tr. (Kotick), at 731:12–14 ("In our

21    current long-range plan, we don't have any revenues that are being generated from a multi-game

22    subscription service"); 6/28/23 Tr. (Kotick), at 746:19–21 ("I would say it's just not something

23    that we do have any plans to do or have ever done . . . ."). This "philosophical aversion" to

24    subscription services is due to multiple concerns, including that having a game in a multigame

25    subscription would "degrade the economics" of Activision's buy-to-play business model, is

26    "inconsistent with the idea of starting out with free-to-play as the way that you build game

27    universes and franchises," and could lead to substantial cannibalization. 6/28/23 Tr. (Kotick), at

28

1    729:3–16, 743:22–24; *see also* 6/28/23 Tr. (Kotick) at 744:8-11 (explaining that "cannibalization

2    would play a role" in a decision not to place games in a multigame subscription).

3          65.      Activision only rarely allows even its older back-catalog titles to be included in

4    subscription for brief periods of time. PX7054 (Ryan Dep. Tr. Vol II), at 8:7–16 ("And you then

5    said that you never asked Activision to put the current Call of Duty games in day and date

6    because you thought – you knew Mr. Kotick would never agree to that right?" . . . "I don't know,

7    but I don't believe he would have agreed to it."); PX7053 (Ryan Dep. Tr.), at 258:20–24 ("You

8    have no reason to believe that Mr. Kotick and Activision would put Call of Duty on a

9    subscription service like Game Pass for any length of time or day and date if this transaction is

10    not completed, right?" "Correct.").

11          66.      Indeed, the only Activision titles that have been made available on multigame

12    subscription services have been back-catalog games offered for a limited period of time, often

13    for promotional purposes, rather than new games made available day and date. *See* 6/28/23 Tr.

14    (Kotick), at 774:9–24; *see also* 6/28/23 Tr. (Kotick), at 747:3–10, 750:10–13 (acknowledging

15    occasional placement of "a very old catalog title for a short period of time" on subscription

16    services).

17          67.      Subscription offerings compete directly with traditional buy-to-play options:

18    When a game is added to a subscription library, buy-to-play sales decrease, and when a game is

19    withdrawn, buy-to-play sales increase. 6/28/23 Tr. (Bailey), at 787:19–788:2; *see also* RX5055,

20    at 84–85 exs. 43–44.

21          68.      As the FTC itself has recognized, subscription fees "replac[e] the cost of

22    purchasing individual titles." Dkt. 7, at 14; *see* 6/22/23 Tr. (Bond), at 141:17–22 ("THE

23    COURT: [W]hy would anyone go buy a $70 [game]? They wouldn't; right? Because they can

24    always play it through Game Pass? THE WITNESS: You're probably right.").

25               **3.**     **Cloud gaming.**

26          69.      Cloud gaming (also known as cloud game "streaming") is a potential alternative

27    delivery mechanism to downloading native games for play onto hardware. 6/22/23 Tr. (Bond), at

28

1   131:20–132:5; PX7060 (Eisler Dep. Tr.), at 29:12–19. Cloud gaming is a catchall term for

2   technology that runs games on remote servers that gamers can access using consoles, PCs,

3   mobile devices, or TVs. 6/23/23 Tr. (Zimring), at 468:16–469:13. Cloud gaming can allow

4   gamers to play games on less highly-powered and more affordable devices, particularly salient in

5   less modernized nations. PX7060 (Eisler Dep. Tr.), at 35:08–36:17, 45:05–08, 46:10–47:09.

6        70.     Although cloud gaming technology is not new, PX7054 (Ryan Dep. Tr. Vol. II)

7   63:07–14 (noting PlayStation has had a cloud streaming service since 2014), it makes up only a

8   tiny fraction of the billions of hours of gameplay each year and has never achieved consumer

9   demand beyond its current niche. PX7053 (Ryan Dep. Tr. Vol I), at 63:12–14 (PlayStation has

10  had "a form of cloud streaming service…[since] 2014"); PX7062 (Fisher Dep. Tr.), at 133:22–

11  134:04 (agreeing that "cloud gaming is still in its early days" and "is a very small part of the

12  market"); PX7053 (Ryan Dep. Tr. Vol I), at 83:25–84:10 ("[C]loud gaming is always five to six

13  years away no matter when you read an article."); *see also* PX7053 (Ryan Dep. Tr. Vol. I)

14  84:01–10 (acknowledging someone from Sony "commented that cloud gaming is always five to

15  six years away no matter when you read an article."); 6/28/253 Tr. (Nadella), at 851:16–24

16  (discussing the difficulty of launching mobile streaming).

17       71.     Several companies, including Xbox, Amazon, Nvidia, and other companies, have

18  experimented with different forms of cloud gaming. But the technology and economics of cloud

19  gaming remain challenging, particularly for latency-sensitive multiplayer games. Due to those

20  latency issues, users sometimes experience a stuttering effect or lags in gameplay. 6/22/23 Tr.

21  (Bond), at 145:6–11; 6/23/23 Tr. (Spencer), at 395:10–16; PX7060 (Eisler Dep. Tr.), at 47:05–

22  47:23. Cloud gaming is also limited in its ability to replicate controller functions for console

23  games streamed to mobile devices. 6/23/23 Tr. (Spencer), at 395:23–396:7; 6/28/23 Tr. (Kotick),

24  at 733:15–21.

25       72.     In 2020, Xbox launched a cloud gaming feature as part of its Game Pass

26  subscription service, known as Xbox Cloud Gaming, or xCloud, "as a way to bring more

27  competition to mobile platforms." 6/28/23 Tr. (Nadella), at 851:16–21; 6/22/23 Tr. (Booty), at

28

1   64:8–14; RX1079. The motivation for this step was to find a way onto mobile phones as fast as

2   possible. But the strategy turned out to have little basis in reality. Xbox offers cloud gaming only

3   as a feature within the most expensive Game Pass subscription tier, Game Pass Ultimate (with

4   the exception of *Fortnite*, which is available to play for free on Xbox Cloud Gaming via

5   browser). 6/22/23 Tr. (Bond), at 146:17–24, 192:18–193:3; 6/22/23 Tr. (Hines), at 92:20–22.

6   The feature allows users to stream certain console games available on Game Pass through the

7   cloud, instead of downloading native versions of the games. 6/22/23 Tr. (Booty), at 64:8–14;

8   6/23/23 Tr. (Spencer), at 393:16–394:4; *see also* PX7054 (Ryan Dep. Tr. Vol. II), at 62:16–24

9   (Sony's cloud streaming is a mere "component" of PlayStation Plus and not a standalone

10  platform). But, as it turns out, most consumers do not want to play console games on a touch

11  screen with no controller. 6/23/23 Tr. (Spencer), at 395:6–396:7.

12       73.    Accordingly, Xbox Cloud Gaming on Game Pass Ultimate is played

13  predominantly by Xbox console players on their consoles. 6/22/23 Tr. (Bond), at 145:12–19;

14  6/28/23 Tr. (Bailey), at 790:4–791:2. Cloud gaming has been plagued by high costs, technical

15  problems, and low consumer demand and engagement. Because Xbox Cloud Gaming does not

16  run on Microsoft's Azure cloud server infrastructure, but rather on individual Xbox consoles,

17  Xbox loses money on every hour of streamed gaming. 6/22/23 Tr. (Bond), at 195:1–4, 208:19–

18  210:9 ("[T]he revenue we get, you know, per minute, per hour from [xCloud] is lower than the

19  cost . . . ."). The machines doing the streaming do not have other monetizable uses when they are

20  not engaged.

21       74.    As a result of technical limitations, a large majority of Xbox Cloud Gaming users

22  report relying on the service primarily to play a game while it is being downloaded to play

23  natively on Xbox. 6/22/23 Tr. (Bond), at 145:12–146:7; 6/23/23 Tr. (Spencer), at 394:23–396:7;

24  *see also* 6/28/23 Tr. (Bailey), at 790:4–791:9 (telemetry data show that xCloud is "largely [used

25  to] play[] one game they never played before and not playing it ever again," which is "exactly

26  consistent with" gamers using xCloud while the game downloads).

27

28

1    75.    In addition, today, Xbox cannot make streaming games available on mobile

2  devices due to the terms of the Apple and Google app stores. 6/22/23 Tr. (Bond), at 132:15–17;

3  6/23/23 Tr. (Spencer), at 410:1–411:14.

4    76.    Other competitors have had similar struggles. In fact, Google shut down its Stadia

5  cloud gaming service earlier this year, even though Stadia "had the best technology on the

6  market" and "delivered the best latency." 6/23/23 Tr. (Zimring), at 470:15–16, 471:25–473:3.

7    77.    Stadia came out in a beta version at the end of 2018 and was launched as an actual

8  service in November 2019. 6/23/23 Tr. (Zimring), at 470:7–12. Google put "substantial effort"

9  into the technology and data centers necessary to lower Stadia's latency, but still found it

10  "extremely difficult . . . for something new like Stadia to be able to find a footing." 6/23/23 Tr.

11  (Zimring), at 482:8–19. Google sought to develop a customer base by having its own first-party

12  game development studio produce exclusive games, but the studio shut down due to rising costs.

13  6/23/23 Tr. (Zimring), at 478:12–480:23. Stadia competed with consoles and PC gaming when it

14  launched and with other cloud gaming services during its existence. 6/23/23 Tr. (Zimring), at

15  483:7–10, 484:23–486:3. Activision's content was never on the Stadia service. 6/23/23 Tr.

16  (Zimring), at 484:23–25, 487:18–20.

17    78.    Cloud gaming has suffered from latency issues that negatively affect the gaming

18  experience. Due to those latency issues, users sometimes experience a stuttering effect or lags in

19  gameplay. 6/22/23 Tr. (Bond), at 145:6–11; 6/23/23 Tr. (Spencer), at 395:10–16; PX7060 (Eisler

20  Dep. Tr.), at 47:5–47:23. Cloud gaming is also limited in its ability to replicate controller

21  functions for console games streamed to mobile devices. 6/23/23 Tr. (Spencer), at 395:23–396:7;

22  6/28/23 Tr. (Kotick), at 733:15-21.

23    79.    Jim Ryan acknowledged that it is ████████████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  PX7054 (Ryan Dep. Tr. Vol. II), at 60:12–15, 64:9–20. Likewise, Sony Group's CEO, Kenichiro

27  Yoshida, has opined that "cloud itself is an amazing business model, but when it comes to

28

games, the technical difficulties are high." [2] Activision executives have similarly observed that cloud gaming technology would not provide a very good experience for players of its games. *See, e.g.*, 6/28/23 Tr. (Kotick), at 733:2–14. Phillip Eisler, the general manager of Nvidia's GeForce NOW cloud gaming service, admitted that GeForce NOW ███████████████ PX7060 (Eisler Dep. Tr.), at 49:11–13.

**III.     Xbox and Activision Both Face Intense Competition.**

   **A.     Xbox Has a Negligible Presence in Mobile, the Fastest Growing Gaming Segment.**

   80.     Mobile is the largest and fastest-growing sector of the gaming industry, and Xbox has tried for years without success to gain a foothold into mobile gaming. 6/23/23 Tr. (Spencer), at 392:7–12, 404:21–22; 6/27/23 Tr. (Bailey), at 661:3–23. Xbox today still has no real mobile presence. Xbox has had almost no revenues from mobile gaming, no hit mobile games, and no success monetizing its console games on mobile. 6/22/23 Tr. (Bond), at 131:10–12; RX5058 (Hood Decl.), ¶ 14; RX5055, at 23 ex. 14.

   81.     Xbox's presence in mobile gaming is "de minimis," essentially limited to *Minecraft* mobile and its xCloud service. 6/22/23 Tr. (Bond), at 131:10–12, 133:24–134:4. Activision, by contrast, is the largest mobile gaming company in the United States—and the largest in the world with the exception of some Chinese companies, such as ByteDance. 6/23/23

---

[2] Kana Inagaki and Leo Lewis, "Sony Chief Warns Technical Problems Persist For Cloud Gaming" Financial Times (June 3, 2023), https://www.ft.com/content/4b410761-78d8-4bec-a48b-79f1373d42e1.

1   Tr. (Spencer), at 402:22–403:3. However, even with the merger, Microsoft's share of the mobile

2   gaming market would rise only from ▮% to ▮%.

3

4

5

6

7

8

9

10

11

12   RX5055, at 20 ex. 14.; 6/27/23 Tr. (Bailey), at 661:24–662:13.

13      82.    Xbox leadership has discussed the importance of a mobile acquisition dating back

14   to the early 2010s. 6/23/23 Tr. (Spencer), at 399:7–17; RX1141, at 16; RX1080 ("We are quickly

15   working through additional mobile-first acquisition opportunities."). In 2021, Xbox undertook a

16   broad evaluation of mobile targets, ultimately identifying ▮ potential acquisition targets.

17   RX1141, at 22. That list included Activision but focused on ▮▮ other companies (particularly

18   Zynga) because Activision was considered too expensive. Following that evaluation, Microsoft

19   seriously contemplated the possibility of a Zynga acquisition, 6/23/23 Tr. (Spencer), at 399:21–

20   400:1; RX5058 (Hood Decl.), ¶12 & n. 7; RX1133, but the possible acquisition ultimately did

21   not come to fruition because Microsoft "needed to have something that was even bigger than

22   what Zynga was given [its] very small starting space in the . . . mobile gaming business." 6/23/23

23   Tr. (Spencer), at 402:1–5.

24      83.    The Zynga discussions focused Xbox more than ever on the strategic importance

25   of mobile. *See, e.g.*, RX1140. After the Zynga discussions ended, Xbox pivoted to the Activision

26   acquisition just a few months later. The mobile component of the strategic rationale for a

27

28

1    potential Activision acquisition was well known to Xbox and Microsoft leadership due to the

2    analysis that had been conducted for Zynga. 6/23/23 Tr. (Spencer), at 403:4–11.

3           84.     The importance of mobile to the Activision deal rationale is reflected throughout

4    internal materials, including the final deck about the deal presented to the Microsoft Board of

5    Directors. RX1156, at 4 (noting ████████████████████████████████████

6    ████████"); RX5058 (Hood Decl.), ¶ 15. In particular, Xbox was interested in Activision's King

7    segment, ████████████████████████████████████████████████████

8    ███████████████████████ RX1142, at 10. Xbox was also attracted to the success Activision had

9    releasing the mobile *Call of Duty* game *Call of Duty: Mobile*. RX1142, at 10 (noting that *Call of*

10   *Duty Mobile* was a "Top-15 core Mobile franchise"); RX1147; 6/23/23 Tr. (Spencer), at 402:22–

11   403:3; *see also* RX1066, at 1 ("████████████████████████████████.").

**B.    Xbox Has Lost the Console Wars, and Its Rivals Are Positioned to Continue
         to Dominate, Including by Leveraging Exclusive Content.**

**1.    Xbox has consistently ranked third in consoles behind PlayStation
         and Nintendo.**

15          85.     In 2001, Microsoft entered the gaming industry with the launch of its first Xbox

16   video game console, in competition with the established incumbents Sony and Nintendo.

17   RX5055, at 97. For twenty years, Sony and Nintendo have outsold Xbox by a significant margin.

18   *See* 6/23/23 Tr. (Spencer), at 416:3–17. With every succeeding generation over the twenty years

19   since, Sony, Nintendo, and Xbox have remained the three major console producers, and have

20   been engaged in what the industry refers to as the "console wars." *See* PX5054 (Ryan Dep. Tr.

21   Vol. II), at 25:22–26:8 (reporting that since the release of PlayStation 5 and Xbox Series X|S,

22   Xbox outsold PlayStation "about three months"); 6/23/23 Tr. (Spencer), at 294:23–295:6;

23   6/28/23 Tr. (Nadella), at 850:4 (describing the console market as "us and Sony and Nintendo").

24          86.     Sony is the dominant player in consoles. 6/23/23 Tr. (Spencer), at 297:9-10. Sony

25   PlayStation, for over two decades and through five generations, has been the leading console

26   both worldwide and in the United States. Sony's gamer base is two times as large as Xbox's

27   worldwide, and 50% larger in the United States. *See* PX7053 (Ryan Dep. Tr. Vol. I), at 113:20–

28

1   114:7 (PlayStation 5 consoles outnumber Xbox Series X|S consoles roughly 2:1); *see also*

2   Carlton Decl. ¶ 8 (as compared to Microsoft, "Sony is the larger console seller by far."). Sony

3   was able to grow, and has been able to maintain, its "enormous competitive advantage" due to its

4   vast library of intellectual property and global distribution network. *See* 6/28/23 Tr. (Kotick), at

5   723:13–16, 722:20–723:21 (opining that Sony "is the most successful consumer electronics

6   company of all time and they have distribution in every country, in every small town,

7   everywhere in the world," along with "thousands of different intellectual properties that they can

8   commercialize").

9        87.    Xbox's console has consistently ranked third (of three) behind PlayStation and

10   Nintendo in sales. 6/22/23 Tr. (Bond), at 129:3–4; 6/23/23 Tr. (Spencer), at 295:2–6, 9–10;

11   RX5046. In 2021, Xbox had a share of ▮% while Nintendo and PlayStation had shares of ▮%

12   and ▮%, respectively. Likewise for console revenues and share of consoles currently in use by

13   gamers ("installed base"), Xbox trails with ▮% while PlayStation and Nintendo have shares of

14   ▮% and ▮%, respectively.

15

16

17

18

19

20

21

22

23

24   6/28/23 Tr. (Bailey), at 783:21–784:2; *see* RX5055, at 9 ex. 4.

25        88.    Both Xbox and Sony view Nintendo Switch as a principal rival and a competitive

26   platform. 6/22/23 Tr. (Bond), at 129:5–6, 167:22–23; 6/23/23 Tr. (Spencer), at 435:1–15 ("[I]f

27   [customers] purchase the Switch, they likely did not purchase an Xbox. So I would see it as

28

competition."); *id.* at 291:4–6 ("I get a weekly report on share that shows Nintendo, Sony, and Xbox run rate . . . ."); PX7053 (Ryan Dep. Tr.), at 108:16–19 ("Switch is also defined by you as a competitive platform?" "Correct."); RX2069, at 4 n.19 (Sony filing to the CMA stating that Sony's "principal rivals" include "Nintendo's Switch console."); RX0020, at 1 (███████████ ███████████████████████████████████████████"). Wright Stip. (Dkt. 228), at 8–9 ("Our gaming platform competes with console platforms for Nintendo and Sony."); Singer Dep. 224:14–225:20 (███████████████████████████████████ ██████████).

89.     The entry-level versions of the current Xbox (Series S) and Nintendo consoles are offered at the same price point ($299.99). *See* 6/28/23 Tr. (Bailey), at 783:11–19; RX5055, at 73 ex. 42. This price point for Xbox Series S was set specifically to compete with Switch. 6/29/23 Tr. (Stuart), at 1030:8–1031:1.

90.     Many of the most popular games on PlayStation and Xbox consoles are also available on Switch. 6/28/23 Tr. (Bailey), at 782:5–783:10; *see* RX5055, at 69–71 exs. 38–41. And both Xbox and Sony data show that the release of the Switch in March 2017 led to a substantial decline in the number of weekly users and hours spent per week playing Xbox and PlayStation, which Dr. Bailey opined is indicative of competition between the consoles. 6/28/23 Tr. (Bailey), at 779:2–780:21; *see* RX5055, at 69–71 exs. 38–41.

91.     As with prior generations, Sony leads in sales of "Generation 9" consoles, which consist of Sony's PlayStation 5 and Xbox's two consoles, the Series X and the budget version Series S. 6/22/23 Tr. (Booty), at 57:21–58:2; *see also* Ryan Tr. 115:25–117:17. Sony PlayStation has a "disproportionate market share," 6/28/23 Tr. (Kotick), at 723:2–9, dwarfing Xbox whether you measure by console revenues, units sold, or install base, 6/28/23 Tr. (Bailey), at 783:21–784:2; 6/29/23 Tr. (Stuart), at 1042:7–10 (PlayStation *Minecraft* revenue is "four times as big as Xbox"). In the ordinary course of business, Microsoft tracks its Xbox sales as ███████████████ ███████████████████████████████████████ *See* RX5046. Microsoft also tracks the position of its Series X and Series S consoles relative to the PlayStation 5 because both sets of

Generation 9 consoles released at the same time. 6/28/23 Tr. (Nadella), at 849:11–19. In addition, both consoles are supplied by the same chip manufacturer, which creates a supply constraint; accordingly, Microsoft tracks PlayStation 5 performance to ensure that the Xbox is receiving its "fair share." 6/28/23 Tr. (Nadella), at 849:19–22.

### 2. Building on their leading consoles, PlayStation and Nintendo rely heavily on exclusive gaming content.

92.     Each of the three major console companies is also a vertically integrated first-party game developer and publisher. And while each has a collection of platform-exclusive titles, "the Nintendo Switch, the PlayStation, they both have significantly higher number of exclusive games on their platform than Xbox does." 6/23/23 Tr. (Spencer), at 346:25–347:2; *see also* 6/23/23 Tr. (Spencer), at 440:24-441:4 (exclusives are "an established part of the console business, the video game business, and Sony and Nintendo are very strong with their exclusive games"). Sony and Nintendo, due to their past and present successes, can leverage their existing gamer bases, respective catalogs, and resulting revenues to maintain and grow the attractiveness of their consoles. 6/23/23 Tr. (Spencer), at 440:14–441:4.

93.     As a game publisher, Sony's in-house developer, PlayStation Studios, is responsible for blockbuster hits like *God of War*, *The Last of Us*, and *Spider-Man*, the vast majority of which can be played only on PlayStation. *See* PX7053 (Ryan Dep. Tr. Vol. I), at 20:16–20:23; RX5055, at 12–13. And as a purchaser of third-party games, Sony pursues exclusivity from independent game publishers via generous co-marketing deals in return for timed exclusivity and restrictions on putting the games in rival subscription services. PX7054 (Ryan Dep. Tr. Vol. II), at 107:10–18.; 6/23/23 Tr. (Spencer), at 357:12–16.

94.     Sony views exclusive content as crucial to PlayStation's continued success and to "differentiate [their] platform." PX7053 (Ryan Dep. Tr. Vol. I), at 212:19–23; RX0079. As a result, Sony offers far more exclusive first- and third-party titles than Xbox. PX7053 (Ryan Dep. Tr.), at 169:24–170:2; 6/23/23 Tr. (Spencer), at 362:17–23. Sony also enjoys "an enormous competitive advantage" because it can draw on the intellectual property of "Sony Music, Sony

1    TV, and Sony's film library" for its game development. 6/28/23 Tr. (Kotick), at 723:13-16. The

2    number of exclusive games available on PlayStation dwarfs the number available on Xbox, with

3    eight exclusive games on PlayStation for every one on Xbox. RX2098, at 1 ("Overall, for every

4    1 exclusive Microsoft game, PlayStation has 8 of them."); *see* 6/27/23 Tr. (Bailey), at 684:3–25;

5    RX5055, at 15–16 exs. 11A, 11B; 6/28/23 Tr. (Nadella), at 849:1–8 ("The dominant player [*i.e.*,

6    Sony] there has defined market competition using exclusives and so that's the world we live in.").

7         95.    Sony has proven willing to use its installed base advantage over Xbox to acquire

8    exclusive (relative to Xbox) rights to valuable third-party content. In particular, Sony has often

9    paid third-party studios to "skip" Xbox—either entirely or to delay a title's release on Xbox.

10   6/23/23 Tr. (Spencer), at 313:4–8. As a timely example, *while this trial was happening*, Square

11   Enix released *Final Fantasy XVI*, the latest release in the iconic *Final Fantasy* franchise,

12   exclusive to PlayStation 5 on June 22, 2023. Previous versions of *Final Fantasy* shipped on

13   Xbox, but the reason *Final Fantasy XVI* is a PlayStation exclusive is because Sony "pa[id] to

14   exclude Xbox." 6/23/23 Tr. (Spencer), at 312:20–313:8, 441:18–443:1. ZeniMax, too, was paid

15   by Sony not to ship *Deathloop* or *Ghostwire* for Xbox, and one of the reasons Microsoft bought

16   ZeniMax was concern that Sony would also arrange for *Starfield* to go exclusive and skip Xbox.

17   6/23/23 Tr. (Spencer), at 314:16–24.

18        96.    In addition to exclusivity, Sony also uses its market power to extract other

19   preferential treatment from third-party game developers, including earlier release dates,

20   exclusive marketing agreements, and exclusive in-game content. *E.g.*, 6/22/23 Tr. (Bond), at

21   162:1–4, 186:5–8. For example, Sony has exclusive marketing agreements with Activision and

22   Warner Brothers that prevented Xbox from promoting the upcoming release of popular games

23   (*Call of Duty* and *Hogwarts Legacy*, respectively) on third-party channels. 6/22/23 Tr. (Bond), at

24   162:19–165:8; *see also* PX7053 (Ryan Dep. Tr. Vol. I), at 240:24–241:10 (discussing ███████

25   ████████████████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████ These Sony agreements, critically,

27

28

1  generally preclude Xbox from putting those games on Game Pass. *See* Ryan Dep. 107:10–
2  109:21.

3      97.     For all these reasons, Sony is well-positioned to overcome any theoretical loss of
4  Activision content. As Sony's CEO told investors in the wake of the Microsoft/Activision
5  merger, Sony can "grow [its] own studios organically" to increase Sony's own value proposition
6  to consumers. Ryan Dep. 255:14–24; RX0079.

7      98.     Nintendo is also a significant first-party publisher with some of the most popular
8  exclusive game franchises in the world, including *Mario*, *Zelda* and *Pokémon*. RX5055, at 26–
9  30, exs. 15–19.

10     99.     Nintendo Switch has been wildly successful even though it does not currently
11 have access to *Call of Duty*. 6/22/23 Tr. (Bond), at 153:18–154:8; 6/23/23 Tr. (Spencer), at
12 435:20–437:4; PX7065 (Singer Dep. Tr.), at 212:24–213:8 ("███████████████████████
13 ███████████████); 6/28/23 Tr. (Kotick), at 722:11–12 (describing Nintendo Switch as
14 "probably the second-most successful video game system of all time").

15          **3.     Xbox approaches exclusivity on a case-by-case basis.**

16     100.    Microsoft CEO Satya Nadella explained that the company's core view is that
17 "software should run in as many platforms as possible," including video games, but that the
18 larger players in the video game market have taken a different course. 6/28/23 Tr. (Nadella), at
19 848:20–849:10 ("[I]f it is up to me, I would love to get rid of the entire sort of exclusives on
20 consoles, but that's not for me to define especially as a low-share player in the console market.").

21     101.    The economics of exclusivity differ significantly among the three major
22 platforms. The reason is simple: the larger the platform's user base of potential purchasers
23 relative to rivals, the smaller the portion of the market that must be "bought out" (internally or
24 externally) to take a game exclusive. This basic economic calculus makes exclusivity
25 considerably more costly for Xbox than it is for Sony and Nintendo. 6/23/23 Tr. (Spencer), at
26 462:24–463:10

27

28

1    102.    Having exclusive content, however, is important to differentiate consoles—that is,

2  to give gamers a reason to buy your console. Ryan Dep. 20:16–20 ("Q. Are Sony's first-party

3  games exclusive to PlayStation? A. Typically, yes. Q. Why are they typically exclusive to

4  PlayStation? A. We wish to use them as a point of difference when it comes to the decisions that

5  games ship on all three consoles, 6/27/23 Tr. (Bailey), at 782:19–783:5, they all have to offer

6  some exclusive content to attract gamers. 6/23/23 Tr. (Spencer), at 362:17-23 (explaining that

7  "all of the platforms have exclusive games that don't launch on the competitive platforms," and

8  that the number of exclusive games is "one of the decisions people make when they're going into

9  a store on what console to go buy."); *see also* 6/23/23 Tr. (Zimring), at 478:25–479:1–5

10  (explaining that "it was important to have reasons for players to come to Stadia, and games they

11  couldn't get anywhere else would certainly be a reason").

12    103.    Given the need for some exclusive content to keep the Xbox relevant in the

13  console space and the reality of the costs of exclusivity, Xbox assesses whether it makes sense

14  for a game to be exclusive (and on what terms) on a "title-by-title" basis. 6/22/23 Tr. (Hines), at

15  104:22–105:14, 121:23–122:1–4; 6/22/23 Tr. (Booty) 55:10–14; 6/23/23 Tr. (Spencer), at

16  426:21–427:5. Among other considerations that factor into the exclusivity decision, Xbox

17  considers whether a game has launched on multiple platforms previously, has an existing

18  multiplatform gaming community, or is designed to be played multiplayer with as many people

19  as possible. 6/23/23 Tr. (Spencer), at 365:9–21. A related consideration is the magnitude of lost

20  sales that would come from making a game exclusive. 6/23/23 Tr. (Spencer), at 366:7–12. If a

21  game is already designed for multiple platforms or the quality of gameplay depends on large

22  pools of gamers for cross-play modes, Xbox is less likely to make a game exclusive. 6/23/23 Tr.

23  (Spencer), at 427:19–428:3. Under those circumstances, the costs of exclusivity would likely

24  outweigh the potential upside.

25         a.    **Minecraft**

26    104.    Xbox's experience with *Minecraft* is particularly illustrative. Microsoft acquired

27  Mojang, the developer of the hugely popular *Minecraft* franchise, in 2014. 6/22/23 (Booty), at

28

1  Tr. 72:4–5. Minecraft is one of the most successful games of all time, and is Microsoft's largest

2  ███████████. 6/23/23 Tr. (Spencer), at 362:24–25; RX5058 (Hood Decl.), ¶ 11. It includes a

3  popular multiplayer mode and has produced a large community across platforms. 6/22/23 Tr.

4  (Booty) 77:23–78:1. At the time of the Mojang acquisition, *Minecraft* was available on Xbox,

5  PlayStation, and PC. 6/22/23 Tr. (Booty), at 78:2–7.

6        105.    Xbox could have made *Minecraft* exclusive to its own platform, yet it determined

7  that was not in its economic interest nor in the interest of the brand or the game. Instead, Xbox

8  continued to ship *Minecraft* on all those same platforms post-acquisition and made subsequent

9  games in the franchise (*e.g.*, *Minecraft: Dungeons* and *Minecraft: Legends*) available for

10  Nintendo consoles and even Sony's subscription service, PlayStation Plus. 6/22/23 Tr. (Booty),

11  at 78:11–79:4; 6/23/2023 (Spencer), at 421:8–423:1; RX3156.

12        106.    As Xbox CFO Tim Stuart explained, the decision to ship Minecraft on "all

13  platforms" enabled "its mass, mass, mass market" appeal. 6/29/23 Tr. (Stuart), at 976:13–977:5.

14  And as Phil Spencer explained, the decision was dictated by the economics and the desire not to

15  break up existing communities of gamers. 6/23/23 Tr. (Spencer), at 365:13–15 ("[I]f we were to

16  acquire something that has found customer love, users, business on another platform, we want to

17  nurture and grow that for the games that we're building"); *id.* At 362:24–363:5 (Minecraft "has

18  reached a financial level of success where it's – it's a significant profit driver for us given that

19  it's shipping on all the platforms. So if you–an get a game that's at that level of hit and that level

20  of business, the size of the business, our job is to maintain and grow that."); RX1137.

21        107.    *Call of Duty*, like *Minecraft*, has a large multiplayer community across multiple

22  platforms, and has similarly reached the point where "pulling Call of Duty from PlayStation . . .

23  would create irreparable harm to the Xbox brand." 6/23/23 Tr. (Spencer), at 367:10–15; 6/28/23

24  Tr. (Kotick), at 724:19–22 ("it would be very detrimental to our business").

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**b.    Microsoft's history of cross-platform game development**

108.    Xbox has a well-established history of shipping more games to rival platforms than Sony or Nintendo, keeps fewer games exclusive than either of the other two consoles, and has shown that it can ship high-quality games for PlayStation and Switch.

109.    In general, Xbox has a history of continuing to publish its newly acquired first-party games on PlayStation after acquiring game studios. In fact, in the below chart, the yellow columns indicate games Xbox studios have shipped on PlayStation post acquisition.

| Xbox Game Studios - Games On PlayStation | | |
|---|---|---|
| **Studio** | **Title** | **Release Date (PS)** |
| Obsidian | The Outer Worlds | Oct 2019 |
| ZeniMax | Doom Eternal | Mar 2020 |
| ZeniMax | Doom 64 Osiris | Mar 2020 |
| Mojang | Minecraft Dungeons | May 2020 |
| ZeniMax | Doom 2 Osiris | May 2020 |
| InXile | Wasteland 3 | Aug 2020 |
| ZeniMax | Doom 3 BFG VR | Mar 2021 |
| ZeniMax | The Elder Scrolls Online: Blackwood | June 2021 |
| Double Fine | Psychonauts 2 | Aug 2021 |
| ZeniMax | Deathloop | Sept 2021 |
| ZeniMax | Quake (2021) | Oct 2021 |
| ZeniMax | Ghostwire: Tokyo | Mar 2022 |
| ZeniMax | The Elder Scrolls Online: High Isle | June 2022 |
| Mojang | Minecraft Legends | April 2023 |
| ZeniMax | The Elder Scrolls Online Collection: Necrom | June 2023 |

6/22/23 Tr. (Booty), at 75:12–24; 76:16–77:14; RX5045. This demonstrates a long track record of shipping Xbox titles, even acquired titles, on PlayStation. In fact, today, Xbox has "over 50 games in the PlayStation digital store." 6/23/23 Tr. (Spencer), at 366:13–14.

110.    Microsoft has never received a complaint from Sony about the quality or ongoing servicing of games released on PlayStation. *See, e.g.*, 6/22/23 Tr. (Booty), at 76:20–77:14, 79:5–13; 6/22/23 Tr. (Hines), at 111:5–10; Ryan 4/6/22 Dep. 186:22–187:04. To the contrary, Xbox has a "cordial and productive relationship" with Sony regarding Xbox games released on PlayStation. *See, e.g.*, 6/22/23 Tr. (Booty), at 79:14–19; 6/2/23 Tr. (Spencer), at 420:2–5 ("We have a publisher agreement with Sony that allows us to ship games on their platform, and it's a

1  very cordial relationship we have with them on shipping, and they support us well when we ship

2  games on their platform."). That is because Xbox "know[s] how to ship games at parity on

3  PlayStation." 6/23/23 Tr. (Spencer), at 448:24–449:3.

4      111.   Moreover, Sony admits that Xbox has honored its contracts in good faith. Ryan

5  Dep. Vol. I 168:18–22 ("Q. ███████████████████████████████████████████████

6  ███████████████████████████."); 6/22/23 Tr. (Hines), at 111:5–10 ("My recollection is

7  that the comments we got for them were positive and, like, they were excited about the features

8  we were supporting, the quality of the game. They were positive about it."); 6/22/23 Tr. (Bond),

9  at 186:5–12.

10     112.   Sony nonetheless has historically chosen to provide development kits (or "dev

11 kits") to developers owned by Microsoft later than other studios, ██████████████████████

12 ████████████████████████████████████████████████████████████████████████████

13 ████████████████

14          **c.     ZeniMax**

15     113.   Xbox's handling of the ZeniMax games is fully consistent with its case-by-case

16 approach to exclusivity, and shows that Xbox will stand by its promise to make *Call of Duty*

17 across platforms.

18     114.   Notably, following the 2020 acquisition of ZeniMax, Xbox shipped the next two

19 ZeniMax releases, *Ghostwire* and *DeathLoop*, as PlayStation timed exclusives, pursuant to

20 preexisting contracts. 22/23 Tr. (Hines), at 92:3–11; *see also* Ryan Dep. 29:08–17. Sony

21 expressed no concern about Xbox honoring its contract, and gave "positive" reviews about the

22 games' performances. Ryan Dep. 168:10–22; 22/23 Tr. (Hines), at 111:5–10; *see also* 6/22/23 Tr.

23 (Bond), at 186:5–12. Xbox has also continued to release regular updates of existing ZeniMax

24 games such as *Fallout 76* and *Elder Scrolls Online* on both Xbox and PlayStation, because these

25 games are designed to be played together by broad communities of gamers on different

26 platforms. 6/23/23 Tr. (Spencer), at 427:22–428:3.

27

28

DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT
(No. 3:23-cv-02880-JSC)

115.     More recently, ZeniMax has decided that its next two titles, *Redfall* and the forthcoming *Starfield*, would be Xbox-exclusive games. 6/22/23 Tr. (Hines), at 99:11–16; 6/22/23 Tr. (Hines), at 115:9–13. These games are both new franchises without multiplayer mode, and thus are nothing like *Call of Duty* or *Minecraft*. 6/22/23 Tr. (Hines), at 112:17–112:23 (explaining that *Call of Duty* "focus[es] heavily on multiplayer," and "Redfall is just a completely different game"); 6/29/23 Tr. (Stuart), at 976:23–977:5 (explaining that "the *Minecraft* world" is "different" from the ZeniMax games).

116.     In addition, in the case of *Starfield*, the exclusivity decision was driven by technological reasons. As Pete Hines testified regarding the decision to make *Starfield* exclusive to Microsoft, the game was "irresponsibly large," so "being able to focus on fewer platforms to support, hardware to support [was] a big benefit to [the development] team." 6/22/23 Tr. (Hines), at 108:17–22; *see also id.* at 109:1–11 ("When you're trying to figure out how to make a game look as good as it can, play as smoothly as possible, your programmers really need to know . . . what am I trying to get this to run smoothly on?"); *id*. at 107:18–108:7 ("Q. And is the same point you were making about the ability to streamline a game and the benefits to that game true with Deathloop [a PC and PlayStation 5 exclusive] as well? A. It was literally the reason why I suggested doing it in the first place."). By contrast, when a game is developed to launch on multiple different platforms, there will necessarily be fewer "people testing [each] platfor[m]," which means the developers will be "finding fewer problems" and "not going as fast." 6/22/23 Tr. (Hines), at 109:10–16. Put differently, if a game is coming out on fewer platforms, it will be possible to have more rounds of "quality assurance" testing to remove bugs and glitches. 6/22/23 Tr. (Hines), at 109:10–23. Thus, developing the game on more platforms will make the development "take longer," "cost more," and have a "far greater risk." 6/22/23 Tr. (Hines), at 109:16–18.[3]

---

[3] Similar concerns with "reducing risk and trying to get a degree of certainty" drove the decision to make an upcoming *Indiana Jones* exclusive to Xbox and PC. 6/22/23 Tr. (Hines), at 122:15–18. Before its acquisition by Microsoft, ZeniMax had entered a licensing agreement with Disney to make the *Indiana Jones* game playable on multiple consoles, which would have made releasing the game on time difficult and risky. 6/22/23 Tr. (Hines), at

(*continued on next page*)

1    117.   The decision to make *Starfield* Xbox exclusive has been beneficial to consumers

2  because they are able to access the game sooner: *Starfield* will be released in September 2023, a

3  release date that could not have been met had it been developed for PlayStation also. 6/22/23 Tr.

4  (Hines), at 110:3–8; *see also* ███████████████████████

5  ███████████████████████████████████████████████████████████.").

6    118.   Going forward, Xbox expects that many other future ZeniMax titles will be

7  shipped on PlayStation and Nintendo. ZeniMax's approach to whether or not a game should be

8  made an exclusive remained the same after the Microsoft acquisition as it had been before it.

9  6/22/23 Tr. (Hines), at 122:1–4 ("[W]e were going to continue the approach that we already had,

10  which was to look at these on a title-by-title basis and decide what was – what was best for those

11  games, what was best for us.").

12    119.   The FTC suggests that Microsoft has made a final decision to take all ZeniMax

13  games exclusive ████████████████████████████ However, no such

14  decision has been made. *See* 6/23/23 Tr. (Lawver), at 257:24–258:1; 6/23/23 Tr. (Spencer), at

15  354:12–21. ████████████████████████████████████████████

16  ███████████████████. *See* 6/23/23 Tr. (Lawver), at 257:24–258:1.

17    120.   *Elder Scrolls VI*, for example, is a game that Xbox has announced will be

18  developed by ZeniMax Studios. *See* 6/23/23 Tr. (Spencer), at 354:12-15. ██████████████

19  decision whether the game will be made exclusive to the platform given its early stages of

20  development. *See* 6/23/23 Tr. (Spencer), at 355:6-10.

21    **C.    Activision's Content Faces Intense and Growing Competition.**

22    121.   Activision's content—in particular, the games within its three core franchises—

23  competes with a large variety of games and game franchises of all types and genres.

24  ────────────────

25  122:19–22 ("You're dealing . . . with a licensor who is going to be very – who's going to have a ton of feedback on

26  what you're making that is going to add a lot of time to your schedule."). But after its acquisition by Microsoft,
ZeniMax (no longer "a small independent publisher") was in a position to push back on Disney's desire to make

27  Indiana Jones available on multiple platforms so as to "reduce risk and try and get this on a path where we know that
this will be a big success." 6/22/23 Tr. (Hines), at 122:15–18.

28

DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT
(No. 3:23-CV-02880-JSC)

### 1. Activision has three core video game franchises.

122.  Activision generates 80% of its annual revenue—which totaled $8.5 billion in fiscal year 2022—from three video game franchises. These core video game franchises are *Call of Duty*, which is developed by Activision; *World of Warcraft* ("*WoW*"), a PC-only game, which is developed by Blizzard; and *Candy Crush*, which is developed by King. RX3166, at 10; RX5058 (Hood Decl.), ¶15.

123.  The *Call of Duty* games are "shooter" games that are based on "military conflict through history." 6/28/23 Tr. (Kotick), at 712:21–713:9; 6/22/23 Tr. (Bond), at 152:18–23; 6/22/23 Tr. (Hines), at 112:10–20. *Call of Duty* games have been continuously available on both PlayStation and Xbox consoles since 2003. 6/28/23 Tr. (Kotick), at 714:12-715:12, 720:1–6. Activision typically releases a new buy-to-play *Call of Duty* game every year. 6/28/23 Tr. (Kotick), at 736:12-18 (*COD* released every year); 6/22/23 Tr. (Bond), at 128:23-25 (games cost $70). The latest annual *Call of Duty* titles are playable across platforms via a cross-play feature. 6/22/23 Tr. (Bond), at 152:18–153:2.

124.  Activision also develops and publishes free-to-play versions of *Call of Duty* called *Call of Duty: Warzone*—available on PlayStation, Xbox, and Windows PC—and *Call of Duty: Mobile* ("*COD: Mobile*")—available on iOS and Android mobile devices—which it monetizes through optional in-game microtransactions. 6/22/23 Tr. (Bond), at 153:3–15; *see also* 6/28/23 Tr. (Kotick) 720:3–11. "Half of [the *Call of Duty* franchise's] monthly active players play on phones." 6/28/23 Tr. (Kotick) 716:17–21; *see also* 6/28/23 Tr. (Kotick) 719:2–6 ("[T]he bulk of players [in the *Call of Duty* franchise] are playing on phones."). Recently, for *COD: Mobile* reached 150 million monthly annual users." 6/29/23 Tr. (Stuart), at 1030:4–11.

125.  King's *Candy Crush* franchise consists of casual, free-to-play puzzle games made for mobile devices. 6/28/23 Tr. (Kotick), at 725:25-726:6. *Candy Crush* generated approximately ██████ in revenue in fiscal year 2022—roughly ██% of Activision's overall annual revenue. King primarily monetizes *Candy Crush* through optional in-game microtransactions, and also

1   generates revenue through in-game advertising placements. 6/28/23 Tr. (Kotick), at 726:24–

2   727:4.

3          126.    Blizzard's popular *World of Warcraft* franchise principally consists of a

4   massively-multiplayer-online fantasy role-playing game, and related expansions and content

5   released over the course of the past 20 years. *See* 6/28/23 Tr. (Kotick), at 730:1–18. Blizzard

6   makes *World of Warcraft* available for PCs on a subscription based model. *See, e.g.*, 6/28/23 Tr.

7   (Kotick), 730:1-7. The *Warcraft* franchise also includes the free-to-play mobile game,

8   *Hearthstone*. RX3166, at 10.

9          127.    Beyond its three core franchises, Activision also develops and publishes other

10  games, including *Diablo* and *Overwatch*, both of which are developed and published by

11  Blizzard. Blizzard's *Diablo* franchise and *Overwatch 2* generated approximately ███████

12  and ███████████ in revenue in fiscal year 2022, respectively. *Diablo* is a fantasy role-playing

13  franchise available on gaming consoles, PCs, and mobile devices. While most *Diablo* titles are

14  available for sale on a buy-to-play basis, the mobile entry in the *Diablo* franchise, *Diablo*

15  *Immortal*, is free to play. *Overwatch* is a free-to-play, multiplayer team-based shooter franchise

16  (which was previously buy-to-play) available on gaming consoles and PCs, which Blizzard

17  monetizes through optional in-game microtransactions. *See, e.g.*, RX3166, at 10.

18         128.    Activision and its various business units also have a portfolio of previously

19  successful, but largely dormant, IP that presents significant opportunities for further franchise

20  development. *See* RX3166, at 10 (listing Activision's "[d]eep back catalog" of games such as

21  *Crash Bandicoot*, *Guitar Hero*, and *Spyro* as "[k]ey [a]ssets").

22              **2.    Activision has popular mobile games and the necessary experience**
                        **and expertise to expand mobile content.**
23

24         129.    Expanding audience reach through the development of compelling mobile content

25  is essential to Activision's strategy. Likewise, as Sarah Bond, Microsoft's Corporate Vice

26  President for Game Creator Experience & Ecosystem, explained, Microsoft's "strategy is

27  grounded in having [Xbox] having a very wide and depth and breadth of content and providing

28

1    ubiquity of access to those games." 6/22/23 Tr. (Bond), at 128:4–8. Microsoft's strategy cannot

2    be achieved with a console-only strategy. 6/22/23 Tr. (Bond), at 128:3–20.

3        130.    Activision is the largest mobile gaming company in the United States. 6/23/23 Tr.

4    (Spencer), at 402:22–403:3. Activision's mobile gaming unit, King, now represents

5    approximately a third of Activision's annual net revenue and more than half of its user base.

6    RX3166, at 10; *see also* RX5058 (Hood Decl.), ¶ 15 ("Activision's PC and mobile assets in

7    Blizzard and King generate more revenue and more than double the monthly average users than

8    Activision's console gaming assets.").

9        131.    Activision successfully entered mobile in 2016 when it acquired King—a world-

10   class developer of mobile games. *See* 6/28/23 Tr. (Kotick), at 725:17–22 (noting Activision's

11   2016 acquisition of King, "one of the most successful mobile game companies in the world").

12   Through the King acquisition, Activision broadened its portfolio of iconic video game franchises

13   by obtaining two of the five highest-grossing mobile games in the United States at the time:

14   *Candy Crush Saga* and *Candy Crush Soda Saga*. Given the scale of the *Candy Crush* franchise,

15   which has about 150 million users monthly, the acquisition vastly expanded Activision's overall

16   audience reach. *See* 6/28/23 Tr. (Kotick), at 727:5–7.

17       132.    Since the King acquisition, *Candy Crush* has become a multibillion dollar per

18   year franchise that continues to grow and that would be an incredibly attractive asset for any

19   potential entrant in mobile—much as it was for Activision. 6/28/23 Tr. (Kotick), at 727:5–7;

20   6/23/23 Tr. (Spencer), at 402:22–403:11 (Activision met Xbox's "strategic and financial goals"

21   because it was the "largest publisher of mobile content outside of China").

22       133.    Success in mobile game development requires specific engineering expertise and

23   data analysis. A successful mobile business also must have a deep understanding of free-to-play

24   models and how to service a game with live operations and a constant cadence of content. *See*

25   6/28/23 Tr. (Kotick), at 726:12–727:4. King excels both in mobile game development and in the

26   management of mobile games, and the success of *Candy Crush* is driven by this expertise. *See*

27   6/28/23 Tr. (Kotick), at 726:7–727:4 (explaining that King does "a very good job of blending

28

1   creativity and inspiration in the product development function with commercial thinking and

2   commercial capability.").

3       134.    Activision's other business divisions have also cultivated robust mobile-specific

4   expertise in recent years and, in particular, have acquired an acumen for managing mobile entries

5   in its popular franchises. 6/28/23 Tr. (Kotick), at 758:6–25.; *See* 6/23/23 Tr. (Spencer), at 407:2–

6   5. Popular franchises are becoming more widely available on mobile devices, and releasing

7   native mobile entries in such franchises is a proven means of driving user engagement. *See*

8   6/23/23 Tr. (Spencer), at 408:5–9 (noting that "one of the biggest strategic assets . . . in this deal

9   is mobile engagement and the size of the mobile business for *Call of Duty*"); *see also* 6/23/23 Tr.

10  (Spencer), at 413:1–5 (nothing that *Call of Duty* and *Diablo Immortal* increase engagement and

11  exposure). Activision has pursued this strategy to great success with its *Call of Duty* and *Diablo*

12  franchises through its successful releases of *Call of Duty: Mobile* and *Diablo Immortal*. *See*

13  RX1147; *see also* 6/23/23 Tr. (Spencer), at 413:1–5. Indeed, in fiscal year 2022 alone, *Call of*

14  *Duty: Mobile* accounted for 30% of Activision Publishing's segment net revenues. *See* RX1147,

15  at 1.

16      135.    Activision is further expanding its mobile offerings with its forthcoming release

17  of  *Call of Duty: Warzone* in the fall of 2023, which was developed organically in-house by

18  Activision developers. 6/28/23 Tr. (Kotick), at 720:1–2; 776:17–777:1.

19                  **3.    Activision's games face significant competition.**

20      136.    Despite these successes, Activision is not the biggest or most successful

21  publisher. Its share in console video game publishing is just 7.4% by revenue globally and ██ %

22  by revenue in the United States. By contrast, Nintendo captures ███████████ of U.S.

23  publishing revenues (██ %) and ██████████████ Activision does on a global basis

24  (██ %). 6/27/23 Tr. (Bailey), at 663:8–23, 665:15–666:11; *see* RX5055, at 23–27, exs. 15, 16,

25  18.

26      137.    Because the game publishing industry is so dynamic and hits can come from

27  anywhere, new publishers and games can quickly enter the market and take share. For example,

28

1   *Fortnite* was launched in 2017 and within a matter of months became a global phenomenon;

2   *PlayersUnknown Battleground*, or "PUBG," grew from "a one-room dev team" to become

3   "wildly popular"; and Vampire Survivors, another independent studio game, was a critical

4   success this past year. 6/22/23 Tr. (Bond), at 149:3–14.

### 4.   Activision's commercial success depends on distributing its content broadly.

5
6

7   138.   Activision CEO Bobby Kotick explained that Activision's "view has always been

8   that you want to create your content for as many platforms as possible and build your audiences

9   to be as big as possible." 6/28/23 Tr. (Kotick), at 715:16–24. For that reason, Activision ships

10  games on Xbox, PlayStation, Nintendo, PC, and mobile devices.

11  139.   Activision's current relationship with Microsoft is principally governed by a base

12  publishing agreement, under which █████████████████████████████████

13  ███████████████████████████████████████████████████████████████

14  ████████████████████████. 6/23/23 Tr. (Spencer), at 312:9–

15  12. In 2020, Activision and Microsoft entered into an agreement ██████████████

16  ███████████████████████████████████████████████████████████████

17  ███████████████. 6/22/23 Tr. (Bond) 160:4–161:11.

18  ███ ████████████████████████████████████████████

19  ███████████████. ███████████████████████████████████

20  ███████████████████████████████████████████████████

21  ███████████████. ████████████ ███████████████████████

22  ███████████████████████████████████████████████

23  ███████████████████████████████████████████████████

24  ███████████████████████. ████████████████████████

25  ████████████████████ Activision's current agreement with Sony runs

26  through 2024. RX0020, at 1.

27

28

1     141.    Activision previously released titles in the *Call of Duty* franchise on Nintendo's

2    Wii and Wii U consoles but has not released a *Call of Duty* title on a Nintendo platform since the

3    release of *Call of Duty: Ghosts* in 2013. *See* 6/28/23 Tr. (Kotick), at 721:15–20. Activision

4    considered putting *Call of Duty* the Nintendo Switch, but, as Activision CEO Bobby Kotick

5    explained, he was concerned when he "saw the prototypes for Switch" and "didn't think it was

6    going to be wildly successful." *See* 6/28/23 Tr. (Kotick), at 722:6–9. As Kotick admitted,

7    however, that was "a bad judgment … a bad – bad decision on my part" because the Switch has

8    become "probably the second-most successful video game system of all time." *See* 6/28/23 Tr.

9    (Kotick), at 721:25–722:12. Activision has no plans to port *Call of Duty* to the current Nintendo

10   Switch. As for putting *Call of Duty* on a future Nintendo console, Activision does not "have any

11   present plan to do so," and it is possible that Activision—as a standalone company—may not

12   have "the resources … to prioritize" developing *Call of Duty* game playable on such a future

13   Nintendo console. *See* 6/28/23 Tr. (Kotick), at 767:23–768:7.

14   **IV.    The Transaction Will Provide Xbox with a Position in Mobile and Expand Choice**
         **for Gamers and Developers.**
15

16       142.    Xbox's future relevance depends on finding a way to reach the billions of gamers

17   who want to enjoy games regardless of location, socio-economic status, or device. Xbox is thus

18   betting on accessibility by making its games available through alternative payment structures, on

19   multiple platforms, and even via streaming technology. RX5058 (Hood Decl.), ¶ 11 ("Xbox has

20   been seeking to move away from being tied to exclusive hardware (Xbox consoles) towards

21   wider distribution of its software (games)."); *see also id.*  ¶ 15 (describing how the acquisition of

22   Activision furthers Microsoft's "strategic multi-platform goals").

23       143.    Xbox and Activision determined that, by merging, they could significantly

24   improve gaming and increase Xbox's competitiveness. The deal was predicated on "[c]ontinued

25   sales of Activision [content] on all platforms." RX1156, at 13; *see also* RX5058 (Hood Decl.),

26   ¶ 18.

27

28

**A.      Xbox's Primary Rationale for the Deal Is to Improve Its Mobile Presence.**

144.     Xbox sees the most important aspect of the Activision deal as the opportunity to become relevant with gamers who play on mobile devices. 6/23/23 Tr. (Spencer) 403:4–11 (noting the analysis undergone to evaluate the Activision deal stating, "most importantly was their – their portfolio and engagement that they have on mobile."); *see also id*. at 399:7–12 ("Every time we'd sit down with the Microsoft Board or the senior leadership team … it was pretty clear that if we did not have a strategy that found success on mobile, our relevance in the market was going to continue to shrink."); RX5058 (Hood Decl.), ¶ 14 (explaining Microsoft's goal of increasing "███████████████████████████████████████████

████████████████"); 6/28/23 Tr. (Nadella), at 851:25–852:4 (agreeing that improving Microsoft's presence in mobile gaming is "absolutely" part of the rationale for acquiring Activision); Ryan Dep. Vol I 201:22–201:16 (█████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

145.     Microsoft is acquiring Activision for its talented game developers and well-regarded game franchises. 6/28/23 Tr. (Kotick) 758:9–23. While maintaining existing revenue streams (including sales of Activision games to Play Station users) is required to justify the purchase price, the strategic value of the transaction is to (i) help Xbox meet the billions of gamers who choose to play on mobile devices instead of a console or PC and (ii) learn how to make games that appeal to and engage gamers wherever they want to play. In addition, Xbox intends to add Activision content to Game Pass, though it recognizes that doing so will significantly reduce sales of those standalone games to Xbox users.[4]

---

[4] Microsoft Press Release, *Microsoft To Acquire Activision Blizzard to Bring the Joy and Community of Gaming to Everyone, Across Every Device* (Jan. 18, 2022), https://news.microsoft.com/2022/01/18/microsoft-to-acquire-activision-blizzard-to-bring-the-joy-and-community-of-gaming-to-everyone-across-every-device/ ("The acquisition also bolsters Microsoft's Game Pass portfolio with plans to launch Activision Blizzard games into Game Pass, which has reached a new milestone of over 25 million subscribers.").

146.     Activision's popular free-to-play mobile games offer Xbox consistent revenue from in-game purchases and advertising. *See* 6/28/23 Tr. (Kotick), at 726:19–727:4 (explaining that, for mobile games like *Candy Crush*, "maybe 2 percent of the 150 million monthly active users pay for the game and then you have supplemental forms of monetization like advertising"). But beyond those lucrative revenue streams, Xbox valued the potential access to Activision's established mobile gamer communities, especially its casual gaming audience. *See* 6/28/23 Tr. (Kotick), at 717:13–17 (noting that, for *Call of Duty*, "the phone games are more casual, but people play them in different circumstances")

147.     Xbox sees an opportunity to use Activision's existing mobile games "to gain exposure" and bring a casual gaming audience to the Xbox platform. 6/23/23 Tr. (Spencer), at 412:16-413:6; *see also* RX1105 (opportunity to use Activision's existing mobile games as "natural onramps" to bring that casual gaming audience to the Xbox platform).

148.     The price Microsoft agreed to pay for Activision reflects the strategic investment in mobile gaming. ████████████████████████████████████████ 6/23/23 Tr. (Lawver), at 254:2–256:3; *see* PX4344, at 12. ████████████████ ████████████████████████████████████████ .

**B.     The Transaction Will Give Gamers More Choices than Would Be Available Absent the Deal.**

149.     Having lost the console wars, Xbox is betting on a different strategy than Sony and Nintendo by making games more widely accessible.

150.     Xbox generates profits through game sales, not console sales. That is because Xbox sells its consoles at a loss, effectively subsidizing gamers' purchase of the hardware in hopes of making up the revenue through sales of games and accessories. Wright Stip. (Dkt. 228), at 6; 6/29/23 Tr. (Stuart), at 1044:14–1045:8 (describing the console subsidy).

151.     Xbox accordingly seeks to expand access for gamers by not only continuing to distribute Activision games everywhere they currently exist, but also making those games

available for play in new ways and on new platforms. RX5058 (Hood Decl.), ¶¶ 11–12, 14–15; RX1156, at 13.

          **1.**    **The economics of the transaction depend on maintaining broad access to Activision games, including on PlayStation.**

152.    Although ███████████████████████████████████, *e.g.*, 6/23/23 Tr. (Lawver), at 254:2–256:3, an "essential component" of the valuation was projected revenue stream from continuing business on console and PC as usual, RX5058 Hood Decl.¶ 17; RX1154, at 21. That includes continuing to sell games in the popular *Call of Duty* franchise on both PlayStation and Xbox. *See* 6/28/23 Tr. (Kotick), at 725:14–16 ("They've always said that they're a multiplatform company, and that we would make it available on every platform.").

153.    The valuation model presented to the Microsoft Board of Directors to justify the purchase price for Activision ███████████████████████████████████████████████. *See* RX5058 (Hood Decl.), ¶¶ 17–18; 6/23/23 Tr. (Spencer), at 406:7–407:1 (discussing RX3166). *With* respect to PlayStation, ████████████████████████████████████ ██████████████. *See, e.g.*, PX4344, at 12 ("████████████████████████████████ ███████████████████████████████"); *see also* RX3166, at 16 (████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████).

154.    Xbox operates financially as a standalone business, 6/23/23 Tr. (Spencer), at 405:25–406:6, and literally cannot afford to pay for the deal without those revenues, 6/23/23 Tr. (Spencer), at 418:3–6; *see also* 6/29/23 Tr. (Stuart), at 1029:18–25 (Xbox finance department has "a fiduciary responsibility . . . to represent shareholders" of Microsoft). The Xbox CFO reports to CFO of Microsoft, rather than to the CEO of Xbox Gaming. 6/29/23 Tr. (Stuart), at 1029:18–20. Currently, ███████████████████████████████████████████. RX5058 (Hood Decl.), ¶¶9–10; RX1077 (referring to Xbox's "██████████████████████"); RX1078. Moreover, as discussed above, Xbox has shifted from focusing on the console business to

1   focusing on publishing. *See, e.g.,* 6/28/23 Tr. (Nadella), at 839:3-7 ("I always think software

2   first."). That strategic decision was made, in part, because publishing has better margins than

3   operating a console business. Wright Stip. (Dkt. 228), at 6; 6/29/23 Tr. (Stuart), at 1044:14–

4   1045:8 (describing the console subsidy).

5       155.    Because Xbox loses money on each console sold, Xbox is actually better off

6   financially having a PlayStation gamer purchase *Call of Duty* for PlayStation (for which Xbox

7   would collect royalties) than having a PlayStation gamer purchase an Xbox console for the sole

8   purpose of playing one *Call of Duty* game (because the subsidy loss would be greater than the

9   profit from the game). *See* Wright Stip. (Dkt. 228), at 6; RX5058 (Hood Decl.), ¶ 8 n. 4; 6/29/23

10  Tr. (Stuart), at 1044:14–1045:8.

11      156.    There are other reasons why it would harm Xbox to withhold *Call of Duty* from

12  PlayStation. Exclusivity would decimate *Call of Duty*'s cross-play functionality, which would

13  degrade the gameplay experience for all players. *See, e.g.,* 6/29/23 Tr. (Stuart), at 1038 ("Some

14  of the biggest games in the world – I reference Minecraft, Roblox, Fortnite, Call of Duty – are

15  strong across all platforms, and those are the ones that have the biggest communities of players,

16  typically generate the most money and most profit, and have the biggest impact across

17  gaming."); id. At 1039 ("Q. And is it also profitable for Xbox to continue to have games like

18  Minecraft be multiplatform and cross platform? A. Absolutely. The strength of a game like

19  Minecraft comes from that cross-network play. If you, you know, removed one of those

20  platforms and one of those big user bases, not only – not only would you have a massive brand

21  impact, you would lose a significant revenue stream that you just couldn't make up for.").

22  Indeed, taking *Call of Duty* exclusive would risk destroying what makes the game so popular in

23  the first place. Carlton Decl. ¶ 8 ("Multiplayer games, like *Call of Duty* in particular, benefit

24  from network effects, which means that as more users play them, the value of the game increases

25  to everyone" and noting that "[t]his increases the incentive to distribute such a game widely, on

26  many platforms"). Exclusivity would thus hurt even *Call of Duty* gamers who play on an Xbox;

27  they would no longer be able to play with their friends who play on a PlayStation. *See* 6/28/23

28

1   Tr. (Kotick), at 715:18–24 ("Well, if you think about like from a business perspective and from a

2   consumer perspective, one of the most important things is building communities of players,

3   especially now that you have the ability to compete and socialize. And so our view has always

4   been that you want to create your content for as many platforms as possible and build your

5   audiences to be as big as possible.").

6        157.   In addition, Xbox cannot afford to incur the reputational damage that would result

7   from pulling a popular Activision game, like *Call of Duty*, off PlayStation. 6/23/23 Tr. (Spencer),

8   at 361:2–5 ("the thought that we would create a lower quality game on another platform, my

9   view is it diminishes our brand and our reputation, and it's not something that I would do."); *id.*

10  at 367:11–15 ("Us pulling Call of Duty from PlayStation in my view would create irreparable

11  harm to the Xbox brand after me in so many public places, including here, talking about and

12  committing to us not pulling Call of Duty from PlayStation."); 6/28/23 Tr. (Kotick), at 725:4–7

13  ("if we were to remove Call of Duty from PlayStation, it would have very serious reputational –

14  it would cause reputational damage to the company"); *see also* 66/28/23 Tr. (Kotick), at 727:17–

15  22 (explaining that if a degraded *Call of Duty* experience were offered on other platforms "you

16  would have vitriol from gamers that would be well deserved, and you …would be very vocal and

17  also cause reputational damage to the company"); 6/28/23 Tr. (Kotick), at 715:18–24 ("Well,

18  you would alienate" gamers "and you would have a revolt if you were to remove the game from

19  one platform."); 6/28/23 Tr. (Kotick), at 724:19–22 (taking *Call of Duty* off PlayStation

20  "wouldn't make any sense, it would be very detrimental to our business"). As Ryan recognized,

21  "publishers have every incentive to provide an equal gaming experience or as good a gaming

22  experience as possible on all platforms," so much so that some standard publishing agreements

23  dispense with parity clauses as superfluous. Ryan Dep. Vol. 1 180:23–181:11.

24       158.   Pulling *Call of Duty* from PlayStation would be an unprecedented move in the

25  industry. There are no instances of a game publisher choosing to make exclusive an existing

26  game franchise that is multiplayer, multiplatform, and offers cross-platform play; the FTC could

27  not name a single one at any point during trial. *See also.* Carlton Decl. ¶ 23 ("There is no

28

1   evidence that Professor Lee cites, and I am aware of none, that shows that any established

2   multiplayer, multi-platform game with cross-play, i.e., any game that shares these characteristics

3   of *Call of Duty,* has ever been made exclusive."). This is in part because exclusivity is less likely

4   to be profitable for games that come from established franchises and for games with important

5   cross-platform, multiplayer components. 6/23/23 Tr. (Spencer), at 361:18–22 ("And given that

6   PlayStation is significantly larger than Xbox, building a high-quality game for Xbox and

7   somehow building a lower quality game on the largest market segment doesn't make financial

8   sense or, as I said, brand sense for us, and we haven't done it.").

9       159.    In short, keeping Activision games on PlayStation is both good for gamers and

10  good for Xbox's business. Xbox is thus committed to shipping Activision games, including

11  future titles of *Call of Duty*, on PlayStation for years to come. In fact, Microsoft is so committed

12  to keeping *Call of Duty* on PlayStation that both Mr. Nadella and Mr. Spencer pledged under

13  oath to keep *Call of Duty* on PlayStation so long as Sony allows it.

14      160.    During his testimony, Mr. Nadella affirmed that Microsoft would continue to sell

15  *Call of Duty* to Sony:

16      [MR. KILARU]: Let me ask you here today, Mr. Nadella, will you commit to
17      continuing to ship Call of Duty on the Sony PlayStation?

18      [MR. NADELLA]: **A hundred percent.**

19  6/28/23 Tr. (Nadella), 853:9-11 (emphasis added).

20      161.    Likewise, Mr. Spencer, "the final decision maker at Microsoft Gaming," *see*

21  6/23/23 Tr. (Spencer), at 267:18–20, was unequivocal in his intent to keep *Call of Duty* on

22  PlayStation:

23
24      THE COURT: You're testifying under oath that you will make future versions of
        Call of Duty available for the PlayStation 5? You will invest whatever developer
25      expenses you need to do to do that? Of course Sony has to . . . let you do it, but
        you're testifying under oath that you will do that?

26      [MR. SPENCER]: I'm making the commitment standing here that we will not
27      pull Call of Duty, it is my testimony, from PlayStation. And, as you said, Sony
        obviously has to allow us to ship the game on their platform; but absent any of

28

that, **my commitment is and my testimony is, to use that word, that we will continue to ship Call of -- future versions of Call of Duty on Sony's PlayStation platform**. . . Call of Duty will remain on PlayStation 5 and future versions, as I said, of PlayStation. . . . Our goal is to continue to make Call of Duty a great game for this PlayStation and future PlayStations.

6/23/23 Tr. (Spencer), at 367:18–24, 368:4–10, 429:21–22, 25–430:1 (emphasis added).

### 2.    Xbox has offered Sony a ten-year deal to keep Call of Duty on PlayStation—that Sony has refused.

162.    From the day the deal was announced, Xbox made clear its intentions to keep *Call of Duty* available to its substantial existing PlayStation gamer community long into the future. In particular, as early as January 19, 2022, Microsoft's Satya Nadella and Phil Spencer had a call with Sony CEO Kenichiro Yoshida in which they emphasized that Microsoft is prepared to commit to a new agreement now that would extend the commitment to ship *Call of Duty* at parity on Sony PlayStation after close and after Activision Blizzard's current contract with Sony expires. 6/23/23 Tr. (Spencer), at 418:16–419:16, 443:18-20; RX2172; 6/28/23 Tr. (Nadella), at 852:23–853:8.

163.    Since that time, Xbox made repeated offers to keep *Call of Duty* on PlayStation, which Sony has rebuffed. 6/23/23 Tr. (Spencer), at 443:23–25; RX2170 (Proposed PlayStation Global Provisional Publishing Agreement (12/23/2022). Sony claims that losing *Call of Duty* would be disastrous to its business, yet has refused Xbox's proposal to license those games to PlayStation on the same terms given to Xbox.

164.    On January 31, 2022, Microsoft sent a first written proposal to Sony. PX3109. After reading the proposal, Jim Ryan had no concerns that Microsoft was going to make *Call of Duty* exclusive. Ryan Dep. Vol. 1 186:18–21. Sony took nine months to provide a mark-up to this written proposal. *See* PX3110; *see also* PX3106-001.

165.    Sony sent Microsoft a draft publishing agreement on September 29, 2022 (the "Sony Proposal"). PX3110-002. The Sony Proposal provides for continued distribution of all Activision games on the PlayStation platform at parity to Xbox. PX3110-028-030; PX3110-041–042. In response, Microsoft sent Sony a red-line of this draft agreement on December 23, 2022.

1   PX3110-001. In that most recent proposal, the duration of Microsoft's commitment to Sony is a

2   10-year term, to take effect upon completion of the Transaction. RX2170-003. This term would

3   in any case go beyond the expected starting period of the next generation of consoles (in 2028).

4   Thus, *Call of Duty* will be published on successor PlayStation consoles should one be released

5   during the term of the agreement. RX2170-002. The agreement also would ensure that *Call of*

6   *Duty* console games are offered on PlayStation at parity with Xbox. RX2170-003–006.

7        166.    Microsoft's offer to Sony

8

9

10

11

12

13

14    . Ryan Dep. Vol II 17:18–21, 18:18–22.

15

16

17

18

19

20

21

22

23

24    .

25        167.

26

27

28



1 ███████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 ███████████████████████████████████████████

5      168.     Sony has consistently rejected these offers, including Microsoft's most recent

6 offer to agree to keep *Call of Duty* games on PlayStation for at least 10 years. *See* Ryan Dep.

7 Vol. 2 28:15–25, 30:11–32:19; Carlton Decl. ¶ 53 (noting "Sony refuses to sign a contract that

8 Microsoft offered to guarantee PlayStation access to *Call of Duty*—an offer that includes a ten-

9 year term."). Microsoft's ten-year commitment exceeds any agreement Sony currently has with

10 any other publisher. Ryan Dep. Vol. 2 28:19–25 ("████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ███████████████████████████████████████████████ Sony has refused to

13 accept any offer from Microsoft (1) in an attempt to leverage its objection to the deal to extract

14 far more favorable economic terms and rights than it currently has; or (2) to increase the chances

15 the deal is blocked by regulators. Carlton Decl. ¶ 53. ("It is peculiar to claim that Sony's console

16 will be foreclosed from effective competition by Xbox withholding *Call of Duty* when Sony

17 refuses to sign [the ten-year term contract]. As an economic matter, that behavior is an indication

18 that Sony is more concerned about preventing Xbox from becoming a more potent competitor (or

19 using the regulatory review process to extract even more favorable terms for the distribution of

20 Activision content) than it is with the possible loss of access to *Call of Duty*.").

21      169.     There is no reason for Xbox to not make this deal with Sony, as discontinuing

22 distribution of Activision's titles on other platforms would cost Microsoft ████████ in revenue.

23 *See* PX4344, at 12 ("█████████████████████████████████████████

24 ████████████████████"); *see also* RX3166, at 16 ████████████████████████

25 ████████████████████████████████████████████████████

26 ███████████████████ *see, e.g.*, 6/23/23 Tr. (Spencer), at 418:3–6 ("Nobody inside of

27 Microsoft has ever presented a model that would – to me that would show that pulling Call of

28

1  Duty off of PlayStation would be beneficial to or would cover the costs that we would – the

2  revenue we would lose."); Lawver 6/23/23 Tr. 5–22 (█████████████████████████████

3  ████████████████████████████████████████████████████████████████████

4  ██████████████████.") 6/28/23 Tr. (Kotick), at 722:15-21 ("the PlayStation revenues

5  are probably twice the Xbox revenues").

6      170.    Sony also refuses to extend its *Call of Duty* co-marketing agreement with

7  Activision, which is set to expire in 2024. RX0020, at 1. Activision's CEO Bobby Kotick has

8  attempted to discuss an extension of that agreement with leadership at Sony—namely, Sony

9  CEO Kenichiro Yoshida and PlayStation CEO Jim Ryan. PX7053 at 176:15–19. However, Mr.

10  Ryan refused the offer, saying he "hope[d] that the regulators would do their job and block" the

11  deal. PX7053 at 176:20-177:01.

12      171.    Tellingly, Mr. Ryan wrote to his original boss at PlayStation Europe, a man he

13  considers a mentor, when the deal was announced and said: the transaction is "not an [X]box

14  exclusivity play at all," and that he was "pretty sure we will continue to see COD on

15  [PlayStation] for many years to come":

16
17
18  On Thursday, January 20, 2022, 02:52:57 PM GMT, Jim.Ryan@sony.com <jim.ryan@sony.com> wrote:

    It's not an xbox exclusivity play at all, they're thinking bigger than that, and they have the cash to make moves like this. I've
    spent a fair bit of time with both Phil and Bobby over the past day, I'm pretty sure we will continue to see COD on PS for
    many years to come.

19
20  RX2064, at 1; *see also* Ryan Dep. Vol. 1, 198:1–7, 199:18–201:2, 225:23–226:8. Indeed, in the

21  wake of the announcement, Mr. Ryan continuously confirmed his belief that he expects

22  Activision games to be available on PlayStation for years to come. RX0079-005 (telling

23  investors in February of 22 that "we feel extremely confident that *Call of Duty* and other

24  Activision games will continue to be published on our platform. Actually, these days, we see

25  ourselves in a lot more partnerships like the one we have with Microsoft."); Ryan Dep. Vol. 1

26  225:23–226:08. Mr. Ryan went so far as to recognize that the "ongoing availability of Activision

27
28

games on competitive platforms is going to be central for them to be successful." Ryan Dep. Vol. 1 216:16–217:23; RX0079-005.

### 3. Xbox has made a number of commitments to maintain and expand access to Activision Games after the Transaction.

172. Even while Sony rebuffed and resisted Microsoft's efforts to guarantee *Call of Duty* on PlayStation for the next decade, Microsoft sought other opportunities to expand the reach of both *Call of Duty* and other Activision titles.

173. In connection with the transaction, Xbox has made a number of commitments to maintain and expand access to Activision games including (i) adding Activision games to Game Pass; (ii) bringing *Call of Duty* to Nintendo Switch; and (iii) streaming Activision content on third-party cloud gaming services. In fact, and specifically to demonstrate its intent to expand Activision content to more platforms and more gamers, Microsoft took the unusual step of entering these agreements before completing its acquisition of Activision. 6/22/23 Tr. (Bond), at 169:22–170:12 ("[W]e don't normally do deals for content and assets that we don't own [but] we wanted to make our intention – back it up with actions . . . ."); *id.* at 178:16–179:16.

174. These agreements have the full support and backing of senior Microsoft leadership, including Microsoft CEO Satya Nadella and Xbox Game Studios CEO Phil Spencer. 6/28/23 Tr. (Nadella), at 853:12-17; 6/23/23 Tr. (Spencer), at 365:22-367:3; *see also* 6/22/23 Tr. (Bond), at 185:6–186:4. They are also the product of basic economics that does not require complicated modeling. As a low-share player, Xbox is dependent on revenues from other platforms, and so making multiplayer games available on other platforms is a proven recipe to generate more revenue. 6/29/23 Tr. (Stuart), at 976:13–977:5 (the decision to ship Minecraft on "all platforms" enabled "its mass, mass, mass market" appeal); *see also* 6/28/23 Tr. (Nadella), at 848:23–24 ("software should run in as many platforms as possible").

### a. Xbox will add Activision games to the Game Pass subscription service.

175.    From the day that the deal was announced, Xbox has been clear about its plans to make Activision games available for play under its Game Pass subscription. PX9076; 6/22/23 Tr. (Bond), at 184:17-19.

176.    Adding Activision games—including new releases—to Game Pass will give gamers a new, low-cost way to pay for and access those games. RX3166, at 16. *See* 6/28/23 Tr. (Kotick), at 752:17–19 ("[I] can't imagine ever offering the kind of commercial terms that we would require" to put games on a subscription service); 6/28/23 Tr. (Kotick), at 752:8–11 ("[I] can't imagine that there would be any company that would be willing to make the type of commercial commitment that would be required to avoid the destruction of value."). And in the absence of the deal, new Activision games would not be available on any subscription service. 6/28/23 Tr. (Kotick), at 731:5-14. To date, Activision has never placed one of its new games on a multigame subscription service. *See* 6/28/23 Tr. (Kotick), at 731:7 ("We've never put a single title into Game Pass.").

177.    Activision's long and considered strategy is to not make its new games available on multigame subscription services. *See* 6/28/23 Tr. (Kotick), at 729:3–7, 746:19–21 ("[I] would say it's just not something that we do have any plans to do or have ever done …").

178.    Among other concerns, Activision believes that putting new Activision games on multigame subscription services would cannibalize individual sales. *See* 6/28/23 Tr. (Kotick), at 744:10–11 (explaining that "cannibalization … play[s] a role in" aversion to subscription services); *see also* Carlton Decl. ¶ 15 ("Activision believes participating in content library subscription services would erode its business model, including by resulting in substantial cannibalization of its single game sales of *Call of Duty*."). That is, if gamers can access new Activision games through a subscription that they already pay for, those gamers are unlikely to make standalone purchases of those games.

1     179.    Given that cannibalization, no company has ever offered Activision economics

2    that, from Activision's perspective, would make it profitable for Activision to release new games

3    onto a multigame subscription. *See* Carlton Decl. ¶¶ 15–16; Lee Decl. ¶¶ 126; 6/28/23 Tr.

4    (Kotick), at 730:24–731:14.

5     180.    Over the years, Activision has refused offers to place its new games on

6    subscription services. *See* 6/28/23 Tr. (Kotick), at 751:1–8 ("[W]e made a decision not to include

7    our games on Game Pass' subscription service."). ██████████████████████

8    ███████████████████████████████████████████████████████

9    ███████████████████████████████████████████████████████

10   ██████████████████████████████████████████████. *See*

11   6/28/23 Tr. (Kotick), at 751:1–8. ███████████████████ PX2465-001.

12     181.    Sony, for its part, has never asked Activision about the possibility of putting the

13   current version of *Call of Duty* on PlayStation Plus, because (1) Sony's subscription model is to

14   only include catalog games, and (2) Activision has been so "public" and "vocal" about not doing

15   so. Ryan Dep. Vol. 1, 267:11–25. Activision's participation on PlayStation Plus has been limited

16   to a handful of back-catalog games available for a limited time (*e.g.*, one-month), all of which

17   had been commercially available for over a year at the time of inclusion and selected in an effort

18   to drive interest in Activision's upcoming new releases, which would not be available on

19   subscription services. . *See* 6/28/23 Tr. (Kotick), at 747:22–25 ("[W]e have no plans to provide

20   our games to the Sony [multigame] subscription service in anything other than a test or

21   something promotional but not as a business that would generate any significant revenues."); *see*

22   *also* 6/28/23 Tr. (Kotick), at 748:19–21 (Activision has only put games on PlayStation Plus "in a

23   limited, either experimental or promotional, basis"); 6/28/23 Tr. (Kotick), at 750:10–13

24   (acknowledging occasional placement of "a very old catalog title for a short period of time" on

25   subscription services).

26     182.    Beyond that, multigame subscription services are inconsistent with Activision's

27   increased use of free-to-play models. See 6/28/23 Tr. (Kotick), at 743:22–24; 6/28/23 Tr.

28

1  (Kotick), at 731:12–14. By providing a game for free, Activision can attract large communities

2  of players and then monetize the game through ad revenue and in-game purchases made by

3  different players. *See, e.g.*, 6/28/23 Tr. (Kotick), at 719:9-12; 6/28/23 Tr. (Kotick), at 727-

4  728:24-4. Offering a game without any financial barrier has become a main focus for

5  Activision's efforts to attract gamers and build franchises.  *See* 6/28/23 Tr. (Kotick), at 719:13-

6  17.

7         183.    Ultimately, placing new Activision games on a multigame subscription service

8  would require specific approval from Activision CEO Bobby Kotick. *See* 6/28/23 Tr. (Kotick), at

9  749:11–13. Yet Mr. Kotick has expressed a "general aversion" to multigame subscription

10  services for the reasons described above. 6/28/23 Tr. (Kotick), at 729:3-7; 734:2--5, 743:22–24.

11                    **b.    Xbox will bring Call of Duty to Nintendo Switch.**

12         184.    Activision's *Call of Duty* games have not been available on Nintendo devices for

13  over a decade. Ryan Dep. Vol. 2, 101:9–12; Carlton Decl. ¶ 14.

14         185.    On the day the acquisition was announced, Microsoft called the head of Nintendo

15  North America, Doug Bowser, and Nintendo's lead for partnerships, Steve Singer. During that

16  call, Mr. Bowser said he was "thrilled to hear this announcement and that he had long wished to

17  have *Call of Duty* be on the Switch." 6/22/23 Tr. (Bond), at 167:24–169:18.

18         186.    As a result, in February 2023, Xbox and Nintendo entered a ten-year agreement to

19  bring future *Call of Duty* titles to Switch (and any successor Nintendo consoles) after the deal

20  closes. RX3019 (Letter of Intent); RX1212 (Agreement). That ten-year term was unprecedented.

21  6/22/23 Tr. (Bond), at 172:11–13. (Q. "Are you aware of any agreement in your industry where

22  someone agrees for ten years to provide content to a platform?" A. "Not before this one, no.");

23  Singer Dep. 239:4–12 █████████████████████████████████████

24  ███████████████

25         187.    That agreement guarantees feature and content parity and commits Xbox to

26  releasing new *Call of Duty* titles on Nintendo simultaneous with their launch on other platforms.

27  ████████████████████████████████████████████████

28

1   ██████████████████████████████████████████████████ ”); *see also*

2   Singer Dep. 253:5–10 (██████████████████████████████████████████

3   ██████████████████████████████████████████ ”); Singer Dep. 223:12–15

4   (“██████████████████████████████████████████████████████

5   ██████████████████████████████████ ”); 6/28/23 Tr. (Kotick), at 776:6–16 (agreeing

6   that developers from Activision and Xbox will be able to make "a good [*Call of Duty*] game for

7   the Switch").

8         188.    Post-transaction, approximately 100 million gamers would be able to play *Call of*

9   *Duty* on their existing Nintendo devices for the first time in many years. Bailey Rep., at 9 ex. 4;

10  Singer Dep. 253:5–10 (responding ████████████████████████████████████

11  ██████████████████████████████████████████ ”); Singer Dep. 223:12–15

12  ██████████████████████████████████████████████████████████

13  ████████████████████████████████ 6/28/23 Tr. (Kotick), at 776:6–16 (agreeing

14  that developers from Activision and Xbox will be able to make "a good [*Call of Duty*] game for

15  the Switch"); *see also* Carlton Decl. ¶ 14 ("Because *Call of Duty* is not offered on the Nintendo

16  Switch today and no *Call of Duty* titles have been released on a Nintendo console since 2013,

17  this represents an expansion of access to *Call of Duty*.");

18              **c.    Xbox will maintain access to Call of Duty for PC gamers.**

19        189.    During this same time, Microsoft made a similar offer to Valve, the company that

20  runs the leading PC game store, Steam. 6/22/23 Tr. (Bond), at 173:16–19.

21        190.    While *Call of Duty* is currently on Steam, it has not always been; it was not

22  available between 2018 and 2021.  6/27/23 Tr. (Bailey), at 685:14-24; 6/22/23 Tr. (Bond), at

23  174:11–24.

24        191.    Xbox sent Valve a signed letter agreement committing to make *Call of Duty*

25  available on Steam for ten years. RX1184. Valve did not sign the deal, but only because its

26  business philosophy—"they believe strongly that they should earn the business of . . . the

27  developers"—means they have no such contracts guaranteeing access to content. However,

28

1    Valve responded that "they believed [Microsoft] . . . would continue to provide [*Call of Duty*] on

2    Steam." 6/22/23 Tr. (Bond), at 174:25–175:20. [5]

3                **d.**     **Xbox has made contractual and regulatory commitments to**

4                       **stream Activision content on third-party cloud gaming**

                      **services.**

5        192.     To date, Xbox has entered into four separate ten-year agreements with cloud

6    gaming providers Boosteroid, Nvidia GeForce NOW, NWare, and Ubitus to bring Activision

7    content to their platforms. It has entered into a similar letter of intent with EE Limited, a

8    subsidiary of British Telecommunications. *See* RX1211 (Nvidia); RX3024 (Boosteroid);

9    RX3025 (Ubitus); RX3027 (EE Limited); RX1245 (Nware).

10       193.     None of these companies could stream *Call of Duty* prior to the acquisition being

11    announced. 6/22/23 Tr. (Bond), at 176:15–17; Eisler Dep. 155:25–156:18 (agreeing that, before

12    the merger announcement, Nvidia "had no clear path to getting Activision content on the

13    [GeForce NOW] service").

14       194.     The agreements also ensure that Activision's games available for streaming will

15    have the same quality and content as games available for traditional download.

16       195.     In addition to those agreements, during the European Commission's regulatory

17    process, Xbox made binding commitments to grant streaming rights to Activision games to other

18    cloud gaming services offered to consumers in the European Economic Area—regardless of

19    whether Xbox ultimately decides to stream those games on Xbox Cloud Gaming.[6]

20

21    [5] In a statement to gaming news outlet, Kotaku, Valve President Gabe Newell explained, "Microsoft offered and even sent us a draft agreement for a long-term Call of Duty commitment but it wasn't necessary for us because a)

22    we're not believers in requiring any partner to have an agreement that locks them to shipping games on Steam into the distant future b) Phil and the games team at Microsoft have always followed through on what they told us they would do so we trust their intentions and c) we think Microsoft has all the motivation they need to be on the

23    platforms and devices where Call of Duty customers want to be." *Microsoft Announces Pledge To Bring Call of Duty To Nintendo Consoles*, Kotaku (Dec. 6, 2022), https://kotaku.com/microsoft-activision-call-of-duty-nintendo-

24    switch-steam-1849862479.

25    [6] EU Commission Press Release, "Mergers: Commission clears acquisition of Activision Blizzard by Microsoft, subject to conditions," (May 15, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_2705

26    [hereinafter, "EC Commitments"]. The Court may "take judicial notice of . . . 'records and reports of administrative bodies.'" *Smith v. L.A. Unif. Sch. Dist.*, 830 F.3d 843, 851 n.10 (9th Cir. 2016); *In re German Auto. Manuf.*

27    *Antitrust Litig.*, 392 F. Supp. 3d 1059, 1063 n.2 (N.D. Cal. 2019) (taking judicial notice of European Commission press release).

28

DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT
(NO. 3:23-CV-02880-JSC)

196.     These licenses will ensure that gamers that have purchased one or more Activision games on a PC or console store, or that have subscribed to a multigame subscription service that includes Activision games, have the right to stream those games with any cloud game streaming service of their choice and to play them on any device using any operating system. *See* EC Commitments.

197.     Margrethe Vestager, European Commissioner for Competition, said regarding the commitments, "this solution fully addressed our concerns. And on top of that, it had significant procompetitive effects [compared to] the pre-merger situation, where Activision does not license its games to cloud services."[7]

> e.     **These procompetitive contracts, which expand access to Activision's content, would not exist in the but-for world.**

198.     Microsoft's cloud gaming agreements would expand consumer access to Activision's content because Activision has adopted a general strategy of not participating in cloud streaming services. *See* 6/28/23 Tr. (Kotick), at 731:15–18; 6/28/23 Tr. (Kotick), at 753:13–14. Activision has adopted that strategy for at least three reasons, and there is no evidence to suggest it would alter that strategy if it remains an independent company.

199.     *First*, Activision has determined that cloud gaming technology is not viable for its games due to its technical deficiencies. A major problem with cloud gaming technology is that it introduces significant latency, which, in competitive situations, puts players on cloud gaming services at a perpetual disadvantage. *See, e.g.*, 6/28/23 Tr. (Kotick), at 728:2–6 ("[W]ith all the risks of latency and storage, I actually think playing the game on the phone using the local processor is going to be a much greater opportunity for us than the idea of streaming."); PX7052 (Zerza Dep. Tr.), at 172:22–173:15 (noting the "primary reason" Activision has not offered its games on cloud streaming services is "because of the famous lag," which would lead to a

---

[7] EVP Vestager keynote speech at the International Forum of the Studienvereinigung Kartellrech: "Recent Developments in EU merger control" (May 25, 2023), https://ec.europa.eu/commission/presscorner/detail/en/speech_23_2923

1    negative player experience and "harm not just Activision brands, it would harm the brands of

2    each of our franchises that are distributed on those services").

3        200.     Activision has thus opted not to place its content on cloud streaming services, for

4    fear that the poor user experience associated with cloud gaming would harm Activision's and its

5    franchises' brands. 6/23/23 Tr. (Zimring ), at 486:23–487:20; ; 6/28/23 Tr. (Kotick), at 731:15–

6    18 ("We have experimented with a few [streaming services] …, but I don't really think it's a big

7    opportunity for the company"); 6/28/23 Tr. (Kotick), at 753:13–14 (explaining that Activision

8    tried a "beta test" of Nvidia's GeForce NOW cloud streaming service).

9        201.     *Second*, Activision has concluded that cloud gaming's value to consumers is

10   constrained—and rapidly being eclipsed by—improvements in the local processing capabilities

11   of mobile phones and other consumer electronics. *See* 6/28/23 Tr. (Kotick), at 732:17–20 ("I

12   would say that the growth of gamers and gaming will continue principally on phones"); *See*

13   6/28/23 Tr. (Kotick), at 728:2–6 ("[W]ith all the risks of latency and storage, I actually think

14   playing the game on the phone using the local processor is going to be a much greater

15   opportunity for us than the idea of streaming."). Already, powerful local hardware, including

16   mobile devices and TVs, will see "continued improvements in the micro processing capabilities,"

17   which could avoid latency issues that currently limit cloud gaming technology. *See* 6/28/23 Tr.

18   (Kotick), at 720:18–19 ("[I]f you think about processing in the cloud, I think there was a -- you

19   know some years ago there was this view that you could actually more cost efficiently deliver

20   processing in the cloud. But I think what people have come to realize is that the local devices

21   whether it's a computer or a phone or a console, the processing capabilities are advancing at very

22   rapid rates, and so it's not more efficient to process in the cloud."). As Activision has determined,

23   it is not in its best interest to invest its limited resources in cloud gaming opportunities, which

24   only offer only speculative potential relative to these continued improvements in local hardware.

25   Carlton Decl. ¶ 17; *see also* 6/28/23 Tr. (Kotick), at 733:2–5 (explaining that streaming *Call of*

26   *Duty*, *e.g.*, on mobile, would not be "a very good" experience); 6/28/23 Tr. (Kotick), at 734:2–5

27   (explaining that absent the deal Activision has no plans to allow *Call of Duty* to be streamed).

28

1    202.    *Third*, Activision has concluded that the cloud gaming distribution opportunity

2  cannot offer attractive economics because cloud gaming services lack scale, and cloud gaming

3  services are unlikely to result in meaningful incremental new gamers joining Activision's

4  ecosystem. *See* 6/28/23 Tr. (Kotick), at 731:8-18 ("I don't really think [cloud gaming is] a big

5  opportunity for the company.").

6    203.    Like Activision's aversion to multigame subscription services, Activision's

7  aversion to cloud gaming services is borne out in practice. *See* 6/28/23 Tr. (Kotick), at 731:15–

8  18 ("We have experimented with a few [streaming services] …, but I don't really think it's a big

9  opportunity for the company"). Activision's content is not available on any cloud gaming

10  platforms today, *see* 6/28/23 Tr. (Kotick), at 741:24, and Activision has rebuffed every offer by

11  cloud gaming companies to place its content on their platforms, *see* 6/28/23 Tr. (Kotick), at

12  753:13–14 (explaining that Activision tried a "beta test" of Nvidia's GeForce NOW cloud

13  streaming service but then decided against putting its games on the service); *see also* 6/23/23 Tr.

14  (Zimring ), at 484:23–25 (acknowledging that Google tried to get Activision content for Stadia).

15    204.    Any cloud gaming partnership would require specific approvals from Activision's

16  senior leadership, such as Mr. Kotick. *See* 6/28/23 Tr. (Kotick), at 749:11–13. But Mr. Kotick

17  has been clear that he does not think cloud streaming is "a big opportunity for the company." *See*

18  6/28/23 Tr. (Kotick), at 731:15–18; *see also* Carlton Decl. ¶ 17 & n. 13 ("Mr. Kotick has

19  explained that he and other Activision executives will not put Activision on cloud services.").

20    205.    The FTC has offered no reason to believe that Activision would make its content

21  available on any of these cloud gaming services if it remains an independent company. Prof. Lee

22  testified that *Call of Duty* is not available today on Xbox Game Pass, GeForce NOW,

23  Boosteroid, Ubitus, Nware, or EE, and that it likely *will* be on each of those platforms if the

24  merger were consummated. 6/27/23 Tr. (Lee), at 607:11–608:13, 613:5–23. But the most Dr. Lee

25  was willing to opine about the but-for world is that it is "uncertain" whether *Call of Duty* would

26  be on any of these services. 6/27/23 Tr. (Lee), at 613:24–615:2.

27

28

206.     In other words, the FTC's expert economist was unable to say that the FTC's purported cloud gaming market would be more competitive without the merger than with it.

####     4.     Even withholding Activision content would not foreclose PlayStation because Activision's content is not essential for platform competition.

207.     The broad and ever-expanding nature of competition within video game development and publishing ensures that no one developer, studio, franchise, or game is essential to a platform. 6/22/23 Tr. (Bond), at 148:19–24. Though Activision has enjoyed great success with its core franchises, experience shows that Activision's content—including *Call of Duty*— does not drive platform adoption and is not "must-have" or otherwise essential content on any platform. 6/22/23 Tr. (Bond), at 154:9–10; 6/27/23 Tr. (Bailey), at 666:12–17. The FTC's own expert agrees. 6/27/23 Tr. (Lee), at 540:22–24 (Q. "So you do not take the position that [*Call of Duty*] is essential, correct?" A. "Correct.").

208.     In 2022, ■% of all PlayStation gamers spent zero time playing *Call of Duty*, and ■% played fewer than 5 hours. 6/27/23 Tr. (Bailey), at 676:20–677:20.



209.     Nor do *Call of Duty* gamers show unusual intensity for the title: for ■% of *Call of Duty* gamers, *Call of Duty* was one of at least six franchises they played in 2022; only ■% of

1  *Call of Duty* gamers played only *Call of Duty* games. 6/27/23 Tr. (Bailey), at 677:21–679:3.

2  Furthermore, and contrary to Dr, Lee's testimony, *see* Lee Decl. ¶ 104, ██████████████

3  ████████████████████████████████████████████████████████████████

4  ██████████████████████ 6/27/23 Tr. (Bailey), at 679:4–680:21; *see* RX5055, at 43

5  ex. 29.

6           210.    Furthermore, *Call of Duty* does not uniquely drive PlayStation console purchase

7  decisions, and it is not uniquely important as the first game played on PlayStation. From October

8  21–31, 2022,[8] ██% of new PlayStation owners did not play a *Call of Duty* game on the first day

9  of play. And in late 2022, more gamers opted to play Sony's newly released title *God of War*

10  *Ragnarök* on their first day of play on a new PlayStation console rather than Activision's newly

11  released title *Call of Duty: Modern Warfare II. See* 6/27/23 Tr. (Bailey), at 680:23–682:18 (first-

12  day play is a relevant metric because "if you really like and care about a game, it's probably

13  going to be the game you're going to play on the first day"); *see* RX5055, at 38 ex. 26.

14           211.    And despite *Call of Duty*'s annual release cadence, in the past six years ████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████. Bailey Report ¶ 38 & ex. 22. ████████████████████

17  ██████████████████████████ Bailey Report ¶ 39 & ex. 23.

18           212.    In fact, PlayStation's lead in the console world is so great that ████████████

19  ████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████ *See* RX5055, at 15.

22           213.    210.    Similarly, the FTC's economic expert, Professor Lee, ████████████

23  ████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████ See Lee Decl. ¶

25  119.

---

[8] Dr. Bailey explained that she chose this period of time because it coincided with the release dates of *Call of Duty: Modern Warfare II* (October 28) and *God of War Ragnarök* (November 9) were released. 6/27/23 Tr. (Bailey), at 681:7–13.

1    214.   Two natural experiments, in particular, demonstrate that having access to *Call of*
2  *Duty* content does not "make" a platform and that a lack of such content does not "break" a
3  platform.

4    215.   *First*, Activision has not released a single *Call of Duty* title on the Nintendo
5  Switch—and, indeed, has not released any *Call of Duty* titles on a Nintendo platform since it
6  released *Call of Duty: Ghosts* on the Nintendo Wii U in 2013. *See* 6/28/23 Tr. (Kotick), at
7  721:15–20. Without access to a single *Call of Duty* title, the Nintendo Switch has still been a
8  resounding success, and is the second-best selling gaming console in the United States today,
9  behind only Sony's PlayStation and well ahead of Microsoft's Xbox. *See* 6/27/23 Tr. (Bailey), at
10  685:1–686:5; RX5055, at 49 ex. 34.

11    216.   *Second*, Activision's attempt to take PC digital sales of *Call of Duty* exclusive to
12  its Battle.net platform was a resounding failure. Before 2018, Activision sold digital versions of
13  PC *Call of Duty* titles on Valve's successful Steam platform. In 2018, Activision decided to take
14  the game off of Steam and make it exclusively available on Battle.net—largely in an effort to
15  attract users to, and grow, Activision's own platform. Battle.net's monthly active users
16  ("MAUs") remained relatively flat during the period when it had exclusive access to digital sales
17  of *Call of Duty* on PC, from 2018 through 2022. RX5055, at 50. Meanwhile, during that same
18  period and without access to *Call of Duty*, Steam's monthly active users *grew* by tens of millions
19  of users, nearly doubling from 67 million MAUs in 2017 to 132 million MAUs in 2021. 6/27/23
20  Tr. (Bailey), at 685:1–686:5; RX5055, at 50 ex.35.

21    217.   Moreover, Sony would have a variety of options for responding even if Activision
22  content were withheld, including by lowering its prices, improving its console's quality, by
23  growing its own studios organically, investing in additional third-party games, or by purchasing
24  another publisher (as it did with Bungie in 2022 while the Microsoft/Activision deal was
25  pending. Ryan Dep. Vol. I 201:03–14 (noting in the wake of Microsoft's Activision acquisition
26  announcement "we have some good stuff cooking," referring to Sony's imminent acquisition of
27  Bungie); *see* 6/23/23 Tr. (Spencer), at 441:9–17).

28

1    218.    Ultimately, Activision's games are but a few of the endless game options that are

2    available to gamers, who can and will play other games on their preferred platform if

3    Activision's games are unavailable.

4        **C.    Xbox Will Operate Activision as a Limited-Integration Studio.**

5    219.    Over the past decade, Xbox was acquired a number of gaming studios, and Xbox

6    has incorporated each of these acquired studios as a "limited-integration" or "unplugged" studio.

7    For example, Mojang (2014), Obsidian (2018), DoubleFine (2019), and ZeniMax (2020) were all

8    set up as limited- integration studios within the Microsoft/Xbox corporate structure. *See, e.g.*,

9    6/22/23 Tr. (Hines), at 89:4–5 (ZeniMax is "a limited integration company"); 6/29/23 Tr.

10   (Stuart), at 1036:6–20. Xbox intends to operate Activision as a limited-integration studio.

11   6/29/23 Tr. (Stuart), at 1036:21–23.

12   **V.    Numerous Foreign Antitrust Authorities Have Approved the Transaction.**

13   220.    The transaction has been cleared in nine jurisdictions, and a tenth jurisdiction

14   (Canada) allowed the waiting period to expire without challenging the merger.[9]

| Jurisdiction | Status of Review | Decision Date | Link to Decision |
|---|---|---|---|
| Brazil | Unconditionally cleared | October 5, 2022 (Finalized on October 24, 2022) | Decision: bit.ly/3pkQ89Z Final: bit.ly/3r5kEVG (available only in Portuguese) |
| Canada | Waiting period expired | October 17, 2022 | N/A |
| Chile | Unconditionally cleared | December 28, 2022 | Press Release: bit.ly/46qHLdo (available only in Spanish) |
| China | Unconditionally cleared | May 18, 2023 | Not available |
| European Union | Conditionally cleared | May 15, 2023 | Press Release: bit.ly/3PAgCPj |
| Japan | Unconditionally cleared | March 28, 2023 | Decision: bit.ly/46qSCnK |

---

[9] The Court may take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *FTC v. Qualcomm Inc.*, No. 17-cv-00220-LHK, 2018 WL 5848999, at *3, *5 (N.D. Cal. Nov. 6, 2018), *vacated on other grounds*, 969 F.3d 974 (9th Cir. 2020).

| Serbia | Unconditionally cleared | August 12, 2022 | Decision: bit.ly/3NwMnpF |
|---|---|---|---|
| Saudi Arabia | Unconditionally cleared | June 16, 2022 | Press Release: bit.ly/3CO1iqO |
| South Korea | Unconditionally cleared | May 30, 2023 | Press Release: bit.ly/3r67WWO |
| Ukraine | Unconditionally cleared | April 27, 2023 | Press Release: bit.ly/3JYxQm3 (available only in Ukrainian) |

221.     Most regulators—including those in Brazil, Chile, China, Japan, Saudi Arabia, Serbia, South Korea and Ukraine—have cleared the transaction unconditionally. The transaction received conditional clearance in the European Union ("EU"), which covers 27 countries. In Canada, the waiting period expired end of last year (on October 17, 2022) without action by the Canadian competition regulator, the CCB.[10]

222.     The United Kingdom's Competition and Markets Authority ("CMA") has sought to block the merger, but its only objection to the transaction was that it might harm, at some point in the future, the evolution of cloud gaming. Xbox is currently appealing that decision.

## VI.   Professor Lee's Analysis of the Transaction and Its Impact on Competition Is Flawed and Does not Support the FTC's Claims.

223.     In concluding that Microsoft would have the incentive post-transaction to withhold Activision content, the FTC relies primarily on a flawed quantitative foreclosure analysis by Professor Lee, who concludes that withholding *Call of Duty* would be profitable to Microsoft because it would result in a 5.5% increase in Xbox's share of the console market. *See* Lee Decl. ¶ 106.

224.     While the modeling may seem complex, the facts here are simple. As explained further below, Professor Lee's testimony depends on the idea that there is a 5.5% share shift to Xbox. 6/27/23 Tr. (Lee) 554:21–555:7. ███████████████████████████████████████████████████. PX5001, p. 71; Lee

---

[10] In a letter filed on the final day of the hearing, the CCB purported to clarify the status of the merger review in Canada. Dkt. 265. However, as described above, the CCB allowed the waiting period to expire more than eight months ago without taking any action to block the merger.

1    Direct Testimony, ECF No. 226-2, ¶ 109. It is undisputed that at lower share shifts, foreclosure

2    would not be profitable. 6/27/23 Tr. (Lee) 574:17–575:2.

3         225.    That model depends on two *inputs* that have no support in the record. One is a

4    20% "conversion rate" of current PlayStation gamers, for which Professor Lee provided no

5    evidence at trial. Indeed, the FTC could provide no justification for this input at closing

6    argument, despite multiple opportunities to answer the question. 6/29/23 Tr., at 1071:25–1072:4.

7    The other is the estimate that people who buy an Xbox as a result of foreclosure will spend even

8    more over a five year period than the average user. As explained below, that is a highly

9    speculative assumption with little support.

10        226.    Rather than really defend these inputs, Lee largely tries to defend the output – his

11   5.5% share shift – by reference to what he calls the share shift model, as well as cherry-picked

12   documents. But none of those sources support him, so there is no basis for viewing his model as

13   a reliable source.

14        227.    Indeed, Dr. Lee's own trial testimony is fatal to the FTC's claim that Microsoft

15   would withhold *Call of Duty*. At trial, Professor Lee himself conceded in response to the Court's

16   questioning that he had no basis for testifying that the post-merger company would likely

17   withhold *Call of Duty*. 6/27/23 Tr. (Lee), at 610:3–611:9.

18        **A.    Professor Lee's demand or "share" model is flawed and irrelevant to the**
              **analysis.**
19

20        228.    Professor Lee's share model is relevant only as a potential validation of his

21   foreclosure analysis. Importantly, that model is based on data for the Xbox One and PS4, the last

22   generation of consoles. 6/27/23 Tr. (Lee), at 546:23–548:13. It is also limited to the United

23   States, even though Lee's foreclosure model is based on global data. 6/27/23 Tr. (Lee), at

24   555:15–25.

25        229.    The model purports to predict how sales of Xbox One would change if Xbox

26   withheld *Call of Duty* from Sony. Lee Decl. ¶ 31. Lee says that, because this model predicts an

27

28

DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT
(NO. 3:23-CV-02880-JSC)



1    8.9% share shift, his separate foreclosure model, which depends on a 5.5% share shift, is reliable.

2    6/27/23 Tr. (Lee), at 558:8–13. But this model is flawed and unreliable.

3        230.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Carlton Decl. ¶¶ 8, 31, 33–35, 41 ▮▮▮▮

6    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮. Not only is the Nintendo Switch more popular than the Xbox overall,

9    *see* 6/23/23 Tr. (Spencer), at 435:20–22, Nintendo has a contractual right to obtain Activision

10   content post-merger, including *Call of Duty*, *see* 6/23/23 Tr. (Spencer), at 443:23–25.

11       231.   Professor Lee's model predicts the share shift between Xbox and PlayStation. But

12   share shift alone does not tell the story. Xbox's share could improve without it making any

13   money as a result of foreclosure. For example, assume there are ten Xbox users and ten

14   PlayStation users, such that each platform has 50% share. In the event of withholding, five of the

15   PlayStation users stay on PlayStation, and five do nothing. Xbox's share in this scenario goes up

16   to 75%, but has earned no additional funds. Share shift thus cannot tell the whole story. The

17   relevant question is whether people would actually shift *to Xbox* and generate more profits on

18   that platform. Lee's model does not answer that question at all even though his own academic

19   work predicts that there would be substantial shifts away *from Xbox and PlayStation* in the event

20   of foreclosure, making a foreclosure strategy non-profitable.

21       232.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Carlton Rep. ¶ 105–06 & n.189.

28

233. ███████████████████████████████████████

███████████████████████████████████. Carlton Decl. ¶ 28.████

████████████████████████████████████████████████████████

████████████████████████████████████████. Carlton Decl.

¶ 28.████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

Carlton Decl. ¶ 28.

234.    Correcting for the errors greatly reduces the estimated change in the number of

Xbox Ones sold resulting from the assumed foreclosure of Sony from *Call of Duty*. Carlton Decl.

¶ 35 ("████████████████████████████████████████

████████████████████████████████████████████████.").

235.    The flaws in Dr. Lee's demand model are also discussed below in Section

II.B.1.a.iv. of the Conclusions of Law.

**B.    Professor Lee's foreclosure analysis exaggerates Microsoft's incentive to foreclose.**

236.    Professor Lee's foreclosure analysis attempts to calculate Microsoft's incremental

profits from gamers that switch from PlayStation to Xbox to play *Call of Duty*, and compares

these "benefits" to the "costs" of eliminating revenue from sales of *Call of Duty* on PlayStation.

Lee Decl. ¶ 109. Professor Lee's quantitative analysis did not consider either partial foreclosure

or foreclosure with respect to cloud gaming or library services.

237.    Professor Lee's demand model cannot back up the 5.5% share shift he predicts, as

just explained. So, Professor Lee tried to rely on documents. Leaving aside whether that is a

proper task for an economist, his documents do not come close to supporting his position.

238.    One of the documents Professor Lee relied on is ████████████████

████████████████████████████████████████

████████████████), much lower than the 5.5% share shift predicted by Professor Lee

1    using his 20% conversion rate. Indeed, Professor Lee acknowledged that a 2% share shift would

2    not be profitable under his model. 6/27/23 Tr. (Lee), at 581:1-7. As Professor Lee admitted, the

3    very documents Lee relied on show that Xbox decided not to pursue exclusivity for a suite of

4    popular games because it would not be financially sensible.

5        239.   Professor Lee also relied on a YouGov survey—claiming he was "familiar with

6    the survey," 6/27/23 Tr. (Lee), at 583:21–23; RX5053—when he had read only a *summary* of the

7    survey presented by Microsoft to the U.K. Competition and Markets Authority. 6/27/23 Tr.

8    (Lee), at 591:8–18; *see* RX5054 (summary reviewed by Professor Lee). Despite citing the

9    YouGov survey as evidence supporting his conversion rate and foreclosure model, 6/27/23 Tr.

10   (Lee), at 583:17–20, Professor Lee confessed to not having read the survey itself, 6/27/23 Tr.

11   (Lee), at 595:21–596:1, and to not even knowing whether the number of gamers surveyed was

12   statistically significant, 6/27/23 Tr. (Lee), at 634:12–14.

13       240.   In any event, the YouGov survey does not support Professor Lee's hypothesized

14   conversion rate. The survey was only of gamers who rank *Call of Duty* as one of their favorite

15   games, exaggerating potential conversion compared to Lee's model, which uses the conversion

16   rate across *all* gamers who play *Call of Duty* on PlayStation. But the trial evidence also made

17   clear that Professor Lee was simply attempting to cite any evidence that might save his model,

18   but without a basis for doing so. Professor Lee "didn't look at the survey itself," 6/27/23 Tr.

19   (Lee), at 595:22–596:1; he instead reviewed only "slides that were presented to the CMA

20   summarizing the YouGov survey information," 6/27/23 Tr. (Lee), at 591:13–16; *see* RX5054

21   (slides reviewed by Professor Lee). Professor Lee continued to refer to it as support for his

22   conversion rate, even after acknowledging that he had not read the YouGov survey. 6/27/23 Tr.

23   (Lee), at 632:17–635:19. Indeed, he did though, as he admitted, that he "can't answer" whether

24   "the number of gamers surveyed [was] statistically significant." 6/27/23 Tr. (Lee), at 634:12–23.

25       241.   Professor Lee overestimates the value of future Xbox users to Xbox by using out

26   of date customer lifetime value ("LTV") data. Specifically, the data he uses ends in August 2021,

27   and thus would be based on only the early cohorts that purchased an Xbox Series X|S console.

28

1  These early Xbox Series X|S cohorts would not be expected to be representative of future Xbox

2  users.

3       242.   Professor Lee's foreclosure model overstates the value of Xbox converters, which

4  has the effect of making foreclosure more valuable to Xbox than it actually is.

5       243.   ████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  █████████████████████████

9       244.   Professor Lee understates the cost of foreclosure by failing to account for lost

10 profits on future Xbox and Activision titles that would have been sold on PlayStation absent

11 foreclosure. Carlton Decl. ¶ 8 (████████████████████████████████████████████

12 ██████████████████████████

13      245.   Professor Lee understates the cost of foreclosure by ignoring the impact that

14 eliminating the significant pool of PS *Call of Duty* gamers would have on the value of *Call of*

15 *Duty* to Xbox gamers. As a multiplayer cross-platform game, *Call of Duty*'s attractiveness

16 depends on quickly matching users of comparable skill levels. Reducing the size of the network

17 to a single platform would undermine the value of *Call of Duty* to Xbox gamers, and therefore

18 further drive down the incentive to foreclose. Carlton Decl. ¶ 8 ("Multiplayer games, like *Call of*

19 *Duty* in particular, benefit from network effects, which means that as more users play them, the

20 value of the game increases to everyone. This increases the incentive to distribute such a game

21 widely, on many platforms, and would raise the costs of making a game exclusive. Professor Lee

22 provides no plausible basis for discounting these effects with a game like *Call of Duty*."). Even

23 though the importance of maintaining cross-platform play was highlighted repeatedly at trial, the

24 FTC never sought to elicit any testimony from Professor Lee on this key issue and why he could

25 ignore the harms Xbox would suffer if it effectively eliminated cross-platform play of *Call of*

26 *Duty* by withholding it from Sony.

27

28

246.     The flaws in Dr. Lee's foreclosure model are also discussed below in Section II.B.1.a.iv. of the Conclusions of Law.

### C.     Professor Lee does not show that the transaction would harm competition between any platforms.

247.     Even without correcting any of the flaws in Professor Lee's models and underlying assumptions, and assuming that Xbox did withdraw *Call of Duty* from PlayStation as Professor Lee predicts, Professor Lee does not show that such a strategy would have any adverse impact on console competition. Although Professor Lee conclusorily claims that Microsoft will harm competition in the marketplace by "weaken[ing]" Sony, he does so without addressing Sony's many options for an effective competitive response. Lee Decl. ¶ 93. Indeed, Professor Lee acknowledged on cross-examination that Sony would in fact have competitive responses in the withholding scenarios he described. 6/27/23 Tr. (Lee), at 596:23-25.

248.     Dr. Lee's failure to consider Sony's competitive response and whether any theoretical "withholding" would harm competition is discussed further below in Section II.B.1.b of the Conclusions of Law.

249.     Professor Lee also failed to provide any economic model or other quantitative analysis of several key issues in this case, instead basing his opinions about those issues on untestable "qualitative evidence." *See, e.g.*, 6/27/23 Tr. (Lee), at 551:13. Despite the FTC's pivot to "partial foreclosure" as a theory of competitive harm, for instance, Professor Lee did not model partial foreclosure. 6/27/23 Tr. (Lee), at 551:3–552:5. Nor did Professor Lee model any effects on content library subscription services, 6/27/23 Tr. (Lee), at 556:14–557:1, or cloud gaming, 6/27/23 Tr. (Lee), at 557:2–10.

250.     Because of the modeling Professor Lee failed to do, the FTC has no quantitative evidence for three of its key theories of harm: (1) harm to competition in the console market due to partial foreclosure, (2) harm of any kind to competition in the purported content library subscription services market, and (3) harm of any kind to competition in the purported cloud gaming market.

**VII.    The Transaction Would Produce Significant Pro-Competitive Benefits.**

251.    Vertical mergers produce efficiencies by internalizing pricing externalities, aligning the incentives of the merging firms, and reducing transaction costs between the merging firms. Carlton Decl. ¶¶ 10–12; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 755c (online ed. Aug. 2022). In fact, the presumptively pro-competitive effects of vertical mergers are so widely recognized that the FTC's own expert acknowledges their "beneficial" effects. Lee Decl. ¶ 55; *see also, e.g.*, Gregory S. Crawford, Robin S. Lee, Michael D. Whinston, & Ali Yurukoglu, *The Welfare Effects of Vertical Integration in Multichannel Television Markets*, 86 Econometrica 891 (2018) (academic work by Professor Lee recognizing the pro-competitive effects of vertical integration).

252.    As explained above, the merger will expand output by ensuring *Call of Duty* and other Activision games will be available via subscription and on cloud gaming platforms for the first time. But the merger will expand output in other ways as well, benefiting consumers and increasing competition. For example, the merger will increase incentives to invest in video game development. Carlton Decl. ¶ 20. This is because the combined company will capture more of the incremental profits from investments developing new games or franchises or improving existing games or franchises than Activision does as an independent game developer. *Id*. Additionally, "because adding *Call of Duty* to Game Pass will result in an increase in the number of Game Pass users, that gives Microsoft more incentive to invest in other games, not just Activision games." *Id*.

253.    Professor Lee improperly dismisses the significant procompetitive effects of the merger by speculating that all of the benefits could be obtained through private contracting. *See e.g.*, Carlton Decl. ¶ 20 ("This alignment of incentives [with respect to investment in game development] between Microsoft and Activision has not been and likely cannot be achieved by contract" due to contracting costs, uncertainty, and asymmetric information.").

254.    Professor Lee *also* dismisses the commitments that Microsoft has made to console manufacturers and cloud gaming services, by opining that Microsoft would deviate from those

1   agreements if it had economic incentives to do so. This is counter to the reality that a "a firm's

2   reputation" and "court proceedings, create incentives to rely on contracts." Carlton Decl. ¶ 20.

3   "To assume that contracts cannot effectuate transactions is an extreme assumption, especially

4   when the contractual terms are similar to—or better than—those of the contracts that already

5   exist." *Id*.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**PROPOSED CONCLUSIONS OF LAW**

2

**I.    Legal Standard**

3

      **A.    Section 7 of the Clayton Act**

4           1.      Under Section 7 of the Clayton Act, the FTC bears the burden of demonstrating

5 that this merger "is likely to substantially lessen competition in the relevant market." *United*

6 *States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019); *see* 15 U.S.C. § 18; *United States v.*

7 *Oracle Corp.*, 331 F. Supp. 2d 1098, 1109 (N.D. Cal. 2004) (rejecting merger challenge because

8 government failed to prove "merger will likely lead to a substantial lessening of competition").

9           2.      In making this showing, the FTC cannot "veer into the realm of ephemeral

10 possibilities." *FTC v. Meta Platforms Inc.*, No. 5:22-cv-04325-EJD, 2023 WL 2346238, at *28

11 (N.D. Cal. Feb. 3, 2023); *see also FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 115 (D.D.C.

12 2004) (Section 7 analysis "deals in *probabilities* not ephemeral possibilities"); *United States v.*

13 *Baker Hughes, Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990) (Section 7 "involves probabilities,

14 not . . . possibilities"); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 220

15 (D.C. Cir. 1986) (Section 7 "applies a much more stringent test than does rule-of-reason analysis

16 under section 1 of the Sherman Act"). Nor can the FTC rely on "assumptions and simplifications

17 that are not supported by real-world" facts, *Am. Booksellers Ass'n v. Barnes & Noble, Inc.*, 135

18 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001), or ignore the "economic reality" of the markets at

19 issue, *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004). Instead,

20 taking that economic reality into account, the agency must prove a "reasonable probability of

21 anticompetitive effect." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984) (per

22 curiam); *see also United States v. Marine Bancorp. Inc.*, 418 U.S. 602, 623 n.22 (1974) (alleged

23 harm to competition must be "sufficiently probable and imminent" to warrant relief).

24           3.      In vertical mergers[11] such as this, the FTC carries a particularly heavy burden

25 because "[v]ertical mergers often generate efficiencies and other procompetitive effects." *United*

---

26 [11] A vertical merger is "one that involves firms that do not operate in the same market." *AT&T*, 310 F. Supp. 3d at

27 192 (citation omitted). The FTC concedes that "the Proposed Acquisition is a vertical transaction" and should be analyzed as such. FTC Pre-Trial COL ¶ 29.

28

DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-CV-02880-JSC)

1   *States v. AT&T Inc.*, 310 F. Supp. 3d 161, 197 (D.D.C. 2018), *aff'd United States v. AT&T, Inc.*,

2   916 F.3d 1029 (D.C. Cir. 2019); *see* Carlton Decl. ¶ 11 & n.6. The standard for enjoining a

3   vertical merger is so demanding that U.S. antitrust agencies have rarely even tried to do so: until

4   2017, the government had not litigated a challenge to a vertical merger for four decades, *see*

5   *AT&T*, 310 F. Supp. 3d at 193–94, and its recent court challenges to vertical mergers have all

6   failed, *see id.*; *United States v. UnitedHealth Group*, No. 1:22-cv-0481, 2022 WL 4365867

7   (D.D.C. Sept. 21, 2022).

8        4.      Unlike in horizontal merger cases, the FTC "cannot use a short cut to establish a

9   presumption of anticompetitive effect through statistics about the change in market

10  concentration, because vertical mergers produce no immediate change in the relevant market

11  share." *AT&T, Inc.*, 916 F.3d at 1032. Instead, the FTC must make a merger-specific, market-

12  specific factual showing of how the merger is likely to result in a substantial lessening of

13  competition, taking marketplace realities into account. *Id.* And the "ultimate burden of

14  persuasion . . . remains with the government at all times." *Baker Hughes*, 908 F.2d at 983.

15       5.      Indeed, because vertical mergers are generally procompetitive, the FTC's burden

16  of proving a substantial lessening of competition is higher for vertical mergers than it is for

17  horizontal mergers. *See, e.g.*, *AT&T*, 310 F. Supp. 3d at 197 ("Vertical mergers often generate

18  efficiencies and other procompetitive effects."); *Comcast Cable Commc'ns, LLC v. FCC*, 717

19  F.3d 982, 990 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("Vertical integration and vertical

20  contracts in a competitive market encourage product innovation, lower costs for businesses, and

21  create efficiencies—and thus reduce prices and lead to better goods and services for

22  consumers."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust*

23  *Principles and Their Application*, ¶ 755c (online ed. Aug. 2022). ("Vertical integration is

24  ubiquitous in our economy and virtually never poses a threat to competition when undertaken

25

26

27

28

1    unilaterally and in competitive markets. . . . If the secondary market is competitive, vertical

2    integration as such is rarely anticompetitive.").[12]

3           6.      Nevertheless, the FTC argues that "[t]he same burden-shifting framework applies

4    to both horizontal and vertical mergers." FTC Pre-Trial COL ¶ 28. It is unclear what the FTC

5    means by that statement because, again, there is no "short cut" analogous to market-share metrics

6    that can flip any burden (even of production, let alone persuasion) to the defendants, *see AT&T*,

7    916 F.3d at 1032, and the FTC does not identify one. *See also Republic Tobacco Co. v. N. Atl.*

8    *Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) ("We must be cautious about importing relaxed

9    standards of proof from horizontal agreement cases into vertical agreement cases. To do so might

10   harm competition and frustrate the very goals that antitrust law seeks to achieve."). The FTC

11   likewise accomplishes nothing by quoting the unremarkable proposition that all mergers "must

12   be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate,

13   or other." FTC Pre-Trial COL ¶ 28 (quoting *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577

14   (1967)). That proposition means only that all mergers are subject to Section 7's "substantially

15   lessen competition" standard, not that the modes of economic analysis are the same.

16          7.      To satisfy its burden under Section 7 to show a substantially lessening of

17   competition, the FTC must first "define the relevant market," which in turn requires identifying

18   both "(1) the relevant product market and (2) the relevant geographic market" in which the

19   anticompetitive effects will allegedly occur. *Meta Platforms Inc.*, 2023 WL 2346238, at *8

20   (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962)). "The outer boundaries of a

21   product market are determined by the reasonable interchangeability of use or the cross-elasticity

22   of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325. Put

23   differently, courts must "look at whether two products can be used for the same purpose, and, if

24

---

25   [12] The FTC relies heavily on its own administrative opinion in *In re Illumina, Inc. & Grail, Inc.*, No. 9401, 2023 WL
     2823393, at *19 (F.T.C. Mar. 31, 2023). The FTC's opinions are not binding on the Court and are rarely cited in

26   Section 7 cases. *Illumina* is particularly weak support here since the facts are inapposite to this matter (as it involved
     a merger of an alleged monopoly supplier of an indispensable input), and the FTC's administrative decision has

27   been stayed pending appeal. *See* Order, *In the Matter of Illumina, Inc. & Grail, Inc.*, No. 9401 (F.T.C. Apr. 24,
     2023); *Illumina v. FTC*, No. 23-60167 (5th Cir. petition filed Apr. 5, 2023).

28

1   so, whether and to what extent purchasers are willing to substitute one for the other." *United*

2   *States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011) (citation omitted). The relevant

3   market must also be defined with precision; the FTC may neither combine distinct markets into a

4   single market nor artificially subdivide a market into smaller slivers. *See, e.g.*, *Hicks v. PGA*

5   *Tour, Inc.*, 897 F.3d 1109, 1120–21 (9th Cir. 2018); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278,

6   294–95 (D.D.C. 2020).

7           8.      If it properly identifies a relevant market, the FTC must then prove that the

8   merger "is likely to substantially lessen competition in the relevant market." *AT&T, Inc.*, 916

9   F.3d at 1032.

10         **B.**    **Preliminary Injunction Standard**

11             **1.**    **Likelihood of ultimate success**

12           9.      Section 13(b) of the FTC Act authorizes federal district courts to grant a

13   preliminary injunction against a challenged merger "[u]pon a proper showing that, weighing the

14   equities and considering the Commission's likelihood of ultimate success, such action would be

15   in the public interest." 15 U.S.C. § 53(b). This standard requires a court to (1) "determine the

16   likelihood that the [FTC] will ultimately succeed on the merits" and (2) "balance the equities."

17   *Warner Commc'ns Inc.*, 742 F.2d at 1160.

18          10.     A sufficient likelihood of success requires "more than mere questions or

19   speculations supporting" allegations of anticompetitive conduct. *Meta Platforms Inc.*, 2023 WL

20   2346238, at *8. The standard is a rigorous one: the FTC meets its burden only when it proves

21   that the transaction "raise[s] questions going to the merits so serious, substantial, difficult and

22   doubtful as to make them fair ground for thorough investigation, study, deliberation and

23   determination." *Warner Commc'ns Inc.*, 742 F.2d at 1162; *see also FTC v. Thomas Jefferson*

24   *Univ.*, 505 F. Supp. 3d 522, 537 (E.D. Pa. 2020) ("To stop a merger, a Section 7 plaintiff

25   ultimately must show that a 'substantial lessening of competition' is 'sufficiently probable and

26   imminent.'") (quoting *Marine Bancorp*, 418 U.S. at 623 n.22).

27

28

11.     Likewise, a court may not determine the agency's "'likelihood of success' by [relying on] a statistical calculation of the parties' odds" before the agency tribunal. *See FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2022 WL 16637996, at *5 (N.D. Cal. Nov. 2, 2022). Instead, a court must exercise its "'independent judgment' and evaluat[e] the FTC's case and evidence on the merits." *Id.* Courts have uniformly insisted on such a robust showing not only because a preliminary injunction blocking a merger is an "extraordinary and drastic remedy," *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980) (citation omitted), but also because such injunctions often "kill, rather than suspend, a proposed transaction." *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1087 (D.C. Cir. 1981).

12.     The FTC flatly contradicts this precedent when it advocates a far laxer standard under which courts would enjoin mergers based on "doubts" or "questions" about its competitive effects. *See* FTC Pre-Trial COL ¶¶ 8–14; *but see, e.g.*, *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999) ("A showing of a fair or tenable chance of success on the merits will not suffice for injunctive relief.").

13.     The FTC also flatly contradicts its own long-standing position that, despite superficial differences in statutory language, the standard that courts actually apply in Section 13(b) cases brought by the FTC is functionally equivalent to the standard that courts apply in merger challenges brought by the Department of Justice.[13] The FTC has described the state of the law to Congress as follows:

> [W]hile the preliminary injunction standard prescribed for the FTC under Section 13(b) of the FTC Act is worded differently than the one that applies to DOJ, the FTC, *like DOJ*, is required to make a *robust evidentiary and legal showing* that the transaction would likely be anticompetitive in order to obtain a preliminary injunction. . . . [A]ny effort to seek a federal court injunction against a proposed merger requires the FTC or [DOJ] to present a *convincing factual and legal basis for competitive concern* in order to secure appropriate relief. Indeed, *federal district courts closely scrutinize cases* brought by both agencies. For example, in [*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 23 (D.D.C. 2015),] the court ruled that Section 13(b) "demands *rigorous proof* to block a proposed merger or acquisition." . . . *Notably, there is no evidence to suggest that there is a difference in outcomes as*

---

[13] The two agencies share antitrust authority and divide up cases pursuant to an ad hoc, non-public "clearance" process. The FTC presented the testimony quoted in the text to dispel any concern that this process produces arbitrarily different outcomes depending on which agency pursues a given merger challenge.

*between the FTC and the DOJ despite the differently-worded preliminary injunction standard.*

Prepared Statement of the FTC Before the U.S. Sen. Comm. on the Judiciary 13 (Oct. 7. 2015), https://bit.ly/3NQ354T ("*FTC 13(b) Statement*") (emphases added) (citation omitted). Nothing has happened in the interim to change any of these observations; to the contrary, courts have continued to deny preliminary injunctions in cases where the FTC falls short of its "rigorous" burdens.

14.     The cases on which the FTC now relies for its contrary litigating position do not remotely support it. For example, FTC quotes *FTC v. Whole Foods Market*, 548 F.3d 1028 (D.C. Cir. 2008), for the implausible proposition that "[d]efendants must dispel any and all doubts about the legality of their transaction, such that the court would be 'certain[]' and have 'no doubt that [the] merger would not substantially lessen competition.'" FTC Pre-Trial COL ¶ 10. *Whole Foods* says nothing of the kind. The full quote from the D.C. Circuit's decision (reversing the district court on factual grounds) reads as follows:

> Thus, considering the defendants' evidence as well as the FTC's, as it was obligated to do, the [district] court was in no doubt that this merger would not substantially lessen competition, because it found the evidence proved Whole Foods and Wild Oats compete among supermarkets generally. If, and only if, the district court's certainty was justified, it was appropriate for the court not to balance the likelihood of the FTC's success against the equities. . . . However, the court's conclusion was in error.

548 F.3d at 1036–37. This passage states only that a district court may completely ignore "the equities" only if it first correctly rules against the FTC on likelihood of success on the merits. It does *not* state that the FTC prevails *on that threshold merits inquiry* unless "[d]efendants . . . dispel any and all doubts about the legality of their transaction." FTC Pre-Trial COL ¶ 10.[14] Indeed, if that were the standard, the FTC would always win its Section 13(b) motions to enjoin mergers, whereas in fact the FTC often loses such motions under the "rigorous" standard the

---

[14] The FTC also cites *Warner Communications* for the proposition that this Court cannot "resolve the conflicts in the evidence . . . or undertake an extensive analysis of the antitrust issues." PI Reply 12 (quoting *Warner Commc'ns*, 742 F.2d. at 1164)). The FTC wrenches this language from its context, which makes clear that a court should "not ignore the evidence presented by the defendants which conflict[ed] with the Commission's evidence." *Warner Commc'ns*, 742 F.2d at 1164 (emphasis added).

1   FTC itself described for Congress (*FTC 13(b) Statement* at 13). *See*, *e.g.*, *Meta Platforms Inc.*,

2   2023 WL 2346238 (denying preliminary injunction); *Thomas Jefferson Univ.*, 505 F. Supp. 3d

3   522 (same); *RAG-Stiftung*, 436 F. Supp. 3d 278 (same); *FTC v. Steris Corp.*, 133 F. Supp. 3d 962

4   (N.D. Ohio 2015) (same); *FTC v. Lab'y Corp. of Am.*, No. SACV 10-1873 AG(MLGx), 2011

5   WL 3100372 (C.D. Cal. Mar. 11, 2011) (same); *Arch Coal*, 329 F. Supp. 2d 109 (same).

<h3>2.   Balance of the equities</h3>

7   15.   If the FTC can establish a likelihood of success, a court must then weigh the

8   public and private equities. *See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726–27 (D.C. Cir. 2001).

9   Public equities include the merger's procompetitive benefits, *Warner Commc'ns. Inc.*, 742 F.2d

10  at 1165, and the need to maintain the pre-merger "status quo" so the FTC can award effective

11  relief, *H.J. Heinz Co.*, 246 F.3d at 726. Harm to the merging parties if the merger is enjoined—

12  *i.e.*, "private equities"—is also "entitled to serious consideration." *Warner Commc'ns. Inc.*, 742

13  F.2d at 1165; *see also FTC v. Freeman Hosp.*, 69 F.3d 260, 272 (8th Cir. 1995) ("The FTC argues

14  that the district court erred as a matter of law by giving undue weight to the parties' private

15  interests in consummating the merger. Our cases make clear, however, that a district court may

16  properly consider *both* public and private equities in undertaking the weighing mandated by

17  Section 13(b)."); *Weyerhaeuser*, 665 F.2d at 1083 (courts "have no warrant to drop private

18  equities from the calculus"). Moreover, because the issuance of a preliminary injunction is an

19  "extraordinary and drastic remedy," *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980),

20  in weighing the public and private equities, a court should consider whether less intrusive

21  alternatives would be effective to maintain the status quo even if it finds that the FTC has

22  established likelihood of success on the merits, *id.* at 1344.

23  16.   Any consideration of the equities must account for the reality that "a preliminary

24  injunction may kill, rather than suspend, a proposed transaction." *FTC v. Weyerhaeuser Co.*, 665

25  F.2d 1072, 1087 (D.C. Cir. 1981); *see Exxon Corp.*, 636 F.2d at 1343 ("[A]s a result of the short

26  life-span of most tender offers, the issuance of a preliminary injunction blocking an acquisition

27  or merger may prevent the transaction from ever being consummated."); *Mo. Portland Cement*

28

1    *Co. v. Cargill Inc.*, 498 F.2d 851, 870 (2d Cir. 1974) ("the grant of a temporary injunction in a

2    Government antitrust suit is likely to [spell] the doom of [the] agreed merger"); Kenneth Marks

3    *et al.*, *Middle Market M&A* 114 (2012) ("Time kills deals!"). Indeed, decades of experience with

4    Section 13(b) confirms that preliminary injunctions invariably do kill deals. There appears to be

5    no case in which a court has issued a preliminary injunction under Section 13(b) enjoining an

6    unconsummated merger and the merging parties then extended their agreement for the multiyear

7    period necessary to litigate the underlying administrative proceedings (in which the FTC nearly

8    always rules for itself) and obtain appellate review. Again, that is precisely why Section 13(b)

9    requires "rigorous proof" from the FTC before enjoining a merger, as a Section 13(b) injunction

10   in such cases is preliminary in name only. *See FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 23

11   (D.D.C. 2015); *see also Arch Coal, Inc.*, 329 F. Supp. at 116 ("Given the stakes, the FTC's

12   burden is not insubstantial.").

13   **II.    The FTC Has Failed to Show That It Is Likely to Succeed on the Merits.**

14       **A.    The FTC Has Failed to Identify a Proper Relevant Antitrust Market.**

15       17.    To meet its burden to show a substantial lessening of competition, the FTC must

16   first "define the relevant market" in which anticompetitive effects will allegedly occur. *FTC v.*

17   *Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). Defining the relevant market "is a necessary

18   predicate to deciding whether a merger contravenes the Clayton Act." *Marine Bancorp.*, 418

19   U.S. at 618 (internal quotation marks omitted). The burden to establish a relevant market falls

20   entirely on the FTC; a defendant has no corresponding obligation to propose alternative markets.

21   *See RAG-Stiftung*, 436 F. Supp. 3d at 299–300, 303.

22       18.    A relevant market has two components: a product market and a geographic

23   market. *See FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 37 (D.D.C. 2009). A product market

24   "identifies the products and services with which the defendants' products compete." *Id.* Its "outer

25   boundaries . . . are determined by the reasonable interchangeability of use or the cross-elasticity

26   of demand between the product itself and other substitutes for it." *Brown Shoe*, 370 U.S. at 325.

27   Put another way, "products constitute part of a single product market if they are reasonably

28

1   interchangeable by consumers for the same purposes." *Xerox Corp. v. Media Scis., Inc.*, 660 F.

2   Supp. 2d 535, 543 (S.D.N.Y. 2009).

3        19.    The product market is defined by the substitutes a consumer *could* turn to if the

4   combined company increased price or decreased quantities, including substitutes they would not

5   prefer under pre-merger circumstances. *See Oracle Corp.*, 331 F. Supp. 2d at 1131 ("Customer

6   preferences towards one product over another do not negate interchangeability."). As a result,

7   even products that vary "widely" on issues like price or quality "may, in fact, be in the same

8   market" if customers could substitute them. *See id.* at 1121.

9        20.    A geographic market is "the area to which consumers can practically turn for

10  alternative sources of the product and in which the antitrust defendants face competition." *FTC v.*

11  *Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 49 (D.D.C. 1998); *accord, e.g.*, *Marine Bancorp.*, 418

12  U.S. at 620–21. "Like the product market, the geographic market must correspond to the

13  commercial realities of the industry and be economically significant." *Sysco Corp.*, 113 F. Supp.

14  3d at 48 (internal quotation marks omitted).

15       21.    If the FTC fails to appropriately define either the product market or the

16  geographic market, the agency "has not met its burden," and its preliminary injunction motion

17  must be denied. *See RAG-Stiftung*, 436 F. Supp. 3d at 309.

18       22.    Here, the FTC proposes four relevant product markets and one relevant

19  geographic market. The proposed product markets are: (i) high-performance consoles; (ii)

20  multigame subscription services; (iii) cloud gaming subscription services; and (iv) a combined

21  multigame and cloud gaming subscription services market. Compl. ¶¶ 71–104. The proposed

22  geographic market is the United States. Compl. ¶¶ 105–108.

23       23.    None of the FTC's proposals satisfies the criteria for a relevant market. With

24  respect to the "high-performance consoles" market, the FTC's proposed market arbitrarily

25  excludes Nintendo Switch and PC gaming in order to conjure the illusion that Xbox has market

26  power. In fact, Microsoft is the third-place console maker (out of three), and any increase in

27  market share as a result of this merger will *lessen* market concentration by making a straggling

28

1    competitor more competitive. And with respect to the other three proposed product markets, the

2    FTC presents an inaccurate picture of the gaming industry. Finally, with respect to the proposed

3    geographic market, the FTC erroneously limits the market to the United States, when in reality

4    both Microsoft and Activision compete in dynamic global markets.

5              **1.      "High-performance consoles" are not a relevant product market.**

6          24.    The FTC offers two putative console markets: the first proposes that PlayStation 5

7    and Xbox Series X and S consoles alone constitute a "high performance" console market, while

8    the second acknowledges that Nintendo competes directly with PlayStation and Xbox. Any

9    relevant market, however, "must encompass the product at issue as well as *all* economic

10   substitutes for the product." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir.

11   2008) (emphasis added). Doing so "ensures that the relevant product market encompasses 'the

12   group or groups of sellers or producers who have actual or potential ability to deprive each other

13   of significant levels of business.'" *Hicks*, 897 F.3d at 1120–21 (quoting *Newcal Indus.*, 513 F.3d

14   at 1045). The relevant market thus may not be "contorted to meet [the FTC's] litigation needs,"

15   *id.* at 1121, because "a market definition that is too narrow or excludes relevant competition is

16   misleading," *Malaney v. UAL Corp.*, No. 3:10-CV-02858-RS, 2010 WL 3790296, at *5 (N.D.

17   Cal. Sept. 27, 2010), *aff'd*, 434 F. App'x 620 (9th Cir. 2011). Here, both of the FTC's proposed

18   console market definitions fail as a matter of law because the first arbitrarily excludes Nintendo

19   and they both arbitrarily exclude PCs.

20             **a.      The console market must include Nintendo.**

21         25.    First, there is no basis for excluding Nintendo from any market. The Nintendo

22   Switch is the second most popular and fastest growing console among the three major

23   developers. In terms of installed base (██%), units sold (██%), and revenue (██%), Xbox is a

24   distant third behind Sony (██% base/██% units sold/██% revenue) and Nintendo (██% base/██%

25   units sold/██% revenue). 6/28/23 Tr. (Bailey), at 783:21–784:2; *see* RX5055, at 9 ex. 4. By

26   excluding Nintendo, the FTC artificially elevates Xbox's market share from ██████████████

27   ████. Such low shares are below those that would be indicative of market power, especially

28

1   given the competition that Microsoft faces from larger rivals. *See Jefferson Parish Hosp. No. 2 v.*

2   *Hyde*, 466 U.S. 2, 7–8, 27 (1984).

3          26.     Contrary to the position of the FTC and its expert, Sony, Nintendo, and Xbox all

4   compete in a dynamic platform market, as evidenced by gamer behavior, marketplace dynamics,

5   and internal Xbox, Sony, and Nintendo communications. Singer Dep. 224:14–225:20

6   ███████████████████████████████████████████████████████████ 6/28/23 Tr.

7   (Nadella), at 850:4 (describing the console market as "us and Sony and Nintendo"); RX2069.

8          27.     Gamer behavior also demonstrates that Xbox and PlayStation compete with the

9   Switch for customers and playtime. In particular, Xbox and Sony data show that the release of

10  the Switch in March 2017 led to a substantial decline in the number of weekly users and hours

11  spent per week playing Xbox and PlayStation. 6/28/23 Tr. (Bailey), at 779:2–780:21; *see*

12  RX5055, at 69–71 exs. 38–41.[15] As Dr. Bailey explained, these data are powerful evidence of

13  substitution because "Not only did [Switch users] play on it and purchase it, but more

14  specifically *Xbox gamers and PlayStation gamers switched*. They switched entirely their gaming

15  behavior and they switched in part their gaming behavior." 6/28/23 Tr. (Bailey), at 781:19–25. In

16  other words, this was not new customers entering the console market, but rather existing Xbox

17  and PlayStation users deciding to spend their time and money on a different console. *Id.* at

18  782:5–10.

19         28.     Contemporaneous internal Xbox and Sony communications and sworn testimony,

20  including the deposition of Jim Ryan and ███████████████████, likewise confirm

21  that both companies view the Switch as ███████████████████████

22  ███████████; *see* Ryan Dep. 108:09–24; *see also* 6/22/23 Tr. (Booty), at 58:23–59:4 ("[W]e

23  consider from a platform release standpoint the Switch to be one of that same line-up."); 6/22/23

24  Tr. (Bond), at 167:18:22–23; 6/23/23 Tr. (Spencer), at 435:1–15 ("[I]f [customers] purchase the

25  Switch, they likely did not purchase an Xbox. So I would see it as competition."); Wright Stip.

26  ───────────────────

27  [15] ███████████████████████████████████████████████████

28  ██████████████████████████████████████████████.

1   (Dkt. 228), at 8–9 ("Our gaming platform competes with console platforms for Nintendo and

2   Sony.").

3        29.    The FTC focuses on internal Microsoft documents specifically comparing Xbox

4   sales against PlayStation. This is flawed for at least three reasons. First, many of those same

5   documents also track Xbox's performance against both PlayStation and Switch.

6

7

8

9

10

11

12

13

14   *See, e.g.*, RX5046. Second, Microsoft tracks Xbox's performance against PlayStation not

15   because those two consoles provide a complete competitive landscape, but rather because they

16   were released at the same time. *E.g.*, 6/22/23 Tr. (Bond), at 159:24–160:3; 6/23/23 Tr. (Nadella),

17   at 849:11–19. Switch was released three years earlier, and Nintendo is expected to release the

18   successor to the Switch as early as next year, whereas PlayStation 5 and the Xbox Series X|S are

19   at a different stage of the console life cycle. *E.g.*, 6/23/23 Tr. (Spencer), at 290:15-22. In

20   addition, Microsoft CEO Satya Nadella testified that the chips for both the Xbox and PlayStation

21   consoles are manufactured by the same designer, which created a "supply constraint";

22   accordingly, Microsoft tracked PlayStation 5 sales in order to ensure that Xbox was getting its

23   "fair share." 6/28/23 Tr. (Nadella), at 849:19–22. Third, what Microsoft tracks internally is

24   irrelevant to the market definition question; what matters is how *consumers* view the

25   substitutability of these gaming platforms.

26

27

28

30.     Moreover, the FTC itself in this litigation has described Nintendo as one "of [Microsoft's] competitors." *See* Dkt. 181, at 1 (listing Nintendo as one of the competitors with which Microsoft has executed agreements to provide *Call of Duty*).

31.     The FTC assumes without evidence that certain features that make some Xbox and PlayStation models similar to one another warrant a narrowly defined market for so-called "high-performance consoles," despite the absence of any evidence that anyone in the gaming industry uses that terminology. In reality, consumers weigh a variety of factors—including performance, cost, and game library—and goods can be substitutes for one another even where they vary dramatically on qualities such as "price, use and qualities." *See, e.g., Oracle Corp.*, 331 F. Supp. at 1131. In fact, Xbox and PlayStation differentiate their own products in material ways in order to *compete* with each other and the Switch along each of these dimensions.

32.     ***Price.*** The FTC contends that Xbox and PlayStation constitute a market of two because they are offered at a similar price. That is unpersuasive. To begin with, "[t]he Supreme Court has repeatedly held that a price differential alone is insufficient to infer two separate product markets." *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007). Equally important, the FTC's analysis considers only the high-end models of Xbox (Series X) and PlayStation (Standard Edition), thereby ignoring the differentiation within Xbox's console lines. In fact, the entry-level versions of the current Xbox and Switch are offered at the same price point ($299.99), 6/27/23 Tr. (Lee), at 625:22–626:3, and the Xbox Series S is sold for $50 less than the Switch OLED model ($349.99). In fact, Xbox CFO Tim Stuart testified that the price for the Xbox Series S was set in light of the price of the Switch. *See* 6/29/23 Tr. (Stuart), at 1030:5–1031:5 (Q. "And do you look at Switch pricing when you're considering the pricing of Xbox Series S?" A. "Yes." Q. "And is that one of the reasons you set the price where you guys did?" A. "Yes.").

33.     ***Performance.*** While the FTC focuses on technical differences between Xbox, PlayStation, and the Switch, the fact is that Xbox and PlayStation are also differentiated on performance. The less expensive Xbox Series S has less GPU processing power, system memory,

1  and internal storage and renders images at a lower resolution than the Xbox Series X or

2  PlayStation 5. 6/23/23 Tr. (Spencer), at 273:7–11. ████████████████████

3  ████████████████████████████████████████████████████

4  ███████████████████████████████████████████████

5  ██████████████████████████████.[16] ██████████████████████

6  █████████████████████████████████████████████

7  ███████████████████████████.

8      34.    As for the Switch, while the console has lower technological specifications than

9  Xbox and PlayStation 5, it has some obvious advantages over those two consoles, including a

10  screen, a battery, and portability—consumers can use the device either handheld or plugged into

11  a television through a docking station. *See, e.g.*, 6/23/23 Tr. (Spencer), at 274:18–275:2, 435:16–

12  437:2. There is no evidence to support the FTC's assumption that Xbox and PlayStation

13  customers prioritize performance above all other measures, such that they would never even

14  consider the Switch, when those very customers make trade-offs between performance and

15  cost—especially given that the Switch offers features and functionality not available on any other

16  console.

17      35.    ***Content.*** The FTC argues that the Switch is somehow not a competitor to Xbox

18  and PlayStation because certain games available on those platforms are not available on the

19  Switch. But many of the most popular games on PlayStation and Xbox consoles are also

20  available on the Switch, including *Fortnite*, *Minecraft*, *Rocket League*, *Lego Star Wars*, *Fall*

21  *Guys*, and the *FIFA*, *MLB The Show*, and *NBA 2K franchises*. 6/28/23 Tr. (Bailey), at 782:5–

22  783:10; *see* RX5055, at 71–72 ex. 88; *see also* 6/23/23 Tr. (Spencer), at 435:20–46:5 (testifying

23  that the games most successful on Switch are "the same third-party games that are successful on

24  PlayStation and Xbox for the most part"). Although some popular Xbox and PlayStation games

25  are not available on the Switch, many of those titles are platform exclusives (*e.g.*, the *Halo*

26

27  [16] *See also* Ian Eveden, *PS5 Pro and Slim: Everything We've Heard About Sony's Future Console Upgrades*, Stuff (June 15, 2023), https://bit.ly/43HbYU5.

28

1   (Xbox) or *Last of Us* (PlayStation) franchises); are coming to the Switch in the near future (*e.g.*,

2   *Hogwarts: Legacy*); or, in the case of the *Call of Duty* franchise, will become available on the

3   Switch as a result of this merger. Moreover, these games generally allowed cross-platform play

4   between PlayStation, Xbox, and Switch. 6/28/23 Tr. (Bailey), at 782:5–783:10.

5       36.     The FTC's argument also fails to account for the fact that differences between the

6   game catalog for the Switch and the game catalogs of other platforms is due in large part to the

7   many Nintendo-exclusive titles (such as *Pokémon*, *Mario*, and *Zelda*) that Nintendo releases on

8   the Switch every year. The fact that Nintendo Switch has games that are not available on Xbox or

9   PlayStation hardly shows that the Switch is a "different" product. Nintendo instead uses its

10  exclusive titles to Nintendo instead uses its exclusive titles to attract consumers and better

11  compete with Xbox and PlayStation—as those platforms do as well. And because so many

12  games *are* available on all three consoles, it is clear that there is a high degree of substitutability

13  that undercuts any narrower market definition. *See* 6/27/23 Tr. (Lee), at 529:15–19 ("I believe

14  that there is some substitution in that some consumers may elect to buy a Switch instead of a

15  PlayStation.").

16      37.     The FTC is also wrong to claim that Switch games are primarily marketed

17  towards children and adolescents. For example, *Diablo*, a rated-M (mature) game developed by

18  Activision subsidiary Blizzard is available on Switch. *See* 6/22/23 Tr. (Bond), at 129:7–130:1

19  ("Diablo involves "battl[ing] an unstoppable evil, which is the devil effectively, and you battle

20  through hell"). So, too, are other games with a mature game rating, such as *The Elder Scrolls V:*

21  *Skyrim*, *Dead by Daylight*, *Dying Light 2*, *Mortal Kombat 11*, *The Witcher 3: Wild Hunt*, and

22  *Hitman 3*.

23      38.     And, of course, Nintendo previously carried *Call of Duty* (a mature game), *See*

24  6/28/23 Tr. (Kotick), at 721:15–20, and plans to do so again. In his call with Phil Spencer

25  following the announcement of the Activision acquisition, the head of Nintendo North America,

26  Doug Bowser, expressed a strong desire to bring *Call of Duty* games back to Nintendo,

27  ultimately leading to an agreement with Microsoft to do so. *See* Bond Tr. 6/22/23 167:24–

28

1  169:18. Nintendo clearly understands its customer base differently—and more accurately—that

2  the FTC.

3          39.     Moreover, even accepting that Xbox and PlayStation are differentiated from the

4  Switch in certain ways, products "need not be identical to be considered reasonably

5  interchangeable," and thus part of the same market. *See W. Parcel Express v. United Parcel Serv.*

6  *of Am., Inc.*, 65 F. Supp. 2d 1052, 1059 (N.D. Cal. 1998) (requiring "consideration of the cross-

7  elasticity of demand"), *aff'd*, 190 F.3d 974 (9th Cir. 1999). To the contrary, it is settled law that

8  products may differ markedly and yet remain in the same product market given cross-elasticities

9  of demand. *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 400 (1956)

10  (holding that "cellophane's interchangeability with the other [flexible packaging] materials . . .

11  suffices to make it a part of" the same market despite significant differences); *see Hicks*, 897

12  F.3d at 1122 (alleged differences in price and effectiveness did not imply "a distinct market");

13  *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013)

14  (per curiam) ("perfect fungibility isn't required" for products to belong in the same antitrust

15  market). Likewise, that products are differentiated in ways that some customers prefer "do[es]

16  not negate interchangeability," because the relevant question "is not what [products] the

17  customers would *like* or *prefer*," but instead "what they *could* do in the event of an

18  anticompetitive price increase." *Oracle Corp.*, 331 F. Supp. 2d at 1131. Here, the evidence

19  shows that Xbox, PlayStation, and the Nintendo Switch all serve as substitutes and compete.

20          40.     Similarly, the FTC fixates on issues that are irrelevant to consumer behavior and

21  choices, such as whether the consoles are arbitrarily labeled by industry insiders as "Generation

22  8" or "Generation 9." *See* 6/23/23 Tr. (Spencer), at 435:4–8 ("'Generation 9' is very much an

23  industry term. As a customer, you're walking into the store because you want to buy a video

24  game console and there are three manufacturers on the shelf. There's one from Nintendo, one

25  from Sony, and two from Xbox."). Regardless of industry numbering conventions, the Nintendo

26  Switch is in the "current generation" of gaming consoles. 6/23/23/ Tr. (Spencer), at 434:22–

27  436:12; 438:14–439:4. Moreover, Nintendo is expected to release its next generation console in

28

DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(No. 3:23-CV-02880-JSC)

1  in the near future. *See* 6/28/23/ Tr. (Kotick), at 771:21–772:25 (emphasis added); *see also*

2  PX2421 ████████████████████████████████████████████████████

3  ████████████████████████████████.").

### b. PC gaming competes with consoles.

5  41.    There is also no basis for excluding PC gaming from any market. Leaders of both

6  Microsoft and Sony have identified PC gaming as a meaningful alternative (and competitor) to

7  console gaming. *See, e.g.*, Ryan Dep. 112:17–22 (PC is "a very direct competitor to the

8  PlayStation platform"); 6/22/23 Tr. (Bond), at 130:10–17 (Xbox "consider[s] PC and these

9  consoles [as] competing with each other").

10  42.    Consistent with its strategy to make more games available on devices customers

11  already own, Xbox views consoles and PCs both as "device[s] . . . people choose to play on,"

12  and makes its Game Pass subscription content available on both Xbox and PC. 6/22/23 Tr.

13  (Bond), at 130:16–17. Further, Microsoft is seeking to increase Xbox's footprint in PC gaming

14  specifically because "console is the smallest and slowest growing part of the market." 6/22/23 Tr.

15  (Bond), at 131:4–9.

16  43.    Customers, too, see PC and console as substitutes. PC games can be downloaded

17  directly from publishers or can be accessed through distributors like Steam, and PC gaming

18  offers specifications and features that are comparable to or even greater than those offered by

19  consoles. *See, e.g.*, 6/22/23 Tr. (Bond), at 173:16–19, 6/23/233 Tr. (Zimring), at 483:13–16;

20  6/27/23 Tr. (Lee), at 625:7–13. There is also substantial catalog overlap. In 2022, the top 15

21  games for both Xbox and PlayStation (and all but one of the top 30 Xbox titles and all but three

22  of the top 30 PlayStation titles) were also available on PC. And as with console, these PC games

23  enabled cross-platform play between PC and console. 6/28/23 Tr. (Bailey), at 784:12–23; *see*

24  RX5055, at 18–19 exs. 12–13.

25  44.    In addition, PCs have become an even closer substitute for consoles in recent

26  years due to the advent of cross-platform play, meaning that a gamer on Xbox of PlayStation can

27  play the same game online against a gamer on a PC. 6/28/23 Tr. (Bailey), at 784:21–23.

28

45.     The FTC gainsays the likelihood that customers will switch from console to PC because *some* high-end gaming PCs are substantially more expensive than consoles. *See, e.g.*, 6/27/23 Tr. (Lee), at 624:13–20 (gaming PCs "can be \$1500"). However, customers can play PC games on much less advanced machines, and even where the PC costs more, they also get value from the additional functions that cannot be performed on a console. Further, the FTC's analysis discounts the substantial prevalence of "multi-homing"—*i.e.*, gamers who have a console *and* a PC that could support gaming. *See* 6/28/23 Tr. (Bailey), at 786:19–787:4. For these customers, the cost of switching from console to PC may be no more than the cost of buying a gaming controller for the PC they already own. *See* 6/29/23 Tr. (Closing), at 1085:11–12 (FTC counsel conceding "if someone owns a PC already, they can do the game [on their PC]").

## 2.     Multigame subscription services are not a relevant product market.

46.     As for the FTC's second proposed product market, multigame subscription services—such as Xbox's Game Pass or Sony's PlayStation Plus—are not their own market, but rather are simply an alternative way for consumers to pay for console, PC, or mobile games that are otherwise offered as standalone buy-to-play or free-to-play games. A decision from this District has already rejected a similar effort at "narrowing of a market to consideration of a subscription based payment model" rather than "the broader video game market generally." *Pistacchio v. Apple Inc.*, No. 4:20-cv-07034-YGR, 2021 WL 949422, at *2 (N.D. Cal. Mar. 11, 2021); *see also, e.g.*, *Blue Cross Blue Shield of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1409–11 (7th Cir. 1995) (rejecting the notion that distinct methods of payment for the same product constitutes separate product markets).

47.     In addition, it is highly speculative to assume that such services will become ascendant. Many game publishers, including Sony and Activision, fear that putting newly released games into multigame subscription services will cannibalize sales of those buy-to-play games, which is why they do not embrace that subscription model. 6/23/23 Tr. (Spencer), at 423:11–14; 6/28/23 Tr. (Kotick), at 744:5–22; Ryan Dep. 257:14–258:19; *see also* RX5055, ¶ 76 n.120.

1        48.     The FTC nonetheless contends that subscription services and buy-to-play titles are

2   in different markets, claiming that the data demonstrate only a movement of customers from

3   buy-to-play to subscription but not in the other direction, from subscription to buy-to-play. The

4   FTC nonetheless contends that subscription services and buy-to-play titles are in different

5   markets, claiming that the data demonstrate only a movement of customers from buy-to-play to

6   subscription but not from subscription to buy-to-play. But they cite no data in support. To the

7   contrary, years of data demonstrate not only that buy-to-play sales decrease when a game is

8   added to a subscription library, but also that buy-to-play sales increase when a game is removed

9   from a subscription library. *See* 6/28/23 Tr. (Bailey), at 787:19–788:22.

10        49.     . To the contrary, years of data demonstrate not only that buy-to-play sales

11   decrease when a game is added to a subscription library, but also that buy-to-play sales increase

12   when a game is removed from a subscription library. *See* 6/28/23 Tr. (Bailey), at 787:19–788:22.

13

14

15

16

17

18

19

20   RX5055, at 81–82, exs. 43–44. Subscription services thus compete directly with traditional buy-

21   to-play options: the inclusion of a game in Game Pass eliminates the need for a Game Pass

22   subscriber to buy the individual title. *See* 6/22/23 Tr. (Bond), at 141:17–22 ("THE COURT:

23   Why would anyone buy a $70 [game]? They wouldn't; right? Because they can always play it

24   through Game Pass?" THE WITNESS: You're probably right."). This is "strong, robust evidence

25   of substitution . . . between subscription service and but-to-play." 6/28/23 Tr. (Bailey), at

26   788:25–789:2. This is the only quantitative evidence of substitutability in the case, and it speaks

27   volumes.

28

50.     Ultimately, what differentiates content libraries from traditional buy-to-play offerings is the payment or revenue model, "replac[ing]" (in Professor Lee's words) a one-time payment for the disc or download with smaller payments every month for a suite of games, making the models just different ways to pay for the same games. PX5001-118. In fact, when asked by the Court whether library subscriptions are "just a different way to pay for the same games," Professor Lee equivocated and could not answer in the negative. 6/27/23 Tr. (Lee), at 639:10–640:6 ("It's, again, a good question . . . It's a key question for defining this market, right?").

51.     Further, the FTC's putative content-library market independently fails because it includes products that are not reasonable substitutes. Namely, the FTC contends that Xbox's Game Pass and Sony's PlayStation Plus are competitors. *E.g.*, Lee Decl. ¶¶ 17–18, 144, 147. In fact, Game Pass and PlayStation Plus are not directly substitutable because PlayStation Plus is not available on Xbox and vice versa, and a consumer therefore could not switch between these services without buying a new console. *See* 6/23/23 Tr. (Spencer), at 424:21–425:7. The FTC offers no evidence that a customer would react to a non-trivial increase in Game Pass price by switching to the PlayStation ecosystem, as opposed to simply buying physical or digital copies of individual games.

### 3.     Cloud gaming subscription services are not a relevant product market.

52.     The FTC's third proposed market, cloud gaming subscription services,[17] is similarly untenable. However, the FTC put forward only a muddled view of what the market looks like today, and the evidentiary record shows substantial doubt as to the future of that supposed market and what role (if any) Microsoft plays in it. It therefore cannot be a relevant antitrust market under Section 7, which requires the Court to evaluate effects on competition that are "sufficiently probable and imminent." *Marine Bancorp*, 418 U.S. at 623 n.2.

---

[17] Further demonstrating the instability of the FTC's "cloud gaming *subscription* service," the FTC and its expert include in the putative market services such as Nvidia GeForce Now that do not operate on a subscription model. *See, e.g.*, 6/22/23 Tr. (Bond), at 177:3–18 (explaining how GeForce Now requires customers to "purchase the game" from a place like Steam, then play it on the GeForce Now platform).

1    53.    Today, for Xbox, cloud-gaming capability is not a separate product but merely an

2    add-on to Game Pass that allows subscribers to try streaming games before downloading them.

3    6/22/23 Tr. (Bond), at 145:12–19. Within the small percentage of gamers who use Xbox cloud

4    gaming, █████ do so on an Xbox console—in other words, cloud gaming is content feature

5    for a small number of games played by a small number of console players. 6/22/23 Tr. (Bond), at

6    145:17–19; *see also* 6/28/23 Tr. (Bailey), at 790:4–791:2. Xbox does not offer a "bring your own

7    game" model, and it is not possible to access Microsoft's xCloud product without subscribing to

8    the highest tier of Xbox Game Pass. *E.g.*, 6/22/2 Tr. (Hines), at 92:20–22; 6/22/23 Tr. (Bond), at

9    192:25–193:3.[18]

10    54.    The FTC asks the Court to view the cloud gaming market not merely as one way

11    console gamers can access content on their consoles (as xCloud gamers overwhelmingly do), but

12    rather as a service where *non-console* gamers can play games in a device-agnostic ecosystem on

13    virtually any internet enabled device. There are two glaring problems with this market.

14    55.    *First*, by providing the functionality of a console without the upfront investment

15    in the hardware, this version of cloud gaming is a competitor to consoles and PCs, which

16    therefore must be included in the product market. *See, e.g.*, 6/23/23 Tr. (Zimring), at 483:7–14

17    (Google Stadia had the "perspective . . . that the existing console and PC gaming participants,"

18    including Xbox and PC, "were what represented who we were competing with"). From a

19    consumer's perspective, the technological distinction in how gaming content is delivered does

20    not by itself insulate cloud gaming from competition with console-based gaming or vice versa.

21    *See Ojmar US, LLC v. Sec. People, Inc.*, No. 16-CV-04948-HSG, 2017 WL 5495912, at *2

22    (N.D. Cal. Nov. 16, 2017) (technological differences between products "relate[] only to the

---

[18] Mr. Nadella testified that "I don't think of [cloud gaming] as . . . strictly a substitute to the console" at present because most gamers "love their console" and other gaming devices and "use cloud gaming as an adjunct," but added that "[y]ou have to be competitive in each of these platforms and then look around to see what is the way to expand the market." 6/28/23 Tr. (Nadella), at 834:11-14, 851:8-13. Mr. Nadella also emphasized that, for Xbox, cloud gaming is "not streaming alone," but includes "Xbox Live" as an "integral" part of gaming on the Xbox console or PC platforms. 6/28/23 Tr. (Nadella), at 835:10-20. Other cloud gaming providers take a different approach. Google Stadia, for instance, had the "perspective . . . that the existing console and PC gaming participants," including Xbox and PC, "were what represented who we were competing with." 6/23/23 Tr. (Zimring), at 483:7-14.

1  respective systems' peculiar features," not to whether customers would substitute one for the
2  other).

3      56.   *Second*, Microsoft does not currently compete in this market. Its xCloud service is
4  used almost exclusively by console gamers on their console, and its primary use case is for
5  gamers to try a game before or while downloading it for native play. 6/22/23 Tr. (Bond), at
6  145:17–19; *see also* 6/28/23 Tr. (Bailey), at 790:4–791:2 (xCloud is "largely [used to] play[] one
7  game they never played before and not playing it ever again," which is "exactly consistent with"
8  gamers using xCloud while the game downloads). Xbox does not offer a "bring your own game"
9  model, and it is not possible to access Microsoft's xCloud product without subscribing to the
10  highest tier of Xbox Game Pass. *E.g.*, 6/22/2 Tr. (Hines), at 92:20–22; 6/22/23 Tr. (Bond), at
11  192:25–193:3.

12      57.   To the extent the FTC is concerned not with cloud gaming as it exists today but
13  rather as it may exist in the future, this too is not a relevant product market. Even assuming that
14  perceived harm to a future, hypothetical market is relevant,[19] the FTC itself has recognized that
15  projecting harm in future markets "can be difficult," must be "strongly rooted in the evidence,"
16  and requires "considerable evidence" that the market will emerge and that the merger will result
17  in a substantial lessening of competition in that market. *In re Nielsen Holdings, N.V. & Arbitron
18  Inc.*, FTC File No. 131-0058, at 2–3; *see also, e.g., FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 4
19  (D.D.C. 2021) (rejecting FTC's reliance on a future market as "too speculative and conclusory").

20      58.   Here, the FTC has failed to make those necessary showings. ███████████████
21  ████████████████████████████████████████████████████████████████████████████
22  ██ and Activision's CEO believes that it is still more cost-efficient to process games on a local
23  device than in the cloud, 6/28/23 Tr. (Kotick), at 733:7–14. For that reason, the future of cloud

---

[19] The Supreme Court has never addressed whether harm to "potential competition is a viable theory of section 7 liability." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 75 (D.D.C. 2017); *see also Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 71 (1st Cir. 2002) (noting that "there is no possible way to predict just what would happen" had a challenged transaction not occurred); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1211 (2d Cir. 1981) ("The *existing market* provides the framework in which the probability and extent of an adverse impact upon competition may be measured." (emphasis added)).

1    gaming continues to be uncertain. *See, e.g.*, Ryan Dep. 83:25–84:10 (Q. "Do you agree that it's

2    very difficult to determine when great cloud gaming will be available?" A. "I'd certainly agree

3    it's difficult."). Further, given Xbox's struggles to make xCloud popular and profitable, there is

4    no basis for concluding that Xbox would have market power in any future "cloud gaming

5    market." 6/22/23 Tr. (Bond), at 145:2–11; 6/29/23 Tr. (Stuart), at 1035:15–20.

6                    **4.    The combination of multigame subscription services and cloud
                            gaming subscription services are not a coherent or relevant product
7                            market.**

8         59.    In addition to the separate multigame and cloud gaming subscription services

9    markets, the FTC also puts forward a putative market that combines these two markets (but not

10   other gaming) into a single "gaming services market." But this combined market is no more

11   coherent or tenable than its individual subparts.

12        60.    Multigame subscriptions and cloud gaming are offered at different levels of the

13   video gaming market. Multigame subscriptions, such as Xbox and PlayStation's subscription

14   services (Game Pass and PlayStation Plus, respectively) and subscription services offered by

15   publishers (*e.g.*, EA Play), are a way to purchase gaming content. Cloud gaming, in contrast, is a

16   delivery mechanism for gaming content—whether the game was acquired from a cloud

17   platform's native store, from a third-party developer or retailer, or, critically, from a content

18   library subscription provider. In other words, cloud gaming can be a *feature* of a subscription

19   service, but the two are not inherently linked—cloud gaming can also be a feature of a buy-to-

20   play or "freemium" acquisition model, such as Nvidia's GeForce Now, which provides cloud

21   gaming functionality for gamers who have already purchased the game. *See* 6/22/23 Tr. (Bond),

22   at 146:17–24.

23        61.    The FTC offers no evidence that customers view multigame subscription libraries

24   and cloud gaming as reasonably interchangeable for one another, and indeed, cloud gaming and

25   multigame libraries cannot compete with one another when some customers will use the former

26   to play the latter.

27

28

### 5. The relevant geographic market is global.

62.     The FTC's proposed geographic market is the U.S., but that narrow definition does not reflect market realities. Both Microsoft and Activision compete in global markets. 6/23/23 Tr. (Spencer), at 439:5–17 ("Gaming is very much a global market."); 6/28/23 Tr. (Nadella), at 850:13–16 ("Do you view gaming as a United States specific phenomenon" "Not really. I mean, it's a worldwide phenomenon. It's the same content worldwide. It's the same consoles worldwide, same PCs worldwide, same phone worldwide . . . ."). Those developing platforms and those developing games to play on those platforms "are looking to reach a global audience." *See* 6/23/23 Tr. (Spencer), at 439:10–440:13.

63.     Gamer demographic and identity are the same across geographic regions, whether measured by the distribution of gamer age, game-time hours, or popular games. 6/27/23 Tr. (Bailey), at 672:15–674:12; *see* RX5055, at 93–95 exs. 46–48, 102–109, exs. 52–59. These trends remain constant across all games, across all AAA games, and limited to just *Call of Duty*. 6/27/23 Tr. (Bailey), at 673:11–674:6.

64.     Both consoles and games are typically released on the same or near-same day in the United States and globally. 6/27/23 Tr. (Bailey), at 667:3–669:11; *see* RX5055, at 97–100 exs. 49–51. Virtually all top-selling Xbox and PlayStation games are played by gamers worldwide and allow for cross-regional play, which gives gamers access to a larger gaming pool and provides faster access to matches, no matter where they are located. 6/27/23 Tr. (Bailey), at 669:12–670:13, 671:19–672:14. Further, both consoles and video games are developed for and marketed on a global basis, *see* Ryan Dep. 17:10–13 ("Are you aware that Sony or SIE have any U.S. focused marketing campaigns that are set forth as separate from the global?" "I don't believe so.")], meaning a console bought in one country and a game bought in another will work with each other and can be used in any other country as well. And those games are, with limited exceptions, identical across markets. RX5055, at 98 ████████████████████████████████████████████████████████████████████████████████████████████████████ ").

65.     All of these data and observations demonstrate that "the nexus of competitive activity is global, not limited to the United States." 6/27/23 Tr. (Bailey), at 669:24–25, 674:16–22.

**B.     The FTC Has Failed to Show that the Proposed Merger Is Substantially Likely to Lessen Competition.**

66.     The FTC has alleged only a single theory of harm: vertical foreclosure. Courts place a heavy burden on the government in vertical merger cases because vertical integration is generally pro-competitive. *See, e.g.*, *AT&T*, 310 F. Supp. 3d at 197 ("Vertical mergers often generate efficiencies and other procompetitive effects."); *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) ("[V]ertical integration creates efficiencies for consumers."); *Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 990 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("Vertical integration and vertical contracts in a competitive market encourage product innovation, lower costs for businesses, and create efficiencies—and thus reduce prices and lead to better goods and services for consumers."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 755c (online ed. Aug. 2022) ("Vertical integration is ubiquitous in our economy and virtually never poses a threat to competition when undertaken unilaterally and in competitive markets."). Indeed, the government itself has stated that "[v]ertical mergers . . . should be allowed to proceed except in those few cases where convincing, fact-based evidence relating to the specific circumstances of the vertical merger indicates likely competitive harm." Delegation to the Organization for Economic Co-operation and Development, Competition Committee 2 (Feb. 15, 2007), bit.ly/3Cz9hIb.

67.     The FTC's central claim is that the combined firm would withhold certain Activision content—in particular, the *Call of Duty* franchise[20]—from its console, subscription, or cloud gaming competitors and that each of the alleged relevant markets would become substantially less competitive as a result. *Cf. UnitedHealth Grp. Inc.*, 2022 WL 4365867, at *25–27 (addressing, and rejecting, analogous vertical foreclosure theory). To establish such

---

[20] *See, e.g.*, Mot. for TRO at 19, 20 (emphasizing potential for withholding of *Call of Duty*); Compl. ¶¶ 6-7, 67, 115, 128 (same); FTC Pre-Trial FOF ¶¶ 183, 197-214, 327-30, 335-38, 349, 356, 358-60 (same).

1    "foreclosure" as a basis for opposing this transaction, the FTC must prove, among other things,

2    (1) that the combined company would have the *incentive* to withhold *Call of Duty* from rivals to

3    whom an independent Activision would otherwise sell *Call of Duty* (*i.e.*, that doing so would be

4    profitable despite the forgone sales to rivals), (2) that the combined company would have the

5    *ability* to do so (despite its long-term contracts to the contrary), and (3) that *competition* (as

6    opposed to individual competitors) would likely be harmed as a result. *See id.* A vertical merger,

7    in particular, "will not have an anticompetitive effect" where "substantial market power is absent

8    at any one product or distribution level." *Auburn News Co. v. Providence J. Co.*, 659 F.2d 273,

9    278 (1st Cir. 1981).

10         68.    To the extent the FTC suggests that *Brown Shoe* somehow excuses this showing,

11   it is mistaken. The FTC does not seriously claim that it can demonstrate harm from the merger

12   without showing that Xbox has the incentive and ability to withhold *Call of Duty*; without both,

13   there could be no withholding in the first place. Further, as discussed in the text and below, an

14   antitrust plaintiff challenging a vertical merger must show not merely that withholding is likely,

15   but also that the withholding would have significant anticompetitive effects, such as when a

16   monopolist withholds a critical input that rivals need to compete.

17         69.    To make these showings, the FTC relies principally on the opinion of its

18   economic expert, Professor Lee. As explained below, however, the FTC's "foreclosure theory has

19   significant flaws," *UnitedHealth Grp. Inc.*, 2022 WL 4365867, at *25–27, and the agency has

20   failed to establish any likelihood of ultimate success on its foreclosure claims, either in the

21   console market or in the other allegedly distinct markets for "content library services" and "cloud

22   gaming services." That the FTC cannot establish these essential prerequisites is unsurprising: at

23   the end of the day, the FTC's challenge is designed to protect the dominant console provider—

24   Sony—from increased competition that would flow from a merger of two entities that lack

25   market power.

26

27

28

**1.      The FTC has failed to show that the merger is likely to result in total foreclosure in the console market.**

70.      With respect to the console market, the FTC has failed to show that Xbox would have either the incentive or the ability to withhold *Call of Duty* from its rivals or that, if Xbox did withhold *Call of Duty*, such an action would substantially lessen competition.

**a.      Xbox has no incentive or ability to withhold *Call of Duty* from its rivals.**

71.      Xbox and Activision operate in intensely competitive markets. Given this competition, Xbox has strong incentives to maximize distribution of *Call of Duty*[21] post-merger, not restrict it. The FTC bases its contrary claim on the economic analysis of Professor Lee, which contains serious errors and ignores marketplace realities. Indeed, at trial, Professor Lee concluded that he could not opine that Xbox would be likely to withhold *Call of Duty*. *See* 6/27/23 Tr. (Lee), at 610:3–611:9.

**(i)      Microsoft has made clear its intention to continue to make *Call of Duty* available on rival platforms.**

72.      From the moment this transaction was announced, Xbox has stated without equivocation its intention to continue selling *Call of Duty* on all existing platforms (including PlayStation) and to expand *Call of Duty* to new platforms. Backing up its words with action, Xbox has offered to provide Activision content to Sony for the next *ten years*. RX2170; 6/23/23 Tr. (Spencer), at 443:7–10, 18–20. Only Sony's refusal to sign or meaningfully negotiate has prevented Sony from ensuring *Call of Duty* remains on PlayStation through the mid-2030s. That

---

[21] To be sure, Activision publishes numerous other games, including *World of Warcraft*, *Candy Crush*, *Diablo*, *Overwatch*, *Crash Bandicoot*, and *Tony Hawk Pro Skater*. Professor Lee purported to undertake a quantitative analysis of *Diablo*, Lee Decl. ¶ 110, but as discussed below, he ultimately refused at trial to opine as to whether any particular Activision title might be withheld. In all events, as Dr. Carlton explains, Professor Lee's conclusions with regard to *Diablo* are even weaker than they are for *Call of Duty*: his demand model predicts only a small shift from PlayStation to Xbox if *Diablo* is foreclosed, and his foreclosure model used the wrong price for the game, thereby understating the predicted costs of foreclosure. Carlton Report ¶ 92 n.171. With regard to the other titles, the FTC has made no serious attempt to provide evidence that Xbox had any incentive to withhold access to these games or that such a withholding would have any potential to lessen competition. *See* Carlton Decl. ¶ 38 & n.28 (██████████ ████████████████). And indeed, given the unique features of these games—*Candy Crush*, for example, is primarily a mobile game, while *World of Warcraft* is available only on PC—Xbox could not plausibly "withhold" these games without fundamentally restructuring their profile and alienating the games' existing fanbases.

DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(No. 3:23-cv-02880-JSC)

1  Sony has refused to sign reveals not a genuine fear of "foreclosure" (which it could prevent with

2  the stroke of a pen), but rather a concern that this transaction will make third-place Xbox a more

3  effective competitor.

4        73.     That Sony has refused to meaningfully negotiate continued access to *Call of Duty*

5  is irrelevant. Xbox has every intention and incentive to ship *Call of Duty* on PlayStation if Sony

6  allows it. That decision, in fact, is so beyond doubt that Microsoft committed to the public, to its

7  shareholders, to its board, and to the Court that it planned to sell *Call of Duty* on PlayStation so

8  long as Sony allows:

9        THE COURT: You're testifying under oath that you will make future versions of
         Call of Duty available for the PlayStation 5? You will invest whatever developer
10       expenses you need to do to do that? . . .

11       THE WITNESS: That's right. . . . I'm making the commitment standing here that
         we will not pull Call of Duty, it is my testimony, from PlayStation. And, as you
12       said, Sony obviously has to allow us to ship the game on their platform; but
         absent any of that, my commitment is and my testimony is, to use that word, that
13       we will continue to ship Call of -- future versions of Call of Duty on Sony's
14       PlayStation platform.

15  6/23/23 Tr. (Spencer), at 367:18–368:10; *see also id.* at 429:19–430:1 (making same

16  commitment for "PlayStation 5 and future versions"). The CEO of Microsoft, too,

17  reaffirmed that commitment. 6//28/23 Tr. (Nadella), 853:9–11 (Q. "Let me ask you here

18  today, Mr. Nadella, will you commit to continuing to ship Call of Duty on the Sony

19  PlayStation?" A. "A hundred percent.").

20       74.     This commitment from Mr. Spencer, Mr. Nadella, and others is powerful

21  evidence that Microsoft will not—and indeed, given the thoroughness of Mr. Spencer's pledge,

22  cannot—withhold *Call of Duty* from PlayStation. A similar commitment undermined the

23  government's case in *UnitedHealth*. The court there rejected the government's foreclosure

24  concerns based on a pledge by United Health's CEO "to maximize UnitedHealth Group's

25  performance . . . by developing great products, not just to the benefit of UHC but to all of our

26  other clients." 2022 WL 4365867, at *27. As the court concluded, "this testimony—and the

27  similar testimony of a number of other United executives—is far more probative of post-merger

28

1   behavior than [the government expert's] independent weighing of costs and benefits." *Id.*

2   Professor Lee acknowledged that such evidence is "important," 6/27/23 Tr., at 527:17-21, but he

3   never attempted to reconcile his model's predictions with Mr. Spencer's testimony.

4          75.     Even if Xbox did consider making *Call of Duty* an Xbox exclusive, Xbox now has

5   no ability to withhold *Call of Duty* from its rivals. Specifically, Xbox cannot implement an

6   exclusivity policy for any Activision content because (1) five cloud providers have already

7   signed contracts that fully protect their access to that content on nondiscriminatory terms for 10

8   years and (2) Xbox has also contractually agreed to provide a version of *Call of Duty* to

9   Nintendo for its Switch console and its upcoming console upgrade. *See* RX1212 (Nintendo),

10  RX1211 (Nvidia); RX3024 (Boosteroid); RX3025 (Ubitus); RX3027 (EE Limited); RX1245

11  (Nware). Indeed, the FTC's economist acknowledged it was "likely" that *Call of Duty* will be

12  available on Nintendo Switch as a result of the merger, *see* 6/27/23 Tr. (Lee), at 612:3-613:4, as

13  well as cloud gaming platforms, 6/27/23 Tr. (Lee), at 613:13-23. Thus, even if Sony remains a

14  holdout, the contractually guaranteed availability of Activision content on Nintendo's

15  forthcoming console and other gaming platforms would make a foreclosure strategy targeting

16  Sony even more unprofitable than it would be in the absence of those guarantees because Xbox

17  would capture an even smaller percentage of dissatisfied PlayStation customers.

18         76.     As discussed further below, *infra* ¶¶ 163–73, the FTC must, as part of its *prima*

19  *facie* case, account for the "economic reality" of these existing contracts and commitments.

20  *Craftsmen Limousine, Inc.*, 363 F.3d at 777; *see*, *e.g.*, *AT&T*, 916 F.3d at 1038, 1041 (upholding

21  district court's finding that "the government had not met its first-level burden of proof" because

22  its economic evidence did not "account[] for the effect of the . . . arbitration agreements, which

23  the district court stated would have 'real world' effects" on commercial negotiations); *New York*

24  *v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 227–33 (S.D.N.Y. 2020); *UnitedHealth Grp. Inc.*,

25  2022 WL 4365867, at *15–24. The FTC's burden to show that the merger is likely to result in a

26  substantial lessening of competition requires a comparison between the world with the merger

27  and the one without it (the "but-for world"). Ignoring Xbox's legal obligations in a world where

28

1   the merger is consummated looks to neither, but instead to a fictional future world that exists

2   solely in the minds of the FTC and the model of its expert. *See, e.g. Arch Coal*, 329 F. Supp. 2d

3   at 115 (antitrust analysis eschews "ephemeral possibilities"). Put simply, "antitrust theory and

4   speculation cannot trump facts." *Arch Coal*, 329 F. Supp. 2d at 116.

5        77.     To the extent the FTC suggests that this is a mere remedy issue, that is incorrect.

6   Numerous courts have recognized that the FTC must account in its *prima facie* case for

7   economic reality, such as existing contracts and commitments, when it seeks to prove liability.

8   *See AT&T*, 916 F.3d at 1041; *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 227–33

9   (S.D.N.Y. 2020); *UnitedHealth Grp. Inc.*, 2022 WL 4365867, at *15–24.

10
11
          **(ii)**     **Xbox has no incentive to withhold *Call of Duty* in light of the highly competitive marketplace.**

12        78.     Basic and undisputed economics and market dynamics demonstrate why

13   Microsoft has locked itself into commitments to make *Call of Duty* widely available: The

14   withholding strategy postulated by the FTC, Microsoft's CEO explained, would "make[] no

15   economic sense and no strategic sense." *See* 6/28/23 Tr. (Nadella), at 852:14–19; *accord* 6/28/23

16   Tr. (Kotick), at 716:9–21. As numerous witnesses testified, removing *Call of Duty* from

17   PlayStation (*Call of Duty*'s largest and most profitable console market) would cause direct

18   economic harm to Microsoft, and would have cascading effects on Xbox's brand and customer

19   base. *See* 6/23/23 Tr. (Spencer), at 361:2–5 ("the thought that we would create a lower quality

20   game on another platform, my view is it diminishes our brand and our reputation, and it's not

21   something that I would do."); *id.* at 367:11–15 ("Us pulling Call of Duty from PlayStation in my

22   view would create irreparable harm to the Xbox brand after me in so many public places,

23   including here, talking about and committing to us not pulling Call of Duty from PlayStation.");

24   6/28/23 Tr. (Kotick), at 725:4–7 ("if we were to remove Call of Duty from PlayStation, it would

25   have very serious reputational – it would cause reputational damage to the company"); *See*

26   Wright Stip. (Dkt. 228), at 6; RX5058 (Hood Decl.), ¶ 8 n. 4.

27
28

79.     The FTC's assumption that Microsoft would engage in such futile self-harm relies entirely on "assumptions and simplifications that are not supported by real-world" facts, *Am. Booksellers*, 135 F. Supp. 2d at 1041, and that ignore "economic reality," *Craftsmen Limousine, Inc.*, 363 F.3d at 777. Here, undisputed market realities create a strong economic incentive for Xbox to maximize rather than withhold distribution of *Call of Duty*.

80.     A foreclosure strategy would harm Xbox economically. *See Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1216–17 (W.D.N.C. 1989) (rejecting antitrust claim where defendants had no "economic incentive" to "lock out existing suppliers" and "raise the cost of an input"). Xbox would be losing *Call of Duty* revenues on the largest console provider, Sony. Those revenues were critical to the price Microsoft paid for Activision, the Board's evaluation of the transaction, and the financial targets to which Xbox is held accountable. *See* 6/29/23 Tr. (Stuart), at 1045:18–20 ("For games specifically like Call of Duty that are highly multiplayer-based games, large communities, that would not make sense to make it single platform."); *id.* at 1045:21–24 ("Q.  So from a financial -- just so we have a clear record, from a financial perspective, as Xbox CFO, do you think it would make sense to take Call of Duty exclusive? A. No."); 6/28/23 Tr. (Nadella), at 852:10–19 (explaining that a strategy of "forego[ing] sales of Call of Duty on the PlayStation to sell more consoles" "makes no economic sense and no strategic sense"); 6/23/2023 (Lawver), at 261:18–22 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); RX5058 (Hood Decl.), ¶ 18 ("The possibility of making *Call of Duty* exclusive to Xbox was never assessed or discussed with me, nor was it even mentioned in any of the presentations to or discussions with the Board of Directors. I understood the necessity of keeping *Call of Duty* on other platforms. The Acquisition's strategic rationale and financial valuation are both aligned toward making Activision games more widely available, not less."); 6/23/23 Tr. (Spencer), at 367:11–15 ("Us pulling Call of Duty from PlayStation in my view would create irreparable harm to the Xbox brand after me in so many public places, including

1  here, talking about and committing to us not pulling Call of Duty from PlayStation."); *see also*

2  6/28/23 Tr. (Kotick), at 725:4–7 ("if we were to remove Call of Duty from PlayStation, it would

3  have very serious reputational – it would cause reputational damage to the company"); *id.* at

4  715:18–24 ("Well, you would alienate" gamers "and you would have a revolt if you were to

5  remove the game from one platform."); *id.* at 724:19–22 (taking *Call of Duty* off PlayStation

6  "wouldn't make any sense, it would be very detrimental to our business"); RX3116.

7      81.    Withholding *Call of Duty* from other platforms would cause even greater harm by

8  degrading the game and infuriating gamers. A significant appeal of *Call of Duty* is that it is a

9  multiplayer game oft-played by groups across different platforms, including PlayStation (known

10  as cross-play or cross-platform play). *See* 6/27/28 Tr. (Bailey), at 669:22–670:4; 6/28/23 Tr.

11  (Kotick), at 716:5–8; see also id. at 713:24–714:10 ("the big evolution of the industry has been

12  this transformation to the social experience"), 715:18–24. Having a broad community of gamers

13  ensures players can quickly and easily find groups of comparable skill levels, making the game

14  fun. Removing *Call of Duty* from PlayStation would dramatically shrink the community and

15  overall matchmaking pool, making the gaming experience worse for anyone left.

16      82.    In addition, both Xbox and Activision operate in fragmented and highly

17  competitive markets. Xbox lags behind its competitors in console-based gaming, which in turn is

18  "the smallest part of the industry." 6/22/23 Tr. (Bond), at 129:3–4. Specifically, Xbox is a distant

19  third-place console, behind Sony and Nintendo, regardless of whether the market is measured by

20  console units sold, console revenues, or installed base. 6/28/23 Tr. (Bailey), at 783:21–784:2; *see*

21  RX5055, at 9 ex. 4. Likewise, Activision games account for only a modest fraction of games—

22  approximately from 7.4% to ███%, depending on market definition (all games vs. AAA,[22]

23  global vs. U.S.). 6/27/23 Tr. (Bailey), at 663:8–23, 665:15–666:11; *see* RX5055, at 23–27, exs.

24  15, 16, 18. *Call of Duty*'s share is, of course, even less than the share of Activision games

25  overall. 6/27/23 Tr. (Bailey), at 663:24–664:2. It is implausible that a game with this market

---

[22] There is no generally accepted definition of the term "AAA" as a measure of game quality, except that it refers to the highest-quality titles. 6/22/23 Tr. (Booty), at 51:20–52:8.

1    share could somehow reshape the console market. *See AT&T*, 310 F. Supp. 3d at 202 (rejecting

2    argument that Turner content was "must-have" in the video distribution industry because "[t]he

3    evidence showed that distributors have successfully operated, and continue to operate, without

4    the Turner networks or similar programming").

5         83.    Indeed, as Dr. Bailey has explained, *Call of Duty* is not uniquely important to

6    Sony (or any entity). For example, ███████████████████████████

7    ████████████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ███████████████████████████████████. *See* 6/27/23 Tr. (Bailey), at

10   676:20–677:20; RX5055, at 32 ex. 21.

11        84.    ████████████████████████████████████████

12   ███████████████████ (Lee Report) ¶¶ 471–72, ████████████████

13   ████████████. Although the model of "perfect competition" uses "price above marginal

14   cost . . . as a benchmark against which to measure the behavior of firms," that definition, if

15   "applied literally," would suggest "every firm in the United States has at least a tiny bit of market

16   power" and "describes few, if any, actual industries." Carlton & Perloff, MODERN INDUSTRIAL

17   ORGANIZATION, at 642 4th ed. (2005). Instead, "when courts find that a firm has market power,

18   they must mean the firm has a substantial amount of market power for some significant period of

19   time." *Id.*

20        85.    Xbox could not realistically expect to gain market power by driving PlayStation

21   customers to Xbox, ██████████████████████████████████████

22   ████████████████████████████████████████████████

23   ████████████████████████████████. RX5055, at 12. ████████████

24   ████████████████████████████████████████████████

25   ███████████████████████████. 6/23/23 Tr. (Lawver), at

26   257:15–17, 261:2–8; 6/23/23 Tr. (Spencer), at 366:8–12 ("the size of Call of Duty, the role it

27

28

1   plays in the valuation of buying Activision makes it both financially impossible for us to figure

2   out how we would recover from losing Call of Duty on its largest console platform.").

3        86.    Xbox's inability to gain market power by withholding Activision content is also

4   clear because Nintendo, for its part, outcompetes Xbox even though Nintendo does not currently

5   have access to *Call of Duty*. 6/22/23 Tr. (Bond), at 153:23–154:8. Likewise, Steam, the leading

6   PC game store, has risen in popularity during the period where it was without *Call of Duty*.

7   6/22/23 Tr. (Bond), at 174:8–24; 6/27/23 Tr. (Bailey), at 685:18–24. That strong evidence that

8   *Call of Duty* is not essential to competition may account for the FTC's attempt to exclude both

9   Nintendo and PC gaming from the relevant market. 6/22/23 Tr. (Bond), at 148:19–24; 6/27/23

10   Tr. (Bailey), at 685:1–686:5; RX5055, at 49–50 exs. 34–35.

11       87.    The FTC asserts that Nintendo's success without *Call of Duty* somehow implies

12   that Nintendo customers would not play *Call of Duty* if it were available. *See* [PI Reply 3–4].

13   That is implausible. As Microsoft executive Sarah Bond testified, "hours after the transaction

14   was announced," Microsoft set up a call with Nintendo North America to discuss the acquisition.

15   During that call, Nintendo North America's President, who knows his customers' gaming

16   preferences far better than the FTC does, told Microsoft that he was "thrilled to hear this

17   announcement" because he "long wished to have Call of Duty be on the Switch." 6/22/23 Tr.

18   (Bond), at 168:12–169:18.

19       88.    Even if Xbox were able to gain console customers by making *Call of Duty*

20   exclusive, that would in fact make the console market *less concentrated* and *more competitive* by

21   reducing the large gap that currently separates the number one and two market actors (Sony and

22   Nintendo) from the lagging third-place Xbox. Enjoining a merger that both sides agree would

23   *deconcentrate* an industry would be unprecedented. Indeed, making Xbox more competitive vis-

24   à-vis Sony and Nintendo would be a reason to *approve* the deal, not to block it, because "the

25   antitrust laws . . . were enacted for the protection of competition not competitors." *Brunswick*

26   *Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (cleaned up).

27

28

(iii)  **Microsoft's acquisition of *Minecraft* and its decision to continue making the game available to Sony underscores its strong incentives to make *Call of Duty* available to other console providers.**

89.     Microsoft's acquisition of Mojang's *Minecraft* franchise in 2014 illustrates why these incentives cut against withholding a multiplayer game that offers cross-platform play (like *Call of Duty*). Like *Call of Duty*, *Minecraft* is an existing franchise with substantial cross-platform play. 6/22/23 Tr. (Booty), at 77:23–78:10. Under the reasoning advanced by the FTC and Professor Lee, Xbox would have had incentives to make *Minecraft* exclusive to Xbox. But that did not occur. On the contrary, Xbox expanded access to the game and continues to make new editions of *Minecraft* available on PlayStation, because withholding it from other platforms would lead to lost sales on other platforms *and* on Xbox due to these cross-platform network effects. 6/22/23 Tr. (Booty), at 78:11–79:4]; *see also* Carlton Decl. ¶ 8.

90.     Xbox CFO Tim Stuart explains why market dynamics encourage and effectively required Microsoft to keep *Minecraft* on other platforms—and indeed to expand it to more platforms. Like *Call of Duty*, *Minecraft* derives its value from cross-network play. 6/29/23 Tr. 1039:1–8. For these types of games, Xbox "highly encourage cross-platform play." *Id.* at 1037:14–1038:14. And this strategy has worked; *Minecraft* is "one of the most profitable if not the most profitable IP that [Xbox] has." *Id.* at 1043:3–4. Today, Xbox makes four times as much money from sales on PlayStation and Nintendo than it does on Xbox. *Id.* at 1041:8–1042:8 (Xbox "is the smallest" platform for *Minecraft*).

91.     The FTC points to Xbox's acquisition of ZeniMax as a counterexample. But the comparison fails because in its game development, ZeniMax is unlike Activision, and its games are unlike *Call of Duty*. Over the years, ZeniMax has "done lots of exclusivity deals." 6/22/23 Tr. (Hines), at 114:14–25. The first two ZeniMax games that Xbox released post-acquisition (*Deathloop* and *Ghostwire*) were exclusives *for Sony*. Ryan Dep. 29:08–21; 6/22/23 Tr. (Hines), at 92:3–11. A consideration in making *Deathloop* and similar games exclusive is that it

1  "streamline[s] development" to tailor a game for only one technological platform rather than

2  many. 6/22/23 Tr. (Hines ), at 107:9–108:3; PX9186, at 5.

3      92.    Since then, Xbox has released or is scheduled to release two new ZeniMax games

4  exclusive to Xbox, but unlike *Call of Duty*, those games do not depend on or materially feature

5  multiplayer play, and they are new games without existing cross-platform gaming communities.

6  6/22/23 Tr. (Hines), at 112:17–112:23 (explaining that *Call of Duty* "focus[es] heavily on

7  multiplayer," and "Redfall is just a completely different game"). For example, in *Redfall*, up to

8  four people can play together *against the game*, but they cannot play against each other, and

9  *Redfall* thus offers "a dramatically different experience than multiplayer" games like *Call of

10  Duty*, "where there are other people making choices" affecting each player and there are

11  "humans on the other side." 6/22/23 Tr. (Hines), at 113:5–11; *see also* 6/22/23 Tr. (Hines), at

12  113:1–3 ("[W]e don't think about Redfall as multiplayer because to our audience 'multiplayer'

13  means I get to play against another human being, I get to defeat another person."). *Starfield* is

14  even more "wildly different" from *Call of Duty*; it "is a single-player game" that "is entirely

15  about you and the choices that you make." 6/22/23 Tr. (Hines), at 113:25–114:8.

16      93.    Nor did new owner Microsoft impose on ZeniMax a unilateral decision to make

17  *Starfield* exclusive; rather, the decision had the support of the ZeniMax studios that were actually

18  making the games. 6/22/23 Tr. (Hines), at 108:8–11. Regarding the decision to make *Starfield*

19  exclusive to Microsoft, Pete Hines testified that the game was "irresponsibly large" and that

20  "being able to focus on fewer platforms to support, hardware to support [was] a big benefit to

21  [the development] team." 6/22/23 Tr. (Hines), at 108:17–22; 6/22/23 Tr. (Hines), at 109:1–11

22  ("When you're trying to figure out how to make a game look as good as it can, play as smoothly

23  as possible, your programmers really need to know . . . what am I trying to get this to run

24  smoothly on?"). By contrast, when a game is developed to launch on multiple different

25  platforms, there will necessarily be fewer "people testing [each] platfor[m]," thereby slowing the

26  development and quality-assurance process. 6/22/23 Tr. (Hines), at 109:10–16. In short,

27  developing a game for more platforms will make the development "take longer," "cost more,"

28

1   and have a "far greater risk." 6/22/23 Tr. (Hines), at 109:16–18. For example, *Starfield*, which

2   will be released in September 2023, could not have come out so soon had it been developed for

3   PlayStation also. 6/22/23 Tr. (Hines), at 110:3–8.

4   94.   Similarly, concerns with "reducing risk and trying to get a degree of certainty"

5   drove the decision to make an upcoming Indiana Jones exclusive to Xbox and PC. .6/22/23 Tr.

6   (Hines), at 122:15–18. Before its acquisition by Microsoft, ZeniMax had entered a licensing

7   agreement with Disney to make the Indiana Jones game playable on multiple consoles, which

8   would have made it difficult and risky to release the game on time. 6/22/23 Tr. (Hines), at

9   122:19–22 ("You're dealing . . . with a licensor who is going to be very – who's going to have a

10  ton of feedback on what you're making that is going to add a lot of time to your schedule"). But

11  after its acquisition by Microsoft, ZeniMax (no longer "a small independent publisher") could

12  push back on Disney's desire to make Indiana Jones available on multiple platforms so as to

13  "reduce risk and try and get this on a path where we know that this will be a big success."

14  6/22/23 Tr. (Hines), at 122:15–18.

15  95.   Importantly, the fact that a game is exclusive when it enters the market does not

16  mean it will remain exclusive. [6/22/23 Tr. (Hines), at 115:1–16] To the contrary, many games,

17  including games like *Deathloop* and *Ghostwire* (which were released exclusive to Sony), are

18  "timed exclusive," which means "there's a period of time for which you talk about that game as

19  if it's an exclusive, but then" the developer "can, in fact, bring it to another platform." [6/22/23

20  Tr. (Hines), at 115:1–16. Just because a consumer must wait a little longer to have access to a

21  game on their platform of choice due to time-limited exclusivity on another platform does not

22  mean that consumers will feel compelled to switch platforms. Notably, the FTC provides no

23  evidence refuting the commonsense that most consumers will sill simply wait to enjoy a game on

24  their platform of choice.

25  96.   ZeniMax is also a poor analogy for Activision, for the independent reason that

26  Activision's valuation is an order of magnitude greater than ZeniMax's and its game portfolio is

27  vastly different than ZeniMax's—particularly Call of Duty, which has a large, cross-platform

28

1    multiplayer community that drives the franchise's popularity and revenue. ████████

2    ████████████████████████████████████████████████████████████████████

3    ████████████████████. 6/23/23 Tr. (Lawver), at 261:2–8. It would therefore be

4    "financially impossible for us to figure out how we would recover from losing Call of Duty on

5    its largest console platform" given "the size of Call of Duty [and] the role it plays in the

6    valuation of buying Activision." 6/23/23 Tr. (Spencer), at 366:8–12; *accord, e.g.*, 6/23/23 Tr.

7    261:9–22 (Q. "[C]ould Xbox plausibly make up the lost PlayStation profits if it took Call of

8    Duty exclusive in your opinion?" A. "I don't think so.").[23]

9         97.     In sum, Xbox's approach to the ZeniMax games sheds no light on what Xbox

10    would do with an existing, multiplayer, cross-platform franchise like *Call of Duty*. In contrast,

11    *Minecraft* offers a far better comparison.[24]

12         98.     Finally, there is no evidence that *any* game publisher has ever made an existing

13    game franchise exclusive when the game—like *Call of Duty*—features multiplayer and cross-

14    platform play on multiple platforms. For this reason, it is highly unlikely that Xbox would have

15    any incentive to do so now.

16                     **(iv)**     **The FTC's console foreclosure theory is based on**
17                            **flawed economic analysis and is without merit.**

18         99.     The FTC disagrees that Xbox has strong incentives to provide *Call of Duty* to

19    Sony, primarily relying on a quantitative foreclosure analysis by Professor Lee.[25] That analysis

20

[23] ████████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████████.

23 [24] In drawing its analogy to ZeniMax, the FTC wrongly implies that Xbox misled the European Commission about
24 its intent regarding future ZeniMax titles. The European Commission took the extraordinary step of responding directly when the FTC made this claim in its administrative complaint in December 2022, by stating publicly that Microsoft did not make any "commitments" to the European Commission, nor did the European Commission "rely
25 on any statements made by Microsoft about the future distribution strategy concerning ZeniMax's games." Instead, the European Commission cleared the transaction "unconditionally as it concluded that the transaction would not
26 raise competition concerns." RX5038, at 1.

27 [25] *See, e.g.*, FTC Pre-Trial FOF ¶¶ 183, 348, 356 (emphasizing Professor Lee's quantitative analysis); FTC TRO Mot. at 19-22 (same).

28

1    purports to show that withholding *Call of Duty* would be profitable to Xbox because it would

2    result in a 5.5% increase in Xbox's share of the console market. Lee Decl. ¶ 106. Professor Lee's

3    analysis is based on two models: a *consumer demand model* and a *foreclosure model*. Lee Decl.

4    ¶¶ 31, 100–12; *see also* Carlton Decl. ¶¶ 8, 22. The consumer demand model attempts to predict

5    how sales of Xbox One would change if Xbox withheld *Call of Duty* from Sony. Carlton Decl.

6    ¶¶ 22, 24. The foreclosure analysis attempts to calculate Xbox's incremental profits from gamers

7    that switch from PlayStation to Xbox in order to play *Call of Duty*, and compares these

8    "benefits" to the "costs" of eliminating revenue from sales of *Call of Duty* on PlayStation. Lee

9    Decl. ¶ 109; *see also* Carlton Decl. ¶ 38.

10       100.    At trial, the FTC's position collapsed. As explained below, Professor Lee's

11   demand model and the foreclosure model were shown to suffer from fundamental flaws that

12   render them unreliable. *See also* Carlton Decl. ¶¶ 8–9, 22–52. But quite apart from these flaws,

13   Professor Lee himself conceded in response to the Court's questioning that he had no basis for

14   testifying that the post-merger company would likely withhold *Call of Duty*. 6/27/23 Tr. (Lee), at

15   610:3–611:9. By itself, this remarkable and belated concession, concerning the game at the

16   center of this litigation, independently undermines the FTC's principal rationale for enjoining

17   this merger: the notion that the post-merger company would likely "foreclose" the market-

18   dominant Sony by withholding *Call of Duty*.

19       101.    ***Flaws in the consumer demand model.*** Professor Lee's consumer demand model

20   appears tailored to achieve the predetermined conclusion that making *Call of Duty* exclusive to

21   Xbox would drive massive numbers of customers to Xbox and away from PlayStation.

22   According to Professor Lee, Microsoft would increase its global console sales by approximately

23   1.6 million units—a share increase of about 5.5%. Lee Decl. ¶ 106.

24       102.    Preliminarily, Professor Lee simply assumes away Microsoft's commitment to

25   continue to provide *Call of Duty* to Sony—and its contractual offer to Sony that would guarantee

26   the company access to *Call of Duty* for ten years. Carlton Decl. ¶ 23. As explained above, the

27   FTC must account for such "economic realities" and Professor Lee cannot simply assume that

28

1   Microsoft has the ability to withhold *Call of Duty*. *See Craftsmen Limousine, Inc.*, 363 F.3d at

2   777; *See AT&T*, 916 F.3d at 1041; *UnitedHealth Grp. Inc.*, 2022 WL 4365867, at *15–24; *RAG-*

3   *Stiftung*, 436 F. Supp. 3d at 304; *Arch Coal*, 329 F. Supp. 2d at 116; *Deutsche Telekom AG*, 439

4   F. Supp. 3d at 227–33.

5          103.    But even putting this fundamental concern aside, Professor Lee's demand model

6   suffers from flaws that cause Professor Lee's demand model to overstate the number of

7   PlayStation subscribers that would switch to Xbox if *Call of Duty* were no longer available on

8   PlayStation.

9          104.    *First*, Professor Lee assumes that every gamer that would abandon PlayStation

10  when *Call of Duty* and other Activision content is no longer available would switch to Xbox.

11  Carlton Decl. ¶ 8, 33–34; *see also* 6/27/23 Tr. (Lee), at 528:15–21 (acknowledging he did not

12  consider diversion to Nintendo Switch). This assumption defies reality. Carlton Decl. ¶ 8, 33–34.

13  Most obviously, many of those gamers would choose Nintendo. The Nintendo Switch is not only

14  more popular than Xbox overall, *see* 6/23/23 Tr. (Spencer), at 435:20–22, but Nintendo has a

15  contractual right to obtain Activision content post-merger, including *Call of Duty*, *see* 6/23/23 Tr.

16  (Spencer), at 443:23-25; *see also* 6/27/23 Tr. (Lee), at 612:3–613:4 (agreeing it is "likely" that

17  *Call of Duty* will be available on Nintendo Switch as a result of the merger). Many gamers could

18  also be expected to play *Call of Duty* on PC—as millions already do. *See* 6/28/23 Tr. (Kotick), at

19  718:20–22, 719:3–4 (noting that "on any given day there's probably 7 to 10 million people

20  playing" *Call of Duty* and that "20-some odd percent [are] playing on personal computers").

21  Others could decide to switch to mobile gaming or cease gaming altogether. By simplistically

22  assuming that every gamer that leaves PlayStation will buy an Xbox, Professor Lee effectively

23  assumes his entire conclusion: that Xbox would gain substantial customers if it were to withhold

24  *Call of Duty*. *See* Carlton Decl. ¶¶ 33–34. Prof. Lee makes this assumption despite the fact that

25  his own academic research on consumer demand models for consoles shows that diversion to

26  outside goods is significant. *See id*. ¶ 33.

27

28

1     105.    *Second*, Professor Lee makes a highly consequential technical error in calculating

2  the number of PlayStation customers that would leave should *Call of Duty* become exclusive on

3  Xbox. ██████████████████████████████████████████████

4  ██████████████████████████████████████. Carlton Decl. ¶¶ 26-30.

5  In other words, ███████████████████████████████████████████

6  ████████████████████. Carlton Decl. ¶ 28.[26] That assumption ignores

7  "economic reality." *See Craftsmen Limousine, Inc.*, 363 F.3d at 777 (rejecting expert opinion

8  because it "failed to 'incorporate all aspects of the [market's] economic reality'").

9     106.    Dr. Carlton demonstrates that Professor Lee's errors are highly consequential and

10  "████████████████████████████████████████████████

11  ████████████████████." Carlton Decl. ¶ 35. In fact, accounting for these

12  corrections, Professor Lee's "o████████████████████████████████████

13  ██████████████████████████████. Carlton Decl. ¶

14  35.[27]

15     107.    For all of those reasons, Professor Lee's consumer demand model is unreliable

16  and entitled to no weight.

17     108.    ***Flaws in the foreclosure model.*** Professor Lee's foreclosure model likewise rests

18  on erroneous "assumptions and simplifications," *Am. Booksellers*, 135 F. Supp. 2d at 1041, that

19  cause him to overstate the supposed profitability of withholding *Call of Duty*.

20

21  ———————————————

22  [26] ███████████████████████████████████████████, ¶ 28. ████

23  ████████████████████████████████. Carlton Decl. ¶ 28. ████████

24  ████████████. Carlton Decl. ¶ 28.

25  [27] ███████████████████████████████████. ¶ 36. ████████

26  ███████████████████████████" Carlton Decl. ¶ 36.

27  ██████████████████. Carlton Decl. ¶ 36.

28

109.    Foremost, a key input to Professor Lee's foreclosure model is the conversion rate from PlayStation to Xbox in the event of foreclosure. ████████████████████
████████████████████████████████. Carlton Decl. ¶ 22. ████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████. ¶ 46; *see also* 6/27/23 Tr. (Lee), at 4–
17 (Professor Lee agreeing that his model would show withholding *Call of Duty* would be
unprofitable if the conversion rate was slightly reduced from his assumption); 6/27/23 Tr. (Lee),
at 557:8–15 (agreeing that "sensitivity of results is a critical input into reasonable economic
modeling").[28]

110.    At the evidentiary hearing, Professor Lee claimed that his conversion rate
assumption (a 5.5% share increase) can be justified by an internal Microsoft document regarding
"an exclusive AAA release." Lee Decl. ¶ 106, *see* PX1136 (11/1/2019 email). However, ██████
████████████████████████████████████████████████████████████
████████████████████████ well below the 5.5% shift assumed in Professor Lee's foreclosure
model. Professor Lee acknowledged that his foreclosure model, u██████████████████
████████████████████████ would likely show—as Dr. Carlton explained—that
"████████████████████████." Carlton Decl. ¶ 44; *see* 6/27/23 Tr. (Lee), at 581:1-7 ("Q:
[A]nd you modeled that out, the 2 percent, that would not make it financially feasible or
reasonable to withhold Call of Duty from PlayStation; right? A: So in my vertical foreclosure
model, I don't recall the exact numbers, but if the conversion rate fell and you got a 2 percent
shift and you held fixed all the other inputs, that likely will be the case in the model.").

111.    Professor Lee also attempted to support his implausible conversion rate by
pointing to a YouGov survey of European PlayStation users and potential PlayStation purchasers,

---

[28] ████████████████████████████████████████████████████████████
████████. Carlton Rep. ¶ 95; *see also* 6/27/23 Tr. (Lee), at 547:16–23.

1  claiming that it was "survey evidence consistent with output from the 20 percent conversion

2  rate." 6/27/23 Tr. (Lee), at 583:19–20. But Professor Lee "didn't look at the survey itself,"

3  6/27/23 Tr. (Lee), at 595:22–596:1; he instead reviewed only "slides that were presented to the

4  CMA summarizing the YouGov survey information," 6/27/23 Tr. (Lee), at 591:13–16; *see*

5  RX5054 (slides reviewed by Professor Lee). Remarkably, even after acknowledging that he had

6  not read the YouGov survey, Professor Lee continued to refer to it as support for his conversion

7  rate. 6/27/23 Tr. (Lee), at 632:17–635:19. Yet Professor Lee also admitted, in response to the

8  Court's questions, that he "can't answer" whether "the number of gamers surveyed [was]

9  statistically significant." 6/27/23 Tr. (Lee), at 634:12–23.

10        112.    This testimony further undermines Professor Lee's attempt to justify his

11  overstated conversion rate. *See Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C.

12  Cir. 1977) (model cannot be based on "unsupported assumptions"). Without a reliable conversion

13  rate, Lee's model proves nothing.

14        113.    In addition to a flawed conversion rate, Professor Lee made other errors ███

15  ████████████████████████████████████████████████████████████████████████████████████

16  ███████████████████████████████████████████." Carlton Decl. ¶¶ 46.

17        114.    *First,* ███████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████████████████

19  ████████████  Carlton Decl. ¶¶ 47–48.

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████████████████

22  ████████████. ¶ 48.

23  ████████Carlton Decl. ¶ 48.

24        115.    ████████████████████████████████████████

25  ████████████████████████████████████████████████████████████

26  ████████████████████████. Carlton Decl. ¶ 49.

27

28

1 ████████████████████████████████████████████████████████████████████

2 ███████████████████████ Carlton Decl. ¶ 49.

3       116.   *Third*, Professor Lee assumes that *Call of Duty* gamers that switch to Xbox will

4 spend far more than the average Xbox gamer. I████████████████████████████████

5 ████████████████████████████████████████████████████████████████████.

6 Carlton Decl. ¶ 50. ████████████████████████. Carlton Decl. ¶¶ 50-51. ████████

7 ████████████████████████████████████ Carlton Decl. ¶ 51.

8       117.   *Finally*, Professor Lee's foreclosure model ignores t█████████████████

9 ████████████████████████████████████████████████████████████████████.

10 Carlton Decl. ¶ 8. That is, the model assumes away the importance of "network effects," even

11 though the FTC has elsewhere premised antitrust complaints almost entirely on the importance

12 of such effects. *See FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 50 (D.D.C. 2022). That means

13 that withholding would be far more costly than Professor Lee claims, because it would reduce

14 the value of *Call of Duty* and thereby reduce sales of the game and in-game purchases.

15                                          * * *

16

17       118.   An expert can make simplifying assumptions, but the resulting model must still

18 accurately describe reality. The FTC cannot meet its burden with expert an opinion "based on a

19 mathematical construction" that "in turn rests on assumptions" that are both "implausible and

20 inconsistent with record evidence." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

21 574, 594 n.19 (1986) (plurality opinion); *see also Brooke Grp., Ltd. v. Brown & Williamson

22 Tobacco Corp.*, 509 U.S. 209, 242 (1993) (antitrust plaintiff cannot meet its burden with expert

23 opinion that "is not supported by sufficient facts"). For this reason, when "there are undisputed

24 facts about the structure of the market that render the inference" drawn by an expert

25 "economically unreasonable," the "expert opinion is insufficient" as a matter of law. *Rebel Oil

26 Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435–36 (9th Cir. 1995) (citing *Eastman Kodak Co. v.

27 Image Tech. Serv., Inc.*, 504 U.S. 451, 468–69 (1992)). Courts therefore routinely reject expert

28

opinions that "fai[l] to incorporate economic realities," *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1003 (8th Cir. 2019), or that rest on "unsupported assumptions," *Merit Motors, Inc.*, 569 F.2d at 673, such that they have "no anchor" in the real world, *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011).

119.    Once those errors are corrected, Professor Lee's quantitative analysis supports the conclusion that Xbox would lack an incentive to withhold *Call of Duty*.

### b.    The FTC has not shown that withholding *Call of Duty* would harm competition.

120.    As discussed, Xbox has neither the incentive nor the ability to make *Call of Duty* exclusive post-merger. Indeed, as discussed above, Dr. Lee himself was unwilling to say at trial that Xbox would be likely to withhold *Call of Duty*. Quite clearly, absent any withholding, there can be no possible claim of harm to competition.

121.    But even if Xbox *could* be expected to make *Call of Duty* or other Activision content exclusive to itself, the FTC has not shown that such exclusion would harm *competition* as opposed to other *competitors* in the console market. *See United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (practice has an "anticompetitive effect" only if it "harm[s] the competitive *process* and thereby harm[s] consumers," and "harm to one or more *competitors* will not suffice"). The FTC's claim boils down to the proposition that an exclusive arrangement that shifts 5.5% of the market away from the dominant firm, Sony, to the number three provider, Microsoft, somehow "lessens" competition. But that would make the market *less* concentrated and presumptively *more* competitive. Tellingly, the FTC does not cite a single case in which a court found a merger that made the market less concentrated nevertheless "harms the competitive process."

122.    The FTC's contrary view rests principally on Professor Lee's assertion that any exclusivity that would result from the merger must necessarily be anticompetitive because it would reduce the availability of a single company's games on a single company's platform. Lee Decl. ¶¶ 9, 47, 114 (consumers would lost the "choice" of playing *Call of Duty* on PlayStation).

1   But that fact is common to all exclusivity arrangements and is obviously not a sufficient basis for

2   finding competitive harm. To the contrary, exclusivity arrangements (whether from contract or

3   vertical integration) are ubiquitous throughout the economy and are usually procompetitive. *See*,

4   *e.g.*, *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984). For example, in

5   *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996), a newspaper

6   plaintiff claimed that its competitors' exclusivity arrangements "deprived [it] of access" to some

7   of the "best known" newspaper content on the grounds, but the court rejected its antitrust claims

8   on the ground that the plaintiff could still compete by acquiring other content. *Id.* at 44; *see also*

9   *Fruehauf*, 603 F.2d at 352 n.9 (a showing of "vertical foreclosure" is insufficient to establish

10  harm to competition).

11      123.    In fact, both Sony and Nintendo have entered into a wide range of exclusivity

12  arrangements of their own with various game publishers, and each has far more such

13  arrangements than Xbox does. *See, e.g.*, 6/23/23 Tr. (Spencer), at 312:20–314:24, 441:18–443:1;

14  6/22/23 Tr. (Bond), at 161:12–165:8. Professor Lee himself has recognized that such

15  arrangements can be pro-competitive in this setting. Carlton Decl. ¶ 11 n.6. The FTC does not

16  argue that there is anything generally anticompetitive about these existing exclusivity

17  arrangements or that consumers would be better off with fewer such arrangements. This is

18  particularly notable because Sony—the leading console player—has many times more exclusive

19  content on PlayStation than does Xbox. ███████████████████████████████████████████

20  ██████████████. Moreover, Sony goes to great lengths to secure exclusive advantages from

21  third party publishers vis-à-vis Xbox. This can only be read to suggest that input exclusivity is

22  not by itself anticompetitive at all. *See, e.g.*, 6/23/23 Tr. (Spencer), at 312:20–314:24, 441:18–

23  443:1; 6/22/23 Tr. (Bond), at 161:12–165:8; Ryan Dep. 240:24–241:10, 94:14–95:08.

24      124.    Nor does this transaction exhibit any of the special features that have led other

25  courts in unusual cases to conclude that vertical integration will give rise to anticompetitive

26  outcomes. In particular, *Call of Duty* is not a "necessary input" for Xbox rivals, *see Sprint Nextel*

27  *Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 330 (D.D.C. 2011), and any "foreclosure" percentages

28

1   would be far too small to warrant any presumption of competitive harm. *See Alberta Gas Chems.*

2   *Ltd. v. E.I. Du Pont De Nemours & Co*., 826 F.2d 1235, 1244–46 (3d Cir. 1987) ("foreclosure"

3   concerns are only raised where withholding of inputs would result in "post-merger market

4   power"). To the contrary, to the extent the Microsoft-Activision merger would allow Xbox to

5   gain some console subscribers, that would only serve to make the market *less* concentrated and

6   presumptively *more* competitive.

7       125.    As noted, Activision's share of console-game publishing is modest by any

8   measure—between approximately 7% and ■%. These 7-■% foreclosure figures would be far

9   smaller than the level needed to raise any presumption of anticompetitive effect even if Xbox

10  were a platform *monopolist*. *See McWane, Inc. v. FTC*, 783 F.3d 814, 838–39 (11th Cir. 2015)

11  (vertical integration is generally found to raise antitrust concerns only where it leaves rivals

12  "stunted" as competitors and materially impairs their ability to discipline the defendant's prices);

13  *see also Microsoft Corp.*, 253 F.3d at 70 (foreclosure of "roughly 40% or 50% share" is "usually

14  required in order to establish" a violation of Section 1 of the Sherman Act); *Fruehauf*, 603 F.2d

15  at 352–54; *Alberta Gas*, 826 F.2d at 1244–46. And, of course, Xbox is *not* a monopolist; it is

16  running a distant third behind Sony and Nintendo in the console market.

17      126.    And, again, *Call of Duty* is not so uniquely important to gamers that Xbox could

18  hope to obtain substantial market power by making it exclusive to Xbox. *See* 6/27/23 Tr.

19  (Bailey), at 576:4-686:5 (describing data demonstrating "there's nothing unique or special about

20  *Call of Duty* in having a console or even PC be successful"); *see also* 6/22/23 Tr. (Bond), at

21  154:9–10; RX5055, ¶¶ 25-62. This is underscored by Professor Lee himself, who frankly

22  acknowledged that Sony did not need *Call of Duty* "to produce a viable product in the console

23  market." 6/27/23 Tr. (Lee), at 540:18–21; *see also* 6/28/23 Tr. (Kotick), at 724:5–12 ("They have

24  [an] enormous amount of development capacity. They own some of the very best game

25  developers in the world."). ████████████████████████

26  ████████████████████████████████████

27

28

1   ████████████████████████████ RX5055, at 12. And Nintendo, for its part, outcompetes

2   Xbox even though it does not currently have access to *Call of Duty*. *Id.* at 48–49.

3       127.   For these reasons, the FTC cannot show what it must to justify blocking this

4   vertical transaction: that the supposed foreclosure would *harm competition* by making the

5   combined company's rivals ineffective as competitors. *See McWane*, 783 F.3d at 838–39 (vertical

6   integration is generally found to raise antitrust concerns only where it leaves rivals "stunted" as

7   competitors and materially impairs their ability to discipline the defendant's prices); *Microsoft*

8   *Corp.*, 253 F.3d at 71 (issue is whether exclusive dealing keeps competitors "below the critical

9   level necessary . . . to pose a real threat" to defendant's market power); *Fruehauf Corp. v. FTC*,

10  603 F.2d 345, 352 n.9 (2d Cir. 1979) (discussing *Brown Shoe* and *DuPont* and concluding that

11  "we are unwilling to assume that any vertical foreclosure lessens competition.").[29]

12      128.   It is well established that any competitive analysis of exclusivity arrangements

13  must be dynamic, not static, because their "long term effects on consumers depend in large

14  measure on competitors' responses." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227,

15  232 (1st Cir. 1983) (Breyer, J.); *see id.* at 235 (highlighting the importance of considering

16  "competitors' responses to price shifts"); *see also Arch Coal, Inc.*, 329 F. Supp. 2d at 148–50

17  (relying on fact that competitors "can and would expand production in response to a [merger-

18  induced] price increase" to deny agency's injunction request). For example, in *Paddock*

19  *Publications*, discussed above, the Seventh Circuit rejected a challenge to an exclusivity

20  agreement between incumbent newspapers and several content creators by a rival newspaper.

21  103 F.3d at 44. The court explained that a competitor who is "deprived of access" to even the

22  "best known" content can still compete using alternative content. *Id.*; *see also id.* ("[A]

23

---

24  [29] "Exclusive dealing" arrangements raise the same foreclosure issues as vertical integration. Under an exclusive dealing contract, a supplier agrees to sell all of its goods through one distributor (or vice versa), thereby aligning the

25  parties' interests in ways similar to a vertical merger. Such arrangements are routine and "presumptively legal." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004) ("Unlike horizontal agreements

26  between competitors, vertical exclusive distributorships . . . are presumptively legal."). Notably, exclusive-dealing cases arise under Section 3 of the Clayton Act, 15 U.S.C. § 14, whose text is identical to Section 7 in all relevant

27  respects ("may . . . substantially lessen competition") and is thus read *in pari materia* with that provision. *See Fruehauf*, 603 F.2d at 352 n.9; *see also United States v. Phila. Nat'l Bank*, 374 U.S. 321, 365–66 (1963).

28

1    newspaper deprived of access to the *New York Times* crosswords puzzles can find others, even if

2    the *Times* has the best known one.").

3    129.    Professor Lee could thus claim (albeit without any supporting analysis) that

4    withholding *Call of* Duty would materially "weaken" Sony, Lee Decl. ¶ 93, only by

5    impermissibly adopting a static analysis that ignores Sony's many options for an effective

6    competitive response.[30] *Cf. Fruehauf*, 603 F.2d at 352 n.9 (requiring assessment of competitive

7    response to determine whether foreclosure "lessens competition"). This static analysis is

8    particularly inappropriate in a dynamic industry where popular content can come from a number

9    of developers. For example, Sony's CEO told investors in the wake of news of Microsoft's

10   acquisition of Activision that "the smart thing to do would be to grow [Sony's] own studios

11   organically" to increase Sony's own value proposition to consumers. RX0079, at 7. Likewise,

12   Sony could leverage its vast library of intellectual property to commercialize into video game

13   content. 6/28/23 Tr. (Kotick), at 723:10-21. These market dynamics are the very essence of

14   competition, which this merger could only enhance competition.

15   130.    At trial, Professor Lee was confronted with this omission, and acknowledged on

16   cross-examination that Sony would in fact have competitive responses in the withholding

17   scenarios he described. 6/27/23 Tr. (Lee), at 596:23-25. And he did not dispute that Sony could

18   acquire additional content, as it did when it recently purchased Bungie "just days after the

19   Activision Xbox transaction was announced." 6/27/23 Tr. (Lee), at 597:1-6. Professor Lee also

20   did not dispute that Sony could protect itself by accepting Xbox's offer to maintain *Call of Duty*

21   on PlayStation and that he failed to reflect that option in his competitive analysis. 6/27/23 Tr.

22   (Lee), at 597:1-598:2. And he did not dispute that Sony could counter by making content

23   exclusive to PlayStation, including paying third-parties for exclusivity as it had done in the past.

24   6/27/23 Tr. (Lee), at 5998:15-602:22.

25

26   ───────────────

     [30] Indeed, because Professor Lee was unwilling to say which particular Activision content (in his view) would likely

27   be withheld as a result of the merger, *see* 6/27/23 Tr. (Lee) at 610:3-611:9, he *could not* have analyzed Sony's likely
     competitive responses to such withholding.

28

DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-CV-02880-JSC)

1    131.    Finally, the FTC ignores critical variables in the economic analysis by

2  disregarding the new options the merger will create for consumers to access and play Activision

3  content. Indeed, "increased output" is a clear "indicator[] of a merger's competitive impact." *In

4  re AMR Corp.*, 625 B.R. 215, 255 (Bankr. S.D.N.Y. 2021), *aff'd*, No. 22-901, 2023 WL 2563897

5  (2d Cir. Mar. 20, 2023); *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2289 (2018)

6  (practices that "expand[] output and improv[e] quality" are procompetitive); *Chi. Pro. Sports*

7  *Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output.");

8  *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1222 (11th Cir. 1991) ("Whether an acquisition would

9  yield significant efficiencies is an important consideration in predicting whether the acquisition

10  would substantially lessen competition."). The FTC must account for such consumer benefits in

11  determining the "competitive effects" of the merger. *See Tenet Health Care Corp.*, 186 F.3d at

12  1054. One cannot logically determine whether a merger makes consumers worse off without

13  considering the numerous new options the merger will create for playing *Call of Duty* post-

14  merger—including on platforms on which it is not available today. *See id.* ("We further find that

15  although Tenet's efficiencies defense may have been properly rejected by the district court, the

16  district court should nonetheless have considered evidence of enhanced efficiency in the context

17  of the competitive effects of the merger.").

18    132.    Here, the acquisition would benefit consumers by making *Call of Duty* available

19  on platforms on which it would not otherwise become available in the absence of the transaction,

20  including Xbox's Game Pass on the day it is released on console (with no price increase for the

21  service based on the acquisition), on Nintendo's Switch, and on other services that allow cloud

22  streaming. *See* 6/27/23 Tr. (Lee), at 612:3-613:4 (agreeing it is "likely" that *Call of Duty* will be

23  available on Nintendo Switch as a result of the merger); 6/27/23 Tr. (Lee), at 613:5-9 (agreeing it

24  is "likely" that *Call of Duty* will be available on Game Pass as a result of the merger); 6/27/23

25  Tr. (Lee), at 613:13-23 (agreeing it is "likely" that *Call of Duty* will be available on GeForce,

26  Ubitus, Nware, and EE cloud gaming services); ████████████████████████████████

27  ████████████████████████████████████████████████████████████

28

1  ████████ ). Activision has historically refused to provide this type of access to *Call of Duty*, and

2  every Activision witness to address the matter said that business strategy would continue into the

3  foreseeable future. Ryan Dep. 258:20–25. These clear consumer benefits likewise vitiate the

4  FTC's claim that the merger will ultimately injure the competitive process and consumers.

5      133.    The FTC misleadingly claims that Microsoft is asserting an "efficiencies defense"

6  whereby a merger with anticompetitive effects can otherwise be justified on the basis of

7  efficiencies. *See* FTC Pre-Trial COL ¶¶ 108–22. To the contrary, Microsoft's argument is not that

8  efficiencies justify the merger, even though the merger will lessen competition, but instead that

9  an analysis of the efficiencies resulting from the merger demonstrates that the transaction will

10  not lessen competition at all. Put differently, the argument is not that efficiencies will outweigh

11  harms, but that there will be no harm. *See Tenet Health Care Corp.*, 186 F.3d at 1054

12  (acknowledging that "efficiencies defense may have been properly rejected by the district court,"

13  but holding that "the district court should nonetheless have considered evidence of enhanced

14  efficiency in the context of the competitive effects of the merger.").

15      134.    Although the FTC cites a handful of decisions expressing skepticism of an

16  efficiencies *defense*, in which benefits in one market are said to outweigh harms in another, the

17  FTC ignores numerous decisions holding that courts *must* consider efficiencies in determining a

18  merger's competitive effects in the relevant markets themselves. *See, e.g, Tenet Health Care*

19  *Corp.*, 186 F. 3d at 1054; *Univ. Health, Inc.*, 938 F.2d at 1222; *see also Deutsche Telekom AG*,

20  439 F. Supp. 3d at 207 (citing cases establishing that "evidence of efficiencies may rebut the

21  presumption that a merger's effects will be anticompetitive"). After all, "[w]hether an acquisition

22  would yield significant efficiencies . . . is an important consideration in predicting whether the

23  acquisition would substantially lessen competition." *Univ. Health, Inc.*, 938 F.2d at 1222. Here,

24  one cannot logically determine whether consumers are "worse off" without considering the

25  numerous new options they would have for playing *Call of Duty* post-merger—including on

26  platforms on which it is not available today. As the evidence shows, the massive expansion in the

27

28

1  availability of *Call of Duty* resulting from the merger proves that there will be no harm (but only

2  benefits) to consumers.

3      135.    Rather than engage and rebut this evidence—which it cannot—the FTC asked the

4  Court to exclude any evidence or testimony about the anticipated effect of Microsoft's

5  agreements to bring *Call of Duty* to six new platforms post-acquisition because, it says,

6  Microsoft supposedly asserted privilege over analyses that preceded those agreements. *See*

7  Bench Brief Regarding Defendants' Proffered Testimony Regarding Microsoft's Agreements,

8  Dkt. 181 (June 22, 2023) For multiple reasons, that request was misplaced.

9      136.    *First*, the issue is moot. At the pre-hearing conference, the FTC announced its

10  intent to file a bench brief on the first day of trial because of the then-anticipated testimony of

11  Microsoft gaming executive Sarah Bond. *See* Pre-Hrg. Tr. 28:4–6. The Court suggested that,

12  rather than filing a brief, the FTC "just ask" Ms. Bond about the issues and "lay your

13  foundation" so the Court could evaluate the privilege issues in the appropriate context. *Id.* at

14  28:13–17. But the FTC did not heed the Court's suggestion: it *did* file a brief the Court made

15  clear would be premature, and then chose *not* to elicit any foundation for the privilege issue with

16  Ms. Bond. The FTC similarly failed to raise the issue with other witnesses who addressed the

17  existence and effect of Microsoft's agreement with competitor platforms, including Matt Booty

18  and Jamie Lawver.[31]

19      137.    *Second*, the FTC's brief rests on a false premise. While the FTC claims that

20  Microsoft has withheld under claim of privilege financial analyses of "the supposed real-world

21  benefits of the Agreements," Dkt. 181, at 2, there **were no such financial analyses**, and as such,

22  **nothing** has been withheld as privileged. Microsoft explained this to the FTC prior to the filing

23  of its Bench Brief, and directed the FTC to sworn testimony to this effect.[32] But the FTC

24  persisted in this line of argument and filed its brief anyway.

---

[31] Rather than give the Court any evidentiary foundation to make a ruling on these issues, the FTC waited until closing to raise its privilege arguments again, for the first time since the Pre-Hearing Conference.

[32] *See, e.g.*, Spencer Dep. Tr. 182:22–183:15 ("Q. Are you aware of anyone at Microsoft doing any analysis of the economic effects of entering this agreement on Microsoft? A. No. Q. Are you aware of any analysis inside Microsoft

(*continued on next page*)

138.    *Third*, and in any event, the FTC's objection would be entirely meritless even if Microsoft had performed and then withheld financial analyses of these agreements. Virtually every negotiated contract reflects the advice of counsel, yet no court has ever ruled that a party must either express no view on the contract or waive privilege over everything that led to it. The implications of such an extreme rule would indeed be bizarre, and in no way limited to contracts. The FTC's filings in this case, for example, no doubt reflect various drafts, communications, and memoranda protected by the attorney-client privilege and work-product doctrine; it cannot be the FTC's position that, having opined on the sword-and-shield doctrine and the appropriateness of "litigating the fix" in its Bench Brief, it now must provide Microsoft and Activision all of the analyses that led to that argument or else abandon the argument.

139.    The FTC's brief further reveals that it has no actual interest in the supposed financial analyses. Rather than ever request the non-existent financial analyses (which it had months to do and never did), the FTC instead belatedly asks the Court to disregard any testimony about the effect of Microsoft's agreements. But the FTC cites not a single case where the sword-and-shield doctrine was used to exclude relevant testimony on the grounds that other discovery was withheld under an unchallenged claim of privilege, rather than used to compel the production of withheld information. *See, e.g.*, *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (holding that sword-and-shield operates as a waiver, an argument the FTC expressly disclaims); *but see* Dkt. 181, at 1 ("The FTC is not requesting a finding of waiver or to pierce the privilege . . . .").[33]

---

about how entering this agreement will affect Microsoft Gaming's profit and loss? A. No. Q. Are you aware of any analysis of the economic benefits to Microsoft from entering into this agreement with Nintendo? A. No. Q. Are you aware of any analysis at Microsoft of the effects of entering this agreement on Xbox console sales? A. No.); Bond Dep. Tr. 109:20–110:7 ("Q. Was there any analysis done of Microsoft's expectation for what that revenue share [under the Nintendo agreement] would be? A. Nope. Q. No, there is no analysis then? A. No, there was not."); Wright Dep. Tr. (personal) 134:3–16 ("I never saw a financial analysis on this model."); *id.* at 135:17–19 ("I am not aware of any financial analysis that has been done on the game listing agreement either.").

[33] And even if excluding relevant evidence were a recognized remedy in some sword-and-shield scenarios, this case—where the FTC had months to challenge the assertion of privilege or assert waiver but opted not to—would not be an appropriate candidate for such a remedy.

140.     And regardless, the sword-and-shield doctrine applies only where a party has "asserted claims the opposing party cannot adequately dispute unless it has access to the privileged materials." *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003). It does not apply where, as is the case here, the asserted claims relate to an assessment of the competitive effect of an agreement that is based on "objective evidence" or "subjective beliefs derived exclusively from business judgement and experience." *See In re Lidoderm Antitrust Litig.,* 2016 WL 4191612, at *1 (N.D. Cal. Aug. 9, 2016). The FTC's concerns relate to the competitive effect of six contracts that are in evidence. RX1212 (Nintendo); RX1211 (Nvidia); RX3024 (Boosteroid); RX3025 (Ubitus); RX3027 (EE Limited); RX1245 (Nware). If the FTC needed to do more than simply read the contracts, it had nearly a year and a half—during which time it generated thousands of pages of deposition and investigation transcripts and compelled the production of millions of pages of documents—to make its own objective case for why these agreements will not deprive Microsoft of the ability to withhold Activision content.[34] Unable to do so, it instead seeks to prevent Microsoft from describing the pro-competitive effect of contracts in evidence. Neither the facts nor the law—nor logic—compels such an absurd result.

141.     *Fourth*, the FTC vaguely asserts, without citing any examples, that Microsoft's economist, Dennis Carlton, also should be precluded from offering "opinions regarding the procompetitive effects of witnesses [*sic*] whose foundation is locked behind privilege." Dkt. 181, at 4. However, the bases for Dr. Carlton's opinions were disclosed to the FTC, and the non-existent financial analyses were not among them. Rather, ███████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████. *E.g.*, Carlton Decl. ¶¶ 52–54. Even if Microsoft had conducted a financial analysis (it did not) and even if withholding such analyses would have

---

[34] In that time, the only apparent defects the FTC has identified is that Microsoft is not omniscient and has not developed the ability to tell the future. *See* Dkt. 1, at nn.1–2 (citing standard contractual provisions about "Unanticipated and Unforeseeable Future Events" and Microsoft's commitment to make *Call of Duty* available on an in-development Switch model).

been improper (it would not have been), nothing prevents an expert from arriving at an independent conclusion based on his review of facts and data fully disclosed to the FTC.

> **2.  The FTC has failed to show that the merger is likely to result in partial foreclosure in the console market.**

142.    On the eve of the evidentiary hearing, the FTC pivoted abruptly and suggested for the first time that it was seeking to block this deal on a partial foreclosure theory. *See* PI Reply 7. In other words, the FTC is claiming that the combined firm might not withhold *Call of Duty* from PlayStation entirely, but instead that it will simply give gamers on Xbox preferential options over PlayStation. But Professor Lee did not even try to model the effect of any partial foreclosure, and the FTC presented no evidence of any past history of partial foreclosure.

143.    Professor Lee admitted that he "did not predict the share change arising from a partial foreclosure strategy," and that he cannot offer any quantitative evidence on, for instance, timed exclusivity. 6/27/23 Tr. (Lee), at 550:22–552:5; *see also* Carlton Decl. ¶¶ 55–56. In fact, as Dr. Carlton explained, even if one were to ignore the errors in Professor Lee's foreclosure model, it does not provide any evidence that a "partial foreclosure" strategy would be profitable. Carlton Decl. ¶ 56. Professor Lee would need to identify actual partial withholding strategies and develop a new model to estimate all of the costs and benefits of such strategies. He has not done so. Carlton Decl. ¶ 56.

144.    Nor is it clear how any economic analysis even *could* support a partial foreclosure theory. If, as demonstrated above, withholding *Call of Duty* entirely from PlayStation would not lessen competition, then there is no reason to expect that merely withholding "a neat player or a tool," 6/22/23 Tr. (FTC Opening), at 27:4–10, or "cool outfits," 6/22/233 Tr. (Booty), at 98:11, would make third-place Xbox an unstoppable competitor to first-place Sony.

145.    Mr. Kotick testified that he had never heard of a developer intentionally developing a "subpar game for one platform versus another." 6/27/23 Tr. (Kotick), at 728:2–6. To do so, he said, would draw "vitriol from gamers that would be well deserved," and would "cause reputational damage to the company." 6/27/23 Tr. (Kotick), at 727:20–22. Mr. Spencer

1    agreed, testifying that "the thought that we would create a lower quality game on another

2    platform, my view is it diminishes our brand and our reputation, and it's not something I would

3    do." 3/23/23 Tr. (Spencer), at 361:2–5.

4         146.    Nor did the FTC present any evidence that Microsoft has engaged in such conduct

5    in the past. Even when Sony decided not to provide Xbox with a developer kit in time for

6    Microsoft to optimize Minecraft for the launch of the PlayStation 5, Microsoft continued to make

7    the PlayStation 4 version of Minecraft available for PlayStation 5 with no additional charge to

8    gamers who already owned it. 3/23/23 Tr. (Spencer), at 328:22–329:1.

9         147.    Moreover, the FTC's concern with partial foreclosure by Microsoft is ironic,

10   when market-leader Sony already engages extensively in the FTC's so-called partial foreclosure

11   conduct *against* Microsoft. As the undisputed evidence at the hearing showed, Sony uses its

12   large customer base and market power to further entrench itself. Sony has, for example, paid

13   third-party game publishers (including Activision) to skip Xbox altogether, to delay game release

14   dates on Xbox, to limit Xbox's ability to market certain titles, and otherwise make identical

15   games more attractive on PlayStation than on Xbox. *See, e.g.*, 6/23/23 Tr. (Spencer), at 312:20–

16   314:24, 441:18–443:1; 6/22/23 Tr. (Bond), at 161:12–165:8. The FTC does not even attempt to

17   explain how something routinely done by the market leader is anticompetitive if done by the last-

18   place competitor.

19              **3.     The FTC has failed to show that the merger is likely to substantially
                        lessen competition in the putative content library or cloud gaming
20                      subscription service markets.**

21        148.    The FTC's showing is also insufficient with respect to its proposed markets for

22   "content library" and "cloud gaming" subscription services.[35] With respect to the console market,

23   the FTC and Professor Lee at least purport to offer a quantitative analysis of likely foreclosure

24   effects, albeit a badly flawed one. But they make no such effort when they turn to the putative

25   markets for "content library" and "cloud gaming" services. *See* 6/27/23 Tr. (Lee), at 638:11–15

26   ─────────────────────
     [35] As noted above, *see supra* note 17, the FTC's complaint identified cloud gaming *subscription* services as the
27   relevant market, but in its analysis includes products like Nvidia GeForce Now that are based on a bring-your-own-
     game model. *See* Lee Decl, ¶ 18.
28

1  (cloud gaming and content library services are "both relatively nascent and new compared to

2  consoles, and the lack of really good data for these services made it very difficult to perform

3  something that I would view as reliable that's quantitative for those markets."). As discussed

4  above, those are not genuine "markets" in the first place: "content library" subscriptions compete

5  with buy-to-play (and free-to-play), and console-independent "cloud-gaming services" (to the

6  limited extent they exist) compete with native console- and PC-based gaming.

7      149.   But even if these gaming features are considered separate "markets" for antitrust

8  purposes, the FTC's Section 7 claims regarding "content-library" and "cloud gaming" services

9  would fail because the FTC does not allege—let alone substantiate any allegation—that the

10  merger will *likely* cause Activision to withhold content that it *would otherwise provide* to third-

11  party content-library or cloud-gaming providers.

12          a.   **The FTC applies the wrong legal standard.**

13      150.   As a threshold matter, the FTC misconceives the applicable legal standard

14  governing its claims about content-library subscription services and cloud gaming. As noted

15  above, the FTC must prove that this "merger will *likely* lead to a substantial lessening of

16  competition," *Oracle Corp.*, 331 F. Supp. 2d at 1109 (emphasis added)—*i.e.*, that the future

17  world with this merger is "likely" to be substantially less competitive than the but-for world

18  without the merger. *See AT&T*, 916 F.3d at 1032.[36] But the FTC does not even try to make that

19  showing as to content-library subscription services and cloud gaming subscription services.

20  Instead, Professor Lee explicitly disavows such a showing, contending that he need only show

21  that "an independent Activision" is somewhat "*more* likely" than the combined company would

---

[36] For these purposes, we are accepting *arguendo* the FTC's premise that the relevant comparison is between a *future* world with this merger and a *future* world without it. By its plain text, however, Section 7 would seem to preclude liability here for the simple reason that Activision does not make *Call of Duty* available to content-library or cloud-gaming providers today; thus, continued withholding of that content from content-library or cloud-gaming providers could not constitute a "substantial lessening" of competition. *See United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 537 (1973) ("[w]e leave for another day the question of the applicability of § 7 to a merger that will leave competition in the marketplace exactly as it was" but will nonetheless result in "less competition than there would have been" in the but-for world absent the transaction); *Marine Bancorp.*, 418 U.S. at 639 (continuing to "express no view on the appropriate resolution of the question reserved in *Falstaff*"). In all events, as discussed in the text, the FTC's alternative-market theories of harm fail even if the relevant Section 7 comparison is between future but-for and with-merger worlds.

28

1   be to "support gaming services offered by Microsoft's rivals." Lee Decl. ¶ 196 (some emphasis

2   omitted);[37] *see also id.* ¶¶ 189–90, 197; 6/27/23 Tr. (Lee), at 635:24–636:6 ("Q: And just

3   generally, Professor Lee, can you explain the evidence that supports your conclusion that the

4   merged entity *would likely foreclose* Activision content in the content library subscription

5   services market? A: So my conclusion [is] it would be *more likely* because of the merger [than]

6   absent the merger to engage in foreclosure of Activision content and content library services and

7   cloud streaming services.") (emphases added).

8       151.    To say that a merger makes an outcome "more" likely—for example, by raising "a

9   10% probability" to "a 20% probability," in Professor Lee's words, PX5001 (Lee Reply Report),

10  ¶ 48 n.38—is not to say that the merger makes that outcome *likely to occur:* a 20% chance of

11  rain does not mean that rain is "likely." Again, the relevant question instead is whether a merger

12  is "likely" to produce anticompetitive outcomes that would not otherwise occur. *See, e.g., AT&T,*

13  310 F. Supp. 3d at 246–47; *Oracle Corp.*, 331 F. Supp. 2d at 1109. Professor Lee must therefore

14  show (among many other things) that an independent Activision *likely* would support relevant

15  services offered by third parties and that the combined company *likely* would not. Professor Lee

16  abjures any such showing, and that refusal dooms the FTC's content-library and cloud-gaming

17  claims. Similarly, in *AT&T*, the court rejected a claim of increased coordination risk because,

18  *inter alia*, "the Government ha[d] failed to put forward sufficient evidence to show more than a

19  theoretical 'possibility' of coordination," given its expert's concession "that he was 'not in a

20  position to say' that coordination is 'more likely to happen than not.'" 310 F. Supp. 3d at 246–47

21  (citation omitted).

22      152.    The errors in Professor Lee's approach, if adopted by this Court, would radically

23  transform antitrust law. Professor Lee's claim that the combined company would have a "greater

24  economic incentive" to withhold content, Lee Decl. ¶ 190, is meaningless because the same

25

26  ---
    [37] Professor Lee qualifies even this tepid statement, clarifying that it "███████████████████████████
    ███████████████████████████████████████," Lee

27  Decl. ¶ 196 n.154. Any analysis that excludes consideration of such existing cloud-gaming providers is unsound for
    that reason alone, quite apart from the other defects discussed in the text.

28

DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(NO. 3:23-CV-02880-JSC)

1    claim could be made of *any* vertical merger. Professor Lee is simply asserting that the combined

2    company's incentives are slightly more complex than Activision's alone because the combined

3    company would derive *some* benefit from withholding content from its rivals (a benefit that

4    would be completely outweighed by countervailing costs). But a vertically integrated firm's

5    incentives are *always* more complex in that respect than the standalone incentives of its

6    components. In other words, if this merger could be condemned simply because the combined

7    company would derive *some* economic benefit from withholding, *any* vertical merger could be

8    condemned on the same ground, despite the indisputable pro-competitive effects of many

9    vertical mergers.

10       153.    Of course, that is not the law. Professor Lee's approach would make vertical

11   mergers presumptively (if not dispositively) anti-competitive, when courts and economists have

12   long recognized vertical mergers to be presumptively pro-competitive and legal. *See, e.g.*, *AT&T,*

13   *Inc.*, 916 F.3d at 1032 *Republic Tobacco*, 381 F.3d at 736. As discussed, the plaintiff in a vertical

14   merger case must present a rigorous showing that, among other things, the incremental benefit of

15   withholding would likely exceed the associated costs of forgone revenues and that any

16   withholding would have the effect of substantially limiting rivals' ability to compete effectively.

17   *See supra* § II.B.1. Professor Lee provides no such analysis for content library or cloud gaming

18   services.

### b.    The FTC's case rests on multiple layers of implausible speculation.

19
20
21       154.    More broadly, to carry its burden as to content-library or cloud-gaming services,

22   the FTC must prove that *all* of the following propositions are likely true:

23   •    But for this merger, Activision would *allow Call of Duty* to be available on third-
          party cloud-gaming services or day-and-date on a multigame subscription service
24        even though Activision has long refused to do so;

25   •    Xbox would nonetheless *prevent* Activision from making *Call of Duty* available to
          third-party services if this merger proceeds, when the evidence shows Microsoft is
26        entering into contracts to provide even greater access than Activision
          hypothetically would; *and*

27

28

- Withholding this one game from third-party providers (that have never before been granted access) would nevertheless hobble third-party providers and harm the competitive process, even though any given consumer could readily mix and match services from multiple providers to obtain access to his or her preferred line-up of games, as they commonly do in other media markets like video streaming.

155.   As to the cloud-gaming "market" in particular, the FTC must further prove that both of the following additional propositions are *also* likely to be true:

- That cloud gaming will develop in the near-to-intermediate term as a genuine alternative to consoles or performance PCs for multiplayer, fast-twitch, graphics-intensive games such as *Call of Duty*, despite the formidable technological and economic obstacles that no cloud provider has yet been able to overcome; *and*

- That a post-merger Xbox will become a dominant player in that cloud-gaming market even though the xCloud has experienced technical difficulties, high costs, and relatively low engagement associated with the service.

156.   The FTC cannot substantiate *any* of these propositions.

157.   *First*, but for this merger, Activision would be very unlikely to offer content to any third-party subscription library or cloud-gaming providers in the first place.[38] That point is confirmed by Activision's longstanding aversion to those business models, its ordinary-course documents, and its CEO's testimony. *See* 6/28/23 Tr. (Kotick), at 743:22–24 (agreeing that he has a "philosophical aversion" to subscription services); *id.* at 752 4-6 ("I don't think that there is a circumstance where a company could ever offer us a commercial arrangement where that would make sense."); *id.* at 731:8-14 ("In our current long-range plan, we don't have any revenues that are being generated from a [multigame] subscription service."); *id.* at 731:15–18 ("We have experimented with a few [streaming services] . . . , but I don't really think it's a big opportunity for the company"); *see also SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1211 (2d Cir. 1981) ("The *existing market* provides the framework in which the probability and extent of an

---

[38] Professor Lee asserts that "Activision content would likely be available on the Xbox Game Pass in the but-for world," but his only support for that opinion is a statement by Activision's CEO stating that "it's possible." Lee Decl. ¶¶ 125–26. Further, even if this possibility became a certainty, Professor Lee cannot even speculate that Activision content is likely to come to Game Pass on a day-and-date basis, as Microsoft has committed to do post-merger. Further, even if this possibility became a certainty, Professor Lee cannot even speculate that Activision content is likely to come to Game Pass on a day-and-date basis, as Microsoft has committed to do post-merger.

1    adverse impact upon competition may be measured." (emphasis added)). Activision has

2    consistently concluded (1) that making its new games available day-and-date in a multigame

3    subscription service would cannibalize more profitable direct sales of its games and (2) that

4    allowing games such as *Call of Duty* to be played on the cloud would generate poor user

5    experiences, thereby harming the company's reputation. Thus, the merger is likely to increase

6    (rather than decrease) access to *Call of Duty* on these services. As cloud-gaming provider Nvidia

7    explained, "[w]e see this as a benefit to cloud gaming."[39]

8        158.    *Second*, even assuming that Activision would license *Call of Duty* to some

9    content-library or cloud-service providers in the but-for world, the FTC—as discussed—has

10   alleged only that the combined company would be somewhat *less likely* (in a comparative sense)

11   to do so in the world with the merger. It has not alleged that the post-merger company would in

12   fact be *likely* to withhold that content in an absolute sense. But only the latter, unmade showing

13   would be sufficient to meet the FTC's burden to show a "likely" lessening of competition. *See*

14   *supra* § II.B.2.a.

15       159.    *Third*, even if the FTC could show both that an independent Activision likely

16   would make *Call of Duty* available to some third parties in the but-for world without the merger

17   *and* that the combined company likely would not do so in a post-merger world, that showing still

18   would not demonstrate any substantial lessening of *competition*. As discussed, exclusivity

19   arrangements are ubiquitous, and Sony and Nintendo already make far more use of them than

20   Xbox does. *See supra* § II.B.1.c. And such arrangements raise no competitive concerns except in

21   narrow circumstances involving substantial market power and large foreclosure percentages,

22   neither of which is present here. *See, e.g.*, *McWane*, 783 F.3d at 838–39; *Microsoft Corp.*, 253

23   F.3d at 71; *Alberta Gas*, 826 F.2d at 1244–46. That point disposes of the FTC's claims of

24   "foreclosure" in any of the alleged markets. While content is an important driver to any platform,

25

26   _____

     [39] Michael Kan, *Nvidia Rebuts UK, Says Microsoft-Activision Deal Good for Cloud Gaming*, PCMag.com (Apr. 28,
27   2023), https://www.pcmag.com/news/nvidia-rebuts-uk-says-microsoft-activision-deal-good-for-cloud-gaming
     (quoting Nvidia statement).

28

1  including cloud, *Call of Duty* is not the only or indispensable content. Other platforms, including

2  Switch and Nintendo, have thrived without it.

3  160.  *Fourth*, as to the cloud-gaming "market," the FTC must prove that cloud gaming

4  will develop in the near-to-intermediate term as a genuine alternative to consoles or performance

5  PCs for multiplayer, fast-twitch, graphics-intensive games such as *Call of Duty*. But the FTC has

6  shown no such thing; it merely speculates that it could happen. The evidence indicates that

7  widespread cloud gaming of the type that could support *Call of Duty* and similar multiplayer,

8  latency-sensitive games does not even exist today and is unlikely to do so within the foreseeable

9  future. 6/22/23 Tr. (Bond), at 145:6–11; 6/23/23 Tr. (Spencer), at 395:10–396:7; 6/23/23

10  (Zimring), at Tr. 470:16, 471:25–473:3. That is why Sony and others have acknowledged that

11  cloud gaming may be a decade or more away from being a viable and profitable gaming model.

12  *See, e.g.*, Ryan Dep. 83:25–84:10.

13  161.  As in previous cases, the FTC cannot challenge a merger on the basis of

14  speculation about harm to non-existent markets that are unlikely to materialize anytime in the

15  foreseeable future. *See Facebook*, 560 F. Supp. 3d at 4 (rejecting the FTC's "naked allegation" as

16  "too speculative and conclusory," especially given that the market for Personal Social

17  Networking Services was "no ordinary or intuitive market" and the "exact metes and bounds" of

18  that market were "hardly crystal clear"); *see also Tenneco, Inc. v. FTC*, 689 F.2d 346, 354 (2d

19  Cir. 1982) (rejecting the FTC's "unsupported speculation" that "Tenneco would have entered the

20  market . . . absent its acquisition of Monroe"); *Fruehauf*, 603 F.2d at 355 (rejecting the FTC's

21  theory of anticompetitive effects as "based on speculation rather than fact"); *Arch Coal*, 329 F.

22  Supp. 2d at 116 ("[A]ntitrust theory and speculation cannot trump facts."). The projected

23  anticompetitive harms must be "sufficiently probable and imminent." *Marine Bancorp*, 418 U.S.

24  at 623 n.2. Here, the FTC has not even attempted to show either.

25  162.  *Fifth*, the FTC's "cloud-gaming" theory of harm assumes not only that a cloud-

26  gaming market will develop, but that Xbox will be a major player in it. In fact, the overwhelming

27  evidence confirms that the users of Xbox's xCloud capability use it to try games they are buying

28

1   on console, not for the type of device-agnostic gaming that the FTC seems to believe is the

2   future. *See supra* § II.A.3; 6/22/23 Tr. (Bond), at 145:2–19. Moreover, ████████████████

3   ████████████████████████████████████████████████████████████████████████. It is

4   exceedingly unlikely to enter this (largely nonexistent) "market" within the foreseeable future. In

5   short, xCloud has "not [been] successful" and "does not generate profit." 6/29/23 Tr. (Stuart), at

6   1035:15–20.

### c.   The FTC and its expert fail to account for Microsoft's agreements to make *Call of Duty* available to cloud platforms.

8   163.    In all events, as explained above, Microsoft has reached agreements with five

9   different cloud gaming providers, including Nvidia, that do offer nascent cloud gaming services.

10  *See* RX1211 (Nvidia); RX3024 (Boosteroid); RX3025 (Ubitus); RX3027 (EE Limited); RX1245

11  (Nware).Those agreements ensure that such cloud providers will have access to Activision

12  content post-merger—access that *they would otherwise lack*, given Activision's entrenched

13  opposition to making its games available on the cloud. EislerAll2.49, EislerAll2.50 (155:25–

14  156:04).

15  164.    At the hearing, the FTC suggested that Dr. Carlton's analysis of these cloud-

16  gaming agreements was unreliable because he did not consider where the companies were

17  located and what effect that might have on cloud gaming in the United States. 6/28/23 Tr.

18  (Carlton), at 893:17–896:24. This line of attack is nothing but desperate speculation.[40] The

19  location of the cloud gaming providers is irrelevant; it is the location of the servers that matters.

20  And it is a matter of public record that these companies have U.S. servers. For example,

21  Boosteroid (a Ukrainian company) has gaming servers in Pennsylvania, North Carolina, Texas,

22  Illinois, Florida, Washington. *See* Boosteroid, *Important to Know About Boosteroid*,

23  https://bit.ly/44pd8Dr (last accessed June 30, 2023). If anything, that U.S. gamers can use a

24  Ukrainian service to connect to gaming servers across the United States—and, if they are

---

[40] The co-parties to these agreements are sophisticated companies with expertise in internet technology and server architecture. It is preposterous to presume that they would sign these contracts if they did not expect they could provide cloud gaming services in the United States.

1   unhappy, switch to services out of Taiwan (Ubitus), the UK (EE Ltd.), Spain (NWare), or the

2   United States (Nvidia)—demonstrates that gaming is a global market.

3          165.    Tellingly, these companies *support* this merger even though, if the FTC's

4   concerns were valid, they would be the *victims* of any foreclosure strategy. In Nvidia's words,

5   "GeForce Now and other cloud gaming providers stand to gain an even deeper catalog of games

6   if Microsoft's acquisition of Activision is completed . . . We see this as a benefit to cloud

7   gaming."[41] *See also* Fisher Dep. 126:01–07 ("[D]o I believe that Microsoft-Activision is good

8   for gamers? I – I think it is. . . . I think it's good for the industry . . . .").

9          166.    These agreements show both (1) that Microsoft is contractually bound to provide

10  *Call of Duty* and other Activision games to cloud gaming competitors and (2) that it has no

11  intention of foreclosing such competitors in the first place. The FTC is thus wrong to argue that

12  these agreements are somehow relevant only to "remedy" rather than liability. FTC Pre-Trial

13  COL ¶ 124. To the contrary, such binding contractual obligations must be considered during the

14  liability stage because they obviously affect the probability that a transaction will result in a

15  substantial lessening of competition.

16         167.    Disregarding this, the FTC cites *FTC v. Warner Communications, Inc.*, 742 F.2d

17  1156, 1164 (9th Cir. 1984), as requiring the Court to ignore Microsoft's and Activision's binding

18  post-merger legal commitments. But *Warner* says no such thing: it simply stands for the

19  proposition that a Section 13(b) proceeding is not a substitute for a full administrative trial. *Id.* at

20  1162 ("Our present task is not to make a final determination on whether the proposed merger

21  violates Section 7, but rather to make only a preliminary assessment of the merger's impact on

22  competition."). The Court cannot make a "preliminary assessment of the merger's impact on

23  competition," *id.*, without considering the combined firms' legal commitments. *See, e.g.*, *AT&T*,

24  916 F.3d at 1039 ("The district court had to determine whether the economic theory applied to

25  the particular market by considering evidence about the structure, history, and probable future of

26  the . . . industry."). Further, and contrary to the FTC's plea, *Warner* itself stressed that courts

27  _____
    [41] Kan, *supra* n.48 (quoting Nvidia statement).

28

DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
(No. 3:23-cv-02880-JSC)

1  should "*not ignore* the evidence presented by the defendants which conflict[ed] with the

2  Commission's evidence." 742 F.2d at 1164 (emphasis added). Indeed, the only Section 13(b)

3  case in this circuit to rely on the language in *Warner* relied upon by the FTC *denied* the FTC's

4  request for a preliminary injunction expressly because the Defendants "presented sufficient

5  rebuttal evidence" about the post-merger competitive landscape. *See Lab'y Corp.*, 2011 WL

6  3100372, at *21 (emphasis added).[42]

7         168.    Federal courts have consistently relied upon legal obligations—like those relied

8  upon by the merging parties here—in assessing whether a merger will actually lessen

9  competition. To take a few recent examples:

- *United States v. AT&T, Inc.*, 916 F.3d 1029, 1041 (D.C. Cir. 2019): Holding that the vertically integrated firm's contractual obligations to arbitrate disputes with downstream rivals about access to upstream content made the government's foreclosure-related concerns "largely irrelevant."

- *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 304 (D.D.C. 2020): Relied upon the merging firms' commitment to divest a key plan to a new competitor as a basis for denying the FTC's motion for a preliminary injunction.

- *United States v. UnitedHealth Group Inc.*, No. 1:22-cv-01481, 2022 WL 4365867, at *15–24 (D.D.C. Sept. 21, 2022): Considered structural guarantees, including firewalls and customer contracts, that would prevent the disclosure of customers' competitively sensitive information as part of the government's burden to show a substantial lessening of competition.

- *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 115 n.2 (D.D.C. 2004): Rejecting the FTC's argument that the court could not consider a post-merger agreement to divest a subsidiary.[43]

20         169.    And indeed, desspite asking the Court to pretend these agreements do not exist,

21  FTC counsel eventually admitted that post-merger agreements would have addressed the

22  Commission's concerns had Sony signed one. 6/29/23 Tr. (Closing), at 1056:19– ("THE

---

[42] In particular, *Labcorp* determined that it was likely "new entrants" would emerge to compete with the combined firm. 2011 WL 3100372, at *21. Here, the Court is not being asked to make a predictive judgment about what non-parties might do, but simply to evaluate Microsoft's binding legal obligations and sworn testimony.

[43] For its contrary position, the FTC recites the truism that courts do not "reach the question of remedy" if there is "no violation of § 7." FTC Pre-Trial COL ¶ 124 (quoting *United States v. Greater Buffalo Press, Inc*., 402 U.S. 549, 556 (1971)). Again, however, contractual commitments are relevant to liability, not remedy, and nothing in *Greater Buffalo Press* suggests otherwise. *See also supra*, note 19, (addressing FTC's reliance on its own statements in the stayed *Illumina* decision).

1  COURT: Let me ask you this: If Sony actually had an agreement with Microsoft, the ten-year, to

2  keep Call of Duty and future versions of Call of Duty on PlayStation and future versions of

3  PlayStation, would we be here?" . . . A. "[W]e would be here because of concerns *about the*

4  *other markets*.") (emphasis added).[44]

5      170.    The FTC argues alternatively that these agreements should be given no weight

6  because there is no reason to expect they will yield benefits to the counterparties. This is a

7  bizarrely patronizing stance for an antitrust regulator. That these sophisticated companies—

8  including Nvidia, one of only six companies with a trillion dollar market capitalization—signed

9  these contracts is powerful evidence that they will be effective, beneficial, and enforced.

10     171.    Likewise, the FTC does not justify its argument that some of these companies are

11  headquartered outside of the United States does and therefore "shouldn't even count," as the FTC

12  argues. These cloud service providers compete in the United States and offer their services to

13  U.S. customers. They cannot be excluded any more than Sony and Nintendo (both Japanese

14  companies) can be ignored when assessing the console market. *See* 6/29/23 Tr. (Closing), at

15  1136:13–16.

16     172.    In sum, the FTC offers no evidence that Activision's content is critical to cloud

17  competition or would even be an input into cloud at all, nor can it since Activision has no

18  confidence in the technology and is not inclined to support it. Even if it were, the FTC offers

19  nothing specific to cloud regarding incentive to withhold, which is particularly problematic

20  considering that Xbox has entered into agreements with no fewer than five cloud providers to

21  allow them to provide their services to any Activision games ███████. Instead, the FTC

22  appears to be imagining a far off time when the technical challenges of cloud have been solved,

23  and then claiming without any evidentiary support that Microsoft would have the incentive and

24  ability to harm competition in that theoretical world. Such a speculative case is precisely the

25  "ephemeral possibilit[y]" that the Supreme Court has counseled is not the province of Section 7.

26  _____

27  [44] In a variation on its relevance argument, the FTC argues that Microsoft "bears the burden of persuasion" on
whether these agreements will be pro-competitive. Not so; in merger cases, the "burden of persuasion . . . remains
with the government *at all times*." *Baker Hughes*, 908 F.2d at 983 (emphasis added).

28

1   *FTC v. Meta Platforms Inc.*, No. 5:22-cv-04325-EJD, 2023 WL 2346238, at *28 (N.D. Cal. Feb.

2   3, 2023).

3         173.   The FTC misleadingly attempts to convey that Nintendo's lead for partnerships,

4   Steve Singer, thought that certain language in the contract with Activision concerning Nintendo's

5   next generation console ███████████." FTC Pretrial FOF ¶ 519, at 177:22–178:8. But the

6   full context of Mr. Singer's quote ████████████████

7   ████████████████████████████

8   ██████████████████████████████

9   ████

10  ███████████████████████████████

11  █████████████████████████████

12

13  PX7065 (Singer Dep.) at 177:22–177:8. ████████████████

14  ████████████████████████████

15  ████████████████████

### III.   The Equities Weigh Against a Preliminary Injunction.

17        174.   Because the FTC has failed to demonstrate the requisite likelihood of ultimate

18  success, there is no reason for the Court to consider the equities. *Meta Platforms Inc.*, 2023 WL

19  2346238, at *33; *see also RAG-Stiftung*, 436 F. Supp. 3d at 291. "[E]quities alone will not justify

20  an injunction." *Arch Coal, Inc.*, 329 F. Supp. 2d at 116. Nonetheless, assuming for the sake of

21  argument that the FTC has made some showing of ultimate success, the equities—both public

22  and private—weigh against granting the "extraordinary and drastic remedy" of a preliminary

23  injunction. *FTC v. Staples*, 190 F. Supp. 3d 100, 115 (D.D.C. 2016).

24        175.   As a threshold matter, Microsoft's merger with Activision does not implicate the

25  "principal" "public equity consideration [that Congress had] in mind when it enacted section

26  13(b)"—namely, the need to maintain the pre-merger "status quo" so the FTC can award

27  effective relief if it succeeds on the merits. *H.J. Heinz Co.*, 246 F.3d at 726. This consideration

28

1  applies chiefly in the context of horizontal mergers where two competing companies integrate

2  their operations and, in the process, often eliminate stores, factories, or other redundant assets.

3  When that occurs, the FTC's "inability to unscramble merged assets," *FTC v. Dean Foods Co.*,

4  384 U.S. 597, 606 n.5 (1966), or revive shuttered stores post-merger may make it difficult for the

5  agency to "restore the parties to their pre-merger state," *Sysco Corp.*, 113 F. Supp. 3d at 87.

6      176.    Microsoft's *vertical* merger with Activision, however, raises none of these

7  concerns. Microsoft and Activision are not competitors in the relevant markets alleged. And

8  Microsoft intends to operate Activision similar to the way it has handled other recent

9  acquisitions, such as Mojang, ZeniMax, and other studios. Consequently, even in the (unlikely)

10 event the FTC continues to press its Part 3 case and then succeeds on the ultimate merits in that

11 proceeding, the agency can order Microsoft's divesture of Activision—"an effective ultimate

12 remedy," *FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84, 99 (N.D. Ill. 1981). As a result, the

13 "principal public equity," *H.J. Heinz Co.*, 246 F.3d at 726, cuts against the FTC: "a preliminary

14 injunction is particularly inappropriate where divestiture is a viable remedy," and that "[c]ourts

15 have routinely permitted integration of certain assets where such integration would preserve the

16 potential for divestiture in the future." *Lab'y Corp.*, 2011 WL 3100372, at *23 (citing cases). It is

17 thus unsurprising that no court has preliminarily enjoined (and thus effectively doomed) a

18 vertical merger under Section 13(b).[45]

19      177.    Other "public equities" likewise favor denying a preliminary injunction that

20 would rob consumers of the "beneficial economic effects and procompetitive advantages"

21 resulting from this merger. *See FTC v. Pharmtech Rsch., Inc.*, 576 F. Supp. 294, 299 (D.D.C.

22 1983) (citing *Weyerhaeuser Co.*, 665 F.2d at 1082–83); *see also Warner Commc'ns Inc.*, 742 F.2d

23 at 1165 ("public equities" include procompetitive benefits for consumers). The merger would

---

24 [45] The FTC's perfunctory rejection of these points as "a non sequitur," FTC Pre-Trial COL ¶ 134, is itself a non-
25 sequitur. The FTC cites *Warner Communications* as "rejecting defendants' argument 'that effective relief would still
    be possible' following the administrative proceeding." *See id.* (quoting *Warner Commc'ns Inc.*, 742 F.2d at 1165).
26 But the court there based its decision on narrow factual grounds specific to that horizontal transaction, which
    "call[ed] for [one of the parties] to dismantle its distribution operations" such that compliance with any post-hearing
27 divestiture order "would be exceedingly difficult." *Warner Commc'ns Inc.*, 742 F.2d at 1165. The FTC cites no
    remotely similar concern about post-hearing compliance here.

28

1   expand the availability of content to consumers and enhance Xbox's ability to compete against

2   the dominant console provider, Sony. While there is no risk that consumers would be injured

3   while the administrative process runs its course (even Sony's existing contract for *Call of Duty*

4   runs through 2024 and it has an offer for much longer access), consummating this merger would

5   immediately benefit consumers by increasing the availability of Activision content. The "public

6   equities" therefore cut against any delay in conferring those benefits on consumers.

7        178.    Nor would a preliminary injunction simply delay those benefits. As other courts

8   have recognized in this context, an injunction would likely eliminate the consumer benefits

9   entirely because the deal must close soon or it will fall through. *See Mo. Portland Cement Co. v.*

10   *Cargill Inc.*, 498 F.2d 851, 870 (2d Cir. 1974) ("the grant of a temporary injunction in a

11   Government antitrust suit is likely to [spell] the doom of an agreed merger"); *Weyerhaeuser Co.*,

12   665 F.2d at 1087 ("[a] preliminary injunction may kill, rather than suspend, a proposed

13   transaction"); *see supra* ¶ 15. Here, the parties' agreement expires on July 18, so the risk of the

14   deal falling through is imminent. And Activision's CEO made clear in sworn testimony that a

15   preliminary injunction would be a death knell for the merger. *See* 6/28/23 Tr. (Kotick), at

16   734:21–2 ("My board's view is that if the preliminary injunction is granted, that they don't see

17   how the deal would continue").

18        179.    The FTC suggests that Microsoft and Activision should avoid that outcome by

19   negotiating the multiyear extension of their agreement needed for them to await the outcome of

20   the FTC's own administrative proceeding and subsequent review in the court of appeals. 6/22/23

21   Tr. (FTC Opening), at 31:7–15. That suggestion is untenable. Indeed, in the history of Section

22   13(b), it appears that no unconsummated merger has ever survived a preliminary injunction

23   pending FTC administrative proceedings. *Id.* Recent FTC precedent illustrates the delays

24   inherent in that administrative process.

25        180.    In the *Illumina/Grail* case (where the FTC sought but then abandoned its request

26   for a preliminary injunction), the FTC's administrative law judge commenced an evidentiary

27   hearing on August 24, ***2021***. After careful deliberation, he issued a decision dismissing the FTC's

28

1    administrative complaint on September 9, *2022*. The FTC then reviewed that decision *de novo*,

2    and reversed—as it nearly always does when the ALJ rules for the merging parties[46]—on April 3,

3    *2023*. That case is now on appeal, with briefing still ongoing.

4        181.    Besides denying consumers this merger's procompetitive benefits, a preliminary

5    injunction would also cause Microsoft's shareholders to incur substantial unrecoverable losses,

6    such as a $3 billion termination fee to Activision. PX0083. Such "private equities," too, "are

7    entitled to serious consideration." *See Warner Commc'ns Inc.*, 742 F.2d at 1165; *Weyerhaeuser*,

8    665 F.2d at 1083 (explaining that courts "have no warrant to drop private equities from the

9    calculus"); *see also* 6/28/23 Tr. (Kotick), at 734:2–5 (noting that 98 percent of Activision

10   shareholders voted for the merger).

11       182.    In sum, the FTC does not need an injunction to safeguard its ability to award

12   effective relief at the conclusion of its administrative process, and other public and private

13   interests favor permitting the parties to consummate this pro-competitive transaction. While

14   "equities alone will not *justify* an injunction," *Arch Coal, Inc.*, 329 F. Supp. 2d at 116 (emphasis

15   added), they weigh decisively against granting one.

16       183.    The FTC repeatedly invokes the principle that public equities outweigh private

17   ones, yet the agency presents no evidence that the public equities actually tip in its favor. *See,*

18   *e.g.*, FTC Pre-Trial COL ¶ 130. Such equities cannot simply be presumed. It the FTC's burden to

19   present evidence and make an actual showing that that the equities favor enjoining the

20   transaction. *See, e.g., Arch Coal,* 329 F. Supp. 2d at 160 (finding that the evidence presented by

21   the FTC on equities was insufficient); *FTC v. Ill. Cereal Mills, Inc*., 691 F. Supp. 1131, 1140

22   (N.D. Ill. 1988) (The FTC "must show that the equities favor issuing the relief sought."), *aff'd*

23   *sub nom. FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989); *Great Lakes Chem. Corp.*,

24

25

---

26   [46] *See* Joshua D. Wright, Comm'r, FTC, *Section 5 Revisited: Time for the FTC to Define the Scope of Its Unfair*
     *Methods of Competition Authority* 6 (Feb. 26, 2015), https://bit.ly/3AGJYRj ("In other words, in 100 percent of
27   cases where the administrative law judge ruled in favor of the FTC staff, the Commission affirmed liability; and in
     100 percent of the cases in which the administrative law judge ruled found no liability, the Commission reversed.").

28

1   528 F. Supp. at 86 ("[T]he FTC must show that 'the equities' favor enjoining the transaction.").

2   The FTC has made no such showing here.

3       184.    Nor is it sufficient for the agency to rely on the need to maintain the status quo

4   that so often justifies preliminary injunctions under Section 13(b). To The only reason for the

5   *need* to maintain the status quo is that failure to maintain it can, in the mine run of horizontal

6   merger cases, prevent the agency from affording effective relief. *See, e.g.*, *H.J. Heinz Co.*, 246

7   F.3d at 726 (discussing congressional rationale for enacting § 13(b)). In those contexts, the FTC's

8   "inability to unscramble merged assets," *FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966),

9   or "restore the parties to their pre-merger state" can necessitate a preliminary injunction to

10   preserve the status quo. 3d at 87. But in the context of this vertical merger, such concerns are

11   irrelevant. So parroting language about the need to maintain the status quo does not suffice to

12   meet the agency's burden.

13       185.    The only thing the FTC says on this point is that Microsoft's "speculation that

14   divestiture may still be 'possible' after the administrative proceeding, is a non sequitur." *See*

15   FTC Pre-Trial COL ¶ 134. The FTC does not explain why Microsoft's explanation regarding the

16   undisputed differences between vertical and horizontal mergers is "a non sequitur.,". Instead, the

17   agency simply cites *Warner Communications* as "rejecting defendants' argument 'that effective

18   relief would still be possible' following the administrative proceeding." *See* FTC Pre-Trial COL

19   ¶ 134 (quoting *Warner Commc'ns Inc.*, 742 F.2d at 1165). But the reason that *Warner*

20   *Communications* rejected that argument was that the court was presented with affirmative

21   evidence that "effective relief" would *not* be possible because the transaction called for one of

22   the parties "to dismantle its distribution operations," and the defendants would be unable "to

23   make alternate distribution arrangements" if required to undo their joint venture subject to a

24   divestiture order. *Warner Commc'ns Inc.*, 742 F.2d at 1165.

25       186.    In sum, the FTC simply ignores the cases holding that "a preliminary injunction is

26   particularly inappropriate where divestiture is a viable remedy," and that "[c]ourts have routinely

27   permitted integration of certain assets where such integration would preserve the potential for

28

1 | divestiture in the future." *Lab'y Corp.*, 2011 WL 3100372, at *23. Ignoring the law, and

2 | presenting no facts to suggest that divestiture would not be a viable remedy in this case, the FTC

3 | has not met its burden to establish that the public equities weigh against the merger.

4 | <u>**CONCLUSION**</u>

5 | For the foregoing reasons, the FTC's Motion for a Preliminary Injunction is **DENIED**.

6 | Further, because a decision on the FTC's request for a preliminary injunction "effectively

7 | terminate[s] the litigation and constitute[s] a final order," this case is **DISMISSED**. *FTC v.*

8 | *Hackensack Meridian Health, Inc.*, 30 F.4th 160, 165 n.2 (3d Cir. 2022).

9

10 | Dated: June 30, 2023                                      Respectfully submitted,

11 | By: */s/ Beth Wilkinson*

Caroline Van Ness (SBN 281675)          Beth Wilkinson (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER          Rakesh N. Kilaru (*pro hac vice*)
& FLOM LLP                                              Kieran Gostin (*pro hac vice*)
525 University Avenue                              James Rosenthal (*pro hac vice*)
Palo Alto, California 94301                       Grace Hill (*pro hac vice*)
Telephone: (650) 470-4500                     Anastasia M. Pastan (*pro hac vice*)
Facsimile: (213) 621-5430                       Sarah Neuman (*pro hac vice*)
caroline.vanness@skadden.com              Alysha Bohanon (*pro hac vice*)
                                                                Jenna Pavelec (*pro hac vice*)
Steven C. Sunshine (*pro hac vice*)        WILKINSON STEKLOFF LLP
Julia K. York (*pro hac vice*)                    2001 M Street, N.W., 10th Floor
SKADDEN, ARPS, SLATE, MEAGHER          Washington, D.C. 20036
& FLOM LLP                                              Telephone: (202) 847-4000
1440 New York Avenue, N.W.                 Facsimile: (202) 847-4005
Washington, DC 20005-2111                   bwilkinson@wilkinsonstekloff.com
Telephone: (202) 371-7000                     rkilaru@wilkinsonstekloff.com
Facsimile: (202) 393-5760                       jrosenthal@wilkinsonstekloff.com
steven.sunshine@skadden.com              kgostin@wilkinsonstekloff.com
julia.york@skadden.com                          ghill@wilkinsonstekloff.com
                                                                apastan@wilkinsonstekloff.com
Michael J. Sheerin (*pro hac vice*)          sneuman@wilkinsonstekloff.com
Evan R. Kreiner (*pro hac vice*)              abohanon@wilkinsonstekloff.com
SKADDEN, ARPS, SLATE, MEAGHER          jpavelec@wilkinsonstekloff.com
& FLOM LLP
1 Manhattan West                                   Jonathan E. Nuechterlein (*pro hac vice*)
New York, NY 10001                               C. Frederick Beckner III (*pro hac vice*)
Telephone: (212) 735-3000                     William R. Levi (*pro hac vice*)
Fax: (212) 735-2000                                Daniel J. Hay (*pro hac vice*)
michael.sheerin@skadden.com              Lucas Croslow (*pro hac vice*)
evan.kreiner@skadden.com                    Manuel Valle (*pro hac vice*)
                                                                Aaron P. Haviland (*pro hac vice*)
*Counsel for Defendant Activision Blizzard,*   SIDLEY AUSTIN LLP
*Inc.*                                                       1501 K Street, N.W.
                                                                Washington, D.C. 20005

1                                      jnuechterlein@sidley.com
                                       rbeckner@sidley.com

2                                        william.levi@sidley.com
                                       dhay@sidley.com

3                                        lcroslow@sidley.com
                                       manuel.valle@sidley.com

4                                        ahaviland@sidley.com

5                                        Bambo Obaro (SBN 267683)
                                       WEIL, GOTSHAL & MANGES LLP

6                                        201 Redwood Shores Parkway
                                       Redwood Shores, CA 94065

7                                        Telephone: (650) 802-3083
                                       Facsimile: (650) 802-3100

8                                        bambo.obaro@weil.com

9                                        Megan A. Granger (*pro hac vice*)
                                       Michael Moiseyev (*pro hac vice*)

10                                       WEIL, GOTSHAL & MANGES LLP
                                      2001 M Street, NW

11                                       Suite 600
                                      Washington, DC 20036

12                                       Telephone: (202) 682-7000
                                      Facsimile: (202) 857-0940

13                                       megan.granger@weil.com
                                      michael.moiseyev@weil.com

14

15                                    *Counsel for Defendant Microsoft Corp.*

16

17

18

19

20

21

22

23

24

25

26

27

28