James H. Weingarten, DC Bar No. 985070
Peggy Bayer Femenella, DC Bar No. 472770
James Abell, DC Bar No. 990773
Cem Akleman, FL Bar No. 107666
Meredith R. Levert, DC Bar No. 498245
Jennifer Fleury, NY Bar No. 5053178
James Gossmann, DC Bar No. 1048904
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3570
*jweingarten@ftc.gov; pbayer@ftc.gov:*
*jabell@ftc.gov; cakleman@ftc.gov;*
*jfleury@ftc.gov; mlevert@ftc.gov;*
*jgossmann@ftc.gov*

Erika Wodinsky, Cal. Bar No. 091700
90 7th Street, Suite 14-300
San Francisco, CA 94103
Tel: (415) 848-5190
*ewodinsky@ftc.gov*

[Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **MICROSOFT CORP.** <br><br> and <br><br> **ACTIVISION BLIZZARD, INC.,** <br><br> Defendants. | Case No. 3:23-cv-2880 <br><br> **PLAINTIFF FEDERAL TRADE COMMISSION'S FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

# TABLE OF CONTENTS

I.   BACKGROUND ...................................................................................................... 15

A.   Gaming is the Largest Category in the Entertainment Industry, and It Continues to Grow .................................................................................... 16

B.   Console Gaming ............................................................................................ 18

1.   PlayStation and Xbox are Fierce Competitors, and Nintendo is Differentiated .. 19

2.   Console Gaming is Distinct from PC and Mobile Gaming ................................. 28

a) PC Gaming Is Distinct ......................................................................... 28

b) Mobile Gaming Is Distinct ................................................................... 31

C.   Multi-Game Content Subscription Services ................................................. 33

D.   Cloud Gaming Subscription Services ........................................................... 35

E.   A Gaming Platform Must Offer AAA Content to Succeed ........................... 40

1.   The Industry Has a History of Consolidation ................................................... 42

2.   A Small Group of Top AAA Games Is Particularly Important .......................... 44

3.   AAA Games are Difficult and Costly to Make .................................................. 46

F.   Exclusive Gaming Content is Important for Attracting Customers and Driving Sales ................................................................................................. 47

G.   Activision Content is Particularly Important ................................................ 52

H.   Microsoft Has a History of Making Content from Acquired Studios Exclusive . 58

II.  RELEVANT MARKETS ......................................................................................... 58

A.   High-Performance Consoles Constitute a Relevant Product Market ................ 58

B.   Video Game Consoles Also Constitute a Relevant Market ........................... 67

C.   Multi-Game Content Subscription Services Constitute a Relevant Product Market .......................................................................................................... 69

D.   Cloud Gaming Subscription Services Constitute a Relevant Product Market ..... 73

E.   Multi-Game Content Subscription Services and Cloud Gaming Subscription Services Together Constitute a Relevant Product Market .................................. 80

F.   The Relevant Geographic Market Is the United States .................................. 82

1.   Game Prices and Releases Vary Country-by-country, Supporting the Ability of Market Participants to Price Discriminate ........................................................ 82

2.   Gamer Preferences and Behavior Vary Country-by-country and Inform Market Participants' Strategic Decisions .................................................................... 85

III. RELATED PRODUCT .......................................................................................... 86

A.   Activision Content Is an Important Input that Drives Acquisition, Engagement, and Retention ................................................................................................ 86

**IV.   THE PROPOSED ACQUISITION IS LIKELY TO RESULT IN A SUBSTANTIAL LESSENING OF COMPETITION** ...................................................91

   A.   Microsoft Would Have the Ability to Foreclose Rivals in the Relevant Markets ...................................................................................................................91

   B.   Unlike an Independent Activision, the Combined Firm Would Have an Incentive to Foreclose in the Relevant Markets....................................................93

      1.   The Combined Firm Will Have an Increased Incentive to Foreclose in High-Performance Consoles and Video Game Consoles...............................93

      2.   The Combined Firm Will Have an Increased Incentive to Foreclose in Content Subscription Services and Cloud Gaming Services...........................102

      3.   Microsoft's Deal Model Predicted Recoupment of Losses .............. 108

      4.   The Combined Firm Will Have Decreased Incentive to Collaborate on Innovations in the Relevant Markets ..................................................110

   C.   Microsoft's Past Statements and Actions Demonstrate Microsoft has the Ability and Incentive to Foreclose Rivals Post-Acquisition ...........................112

      1.   Microsoft is Willing to Lose Money on First-party Exclusive Titles and Treat Them as a "Loss Leader."..................................................................112

      2.   Past Acquisitions......................................................................... 114

      3.   ZeniMax........................................................................................ 116

      4.   *Minecraft* is Not Predictive of Microsoft's Behavior Here ............... 125

      5.   Current First Party Games ............................................................ 129

   D.   The Proposed Acquisition is Likely to Harm Competition ................. 130

      1.   The Proposed Acquisition is Likely to Result in Competitive Harm in the Market for High-Performance Consoles and Video Game Consoles............................ 130

      2.   The Proposed Acquisition is Likely to Result in Competitive Harm in Content Subscription Services and Cloud Gaming Services...........................133

      3.   The Proposed Acquisition is Likely to Harm Innovation ................. 138

   E.   Respondents Cannot Rebut Complaint Counsel's Prima Facie Case Showing the Proposed Acquisition Would Result in Competitive Harm ..............................142

      1.   Respondents Cannot Demonstrate that Entry or Expansion would be Timely, Likely, or Sufficient to Prevent Harm from the Proposed Acquisition .............142

         a) Entry into Consoles Markets is Unlikely to be Timely, Likely, or Sufficient to Reverse the Likely Harm of the Proposed Transaction.................................142

         b) Entry or Expansion into the Broader Content and Cloud Services Market, the Content Library Services Market and Cloud Gaming Services Market—is Unlikely to be Timely, Likely, or Sufficient to Reverse the Likely Harm of the Proposed Transaction ...................................................................144

      2.   Defendants Cannot Show Efficiencies or Procompetitive Benefits that Negate Competitive Harm...........................................................................146

F.     F. Microsoft's Recently Executed or Proposed Agreements Fail to Replace the Competitive Intensity Likely to Be Lost from the Proposed Acquisition. ........ 152

**V.     PROPOSED CONCLUSIONS OF LAW** ..................................................... 163

A.     The FTC Is Likely to Succeed on the Merits of Its Section 7 Challenge .......... 167

B.     High-Performance Consoles, Multi-Game Content Library Subscription Services, and Cloud Gaming Subscription Services Are Relevant Markets ..... 172

1.     The Relevant Markets Satisfy the *Brown Shoe* Practical Indicia .................... 175

2.     The Relevant Markets Satisfy the HMT ........................................................ 176

3.     Harm is Also Likely to Occur in Broader Relevant Product Markets .............. 176

C.     The United States is the Relevant Geographic Market .................................... 177

D.     Activision's Gaming Content Is a Related Product to the Relevant Markets .... 178

E.     The Proposed Acquisition Has a Reasonable Probability of Substantially Lessening Competition in the Relevant Markets ............................................... 179

1.     Foreclosure of Microsoft's Rivals in the Relevant Markets ............................ 179

2.     Harm to Innovation in the Relevant Markets ................................................ 184

F.     Defendants Fail to Meet their Burden to Show Entry Will Be Timely, Likely, and Sufficient to Counteract the Competitive Harm from the Proposed Acquisition ........................................................................................................ 185

G.     Defendants Fail to Meet their Burden to Demonstrate That Their Proposed Efficiencies and Any Other Alleged Procompetitive Benefit Offset the Competitive Harm .......................................................................................... 186

H.     Proposed Remedies Are of Questionable Relevance in a § 13(b) Proceeding .. 190

I.     Temporary Relief to Preserve the Status Quo is in the Public Interest.............. 193

**EXECUTIVE SUMMARY**

i.  Microsoft's proposed acquisition of Activision is a permanent restructuring of the gaming industry.  One of the "Big Four" publishers will be permanently owned by one of the largest platform holders. This restructuring would eliminate the independence of the maker of Call of Duty—the most successful video game franchise in history—and place it under the control of Microsoft.

ii.  In the video gaming industry, regardless of whether a gamer likes to play games on a console, through a subscription service, or through cloud gaming streaming services, one thing is clear: "Content is king."  *See* § I. A.

iii.  AAA content is so important that Microsoft is willing to pay $70 billion to acquire Activision – in large part because of the unique durability and sustainability of Activision's Call of Duty franchise.  *See* § I.; Sec. I. G.

iv.  Despite analogies made during this hearing, the competitive dynamics of the video game industry do not map onto movies, music, and other entertainment.  First, the development costs of video games are magnitudes larger than any other form of entertainment.  AAA games like Call of Duty require hundreds of millions of dollars to make with development teams in the hundreds.

v.  Second, development cycles take years with uncertain prospects on when the games will be finalized and shipped.  Third, video games drive engagement that is far beyond that of movies.  Gamers can spend hundreds of hours on a single game like Call of Duty, which translates into billions of dollars monetized from gamers—not only from the sale of the base game but from additional content sold in online stores.  For Call of Duty—which has over 20 games in the franchise over 20 years—transferring ownership to Microsoft is not the same as a single movie being made by a different studio.

vi.  As an independent publisher, Activision's incentives differ significantly from the incentives of a merged Microsoft/Activision. *See* § IV B. 1.; Section IV D. 2.; § IV E. 2.

vii. Activision is currently "platform agnostic" and wants its gaming content, including Call of Duty, available on as many platforms as possible. *See* § I. H; § IV. D. 2.

viii. Microsoft and Sony currently compete for partial or full exclusive deals with specific games from Activision (and other independent game developers), in order to differentiate their generation 9 consoles, subscription services, and cloud gaming streaming services. *See* § I. F., G.

ix. This competition between Microsoft and Sony for gaming content benefits consumers in a number of ways. First, it enables co-development between Microsoft and Activision and between Sony and Activision to innovate on both video games themselves, and on console hardware to improve the gaming experience for consumers. *See* § IV. B. 3; § IV. D. 3.

x. For example, ████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████ *See* § IV. D. 3.

xi. In order for co-development to be possible and successful, proprietary information about Sony or Microsoft's consoles, business strategies, and long-term strategic plans, are shared with Activision, who does not compete with Sony or Microsoft in consoles. *See* § IV. B. 3; § IV. D. 3.

xii. Post-Merger, Microsoft would have the incentive and ability to improperly use this confidential and strategic information from Sony. This ability and incentive will likely prevent Sony from sharing its proprietary information, limiting the ability for innovation on Sony's video gaming platforms to occur as it does today with Activision. This in turn harms consumers who benefit from ███████████████████████████ ████████████████████████████████████ *See* § IV. D. 1, 3.

xiii. Second, the competition for gaming content promotes competition between video game platform manufacturers to improve and innovate their platforms and their product offerings. *See* § IV. D. 3.

xiv.   Post-Merger, Microsoft will also have the ability and incentive to entirely or partially foreclose Sony from Activision content, including Call of Duty. *See* § IV. B. 1.

xv.   Microsoft has shown it has both the ability and incentive to engage in foreclosure, through its actions after past acquisitions. *See* § IV. C. 1-3.

xvi.   While ZeniMax does not have an exact Call of Duty equivalent (no one does), ZeniMax had popular games that gamers want to play and take into consideration when they make their purchasing decisions.  *See* § IV C. 3.

xvii.   ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████. Lawyer Tr. 235:9-16; 242:24-246:9.

xviii.   ████████████████████████████████████ ████████████████████████████████████. Lawyer Tr. 236:14-18.

xix.   ████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████ *See, e.g.* § IV.C.3, ¶¶ 590-595; *see also* § IV.C.1.

xx.   These titles included *Redfall* and *Starfield*.  Microsoft has also indicated it plans take the next version of the popular franchise *Elder Scrolls*, *Elder Scrolls VI*, exclusive when it is released. *See* § IV.C.3.

xxi.   Microsoft did the same type of analysis for its Board of Directors for the Microsoft/Activision acquisition, modeling ██████████████████████ *See* § IV.B.3

xxii.   While Microsoft may need to consider potential reputational effects, Microsoft still has the ability and incentive to foreclose or partially foreclose Activision content, including *Call of Duty* from gamers who prefer the Sony platform. *See* § IV.B.1.

xxiii. Microsoft Gaming Chief Financial Officer Tim Stuart modeled different ways to "fill the gap" from potential revenue losses for Activision arising from reduced business with Sony could be offset by a boost in Microsoft's console and online gaming business. *See* § IV.B.3.

xxiv. Dr. Carlton is the only witness for Defendants that testified regarding Plaintiff's allegations of potential competitive effects of the Acquisition, and his analysis relied mostly on the side agreements that Microsoft signed with a limited number of third parties. *See* § IV.F.  Dr. Carlton's statements and analyses that these agreements guaranteed the third-parties access to *Call of Duty* had "no evidentiary value in terms of whether it's guaranteed." Trial Tr. Vol.5 at 1115:19-1116:2. *See* § IV.F, ¶ 761.

xxv. Defendants offered no analysis, quantitative or otherwise, of the potential procompetitive benefits of the side agreements.

xxvi. There is no evidence in the record, other than the agreements themselves, for how the terms of the agreements will be interpreted and enforced. *See* § IV.F.

xxvii. ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████. (Ryan Trial Testimony, 62:25-63:08); (PX3110 at 028-29), PX3378 at 019 (Ryan (Sony) Hr'g Testimony at 65:16-65:19); 4) PX3378 at 017 (Ryan (Sony) Hr'g Testimony at 61:5-11); PX7053 (Ryan (Sony) Dep.) at 69:19-70:2 (discussing PX3110 at 037 (Microsoft Proposal to Sony, Dec. 23, 2022)).  *See* § IV.F, ¶¶ 800-809.

xxviii. Additionally, Sony has concerns about the sharing of confidential business information with a competitor. If the merger is allowed, collaboration between Sony and Activision on console innovations would be lost, because "the commercial risks associated with [] knowledge of these feature sets leaking to our principle competitor is not something that

we would choose to reply on any contract to enforce." PX3378 at 011 (Ryan (Sony) Hr'g Testimony at 39:11-15). *See* § IV.D.3.

xxix. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████ *See* § IV.F, ¶¶760, 792-794; PX3381
██████████████████████ PX1781.

xxx. A significant portion of the Nvidia agreement is not merger specific. Specifically, as part of the agreement Nvidia received access to Microsoft gaming content. This deal could have been reached with out the Acquisition, and there is not merger specific. *See* § IV.F, ¶¶ 783-787.

xxxi. ███████████████████████████████████
███████████████████████████████████████
███████████████ *See* § IV.F, ¶ 786.

xxxii. The Nintendo agreement is not merger specific. Bobby Kotick testified that he regretted not putting Call of Duty on the Nintendo Switch earlier and would consider putting Call of Duty on the Nintendo Switch. *See* § IV.E.2, ¶ 720.

xxxiii. There is no evidence in the record quantifying the potential benefits from Microsoft's agreements with the small cloud provider agreements. The evidence indicates that these providers are not U.S. companies, and that the companies are located in other countries including Ukraine, Taiwan and Spain. *See* § IV.F, ¶¶ 756-758

xxxiv. Temporary relief to ensure the current status quo is in the public interest. There is immediate harm if Microsoft and Activision are allowed to merge right now. The parties can immediately begin sharing confidential information including strategic and long-term plans. *See* § I.

xxxv. Microsoft and Activision could also immediately start making exclusivity plans and announcements. For example, the ZeniMax deal closed on March 9, 2021, and on June

1   13, 2021, Microsoft publicly acknowledged that Starfield and Redfall will be going

2   exclusive in blog posts. PX00003. *See* § IV.C.3, ¶¶ 598, 603.

3   xxxvi.   Record evidence actually indicates that Microsoft made a decision ███████

4   ████████████████████████████████ PX1391-003

5   ████████████████████████████████████████

6   █████████████████████████████████████

7   ████████████████ PX4323. PX7042 (Lawver (Microsoft) Dep.) at 302:2-5

8   █████████████████████████████████████████████

9   █████████████████████████ *See* § IV.C.3, ¶ 602.

10  xxxvii.   Plaintiff has demonstrated that Microsoft has the ability and incentive to foreclose or

11  partially foreclose Activision content in the consoles market, subscription services market

12  and the cloud game services market and that the equities favor a preliminary injunction.

13  *See* §§ IV.D, V.E, I.

14

15  xxxviii.   Plaintiff has demonstrated harm in each of the relevant markets but is only required to

16  demonstrate that the acquisition poses a reasonable probability of harm in ***any*** relevant

17  market. *Crown Zellerbach Corp. v. FTC*, 296 F.2d 800, 812 (9th Cir. 1961) ("In the

18  statutory phrase 'in any line of commerce', the word entitled to emphasis is 'any'."). *See*

19  § V.B.

20  **I.      Responses to the Court's Core Questions at Closing**

21  ***Are ZeniMax titles comparable to Call of Duty, for purposes of assessing Microsoft's***

22  ***incentives?  Hr'g Tr. 1051:17-20.***

23  xxxix.   Yes, ZeniMax titles are comparable to Call of Duty, for purposes of assessing

24  Microsoft's incentives.  In the ten-year period before ZeniMax was acquired by

25  Microsoft, ZeniMax had never released a game exclusive to a single console.  Hines

26  (Microsoft) Hr'g Tr. 91:2-13.  Since the acquisition, Microsoft has made two major new

27  releases Microsoft exclusives, *Starfield* and *Redfall*; announced that another ZeniMax

28  billion-dollar eagerly anticipated title, *Elder Scrolls 6*, will be exclusive to Microsoft; and

1   paid to have a new Indiana Jones game changed from multi-platform, as it was under its

2   original contract, to exclusive. *See* § IV.C. The fact that none of these games exactly

3   mirrors all of the attributes of Call of Duty is not the FTC's point – *Call of Duty* is

4   unique.

xl.   Instead, Microsoft's actions and its statements about ZeniMax undermine the credibility

of its claimed incentives today. Microsoft publicly and privately disclaimed any incentive

to make ZeniMax content exclusive, just like with Activision today. Once it completed

the acquisition, it conducted a new analysis and decided it would make future ZeniMax

content exclusive. See § IV. C. 3.

xli.   *Elder Scrolls 6* is a beloved repeat franchise, like *Call of Duty*. *Redfall* is a multi-player

game that was designed to work cross platform, like *Call of Duty*. See § IV. C.*Starfield*

is one of the most expensive, ambitious, and eagerly anticipated titles of the year, like any

*Call of Duty* release, that was switched to being a Microsoft exclusive to the great

disappointment of a large number of gamers. See § IV. C. ZeniMax was one of the few

powerful independent publishers capable of making billion dollar franchises at the time

of the Microsoft acquisition. See § IV. C. In acquiring ZeniMax, Microsoft acquired four

additional billion dollar franchises (*Fallout*, *Doom*, *The Elder Scrolls*, *Dishonored*), to

add to its six (*Halo*, *Minecraft*, *Age of Empires*, *Flight Simulator*, *Gears of War*, *Forza*),

for a new total of 10 billion dollar franchises. See § IV. C. As Phil Spencer told fans at

the ZeniMax announcement, Microsoft's spate of acquisitions was about creating a moat

of exclusive content for its platforms, including Game Pass and xCloud. See § IV. C. The

ZeniMax acquisition offers a clear picture of how the merged firm's incentives differ

from an independent developer.  In the words of Phil Spencer, the Court should focus on

"the actions we have taken as a publisher." Spencer Tr. (Vol. 2) at 360:5-13.

***Should the relevant market include PCs (regular PCs and/or gaming PCs)?  Hr'g Tr. 1081:5-
15.***

xlii.   No. The type of PCs that can run AAA games like Call of Duty in a comparable way to the Xbox Series consoles or PlayStation 5 are extremely advanced, dedicated gaming machines.  PX0003 at 136 Bond (Microsoft) Hr'g Tr. 130:18-23. See § I. B. 2.

xliii.  Typical general purpose laptops cannot, for example, play Call of Duty Modern Warfare II because their technical abilities are underpowered. Bond (Microsoft) Hr'g Tr. 143:23-144:2.  See § I. B. 2. Advanced gaming PCs are also excluded from the relevant market. First, the consumer experience is very different from consoles. See § I. B. 2. Gaming PCs are assembled from specialized parts, often customized and require the consumer to have greater technical sophistication than the purchasers of consoles who are required to do very little set up after they take the console out of the box. PX8001 (Ryan (Sony) Decl. ¶ 15). Second, the wide variety of specialized PC parts means that gaming PCs have a large range in technical performance compared to consoles which provides a more standardized experience; some PCs can run graphically demanding games at a better performance than the latest Generation 9 consoles. Bond (Microsoft) Hr'g Tr. 130:24-131:3. Third, the specialized parts also means that gaming PCs tend to be far more expensive than the Xbox Series consoles and PlayStation 5 consoles, both priced at $500. Gaming PCs often cost anywhere from $800 to more than $2,500.  PX8001 (Ryan (Sony) Decl.) ¶ 15.

xliv.   These differences between gaming PCs and consoles from the consumer perspective translate into different commercial strategies. See § I. B. 2. The consumers shopping for a device to play Call of Duty do not perceive gaming PCs to be a substitute for consoles like Xbox and PlayStation. See § I. B. 2. ██████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████ PX1563 (Microsoft) at 025-30; Ryan Hr'g Testimony (PX7054 (Ryan (Sony) Dep. Vol. II) at 98:11-14)

xlv.    The key case for understanding why gaming PCs should not be in the relevant market is *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008).  The FTC in that case

proposed a product market of premium, natural, and organic supermarkets. *Id.* at 1032. The district court concluded that less specialized grocery stores and supermarkets competed against these premium, natural, and organic supermarkets. *Id.* at 1033. On appeal, the D.C. Circuit noted that "[o]f course customers cross-shop" between these premium grocery stores and more generalized grocery stores, but "[t]he fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market." *Id.* at 1041. Gamers can play Call of Duty on very advancing gaming PCs, but that does not imply there is no definable market of high-performance video game consoles.

***If the merger goes forward, how would consumers in the console market be harmed? Hr'g Tr. 1055:16-23.***

xlvi. In the consoles market, consumers who want to play each new optimized version of Call of Duty or other Activision games will be forced to purchase an Xbox or settle for less.  In the subscription services market, Microsoft's clear intent to make its acquired content exclusive. ████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████ ██████████████ This means other subscription current or future subscription service competitors will not have the ability to negotiate to offer ATVI's content on their services. The same is true for most current or future cloud gaming competitors. While MSFT has signed deals with several small cloud-gaming providers, all of whom are out of market other than Nvidia, notably those companies only offer "Bring Your Own Game" models, where a gamer must already own a game in order to stream it on the service. MSFT does not have deals with the other two largest cloud-gaming services (Amazon Luna and PS Plus Premium), both of whom offer subscription content models (whereby gamers can stream games through the subscription without having to already

own the games). Allowing MSFT to pick the winners in this nascent market harms competition, particularly when MSFT has picked "winners" who seem to offer the least competitive threat.

xlvii.   In all relevant markets, Microsoft's efforts to build a "moat" of exclusive content through acquisitions will stymie new entrants' ability to provide other options for consumers to access gaming content. PX8003, paragraph 24 ("[Google Stadia's] experience with Microsoft's 2021 acquisition of ZeniMax, parent of the iconic game studio Bethesda Softworks, shows that Activision under Microsoft's ownership very likely will be unwilling to bring its titles to competing game platforms, especially those competing with its leading cloud gaming and Windows platforms, making it more difficult for existing and new platforms to attract users and compete against Microsoft's services.") See sec. IV.C.1. paras. 559-567; IV.C.3. paras. 575-613.

**Why don't the side agreements address the potential competitive effects of the merger? Hr'g Tr. 1133:34**

xviii.   The agreements between Microsoft and cloud gaming services providers and Nintendo do not effectively address the potential competitive effects of the merger for several reasons. First the agreements are with a limited number of market participants. For example, there are no agreements between Microsoft and Google or Microsoft and Amazon – the two other significant cloud gaming service providers. While Google Stadia exited the market earlier this year, the testimony was clear that the main reason Stadia exited was lack of AAA content, and Activision clearly has substantial AAA content. *See* sec. IV.F. paras. 756-767.

xlix.   Second, Microsoft did not attempt to quantify the potential benefits from any of these agreements. See sec. IV.F. paras. 758-761. I.D. para. 175; I.E. paras.183, 187Microsoft's expert, Dr. Carlton, did not conduct any quantitative analysis of the consumer benefits of the hastily signed third party agreements. See sec. IV.F. paras. 758-761.Microsoft's Chief Financial Officer for Xbox Gaming, Tim Stuart, did not conduct any financial analyses of the signed agreements with Nvidia, Nintendo, or the cloud gaming service

providers.  See sec. IV.F. paras. 775, 795. Microsoft's Chief Financial Officer for Xbox Gaming, Tim Stuart, did not conduct any financial analyses of Microsoft's proposal to Sony for Call of Duty. *See* sec. IV.F. para. 809.

l.   Third, the record evidence demonstrates that at least two companies were concerned with the terms of the agreements or proposed agreements. *See* sec. IV.F. paras. 758, 801, 806

li.   Finally, there is no evidence in the record, other than the agreements themselves, about their potential efficacy or how they will "guarantee" access to Call of Duty on consoles, subscription services, or cloud gaming streaming services. *See* sec. IV.F. paras. 754-766.

***Will immediate harm will occur if the parties are allowed to merge?  Hr'g Tr. 1168:1-1169:14.***

lii.   Yes, if this merger is consummated the harm begins immediately.  If a preliminary injunction is not granted, Microsoft and Activision can begin to share confidential business information, long term strategic planning information, and can begin to make exclusivity plans.  Competitors who currently share information with Activision in order to engage in procompetitive innovations will likely stop sharing information with a combined Microsoft/Activision. Without a preliminary injunction, even if the FTC ultimately prevails in its August 2 administrative trial, Microsoft and Activision could begin to engage in foreclosure or partial foreclosure during the pendency of the litigation and any appeals process. This will result in ongoing harm to consumers that will be difficult to remedy after the full litigation process runs its course.

***What is the basis for Professor Lee's 20% conversion rate? Hr'g Tr. 1058:14-16.***

liii.   Professor Lee's 20% Xbox Conversion rate, as used in his Vertical Foreclosure model, is based on ordinary course evidence and actual data, and therefore was a reliable input into his model. In his vertical foreclosure model, Professor Lee uses an Xbox Conversion rate of 20%. The universe for this Conversion rate is all PlayStation Call of Duty gamers (from projected sales data in Microsoft's Project Denali) who do not multi-home (i.e., who would not switch to playing Call of Duty on an Xbox or suitable gaming PC that they already own). *See* PX5000, Expert Report of Robin S. Lee, at 207 ("Figure 48:  Recoupment channels for the foreclosure of PlayStation consoles by the Merged

Entity"). The 20% Conversion rate means that 20% of that universe would switch. These are PlayStation Call of Duty gamers that would purchase an Xbox to continue playing Call of Duty in the event of foreclosure. A 20% Conversion rate is justified, because it corresponds to a "share shift" – i.e., an increase in Xbox share versus PlayStation share – in a given year relative to 2022 global console sales of approximately 5.5 percentage points (5.5%).

liv.   The 5.5% share shift is reasonable and supported by:

- Professor Lee's Share Model, which predicts a relative share shift between Xbox and PlayStation of 8.9 percentage points (8.9%) in the event of foreclosure of Call of Duty, compared to an expected 1.8% share shift in response to foreclosure of an average AAA game.

- Microsoft's ordinary course business documents, including documents that indicate that ███████████████████████████████████ ████████████████████████████ Given that *Call of Duty* has uniquely high sales compared to other AAA titles (cite to Lee Figure red/blue dots), these share shifts likely understate the actual effect of foreclosure of Call of Duty.

- The survey commissioned by Microsoft as advocacy to the UK CMA, which found that 5% of gamers planning to purchase a PlayStation "will purchase an Xbox instead" if *Call of Duty* were not on PlayStation.

lv.   Along with the Xbox Conversion Rate, Dr. Lee's Vertical Foreclosure Model uses Microsoft's five-year console consumer "lifetime values", or "LTV." The LTV provides a "lifetime value" of a customer to Xbox. ███████████████████████ ██████████████████████████████████████████████████ ███████ To account for this difference in spending, between *Call of Duty* gamers and an average Xbox gamer, Dr. Lee incorporates an "LTV adjustment factor" into his vertical model. This LTV adjustment factor adjusts the LTV to account for the difference in spending compared to an average gamer. █████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████

lvi.   Using a 20% Xbox Conversion rate and a 40% LTV adjustment factor, Professor Lee's vertical foreclosure model calculates that the Merged Entity will recoup over 100% of its lost sales on Sony PlayStation consoles through additional software, Xbox console, and Xbox Game Pass sales.  And, as shown in Figure 11 of Professor Lee's reply report, PX5001-076, the Merged Entity recoups at least 100% of sales under a number of sensitivity adjustments to both the Xbox Conversion Rate and LTV adjustment factors. Even with a modestly higher LTV adjustment factor, Dr. Lee's model shows the merged entity would have an incentive to foreclose Call of Duty even with a significantly lower Xbox conversion rates and implied share shift and without accounting for other sources of profits that Microsoft acknowledges increase it incentives to take games exclusive.

***How do you prove that enough people would switch to the Xbox such that Microsoft would have the economic incentive to foreclose? Hr'g Tr. 1067:8-19.***

lvii.   Even in the absence of Dr. Lee's vertical foreclosure analysis, Microsoft's own internal financial analyses demonstrate that it has an economic incentive to foreclose. The CFO of Microsoft Gaming, Tim Stuart, was asked to model how Microsoft could make up a loss in revenue from Activision sales from Sony in preparation for presenting the Activision deal model to the Microsoft Board of Directors in January 2022, three days before the deal was announced. Stuart (Microsoft) Hr'g Tr. 1008:1-20; PX7040 at 202:2-14. Mr. Stuart testified that Microsoft calculated both the incremental subscribers to Game Pass, and how much Activision revenue would need to shift from PlayStation to Xbox console in order to make up the potential loss of Activision revenue on PlayStation. Stuart (Microsoft) Hr'g Tr. 1016:19-1017:24; PX4358 at -001-02. At Tim Stuart's directive, Jamie Lawver calculated that Microsoft could make up the loss of Sony revenue "if we can shift Activision revenues to be greater on Microsoft console." Stuart (Microsoft) Hr'g

1    Tr. 1019:8-15, 1020:5-21; PX4358 at -001-02. ███████████████████

2    ███████████████████████████████████████████████

3    ███████████████████████████████████████████████

4    PX7042 (Lawver (Microsoft) Dep.) at 229:8-230:10.

5    viii.    Initially, Ms. Lawver calculated that Microsoft would need "either approximately ████

6         ████████ additional engage [Game Pass subscribers] or platform mix going from ██

7         percent Microsoft to ██ percent Microsoft." Stuart (Microsoft) Hr'g Tr. 1016:10-1017:19

8         PX7040 at 224:21-226:5; PX4358 at -001. Mr. Stuart testified that he presented to the

9         Board of Directors that a reduction in Activision royalties could be made up by "mix shift

10        to Xbox Game Pass subscribers of approximately ████████ per year or a ████ share

11        shift to Game Pass and Xbox consoles." Stuart (Microsoft) Hr'g Tr. 1024: 25-1026:12;

12        PX4367 at -001. Mr. Stuart testified that attaining these such outcomes was "reasonable"

13        and "achievable." Stuart (Microsoft) Hr'g Tr. 1028:9-1029:1; PX4472 at -001.

14    lix.    Despite performing this modeling days before announcing the deal, Microsoft has argued

15        that in their formal model, they did not forecast any additional consoles sales as a result

16        of putting Activision content on Xbox Game Pass. PX7042 (Lawver (Microsoft) Dep.) at

17        225:3--24. Nonetheless, Microsoft's board documents still recognized two "strategic

18        benefits" of the deal. One of those benefits, one of which was called "Xbox console

19        ecosystem." When asked to describe what "Xbox console ecosystem" means, both Tim

20        Stuart and Jaime Lawver noted it refers to increasing console share. Stuart (Microsoft)

21        Hr'g Tr. 998:13-999:13; PX4341 (Microsoft) at 24; (Lawver (Microsoft) Dep.) at 224:14-

22        225; 219:6-13.

## I.     BACKGROUND

1.     Through an "Agreement and Plan of Merger" dated January 18, 2022, Microsoft Corp. ("Microsoft") proposes to acquire Activision Blizzard, Inc. ("Activision") (the "Proposed Acquisition"), for approximately $68.7 billion. PX0083 at 001; PX9050 at 025.

2.     Defendant Microsoft is a publicly traded company organized under the laws of Washington and is headquartered in Redmond, Washington. PX0083 at 005; PX9050 at 001.

3.     Microsoft made $198 billion in revenue in 2022. PX9050 at 043.

4.     Gaming is part of Microsoft's More Personal Computing division. PX9050 at 014.

5.     Microsoft's gaming business includes Xbox, Xbox Game Pass (a gaming subscription service), and Xbox Cloud Gaming. PX9050 at 014.

6.     Microsoft publishes video games through Xbox Game Studios, comprising 23 game development studios, including eight studios that were included in Microsoft's acquisition of ZeniMax Media Inc., announced in September 2020 and finalized in March 2021. Direct Testimony of Robin S. Lee, Ph.D. (Dkt. 224) ("Lee Written Direct") at ¶ 14; PX0003 at 086 to 087 (detailing Microsoft acquisitions of gaming studios); PX1527 at 002 (Microsoft).

7.     Defendant Activision is a publicly traded company organized under the laws of Delaware and headquartered in Santa Monica, California. PX0083 at 005; PX9388 at 01, 037.

8.     "Activision develops and publishes video games for consoles, PC's and mobile devices. Microsoft often refers to Activision, along with EA, Take-Two Interactive Software, Inc., and Ubisoft, as one of the "Big 4" independent video game publishers." Lee Written Direct at ¶ 19.

9.     "Activision's most successful video game franchise is *Call of Duty*, a first-person shooter video game series playable on video game consoles and PCs. Since its first release in 2003, *Call of Duty* has become one of the most successful video game franchises in history, earning approximately ████████ in sales revenue annually. The most recent installment in the franchise, *Call of Duty: Modern Warfare II*, earned a franchise record

of over $1 billion in revenue in the first 10 days after its release." Lee Written Direct at ¶ 20; PX9132 at 001.

10.   "Activision also produces other popular video games for consoles, including games from the *Diablo*, *Overwatch*, *Crash Bandicoot*, and *Tony Hawk* franchises, as well as video games for other devices, including games from the *Candy Crush* (for mobile devices) and *Warcraft* (for PC) franchises." Lee Written Direct at ¶ 21.

11.   Activision earned $7.5 billion in revenue in 2022. PX9388 at 040 (Activision 10-K 2022).

12.   During the last three years, three Activision franchises (*Call of Duty*, *Warcraft*, and *Candy Crush*) accounted for approximately 80% of its revenue. PX9388 at 010.

   A.   **Gaming is the Largest Category in the Entertainment Industry, and It Continues to Grow**

13.   The gaming industry started over 40 years ago with arcade games, and then developed with consoles and gaming PCs, and has moved into mobile gaming. Bond (Microsoft) Hr'g Tr. 127:14-19.

14.   Today, the gaming industry has over 3 billion players worldwide, with revenues larger than the film, music, and print industries. Bond (Microsoft) Hr'g Tr. 127:20-128:1; PX1777 (Microsoft) at 032–33.

15.   Gaming is the fastest-growing form of media and entertainment, and it is expected to reach over 4.5 billion gamers by 2030. PX1785 (Microsoft) at 009.

16.   In 2021, one in three people in the world played video games. PX1777 (Microsoft) at 032.

17.   Video games can be played on different devices, including consoles, PCs, and mobile devices. PX1777 (Microsoft) at 033.

18.   Games can be played on general purpose PCs or gaming PCs, but gaming PCs typically have more advanced hardware to allow them to play more computationally demanding games. PX8001 (Ryan (Sony) Decl.) ¶ 15.

19.   Conversely, games played on mobile have lower graphics and are less sophisticated than games played on consoles or gaming PCs. PX0003 at 073.

20.   The three primary console makers are Microsoft (Xbox Series X|S), Sony (PlayStation 5), and Nintendo (Switch). PX1777 (Microsoft) at 008; Lee Written Direct ¶ 13.

21.   A game publisher brings games to market and sometimes provides funding to the game developer to do so. PX7014 (Booty (Microsoft) IH) at 28:5-15.

22.   A developer creates the assets for a game, including writing the code and designing the art. Booty (Microsoft) Hr'g Tr. 50:14-19; PX7014 (Booty (Microsoft) IH) at 28:5-15.

23.   First-party content is created and developed by a console manufacturer at an in-house studio. Booty (Microsoft) Hr'g Tr. 50:25-51:2; Lee Written Direct at ¶ 15PX7014 (Booty (Microsoft) IH) at 58:20–59:9.

24.   Microsoft has first-party content that is created at Xbox Game Studios. PX9050 at 015; PX0003 at 016.

25.   Some of Microsoft's first-party franchises include *DOOM*, *Forza*, *Gears of War*, *Halo*, *Minecraft*, and *The Elder Scrolls*. PX9252 at 001.

26.   Third-party content refers to games that are independently developed and published by a third-party publisher. Booty (Microsoft) Hr'g Tr. 51:6-8; Lee Written Direct at ¶ 15; PX8001 (Ryan (Sony) Decl.) ¶ 5; PX0003 at 016.

27.   Occasionally, console manufacturers will publish titles developed by a third-party development studio, known as second-party games. PX8001 at ¶ 5 (Ryan (Sony) declaration); PX7003 (Bond (Microsoft) IH) at 152:2-10; PX0003 at 016.

28.   Console manufacturers typically negotiate publisher license agreements with game publishers setting the terms for any titles that the console manufacturer ships from that publisher. Spencer (Microsoft) Hr'g Tr. 420:11-421:2.

29.   For second- or third- party developers, console manufacturers create development kits for those second- or -third- party developers to use to ensure that the game will run on the console. Bond (Microsoft) Hr'g Tr. 156:7-17.

30. Games can be single-player or multi-player. Single-player games are normally story-driven, and other characters in the game are computations in the game rather than real people. In multiplayer games, players are matched with other people of similar skill level, and players interact in real time. Bond (Microsoft) Hr'g Tr. 134:5-19.

31. Both consumers and industry participants acknowledge that content drives sales. As a 2021 Microsoft document states, "In the business of gaming, content remains king." Lee Written Direct at ¶ 22 (citing PX1070 (Microsoft) at 003). *See also* PX1538 (Microsoft) at 005; PX1087 (Microsoft) at 001 ("well said, content is king"); PX9102 at 009 (Microsoft FY2022 Q2 Earnings Call transcript) ("The big bets we have made across content, community, and cloud over the past few years are paying off … Our differentiated content is driving the service's growth.").

**B.      Console Gaming**

32. Video game consoles are consumer devices that are designed for, and whose primary use is, to play video games. PX8001 (Ryan (Sony) Decl.) at ¶ 10.

33. Consumers purchase video game consoles based on the hardware features of the consoles as well as the availability of game content on that console. PX8001 (Ryan (Sony) Decl.) at ¶¶ 4, 11; PX7053 (Ryan (Sony) Dep. Vol. I) at 21:1-5.

34. Console manufacturers earn revenues from several sources: sales of consoles and accessories like game controllers, headsets, supplemental storage, cables, and power supplies (*i.e.*, hardware) and revenue shares or royalties from sales of video game titles (*i.e.*, software) and accessories for the console. PX8001 (Ryan (Sony) Decl.) ¶ 4; PX0003 at 016. Within the gaming industry, the customary revenue share for content published on a console is 70% to the content creator and 30% to the console manufacturer. Spencer (Microsoft) Hr'g Tr. 270:9-12.

35. Console manufacturers can also earn revenue from post-sale monetization. For example, console manufacturers may split royalties with publishers and developers on the sale of add-on content or in-game purchases. PX1110 (Microsoft) at 012 ; PX1065 (Microsoft) at 003.

36.   A trio of gaming companies—Microsoft (under its Xbox brand), Sony (under its PlayStation brand), and Nintendo—produce the most popular video game consoles today. PX0003 at 060.

37.   These manufacturers historically release new generations of their consoles approximately every five to ten years in "generations." PX0003 at 060; PX9037 at 001-03.

38.   Consoles are in the ninth generation and include Sony's PlayStation 5 and Microsoft's Xbox Series X|S. PX0003 at 105; Lee Written Direct at ¶ 13.

39.   Nintendo's most recent console, the Switch, was released in 2017. PX7059 (Prata (Nintendo) Dep.) at 19:24-20:1; PX8002 (Prata (Nintendo) Decl.) ¶ 2.

40.   The Nintendo Switch is not a Generation 9 console, consistent with Nintendo staying at least one generation behind current generation hardware. PX2421 at 008-09 (Activision); Lee Written Direct at ¶ 13.

41.   In addition to the Switch, Nintendo also makes the Switch OLED and the Switch Lite, two models of the Switch with slight hardware differences. PX8002 (Prata (Nintendo) Decl.) ¶ 5.

42.   The OLED version has the same features and functionality of the Switch, but with a slightly larger OLED touch screen that allows for more vivid color and sharper contrast. PX8002 (Prata (Nintendo) Decl.) ¶ 5. There are no additional games or functionality available on the OLED version as compared to the Switch. PX8002 (Prata (Nintendo) Decl.) ¶ 5.

43.   The Switch Lite can only be played in handheld mode. All games that play in handheld mode are supported on the Switch Lite. PX8002 (Prata (Nintendo) Decl.) ¶ 5.

**1.   PlayStation and Xbox are Fierce Competitors, and Nintendo is Differentiated**

44.   For the last 20 years, Microsoft and Sony have viewed each other as each company's closest competitor in console gaming. PX8001 (Ryan (Sony) Decl.) ¶ 12. Lori Wright, the Corporate Vice President of Gaming Ecosystem Partners, testified in another matter that the Sony PlayStation is "[Microsoft's] most direct competitor," with Nintendo

Switch competing in console sales "to a much lesser extent." Dkt. 228 (Joint Stip. and [Proposed] Order) at 2.

45.   An internal Microsoft Gaming analysis provides: "Historically, Sony has been Microsoft's primary competitor in gaming, with similar products, services, and business models vying for similar customers." PX1638 (Microsoft) at 019. An example of this, as Avtivision's CEO testified to, Call of Duty has not been on a Nintendo console in the past ten years. Kotick (Activision) Hr'g Tr. 29:12-17.

46.   Each console generation represents an opportunity for Sony or Microsoft to "win" the console generation by shifting the distribution of gamers onto their respective consoles. PX8001 (Ryan (Sony) Decl.) ¶ 11.

47.   In the United States, Microsoft won Generation 7 with the Xbox 360 pitted against the PlayStation 3. PX8001 (Ryan (Sony) Decl.) ¶ 11. However, Sony won Generation 8 with the PlayStation 4. PX8001 (Ryan (Sony) Decl.) at ¶ 11.

48.   In this current generation—the ninth generation—the Xbox Series X|S and PlayStation 5 were both launched in November 2020 in direct competition. PX0003 at 050, 060; *see also* Booty (Microsoft) Hr'g  Tr. 57:21-58:2, 58:25-59:4.

49.   Since its launch, Microsoft's Xbox Series X|S has been a successful player in the Generation 9 console competition with aspirations to match sales of Sony's PlayStation 5. Spencer (Microsoft) Hr'g Tr. 296:11-297:6 (discussing PX1145 (Microsoft) at 002 ██████████ Spencer (Microsoft) Hr'g Tr. 286:17-287:2 (discussing PX1889 (Microsoft) at 035 ██████

50.   The release of the Nintendo Switch in 2017, three years before the PlayStation 5 and Xbox Series X|S, means that it did not have similar launch conditions in the market as the Generation 9 consoles. PX7028 (Spencer (Microsoft) Dep.) at 160:9-25.

51.  Microsoft Gaming CEO Phil Spencer explained why Nintendo was excluded from Microsoft's estimations of Generation 9 console share: "Because PlayStation 5 and Xbox Series X are at the same place in their lifecycle in the consumer market." Spencer (Microsoft) Hr'g Tr. 291:21-292:18; PX7028 (Spencer (Microsoft) Dep.) at 159:2-11. The Nintendo Switch is not considered a Generation 9 console. Booty (Microsoft) Hr'g Tr. 59:5-7.

52.  Microsoft's President of Xbox Games Marketing Aaron Greenberg went as far as to say, ███████████████████████████████████████████ ████████████████████████ PX5000 (Lee Report) at 77 (quoting PX1950 (Microsoft) at 001).

53.  The Xbox Series X|S and PlayStation 5 also launched with similar pricing schemes. The more advanced Xbox Series X and PlayStation 5 launched with a price of $499, while the Xbox Series S and PlayStation 5 Digital Edition launched at $299 and $399, respectively. PX7028 (Spencer (Microsoft) Dep.) at 138:22-139:8; PX8001 (Ryan (Sony) Decl.) ¶ 12; PX4905 (Microsoft) at 001.

54.  The Xbox Series X is a "premium" console while the Series S is more affordable. PX0003 at 016. Together, these consoles provide Microsoft's "flagship gaming experience." PX4627 (Microsoft) at 003.

55.  Microsoft Gaming CFO Tim Stuart testified that the Xbox Series S was priced at $299 as the best entry point for Gen 9 consoles. Stuart (Microsoft) Hr'g Tr. 947:4-948:4; PX4380 at -001.

56.  Microsoft CEO Satya Nadella highlighted the achievements of the Xbox Series X|S in an April 26, 2022 earnings call when he announced that Microsoft had "had taken share globally for two quarters in a row and we are the market leader this quarter among the next gen consoles in the United States, Canada, U.K., and Western Europe." Nadella (Microsoft) Hr'g Tr. 827:18-21; PX9015 (Microsoft) at 005.

57.  Satya Nadella further hailed the success of the Xbox Series X|S in a July 26, 2022 earnings call when he announced that the company "ha[d] been the market leader in

1   North America for three quarters in a row among next gen consoles." Nadella (Microsoft)

2   Hr'g Tr. 828:14-16; PX7010 (Nadella (Microsoft) IH) at 66:12-21; PX9084 at 005.

3   58.   When Satya Nadella submitted his most recent annual self-assessment package to the

4   Board of Directors, ███████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████

6   ██████████████████████████████ Nadella (Microsoft) Hr'g Tr. 830:20-831:7;

7   PX1747 (Microsoft) at 009. Satya Nadella's CEO self-assessment memo forms part of

8   the basis of his compensation package. Nadella (Microsoft) Hr'g Tr. 832:20-23.

9   59.   In Generation 9, Microsoft's Xbox Series X|S and Sony's PlayStation 5 have engaged in

10   very close competition in the United States. PX7028 (Spencer (Microsoft) Dep.) at 156:3-

11   156:13; PX1240 (Microsoft) at 019; PX7053 (Ryan (Sony) Dep.) at 14:16-15:5.

12   60.   Although Nintendo is often ██████████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ██████████████████████████████████████ PX8002 (Prata (Nintendo)

15   Decl.) ¶ 3.

16   61.   As Nintendo's Executive Vice President of product development and publishing, Tom

17   Prata, stated, the Switch ████████████████████████████████████

18   ████████████ PX8002 (Prata Decl.) ¶ 4.

19   62.   ███████████████████████████████████████████████████

20   ██████████████████████████████████████████ PX8002 (Prata

21   (Nintendo) declaration) at ¶ 3.

22   63.   The Switch ████████████████████████████████████████████████

23   ██████████████████████████████████████████ PX8002 (Prata

24   (Nintendo Decl.) ¶ 3.

25   64.   To start, Nintendo is a "hybrid" console, while Xbox and PlayStation are considered

26   stationary consoles. PX7059 (Prata (Nintendo) Dep.) at 20-25; PX7065 (Singer

27   (Nintendo) Dep.) at 72:5-12.

28

65. As a hybrid console, Nintendo offers both stationary and portable play modes, which include handheld or tabletop mode. PX8002 (Prata (Nintendo) Decl.) ¶ 4.

66. The Switch controllers, called "Joy-Cons," can be detached to control gameplay both through movement and pressing buttons, and provide ████████████████████ ████████████████ PX8002 (Prata (Nintendo) Decl.) ¶ 4.

67. Joy-Cons can be used separately so that two players can simultaneously enjoy multiplayer games while physically in the same place, and they can also be used in tabletop mode. PX8002 (Prata (Nintendo) Decl.) ¶ 4.

68. The Xbox and PlayStation do not have these same capabilities. The Xbox and PlayStation have more traditional gaming console controllers that cannot be detached, and the system itself, being stationary, "cannot be easily taken out of the home." PX7065 (Singer (Nintendo) Dep.) at 70:22-71:17; PX7035 (Kotick (Activision) Dep.) at 143:14-21. Unlike the Switch, the Xbox does not have a battery, a screen built into the console, speakers, or touchscreen functionality. Dkt. 228 (Joint Stip. And [Proposed] Order) at 2.

69. While the Switch can run from a battery in portable mode, the Xbox and PlayStation must be plugged into a wall and connected to a TV. PX7065 (Singer (Nintendo) Dep.) at 72:5-19.

70. As a result of these hardware differences, Nintendo provides a differentiated console experience, in which motion controls and portability inform game development. PX7059 (Prata (Nintendo) Dep.) at 59:23-60:7; PX1950 (Microsoft) at 001; PX7035 (Kotick (Activision) Dep.) at 215:7-215:19, 225:6-225:16; PX7059 (Prata (Nintendo) Dep.) at 67:13-21.

71. As the CEO of Microsoft Gaming, Phil Spencer, testified, "Switch is a differently designed device" and "the Switch is radically different" from Xbox and PlayStation Hr'g Tr. (Spencer) 274:17, 459:10-11.

72. While Nintendo provides a unique form of gameplay, the Xbox and PlayStation offer higher performance. The Nintendo Switch has a less technically capable hardware than the current PlayStation and Xbox consoles, and its lower power impacts which games can

run on the Switch. Booty (Microsoft) Hr'g Tr. 60:15-61:23. As President of Xbox Games Marketing Aaron Greenberg explained, the Switch is a "lower spec device" because games are designed to match the specifications of a device. Games built for the PlayStation 5 or Xbox Series X|S would have to be designed differently for the Switch. PX7031 (Greenberg (Microsoft) Dep.) at 59:23-60:21; *see also* Spencer (Microsoft) Hr'g Tr. 273:20-274:17 (Xbox Series X|S and PlayStation 5 can showcase Generation 9 hardware and capabilities, unlike Switch).

73. As Sony Interactive Entertainment's ("SIE") CEO recognizes, "Nintendo's hardware technology is of a much less sophisticated nature than PlayStation or Xbox." PX7053 (Ryan (Sony) Dep.) at 21:9-16. Similarly, Activision's CFO testified, "Nintendo has . . . very different capabilities than Microsoft and Sony has. . . Nintendo is not at the forefront of technology." PX7004 (Zerza (Activision) IH) at 74:2-14.

74. A December 15, 2022 internal briefing for Activision's CEO stated, "Switch development [is] difficult: ██████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████ PX2421 (Activision) at 002.

75. The Xbox and PlayStation are significantly more powerful than the Switch. The Switch's maximum processing power reaches only 393 gigaflops (even less in handheld mode – 236 gigaflops), while the Xbox Series X and PlayStation 5 are at least 26 times (*i.e.*, 2,600%) more powerful, capable of 12 and 10.3 *tera*flops (12,000 and 10,300 gigaflops, respectively. PX5000 (Lee Report) at 080, fig. 13; *see also* Spencer (Microsoft) Hr'g Tr. 277:1-14 (agreeing that the Xbox Series X and S both operate at higher FLOPS rates than the Switch).

76. ███████████████████████████████████████████████ ██████████████████████████████████████████████████ PX7065 (Singer (Nintendo) Dep.) at 85:25-86:9.

77. The Xbox Series X and PlayStation 5 have one terabyte and 825 gigabytes, respectively, of internal storage, providing more than 25 times the storage capacity for game downloads. PX5000 (Lee Report) at 080, fig. 13.

78. While the Switch only has four gigabytes of system memory, the Xbox Series X and PlayStation 5 each have 16 gigabytes, four times as much as the Switch. PX5000 (Lee Report) at 080, fig. 13.

79. The Switch is only capable of rendering games at a lower resolution than the Xbox and PlayStation, achieving a maximum frame rate of 60 frames per second, while Xbox and PlayStation can reach up to 120 frames per second. Spencer (Microsoft) Hr'g Tr. 276:6-18, 23-25; PX3270 (Nintendo) at 002; PX5000 (Lee Report) at 080, fig. 13; *see also* Spencer (Microsoft) Hr'g Tr. 275:20-276:4, 276:19-22 (Xbox Series X|S and PlayStation 5 can scale up to support maximum resolution of 4K HD, unlike Switch).

80. The Switch's hardware differences also limit the kinds of third-party games that can be offered on the Switch. The Nintendo Switch lacks the PlayStation 5 or Xbox Series X|S's processing power and graphics ability. PX7053 (Ryan (Sony) Dep.) at 21:21-22:3; Spencer (Microsoft) Hr'g Tr. 279:9-19 ("In terms of CPU and GPU, [the Switch] would be more akin to a Gen 8 device."); PX7028 (Spencer (Microsoft) Dep.) at 114:18-21, 119:11-23. Consequently, porting a third-party game to run on Switch requires "significant work and modifications," including reducing the graphical complexity, resolution, and frame rate, and possibly incorporating less complex scenes. Booty (Microsoft) Hr'g Tr. 62:4-64:6.

81. Because of performance limitations, there are games that can run on Xbox and PlayStation consoles (including the previous generations of these consoles) that cannot run on the Switch. PX4684 (Microsoft) at 003. *See also* PX7028 (Spencer (Microsoft) Dep.) at 191:24-192:4; PX9372 at 001 (press release explaining that, while *The Forgotten City* is available natively on Xbox One, Xbox X/S, PS4 and PS5, "the Switch isn't quite powerful enough to run [the game] at its best," and must be streamed in order to be played on the Switch); PX2093 (Activision) at 005 ██████████

1  ████████████████████████████████████████████████████

2  ██████████████████████████████████████████████

3  ████████████████████████

4  82.   Some third-party games are only available on the Switch via cloud streaming████

5        ████████████████████████████████████ PX8002 (Prata

6        (Nintendo) Decl.) ¶ 16; PX9372 at 001 (press release explaining that, while *The*

7        *Forgotten City* is available natively on Xbox One, Xbox X/S, PS4 and PS5, "the Switch

8        isn't quite powerful enough to run [the game] at its best" and must be streamed in order

9        to be played on the Switch).

10  83.   Porting games that run on Xbox and PlayStation to the Switch can be difficult and at

11        times impossible. PX7048 (Booty (Microsoft) Dep.) at 113:5-115:5; PX9371 at 001 (Hi

12        Rez press release announcing the end of support of its game Rogue Company due to

13        "performance of [its] Switch port."); PX2421 (Activision) at 008 ("Switch system is a

14        challenging choice . . . for the majority third-party porting efforts, for all the usual

15        reasons we always encounter with Nintendo," including that ████████████████

16        ████████████████████████████████████████████████████

17        ████████████████████████████████████████████

18        ██████████████████████████████████████████████████

19        ████████████████████████████████████

20  84.   ████████████████████████████████████████

21        ████████████████████████████████████████████████

22        ████████████████████████████████████ PX8002 (Prata (Nintendo)

23        Decl.) ¶ 6.

24  85.   ████████████████████████████████████████████

25        ████████████████████████████ PX8002 (Prata (Nintendo) Decl) at ¶ 6. As a

26        result, Nintendo's first-party titles are not available on Xbox or PlayStation.  PX8002

27        (Prata (Nintendo) Decl.) ¶ 6.

28

86.   Nintendo's content portfolio differs from Xbox and PlayStation in other ways, too. An internal Activision briefing states that ███ of Switch sales in 2020 were first-party titles. PX2093 (Activision) at 005. In 2022, Nintendo's first-party sales accounted for 78.8% of Nintendo's total software sales. PX9207 at 005.

87.   As of December 31, 2022, Nintendo's top 10 selling titles were Nintendo first-party games. PX9209 at 001–03.

88.   Nintendo's distinctive gaming experiences has created a deeply loyal fanbase. PX8002 (Prata (Nintendo) Decl.) ¶ 9.

89.   By contrast, Xbox and ███████████████████████████████ ███████████ PX1072 (Microsoft) at 001; PX8001 (Ryan (Sony) Decl.) ¶ 5 ███ ████████████████████████████████████████████████ ██████████████████████████████████ Microsoft executive Lori Wright estimated that there were roughly 3,500 third-party games for Xbox in 2021 but less than a hundred Microsoft-developed first-party games. Dkt. 228 (Joint Stip. and [Proposed] Order) at 5.

90.   For several reasons, Switch ████████████████████████ ███ when compared to the "Xbox and PlayStation." PX8002 (Prata (Nintendo) Decl.) ¶ 10; PX7059 (Prata (Nintendo) Dep.) at 94:14-20.

91.   Nintendo tends to be more family-friendly and its most iconic games appeal to a younger audience. PX7053 (Ryan (Sony) Dep.) at 22:11-22; PX8002 (Prata (Nintendo) Decl.) ¶ 10.

92.   Nintendo has ████████████████████████████████ ████████████████████████ PX8002 (Prata (Nintendo) Decl.) ¶ 10.

93.   ████████████████████████████████████████ ████████████████████████████████████████ PX8002 (Prata (Nintendo) Decl.) ¶ 10.

94.   According to testimony from Activision CEO Bobby Kotick, the Nintendo Switch is a "very well differentiated" console. Kotch (Activision) Hr.g Tr. 73:18-20. Mr Kotick agrees the Switch has unique characteristics including unique hardware, different capabilities, and has portability. Kotick (Activision) Hr'g Tr 73:11-20

95.   Because of these differences, gamers often own both a Switch and an Xbox or PlayStation. █████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████ PX3161 (Nintendo) at 011.

### 2.   Console Gaming is Distinct from PC and Mobile Gaming

#### a)   PC Gaming Is Distinct

96.   PCs are used more broadly for general purposes rather than dedicated gaming. PX0003 at 136 Bond (Microsoft) Hr'g Tr. 130:18-23.

97.   Although consumers may play games on PCs, it is a distinct and differentiated experience. PX5000 (Lee Report) at 093; Bond (Microsoft) Hr'g Tr. 130:18-23. Microsoft executive Lori Wright testified in another matter that besides the Sony PlayStation—Xbox's "most direct competitor"—and "to a lesser extent" the Nintendo Switch, Xbox consoles did not compete against any other device for hardware sales. Dkt. 228 (Joint Stip. and [Proposed] Order) at 2-3.

98.   Gaming PCs, which possess specialized parts dedicated to run computationally demanding games, may have superior performance to that of even the most recent Generation 9 consoles; they can more easily handle games with greater graphical intensity and run them faster. Sarah Bond testified that PCs and consoles have different experiences in gaming because they have different specs. Bond (Microsoft) Hr'g Tr. 130:24-131:3; PX8001 (Ryan (Sony) Decl.) ¶ 15; PX1324 (Microsoft) at 001; PX3053 (Sony) at 003.

99.   Lower-powered PCs that are not specialized for gaming cannot play some games. Bond (Microsoft) Hr'g Tr. 143:23-144:2.

100. Gaming PCs tend to be more expensive than video game consoles, with gaming PCs costing anywhere from $800 to more than $2,500, while Generation 9 consoles retail for approximately $300 to $500. PX8001 (Ryan (Sony) Decl.) ¶ 15.

101. High-performance consoles—unlike PC gaming devices—rely heavily on subsidies, generating most of their revenue from subsequent game sales after a customer has purchased a console. PX1494 (Microsoft) at 001; PX1145 (Microsoft) at 001.

102. The audience for PC gaming is also different than the audience for console gaming. High-end PC gaming often requires a higher level of technical competency in assembling specialized equipment. PX8001 (Ryan (Sony) Decl.) ¶ 15. PC gamers will often build or specially customize their devices with a wide variety of components to add extra upgrades and personalize their experience. PX8001 (Ryan (Sony) Decl.) ¶ 15. That stands in contrast to consoles, which are designed to be used out of the box, and whose users tend to customize their devices far less. PX8001 (Ryan (Sony) Decl.) ¶ 15.

103. █████████████████████████████████████████████ ████████████████████████████████████ ████████ PX3053 (Sony) at 022 (Sony).

104. █████████████████████████████████████████████ ████████████████████████████████████ ████████████████ PX3050 (Sony) at 034. █████████████████████████████████████████████ PX3050 (Sony) at 019–20, 031.

105. These differences between PC gaming and console gaming affect the commercial strategy and revenues of gaming companies. ████████████ █████████████████████████████████████████████ ████████████████████████ PX4647 (Microsoft) at 002 ; PX1476 (Microsoft) at 001–02.

106. Microsoft considers their presence on PC to be small. Bond (Microsoft) Hr'g Tr. 130:10-12.

1    107.   Microsoft's internal documents show that they saw console gaming and PC gaming as

2           distinct, with a now-Activision, former Microsoft executive remarking, ███████████

3           ████████████████████████████████████████████████████████████████

4           █████████████████████████████████████████████████████████████████████

5           ██████████████████████████ PX1639 (Microsoft) at 003.

6    108.   In a yearly report on the gaming market, █████████████████████████████████

7           █████████████ PX1563 (Microsoft) at 025-30 ██████████████████████████

8           ████████████████████

9    109.   Similarly, Activision CFO Armin Zerza distinguished between PC and console segments

10          in terms of where Activision competes and who the major participants are: "[W]e

11          compete across different platforms, you know, with PC platforms, like Steam, with

12          console platforms like, Sony, Nintendo, Microsoft, with mobile platforms like Apples

13          and Googles." PX7004 (Zerza (Microsoft) Dep.) at 219:7-12.

14   110.   █████████████████████████████████████████████████████████████████

15          ███████████████████████████ PX3378, Ryan Hr'g Testimony (Ryan Dep. Vol II at

16          98:7-10). ███████████████████████████████████████████████ PX3378,

17          Ryan Hr'g Testimony (PX7054 (Ryan (Sony) Dep. Vol II) at 98:11-14).

18   111.   While buy-to-play games accounted for ███ of the revenue for console gaming in 2020,

19          it accounted for only ███ of revenue for PC gaming. PX1571 (Microsoft) at 017.  Nearly

20          ███ of PC gaming revenue was derived from free-to-play games. PX1571 (Microsoft) at

21          017.

22   112.   Microsoft is much more likely to publish their games on PC than rival consoles.

23          Microsoft CEO Phil Spencer testified "We launch games on PC and console almost every

24          instance on the same day." PX7011 (Spencer (Microsoft) IH Vol. I) at 124:2-4.

25   113.   The most popular distribution channels for PC games do not resemble the distribution

26          channels for consoles. While Sony and Microsoft make sales in their respective digital

27          stores, the most prominent digital marketplaces for PC games include Valve's Steam

28

Store, the Epic Games Store, and Activision's Battle.net. PX1476 (Microsoft) at 001; PX0004 at 030.

### b) Mobile Gaming Is Distinct

114. Mobile is the largest segment of gaming according to Microsoft's internal gaming analysis, with ▇▇ of gamers playing on mobile. PX1563 (Microsoft) at 005, 011.

115. Microsoft reported that many players either exclusively play mobile, or multi-home with mobile and other gaming devices. Forty-five percent of gamers only play on mobile, 21% play on console, mobile, and PC, and 5% only play on console and mobile. PX1563 (Microsoft) at 032.

116. In a yearly report on the gaming market, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇ PX1563 (Microsoft) at 025–30.

117. Mobile games have to be built specifically for the mobile operating system. Bond (Microsoft) Hr'g Tr. 132:6-10.

118. Game development for mobile devices is significantly less expensive than development for consoles. PX0003 at 073.

119. Mobile game development also relies on smaller teams of developers and less technological innovation. PX0003 at 073. Mobile games do not require the same level of computing power as console games to run on devices. Dkt. 228 (Joint Stip. and [Proposed] Order) at 4. Console games often require "massive game size files" of 150, 250, or even 450 gigabytes of data, which require "a lot of graphics intensity and all sorts of other technical requirements" that cannot run on a mobile device like an iPhone. Dkt. 228 (Joint Stip. and [Proposed] Order) at 4.

120. Activision CEO Bobby Kotick explained that, though there is a Call of Duty game available on mobile, it is not linked to the other Call of Duty games, rather it is its own game. Hr'g Tr. (Kotick Rough) 27:25-28:3. Call of Duty Mobile was largely developed by an outside company, Tencent. Kotick (Activision) Hr'g Tr. 68:20-22. Additionally, Mr. Kotick testified at the hearing that King is the assembled workforce at ABK for

mobile, and outside of King, ABK does not have a well developed capability to make mobile games. Kotick (Activision) Hr'g Tr. 66:16-22.

121.  Mobile games are also distinct from console games because they "are typically more casual" than console games which often involve "thoughtful, long storyline[s]" and are more "immersive." Dkt. 228 (Joint Stip. and [Proposed] Order) at 3. For example, Microsoft's first-party franchise *Halo* was "built for the console" and "could not run on mobile" due to its immense 150 gigabyte size, which is approximately 50 times too large to run on a mobile device. Dkt. 228 (Joint Stip. and [Proposed] Order) at 4.

122.  As the Court confirmed with Activision CEO Bobby Kotick, mobile devices are not at the point to where AAA games such as Modern Warfare II will be playable on them. Kotch (Activision) Hr'g Tr. 81:4-8.

123.  Mobile gaming also requires different design considerations given the large difference in form factor. As Activision's CEO expressed, "the controller matters greatly. So when you're playing on glass [mobile], it's going to be a different experience than the one you're going to play on the PlayStation." PX7035 (Kotick (Activision) Dep.) at 142:12-25.

124.  Tim Stuart, Microsoft Gaming CFO, recognized that mobile gaming tends to be a more "casual path" than console gaming. PX1170 (Microsoft) at 001.

125.  As Lori Wright, Microsoft's Vice President of Business Development for Gaming, Media, and Entertainment, testified in a previous matter, the Xbox lacks many basic capabilities of a smartphone, including a screen, speakers, touch controls. Dkt. 228 (Joint Stip. and [Proposed] Order) at 1–2.

126.  Dr. Bailey concedes that the transaction would not affect competition in any mobile market. Bailey (Defendants' Expert) 819:21-820:4.

**C.      Multi-Game Content Subscription Services**

127.   Multi-Game Content Subscription Services (or "content subscription services") provide
subscribers access to a library of video games for a periodic subscription fee, typically
monthly or yearly. PX0003 at 018; PX0006 at 013.

128.   Unlike traditional buy-to-play games, with content subscription services, gamers
purchase a recurring subscription and can play any game contained in the library for zero
additional cost above the subscription fee. PX0003 at 018; PX0006 at 013. Bond
(Microsoft) Hr'g Tr. 138:2-9.

129.   Microsoft launched its content subscription service, Game Pass, in 2017. PX0006 at 013.

130.   Game Pass is available in two different tiers for console. PX0003 at 018. Xbox Game
Pass for Console and Xbox Game Pass for PC provides subscribers access to a library of
over 300 first-party and third-party games for download to play on an Xbox console and
Windows PC, respectively. PX0003 at 018. Bond (Microsoft) Hr'g Tr.  137:23-138:1;
Lee Written Direct at ¶ 16.

131.   The highest tier, Xbox Game Pass Ultimate, provides access to a library of games for
both Xbox consoles and Windows PCs, which subscribers can download and play or
access through cloud gaming, allowing subscribers to play certain games by streaming
from a remote server to any supported web-enabled device such as an Xbox console, PC,
mobile device, or smart TV. Lee Written Direct at ¶ 16..  PX0003 at 018.

132.   Approximately ▮▮▮▮ of Game Pass subscribers subscribe to Game Pass Ultimate. PX0003
at 018.

133.   Microsoft's CEO Satya Nadella has described Game Pass as a "Netflix for Games."
PX7010 (Nadella (Microsoft) IH) at 78:17-20; PX1283 (Microsoft) at 008.

134.   Xbox Game Pass had over 25 million total subscribers by the beginning of 2022.
PX1516 (Microsoft) at 039; PX9003 at 003.

135.   In the United States, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ PX5000 (Lee Report) at 055, 056 (citing Microsoft monthly subscriber

counts data). Xbox Game Pass is the market leader in content subscription services. PX5000 (Lee Report) at 041; PX8001 (Ryan (Sony) Decl.) ¶ 9.

136. Microsoft Gaming CEO Phil Spencer called Game Pass "a reach bet off of console fueled by console users as an early catalyst." Spencer (Microsoft) Hr'g Tr. 301:8-17; PX7028 (Spencer (Microsoft) Dep.) 225:5-13. Microsoft tells game developers that Game Pass is accretive to standalone game sales to attract them to put their games into the service. Spencer (Microsoft) Hr'g Tr. 299:25-300:7.

137. Aside from Game Pass, Microsoft also offers Xbox Live Gold, which provides subscribers with access to online, multiplayer games and a limited selection of downloadable games each month among other benefits, such as audio and visual communications and certain discounts. PX0003 at 018; Bond (Microsoft) Hr'g Tr. 136:18-24.

138. Xbox Live Gold does not provide subscribers with access the vast library of games that subscribers of Xbox Game Pass for PC or Console and Game Pass Ultimate receive. PX0003 at 018.

139. Sony has the second most popular content subscription service, called PlayStation Plus. PlayStation Plus has three tiers. The highest two tiers—PlayStation Plus Extra and PlayStation Plus Premium—are content subscription services. PX7053 (Ryan (Sony) Dep.) at 17:9-14. Those two tiers provide similar features that correspond to Microsoft's Xbox Game Pass for PC or Console and Game Pass Ultimate. PX7053 (Ryan (Sony) Dep.) at 17:9-22.

140. By subscribing to PlayStation Plus Extra, subscribers gain access to up to 400 games within PlayStation's library. PX8001 (Ryan (Sony) Decl.) ¶ 9.  Those who subscribe to PlayStation Plus Premium receive access to a library of up to 740 games and cloud gaming services for certain games. PX8001 (Ryan (Sony) Decl.) ¶ 9.

141. As of July 2022, PlayStation Plus Extra had approximately ███████ subscribers and PlayStation Plus Premium had approximately ██████ subscribers. PX7053 (Ryan (Sony) Dep.) at 17:23-18:4.

142.    Like Microsoft's Xbox Live Gold, the lowest tier of PlayStation Plus—PlayStation Plus Essential—offers subscribers access to online, multiplayer games and two monthly downloadable games alongside discounts on other games and cloud storage.  PX8001 (Ryan (Sony) Decl.) ¶ 9. PlayStation Plus Essential does not provide subscribers access to the vast libraries available to subscribers of PlayStation Plus Extra and PlayStation Plus Premium receive. PX8001 (Ryan (Sony) Decl.) ¶ 9.

143.    PlayStation Plus Essential, the most basic tier, of PlayStation Plus services, provides similar services to Microsoft's Xbox Live Gold: access to online multiplayer and the ability to access a limited selection of monthly downloadable games. PX7053 (Ryan (Sony) Dep.) at 17:1-8.

144.    Amazon provides two content subscription services: Prime Gaming and Luna+.  Prime Gaming is included with an Amazon Prime subscription, which costs $14.99 per month and includes several other non-gaming related benefits. Luna+ offers subscribers access to a library of games, priced at $9.99 per month with additional options available for further purchases and provides streaming access to a library of over 100 third-party games. See Amazon Luna, https://www.amazon.com/luna; PX3206 (Amazon), Luna OP1 22 (Oct. 5, 2021) at 004.

145.    Electronic Arts also offer content library services, EA Play, for its own published titles. EA Play can also be accessed through a subscription to Microsoft's Game Pass Ultimate. PX7011 (Spencer (Microsoft) IH Vol. I) at 260:3-15; PX0003 at 018, 019.

146.    Ubisoft offers Ubisoft+ in two tiers: PC Access, for $14.99/month, and Multi Access, for $17.99/month. Both tiers allow subscribers to pay over 100 Ubisoft games on PC (through Ubisoft Connect or Steam), including new releases available at launch, premium editions, and select third-party indie games. PX0006 at 80.

**D.    Cloud Gaming Subscription Services**

147.    For years, video games have run locally on the player's hardware—typically a Windows PC or gaming console located in the player's home. PX8000 (Eisler (Nvidia) Decl.) ¶¶ 6,

50. Nvidia executive Philip Eisler described cloud gaming as "the future of gaming." PX3381 (Eisler Video) at 59:21-60:5.

148.   Recently, however, cloud gaming services have been introduced that allow players to stream games that run on remote hardware without downloading the game locally. PX8000 (Eisler (Nvidia) Decl.) ¶ 7; PX0003 at 077; Booty (Microsoft) Hr'g Tr. 64:8-10; PX3381 (Eisler Video) at 29:24-30:2; Zimring (Google) Hr'g Tr. 467:24-468:22.

149.   Microsoft's xCloud app is available on Samsung smart TVs. Nadella (Microsoft) Hr'g Tr 846: 9-12. No console is required for Samsung smart TV owners to stream games. Nadella (Microsoft) Hr'g Tr. 846:12-1.3

150.   Microsoft CEO Satya Nadella has highlighted the fact that xCloud is available on Samsung smart TVs to the investor community. PX7036 (Nadella (Microsoft) Dep.) at 125:6-10 PX9084 at 005. Satya Nadella expressed excitement about the news of the Samsung deal. PX7036 (Nadella (Microsoft) Dep.) at 55:15-24. ;PX1750 (Microsoft) at 001

151.   Satya Nadella acknowledged that the cloud is one of the pillars that makes up the core of Microsoft's gaming strategy. Nadella (Microsoft) Hr'g Tr. 835: 10-12.

152.   Satya Nadella stated to investors that cloud was one of the big bets that is paying off for Microsoft's gaming business. Nadella (Microsoft) Hr'g Tr. 836: 1-4; PX9102 (Microsoft) at 009.

153.   Satya Nadella wrote that he wanted "to make it clear to the world that Microsoft is focused on cloud first approaches, Teams, WIN 365, xCloud as the future of their end-use sockets." Nadella (Microsoft) Hr'g Tr. 841: 15-19; PX4066 (Microsoft) at 002.

154.   Satya Nadella and Phil Spencer have discussed the "North Star" vision of ███████ ██████████████████████████████████████████ Nadella (Microsoft) Hr'g Tr. 839:22-840:1; PX1751 (Microsoft) at 001.

155.   ████████████████████████████████████████ Nadella (Microsoft) Hr'g Tr. 844: 2-6; PX1746 (Microsoft) at 018. A needle moving priority is

defined as an initiative that can generate or impact at least $10 billion of new revenue by FY2030. Nadella (Microsoft) Hr'g Tr. 843: 17-24;PX1746 (Microsoft) at 009.

156.   During a gaming CSA Senior Leadership Team strategy review, ███████████████

███████████████████████████████████████████████████████

███████████████████████████ Nadella (Microsoft) Hr'g Tr. 847:2-848:5; PX1777 (Microsoft) at 003.

157.   The primary computational processing for the game occurs in a remote datacenter, and a live video feed of game is streamed to a player's device. PX0003 at 095; PX8000 (Eisler (Nvidia) Decl.) ¶ 7; Bond (Microsoft) Hr'g Tr. 131:20-132:5; PX3381 (Eisler Video) at 33:8-33:12 ("Our cloud gaming servers are more powerful than consoles, so we're able to run higher resolutions, higher frame rates and add more visual effects."), 33:13-33:22.

158.   Cloud gaming broadens access to gaming by expanding the universe of devices that can play games. PX8000 (Eisler (Nvidia) Decl.) ¶¶ 6, 9, 17. Mr. Eisler of Nvidia explains that "[s]hifting gaming hardware to the cloud has helped AAA gaming reach users in lower socioeconomic groups who otherwise would not be able to purchase, or could not afford, their own video game system or gaming PC". PX8000 (Eisler (Nvidia) Decl.) ¶ 10.

159.   Today, cloud gaming subscription services can stream games to consoles, Windows PCs, Mac PCs, Chromebook PCs, tablets, mobile phones, and some smart TVs, with device compatibility varying by service. PX0003 at 018; PX7050 (Choudhry (Microsoft) Depo.) at 22:11-21; PX0006 at 088. See also PX8000 (Eisler (Nvidia) Decl.) ¶ 7.

160.   Cloud gaming enables gamers to begin playing a game in seconds, rather than waiting for games to download or update, and streaming rather than downloading avoids burdening the storage limits on a gaming device. https://support.xbox.com/en-US/help/games-apps/cloud-gaming/playing-console-game-from-cloud-versus-installing ("You can start playing a game in seconds. There's no waiting for games to finish installing or updating…. download times or storage limits aren't a factor."); PX8000 (Eisler (Nvidia) Decl.) ¶ 17.

161. This permits gamers to play computationally demanding games on less powerful devices that otherwise lack the computing power or storage to support the games. Nadella (Microsoft) Hr'g Tr. 834:3-7;  https://www.nvidia.com/en-us/geforce/geforce-experience/; PX8000 (Eisler (Nvidia) Decl.) at ¶¶ 9, 17; PX3103 (Nvidia) at 008.

162. In September 2020, Microsoft added cloud gaming to its top-tier multi-game content library subscription service offering, Xbox Game Pass Ultimate. PX9091 at 001–06.

163. Xbox Cloud Gaming (also referred to as xCloud) enables Xbox Game Pass Ultimate subscribers to stream certain games, as opposed to downloading games locally, and then to play those games on the device most convenient to them, including consoles, Windows PCs, tablets, and mobile phones. PX0003 at 018.

164. Microsoft also offers free access to Xbox Cloud Gaming for Epic Games' *Fortnite*. PX0003 at 019.

165. *Fortnite* on Xbox Cloud Gaming is separate from Game Pass Ultimate (*i.e.*, no subscription is required to play *Fortnite*), and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX0003 at 019.

166. As Microsoft Gaming CEO Phil Spencer testified, Microsoft's xCloud strategy was to allow who wanted to play Microsoft games on their mobile phones "to have access to those through streaming," allowing Microsoft to "find a significant number of customers given the installed base of people playing games on mobile phones." Spencer (Microsoft) Hr'g Tr. 393:16-394:6.

167. As Microsoft CEO Satya Nadella told investors, to date, more than 20 million gamers have used Xbox Cloud Gaming to stream games from the cloud. PX9171 at 017 (Nadella: "[W]ith Cloud Gaming, we're transforming how games are distributed, played, and viewed. More than 20 million people have used the service to stream games to date."); *see also* Hines (Microsoft) Hr'g Tr. 93:6-10 (Hines) (testifying to personally using xCloud to play games on a regular basis).

168. In ordinary course documents, Microsoft has stated that cloud gaming "dramatically expand[s] our market opportunity." Spencer (Microsoft) Hr'g Tr. 308:4-11; PX1056

(Microsoft) at 017. According to Microsoft, "[c]loud gaming services remain in their infancy but cloud gaming is evolving rapidly (both in terms of the number of services available and the size of the relevant catalogues), and is expected to grow in the short- to medium-term." PX0003 at 074.

169. Microsoft CEO Satya Nadella acknowledged that by allowing lower powered devices to play high intensity games, cloud gaming potentially expands the overall gaming market. Nadella (Microsoft) Hr'g Tr. 834:15-18.

170. Other companies that have introduced cloud gaming include Amazon, Nvidia, and Google. PX0003 at 068. Sony has also introduced cloud gaming available on the highest tier of its PlayStation Plus subscription service, "PlayStation Plus Premium," █████ ████████████████████████████ PX8001 (Ryan (Sony) Decl.) ¶ 9; PX3080 (Sony) at 075.

171. Sony Interactive Entertainment CEO Jim Ryan testified that Sony "is making significant investments in cloud in anticipation of it becoming a very meaningful way in the way that gamers access game content." PX3378-050 (Ryan (Sony) Hr'g Testimony, 65:1-4) ██ █████████████████████████████████████████████ ███ PX3378-055 (Ryan (Sony) Hr'g Testimony, 112:24) ███████ █████████████████████████████████████████████ █████████████████████████████████████████████ ██████ PX3378-052 (Ryan (Sony) Hr'g Testimony, 97:14-25, 98:04-06).

172. Amazon's Luna+ (a tier of Amazon Luna), priced at $9.99 per month with additional options available for further purchases, provides streaming access to a library of over 100 third-party games. See Amazon Luna, https://www.amazon.com/luna; PX3206 (Amazon) at 004.

173. Nvidia GeForce NOW, priced at $49.99 for six months for the Priority tier or $99.99 for six months for the RTX 3080 tier, allows gamers access streaming versions of game titles that the gamers already own, with the streaming hosted on Nvidia Corporation datacenters. Nvidia, GeForce NOW, https://www.nvidia.com/en-us/geforce-now/;

1    PX8000 (Eisler (Nvidia) Decl.) at ¶¶16, 18, 28. Bond (Microsoft) Hr'g Tr. 177:6-177:24.

2    ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████    PX3381

5    (Eisler Video) at 49:17-50:01.

174.    Google Stadia Pro was priced at $9.99 per month with additional options for further purchases, allowing gamers to stream games from a library of hundreds of third-party games. PX8003 (Zimring (Google) Decl.) at ¶ 3.

175.    Google discontinued Stadia in January 2023 in part due to the cost and difficulty of securing content to offer to Stadia users. Zimring (Google) Hr'g Tr. 470:15-471:1; PX8003 (Zimring (Google) Decl.) ¶ 2.

176.    As Professor Lee stated in his written direct, cloud gaming is a nascent technology and is growing in usage, and cloud usage on Microsoft's cloud gaming service offering through Xbox Game Pass has increased, measured both by hours and the number of monthly active users. Lee Written Direct at 158.

### E.    A Gaming Platform Must Offer AAA Content to Succeed

177.    "AAA" content is an industry term and can be synonymous with "a tentpole title, a marquee title, a big blockbuster title" that has a high development budget and high expectations for sales. Bond (Microsoft) Hr'g Tr. 147:20-148:2 ("[AAA] tends to imply a game of a certain size and scope, a certain level of investment put into the game."); PX7046 (Leder (Microsoft) Dep.) at 97:1-11; PX7011 (Spencer (Microsoft) IH Vol. 1) at 36:22-37:3 ("I wouldn't say there's an industry definition for what AAA actually means. I think the notion of a AAA game is a game with a high development budget with presumably a high expectation for -- for sales and kind of splash when it launches."); PX8001 (Ryan (Sony) Decl.) ¶ 20 ("AAA games often feature cinematic storytelling, immersive environments, and detailed graphics."). AAA games are "immersive," "major blockbuster titles" that tend to include "thoughtful, long storyline[s]" with significant "compute power" and "graphic fidelity." Dkt. 228 (Joint Stip. and [Proposed] Order) at 3.

178. AAA games are particularly important in the gaming industry. PX8001 (Ryan (Sony) declaration) at ¶¶ 18-23; Booty (Microsoft) Hr'g Tr. 51:20-52:8.

179. "Video game sales, revenues, and engagement are concentrated among a relatively small number of hit "blockbuster" titles and franchises, often referred to as "AAA" games. AAA games often are high-budget video games that have, or are expected to have, high unit sales and revenues. They tend to have high quality graphics and gameplay, have significant marketing and promotion, and usually require substantial investment and take longer to develop and than those without the AAA description. Lee Written Direct at ¶ 23 (citing PX4671 (Microsoft) at 001; PX8001 (Ryan (Sony) Decl.) ¶ 20; PX1063 (Microsoft) at 003.

180. "AAA" or tentpole titles can drive customer growth and engagement, as they "lift the entire tent" for other types of content. PX1089 (Microsoft) at 009; PX7046 (Leder (Microsoft) Dep.) at 111:24-112:12

181. Former Stadia Product Director Dov Zimring testified that all of Google's consumer research indicated that new games platforms needed these AAA or "blockbuster[]" games in order to generate player interest. Zimring (Google) Hr'g Tr. 477:3-10. Google even invested in its own games studio, Stadia Games and Entertainment, in the hopes of creating exclusive games for Stadia that would draw players to the platform. Zimring (Google) Hr'g Tr 478:3-479:5.

182. Microsoft and Sony need to have these AAA titles to build their gaming ecosystems. Spencer (Microsoft) Hr'g Tr. 301:24-302:15 (agreeing that Microsoft needs to offer "a predictable cadence of AAA launches in its products and services" to drive acquisition and retention of users across Microsoft products and services); PX1102 (Microsoft) at 001 ███████████████████████████████████████

███████████████████████████████████████████████

PX8001 (Ryan (Sony) Decl.) ¶ 24 (Activision content critical to PlayStation competitiveness).

183. AAA titles have long development cycles with high engagement, leading to a reduced supply of gaming content. PX1050 (Microsoft) at 034-35 ███████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████

184. Microsoft CEO Phil Spencer testified that gaming users do not use the term AAA when discussing mobile games. Spencer (Microsoft) Hr'g Tr. 309:2-3.

185. Consolidation in the industry has led to fewer AAA titles. PX1154 (Microsoft) at 001

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ Former Product Director for Stadia Dov Zimring testified that Stadia's development studio, Stadia Games and Entertainment, closed in early 2021 as a result of the high costs brough on by industry consolidation.  Zimring (Google) Hr'g Tr 479:14-23.

186. In past acquisitions, Microsoft has made procuring AAA content its main driver. For example, during the proposed acquisition of ██████████████████████

██████████████████████████████████████████

████████████████████████████████ PX1791 (Microsoft) at 004.

### 1.   The Industry Has a History of Consolidation

187. Over the last decade there has been significant, accelerating consolidation among video game publishers and developers. PX2094 (Activision) at 015; PX0027 at 002–04; PX7039 (Sakhnini (Activision) Dep.) at 116:5-117:9.

188. As CEO of Microsoft Gaming, Phil Spencer has been the leader of Microsoft's strategy to acquire more first-party gaming content. Spencer (Microsoft) Hr'g Tr. 268:12-16. Over the course of Mr. Spencer's nine years as CEO, Microsoft has more than doubled the number of gaming studios it owns. Spencer (Microsoft) Hr'g Tr. 268:19-269:11.The include eight studios that Xbox Game Studios acquired between 2018 and 2020,

1   including Playground, The Initiative, Ninja Theory, Undead Labs, Compulsion Games,

2   inXile, Obsidian, and Playground. PX1425 (Microsoft) at 005.

3   189.   The need for and scarcity of content has driven this consolidation. Microsoft Gaming

4   CFO Tim Stuart explained, ███████████████████████████████

5   █████████████████████████████████████████

6   ████████████████████ PX1154 (Microsoft) at 001.

7   190.   Microsoft Gaming CEO Phil Spencer was concerned about ███████████████

8   █████████████████████████████████ PX1136

9   (Microsoft) at 001.

10   191.   Microsoft Gaming CEO Phil Spencer ████████████████████████

11   ██████████████████████████████████████

12   █████████████ PX1136 (Microsoft) at 001; PX1791 (Microsoft) at 018. The

13   "Gaming Industry Outcomes" memo found that ██████████████████████

14   █████████████████████████████████████████

15   █████████ PX1791 (Microsoft) at 049.

16   192.   The "Gaming Industry Outcomes" memo also concluded ████████████████

17   █████████████████████████████████████████

18   ███████████████████████████████████████

19   █████████████████████████████████████████

20   ████████████████████████████████████

21   █████████ PX1791 (Microsoft) at 026.

22   193.   Microsoft generated ████████████████████████████████

23   █████████████████████████████████████

24   ████████████████████ PX7026 (Hampton (Microsoft) Dep.) 253:11-

25   254:11.

26   194.   When seeking board approval for the ZeniMax acquisition, Microsoft noted that

27   █████████████████████████████████████████

28   ████████████████████████████████████████

PX1050 (Microsoft) at 004. Microsoft recognized that subscriber scale is imperative for a successful subscription service, and that "the supply of attractive games is structurally limited." Spencer (Microsoft) Hr'g Tr. 308:10-20 (discussing PX1065 (Microsoft) at 017); PX1050 (Microsoft) at 032, 034–36.

195. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████ PX1050 (Microsoft) at 035.

196. Activision was also aware of consolidation in the gaming industry. A July 2021 Long Range Plan explains:████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
PX2094 (Activision) at 006, 015.

## 2. A Small Group of Top AAA Games Is Particularly Important

197. Video game sales and revenues are concentrated among a relatively small number of hit "blockbuster" titles and franchises often referred to as "AAA" games. PX5000 (Lee Report) at 035. Microsoft Gaming CEO Phil Spencer testified that "AAA games are a small part of the overall game releases in a given year." Spencer (Microsoft) Hr'g Tr. at 304:7-14, 304:25-305:14; PX7011 (Spencer (Microsoft) IH) (in camera) at 38:22-39:7 (estimating 10-20 AAA games out of 300-400 console games per year).

198. Microsoft's Corporate Vice President of Gaming Jerrett West defines tentpole content as "things we believe will drive acquisition, engagement hours, and have talkable and shareable marketing value" and describes them as "rare commodities." PX1102 (Microsoft) at 001. Matt Booty, Head of Xbox Game Studios, notes that "[t]he number of AAA developers continues to drop." PX7014 (Booty) (Microsoft) IH 230:12-231:4.

199. Mr. Booty testified that "AAA" can refer to the quality level, budget size, consumer expectations about a gaming, and "tentpole" means games that are well-known or recognizable. Booty (Microsoft) Hr'g Tr. 51:20-52:15; *see also* PX7005 (West)

(Microsoft) IH) at 75:24-76:1 ("tentpole game" and "AAA game" are largely interchangeable).

200. In a 2023 email, a Microsoft executive noted that, "there are relatively few of these games being released—either by us or by 3P—annually. The stat to call out here is there's been ███████████████████████████████████████████ In other words, the pool of available tentpoles is ████████████████ PX4673 (Microsoft) at 002.

201. Microsoft uses the term "exclusive" to refer to a game available on Xbox consoles, Xbox Game Pass, and PC. Booty (Microsoft) Hr'g Tr. 54:12-15. Microsoft documents highlight the importance of AAA exclusive content for driving console sales and Xbox Game Pass growth. ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ PX1136 (Microsoft) at 004.

202. A 2021 report by a consultant to Microsoft explains that tentpoles are "pre-eminent acquisition *and* retention drivers." PX1089 (Microsoft) at 009.

203. Regardless of the specific term used, there is widespread industry recognition that certain games are particularly important drivers of sales and engagement. PX7033 (Schnakenberg (Activision) Dep. 146:4-147:22). As Phil Spencer, CEO of Microsoft Gaming, testified, "[T]he most profitable thing in our industry are massively hit games, and what you do to keep those games at their [peak] of popularity is to continue to deliver high-quality content to as many customers as you can." Spencer (Microsoft) Hr'g Tr. 362:2-6; *see also* Spencer (Microsoft) Hr'g Tr. 432:2-5 ("The highest value driver in the gaming business are the hit franchises."). .

204.     Phil Eisler, Vice President and General Manager of Nvidia GeForce Now, stated,

"Access to AAA titles, which are the latest, most-popular gaming franchises, is critical to

the success of any gaming platform." PX8000 (Eisler (Nvidia) Decl.) ¶ 30.

### 3.  AAA Games are Difficult and Costly to Make

205.     Microsoft recognizes four independent publishers, collectively known as the "Big 4"—

Activision, Entertainment Arts, Take-Two, and Ubisoft—are necessary for Xbox.

PX1019 (Microsoft) at 004 ("Guiding principle #1 – Scarlett success requires the Big 4 +

Epic.").

206.     The latest version of *Halo*, *Halo Infinite*, ███████████████████████████

███████ PX1419 (Microsoft) at 003. ██████████████████████████████

████████████████████████

207.     Other games can take even longer, with Matt Booty at Microsoft predicting ███████

█████████████████████████ PX7014 (Booty (Microsoft) IH) at 131:3-6.

208.     Phil Spencer, CEO of Microsoft Gaming, testified "Developing big games today is very

expensive." Spencer (Microsoft) Hr'g Tr. 361:12.

209.     Over 3,000 people worked on Call of Duty: Modern Warfare. PX9005at 004.

210. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████ PX1805 (Microsoft)at 006.

211. ████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████ PX1050 (Microsoft) at 034.

212. ████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████ PX1050 (Microsoft) at 036.

213. ████████████████████████████████████████████

████████████████████████████████████████████

1  ████████████████████████████████████████████████

2  ████████████████████████████████████████████

3  ███████████████████████████████ PX2107 (Activision) at 073.

4  214.  Phil Eisler, Vice President and General Manager of Nvidia GeForce Now, explained the

5       challenge that "[t]oday's AAA video games . . . require tens of millions of dollars (in

6       some cases over $100 million) and years to produce." PX8000 (Eisler (Nvidia) Decl.) at

7       ¶ 31. Developing games has become more expensive in the last five to ten years, with

8       games on average taking longer to develop and experiencing delays in development.

9       Booty (Microsoft) Trial Tr. 53:10-21.

10 215.  ████████████████████████████████████████████

11      ██████████████████████████████████████

12      ████████████████████████████████████████████

13      ████████████████████████████████████████████

14      ██████████████████████████████████████

15      PX1063 (Microsoft) at 003. Activision CEO Mr. Kotick concluded in his hearing

16      testimony that sustaining AAA games requires broad and deep capabilities, and a AAA

17      title is not guaranteed even with that capability (though Mr. Kotick admits Activision has

18      the capability to release a AAA every single year). Kotick (Activision) Hr'g Tr. 43:14-22

19 216.  Because of Microsoft's gaming content advantages, Mr. Spencer has stated that even

20      well-capitalized competitors like Google and Amazon "will not catch up to Microsoft in

21      gaming." Spencer (Microsoft) Hr'g Tr. 303:16-20, 304:2-4.

22      **F.    Exclusive Gaming Content is Important for Attracting Customers and**

23             **Driving Sales**

24 217.  Exclusive content can be a driver of consumer console purchase decisions, as a Microsoft

25      strategy document explains, If the content any player wants to play is not available on our

26      platform, even the best Xbox fans will use another platform to play those games." Lee

27      Written Direct at ¶ 24 (citing PX1070 (Microsoft) at 003).

28

218. Microsoft Gaming CFO Tim Stuart testified that content is a key differentiator for gaming products and services. Stuart (Microsoft) Hr'g Tr. 939:4-11. Mr. Stuart testified that a pipeline of content helps drive user or consumer decisions about a subscription service or ecosystem for video games. Stuart (Microsoft) Hr'g Tr. 940:12-15.

219. Microsoft Gaming CEO Phil Spencer testified that discussions about the impact of exclusive gaming content on Xbox platforms has been a topic of discussion throughout the Xbox's two decades in the gaming industry. Spencer (Microsoft) Hr'g Tr. 315:9-13. Mr. Spencer testified that one of the benefits of owning content is that it allows Microsoft to decide where the content appears. Spencer (Microsoft) Hr'g Tr. 314:2-5.

220. Mr. Spencer testified that he has told colleagues that he does not see a point in putting Microsoft's first-party games on other closed platforms. Spencer (Microsoft) Hr'g Tr. 318:24-319:8.

221. Microsoft's decision to keep its *Halo* franchise exclusive to Xbox is instructive. *Halo* is a first-person shooter franchise that offers multiplayer mode. PX7005 (West (Microsoft) IH) at 42:16-18, 43:13-19. As Mr. Spencer admitted on the stand, Microsoft chooses not to ship *Halo* on PlayStation because the exclusives available on its platform are "one of the decisions people make when they're going into a store on what console to buy." Spencer (Microsoft) Hr'g Tr. 362:8-23.

222. Differentiated and exclusive content allows a console or service to provide a distinct benefit to customers. Lee Written Direct at ¶ 24 (citing PX7031 (Greenberg (Microsoft) Dep.) 75:24-76:22).

223. Ample evidence exists to show that industry participants acknowledge that video game content availability and quality are one of the important determinants of whether consumers purchase a video game console. For example, a 2019 Microsoft document regarding a potential acquisition of ▮▮▮▮ explains that "having access to relevant content is one of the single most important drivers in … console growth.▮▮▮▮

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Lee Written Direct at ¶ 26. Differentiated and

2 exclusive content allows a console or service to provide a distinct benefit to customers.

3 Lee Written Direct at ¶ 24 (citing PX7031 (Greenberg (Microsoft) Dep. Tr.) 75:24-

4 76:22).

5 224.   Internal market share simulators and machine-learning models produced by Microsoft

6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX5000 (Lee Report) at 155; PX1477

8 (Microsoft) at 001; PX1075 (Microsoft) at 002.

9 225.   Microsoft Gaming CEO Phil Spencer testified Microsoft's acquisition of ZeniMax was

10 motivated by a desire to have greater control over ZeniMax content on its own platform.

11 Spencer (Microsoft) Hr'g Tr. 314:7-24. ▮▮▮▮▮▮▮▮▮▮▮▮▮

12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX1050 (Microsoft) at

13 034.

14 226.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX1080

17 (Microsoft) at 001.

18 227.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX7053

21 (Ryan (Sony) Dep.) at 20:16-21:5. Likewise, almost all of Microsoft's first-party games

22 are exclusive to Xbox. PX7011 (Spencer (Microsoft) IH Vol. 1) at 360:2-13.

23 228.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮ PX7053 (Ryan (Sony) Dep.) at 24:20-26:8.

26 229.   A model of consumer demand for consoles and titles estimated by Dr. Lee using

27 historical Microsoft sales data predicts an average share shift of 8.9% toward Microsoft

28

from making past *Call of Duty* titles exclusive, and a smaller but significant shift toward Microsoft from making other Activision titles exclusive. PX5000 (Lee Report) at 156-57.

230. Microsoft Gaming CEO Phil Spencer testified that Microsoft's goal is to increase the number of Game Pass subscribers by adding attractive content. Spencer (Microsoft) Hr'g Tr. 302:24-303:1. In attracting subscribers to Game Pass, Microsoft recognizes the importance of "content that is … exclusive to the service, to differentiate relative to other services," and has noted "a strong relationship, which we believe is causal, between differentiated content and subscriber growth." Spencer (Microsoft) Hr'g Tr. 307:6-21; PX7011 (Spencer (Microsoft) IH Vol. 1) at 102:24-103:15 (discussing PX1065 (Microsoft) at 015, 017.

231. Microsoft Gaming CFO Tim Stuart testified that exclusive content is important to attracting subscribers to Game Pass, saying, "[H]aving content that is exclusive to that service is an optimal … way to attract customers into that service." PX7007 (Stuart (Microsoft) IH) at 167:5-168:9. Mr. Stuart testified that a subscription services requires a robust content pipeline to scale up and reach scale, and that there is correlation between content, engagement, and revenue on a subscription service. Stuart (Microsoft) Hr'g Tr. 939:12-16; 941:4-7.

232. The head of marketing for Xbox Game Studios, Aaron Greenberg, observed that launching titles exclusively on Xbox for the first year will enable Microsoft to ██████████ ████████████████████████████████████████ PX1951 (Microsoft) at 001; *see* PX7031 (Greenberg (Microsoft) Dep.) at 74:18-75:5 ██████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████

233. Microsoft has negotiated exclusive content for Game Pass subscribers in the past, including exclusive weapons, skins, and maps for *Destiny 2*. PX7007 (Stuart (Microsoft) IH) at 111:5-16.

234. 

PX2083 (Activision) at 013.

235.

236.

PX4808 (Microsoft) at 011.

237.

PX4775 at 008-9.

238. Microsoft and Sony compete to reach agreements with third-party game studios for content, including for exclusive content. Both Sony and Microsoft have deals with third-party game publishers that prohibit the publishers from placing certain games onto competing consoles or subscription services. PX3354 (Sony) at 020

PX3378 at 52-53 (Ryan (Sony) Hr'g Testimony at 95:09-13).

PX3378 at 52-53 (Ryan (Sony) Hr'g Testimony at 94:14-95:13).

239.

PX4743 (Microsoft).

1  ███████████████████████████████████████████████████████

2  ███████████████████████████████████████ PX4743

3  (Microsoft) at 014.

### G.    Activision Content is Particularly Important

240.  Activision develops and publishes high-quality video games for multiple devices, including video game consoles, PC, and mobile devices. PX9005 at 010–11.

241.  According to Microsoft's Board presentation summarizing the deal, ████████████ ███████████████████████████ PX4341 (Microsoft) at 027.

242.  Activision's "legendary franchises" include *Call of Duty*, *World of Warcraft*, *Diablo*, and *Overwatch*. PX4218 (Microsoft) at 001.

243.  Activision's CEO Bobby Kotick testified that Activision's games are "iconic" and "beloved." PX7006 (Kotick (Activision) IH) at 74:23-76:4). Mr. Kotick explained he and the gaming industry view Activision games as beloved and iconic because of the "duration, the popularity, the joy, and the fun people experience" with Activision games. Kotick (Activision) Hr'g Tr. 44:1-6.

244.  Activision's Vice Chairman Hunan Sakhnini testified that Activision makes "iconic IP" in titles like *Diablo 4* and *World of Warcraft*, and that he expected *Diablo 4* to become a "megahit." PX7039 (Sakhnini (Activision) Dep.) at 93:3-24, 108:17-24.

245.  *Call of Duty*, alone, has approximately 100 million active gamers and span a "pretty broad range" of player types. Kotick (Activision) Hr'g Tr.  at 717:6-9; 717:10-17.

246.  ██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████ Lee Written Direct
at ¶ 29 (citing PX7003 Bond (Microsoft) (IH) at 110:4-111:2; 218:19- 219:4; 257:20-
258:9; PX1182 (Microsoft) at 003; PX 0006 at 016; PX2157 (Activision) at 005; PX7052
(Zerza (Activision) (Dep.) at 203:24-204:2; PX1245 (Microsoft) at 001).

1    247.    ███████████████████████████████████████████████

2            ██████████████████████████████████████████████████

3            ████████████████████████████████████████████

4            ████████████████████████████████████████████

5            ██████████████████████████████████████████████████

6            ██████████████████████████████████████████████

7            ██████████████████████████ Lee Written Direct at ¶ 29 (citing PX1182

8    (Microsoft) at 004).

9    248.    Dr. Lee found that this evidence also indicates that there is "no comparable replacement

10           for Activision content: if Microsoft and Sony could easily replace Activision content with

11           alternative content that generated comparable value, then there is no clear economic

12           reason that ██████████████████████████████████████████████████

13           █████████████████████████████████████ Lee Written Direct at

14           ¶ 30.

15   249.    To further investigate the impact of Activision content on share of console sales, Dr. Lee

16           developed and estimated an econometric model of consumer demand for video game

17           consoles and video game titles using Generation 8 sales data, (the "share model."). Dr.

18           Lee estimated "that removing a *Call of Duty* title from PlayStation consoles could

19           increase the share of Xbox consoles sold of the course of a year, relative to PlayStation

20           consoles, by approximately 8.9 percentage points on average." Dr. Lee also estimated

21           that "removing a non-*Call of Duty* Activision title from Play Station consoles could

22           increase the share of Xbox consoles sold over the course of a year by ███████

23           ████████████████████████████████ Lee Written Direct at ¶ 31.

24   250.    As shown in Figure 1 of his written direct report, Dr. Lee's share model predicts that

25           making games with high unit sales exclusive tends to generate greater changes in Xbox

26           and PlayStation console shares. Dr. Lee also found that "the predicted increases in Xbox

27           shares from making *Call of Duty* titles exclusive are higher than for many other AAA

28

titles, as *Call of Duty* game sales are correspondingly higher than for most other AAA titles." Lee Written Direct at ¶ 32.

251. Activision's iconic video game titles include several leading AAA franchises – like *Call of Duty*, *Overwatch*, and *Diablo*, ██████████████████████ ████████████ PX1741 (Microsoft) at 010; PX2113 (Activision) at 010. In a presentation to a credit ratings agency, Activision's CFO and others characterized those three titles as "super franchises." PX2107 (Activision) at 051.

252. Activision has released a new Call of Duty in 19 of the past 20 years. Kotick (Activision) Hr'g Tr. 44:10-15.

253. Mr Kotick confirmed at the hearing that not only has Call of Duty been the best selling game in the United States every single year for the past 13 years, but the 2022 release of Call of Duty: Modern Warfare was the best selling Call Of Duty title of all time, the highest grossing entertainment opening of the year, and made $1 billion dollars in the first ten days of its release. Kotick (Activision) Hr'g Tr. 44:15-45-21

254. Activision's Diablo franchise also had a record breaking year with its release of Diablo IV the same month as this hearing, June 2023. Kotick (Activision) Hr'g Tr. 48:17-49:3. Diablo IV was both the best-selling Diablo game at launch of all time, Diablo IV also had the biggest opening week of the year with a record breaking $666 grossed in just 5 days. Kotick (Activision) Hr'g Tr. 48:25-49:13

255. Microsoft, in presentations to its Board of Directors regarding the Proposed Acquisition, called Activision's content "world class … across console, PC, and mobile."  PX4341 (Microsoft) at 027.

256. Activision's largest franchise, *Call of Duty*, is a AAA game. Spencer (Microsoft) Hr'g Tr. 309:6-7. Itis "one of the most successful entertainment franchises of all time." PX9005 at 004.

257. Microsoft and Sony compete fiercely for access to Activision content, and Microsoft has agreed to ██████████████████ with Activision to keep Activision titles from skipping its platform. ████████████████████████████

1   ████████████████████████████████████████ Spencer (Microsoft) Hr'g Tr.

2   312: 2-19 ("Q. Okay. And you were willing to make that that kind of offer that would

3   have [caused Microsoft to lose money], because you had to make the economics good

4   enough for Activision to not skip Xbox X and S; right? A. That was the threat."); PX7011

5   (Spencer (Microsoft) IH Tr.) 125:14-126:15, 127:20-24; *see also* Spencer (Microsoft)

6   Hr'g Tr. 311:5-21, 313:9-14; PX7011 (Spencer (Microsoft) IH Vol. 1) at 118:14-119:10

7   ████████████████████████████████████████████████

8   ███████████ Dr. Lee determined that "if a console or gaming service were to lose access

9   to Activison content there are limited and likely insufficient alternative options for a

10  console manufacturer or gaming service provider to *replace* the impact and attractiveness

11  of Activision content." Lee Written Direct at ¶ 33.

12  258.   In its ██████████████████████████████████████

13  ████████████████████████████████████ PX2094

14  (Activision) at 007.

15  259.   Even among AAA games, Activision's most well-known franchise, *Call of Duty*, is

16  particularly strong. First released nearly twenty years ago in 2003, *Call of Duty* is, in

17  Activision's own words, "one of the most successful entertainment franchises of all

18  time." PX9005 at 004. Microsoft concurs. ████████████████████

19  ████████████████████████████████████████████████

20  ███████ PX4341 (Microsoft) at 027.

21  260.   *Call of Duty* is Activision's "key product franchise." PX9052 at 037; *see also* PX8001

22  (Ryan (Sony) Decl.) ¶ 25 (calling COD "unique").

23  261.   Activision releases new *Call of Duty* titles every year. Hines (Microsoft) Hr'g Tr. 112:10-

24  16. This annual release cycle is unique among AAA games, with the exception of sports

25  games, because games of this caliber often require immense time and resources that take

26  years in between releases. PX8001 (Ryan (Sony) Decl.) ¶ 25. Activision uses four

27  separate studios and several support studios to complete the development work necessary

28  to launch an annual release. PX8001 (Ryan (Sony) Decl.) ¶ 25; PX3378-015 (Ryan

(Sony) Hr'g Testimony at 52:1-19) ("[Activision has] been able to organize themselves to release basically new [Call of Duty] games every single year. And the games are different, unique games. There's nothing like it in the industry.").

262. As SIE CEO Jim Ryan explains, the annual releases of Call of Duty are unlike anything else in the industry: "They have different themes. They have different story lines. They have different came play. They're made by different [Activision] studios. The closest analogy would be of annual iterations of the major sports franchises, but that situation is totally different. The developer and publisher build incrementally on the previous year's version of the game. Activision manages somehow to make a new game every single year. The situation is very different." PX3378-015 (Ryan (Sony) Hr'g Testimony at 52:09-19).

263. ███████████████████████████████████████████████████ ███ PX3378 (Ryan (Sony) Hr'g Testimony at 50:19-51:08). ███████████ ███████████████████████████████████████████████████ ████████████████████████████████████████ PX3378 (Ryan (Sony) Hr'g Testimony at 50:23-51:01).

264. *Call of Duty*'s loyal fanbase and enduring appeal have made it particularly valuable, influencing gamer engagement and gaming product adoption. PX2160 (Activision) at 009; PX0031 at 003-004. ████████████████████████████ █████████████████████████████████████ ███████████████ PX8000 (Eisler Decl.) at ¶ 49.

265. Call of Duty has a massive following, with ████████ monthly active users ("MAU") in 2020, according to an Activision strategy document. PX2094 (Activision) at 007.

266. In every year since 2014, the best-selling buy-to-play console game in the United States has been a *Call of Duty* game except for 2018, when *Red Dead Redemption II* was released. PX8001 (Ryan (Sony) Decl.) ¶ 26; *see* PX9053 at 003 (*Call of Duty* will remain best-selling U.S. franchise in 2022 for 14th consecutive year). In 2018, *Call of Duty Black Ops 4* ranked #2. PX8001 (Ryan (Sony) Decl.) ¶ 26.

267. In 2020, the #1 and #2 best-selling paid console games were *Call of Duty* titles. PX8001 (Ryan (Sony) Decl.) ¶ 26.

268. In 2021, *Call of Duty: Vanguard* topped the revenue charts as the best-selling game in the United States, with another *Call of Duty* title, *Black Ops Cold War*, coming in second. PX2056 (Activision) at 001.

269. In 2022, *Call of Duty: Modern Warfare II* took in $1 billion globally in the first ten days following its launch, making it the highest grossing entertainment opening of 2022. PX9132 at 001–02.

270. By comparison, the highest grossing film of 2022, *Top Gun: Maverick*, took one month to reach the $1 billion threshold. https://www.economist.com/business/2022/11/29/microsoft-activision-blizzard-and-the-future-of-gaming.

271. *Call of Duty* was the most requested title on GeForce NOW in April 2022. PX3052 (Nvidia) at 031.

272. ▮▮▮▮▮▮▮▮ PlayStation gamers play *Call of Duty*. PX7053 (Ryan (Sony) Dep. Vol. 1) 54:14-55:2; PX8001 (Ryan (Sony) Decl.) ¶ 28 (Since 2019, ▮▮▮▮ PlayStation's total user base played *Call of Duty*).

273. In the United States since 2019, ▮▮▮▮▮▮▮ unique PlayStation gamers have played *Call of Duty*. ▮▮▮▮▮▮▮ of PlayStation's total user base. PX8001 (Ryan (Sony) Decl.) ¶ 28.

274. *Call of Duty* has the ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ PX8001 (Ryan (Sony) Decl.) ¶ 28.

275. In 2021, *Call of Duty* players ▮▮▮▮▮▮▮ playing *Call of Duty*. PX8001 (Ryan (Sony) Decl.) ¶ 28.

276. Activision gets 60% of its global revenue from inside the United States. Bailey (Defendants' Expert) 803:17-804:1

277. SIE CEO Jim Ryan testified that "Call of Duty players, meaning those who engage with Call of Duty at some point in a year, drive a significant portion of SIE's revenue, with the

total spend on PlayStation by these players across all items—including hardware, accessories, subscriptions, games and add-ons—accounting for over ▮▮▮ of overall PlayStation spending." PX8001 (Ryan (Sony) Decl.) ¶ 27.

**H.      Microsoft Has a History of Making Content from Acquired Studios Exclusive**

278.     As described *infra* in Sections IV.C., Microsoft has a history of acquiring game studios and making future releases from those studios exclusive to Xbox.

279.     For example, Microsoft acquired a number of game studios in 2018-2019, and its approach to those acquisitions was that "going forward these new studios will focus on making games for our console and we have no plans to expand our exclusive first party IP to other consoles." PX1949 (Microsoft) at 002 ; *see infra*, Section IV.C.2.

280.     As discussed *infra* in Section IV.C.3., in 2021 Microsoft acquired ZeniMax Media ("ZeniMax"), the parent company of the large game developer and publisher Bethesda Softworks LLC ("Bethesda"), for $7.5 billion. Microsoft told the European Commission that it would not have the incentive to withhold future ZeniMax titles from rival consoles, but subsequently decided to do exactly that. *See infra*, Section IV.C.3.

281.     Microsoft's tendency to make its acquired studios' future games exclusive to Xbox (as mentioned above) is contrary to Activision's view that Activision CEO Bobby Kotick referred to as  "platform agnostic". Kotick (Activision) Hr'g Tr. 50:2-4. Activision CEO Bobby Kotick also testified to Activision not having a multigame subscription service, a console, or a cloud streaming service; and their core business is limited to making games. Kotick (Activison) Hr'g 49:14-23.

**II.     RELEVANT MARKETS**

**A.      High-Performance Consoles Constitute a Relevant Product Market**

*Brown Shoe* **– Industry and Public Recognition**

282.     It is acknowledged within the industry that Microsoft and Sony are extremely close competitors. PX0006 at 064–65; PX1275 (Microsoft) at 001; PX8001 (Ryan (Sony) Decl.) ¶¶ 12, 14. Microsoft executive Lori Wright previously testified in another matter that "[t]he most direct competitor for hardware sales would be the Sony PlayStation" and

that Microsoft competed against Nintendo's Switch "to a much lesser extent." Dkt. 228
(Joint Stip. and [Proposed] Order) at 2-3. Defining a relevant product market requires
identifying the set of products that, from a consumer perspective, are reasonable
substitutes. Bailey (Defendants' Expert) 795:5-23. However, Dr. Bailey did not study
consumer purchases of gaming consoles. Pg: 797 Ln: 17 – 23.

283. ██████████████████████████████████████████████████
██████████████████████████████████████████ PX7028 (Spencer (Microsoft)
Dep.) at 151:20-152:17, 157:11-18; PX1635 (Microsoft) at 002.███████████████
██████████████████████████████████████████████████████████
PX7028 (Spencer (Microsoft) Dep.) at 158:16-25.

284. ██████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████ PX1114 (Microsoft) at 013; PX7011 (Spencer
(Microsoft) IH Vol. 1) at 165:22-166:23; PX1240 (Microsoft) at 019; PX1274
(Microsoft).

285. Internal analyses within Microsoft often exclude Nintendo consoles from their market
research and focus on comparing Xbox to PlayStation in terms of branding and consumer
preferences. Spencer (Microsoft) Hr'g Tr. 283:13-284:4; PX1888 (Microsoft) at 036
(explaining that Microsoft's Generation 9 console share estimates exclude Generation 8
consoles and the Switch); PX1636 (Microsoft) at 011–12.

286. Microsoft analyses of Xbox and PlayStation console market shares ████████████
██████████████████████████████████████████████████████████
████████████ PX7028 (Spencer (Microsoft) Dep.) at 144:16-145:13.

287. Microsoft generally████████████████████████████████████████████
██████████████████████████████████████████████ PX7028
(Spencer (Microsoft) Dep.) at 161:2-17. Microsoft Gaming CFO Tim Stuart testified that
Microsoft breaks down the console market into a Gen 9 component, consisting of Xbox
X/S and PlayStation 5, and a total console market, which includes the Gen 9 component

1    in addition to the Nintendo Switch and Generation 8 consoles. Stuart (Microsoft) Hr'g Tr.

2    937:7-21; PX1240 at -019.

3    288. ████████████████████████████████████████████

4    ████████████████████████████████████████

5    ██████████████████████████████████ PX3081 (Sony) at 028,

6    040.

7    289. As Sony Interactive Entertainment's CEO describes, "[w]e considered Nintendo to

8    participate in a different market segment to Xbox and PlayStation." PX7053 (Ryan

9    (Sony) Dep.) at 21:9-14.

10   290. Gaming journalists and commentators in the public also frequently observe the vigorous

11   competition between Xbox and PlayStation while excluding Nintendo's consoles. In a

12   public interview, the former head of Xbox commented, "We encouraged the console

13   wars, not to create division, but to challenge each other. And when I say each other I

14   mean Microsoft and Sony." PX9061 at 001; PX9037 at 006 ("Microsoft and Sony at the

15   forefront of the console wars, releasing competing devices within months of each other:

16   first with the Xbox 360 and PlayStation 3 in the 00s, then with the Xbox One and

17   PlayStation 4 in 2013, and now with the Xbox Series X and PlayStation 5. Nintendo,

18   meanwhile, decided that warring over the cutting edge of entertainment was for suckers,

19   and instead put out a series of comparatively underpowered consoles, most recently the

20   Nintendo Switch, that cheerfully sold hundreds of millions of units.").

21   ***Brown Shoe* – Characteristics and Uses**

22   291. Dr. Lee found that the Xbox Series X|S and PlayStation 5 have similar technical

23   specifications and Microsoft and Sony regard them as the most powerful video game

24   consoles available today. Lee Written Direct at ¶ 67 (citing PX5000 (Lee Report) at 080

25   fig. 13.

26   292. Xbox Series X|S and PS5 consoles are the only high-performance consoles available

27   today and are considered to be in the ninth generation of gaming consoles.  PX1635

28   (Microsoft) 002.████████████████████████████████████

1     ███████████████████████████████████████

2     ███████████████████████████████████████

3     ████████████████ PX1638 (Microsoft) at 019.

4    293.   The new generation of Xbox and PlayStation consoles possess extremely fast processing,

5           which shapes the kind of content that can run on high-performance consoles, enabling

6           higher resolution, realistic graphics, and cutting-edge performance. The delta between the

7           technical performance of the Xbox Series X and PlayStation 5 is smaller than the delta

8           between the Xbox One X and PS4 Pro. PX1635 (Microsoft) at 002; *see also* PX7053

9           (Ryan (Sony) Dep. Vol. 1) at 21:16-22:3, ("Many of the games that we make for

10          PlayStation are simply too powerful to be played on a Nintendo Switch."); PX7048

11          (Booty (Microsoft) Dep.) at 42:17-43:6 ("Well, the Nintendo Switch is a very popular

12          console, but it also is less technically capable, just the hardware); PX7028 (Spencer

13          (Microsoft) Dep.) at 114:1821.

14    294.   From a consumer perspective, the Xbox Series X|S and PlayStation 5 consoles are

15           "roughly comparable" in a number of technical specifications, including offering similar

16           graphics, user experiences, and hardware features. PX1275 (Microsoft) at 002.

17    295.   Nintendo prides itself on ███████████████████████████

18     ███████████████████████████████ PX7059 (Prata (Nintendo) Dep.) at

19           66:19-67:3 158:7-22, 161:16-20; *see also* PX8002 (Prata (Nintendo) Decl. ¶ 3

20     ████████████████████████████████████████

21     ██████████████████████████████████████

22     █████████████████████████████████████

23     ████████████████████████████████████

24    296.   Mr. Kotick also testified that Nintendo's Switch is "very well differentiated," including

25           that it has unique characteristics, unique hardware, different processors, and different

26           capabilities. Kotick (Activision) Hr'g Tr. 765:14-23.

27

28

297.  Mr. Kotick explained to the Court that the reason he decided against offering *Call of Duty*
on the Switch was because he did not think that *Call of Duty* was appropriate for the
Switch. Kotick (Activision) Hr'g Tr. at 768:8-13.

298.  ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████ PX1638 (Microsoft) at 018.

299.  Both the Xbox Series X|S and PlayStation 5 consoles are home consoles typically played
on television screens and use a "traditional type of control scheme" that relies on analog
sticks and buttons as opposed to motion control. PX7059 (Prata (Nintendo) Dep.) at 45:5-
46:23, 158:13-22. They lack the ability to remove controllers from their console and
cannot be easily taken out of the home. PX7065 (Singer (Nintendo) Dep.) at 71:11-17.

300.  However, their stationary design allows them the power and technical capability to run
more computationally demanding games. PX7053 Ryan (Sony) Dep.Vol. 1) at 21:16-
22:3 ("Many of the games that we make for PlayStation are simply too powerful to be
played on a Nintendo Switch.").

301.  In contrast, Nintendo's most recent console—the Nintendo Switch—is not a ninth-
generation gaming console. PX0003 at 060; PX1888 (Microsoft) at 036 ████████
████████████████████████████████████████████████
████████████████████████████████████████ The Switch
also has lower computational performance, more in line with Microsoft's and Sony's
eighth generation consoles. PX7011 (Spencer (Microsoft) IH Vol. 1) at 169:19-25;
PX7053 (Ryan (Sony) Dep. Vol. 1) at 21:12-22:3)

302.  Microsoft's expert, Dr Bailey, compared the Nintendo Switch for only a ten-week period
over six years ago with the last generation of consoles -- when the Switch was a brand
new product. Bailey (Microsoft) Hr'g Tr. 89:2-8. Additionally, Microsoft's second expert
did not attempt to define a relevant market at all, and did not rely on Dr. Bailey's report
for any product market statements. Carlton (Microsoft) 168:25-169:8

1

2   303.   Dr. Lee found that "evidence indicates the Xbox Series X|S and PlayStation 5 are

3           differentiated from the Nintendo Switch with respect to performance, form factor,

4           technical specifications, pricing and game availability." Lee Written Direct at ¶ 66.

5   *Brown Shoe* **– Sensitivity to Price Changes / Substitutability**

6   304.   Multi-homing patterns also show that gamers tend to find the Xbox Series X|S and

7           PlayStation 5 more substitutable for each other than the Nintendo Switch. Industry group

8           data shows that from October 2020 through December 2020. ██████████████████

9   ████████████████████████████████████████████████████

10  ████████████████████████████████████████████

11  ██████████████████████ PX5000 (Lee Report) at ¶ 213.

12  305.   Dr. Lee determined that "Xbox Series X/S and PlayStation 5 consoles have video game

13          content porfolios that are more similar with each other than with the Nintendo Switch.

14          The majority of sales for Xbox Series X/S and PlayStation 5 are of titles that are available

15          on both Xbox and PlayStation consoles but not on the Nintendo Switch.  By comparison,

16          over 70% of game sales for the Nintendo Switch are from titles that are exclusive to the

17          Switch."  Lee Written Direct at ¶ 69.

18  306.   Similarly, according to Jim Ryan, Sony Interactive Entertainment's CEO. ████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████ PX8001 (Ryan (Sony) Decl.) ¶ 14.

22  *Brown Shoe* **– Distinct Prices**

23  307.   The Xbox Series X|S and PlayStation 5 also launched with similar pricing schemes. The

24          more advanced Xbox Series X and PlayStation 5 launched with a price of $499 while the

25          Xbox Series S and PlayStation 5 Digital Edition launched with a price of $299 and $399,

26          respectively. PX7028 (Spencer (Microsoft) Dep.) at 138:22-139:8; PX8001 (Ryan (Sony)

27          Decl.) ¶ 12. Microsoft Gaming CEO Phil Spencer testified that Microsoft competes on

28          price with Sony in consoles. Spencer (Microsoft) Hr'g Tr. 299:19-21. The price of the

1    Nintendo Switch, by contrast, is lower than the PlayStation 5 and Xbox Series X. Hr'g

2    Tr. (Spencer) 278:7-13.

3    308.   While the Xbox Series S had the same retail price at launch as the Nintendo Switch,

4         PX7028 (Spencer (Microsoft) Dep.) at 138:22-139:8. ███████████████████████

5    ████████████████████████████████████████████████████████

6    ███████████████████ PX8002 (Prata (Nintendo) Decl.) ¶ 3; PX5000 (Lee Report) at

7    080. In addition. ██████████████████████████████████████████████████

8    PX4631 (Microsoft) at 008, 009; PX9207 at 005.

9    ***Brown Shoe* – Distinct Customers**

10   309.   According to NPD data for October 2020–December 2020. ██████████████████

11   ██████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████ *See* PX0006

14   at 290; *see also* PX3161 (Nintendo) at 011 ████████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████ PX3065 (Sony) at

17   051 ████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ███████████████████████████████████

21   310.   ██████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   PX8001 (Jim Ryan (Sony) Decl.) ¶ 14.

25   311.   These multi-homing patterns are consistent with, on average, owners of an Xbox Series

26        X|S console obtaining more value from purchasing a Nintendo Switch than a PlayStation

27        5 console and, likewise, owners of a PlayStation 5 console obtaining more value from

28        purchasing a Nintendo Switch than an Xbox Series X|S console.

312. The patterns are also consistent with Nintendo's claim in a declaration that ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████ PX8002 (Prata (Nintendo) Decl. ¶ 3 001–

002.

313. ████████████████████████████ PX3047 (Sony) at 014 ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

314. High-performance consoles target a different audience than their next closest substitute, the Nintendo Switch. *See* PX7048 (Booty (Microsoft) Dep.) at 124:20-125:2(██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ Booty (Microsoft) Hr'g Tr. 62:12-13. The geographic footprint of the high-performance consoles is also different because the Nintendo consoles "skews much more heavily towards the Japanese market than the PlayStation market does or the Xbox market does."  PX7053 (Ryan (Sony) Dep.) at 104:19-105:2.

315. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ PX8002 (Prata

(Nintendo) Decl.) ¶¶ 3, 10; PX7053 (Ryan (Sony) Dep. Vol. 1) 22:11-22. SIE CEO remarked that Nintendo's consoles were "defined by characters such as Mario and Zelda, whereas [Sony's] platform is characterized by games such as Call of Duty or God of War, much more adult themed content." PX7053 (Ryan (Sony) Dep.) at 103:4-104:6.

316. SIE CEO Jim Ryan observed that when Call of Duty was on Nintendo a decade ago, its sales on Nintendo were not significant. Based on his experience in the industry, Mr. Ryan believes that Call of Duty is "aimed at a very different audience to the standard Nintendo

1   audience that enjoys Mario and Zelda but not Call of Duty." PX3378 (Ryan (Sony) Hr'g
2   Testimony at 101:04-22).

3   317.   Dr. Lee's analysis shows Microsoft and Sony impose the most significant competitive
4   constraints on one another among console manufacturers and consumer substitution to
5   products outside of the High-Performance Video Games Consoles Market would not
6   constrain a hypothetical monopolist of high-performance consoles from likely profitably
7   implementing a small but significant and non-transitory increase in price ("SSNIP"). Lee
8   Written Direct at ¶ 64; PX5000 (Lee Report) at 102. His analysis concluded that a
9   hypothetical monopolist of high performance consoles would likely profitably impose a
10   SSNIP on at least one product contained within this market and thus High-Performance
11   Video Game Consoles market satisfies the hypothetical monopolist test. Lee Written
12   Direct at ¶ 64; PX5000 (Lee Report) at 102; Lee (Plaintiff Expert) Hr'g Tr. 529:9-530:7,
13   530:8-17.

14   318.   Dr. Lee concluded that High-Performance Video Game Consoles is a relevant product
15   market for analyzing the competitive effects of this Proposed Transaction. Lee Written
16   Direct at ¶ 60.

17   319.   Dr. Lee determined that the High-Performance Video Game Consoles market includes
18   only Microsoft's Xbox Series X|S consoles, and Sony's PlayStation 5 consoles.
19   Professor Lee also found that this "market excludes other video game consoles, including
20   the Nintendo Switch (released in2019) as well as PCs, mobile devices, virtual reality
21   devices and non-console cloud gaming." Lee Written Direct at ¶ 61.

22   320.   Dr. Lee also found that "[e]vidence supports the conclusion that Xbox Series X|S and
23   PlayStation 5 consoles compete more closely with each other than with the Nintendo
24   Switch." Lee Written Direct at ¶ 62.

25   321.   Finally, Professor Lee concluded that "other video game consoles would likely not
26   constrain a hypothetical monopolist of high-performance video game consoles from
27   profitably imposing a SSNIP. Lee Written Direct at ¶ 70. (citing PX5000 (Lee Report) at
28   090).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      Video Game Consoles Also Constitute a Relevant Market**

322.   The console market can be expanded to include Xbox Series X|S, PlayStation 5, and
Nintendo Switch, although this is broader than necessary and does not eliminate the
anticompetitive effects. PX5000 (Lee Report) at 102; Lee (Plaintiff Expert) Hr'g Tr.
528:9-14, 529:3-14 ("I think it's important to understand the role of market definition.
It's to focus attention on where competitive effects may occur, and there need not be a
single market to use when evaluating these competitive effects.").

323.   Dr. Lee concluded that Video Game Consoles "is a relevant product market, albeit
broader than is necessary to satisfy the Hypothetical Monopolist Test, for analyzing the
competitive effects of the Proposed Transaction."  Lee Written Direct at ¶¶ 76, 79.

324.   Dr. Lee found that the Video Game Console market would include "the Xbox Series X|S,
PlayStation 5, and Nintendo Switch consoles, as well as other home video game consoles
and handheld consoles." Lee Written Direct at ¶ 76.

325.   Dr. Lee testified that "because the Video Game Consoles market wholly contains all
products in the High-Performance Video Game Consoles market, any competitive effects
of the Proposed Transaction that would occur in the High-Performance Video Game
market would also occur in the broader Video Game Consoles market." Lee Written
Direct at ¶ 77.

326.   ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████ PX1240 (Microsoft) at 019.

327.   In its representations to the Federal Trade Commission, Microsoft identifies other console
distributors as Sony and Nintendo. PX0003 at 048, 060, 132.

328.   ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████ PX5000 (Lee Report) at 108.

329. ████████████████████████████████████

████████████████████████████████

████████████ PX5000 (Lee Report) at 108.

330. By comparison, the next largest video game console is the Valve Steam Deck, which according to Dr. Lee accounted for ███ of console unit sales and ███ of console revenue in 2022. PX5000 (Lee Report) at 108.

331. █████████████████████████████████████

████████████████████████████ PX8002 (Prata (Nintendo) Decl.) ¶¶ 1–3.

332. Dr. Lee's analysis of the High-Performance Video Game Consoles market shows that the High-Performance Video Game Consoles market satisfies the hypothetical monopolist test. PX5000 (Lee Report) at 103. Because all products within the High-Performance Video Game Consoles market are wholly contained within the Video Games Consoles market, that indicates the Video Game Consoles market also satisfies the hypothetical monopolist test.  PX5000 (Lee Report) at 103. Dr. Lee explained that the aggregate diversion ratio for the Video Games Consoles market would necessarily be greater than or equal to the aggregate diversion ratio for the High-Performance Video Game Consoles market because the hypothetical monopolist of the Video Game Consoles market would own strictly more products than the hypothetical monopolist of the High-Performance Video Game Consoles market.

333. Additionally, as opposed a PC, which has multiple uses,  Microsoft's expert witness Dr Bailey explained "there is nothing else you can do with a console… the console is no good without the game." Bailey (Microsoft) Hr'g Tr. 102:7-14. Dr. Bailey did not conduct analysis of consumers' ability to switch between gaming devices in response to price increases. Bailey (Defendants' Expert) 802:19-24. She did however, note that Activision gets 60% of its global revenue from inside the United States. Bailey (Defendants' Expert) 803:17-804:1

C.     **Multi-Game Content Subscription Services Constitute a Relevant Product Market**

334.  Dr. Lee found that a narrower market wholly contained within the Multi-Game Content Subscription Services and Cloud Gaming Subscription Services market is a market consisting of only Multi-Game Content Subscription Services.  (In his Written Direct Dr. Lee refers to Multi-Game Content Subscription Services as Content Library Services which have the same meaning.  Dr. Lee also refers to Cloud Gaming Subscription Services as Cloud Gaming Services which have the same meaning). And that Multi-Game Content Subscription Services is also a relevant product market for analyzing the competitive effects of the Proposed Transaction. Lee Written Direct ¶ 166.

335.  Dr. Lee testified that products in the Multi-Game Content Subscription Services market include Xbox Game Pass (all tiers), PlayStation Plus (Extra and Premium tiers), Nintendo Switch Online, Amazon Luna+ and Prime Gaming, EA Play, and Ubisoft+. Lee Written Direct ¶167.

*Brown Shoe* **- Industry and Public Recognition**

336.  Market participants view content library services as a distinct product segment. For example,

      PX1995 (Microsoft) at 008.

337.  Microsoft has represented that it

                              PX0003 at 077.

*Brown Shoe* **– Characteristics, Benefits and Uses**

338. Sarah Bond, Microsoft Gaming Corporate Vice President of Creator Experiences and Ecosystem Management, testified that users of Xbox Game Pass value being able to play well-known video game titles through the content library service as well as discovering games that they would not otherwise have played. PX7003 (Bond (Microsoft) IH) at 139:7-19.

339. Subscribing to Game Pass reduces subscribers' cost of playing a wider set of games. ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ PX1767 (Microsoft) at 001.

340. A Microsoft presentation on Xbox Game Pass observes that ██████████████████ ████████████████████████████████████████████████████████████ ██████████████████ PX4695 (Microsoft) at-025–26.

341. In a July 2021 earnings call, Microsoft told investors "Game Pass is growing rapidly and it's transforming how people discover, connect, and play games.  Subscribers play approximately 40% more games and spend 50% more than nonmembers." PX9012 at 006.

342. In a regulatory submission to the European Commission regarding the Proposed Transaction, the merging parties have represented, █████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ PX0006 at 013.

### *Brown Shoe* – District Pricing and Marketing

343. Subscribers to Multi-game content subscription services typically pay periodic subscription fees (frequently monthly, quarterly, or annually) for access to the games offered by the service. The monthly subscription fee for Xbox Game Pass ranged from $9.99 to $14.99 per month, but in late June Microsoft announced the base Game Pass

1    subscription for console price will increase from $9.99 to $10.99. PX9446-002. The

2    monthly subscription fee for PlayStation Plus Extra and Premium tiers (the content

3    subscription tiers) ranges from $14.99 to $17.99. PX8001 (Sony) Decl.) ¶¶ 9, 17.

4    344.    Microsoft has explicitly compared and benchmarked the pricing and features of Xbox

5    Game Pass to Sony's PlayStation Plus. Stuart (Microsoft) Hr'g Tr. 942:13-943:21;

6    PX1151 (Microsoft) at 001. Microsoft Gaming CFO Tim Stuart testified that there is an

7    opportunity for Microsoft to increase the price of Game Pass and highlight the much

8    better value that Game Pass top tiers represent versus PlayStation's subscription service.

9    Stuart (Microsoft) Hr'g Tr. 944:1-945:16; PX1151 at -001.

10   345.    ███████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ███████████████████████████████████████ PX7053 (Ryan (Sony)

13   Dep.) at 19:4-8.

14   346.    ███████████████████████████████████████████

15   ████████████████████████████████████████████

16   ██████████████████████████████████████████████

17   ███████████████████████████████████ PX3090 (Sony) at 002.

18   347.    ████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ██████████████████████████████████████████████

21   ███████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ██████████ PX1767 (Microsoft) at -001  (emphasis in original). At trial, Ms. Bond

25   testified that people buy the game after playing it on Game Pass. Microsoft found "people

26   are very likely to actually go buy the game so they can permanently have it in their

27   library." Bond (Microsoft) Hr'g Tr. 140:12-141:12.

28   ***Brown Shoe* – Distinct Customers**

348. Buy-to-play games do not facilitate the same discovery of new content among gamers as content subscription services do. ████████████

████████████

████████████

PX4652 (Microsoft) at 007.

349. Microsoft Gaming CEO Phil Spencer testified that Microsoft targets distinct customers with its Game Pass catalog, noting, "When a game reaches a certain point in its evolution, in its sales, it's an opportunity for us to find customers who did not originally buy the game. Spencer (Microsoft) Hr'g Tr. 423:19-23.

***Brown Shoe* – Sensitivity to Price Changes**

350. Microsoft observed that Game Pass promotes subscriber engagement and retention. ██

████████████

████████████

████████████

████████████

████ PX1050 (Microsoft) at 038.

351. ████████████

████████████

████████████

████████████

████████████

PX4260 (Microsoft) at 005.

352. Xbox Live Gold and PlayStation Plus Essential may offer a limited number of free games on a monthly basis, but they do not offer the same diversity of content and game discoverability as content library services, which often offer a library of hundreds of games. Jerrett West, Corporate Vice President of Gaming Marketing at Microsoft, testified that Xbox Live Gold is "currently separate from Game Pass" and "[t]he big difference is Game Pass has a catalog of games. Live Gold is specifically focused on

PLAINTIFF'S FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW, CASE NO. 3:23-CV-2880

multiplayer gaming. … We offer free games with Gold every month, and a Game Pass subscriber and a Gold subscriber gets those games with Gold—games that we call them every month, but it's not the catalog of Game Pass games." PX7005 (West (Microsoft) IH) at 20:3–24.

353.   Companies like Apple sometimes offer access to a content library of games that are primarily played on mobile devices. Mobile games are highly differentiated from video games primarily played on non-mobile devices. PX0006 (Microsoft) at -052–53.

354.   Consumer substitution to products outside of the Content Library Services (otherwise known as multi-game content subscription services) market does not constrain a hypothetical monopolist of Content Library Services from likely profitably implementing a SSNIP. PX5000 (Lee Report) at 133-34; Lee (Plaintiff Expert) Hr'g Tr. 535:19-536:7. For this reason, a hypothetical monopolist of Content Library Services would likely profitably impose a SSNIP on products within this this market, including Game Pass, and thus, the Content Library Services market satisfies the hypothetical monopolist test. PX5000 (Lee Report) at 133–34; Lee (Plaintiff Expert) Hr'g Tr. 640:9-641:3 (" If Netflix and all those other streaming services, you know, raised their prices slightly, maybe a dollar a month, would people start just buying movies or buying a la carte TV shows in response? Or would it maybe be more likely they would substitute to other subscription service?").

355.   Dr. Lee concluded that the Multi Game Content Subscription Services market (Content Library Services market) satisfies the Hypothetical Monopolist Test and is a relevant product.  Lee Written Direct at ¶ 172.

   **D.   Cloud Gaming Subscription Services Constitute a Relevant Product Market**

*Brown Shoe* **- Industry and Public Recognition**

356.   Dr. Lee testified that a narrower market wholly contained within the Content Library and Cloud Gaming Services market (also known as the Multi-Game Content Subscription Services and Cloud Gaming Subscription Services market) consisting only for Cloud Gaming Services, concluding that Cloud Gaming Services (also known as Cloud Gaming

Subscription Services) is "a relevant product market for analyzing the competitive effects of the Proposed Transaction." Lee Written Direct ¶ 174.

357. Dr. Lee found that the Cloud Gaming Services market contains "all cloud gaming services that offer access to games that are played primarily on non-mobile devices." Lee Written Direct at ¶ 174.

358. Dr. Lee found that products in the Cloud Gaming Subscription Services market "include Xbox Game Pass Ultimate, PlayStation Plus Premium, Nvidia GeForce Now, Amazon Luna+ and Prime Gaming. With the exception of Nvidia GeForce Now, these products also offer content library services." Lee Written Direct ¶ 174.

359. Dr. Lee found that there is substantial evidence that Microsoft considers cloud gaming subscription services as a distinct product segment and other cloud gaming subscription service providers as competitors. Lee Written Direct ¶ 177.

360. Microsoft identifies Xbox Cloud Gaming as a separate economic entity in its public statements. In Microsoft's July 28, 2022 Annual Report Form 10-K, Microsoft described the Gaming segment as "including Xbox hardware and Xbox content and services, comprising first- and third-party content (including games and in-game content), Xbox Game Pass and other subscriptions, Xbox Cloud Gaming, third-party disc royalties, advertising, and other cloud services." PX9050 at 014.

361. Microsoft CEO Satya Nadella admitted that he doesn't "think of [cloud streaming] as a – strictly a substitute to the console."  (Microsoft) Hr'g Tr. 834: 11-12.

362. An October 22 Microsoft presentation directly compares "Other Cloud Gaming Solutions" including Nvidia, GeForce Now, PlayStation Plus and Amazon Luna." Lee Written Direct ¶ 177 fig. 9 (citing PX5000 (Lee Report) at 136 fig. 32.

363. In Microsoft's July 2021 earnings call, CEO Satya Nadella stated: "We continue to lead in the fast-growing cloud gaming market with last month -- just last month, we made Xbox Cloud Gaming available on PCs as well as Apple phones and tablets via the browser in 22 countries with more to come." Nadella (Microsoft) Hr'g Tr. 838:10-14; PX9012 at 006.

364. Microsoft views Nvidia GeForce Now as a competitor ███████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████ PX4351
(Microsoft) at 002.

365. In internal documents, Microsoft compares xCloud (and, later, Xbox Cloud Gaming) to
other cloud gaming streaming services. PX1110 (Microsoft) at 024 (Phil Spencer
presentation to Microsoft's Board identifies the following competitors in a slide titled
███████████████████████████████████████████████████████████
████████████████████ PX4640 (Microsoft) at 001 ██████████████
██████████████████████████████

366. Satya Nadella and Phil Spencer discussed the potential for xCloud to capitalize on the
fact that Google Stadia "hit tech hard, which is important, but totally missed content and
business model." Nadella (Microsoft) Hr'g Tr. 844:20-845:10; PX1750 (Microsoft) at
001.

367. ███████████████████████████████████████████████████████████
███████████████████ PX2183 (Activision) at 008 ██████████████
███████████████████████████████████████████████████████████
████████

368. ███████████████████████████████████████████████████████
███████████████████ PX3069 (Nvidia) at 008 ███████████████████
███████████████████████████████████████████████████████████
████████████████████████████

369. Phil Eisler, Vice President and General Manager of Nvidia GeForce Now, explained in
his declaration that GeForce Now benchmarks its pricing to other cloud gaming services,
including Xbox Game Pass Ultimate. PX8000 (Eisler (Nvidia) Decl.)  ¶¶ 36–37.

370. ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████

████████████████████████████████████

███████████████████████

371.   Documents from Google analyze cloud game streaming services separately from other methods of game distribution. PX3058 (Google) at -001–04 (comparing Stadia to Luna, Nvidia and xCloud).

***Brown Shoe* – Characteristics and Uses**

372.   Cloud Gaming Subscription Services provide a way to play games that is distinct from running them locally on the player's gaming device, by enabling gamers to begin playing a game in seconds rather than waiting for games to download or update, and streaming rather than downloading avoids burdening the storage limits on a gaming device. PX0006 at -088 ("[Cloud gaming] enables gamers to…start gameplay instantaneously without waiting for a game to download to a device…this area is particularly vibrant, with a large number of players."); PX8000 (Eisler (Nvidia) Decl.) at ¶ 17.

373.   Cloud Gaming Subscription Services allow gamers to play computationally demanding games on less powerful devices that otherwise lack the computing power or storage to support the games, reducing the need for gamers to make large investments in expensive hardware. https://www.nvidia.com/en-us/geforce/geforce-experience/; PX8000 (Eisler (Nvidia) Decl.) ¶¶ 6, 9, 17 (explaining the advantage of permitting gamers to play large and technologically complex games on less powerful devices that otherwise lack the computing power or storage to support the games); PX3103 (Nvidia) at 007.

374.   Cloud Gaming Subscription Services enable gaming on devices that do not meet the minimum specifications for large and technologically complex games, such as older and less expensive PCs, MacBooks, Chromebooks, tablets, mobile devices, and smart TVs. PX0006 at 088.

375.   Cloud Gaming Subscription Services enable gamers to play games that were developed for other devices and/or operating systems.PX0006 (Microsoft) at 088.

376.   As an executive with one of the leading cloud gaming services averred, "cloud gaming provides a high-end gaming experience . . . without requiring customers to upgrade the latest graphics card, PC, or console." PX8000 (Eisler (Nvidia) Decl.) ¶ 9.

377.   Kareem Choudhry, Microsoft's former Corporate Vice President for Cloud Gaming, testified that "prior to [xCloud], if you wanted to play an Xbox game, you had to be playing it on an Xbox," and that xCloud's goal was to "free that restriction" and "enable more people to play and participate." PX7002 (Choudhry (Microsoft) IH) at 40:8-18.

378.   Mr. Choudhry testified that xCloud offers "a visionary statement of the games you want, with the people you want, anywhere you want." PX7002 (Choudhry (Microsoft) IH) at 40:10-12.

379.   Mr. Choudhry testified: ████████████████████████████████████████████████████████████████████████ PX7002 (Choudhry (Microsoft) IH) at 116:12-15.

380.   Sarah Bond, Microsoft's Corporate Vice President of Gaming Ecosystem, explained: "We believe that the players should be the center of their experience, that you should be able to play your games with who you want on the device you want, where you want. We believe you should be able to start on PC and pick up on console, you should be playing on console and then be able to play on your phone. And xCloud is one of the many capabilities that are required to deliver that experience." PX7003 (Bond (Microsoft) IH) at 74:4-13.

***Brown Shoe* – Unique Production Facilities**

381.   Cloud gaming service providers operate on cloud infrastructure, either by deploying their own dedicated infrastructure or by contracting with a third party. *See* PX0003 at 141–42 ; PX3272 (Sony) at 016-27.

382.   Xbox Cloud Gaming operates on dedicated Xbox console hardware in Microsoft data centers. PX0003 at 141–42.

383.   Microsoft has ████████████████████████████ in xCloud server capacity. PX1039 (Microsoft) at 002.

384. ██████████████████████████████████████

█████████████ PX1039 (Microsoft) at 002.

**Brown Shoe – Distinct Prices and Marketing**

385. Users access cloud gaming services either by paying a periodic fee (either monthly or yearly) or by streaming free-to-play games (which is available for free on some services). PX0003 at 019; https://www.xbox.com/en-US/cloud-gaming; https://www.nvidia.com/en-us/geforce-now/memberships/; https://www.amazon.com/luna/landing-page; https://www.playstation.com/en-us/ps-plus/#premium.

386. Xbox Cloud Gaming marketing highlights the "play anywhere" functionality of cloud gaming, encouraging users to "discover the freedom and flexibility the cloud brings to your gaming experience" with "more choices in how to play" and the ability to "jump in and start playing in seconds." PX9091 at 001–02; Kareem Choudhry, "Cloud Gaming with Xbox Game Pass Ultimate Launches with More Than 150 Games," XBOX NEWS (Sept. 14, 2020), https://news.xbox.com/en-us/2020/09/14/cloud-gaming-with-xbox-game-pass-ultimate.

387. Nvidia GeForce NOW marketing highlights the "play anywhere" functionality of cloud gaming, using the slogan "Your Games. Your Devices. Play Anywhere." Nvidia, GeForce NOW, https://www.nvidia.com/en-us/geforce-now/.

**Brown Shoe – Distinct Customers**

388. Cloud gaming expands the total addressable market for high-end video games by making these games available to customers that do not own high-end Windows gaming PCs or consoles. PX7062 (Fisher (Nvidia) Dep.) at 46:2-47:14.

389. When Microsoft introduced Xbox Cloud Gaming, Corporate Vice President for Cloud Gaming Kareem Choudhry announced, "[C]loud gaming as part of Xbox Game Pass Ultimate now opens up the world of Xbox to those who may not own a console at all." PX9091 at 002; Kareem Choudhry, "Cloud Gaming with Xbox Game Pass Ultimate

Launches with More Than 150 Games," XBOX NEWS (Sept. 14, 2020),

https://news.xbox.com/en-us/2020/09/14/cloud-gaming-with-xbox-game-pass-ultimate.

390.  Microsoft has estimated that the total addressable market for cloud gaming is
approximately ██████████ compared to ██████████████ PX7011 (Spencer
(Microsoft) IH Vol 1): at 273:3-10; PX9012 at 006.

391.  Microsoft Gaming CEO Phil Spencer confirmed that cloud gaming enables Microsoft to
reach a distinct customer base. ████████████████████████████
████████████████████████████████████████████
████████████████ PX1038 (Microsoft) 002.

392.  Microsoft internal documents ███████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████
████████████████████████ PX1025 (Microsoft)
007.

393.  Nvidia has similarly made the case that ████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████ PX2186 (Activision) at 008.

394.  Google has also recognized that cloud gaming appeals to a distinct set of customers and
is currently marketing three of its Chromebooks as "cloud gaming machines, disguised as
Chromebooks." Google, "Cloud Gaming Chromebooks,"
https://www.google.com/chromebook/discover/gaming.

395.  Dr. Lee opines that the combined qualitative and quantitative evidence supports the
conclusion that a hypothetical monopolist owning all cloud gaming services would likely
implement a SSNIP on at least one of these products. PX5000 (Lee Report) at 137.

Hence, the Cloud Gaming Services market satisfies the hypothetical monopolist test. PX5000 (Lee Report) at 138.

### E.   Multi-Game Content Subscription Services and Cloud Gaming Subscription Services Together Constitute a Relevant Product Market

396.   The market for Multi-Game Content Subscription Services (also called Content Library Services) and Cloud Gaming Subscription Services (also called Cloud Gaming Services) includes all video game subscription services that offer either content library services for games played primarily on non-mobile devices or cloud gaming services for games played primarily on non-mobile devices.  The market also includers any gaming services that offer both Multi-Game Content Subscription Services and Cloud Gaming Subscription Services. Lee Written Direct at ¶ 143; PX5000 (Lee Report) at 103; PX5000 (Lee Report) at 104 (Figure 22).

397.   Products in the Multi-Game Content Subscription Services and Cloud Gaming Subscription Services market than offer multi-game content subscription services for games that are primarily played on non-mobile devices include, among others,  Xbox Game Pass (all tiers), PlayStation Plus (Extra and Premium tiers), Amazon Luna+, and EA Play. This market also includes Nvidia GeForce Now, which offers cloud gaming subscription services but not multi-game content subscription services. Lee Written Direct at ¶ 144.

398.   Several of the products in this market offer both Multi-Game Content Subscription Services, and Cloud Gaming Subscription Services for games that are primarily played on non-mobile devices, including Xbox Game Pass Ultimate, PlayStation Plus Premium, and Amazon Luna+.  Products outside of the Multi-Game Content Subscription Services and Cloud Gaming Subscription Services market do not offer either multi-game content subscription services or cloud gaming subscription services for games primarily played on non-mobile devices.  Lee Written Direct at ¶ 144.

399.   Dr. Lee finds that the Multi-Game Content Subscription Services and Cloud Gaming Services market is broader that and wholly contains all the products in both the Multi-

1    Game Content Subscription market and the Cloud Gaming Services markets. Because

2    Microsoft's Xbox Game Pass Ultimate products offers both multi-game content

3    subscription services and cloud gaming subscription services, each product in the Multi-

4    Game Content Subscription and Cloud Gaming Subscription market competes with Xbox

5    Game Pass Ultimate on at least one of these services.  Lee Written Direct at ¶ 145;

6    PX5000 (Lee Report) at 103.

7    400.   Dr. Lee explains in his written direct that "[s]ubscription services that focus on enabling

8    online multiplayer gaming ("multiplayer gaming subscription services") are not in the

9    Content Library and Cloud Gaming Services market, as they do not offer the same

10   diversity of content and game discoverability as content library services, which often

11   offer a library of hundreds of games. Examples of such services include Xbox Live Gold

12   and PlayStation Plus Essential. Jerrett West, Corporate Vice President of Gaming

13   Marketing at Microsoft, testified that Xbox Live Gold is "currently separate from Game

14   Pass" and "the big difference is Game Pass has a catalog of games. Live Gold is

15   specifically focused on multiplayer gaming." Lee Written Direct at 160; PX7005 (West

16   (Microsoft) IH) at 20:3-24.

17   401.   Dr. Lee concludes that Apple Arcade and other services that offer access to a  content

18   library of games that are primarily plated on mobile devices are also not in the relevant

19   market.  Dr. Lee found that mobile games are highly differentiated from video games

20   primarily played on non-mobile devices, such as consoles or PCs. Lee Written Direct at ¶

21   161. ██████████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████ PX0006

25   (European Commission Form CO) at 52.

26   402.   Microsoft itself has indicated that it views Xbox Game Pass, and its multi-game content

27   subscription services, as complementary to and not a substitute for buy-to-play sales.  In

28   an email discussing digital sales and subscription services address to a third-party

publisher, Sarah Bond, Microsoft Gaming Corporate Vice President of Creator Experiences and Ecosystem Management, wrote that "[Microsoft's] intent with Game Pass (GP) ling-term is to be additive to the ecosystem. Our research of subscriptions across media forms has shown that consumers like and use both models." Lee Written Direct at ¶ 164 (citing PX1767 (Microsoft) at 001).

403. A hypothetical monopolist of all products in the multi-game content subscription services and cloud gaming subscription services market would likely profitably impose a small but significant non-transitory increase in price that would not be defeated by products outside the market, including buy-to-play games. PX5000 (Lee Report) at 127-31.

404. Dr. Lee concludes the Multi-Game Content Subscription Services and Cloud Gaming Subscription Services satisfies the Hypothetical Monopolist Test and is a relevant product market for evaluating the effects of the proposed transaction. Lee Written Direct at ¶¶ 143, 165.

   **F.   The Relevant Geographic Market Is the United States**

      **1.   Game Prices and Releases Vary Country-by-country, Supporting the Ability of Market Participants to Price Discriminate**

405. Dr. Lee concluded that the United States is a relevant geographic market for both the High-Performance Video Game Consoles market and the Video Game Consoles market. Lee Written Direct at ¶ 80.

406. Console manufacturers set prices on a country-by-country basis. PX5000 (Lee Report) at104.

407. Sony raised prices for PlayStation 5 consoles in certain countries, including Canada but not the United States. PX5000 (Lee Report) at 104.

408. Responding to Sony's price increase announcement, ███████████████████ ████████████████████████████████████████████████████ PX1752 (Microsoft) at 001.

409. Console video games are released on a country-by-country basis, and the exclusivity periods that console makers negotiate with publishers vary from country to country.

PX5000 (Lee Report) at 106; PX2167 (Activision) at 023 ; PX2170 (Activision) at 015–16.

410. Sony negotiates separate software distribution agreements for different geographic regions. PX7048 (Booty (Microsoft) Dep.) at 149:12-150:14.

411. Dr. Lee concluded is his testimony that the United States is a relevant Geographic Market for the (i) Multi-Game Content Subscription Services and the Cloud Gaming Subscription Services market, (ii) the Multi-Game Content Subscription Services market, and (iii) the Cloud Gaming Subscription Services market for assessing the competitive effects of the Proposed Transaction. Lee Direct Report ¶ 180. Dr. Bailey applies an incorrect concept of geographic market that does not account for consumers' ability, or inability, to substitute purchases outside of a relevant geographic market. Bailey (Defendants' Expert) 798:8-799:13; 800:16-801:3.

412. Dr. Lee also concluded that evidence indicates that customers do not view purchasing multi-game content subscription services or cloud gaming subscription services in another country as a reasonable substitute for purchasing those gaming services in the United States, and gaming services vary in pricing, content and availability across countries. Lee Written Direct at ¶ 181.

413. The price that Microsoft sets for Game Pass in the United States differs from the price it sets in other countries. Lee Written Direct at ¶ 182; PX5000 (Lee Report) at 138; PX7005 (West (Microsoft) IH) at 221:18-222:11.

414. The availability of gaming services varies by county, even if such services are provided by the same company. Microsoft's Xbox Game Pass for PC supports many more countries than Game Pass for Console or Game Pass Ultimate. Lee Written Direct ¶ 183; PX5000 (Lee Report) at 138.

415. As of April 2023, Xbox Cloud Gaming is only available in 28 countries, and is released on a country-by-country basis.  Lee Written Direct ¶ 183; PX5000 (Expert Report) at 139.

416. Dr. Lee found that "[E]vidence indicates that proximity to cloud services is important to cloud gaming performance."  Lee Written Direct at ¶ 185; (citing PX5000 (Lee Report) at 139-140.

417. Availability of Xbox games on its multi-game content subscription services varies by country.  According to Microsoft, "[g]aming titles, number, features and availability {on Xbox Game Pass] vary over time, by region and platform."  Lee Written Direct at ¶ 184 (citing PX5000 (Lee Report) at 139).

418. If users "move[] to a different country" or are "already in a region different from the one set for your account and/or console," they must "change [their] Xbox country/region." PX5000 (Lee Report) at 139.

Microsoft Gaming CFO Tim Stuart testified that Microsoft breaks out the United States Gen 9 market separate from other geographies. Stuart (Microsoft) Hr'g Tr. 937:22-938:11; PX1240 at -019.

419. Activision's VP of Global Platform Strategy noted "for various reasons, sometimes legal, sometimes commercial, sometimes creative, a territory or a country or a region may have a version of the title that is slightly different.  It might have different languages, localizations.  Content may be slightly altered for regional restrictions." PX7008 (Schnakenberg IH Tr.) at 283:14-23.

420. Xbox Game Studios Head Matt Booty also explained in his deposition that Nintendo and Sony are really three separate companies. As an example, Mr Booty testified that there is "no central approval group for Sony". "So if you ship a game on Playstation you need to negotiate that contract with Sony in the US, which is SCEA Sony Computer Entertainment of America." PX 7048 (Booty (Microsoft) Dep.) at 149:14-150:6.

421. Dr. Lee concluded that the "[e]vidence indicates that customers do not view purchasing video game consoles in another country as a reasonable substitute for purchasing video game consoles in the United States, and console manufacturers treat the United States as a distinct geographic market. Lee Written Direct at ¶ 82.

422.   The United States is also the geographic market for cloud gaming subscription services due to the need for a proximity between the consumer and the data centers used by cloud gaming subscription services. Former Product Director of Google Stadia Dov Zimring testified that the "data center is ideally close to end users" because "the further away the data center is from a consumer, the more latency will exist in the connection" which affects the consumer's experience. Zimring (Google) Hr'g Tr. 469:2-21. Mr. Zimring testified that a consumer located in the United States accessing a cloud streaming service's data center in Europe would have a "far from ideal experience" that "would really be degraded relative to what they could if – if the servers were much closer." Zimring (Google) Hr'g Tr. 460:22-470:6.

   **2.   Gamer Prefe**rences and Behavior Vary Country-by-country and Inform Market Participants' Strategic Decisions

423.   ████████████████████████████████████████████
████████████████████████████████████████████████
████ PX5000 (Lee Report) at 106 ; PX1721 (Microsoft) at011 (Microsoft); *see also* Microsoft (Spencer) Hr'g Tr. 287:3-12; PX1889 (Microsoft) at 035 ████████████
████████████████ Microsoft Gaming CEO Phil Spencer testified that "Xbox's market share versus Sony has traditionally been more competitive" in the United States versus Europe. Spencer (Microsoft) Hr'g Tr. 293:23-294:1.

424.   Microsoft recognizes that ████████████████████████████
████████████████████████████████████ PX7036 (Nadella (Microsoft) Dep.) at 161:6-162:17.

425.   Recognizing that console preferences vary by geography, Microsoft includes Nintendo Switch console sales in its share calculations when it wants "an accurate global perspective of [its] relevance." Spencer (Microsoft) Hr'g Tr. 293:6-18; PX7028 (Spencer (Microsoft) Dep.) at 161:6-17.

426.   Microsoft's CEO Satya Nadella specifically requested a share breakdown of Microsoft's position against Sony's for Gen 9 consoles in the United States. Nadella (Microsoft) Hr'g Tr. 833:14-21; PX1274 (Microsoft) at 001.

427.   Satya Nadella also referred to the United States as ███████████████ ███████████████████ PX7010 (Nadella (Microsoft) IH) at 185:2-6; PX1274 (Microsoft) at 001.

428.   Sony Interactive Entertainment CEO Jim Ryan explained that "console gaming is the more prevalent form of gaming [in the United States] than it is elsewhere in the world." PX7053 (Ryan (Sony) Dep. Vol. I) at 232:24-233:4.

429.   Certain types of games—such as shooter games—are more popular in the United States than in other countries. PX7053 (Ryan (Sony) Dep. Vol. I) at 15:20-16:2.

430.   Activision's share of gaming revenue inside the United States is three times as large as it's share outside the United States. Bailey (Defendants' Expert) 805:4-25.

431.   Gamers located in closer proximity to cloud services are likely to experience better cloud gaming performance. PX5000 (Lee Report) at139 (Lee Report); PX7054 (Ryan (Sony) Dep. Vol. II) at 115:2-13; PX7062 (Fisher (Nvidia) Dep.) at 53:14-54:5.

432.   Professor Lee testified in his written direct that "[t[he United States is a relevant geographic market for each of these relevant product markets". .  Lee Written Direct at ¶142

III.   **RELATED PRODUCT**

    A.   **Activision Content Is an Important Input that Drives Acquisition, Engagement, and Retention**

433.   Activision has internally called several of its franchises, including *Call of Duty* and *World of Warcraft*, ███████████████████████████ ███████████████████ PX2107 (Activision) at 043, 051.

434.   *Call of Duty* is a multi-player game that has an annual release, based in different war scenarios. Bond (Microsoft) Hr'g Tr. 152:18-153:2.

435.   *Call of Duty* is available on Xbox, PlayStation, and PC, but not Nintendo Switch. Bond (Microsoft) Hr'g Tr. 154:7-8.

436.    In every year since 2014, the best-selling buy-to-play console game in the United States has been a *Call of Duty* game except for 2018, when *Red Dead Redemption II* was released. PX8001 (Ryan (Sony) Decl.) ¶ 26; *see* PX9053 at 003 (*Call of Duty* will remain best-selling U.S. franchise in 2022 for 14th consecutive year). In 2018, *Call of Duty Black Ops 4* ranked #2. PX8001 (Ryan (Sony) Decl.) ¶ 26.

437.    *Call of Duty's* annual release cycle—which is unique among non-sports franchises is a key to its singular importance. *See* PX3378-015 (Ryan (Sony) Hr'g Testimony at 52:09-19). The *Call of Duty* franchise generates a top game *year after year*. In contrast, most AAA game franchises go years between new titles. PX8001 (Ryan (Sony) Decl.) at ¶ 25 ("This annual release cycle is unique among AAA games (other than sports games), which typically are released with much longer gaps because of the time and resources required to develop the games.; PX7031 (Greenberg (Microsoft) Dep.) at 248:18-249:1 (five years between the last two Halo launches)

438.    ████████    PlayStation gamers play Call of Duty. PX3378-016 (Ryan (Sony) Hr'g Testimony at 54:21).███████████████████████ ███████████████████████████████████ PX8001 (Ryan (Sony) Decl.) ¶ 28.

439.    In 2021, *Call of Duty* players ███████████████ playing *Call of Duty.* PX8001 (Ryan (Sony) Decl.) ¶ 28.

440.    ████████    PlayStation gamers spent ██████████ playing *Call of Duty* and ████████████████████ playing *Call of Duty*.  PX8001 (Ryan (Sony) Declaration) at ¶ 28.

441.    *Call of Duty* players drive a significant portion of SIE's total revenue, with the total spend on PlayStation by these players—including on hardware, accessories, subscriptions, game purchases, and add-ons—accounting for ██████ of PlayStation spending. PX8001 (Ryan (Sony) Decl.) ¶ 27,

442.    Activision's portfolio of games has the ability to influence video game product purchase decisions. When Activision and Nvidia negotiated over offering Activision games on the

Nvidia GeForce NOW cloud gaming subscription service, Activision stated "[w]e influence players' subscription decisions" and "[w]e influence hardware purchase decisions." PX2159 (Activision) at 007.

443.   In an internal Activision analysis ███████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████ PX2419 (Activision) at 004. A similar Activision analysis considering ███████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████ PX2082 (Activision) at 004.

444.   ████████████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████ PX2049 (Activision) at 006.

445.   In a letter to Phil Spencer summarizing third-party relationships, ████████████
████████████████████████████████████████████████████████
██████████████████████████████████ PX1019 (Microsoft) at 009.

446.   In December 2020, the Head of Microsoft Studios Matt Booty identified the top drivers of Xbox Game Pass subscriber acquisition for the Xbox leadership team. PX1425 (Microsoft) at 012. ███████████████████████████████████████████
████████████████████████████████████████████████████████ PX1425 (Microsoft) at 012; PX5000 (Lee Report) at 172 fig. 41.

447.   Internal Activision survey evidence reaffirms the impact of Activision's portfolio on player acquisitions to subscription services. █████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████

4 ████████████████████████████ PX2159 (Activision) at 007 (Activision).

5 448. ██████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████

7 ██████████████████████████████████████████████████████

8 ████████████████████ PX5000 (Lee Report) at 171–72 & fig. 41 (citing PX1425

9 (Microsoft) at 012).

10 ~~449.~~ An expert analysis of ████████████████████████████████████

11 █████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████

13 █████████████████████████████████ PX5000 (Lee Report) at 171. Dr. Lee

14 testified at the evidentiary hearing that *Call of Duty* sells more units than many other

15 AAA games and thus drives share shift to a greater degree in his foreclosure model. Lee

16 (Plaintiff Expert) Hr'g Tr. 630:3-16. Activision gets 60% of its global revenue from

17 inside the United States. Bailey (Defendants' Expert) Hr'g Tr. 803:17-804:1 All of

18 Activision's revenue inside the United States is AAA. Bailey (Defendants' Expert) Hr'g

19 Tr. 804:14-805:3~~.~~

20 450. Microsoft also recognized that Activision's other franchises also drive sales, retention,

21 and engagement.█████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████

24 ███████████ PX7007 (Stuart (Microsoft) IH) at 98:11-99:17.

25 451. █████████████████████████████████████████████████████

26 █████████████████████████████████████████████████

27 ██████████████████████████████████ PX7011 (Spencer (Microsoft) IH

28 Vol. I) at 117:20-118:13.

452. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ PX7011 (Spencer (Microsoft) IH Vol. I) at 118:14-119:10.

Microsoft Gaming CEO Phil Spencer justified the loss as an attempt to shore up

Microsoft Gaming's long-term player acquisition and retention strategy in an email to

Microsoft CEO Satya Nadella: ████████████████████████████████████

████████████████ PX1245 (Microsoft) at 001.

453. Sony Interactive Entertainment CEO Jim Ryan similarly identified the *Overwatch* and

*Diablo* franchises as part of Activision's "stronger portfolio of games." PX7053 (Ryan

(Sony) Dep. Vol. 1) at 48:10-49:11.

454. The *Call of Duty* franchise is one of the most recognizable and popular video game

series. ████████████████ play *Call of Duty* on PlayStation. PX8001 (Ryan (Sony)

Decl.) ¶ 28.

455. One way Activision's portfolio drives acquisition, engagement, and retention is by tying

their top franchises to esports, which are online multiplayer leagues similar to

professional sports teams. PX7052 (Zerza (Activision) Dep.) at 215:12-16. Activision

organizes leagues in which professional gamers compete in *Overwatch* and *Call of Duty*

matches to build community among the franchise's loyal fanbase, which furthers

Activision's opportunities for monetization. PX7052 (Zerza (Activision) Dep.) at 215:17-

216:4; PX2107 (Activision) at 056 ("We also continue to lead the industry in rolling our

professional, global city-based esports leagues for key franchises.").

456. The importance of Activision content to platforms is reflected in the price. ████████

████████████████████████████████████████

The publisher or developer agree to a revenue split with the platform called a "rev share,"

which is typically 70/30, with the publisher or developer receiving 70% and the platform

receiving 30% ████████████████████████████████████████

████████████████ Bond (Microsoft) Hr'g Tr. 154:15-21, 155:3-17, 158:11-23

160:16-161:3; *see also* PX1742 (Microsoft) at 003; PX7003 (Bond (Microsoft) IH) at 110:11-23; 218:24-219:4 ███████████

PX7007 (Stuart (Microsoft) IH) at 67:8-11; PX7011 (Spencer (Microsoft) IH Vol. I) at 88:12-13; PX7008 (Schnakenberg (Activision) IH) at 59:16-22; PX2157 (Activision) at005 ; PX7052 (Zerza (Activision) Depo.) at 203:24-204:2 ████████

██████

## IV. THE PROPOSED ACQUISITION IS LIKELY TO RESULT IN A SUBSTANTIAL LESSENING OF COMPETITION

### A. Microsoft Would Have the Ability to Foreclose Rivals in the Relevant Markets

457. Dr. Lee concluded that the Merged Entity would have the ability to "foreclose Microsoft's rivals in each of the Consoles Markets from Activision content." Further, withholding Activision content from or partially foreclosing or degrading Activision content to Microsoft's rivals would meaningfully affect their competitiveness and consumer demand for their products." Lee Written Direct at ¶ 88.

458. Dr. Lee also found that the merged entity would have access to a number of viable foreclosure strategies, including withholding the Activision content to Microsoft's rivals entirely or various forms of partial exclusivity. Lee Written Direct at ¶ 89.

459. Today, Activision has the ability to control whether and how its content is delivered. PX2049 (Activision) at 006. Post-transaction, Microsoft would gain that ability to control whether and how Activision content is provided to Microsoft's competitors.

460. As Bobby Kotick testified, game publishers like Activision evaluate how best to optimize their content for every device. Kotick (Activision) Hr'g Tr. at 762:16-21. "Optimize" means take the steps and do the work needed to ensure a good player experience. Kotick (Activision) Hr'g Tr. at 76219-21. He also testified that different features, like different maps and weapons, can be offered on one console versus another. Kotick (Activision) Hr'g Tr. at 728:7-13.

461.  Nintendo's senior vice president of publisher and developer relations Steve Singer confirmed that ███████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████ ██████ PX7065 (Singer (Nintendo) Dep.) at 66:5-69:2.

462.  Microsoft would gain the ability to totally withhold Activision content from Microsoft's competitors. PX7031 (Greenberg (Microsoft) Dep.) at 42:3-11 (confirming any publisher or developer can determine on what platforms its content is available).

463.  Microsoft would gain the ability to partially withhold Activision content from Microsoft's competitors. *See* PX7031 (Greenberg (Microsoft) Dep.) at 42:3-11.

464.  Partial foreclosure strategies include: (1) timed exclusivity, where Microsoft could delay the release of Activision games on competing products; (2) content exclusivity, where Microsoft makes certain versions or add-on content for Activision games exclusive to Microsoft products; and (3) degraded content, where Microsoft degrades the performance, gameplay, or features of Activision games. Lee Written Direct at ¶ 89; PX5000 (Lee Report) at 181. Timed exclusivity refers to a scenario where Microsoft initially launches a game on Xbox platforms, with subsequent release on competing platforms. Booty (Microsoft) Hr'g Tr. 54:16-21. Activision's CEO testified that different features, such as different game maps or weapons, can be available on one platform versus another, and that he considers these features to be for marketing. Kotick (Activision) Hr'g Tr. at 728:7-13, 18.

465.  In November 2020, Microsoft Gaming CFO Tim Stuart told an investor conference that Microsoft Gaming wants ZeniMax content "in the long run to be either first or better or best or pick your differentiated experience on our platforms." Stuart (Microsoft) Hr'g Tr. 957:19-958:5; PX9192 at -014. Tim Stuart told investors at this conference that Microsoft was moving towards this "first or better or best approach on [Microsoft] platforms." Stuart (Microsoft) Hr'g Tr. 961:9-18. Mr. Stuart testified that a platform could degrade the resolution, safety, or security of content as ways Microsoft could ensure content was

deemed "best" on Xbox versus other platforms. Stuart (Microsoft) Hr'g Tr. 960:4-10. Tim Stuart also testified that "better" or "best" could also refer to the timing of the game or downloadable content.  Stuart (Microsoft) Hr'g Tr. 959:8-22

466. ████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

PX2465-005; PX2465-005 (See also Bailey (Defendants' Expert) Hr'g Tr. at 812:15-814:7; PX2465-005 ██████████████████████████████████
██████████

467. Microsoft ██████████████████████████████
████████████████████████ PX1015 (Microsoft) at 027.

468. ████████████████████████████████████████ *See* PX7031 (Greenberg (Microsoft) Dep.) 47:7-49:13; 53:19-54:21 ███████████████

469. ████████████████████████████████████████████
████████ PX1949 (Microsoft) at 001.

**B.    Unlike an Independent Activision, the Combined Firm Would Have an Incentive to Foreclose in the Relevant Markets**

**1.    The Combined Firm Will Have an Increased Incentive to Foreclose in High-Performance Consoles and Video Game Consoles**

470.    Activision's CEO testified that the company "view has always been to create [its] content for as many platforms as possible" Kotick (Activision) Hr'g Tr. 715:21-23, and

471.    This incentive, however, would change if the Proposed Transaction occurs. Dr. Lee testified that the Merged Entity would have a greater economic incentive to engage in foreclosure of Microsoft's console rivals than an independent Activision would have. Lee Written Direct ¶ 90.

472.    Dr. Bailey does not offer any analysis of how the transaction would change Activision's incentives to make its games broadly available across platforms. Bailey (Defendants'

Expert) Hr'g Tr. 814:13-24. Additionally, Dr. Bailey did not conduct any analysis, and offers no opinion, as to how the addition of Activision content would impact consumer welfare. Bailey (Defendants' Expert) Hr'g Tr. 817:6-16.

473. Microsoft has the incentive to foreclose Activision content from PlayStation consoles due to the impact of such foreclosure across the entirety of the Microsoft Xbox ecosystem, which includes a host of complementary products, including Xbox consoles, Xbox cloud gaming services, hardware accessories for Xbox products and services, Xbox subscription services, and games for which Microsoft receives a portion of the revenue on each sale. PX5000 (Lee Report) at 019; Spencer (Microsoft) Hr'g Tr. 269:12-22 (Xbox ecosystem includes Xbox console, Game Pass, Xcloud, and Xbox products on PC); PX0003 at 019–20, 047, 052–53. These incentives are reflected in the testimony of industry participants, in Microsoft's ordinary course documents, and in the economic analysis of Dr. Lee.

474. The combined firm is also incentivized to partially foreclose or degrade Activision content on PlayStation consoles for the same reasons that it has to remove games entirely from PlayStation. Post-acquisition, however, the combined firm will have an interest in optimizing Xbox business by disadvantaging PlayStation consoles to drive gamers to Xbox platforms and thereby removing the ability of PlayStation gamers to access Activision content on their preferred console. PX3378-009 (Ryan (Sony) Hr'g. Testimony at 36:01-06); *see also* PX3378-010 (Ryan (Sony) Hr'g Testimony at 36:7-13) (incentives of independent Activision), 67:7-13 (incentives of acquired Activision). These incentives are likewise reflected in the testimony of industry participants, in Microsoft's ordinary course documents, and in the economic analysis of Dr. Lee.

475. The consequences of these incentives are straightforward. If Microsoft fully or partially forecloses Activision's content from PlayStation consoles, consumers—who would otherwise purchase or remain playing on PlayStation—are more likely to purchase a new Xbox Series console instead. *See* Lee (Plaintiff Expert) Hr'g Tr. 617:11-618:14 (responding to Court's inquiry that *Call of Duty* is one franchise within Activision's

portfolio that may be foreclosed alongside others). These new Xbox console owners would generate additional profits for Microsoft through content, accessory, and subscription service sales. PX4631 (Microsoft) at 011.

476. ███████████████████████████████████████████ ████████████████████████████████ PX8001 (Ryan (Sony) Decl. ¶ 35). ███████████████████████████████████ ████████████████████████████████████████████████ ████████ PX8001 (Ryan (Sony) Decl. ¶ 35).

477. As to testimony of industry participants, in the absence of the merger, Activision CEO Bobby Kotick described Activision's incentives as "platform agnostic." Kotick (Activision) Hr'g Tr. 50:2-4.

478. Sony Interactive Entertainment CEO Jim Ryan testified that "[a]s an independent company, Activision is incentivized to make great games on all platforms," but that he "believe[s] [Microsoft's] primary incentive [], post-acquisition, would be to optimize its overall Xbox business, not the business of Activision." PX3378-009 to -010; Ryan Hr'g Testimony, 36:03-36:11.

479. As Mr. Ryan explained, "Microsoft is a platform holder. That's why this deal is so difficult. There is complete difference in incentive – between the incentives that Activision has and the incentives that Microsoft would have post-acquisition." PX3378-029 (Ryan (Sony) Hr'g Testimony 179:1-8).

480. Mr. Ryan further testified, "I do believe that if Call of Duty was not available on our platform and was only available on Xbox, that ████████████ would desert PlayStation to go to Xbox." PX7053(Ryan (Sony) Dep. Vol. I) at 92:4-7. ████████ ████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████ PX3378-020 (Ryan (Sony) Hr'g Testimony 67:7-13).

481. Mr. Spencer described the impact of Microsoft's first party titles appearing on Sony's product. Microsoft Gaming CEO Phil Spencer testified that Sony is "an aggressive

competitor" and that shipping more Microsoft gaming content on PlayStation, including content with multiplayer and cross-platform play, would allow Sony "to further damage our aspirations" in gaming. Spencer (Microsoft) Hr'g Tr. 297:7-298:11, 298:19-299:11; PX7011 (Spencer (Microsoft) IH) at 363:14-25.

482.    ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

████████████████████ PX7003 (Bond (Microsoft)) IH at 54:1-55:18

████████████████████████████████████████████

PX7014 (Booty (Microsoft)) IH Tr. at 186:6-187:8 ████████████████

██████████

483.    Microsoft's incentives are reflected in Microsoft's ordinary course documents, which reinforce Dr. Lee's quantitative model and provide additional support to the combined firm's incentive to foreclose. In an email regarding the transaction, Microsoft Gaming CEO Phil Spencer ██████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████ PX1759 (Microsoft) at 001.

484.    Microsoft's presentation to the Board of Directors ██████████████████

████████████████████████████

PX1741 (Microsoft) at 014. ██████████████████████████

████████████████████████████

███████ PX7011 (Spencer (Microsoft) IH Vol. I) at 35:11-36:14; *see also* Hr'g Tr. 269:12-

270:2 (Xbox ecosystem includes Xbox console, Game Pass, Xcloud, and Xbox products on PC).

485. ███████████████████████████████████████████████████████████████

Lawver (Microsoft) Hr'g Tr. 233:2-4. Microsoft is acquiring Activision for $68.7 billion. PX0083 at 001. ████████████████████████████████████████████

████████████████████████████████████████

486. A slide from a 2019 Microsoft presentation ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Lee Written Direct at ¶ 92 fig. 4) (citing PX1828

(Microsoft) at 005).

487. Microsoft's documents show that increasing Microsoft's console sales and share position against Sony is a priority of the Gaming Leadership Team. Spencer (Microsoft) Hr'g Tr. 279:22-281:1; 282:7-21; 289:2-11; PX1114 (Microsoft) 013 ███████████████████

███████████████████████ *id.* ████████████████████████████████

████████████████████████████████ PX1888 (Microsoft) at 036

████████████████████████████████ PX1887 (Microsoft) at

001 ███████████████████████████████████████████████████

████████████████████████████

488. Internally.████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

PX4007 (Microsoft) at 006.

489. Microsoft also realizes long-term strategic benefits from the foreclosure of rival consoles from Activision content. In an April 2021 presentation with other members of the Xbox team, Senior Xbox Games Business planner Diarmuid Murphy █████████████████████

1    ████████████████████████████████████████████████

2    ██████████████████████████████ PX1471 (Microsoft) at 009; PX4602 at 27:8-

3    28:5. Mr. Murphy recalled that Phil Spencer noted that if they ████████████

4    ████████████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ██████████████████████████████████ PX4602 (Microsoft) at 30:8-

7    24.

8    490.   Microsoft has reached a similar conclusion that favors foreclosure of content from

9          PlayStation consoles in its analyses of other potential and actual mergers. An internal

10         Microsoft email, when analyzing a potential acquisition of ██████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ██████████████████████████████ PX1012 (Microsoft) at 002.

14   491.   ████████████████████████████████████████

15   ████████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████████████████████████████████

18   ████████████████████████████████████████

19   ████████████████████████████████████████████

20         PX1136 (Microsoft) at 015.

21   492.   Microsoft and Activision ordinary course documents also reflect the incentives for partial

22         foreclosure. A Microsoft email notes ████████████████████████████

23   ████████████████████████████████████████████

24   ████████████████████████████████████████████

25   ████████████ PX4505 (Microsoft) at 002.

26   493.   Activision documents further reinforce the benefits of partial foreclosure. ████████

27   ████████████████████████████████████████████

28   ████████████████████████████████████████

1    PX2049 (Activision) at 006. ███████████████████████████

2    ████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████

4    ██████████████████    PX2049 (Activision) at 006.

494.    Finally, Microsoft's economic incentives, should it acquire Activision, are reflected in Dr. Lee's economic analysis. Dr. Lee's quantitative economic analysis shows that the combined firm would likely have an incentive to engage in the foreclosure of acquired Activision content from PlayStation consoles. PX5000 (Lee Report) at 215. Dr. Lee's model predicts that the combined firm would incur substantial costs by foreclosing PlayStation consoles, but these costs are more than offset by the benefit of bringing additional gamers to Xbox consoles and Xbox Game Pass—which provide Microsoft additional sales of complementary products. PX5000 (Lee Report) at 215. Therefore, Dr. Lee predicts that Microsoft would recoup more than 100% of its lost profits from foreclosing Activision's content and the substantial benefits that Microsoft would incur as a result of bringing additional players to Xbox consoles and adding Activision content to Game Pass would have the effect of also making foreclosure more valuable to Microsoft. PX5000 (Lee Report) at 215. Dr. Lee testified that the new user who switches to Xbox to play *Call of Duty* spends more than the average Xbox user, which sharpens Microsoft's incentive to foreclose. Lee (Plaintiff Expert) Hr'g 572:2-23.

495.    Dr. Lee's model of the proposed transaction and analysis of qualitative and quantitative evidence indicates that the merged entity would likely have an economic incentive to withhold new Activision content, both *Call of Duty* and non-*Call of Duty* titles, from Sony PlayStation consoles. Lee Written Direct at ¶¶ 94, 111.

496.    Dr. Lee's analysis accounted for partial foreclosure—strategies that Microsoft may use to make content exclusive on a timed basis, withhold premium in-game items or benefits, or fail to optimize the performance of its rivals. Lee (Plaintiff Expert) Hr'g Tr. 621:5-21. Dr Lee analyzed that the incentives for full and partial foreclosure are very similar: "to steer

consumers away from rivals to one's own console or subscription service." Lee (Plaintiff Expert) Hr'g Tr. 622:3-15.

497. A model of consumer demand for consoles and titles estimated by Dr. Lee using historical Microsoft sales data predicts an average share shift of 8.9% toward Microsoft from making *Call of Duty* titles exclusive, and a smaller but significant shift toward Microsoft from making other Activision titles exclusive. Lee (Plaintiff Expert) Hr'g 544:25-545:7, 545:15-546:5, 580:13-16 ("*Call of Duty* likely has a much larger share shift than a typical AAA title"); PX5000 (Lee Report) at 156–58 (Lee Report); *see* PX7053 (Ryan (Sony) Dep. Vol. I) at 92:4-7. As Dr. Lee stated, "Call of Duty is a unicorn" because its above-average software sales leads to higher predicted share shifts. Lee (Plaintiff Expert) Hr'g Tr. 631:20-632:7.

498. Lee's 20% Xbox Conversion rate, as used in his Vertical Foreclosure model, is based on ordinary course evidence and actual data, and therefore was a reliable input into his model. In his vertical foreclosure model, Professor Lee uses an Xbox Conversion rate of 20%. Lee Direct Testimony at ¶ 106. The universe for this Conversion rate is all PlayStation Call of Duty gamers (from projected sales data in Microsoft's Project Denali) who do not multi-home (i.e., who would not switch to playing Call of Duty on an Xbox or suitable gaming PC that they already own). *See* Lee Direct Testimony at ¶ 103; PX5000-207 (Expert Report of Robin S. Lee) ███████████████████████ ████████████████████████████████ The 20% Conversion rate means that 20% of that universe would switch. These are PlayStation Call of Duty gamers that would purchase an Xbox to continue playing Call of Duty in the event of foreclosure. A 20% Conversion rate is justified, because it corresponds to a "share shift" – i.e., an increase in Xbox share versus PlayStation share – in a given year relative to 2022 global console sales of approximately 5.5 percentage points (5.5%). Lee Direct Testimony at ¶ 106.

499. The 5.5% share shift is reasonable and supported by: (i) Professor Lee's Share Model, which predicts a relative share shift between Xbox and PlayStation of 8.9 percentage

points (8.9%) in the event of foreclosure of Call of Duty, compared to an expected 1.8% share shift in response to foreclosure of an average AAA game (Lee Direct Testimony at ¶ 31; PX5000 (Lee Opening Report) at ¶¶ 401-406, Fig. 36 & 37); (ii) Microsoft's ordinary course business documents, including documents that indicate that ███████████ ████████████████████████████████████████████████████████ ████████ (PX1136 at -004; *see also* PX5000 (Lee Opening Report) at ¶¶ 396-399; PX1477; PX1075), given that *Call of Duty* has uniquely high sales compared to other AAA titles, these share shifts likely understate the actual effect of foreclosure of Call of Duty (Lee Direct Testimony at Fig. 1, ¶ 32, ¶ 104); and (iii) the survey commissioned by Microsoft as advocacy to the UK CMA, which found that 5% of gamers planning to purchase a PlayStation "will purchase an Xbox instead" if *Call of Duty* were not on PlayStation (PX5000 at ¶ 762).

500.    Along with the Xbox Conversion Rate, Dr. Lee's Vertical Foreclosure Model uses Microsoft's five-year console consumer "lifetime values", or "LTV." Lee Direct Testimony at ¶¶ 103-105. The LTV provides a "lifetime value" of a customer to Xbox. PX5000 at ¶¶ 116-117, Figures 7-8. Using Microsoft and Sony telemetry data, Dr. Lee ████████████████████████████████████████████████████ ██████████ PX5000 (Lee Opening Report) at ¶ 567. ██████████████ ████████████████████████████████████ Lee Direct Testimony at ¶¶ 104-105; PX5000 (Lee Opening Report) at ¶ 567 ████████████████ ████████████████████████████████████████████████ Lee Direct Testimony at ¶¶ 104-105; PX5000 (Lee Opening Report) at ¶ 567. Dr. Lee's analysis also shows that gamers who play Call of Duty the most and would be most likely to purchase an Xbox in the event of foreclosure ███████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ Lee Direct Testimony at ¶ 104.

501.   Using a 20% Xbox Conversion rate and ███████████████████ Professor Lee's vertical foreclosure model calculates that the Merged Entity will recoup over 100% of its lost sales on Sony PlayStation consoles through additional software, Xbox console, and Xbox Game Pass sales. Lee Direct Testimony at ¶¶ 108-109; PX5000 (Lee Opening Report) at ¶ 573. And, as shown in Figure 11 of Professor Lee's reply report, PX5001-076, the Merged Entity recoups at least 100% of sales under a number of sensitivity adjustments to both the Xbox Conversion Rate and LTV adjustment factors. Even with a modestly higher LTV adjustment factor, Dr. Lee's model shows the merged entity would have an incentive to foreclose Call of Duty even with a significantly lower Xbox conversion rates and implied share shift and without accounting for other sources of profits that Microsoft acknowledges increase it incentives to take games exclusive. PX5001-076, Fig. 11.

### 2.   The Combined Firm Will Have an Increased Incentive to Foreclose in Content Subscription Services and Cloud Gaming Services

502.   Dr. Lee testified that the "Merged Entity would have the ability to foreclose Microsoft's rivals in each of the Gaming Service Markets from Activision content." Lee Written Direct ¶ 187.

503.   Further, Dr. Lee found that "the Merged Entity would have the ability to foreclose Microsoft's rivals in the Gaming Service Markets from both new and back-catalog content. Lee Written Direct ¶ 188.

504.   Dr. Lee's analysis shows that "the Merged Entity would have a greater economic incentive to engage in foreclosure than an intendent Activision in the Gaming Services Markets. In addition, the Merged Entity would likely have the economic incentive to engage in foreclosure by withholding Activision content from, or degrading Activision content to, Microsoft's rivals in the Gaming Services Markets." Lee Written Report ¶ 189.

505. Dr. Lee found that Microsoft "realizes additional and longer-term benefits from foreclosing rival gaming service and gaining scale in Xbox Game Pass." Lee Written Direct ¶ 192.

506. Dr. Bailey does not offer any opinion as to how the transaction would change Activision's incentives to contribute its games to cloud subscription services. Bailey (Defendants' Expert) Hr'g Tr. 815:12-23.

507. Several Microsoft documents explicitly reference longer-term benefits of gaining scale in content library and cloud gaming service markets.

508. ███████████████████████████████████████████
███████████████████████████████████████████ █ ███
███ █ █████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████
████████████ PX1049 (Microsoft) at 003.

509. A ███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████
███████████████████████████████████
████████████████████████████████████████
PX1050 (Microsoft) at 004.

510. A 2021 email from Senior Marketing Director of Xbox Guy Welch drew comparisons with video subscription services like Netflix and noted ████████████████
███████████████████████████████████
██████████████████████████████████ PX1877
(Microsoft) at 001 (Microsoft) (emphasis in original).

511.  PX4267 (Microsoft) at 003.

512. Microsoft's statements and internal documents recognizing the company's incentive to withhold content from rival content library services providers are consistent with actions and statement Microsoft made for prior acquisitions, and in the case of Minecraft and ZeniMax, executed.

513. Microsoft Gaming CEO Phil Spencer, in a September 2021 email to members of Gaming Leadership team, wrote, PX1897 (Microsoft) at 001.

514. In an email discussing PX1065 (Microsoft) at 002. PX1065 (Microsoft) at 008.

515. PX1529 (Microsoft) at 021.

516. During the contemplated acquisition of ██████████████████ ██████████████████████████████ ██████████████████████████████ ██████ PX1313 (Microsoft) at 002.

517. Microsoft noted in its regulatory filings to the European Commission regarding the ZeniMax acquisition that "Microsoft will make all acquired games and future releases available to subscribers of its Game Pass service on the day the games are launched (which can be used to play on PCs, Xbox consoles and Android mobiles), but does not currently anticipate distributing them through other subscription services." PX1651 (Microsoft) at 013, 014. This view is reflected in Microsoft's ordinary course documents. Per Matt Booty, "No effing way": "[Microsoft is] not putting our first-party IP on competing streaming or subscription services." Booty (Microsoft) Hr'g Tr. 66:8-19 (discussing PX4351 (Microsoft) at 002).

518. The content that Microsoft pulled from included popular games that Microsoft had previously acquired, including *Minecraft*. PX7060 (Eisler (Nvidia) Dep. 99:16-100:3).

519. The quality of cloud gaming has improved dramatically in recent years. PX8000 (Eisler (Nvidia) Decl. ¶ 7; PX7062 (Fisher (Nvidia) Dep.) at 51:13-51:21; PX3381-004 (Eisler Video) at 48:04-48:23. Cloud publishers can add new content and fix bugs in the cloud, which saves gamers time, effort, and data. PX8000 (Eisler (Decl. ¶ 11).

520. Cloud gaming has a profitable future. PX7062 (Fisher (Nvidia) Dep.) at 63:19-63:20 ("It's my strong belief that cloud gaming has a profitable future, yes."). A May 2022 Xbox presentation entitled "Roadmap to 2030" projects the number of cloud-first subscribers to Game Pass (*i.e.*, those playing on devices other than video game consoles or gaming PCs) to reach ██████ by 2030, representing a growing share of all Game Pass subscribers over time. PX1517 (Microsoft) at 008.

521. Microsoft is well-positioned to grow in the cloud gaming market. Microsoft owns a large portfolio of first-party games and has established relationships with third-party

1    publishers, both of which provide content for the xCloud gaming service. PX0003 at

2    016–19.

3   522.   xCloud is the leading cloud gaming service: "xCloud has put itself in a leading position

4          relative to its streaming competitors by leveraging Xbox Game Pass. With Game Pass

5          and xCloud we create a flywheel of user engagement, subscription value and content

6          relevance that is difficult for competition to match." PX1037 (Microsoft) at 041.

7          Microsoft executive Lori Wright testified in another matter that she agreed with the

8          positive press reviews of XCloud's "super-solid experience" on PC and iOS devices

9          when it first launched with "smooth and stable" performance. Dkt. 228 (Joint Stip. and

10         [Proposed] Order) at 6-7. Even at the beta stage, Xcloud was a "remarkably polished"

11         experience. Dkt. 228 (Joint Stip. and [Proposed] Order) at 8.

12  523.   Microsoft is also one of a limited set of companies that has cloud computing

13         infrastructure with global coverage. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17         ▮▮▮▮▮▮▮▮▮▮▮   PX7050 (Choudry (Microsoft) Dep.) at 64:7-13,

18         154:21-155:20, 158:3-160:4. As Microsoft executive Lori Wright testified in another

19         matter, to develop the development of xCloud, Microsoft "had to effectively go and

20         use—find data centers around the world that were already, you know—as part of our

21         Azure operations." Dkt. 228 (Joint Stip. and [Proposed] Order) at 6. Microsoft has

22         identified the global coverage of its cloud infrastructure as a competitive strength for its

23         cloud gaming service, PX1029 (Microsoft) at 024, and predicts that▮▮▮▮▮▮▮

24         ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   PX1037(Microsoft) at 007.

25  524.   Microsoft has indicated its willingness to foreclose rival cloud streaming services from its

26         first-party content.▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮   PX4351 (Microsoft) at 002; Booty (Microsoft)

Hr'g Tr. 65:13-14. The content that Microsoft pulled included popular games that Microsoft had previously acquired, including Minecraft. PX3381 (Eisler (Hr'g Testimony) 99:16-100:3.

525. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

PX4351 (Microsoft) at 001.

526. Despite Microsoft's representation that cloud gaming investment has been "paused," ████████████████████████████████████████████████ ████████ PX4818 (Microsoft) at013; PX7050 (Choudhry (Microsoft) Dep.) at 189:12-190:11. In late 2022, █████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████ *See* PX4181 (Microsoft) at 083. In order to offer two of the three Generation 10 devices ██████████ ██████████████████████████████████████ ████████ PX7050 (Choudhry (Microsoft) Dep.) at 198:22-201:25; PX4181 (Microsoft) at 083.

527. Dr. Lee's analysis found that the combined firm would likely foreclose Activision content in the content library subscription services market. Lee (Plaintiff Expert) Hr'g Tr. 635:21-636:6. Dr. Lee analyzed documentary evidence that exclusivity in subscription and cloud gaming services is a practice that Microsoft engages in and there is "a tendency not supply rivals in these markets with its own first-party content." Lee (Plaintiff Expert) Hr'g Tr. 636:14-18, 637:9-638.

528. Further Dr. Lee testified that the Merged Entity would likely have the economic incentive to engage in foreclosure in Gaming Services Markets by withholding Activision content from or degrading Activision content for Microsoft's rivals. Lee Written Direct ¶ 193.

### 3. Microsoft's Deal Model Predicted Recoupment of Losses

529. Despite purchasing the largest independent game publisher in the United States, the Microsoft's deal model for the Activision acquisition conspicuously forecasts *no* change in Microsoft's share of the console market resulting from the deal. This is hard to square with both the deal model itself as well as Microsoft's ordinary course documents.

530. ████████████████████████████████████████████████ PX7042 (Lawver (Microsoft) Dep.) at 216:15-22 ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ PX7042 (Lawver (Microsoft) Dep.) at 213:13-22. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ PX7042 (Lawver (Microsoft) Dep.) at 203:24-207:18. ████████████

████████████████████████████████████████████

PX7042 (Lawver (Microsoft) Dep.) at 225:3-24. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ Stuart (Microsoft) Hr'g Tr. 998:13-999:13; PX4341 (Microsoft) at 24; (Lawver (Microsoft) Dep.) at 224:14-225; 219:6-13

.

531.    Microsoft Gaming CFO Tim Stuart testified that Game Pass, Store, and advertising synergies made up the other half of total value of the Activision deal to Microsoft, with Game Pass being ███████ of the remaining ███████ in value to Microsoft. Stuart (Microsoft) Hr'g Tr. 1000:06 - 1001:1; PX4341 at -025. Mr. Stuart testified that the majority of the synergies from the Activision deal model are from Game Pass through "accelerating Game Pass subscriptions across console and PC." Stuart (Microsoft) Hr'g Tr. 1002:2-6; 1003:23-1004:02; PX4341 at -025. Mr. Stuart testified that Microsoft estimated that *Call of Duty* would generate the most hours of engagement and the most revenues on Game Pass. Stuart (Microsoft) Hr'g Tr. 1004:12-1005:15.

532.    In preparation for presenting the Activision deal model to the Microsoft Board of Directors in January 2022, Microsoft modeled a scenario of partial revenue foreclosure on Sony as a result of the Activision transaction. Microsoft Gaming CFO Tim Stuart testified ████████████████████████████████████████████████ ████████████████████████████████ Stuart (Microsoft) Hr'g Tr. 1008:1-20; PX7040 at 202:2-14. Tim Stuart was asked to calculate the revenue risk of such an event, and how ████████████████████████████████████████ ██████ Stuart (Microsoft) Hr'g Tr. 1010:15 - 1012:11; PX1190 at -001. Tim Stuart testified that he told fellow Microsoft employee Jamie Lawver that any margin risk from a decline in the Activision PlayStation revenue split "can be offset with shift to Xbox in overall platform mix." Stuart (Microsoft) Hr'g Tr. 1014:2-18; PX4319 at -001.

533.    Microsoft Gaming CFO Tim Stuart testified that Microsoft calculated both the incremental subscribers to Game Pass, and how much Activision revenue would need to shift from PlayStation to Xbox console in order to make up the potential loss of Activision revenue on PlayStation. Stuart (Microsoft) Hr'g Tr. 1016:19-1017:24; PX4358 at -001-02. Tim Stuart testified that fellow Microsoft employee Jamie Lawver calculated that Microsoft could make up the loss of Sony revenue "if we can shift Activision revenues to be greater on Microsoft console." Stuart (Microsoft) Hr'g Tr. 1019:8-15, 1020:5-21; PX4358 at -001-02 ████████████████████████████████

1  ███████████████████████████████████████████

2  ███████████████████████████████████ PX7042 (Lawver

3  (Microsoft) Dep.) at 229:8-230:10.

4  534.  Microsoft later calculated that Microsoft could make up the lost revenues to Sony

5  through either additional Game Pass subscriber or through getting more Activision

6  revenue on the Microsoft platform. Stuart (Microsoft) Hr'g Tr. 1022:3-15; PX4359 at -

7  001. ██████████████████████████████████████

8  ████████████████████████████████████████████

9  █████████████████████████████ Stuart (Microsoft) Hr'g Tr. 1016:10-

10  1017:19; PX7040 at 224:21-226:5; PX4358 at -001.

11  535.  Microsoft Gaming CFO Tim Stuart testified that for the final presentation to the

12  Microsoft Board of Directors, Microsoft had calculated that ███████████████

13  ████████████████████████████████████████████

14  ██████████████████████████████████████

15  ████████ Stuart (Microsoft) Hr'g Tr. 1024: 25-1026:12; PX4367 at -001. Tim Stuart

16  testified that attaining these additional Game Pass revenues or platform share shifts was

17  "reasonable" and "achievable." Stuart (Microsoft) Hr'g Tr. 1028:9-1029:1; PX4472 at -

18  001.

19      **4.  The Combined Firm Will Have Decreased Incentive to Collaborate on**

20         **Innovations in the Relevant Markets**

21  536.  Hardware providers work closely with video game developers. *See* PX7062 (Fisher

22  (Nvidia) Dep. 20:1318 ("When Nvidia is developing and launching a new series of GPUs

23  for gaming, does Nvidia's gaming business work with game developers to optimize the

24  work – the interplay between the game – a game and the new chipset. A: We do, yes.")

25  537.  As Jim Ryan, CEO of Sony Interactive Entertainment, put it, "So from an early stage in

26  the development of our future consoles we consult with the most valued and prestigious

27  development partners to get their input into what features our next generation hardware

28  should offer." PX7053 (Ryan (Sony) Dep.) at 31:11-15.

538.    In particular, hardware providers have acknowledged that "over the past two decades, Activision has been an important development partner," collaborating closely with console manufacturers. PX8001 (Ryan (Sony) Decl.) ¶ 40; *see also* PX7061 (Fisher (Nvidia) Dep. 37:2-37:8 (Q: Okay. Do you have an understanding of how long there has been a collaborative relationship between Nvidia and Activision to make Nvidia games performant on Nvidia GPUs? A: It's been some number of years. I don't recall when – when we first started working with Activision or Blizzard as separate companies.").

539.    For example, Activision has collaborated with Sony on the development of features that make gameplay "more enjoyable and more realistic," ███████████████████ █████ among others. PX7053 (Ryan (Sony) Dep.) at 30:5-35:5. In order to collaborate on developing console features with Activision, Sony must share confidential details about its console development. *See* PX8001 (Ryan (Sony) Decl.) ¶ 40.

540.    This collaboration leads to high quality products. PX7053 (Ryan (Sony) Dep.) at 34:1-4; *see also* PX7062 (Fisher (Nvidia) Dep. 20:20-21:21 ("[T]he most common reason is for interplayability to make sure that the game is fully compatible with our . . . newest device. . . the other reason most common is that with our new architectures, we add additional features that games can take advantage of.  And we need to teach game developers and work with them so they understand how to modify their games to take advantage of the latest features in our . . . GPUs.").

541.    For example, Nvidia, which sells the cloud streaming service GeForce Now, has produced technology to reduce latency when streaming a game. PX3381 (Eisler Video) at 47:12-23, 48:5-23 ████████████████████████████████████████ ███████████████████████████████████ PX7062 (Fisher (Nvidia) Dep. 22:23-23:21).

542.    ████████████████████████████████████ PX7062 (Fisher (Nvidia) Dep.) 34:13-35:18) ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████

543.    The acquisition of a major publisher would jeopardize this relationship. As Mr. Ryan put

it, "We simply could not run the risk of a company that was owned by a direct competitor

having access to that information." PX7053 (Ryan (Sony) Dep.) at 34:16-24; *see also*

PX1486 (Microsoft) at 002; PX7014 (Booty (Microsoft) IH) at 174:20-175:16 ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ *see also* PX7014

(Booty (Microsoft) IH 176:22-176:25 ████████████████████████████

████████████████████████████████████████████████████████

████████████

544.    This would also affect Activision's incentives to work with other platforms. PX7053

(Ryan (Sony) Dep.) at 35:18-36:13.

### C.    Microsoft's Past Statements and Actions Demonstrate Microsoft has the Ability and Incentive to Foreclose Rivals Post-Acquisition

#### 1.    Microsoft is Willing to Lose Money on First-party Exclusive Titles and Treat Them as a "Loss Leader."

545.    There is significant evidence that Microsoft considers the benefits of foreclosing rivals

from content when deciding whether to make content exclusive for its consoles and Xbox

Game Pass subscription services. Microsoft Gaming CEO Phil Spencer testified that the

Gaming Leadership Team has had conversations about the financial implications of not

shipping content on other platforms, including PlayStation. Spencer (Microsoft) Hr'g Tr.

316:17-317:10; *see* PX7007 (Stuart (Microsoft) IH) at 167:22-168:9 ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

1 ██████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ████████ Booty (Microsoft) Hr'g Tr. 55:22-14.

4 546. ████████████████████████████████████████████

5 ████████████████ PX4007 (Microsoft) at 006 ███████████████

6 ██████████████████████████████████████████

7 ██████████████████████████████████████████████

8 ██████████████████████████████████████████████

9 ████████████████████████████████████████ PX4007

10 (Microsoft) at 005 ██████████████████████████████

11 ██████████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████ Similarly, Microsoft is willing to lose money on Game Pass for a

14 number of years before the service becomes profitable, as "the idea is to create a moat

15 that nobody else can attack." Booty (Microsoft) Hr'g Tr. 67:19-68:5 (discussing PX1442

16 (Microsoft) at001). As Mr. Booty noted to Mr. Stuart, "Content is the one moat that we

17 have in terms of a catalog that runs on current devices and capability to create new. Sony

18 is really the only other player who could compete with Game Pass and we would have a

19 two-year and [10 million] subs lead." Booty (Microsoft) Hr'g Tr. 69:1-12 (discussing

20 PX4352 (Microsoft) at 001).

21 547. As Pete Hines, head of publishing for Bethesda Softworks (a division of ZeniMax)

22 testified, Trial Tr. 88:7-22, he is unaware of any reason why, if Microsoft acquires

23 Activision, games from Activision Blizzard King "would be treated differently" with

24 respect to exclusivity than ZeniMax titles have been treated. Hines (Microsoft) Hr'g Tr.

25 88:7-22, 101:10-102:3 (discussing PX4406 (Microsoft) at 001).

26 548. Further, Professor Lee testified that "[f]irst party publishers tend to have a greater

27 economics incentive than third-party publishers to make content exclusive to their own

28 consoles and gaming services." Lee Written Direct at ¶ 38.

PLAINTIFF'S FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW, CASE NO. 3:23-CV-2880

113

549.    Professor Lee also found that ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ Lee Written Direct at ¶39 (citing PX7011 (Spencer (IH) at 360:2-362:13).

550.    Consistent with this testimony, Microsoft's popular first-party console franchises such as *Halo* and *Gears of War* are exclusive to Xbox consoles and PC's." Lee Written Direct at ¶ 39 (citing PX5000 (Expert Report) at ¶ 522).

551.    Professor Lee found that this behavior extended to acquired studios. Lee Written Direct a ¶ 40.

552.    Conversely, Professor Lee found that in contrast to first-party publishers, independent publishers typically have strong economic incentives to support multiple consoles as doing so provides access to a larger potential customer base and greater potential game sales. Lee Written Direct at ¶ 43 (citing PX5000 (Lee Report) at 161 fig. 38).

553.    Professor Lee calculated that for each of the "Big 4" independent publishers, well over 90% of revenue was earned from multi-platform titles. Conversely, ████████████ ████████████████████████████████████████████ while just over 70% of Xbox Games Studios revenue was from games exclusive to Xbox consoles. "This greater propensity for first-party titles to be exclusive is consistent with console manufacturers benefiting sufficiently from exclusivity and increased console sales to be willing to forgo selling first-party titles to a larger set of users on rival consoles. Lee Written Direct at ¶ 44 (citing PX5000 (Lee Expert Report) at 160.

### 2.  Past Acquisitions

554.    Microsoft's discussion and actions surrounding proposed and consummated acquisitions of video game studios also indicate Microsoft's willingness to forgo profits on content sales to obtain benefits arising from content exclusivity, which is economically rational if the benefits of exclusivity outweigh the foregone sales on other gaming platforms. This has been the case even for new titles that are

1    released in existing franchises.

555.    In evaluating a potential acquisition, Microsoft considers both economic value (near-term financial return) and strategic value (how the acquisition relates to the company's gaming strategy). Spencer (Microsoft) Hr'g Tr. 321:2-10, 322:3-8. The two considerations differ from one another and there is no number assigned to strategic value. Spencer (Microsoft) Hr'g Tr. 322:9-16.

556.    For example, Microsoft acquired a series of game studios in 2018 and 2019, including Ninja Theory, Double Fine, Obsidian Entertainment ("Obsidian"), and inXile Entertainment. (PX0003 at 086–087).

557.    Microsoft's internal documents state that ███████████████ ████████████████████████████████ ████████████████████████████████ ██████████ PX1949 (Microsoft) at 002 ; PX1951 (Microsoft) at 007. *See also* PX1950 (Microsoft) at ███████████████ ████████████████████████████████ ██████████

558.    For example, ██████████████████████████ █████████ PX7031 (Greenberg (Microsoft) Depo.) at 48:11-49:13, 54:6-21.

559.    Obsidian games *Grounded* (which offers multiplayer play) and *Pentiment* were launched in 2022 and are exclusive to Xbox. PX7031 (Greenberg (Microsoft) Depo.) at 56:2-24.

560.    ████████████████████████████████ ████████████████████████████████ ███████████████████████████ █████████████████████ PX1805 (Microsoft) at 013, 015.

### 3. ZeniMax

561. In addition, Microsoft's actions — and internal rationale for those actions —following the acquisition of ZeniMax Media ("ZeniMax") are consistent with Microsoft recognizing that it obtains significant benefits from exclusivity and are instructive as to how Microsoft will handle Activision content post-closing.

562. ZeniMax is the parent company of Bethesda Softworks, an established game publisher with eight game development studios. PX7049 (Hines (Microsoft) Dep.) at 8:17-23. ZeniMax makes "big AAA tentpole launches that when [ZeniMax] put[s] out a game, people stop and pay attention if they're a gamer." PX7049 (Hines (Microsoft) Dep.) at 268:5-16.

563. In September 2020, Microsoft announced it was acquiring ZeniMax for $7.5 billion in cash. PX1962 at 002; *see also* Booty (Microsoft) Hr'g Tr. 57:7-16; Hines (Microsoft) Hr'g Tr. 88:21-22 (Hines) (noting Microsoft acquired ZeniMax in 2021). The Bethesda acquisition added four additional billion-dollar franchises to Microsoft's game portfolio, including *The Elder Scrolls*, *Dishonored*, *Fallout*, *Doom*, as well as major new releases *Starfield* and *Redfall*. PX1425 (Microsoft) at 015; PX4627 (Microsoft) at 001.

564. Prior to being acquired by Microsoft, ZeniMax had historically released its games on both Xbox and PlayStation. PX7053 (Ryan (Sony) Dep.) at 28:9-15. In the ten-year period before ZeniMax was acquired by Microsoft, ZeniMax had never released a game exclusive to a single console. Hines (Microsoft) Hr'g Tr. 91:2-13.

565. ███████████████████████████████████████████ ███████████ Lawver (Microsoft) Hr'g Tr. 234:19-235:3; PX4672 (Microsoft) at 001 ████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████

566. ███████████████████████████████████ ████████████████████████████████████████████

Lawver (Microsoft) Hr'g Tr. 235:9-13; Stuart (Microsoft) Hr'g Tr. 950:7-19. Microsoft

1   ███████████████████████████████████████████████████

2   ███████████████████████████████ Lawver (Microsoft) Hr'g Tr. 235:14-25.

3   567.   Initially, Microsoft's statements to the public and foreign regulators attempted to dispel

4          any concerns over the exclusivity of future ZeniMax games. In announcing the ZeniMax

5          acquisition, Microsoft publicly stated that it would decide whether to make future

6          ZeniMax releases exclusive to Xbox on a "case-by-case basis." PX1962 (Microsoft) at

7          002. In November 2020, Microsoft Gaming CFO Tim Stuart told an investor conference

8          that Microsoft gaming did not have any intention of pulling ZeniMax content off of Sony,

9          Nintendo, or other platforms. Stuart (Microsoft) Hr'g Tr. 955:8-12; PX9192 at -014.

10  568.   Microsoft informed the European Commission that it had "strong incentives to continue

11         making ZeniMax games available for rival consoles (and their related storefronts)" and

12         that it would be "implausible" to earn enough new Xbox console users to offset the losses

13         it would realize from lost sales on competing platforms due to an exclusive strategy.

14         Notably, Microsoft cited to the ███████████████████████████████

15         ██████████████████████████████████ See PX9036 at 021;

16         PX1651 at 125-29 (Microsoft Form CO submitted to the European Commission for

17         Microsoft/ZeniMax, Jan. 29, 2021).

18  569.   However, Microsoft's internal document and post-acquisition actions contradict

19         Microsoft's representations and initial financial modeling for the ZeniMax deal. On the

20         morning the ZeniMax acquisition was announced, Microsoft Gaming CEO Phil Spencer

21         wrote a global email to Microsoft Gaming employees: ███████████████████

22         ███████████████████████████████████████████

23         ██████████████████████████████████████ PX1527

24         (Microsoft) at 002 (Microsoft) (emphasis added).

25  570.   ███████████████████████████████████████████████

26         ███████████████████████████████████████████████

27         Lawver (Microsoft) Hr'g Tr. 236:4-13; PX7048 (Booty (Microsoft) Dep.) at 8:11-18;

28         PX7042 (Lawver (Microsoft) Dep.) at 257:21-258:2; PX1954 (Microsoft) at 001 ████

1  ███████████████████████████████████████████████████

2  ████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  *id.* at 259:23-260:6, 258:21-23.

5  571.  Microsoft Gaming CFO Tim Stuart testified that when Microsoft evaluated exclusivity of

6  ZeniMax games in December 2020, despite having more than 10 million units forecasted

7  for both *Starfield* and *Indiana Jones* on PlayStation, Microsoft believed it could offset

8  losses incurred from taking ZeniMax games exclusive through upside to Game pass and

9  increased console sales. Stuart (Microsoft) Hr'g Tr. 965:15-967:22; PX4376 at -001. Mr.

10  Stuart testified that the Microsoft needed fewer dollars in the short term to make up for

11  the financial impact of exclusivity of ZeniMax games on Microsoft.  Stuart (Microsoft)

12  Hr'g Tr. 967:23-969:2; PX4376 at -001.

13  572.  █████████████████████████████████████████████

14  ████████████████████████████  PX1966 (Microsoft); PX7048

15  (Booty (Microsoft) Dep.) at 31:19-32:9, 33:11-22; PX7040 (Stuart (Microsoft)

16  Dep.) at 302:14-303:14. *See also* PX1519; PX4535 (Microsoft) at 001; PX7056

17  (Murphy (Microsoft) Dep.) at 135:13-15.

18  573.  ███████████████████████████████████████

19  ███████████████████████████████████████████

20  ██████████████████  PX1966 (Microsoft) at -008 (Microsoft); PX4484

21  (Microsoft) at 009.

22  574.  ████████████████████████████████████████████████

23  █████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ███████  PX4484 (Microsoft) at 009, 011.

27  575.  ████████████████████████████████████████████████

28  ████████████████████████████████████████  PX1966

1   (Microsoft) at 002 (Xbox CFO Tim Stuart: ███████████████████████

2   ████████████████████████

3   576.   Microsoft Gaming CFO Tim Stuart testified that around the time of this presentation

4        February 2021, ZeniMax leadership did not want their IP cut from "the potential biggest

5        base" of PlayStation consumers, but that it was "consideration" and "not…a blocker" for

6        Microsoft. Stuart (Microsoft) Hr'g Tr. 974:6-975:7; PX1966 at -003.

7   577.   Mr. Spencer's decision to pursue full exclusivity for ZeniMax games was made

8        ██████████████████████████████████████

9        ████████████████████████████████████

10       ███████████████   *See* PX1471 (Microsoft) at 024.

11  578.   █████████████████████████████████████

12       ████████████████████████████████████████

13       ████████████████████████████████████████

14       ███████████████████████████████████████

15       ████████████████████████████████████████

16       █████████████████████████████████████████

17       ██████████████████████████████████████

18       ██████████████████████████████████Stuart

19       (Microsoft) Hr'g Tr. 982:5-18; PX1116 (Microsoft) at 001; Lawver (Microsoft)

20       Hr'g Tr. 236:14-237:7. *See also* PX7040 (Stuart (Microsoft) Dep.) 323:18-23;

21       PX7042 (Lawver (Microsoft) Dep.) 263:4-20, 264:22-25, 265-22-266:3.

22  579.   ███████████████████████████████████████

23       ████████████████████████████████████Lawver

24       (Microsoft) Hr'g Tr. 23814-239:3; PX1116 (Microsoft) at 001;; Stuart (Microsoft)

25       Hr'g Tr. 983:19-984:3 PX7040 (Stuart (Microsoft) Dep.) at 327:17-20, 328:14-20;

26       PX7043 (Lawver (Microsoft) Corp. Dep. At 14:10-19; *see also* PX4672

27       (Microsoft) at 001 ███████████████████████████████

28       ██████████████████████████████████

1    ██████████████████████████████████████████████████

2    ██████████████████████████

3    580.    Microsoft Gaming CFO Tim Stuart testified that despite making Starfield exclusive

4           he believed that Microsoft Gaming could meet its commitment to the board as set

5           out in the final ZeniMax deal model. Stuart (Microsoft) Hr'g Tr. 984:20-985:11.

6    581.    As Microsoft prepared to announce the completion of the acquisition, Phil Spencer

7           wrote to senior leaders including Mr. Stuart, Mr. Booty, and Sarah Bond, "I want

8           us to be bold in our announce of Bethesda close regarding Bethesda titles focused

9           on Xbox" and that he recognized the "financial implications" of the strategy.

10          Spencer (Microsoft) Hr'g Tr. 344:5-345:5; PX1851 (Microsoft) at 002.

11   582.    ██████████████████████████████████████████

12          █████████████████████████████████████████████████

13          ████████████████████████████ PX7012 (Spencer (Microsoft) IH at 412:7-

14          13; PX7040 (Stuart (Microsoft) Dep. At 333:7-17); Lawver (Microsoft) Hr'g Tr.2

15          240:11-16;  PX4819 (Microsoft) ██████████████████████████

16          ███████████████████████████ PX7042 (Lawver (Microsoft) Dep.) at 309:16-

17          310:11; PX7007 (Stuart (Microsoft) IH) at 280:20-22 ████████████████

18          ████████████████████████████████████████████

19          Bond (Microsoft) Hr'g Tr. 191:13-22 ("Q: And Phil Spencer is responsible for the

20          other decisions about exclusivity, correct? A: He is."); Stuart (Microsoft) Hr'g Tr.

21          964:17-20 (testifying that Phil Spencer makes the ultimate decisions about whether

22          content that Microsoft owns is going to be exclusive to Microsoft).

23   583.    ███████████████████████████████████████████

24          ███████████████████████████Lawver (Microsoft) Hr'g Tr. 252:9-13; PX7042

25          (Lawver (Microsoft) Dep.) at 348:19–349:3, 360:13–20 ████████████████

26          ████████████████████████████████████████████

27          ████████████████████████████████████████████

28          ██████ PX4430 (Microsoft) at 005; PX4303 (Microsoft) at 005. *See also* PX4435

(Microsoft) at 001, 012 ; PX7042 (Lawver (Microsoft) Dep.) at 358:16—359:10. Bond (Microsoft) Hr'g Tr. 191:13-22 ("Q: And I also believe you testified that Phil Spencer made the final call on [the Starfield exclusivity] decision, correct? A: He did.").

584.   Following clearance by the European Commission on March 8, 2021, Microsoft closed the ZeniMax transaction. In a press release on March 9, Microsoft Gaming CEO Phil Spencer stated that some future ZeniMax titles would be exclusive. "With the addition of the Bethesda creative teams, gamers should know that Xbox consoles, PC, and Game Pass will be the best place to experience new Bethesda games, including some new titles in the future that will be exclusive to Xbox and PC players." Phil Spencer, "Officially Welcoming Bethesda to Team Xbox," Xbox Wire, Mar. 2021, https://news.xbox.com/en-us/2021/03/09/officially-welcoming-bethesda-to-the-xbox-family/.

585.   In a roundtable discussion following closure of the ZeniMax acquisition, Mr. Spencer said, "If you're an Xbox customer, the thing I want you to know is this is about delivering great exclusive games for you that ship on platforms where Game Pass exists and that's our goal. That's why we're doing this." Spencer (Microsoft) Hr'g Tr. 339:2-11.

586.   Additionally, in August 2021, Microsoft Gaming CFO Tim Stuart made public statements consistent with a desire to prioritize the quality of Bethesda content on Microsoft's own products, even if they were not withheld from rivals: "[W]hat we want is we want that content, in the long run, to be either first or better or best or pick your differentiated experience, on our platforms. We will want Bethesda content to show up the best as – on our platforms." PX9330.

587.   Free from regulatory scrutiny, following the closing of the ZeniMax deal Microsoft announced that it planned to release several highly-anticipated future ZeniMax titles, including *Starfield* and *Redfall*, exclusively on Xbox and PC. Spencer (Microsoft) Hr'g Tr. 354:2-11, 354:25-355:3; *see* PX7012 (Spencer (Microsoft)

IH) at 406:23-24; 412:7-13; PX7040 (Stuart (Microsoft) Dep.) at 340:6-9, 288:10-289:11, 338:4-7; PX4323 (Microsoft) at 003. Gamers on Sony PlayStation 5 were upset at the news that ZeniMax's *Starfield* title would be exclusive to Xbox and PC. Hines (Microsoft) Hr'g Tr. 95:22-96:7.

588. ███████████████████████████████████████

███████████████████████████████████████

██████████████████ PX7042 (Lawver (Microsoft) Dep.) at 284:23-285:21

(discussing PX1391-004 ██████████████████████████

███████████████████████████████████████

███████████████████████████████████

PX4323-003 (Microsoft)████████████████████

████████████████ (Lawver (Microsoft) Dep.) at 302:2-5████

███████████████████████████████████████

█████████████████████████

589. A pair of Xbox Wire blog posts on June 13, 2021 announced both *Starfield* and *Redfall* as forthcoming exclusives. Bethesda Game Studios, "Starfield Coming November 11, 2022," June 13, 2021, https://news.xbox.com/en-us/2021/06/13/starfield-coming-november-11-2022/; Anne Lewis, "Redfall Revealed, Coming Exclusively to Xbox Series X|S," Xbox Wire, June 13, 2021, https://news.xbox.com/en-us/2021/06/13/redfall-revealed-coming-exclusively-to-xbox-series-xs/.

590. In addition to taking *Starfield* and *Redfall* exclusive, Microsoft announced publicly they intended to release another ZeniMax game, *Elder Scrolls VI*, as an Xbox exclusive. Mr. Spencer testified that "I have made public statements that Elder Scrolls 6 will be exclusive to Xbox and PC." PX7012, Phil Spencer (Microsoft) IH Vol. II) 426:4–12; PX4309 (Microsoft) at 001 (Microsoft); PX7042 (Lawver (Microsoft) Dep.) at 324:9-12; PX0027 at 003; PX9095 at 016–17.

591. At the evidentiary hearing, Mr. Spencer testified that he did not know if his prior

1      sworn testimony about his public statements regarding *Elder Scrolls VI* exclusivity

2      had been accurate. Spencer (Microsoft) Hr'g Tr. 356:8-19; PX7012 (Spencer

3      (Microsoft) IH Vol. II) at 426:4-12.

4    592.  ███████████████████████████████████████████████████

5      ███████████████████████████████████████████

6      ███████████████████████████████████████████████

7      ████████████████████████████  PX4793 (Microsoft) at 001; PX4792

8      (Microsoft) at 022; PX7042 (Lawver (Microsoft) Dep.) at 314:10-16, 309:16-

9      310:11, 343:16-19; Lawver (Microsoft) Hr'g Tr. 240:17-25. While ZeniMax's

10     initial agreement with Disney called for the Indiana Jones game to be released on

11     multiple consoles, the agreement was amended after Microsoft acquired ZeniMax

12     to provide for exclusive release on Xbox and PC. Spencer (Microsoft) Hr'g Tr.

13     356:23-357:16; PX4725 (Microsoft) at 002 ████████████████████

14     ███████████████████████████  Hines (Microsoft) Hr'g Tr.

15     99:17-100:13; *id.* at 119:2-120:5 (discussing PX4391 (Microsoft) at 002).

16    593.  ██████████████████████████████████████████████

17     ███████████████████████████████████████████████████

18     ███████████████████████████████████████████

19     ████████████████████████████████████████████████

20     █████████████████████████████████████████████████

21     ████████████████████████████████████████████████████

22     █████████████████████████████████  Lawver (Microsoft) Hr'g

23     Tr. 242:20-244:03, 245:1-246:20; PX7042 (Lawver (Microsoft) Dep.) at 320:4-24,

24     327:10-328:5, 331:13-336:13; PX4309 (Microsoft) at 001. ████████████

25     ██████████████████████████████████████████████

26     ██████  PX7042 (Lawver (Microsoft) Dep.) at 318:10-320:24, 326:4-328:19; 330:3-

27     331:7. Microsoft made the decision to make ZeniMax games exclusive, despite

28     Microsoft Gaming CFO Tim Stuart noting that Microsoft will have accountability

margin issues from the ZeniMax exclusivity decision because the exclusivity

decision "pull[s] a huge amount of PS units out of the model." Stuart (Microsoft)

Hr'g Tr. 991:5-24; PX4334 (Microsoft) at 001.

594.    At the evidentiary hearing, Mr. Spencer testified that he did not recall telling Mr.

Leder that ZeniMax titles would be Xbox exclusives. Spencer (Microsoft) Hr'g Tr.

348:7-23; PX7028 (Spencer (Microsoft) Dep.) at 44:16-24. Mr. Spencer claimed

that previous testimony in which he had a "general understanding" of what

platforms ZeniMax games would ship on had been inaccurate. Spencer (Microsoft)

Hr'g Tr. 350:25-351:22; PX7028 (Spencer (Microsoft) Dep. 51:14-22. He testified

that he did not remember conversations with any other Microsoft or ZeniMax

executives about making ZeniMax titles Xbox exclusives, including a meeting

where he provided "Guidance on exclusivity of future titles." Spencer (Microsoft)

Hr'g Tr. 345:20-346:13; PX1853 (Microsoft) at 002.

595.    However, ██████████████████████████████████████████████████

██████████████████████████████████████████████████

Lawver (Microsoft) Hr'g Tr. 249:13-250:25, 251:10-252:8; PX4312 (Microsoft) at

005, 008

596.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████     PX7042 (Lawver (Microsoft) Dep.) at 342:13-

344:23. After Microsoft acquired ZeniMax, it asked Nvidia to remove Bethesda

games from GeForce NOW. PX3381 (Eisler (Nvidia) Hr'g Direct) at 96:1-7.

597.    Microsoft's strategy of making ZeniMax content exclusive to Xbox continues

through the present. ████████████████████████████████

████████████████████     PX4818 (Microsoft) at 018, 020, 024 ███████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

598. Microsoft's treatment of ZeniMax games is consistent with Microsoft's strategy of taking IP from acquired game developers exclusive. Out of the 24 games that have been released from the eight studios that Microsoft has acquired since 2018, only six have been released on PlayStation. PX0027 at 002–04..

599. ███████████████████████████████████████████████ ███████████████████████████████████ PX0027 at 002–04; PX7053 (Ryan (Sony) Dep. Vol. 1) a t29:8-29:21; PX7031 (Greenberg (Microsoft) Dep.) at 84:23-85:2) ███████████████████████████████████ ████████████████████████████████████ PX7031 (Greenberg (Microsoft) Dep.) at 52:30-53:13, 66:24-67:15 █████████████ ████████████████████████████████████████████ █████████████████ The two other games are *The Elder Scrolls Online* and *Fallout 76*, both older open-world service games that have continued to receive content updates, but which were released before Microsoft's acquisition of ZeniMax. PX0027 at 004; *see also* PX7031 (Greenberg (Microsoft) Dep.) at 101:19-104:1 ████████████████████████

**4.  *Minecraft* is Not Predictive of Microsoft's Behavior Here**

600. In 2014, Microsoft acquired Mojang, the developer of Minecraft. PX7014 (Booty (Microsoft) IH) at 106:3-5; Booty (Microsoft) Hr'g Tr. 56:17-21 .

601. *Minecraft* is played across many different kinds of devices, including mobile phones, tablets, and the Nintendo Switch, and is available on more devices than Call of Duty. PX0003 at 132; PX7010 (Nadella (Microsoft) IH) at 17:24-18:4. Unlike *Call of Duty*, *Minecraft* was made by a single developer incurring relatively limited costs. PX0003 at 072.

602. At the time of Microsoft's acquisition of Mojang, Mojang had already released a version of *Minecraft* on Sony's PlayStation consoles. PX0003 at 132.

603. *Minecraft* is a sandbox game in which users can create a world within the game, which focuses on user-driven experiences, creativity, and freedom rather than

preset goals or a narrative storyline. PX7049 (Hines (Microsoft) Dep.) at 286:12-20. In the words of a Microsoft executive, *Minecraft* is "a giant untethered, like, players can go and do whatever they want, create their own servers…it's an amazing sandbox game that's just different from anything anybody else made." PX7049 (Hines (Microsoft) Dep.) at 286:12-20.

604.    *Minecraft* is a "service-based game." PX7042 (Lawver (Microsoft) Dep.) at 90:12-15. Also known as "game as a service," games like *Minecraft* have "a development team consistently adding new content to the game to keep it fresh and new." PX7031 (Greenberg (Microsoft) Dep.) at 102:17-103:6. While other games, such as games in Microsoft's first-party *Gears of War* franchise, may possess a single-player game mode and a multiplayer game mode, they do not "keep developing the game as an online service and experience." PX7031 (Greenberg (Microsoft) Dep.) at 102:17-103:6.

605.    As a result, unlike franchises possessing numerous sequels like *Call of Duty* or *Diablo* to progress a story, *Minecraft* does not release "sequels" and new versions of *Minecraft* tend to be more akin to updates to the existing game. PX7007 (Stuart (Microsoft) IH) at 307:22-308:2; PX7004 (Zerza (Activision) IH) at 77:2-4 ██████ ████████████████████████████████████████████████████████████ ████████████████████████ PX7006 (Kotick (Activision) IH) at 53:2-5 ████████████████████████████████████████████████████ ████████████████████████████ PX7012 (Spencer (Microsoft) IH Vol. II) at 421:14-20 ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████

606.    While *Call of Duty* is unique in that its franchise comprises three separate storylines, PX8001 (Ryan Sony Decl.) ¶ 25, each annually released game in the series is far more than an "update" to an existing game. Each is a true standalone

1    game to preceding titles in the franchise. PX7053 (Ryan (Sony) Dep.) at 52:9-12

2    ("[Call of Duty games] have different themes. They have different story lines. They

3    have different game play. They're made by different studios.").

4  607.    *Minecraft*'s unique and differentiated approach to gaming has led it to develop a

5    gamer audience distinct from typical Xbox and PlayStation gamers. In an internal

6    email, Microsoft employees described *Minecraft*'s following as ███████████

7    ███████████████████████████████████████

8    PX4712 (Microsoft) at 001. The email goes onto explain that there were multiple

9    reasons for differentiating *Minecraft*'s audience from the typical Xbox and

10    PlayStation console audience, including ████████████████████████

11    ███████████████████████████████████████

12    ████████    PX4712 (Microsoft) at 001.

13  608.    Microsoft executives recognized *Minecraft*'s unique status in a messaging app chat

14    thread about making ZeniMax-acquired games exclusive to Xbox platforms:

15    "Minecraft being on all platforms enables its mass mass mass market, imo. But

16    that's the Minecraft world. I think its different for [ZeniMax] games." Stuart

17    (Microsoft) Hr'g Tr. 992:3-993:13; PX1966 (Microsoft) at 006. That same chat

18    explained how the nature of service-based games like *Minecraft* affected their

19    commercial strategy regarding exclusivity: ██████████████████████

20    ███████████████████████████████████████

21    ██████████████████████    PX1966 (Microsoft) at 005.

22  609.    In a presentation regarding the exclusivity status of ZeniMax games, *Minecraft* was

23    the only first-party title for which Microsoft did not model exclusivity. PX7056

24    (Murphy (Microsoft) Dep.) at 183:11-14. The Microsoft employee leading the

25    exclusivity analysis explained during the presentation ████████████████

26    ███████████████████████████████████

27    ██████████    PX4602 (Microsoft) at 33:6-14. ███████████████████

28    ███████████████████████████████████

1    █████████████████████████████████████████

2    ███████████████████████████ PX4622 (Microsoft) at 003.

3    610.    Even so, Microsoft has periodically considered making games in the *Minecraft*

4            franchise completely exclusive to Xbox platforms and to make *Minecraft* a timed

5            exclusive title on Xbox platforms. For example, Xbox Chief Marketing Officer

6            Mike Nichols messaged Microsoft Gaming CEO Phil Spencer, "I'm of the mind

7            that [Minecraft] Dungeons ought be Xbox and PC only" to which Mr. Spencer

8            replied, "I agree."  Spencer (Microsoft) Hr'g Tr. 323:11-324:2; PX1898

9            (Microsoft) at 001; PX4694 (Microsoft) at 001–02.

10   611.    *Minecraft* was a game available on Nvidia GeForce NOW while the cloud gaming

11           service was in its beta phase. PX3381 (Eisler Video) at 99:13-17. When GeForce

12           NOW transitioned to a commercial service, ████████████████████████████

13           ███████████████████████████████ PX3381 (Eisler Video)

14           at 99:22-100:3.

15   612.    In March 2020, Mr. Spencer expressed frustration that Microsoft continued to ship

16           *Minecraft* on PlayStation day-and-date. Mr. Spencer wrote ███████████████

17           ██████████████████████████████████████████████████████

18           ████████████████████████████████████████████

19           █████████████████████████████████████████

20           ███████████████████████████████ Spencer (Microsoft) Hr'g Tr.

21           324:19-326:25; PX1895 (Microsoft) at 001.

22   613.    ███████████████████████████████████████

23           ███████████████████████ PX4768 (Microsoft) at 001 ███████████████

24           ██████████████████████████████████████████████████

25           ██████████████████████████████████████████████████

26           ██████████ PX4768 (Microsoft) at 001. ████████████████████████

27           ████████████████████████████████████████████

28           ████████████████████████████████████████

1    PX4768 (Microsoft) at 001.

2    614.   An internal Microsoft email from Phil Spencer shows that Microsoft did not allow

3          Mojang to add *Minecraft* to Sony's PlayStation Now subscription service

4          (predecessor to PlayStation Plus Extra and PlayStationPlus Premium) because "we

5          [Microsoft] do see PSNOW as competition to [Xbox Game Pass]" and Microsoft

6          did not want PlayStation Now to "compete more effectively with [Xbox Game

7          Pass]." Spencer (Microsoft) Hr'g Tr. 332:5-11; PX1897 (Microsoft) at 001.

8    615.   ███████████████████████████████████████████████ Spencer

9          (Microsoft) Hr'g Tr. 327:20-25; PX7058 (Svensson (Sony) Dep.) at 245:12-

10         246:17. Instead, PlayStation 5 gamers play a backwards-compatible PlayStation 4

11         version of Minecraft. Spencer (Microsoft) Hr'g Tr. 329:7-11. Microsoft Gaming

12         CEO Phil Spencer testified that Microsoft refused to optimize *Minecraft* for

13         PlayStation 5 to fight back against Sony for not sending Microsoft software

14         development kits, which Microsoft felt put it at a competitive disadvantage.

15         Spencer (Microsoft) Hr'g Tr. 328:6-329:6, 329:22-330:5. ████████████

16    ████████████████████████████████████████████████████████

17    ████████████████████████████████ PX7058 (Svensson (Sony)

18         Dep.) at 245:12-246:17. Meanwhile, Microsoft has optimized *Minecraft* for

19         Microsoft's own Generation 9 consoles—the Xbox Series X|S. Spencer (Microsoft)

20         Hr'g Tr. 329:12-16; PX7058 (Svensson (Sony) Dep.) at 245:12-246:17.

21              **5.   Current First Party Games**

22    616.   Almost all of Microsoft's first-party games are exclusive. PX7011 (Spencer (Microsoft)

23         IH (Vol. I)) at 360:2-13.

24    617.   Microsoft's past and current first-party console franchises with significant online multi-

25         player functionality including *Halo* and *Gears of War* are exclusive on Xbox consoles or

26         PC only. *See* PX7011 (Spencer (Microsoft) IH Vol. I) at 332:17-20, 362:14-20; PX5000

27         (Lee Report) at 195.  If there are significant benefits to supporting multiple platforms for

28

1    multiplayer franchises like *Call of Duty*, Microsoft would be expected to treat its new

2    franchise similarly to its existing first-party multi-player franchises.

3    **D.    The Proposed Acquisition is Likely to Harm Competition**

4    **1.    The Proposed Acquisition is Likely to Result in Competitive Harm in the**

5    **Market for High-Performance Consoles and Video Game Consoles.**

6    618.    Professor Lee analyzed the competitive effects of the Proposed Transaction by first

7    identifying relevant antitrust markets. Then he analyzed the likely impact of the Proposed

8    Transaction on competition and consumers in each relevant market. Lee Written Direct at

9    ¶ 48.

10   619.    Dr. Lee testified that, although "the effect of exclusivity on competition and customer is

11   *case-specific*," "in the present context a video game console manufacturer and gaming

12   service provider (Microsoft) is seeking to acquire an existing third-party video game

13   publisher (Activision) and its suite of *current and future* video game franchises and

14   intellectual property. Absent a meaningful improvement in the (price-adjusted) quality of

15   Activision content resulting directly from the Proposed Transaction, making Activision

16   content exclusive to Xbox products would tend to *reduce* the availability of content on

17   other consoles and gaming services compared to a world without the merger. This in turn

18   *decreases the quality of products available and thus likely harms competition.*" Lee

19   Written Direct at ¶¶ 45, 47.

20   620.    Professor Lee concluded that this would lead to likely consumer harm "due to higher

21   prices, reduced choice, and lower product quality (as [consumers] would be able to

22   access Activision content on fewer consoles and gaming services), and overall video

23   game console and gaming service sales would likely be lower." Lee Written Direct at

24   ¶47.

25   621.    Activision would likely continue to release console titles on multiple high-performance

26   consoles, absent the Proposed Transaction. PX5000 (Lee Report) at 224 (Lee Report).

27

28

622. All non-*Call of Duty* Activision console games released since 2020 are available on Xbox and PlayStation consoles. PX5000 (Lee Report) at 224 (citing Microsoft Megapivot data).

623. Activision has represented that █████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████ PX0060 at 014.

624. All *Call of Duty* titles released since the introduction of Microsoft and Sony's Generation 8 consoles in 2013 have been available on both Xbox and PlayStation consoles. PX5000 (Lee Report) at 224 (citing Microsoft Megapivot data).

625. Microsoft has indicated that *Call of Duty* "will likely remain" available on PlayStation consoles and Xbox consoles, without the Proposed Transaction. PX4476 (Microsoft) at 008.

626. Foreclosure of Activision content from Sony PlayStation consoles would lead to lower-quality products and reduced consumer choice in the High-Performance Video Game Consoles market relative to the but-for world described above. PX5000 (Lee Report) at 230.

627. Withholding or degrading Activision content would lead to a less attractive game catalog on PlayStation consoles and eliminate options for devices that consumers could use to play the foreclosed games. PX5000 (Lee Report) at 230.

628. Any foreclosed PlayStation consumer who does not already own an Xbox would need to incur the cost of purchasing an Xbox console to continue playing Activision content on a high-performance video game console. PX5000 (Lee Report) at 230.

629. Microsoft acknowledged the potential harm to consumers that can occur from exclusivity (and benefits to consumers from making content more widely available).  PX4476 (Microsoft) at 008 ████████████████████████████ ████████████████████████████████████████████

630.   Microsoft Gaming CEO Phil Spencer noted, ████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████
██████████████████████ PX4629 (Microsoft) at 001 .

631.   Microsoft choosing to foreclose its rivals in consoles by withholding or degrading
Activision content would also effectively "punish" gamers on other consoles and tend to
harm competition in these markets. PX5000 (Lee Report) at 230.

632.   Microsoft's actions following the ZeniMax acquisition inform the likelihood of harm
arising from the Proposed Transaction. ████████████████████████
████████████████████ PX7042 (Lawver (Microsoft) Dep.) at
348:19-349:3, 360:13-20. By deciding to take certain ZeniMax titles, including *Starfield*
and *Redfall*, exclusive following the acquisition, Microsoft has reduced the quality of the
portfolio of games available to play on PlayStation relative to the scenario where those
titles were available on PlayStation.  PX7049 (Hines (Microsoft) Dep.) at 149:15-150:12;
PX1080 (Microsoft) at 001 ████████████████████████
████████████████████████████████████████████
████████████████████████████

633.   Microsoft's own distribution decisions with its past and current first-party console
franchises with significant online multi-player functionality, including *Halo* and *Gears of
War*, reveal its understanding of the value of keeping its titles exclusive on Xbox
consoles or PC only, and the likelihood of harm arising from the Proposed Transaction.
PX5000 (Lee Report) at195–96; PX7011 (Spencer (Microsoft) IH) at 332:17-20.

634.   To provide a quantitative estimate of harm that would arise as a result of a reduction in
the quality of Sony PlayStation consoles if Activision content were foreclosed, Dr. Lee
calibrated an economic model of consumer demand for video game consoles in the
United States to simulate how Xbox and PlayStation console unit sales and prices would

1    adjust if PlayStation 5consoles suffered a quality reduction arising from content

2    foreclosure. Lee Written Direct at ¶ 116.

3    635.   Results from Dr. Lee's share model indicated that the quality of the Sony PlayStation 5

4          would be reduced by ▮▮▮▮▮ as expressed in dollar terms, which in turn implies that

5          the consumer harm from this quality reduction is substantial for consumers who continue

6          to purchase a PlayStation 5. Lee Written Direct at ¶ 117.

7    636.   Dr. Lee also simulated the share model allowing prices to adjust following foreclosure.

8          Dr. Lee considered the scenario that Microsoft would respond to the quality reduction by

9          raising its price, while PlayStation responds by decreasing its price, but not enough to

10         offset the decrease in PlayStation quality. In this scenario every purchaser of Microsoft

11         counsels is also harmed due to the increase in price arising from the weakening of

12         competition. Lee Written Direct at ¶ 118.

13   637.   Dr. Lee's "harm model further demonstrates that even if foreclosure brought by Sony and

14         Microsoft's market shares closer together and reduced market concentration, competition

15         and consumers can still be harmed." Lee Written Direct at ¶ 119.

16         **2.  The Proposed Acquisition is Likely to Result in Competitive Harm in**

17         **Content Subscription Services and Cloud Gaming Services**

18   638.   An independent Activision would likely be willing to support non-Microsoft subscription

19         services. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20         ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21         ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22         ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX2419 (Activision) at 004.

23   639.   Activision has a general goal of platform agnosticism. CEO Bobby Kotick testified that

24         Activision's "goal is to get our games out to as many people on as many devices as

25         possible" and that factors that determine whether an Activision game is available on a

26         subscription service include reaching agreeable commercial terms, sufficient technical

27         capabilities, and confidence that the platform will be successful.  PX7006 (Kotick

28         (Activision) IH) at 135:13–138:25.

640.    Activision CEO Bobby Kotick testified that "the principal reasons [for not offering
Activision games on Game Pass] have been commercial," and if Microsoft offered
Activision attractive commercial terms to offer their games on Game Pass, "it's possible"
that Activision would offer their games on Game Pass. PX7006 (Kotick (Activision) IH)
at 204:13–205:10.

641.    Speaking directly about a potential cloud gaming services arrangement with Nvidia,
Activision CEO Bobby Kotick testified: "The way I would interpret this is that if Nvidia
agreed to all the commercial terms that are outlined here … I think these are sort of
principles of what a commercial arrangement might look like that would be adequate to
get us to support their service." PX7006 (Kotick (Activision) IH) at 169:7-25.

642.    Activision content had been available on Sony's and Nvidia's subscription services
before. PX2189 at 015. For example, Activision titles were available on Nvidia's
GeForce Now between June 2017 and February 2020, including multiple *Call of Duty*
titles. PX8000 (Eisler (Nvidia) Decl.) ¶ 41; PX3381 (Eisler (Nvidia) Hr'g Testimony) at
70:7-17, 70:18-71:1 ███████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████ PX3381 (Eisler
(Nvidia) Hr'g Testimony) at 75:17-22.

643.    ███████████████████████████████████████████
███████████████████████████████████████████
██████████ PX8000 (Eisler (Nvidia) Decl.) ¶¶ 43, 44. ███████████
███████████████████████████████████████
██████████████ PX3381 (Eisler (Nvidia) Hr'g Testimony) at 85:1-7 ████████
███████████████████████████████████ PX3381
(Eisler (Nvidia) Hr'g Testimony) at 71:16-23 █████████████████████
███████████████████████████████████████████

1    ███████████████████████████████████████ PX3381 (Eisler

2    (Nvidia) Hr'g Testimony) at 86:11-87:17.

3    644.    █████████████████████████████████████████

4    ██████████████████████████████████████████

5    ████████████████████████████████████████

6    PX3381 (Eisler (Nvidia) H'rg Testimony) at 87:18-88:12.

7    645.    Activision and Microsoft have identified large financial benefits from bringing Activision

8    content to Game Pass. A ████████████████████████████████

9    ███████████████████████████████████████

10   ██████████████████████████████████████████

11   █████████████████ PX2138 (Activision) at 001.

12   646.    Other large publishers, including all of the other "Big 4" publishers, support gaming

13   services through Xbox Game Pass. EA and Ubisoft also support cloud gaming through

14   Nvidia GeForce Now. PX7060 (Eisler Dep. Tr.) 164:17-164:23.

15   647.    Activision also recognized significant financial benefits from putting its content onto

16   cloud gaming services. ████████████████████████████████

17   ██████████████████████████████████████████

18   █████████████ PX2419 (Activision) at 004.

19   648.    Microsoft analyses reinforce that there were substantial benefits to the merged firm from

20   adding Activision content to Game Pass. ████████████████████

21   ████████████████████████████████████████

22   ██████████████████████████████████████

23   █████████████████████████████████ PX1763 (Microsoft)

24   at 013.

25   649.    In fact, Activision had not ruled out offering its titles on content or cloud subscription

26   services, including those offered by Microsoft, Sony, Nintendo, and Nvidia, and its

27   executives testified that Activision would evaluate commercial terms offered for a

28   subscription opportunity. PX7035 (Kotick (Activision) Dep.) at 130:23-133:20; PX7052

(Zerza (Activision) Dep.) at 42:2-11, 154:13-155:9. With respect to Microsoft's Game Pass, in particular, Activision was open to adding its content to the content subscription service if they could receive "material value" for it and that "[i]t all depends on what MSFT is willing to offer." PX2396 (Activision) at 001; PX2406 (Activision) at 001.

650.    Indeed, when the Court confronted Activision's CEO Bobby Kotick on the stand regarding Microsoft's "express purpose to put Activision content on its Game Pass" being at odds with Mr. Kotick's personal philosophy regarding game subscription services, he explained it's ok have a philosophical difference in business approaches because of the premium Microsoft offered to Activision. Kotick (Activision) Hr'g Tr. 60:17-61:1.

651.    ███████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████ PX2006 (Activision) at 001. Activision's CEO made clear that his decision was motivated by ███████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████ PX2006 (Activision) at 001.

652.    After 2020, internal Activision documents show that its executives were willing to place Activision content on Game Pass if they received the right commercial terms. ███████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████ PX2396 (Activision) at 001. ███████████████
███████████████████████████████████████████████████
███████████████████████████████████████████
███████████████ PX2406 (Activision) at 001.

653. Several of the other major AAA publishers have added their content to Game Pass, including Ubisoft, Take-Two, and Electronic Arts. PX7011 (Spencer (Microsoft) IH Vol. I) at 262:23-263:3; PX4624 (Microsoft) at 001; PX4625 (Microsoft) at 001, 004–05.

654. As Dr. Lee testified, both an independent Activision and a provider of multi-game content subscription services would have realized economic gains from trade, and thus, it is in the economic interest of the parties to come to an agreement. Lee (Plaintiff Expert) Hr'g Tr. 650:20-651:13.

655. The foreclosure of Activision content from Microsoft's rivals would likely increase those rivals' costs of acquiring content for their cloud and content subscription services. Microsoft internal documents ███████████████████████████████████ ██████████████████████████████████ PX1049 (Microsoft) at 003. Microsoft internal documents ████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████ PX1877 (Microsoft) at 001.

656. The result of foreclosure is to make it more difficult for rival content subscription services and cloud gaming services providers to expand the content available on their products. █████████████████████████████████ █████████████████████████████████████ █████████████████████ PX1613 (Microsoft) at 005; Lee (Expert) Hr'g Tr. 644:4-17 ("In nascent markets, the role that's smaller players that entrants have in competition could be greater than in markets that are more mature. And so if smaller players of entrants are disadvantaged because they can't get access to content, then harmful foreclosure could be magnified in the future.").

657. Cloud gaming services require substantial infrastructure and investment. Xbox Cloud Gaming has deployed approximately ██████████████ PX4154 (Microsoft) at 005. ████████████████████████████████████████ ████████████████████████████ PX7060 (Eisler (Nvidia) Dep.) at 48:14-18.

658.    In fact, the discontinuation of Google Stadia shows that even for deep-pocketed

competitors, gaining traction in cloud gaming and/or content subscription services is

difficult without premium content. PX7035 (Kotick (Activision) Dep.) at 154:18-155:5.

Former Product Director of Stadia Dov Zimring testified that Stadia failed despite over

██████████████████████████████████████████████

████████ Zimring (Google) Hr'g Tr. 481:3-8; PX8003 at ¶ 2. Stadia's failure despite

Stadia's technology being the "best on the market at the time" according to several

metrics. Zimring (Google) Hr'g Tr. 471:2-473:3.

659.    Fewer entrants and competitors with adequate scale protects Microsoft's position as the

leading provider of content subscription services and cloud gaming services. ████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████ PX8001 (Ryan (Sony) Decl.) ¶ 38; PX8000 (Eisler

(Nvidia) Decl.) at ¶ 63; *see also* Booty (Microsoft) Hr'g Tr. 71:4-8 (naming only Sony's

"PS Now subscription" when asked to identify competitors to Microsoft in subscription

gaming).

660.    For example, former Product Director of Stadia Dov Zimring testified as to the

innovations Stadia was attempting with its cloud streaming service. Zimring (Google)

Hr'g Tr. 474:1-475:3.

661.    Microsoft would be more likely to increase the prices of its content subscription and

cloud gaming services, understanding that gamers could not play Activision content

elsewhere. PX8000 (Eisler (Nvidia) Decl.) ¶ 63.

### 3.  The Proposed Acquisition is Likely to Harm Innovation

662.    The Proposed Acquisition also poses a serious risk of harm to innovation. Current

customers of Activision content are concerned that Microsoft will use their competitively

sensitive information to reap a competitive advantage, weakening competition and

stifling innovation.  PX8001 (Ryan (Sony) Decl) ¶¶ 32, 40 ████████████

███████████████████████████████████████████████████████████████

expressing concern about "shar[ing] in-development console features with a Microsoft-controlled PlayStation"); PX7053 (Ryan (Sony) Dep.) at 34:5-18, 37:19-21 (information about features in development for PlayStation console is "[i]mmensely sensitive" such that Sony "simply could not run the risk of a company that was owned by a direct competitor having access to" confidential details about its next console in development); PX7058 (Svensson (Sony) Dep.) at 243:20 -245:8 (explaining the difference in Sony's collaboration with independent studios versus Microsoft-owned studios, including specific concern about sharing details on Sony's future hardware out of concerns including the possibility that the competitor might "up their specs on their competing platform").

663.    For example, with the benefit of its rivals' strategic secrets through dev kits or other important proprietary information, Microsoft could redirect its own research and development, adjust its product plans, delay product launches, modify its targeted customers, or take other actions to undermine its competitors in the consoles market, subscription services market, and/or cloud services streaming market.  Even the threat of this behavior could be enough to discourage Microsoft's rivals from working collaboratively with Microsoft-owned Activision as they currently do or from taking procompetitive actions they would otherwise take, such as troubleshooting and debugging to optimize and improve their products. PX8001 (Ryan (Sony) Decl) ¶¶ 32, 40.

664.    A Microsoft-owned Activision could also decline to support competitors' innovations that are not matched on Microsoft's competing platforms and services. *See* PX8000 (Eisler (Nvidia) Decl.) ¶¶ 66-68████████████████████████████

███████████████████████████████████████████████████████████████

1

2

3    665.    The competition between Microsoft's Xbox and Sony's PlayStation has resulted in

4            significant advances in hardware innovation of their respective consoles. PX8001 (Ryan

5            (Sony) Decl.) ¶ 13.

6    666.    To provide a better gaming experience, Sony invests in new hardware advancements in

7            its consoles. For example, the PlayStation 5 featured a new type of controller with haptic

8            feedback, a technology feature that uses vibrations to correspond with the gameplay.

9            Older rumble feedback technology vibrated controllers at a static frequency. Haptic

10           feedback enables varied and sensitive vibration that can simulate the feeling of driving

11           with a flat tire or the impact of getting punched. PX8001 (Ryan (Sony) Decl.) ¶ 13.

12   667.    Faced with competition from PlayStation, Microsoft also invested in improving the

13           hardware capabilities of its Generation 9 consoles. PX2393 (Activision) at 002. It

14           doubled the computing power of the previous generation Xbox console—the Xbox One

15           X—and added a solid state drive to the Xbox Series X. PX8001 (Ryan (Sony) Decl.) ¶

16           13. The hardware advances by Microsoft permit it to showcase the latest in Generation 9

17           games. PX7028 (Spencer (Microsoft) Dep.) at 122:17-122:21.

18   668.

19

20                            PX8001 (Ryan (Sony) Decl.) at ¶ 37.

21   669.    Microsoft and Sony share sensitive, technical information with game publishers and

22           developers to collaborate on new gameplay features. PX7053 (Ryan (Sony) Dep.) at

23           31:19-32:7.

24                                                            PX7053 (Ryan

25           (Sony) Dep.) at 32:18-33:8.

26   670.

27

28

1                 ██████████████████████████████ PX7053 (Ryan (Sony) Dep.) at

2      30:5-31:15.

3    671.    Sony is less likely to share confidential, technical information if Microsoft acquires

4              Activision because it "could not run the risk of a company that was owned by a direct

5              competitor having access" to information "that could leak into other parts of Microsoft

6              and potentially allow them to be able to develop similar features to the ones that [Sony]

7              invented." PX7053 (Ryan (Sony) Dep.) at 34:13-24.

8    672.    ████████████████████████████████████████████

9              ████████████████████████████████████

10          ████████ PX8001 (Ryan (Sony) Decl.) ¶ 39.

11    673.    The loss of Activision content may also dampen innovation in the multi-game content

12              subscription gaming market. Microsoft's dominant position in multi-game content

13              subscription services is likely to be further strengthened by the exclusivity of Activision's

14              content. PX0003 at 018; PX5000 (Lee Report) at 141.

15    674.    Sony's CEO, Jim Ryan, expressed his concern that "if Microsoft made *Call of Duty*,

16              along with other popular Activision games like Overwatch and Diablo, available on

17              Xbox's game Pass but chose not to make them available on PlayStation's PS Plus, ████

18    ████████████████████████████████████████████████

19    ████████████████████████████████████████████

20    ████████████████ PX8001 (Ryan (Sony) Decl.) ¶ 41.

21    675.    The foreclosure of Activision content is also likely to impact the nascent market of cloud

22              gaming services. Nvidia GeForce NOW presents an alternative bring-your-own-game

23              ("BYOB") model that competes against Microsoft's subscription-based Xbox Cloud

24              Gaming. PX8000 (Eisler (Nvidia) Decl.) ¶ 28.

25    676.    Nvidia invested significantly to improve its cloud gaming service to the benefit of

26              gamers, including making resolution upscaling available (reducing image blurring while

27              streaming), reducing the latency of the cloud gaming service, and rolling out touch screen

28              controls to games. PX8000 (Eisler (Nvidia) Decl.) at ¶¶ 20–22.

677. ███████████████████████████████████████

█████████████████████████████████████ PX8000

(Eisler (Nvidia) Decl.) at ¶ 44.

678. Nvidia Vice President and General Manager Phil Eisler suggests tha ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████

███████████████ PX8000 (Eisler (Nvidia) Decl.) ¶ 49.

**E.   Respondents Cannot Rebut Complaint Counsel's Prima Facie Case Showing the Proposed Acquisition Would Result in Competitive Harm**

**1.   Respondents Cannot Demonstrate that Entry or Expansion would be Timely, Likely, or Sufficient to Prevent Harm from the Proposed Acquisition**

**a)   Entry into Consoles Markets is Unlikely to be Timely, Likely, or Sufficient to Reverse the Likely Harm of the Proposed Transaction.**

679. Dr. Lee concluded in his testimony that the "[e]vidence indicates that entry into Consoles Market is unlikely to be timely, likely, or sufficient to reverse the likely harm of the Proposed Transaction." Lee Written Direct at ¶ 120.

680. Meaningful entry into the Consoles Markets is uncommon. Prior to the Xbox console's launch, formerly prominent video game console manufacturers Atari and Sega exited the industry. Lee Written Direct at ¶ 121; PX9347 at 001; PX9346 at 008.

681. Microsoft represented that "following the launch of the first Xbox console in 2001, Microsoft has been one of the three main global console providers," which are Microsoft, Sony, and Nintendo. Lee Written Direct at ¶121; PX0006 at 012.

682. Recent entrants, such as the Valve Steam Deck, have sold significantly fewer consoles than Microsoft, Sony, and Nintendo. PX5000 (Lee Report) at 093. In 2022 ████████ Steam Deck consoles were sold in the United States, with ████████████████ in revenue. PX5000 (Lee Report) at 093 (citing RX3113). Meanwhile ██████████ Xbox Series X|S consoles and ████████████ PlayStation 5 consoles were sold in the

1   United States in 2022, amounting to ███████████ and ████████ in revenue,

2   respectively. PX5000 (Lee Report) at 093 (citing RX3114); PX3311 (Valve).

683.   Entry is expensive. Microsoft has represented that "[g]aming consoles are generally

costly to develop. … [T]he cost to develop and produce a gaming console continues to

increase. Because consoles can be costly to develop, economies of scale are relevant to

the extent that average costs will decrease as more units are manufactured and sold."

PX0003 at 070. Microsoft also details various regulations that consoles must comply with

to be sold in the United States. PX0003 at 071.

684.   To be successful, consoles must offer an attractive catalog of content to attract consumers

and generate sales. Lee Written Direct at ¶ 123; PX1065 at 015, 017. Due to porting and

development costs, publishers are more likely to support consoles with an established

user base and larger installed base. PX5000 (Lee Report) at 049, ¶ 89 fig.5.

685.   Dr. Lee found testified that "valuable content is scarce and there are limited and likely

insufficient alternative options for entrant console manufacturers to replace the impact

and attractiveness of Activision content in their gaming catalogs if they are foreclosed."

Lee Written Direct ¶ 123.

686.   It is unlikely that entrant console manufacturers will be able to replace Activision content

in their prospective video game catalogs if they are foreclosed. The "Big 4" publishers

have accounted for the majority of game sales on Xbox and PlayStation consoles in

almost every year since 2013. PX5000 (Lee Report) at 049 fig.5.

687.   Few publishers have the resources to consistently produce "AAA" titles. PX4671

(Microsoft) at 001; PX4673 (Microsoft) at 002; PX8001 (Ryan (Sony) Decl.) ¶ 31 .

688.   Phil Eisler, Vice President and General Manager of Nvidia GeForce Now, declared that

"[t]oday's AAA video games … require tens of millions of dollars (in some cases over

$100 million) and years to produce." PX8000 (Eisler (Nvidia) Decl.) ¶ 31.

689.   ███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

1 ████████████████████████████████ PX1063 (Microsoft) at 003.

2 Development costs of *Call of Duty* are particularly high. For example, Activision spent

3 ███████████ in development costs for *Call of Duty Cold War* during 2019–2021 and

4 ███████████ for *Call of Duty Modern Warfare* (2019 release). PX4271 (Microsoft) at tab

5 "Sheet1." ████████████████████████████████████

6 ██████████████ PX1979 (Microsoft) at 003.

        **b)  Entry or Expansion into the Broader Content and Cloud Services**

            **Market, and the Content Library Services Market and Cloud Gaming**

            **Services Market—is Unlikely to be Timely, Likely, or Sufficient to**

            **Reverse the Likely Harm of the Proposed Transaction**

690. Dr. Lee testified that the evidence indicates that entry or expansion into the Gaming

Services Market is unlikely to be timely, likely or sufficient to reverse the likely harm of

the Proposed Transaction.  Lee Written Direct ¶ 203.

691. Dr. Lee found that the data indicate that most other gaming services available today

significantly lag the scale of Xbox Game Pass. Lee Written Direct ¶ 204 (citing PX5000

(Expert Report) at 237.

692. Entry and success in content library and cloud gaming services is challenging. Other

subscription services available today significantly lag the scale of Xbox Game Pass.

PX5000 (Lee Report) at 141. The recent discontinuation of Google Stadia provides

additional evidence that entry into cloud streaming services is challenging, even for well-

financed companies like Google and Amazon. PX7035 (Kotick (Activision) Dep.) at

154:18-155:5; PX8003 (Zimring (Google) Decl.) ¶ 2; PX3206 (Amazon) at 001 ████

███████████████████████████████████████████

████████████████████████████

693. Cloud gaming services, in particular, require substantial infrastructure. As of October

2022, Xbox Cloud Gaming had deployed approximately █████████████████ Lee

Written Direct ¶ 205; PX4154 at 005.

694.  Microsoft has discussed spending as much as ███████ on Xbox Cloud Gaming servers through FY2028. PX1039 (Microsoft) at 002.

695.  Nvidia's Vice President and General Manager of GeForce Now, Phil Eisler, testified that Nvidia has ████████████████████████████████████████████████ ██████████████████████████ PX7060 (Eisler (Nvidia) Dep.) at 48:14-18.

696.  There are significant economies of scale in subscription services. In particular, the cost of securing content declines with scale, which gives established incumbents a significant advantage over potential entrants or less established competitors. Lee Written Direct ¶ 206; PX0003 at 139–140. Moreover, the cost of content for entrants increases as incumbents lock in limited available content. PX1979 at 003.

697.  Subscriber scale is also an important determinant of the cost and profitability of investing in new content in that it allows the service to spread investments in content over a larger subscriber base. ████████████████████████████ ████████████████████████ PX1065 (Microsoft) at 014.

698.  ████████████████████████████████████████████ ████████████████████████████████████ PX1065 (Microsoft) at 014.

699.  ████████████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████ PX1065 (Microsoft) at 014.

700.  As noted above for the Consoles Markets, it is unlikely that entrants into the subscription services market will be able to replace Activision content in their prospective video game catalogs if they are foreclosed.

701.  Dr. Lee concluded that "[i]t is unlikely that entrant gaming services will be able to replace Activision content in their prospective video game catalogs if they are foreclosed".  Lee Written Direct ¶ 207.

**2. Defendants Cannot Show Efficiencies or Procompetitive Benefits that Negate Competitive Harm**

702.    Microsoft claims four principal efficiencies or pro-competitive benefits that will result from the Proposed Transaction: (1) making *Call of Duty* titles available on Nintendo; (2) "plans to make Activision content available in Game Pass"; (3) bringing Activision titles to its own cloud gaming service as well as competing services; and (4) "allow[ing] Microsoft to expand into mobile gaming." Microsoft's First Interrogatory Responses at 8–10. None of these claimed pro-competitive benefits constitutes a verifiable, merger-specific efficiency.

703.    Dr. Lee testified that it is not evident that Microsoft's "claimed efficiencies are merger-specific, but, even if they are merger-specific, the Merging Parties have not quantified these claimed efficiencies or provided evidence that these efficiencies are likely to eliminate or offset the likely harms arising from the Proposed Transaction in the Consoles Market." Lee Written Direct at ¶¶ 124, 209.

704.    Because the Nintendo Switch is not contained in the High-Performance Video Game Consoles market, the agreement would not address harm arising in that market. *See* Lee Written Direct ¶ 139.

705.    Microsoft's claim that it will bring "native and console versions of *Call of Duty* titles to Nintendo consoles" for the next 10 years is not a merger-specific efficiency. Lee Written Direct at ¶ 124; Microsoft's First Interrogatory Responses at 8.
        Nintendo's current-generation console, the Switch, lacks the technical capabilities to run *Call of Duty* today. PX2093 (Activision) at 005. ███████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████ PX8002 (Prata (Nintendo) Decl.) ¶ 17.

706.    Nintendo's Steve Singer testified that "Activision Blizzard King could decide to bring [*Call of Duty*] on their own … independent of the transaction" and that the ████ ████████████████████████████████████████████

1    ███████████████████████ PX7065 (Singer (Nintendo) Depo.) at 123:17-124:6, 204:4-

2    9.

3    707.  ████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████

5    ████████████████████████████████ Kotick (Activision) Hr'g Tr.

6    766:19-767:23. Mr. Kotick also testified that he regretted the decision not to offer *Call of*

7    *Duty* on the Switch. Kotick (Activision) Hr'g Tr. at 721:21-722:9; 768:8-19.

8    708.  An Activision Executive Briefing prepared for Mr. Kotick in expectation of a call with

9    the head of Nintendo, Furukawa-San, indicated ████████████████████████

10   ████████████████████████ PX2421 (Activision) at 009.

11   709.  Importantly, Mr. Kotick testified that a *Call of Duty* game for the Switch would be a

12   different game than the *Call of Duty* made for the Xbox or the PlayStation. Kotick

13   (Activision) Hr'g Tr. at 765:11-13.

14   710.  In a December 2022 from Head of Xbox Game Studios Matt Booty to Microsoft Gaming

15   CEO Phil Spencer and Microsoft Gaming CFO Tim Stuart and others, discussing the

16   possibility of Xbox Game Studios games on Nintendo Switch, noted that ██████████

17   ████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

19   ██████████ PX4354 (Microsoft) at 001.

20   711.  Similarly, Microsoft's claim that it "plans to make Activision content available in Game

21   Pass," Microsoft's First Interrogatory Responses at 9, is neither verified nor merger-

22   specific. ████████████████████████████████████████████

23   ████████████████████████████████████ PX4894 (Microsoft) at 001-

24   002.████████████████████████████████████████████████

25   ████████████████████████████████████████████

26   ████████████████████████████████████████████

27   ████████████████████████████████████████████

28   PX4894 (Microsoft) at 002. The following day,████████████████████████

1

2                                                                    PX4894 (Microsoft) at 001.

3   712.   Dr. Lee concluded that "there are several reasons why Activision content would likely be

4          available on Xbox Game Pass in the but-for world absent the Proposed Transaction.

5          Hence, it is not evident that plans to bring Activision content to Xbox Game Pass are

6          merger-specific." Lee Written Direct ¶ 210.

7   713.   Dr. Lee also found that "even if Activision support of Xbox Game Pass was merger

8          specific it would not eliminate or offset the likely harms arising in the evolving and

9          developing Gaming Services Markets, and neither the Merging Parties nor their economic

10         experts have quantified these claimed efficiencies." Lee Written Direct ¶ 211.

11  714.   Even assuming that Microsoft does put Activision titles into Game Pass, the claimed pro-

12         competitive benefit is not merger-specific because Microsoft and Activision could

13         achieve the same result through contract. Although Microsoft claims that Activision

14         content "will remain" unavailable on subscription services "absent the acquisition,"

15         Microsoft's First Interrogatory Responses at 9, the evidence shows that an independent

16         Activision would likely agree to make its content available on subscription services,

17         including as day-and-date releases, if it received adequate commercial terms.

18  715.   Activision's CEO Bobby Kotick testified that he has a "philosophical aversion" to

19         subscription services. PX7035 (Kotick (Activision) Depo.) at 130:23-131-9.  Mr.

20         Kotick's aversion, he testified, is not based on any specific metrics and it is not

21         necessarily based on cannibalization. Kotick (Activision) Hr'g Tr. at 733:23-11. Many

22         people at Activision disagree with Mr. Kotick's aversion to subscription services. Kotick

23         (Activision) Hr'g Tr. at 5-7.

24  716.   Rather, Mr. Kotick testified that his aversion is based on his view about the best way to

25         create financial opportunity for his games, and that subscription can play a role in those

26         financial opportunities. Kotick (Activision) Hr'g Tr. 745:5-13.

27  717.   Activision has made no decision against offering its games on subscription services, and

28         specifically, Activision has made no decision against offering its games on Game Pass,

PlayStation Plus, or GeForce Now. Kotick (Activision) Hr'g Tr. at 746 at 17-21; 751:13-19; 753:19-25.

718.  Mr. Kotick testified to the many strategic reasons for why Activision would consider putting its games on subscription, including, for example, a "greater commercial context," "learning about a new device," "learning about a new market opportunity," bundling software with hardware," "sponsorships" Kotick (Activision) Hr'g Tr. 749:18-750:25.

719.  Indeed, Activision has previously offered its games on PlayStation Plus. Kotick (Activision) Hr'g Tr. at 748:9-16.

720.  Activision has also offered its content on Nvidia's GeForce Now. Kotick (Activision) Hr'g Tr. at 754:1-5. Activision pulled its games from the GeForce Now service because Activision required a commercial arrangement to continue its participation. Kotick (Activision) Hr'g Tr. at 754:6-755:17. Activision internally identified the "principles of a potential commercial arrangement to put Activision's content back on GeForce Now." Kotick (Activision) Hr'g Tr. at 755:18-25; PX2133 at -001. Mr. Kotick testified that these terms were reasonable. Kotick (Activision) Hr'g Tr. at 756:14-757:8.

721.  Activision was not dissatisfied with the quality of Activision's games while being stream on GeForce Now.  Kotick (Activision) Hr'g Tr. at 757:9-758:1.

722.  When past its latest agreement with Microsoft, Activision considered putting its games on Game Pass. Kotick (Activision) Hr'g Tr. at 751:1-4.

723.  Mr. Kotick testified that the "principal reasons" that Activision does not offer its games on Microsoft's Game Pass have been commercial, and that if Microsoft offered Activision attractive commercial terms, it is possible that Activision would put it games on Game Pass. Kotick (Activision) Hr'g Tr. 751:22-25; 12-19.

724.  Activision's CEO has a duty to maximize shareholder value, Kotick (Activision) Hr'g Tr. at 735 at 14-16, and he would therefore evaluate the commercial terms for a subscription opportunity. Kotick (Activision) Hr'g Tr. at 749:14-17.

725. Mr. Kotick further testified that Activision's goal as an independent company is to expand its audience to reach as many players as possible. PX7035 (Kotick (Activision) Depo.) at 74:3-9.

726. Indeed, Activision executive Chris Schnakenberg testified that ████████████ ████████████████████████████ ████████████████████ PX7008 (Schnakenberg (Activision) IH) at 174:21-175:15. ████████████████████████ ████████████████████████████ ███████ PX2115 (Activision) at 009.

727. Activision's actions are consistent with predicted economic incentives for independent third-party publishers, who generally stand to realize greater rewards from supporting multiple content library and cloud gaming services than do console manufacturers offering their own subscription services. PX5000 (Lee Report) at 163–65.

728. For the same reason, the agreements that Microsoft reached during the pendency of regulatory review of the Proposed Transaction to bring Activision content to cloud gaming services, discussed further *infra* in § IV.F, are not merger-specific efficiencies. Testimony and documentary evidence from Nvidia further confirm that Microsoft's claimed benefit of bringing Activision titles to cloud services is not merger-specific.

729. Microsoft's highly speculative plan to expand into mobile gaming is not a verifiable efficiency. Microsoft claims that, with control of Activision's mobile gaming user base, it "intends to scale the Xbox Store to create a new mobile game distribution platform" to rival incumbent app stores from Apple and Google. First Interrogatory Responses at 10.

730. Microsoft has not provided details by which to verify claimed efficiencies in mobile gaming. David Hampton, the Microsoft executive who prepared strategic documents related to the Proposed Acquisition, ████████████████████████████ ████████████████████████████████ PX7027 (Hampton (Microsoft) Corp. Dep.) at 8:18-10:2. ████████████████████████

1     ███████████████████████████████████████████████

2     ██████████████████ PX7026 (Hampton (Microsoft) Corp. Dep.) at 173:22-175:8.

731.    Microsoft Gaming CEO Phil Spencer admitted that Activision did not build *Call of Duty Mobile*, instead relying on an external developer. Spencer (Microsoft) Hr'g Tr. 453:3-13.

732.    Activision's CEO testified that the reason that the company had to rely on another company to develop the mobile game for their key console game franchise, *Call of Duty*, was because Activision was not equipped to make that mobile game. Kotick (Activision) Hr'g Tr. at 761:19-762:7.

733.    Activision's CEO Bobby Kotick also testified that Activision did not build *Diablo Immortal*, the Diablo franchise's mobile game. Kotick (Activision) Hr'g Tr. at 762:8-18. A different company, Netease, made that mobile game for Activision. Kotick (Activision) Hr'g Tr. at 762:8-18.

734.    Mr. Kotick also testified that the mobile division of Activision, King, is not focused on making any new IP, and that its focus instead is to make content updates to its existing franchises. Kotick (Activision) Hr'g Tr. at 759:5-13. ███████████████████

    ███████████████████████████████████████████

    ██████████████ PX2282 (Activision) at 001. ███████████████████

    ███████████████████████████████████████████

    ██████ PX2282 (Activision) at 001.

735.    Outside of King, Activision does not have a well-developed capability to make mobile games, and this was true at the time that Microsoft agreed to buy Activision. Kotick (Activision) Hr'g Tr. at 758:19-759:6.

736.    Microsoft's proposal to create a mobile store is not a merger-specific efficiency. As Phil Spencer testified, Microsoft's ability to launch a mobile storefront requires approval from Google and Apple, which will not change post-Acquisition. Spencer (Microsoft) Hr'g Tr. 410:13-15, 412:8-12. Indeed, Activision's most popular mobile properties are already available in Apple's app store. Spencer (Microsoft) Hr'g Tr. 411:15-24. Microsoft's deal model valued the supposed efficiencies from the Microsoft mobile store at just ██████

1    ████████████████████ Spencer (Microsoft) Hr'g Tr. 451:1-11; RX1156

2    (Microsoft) at 013; Lawver (Microsoft) Hr'g Tr. 233:2-234:15; Stuart (Microsoft) Hr'g

3    Tr. 1001:2-1002:1; PX4341 at -025.

4    737.   Microsoft Gaming CFO Tim Stuart testified that the mobile store synergy in the

5           Activision deal model assumes that Microsoft is able to break the Apple and Google

6           mobile app store duopoly. Stuart (Microsoft) Hr'g Tr. 1005:16-1006:03. Mr. Stuart

7           testified that there is no guarantee that Microsoft will be able to break the Apple and

8           Google mobile app store duopoly. Stuart (Microsoft) Hr'g Tr. 1006:4-6.

9    738.   Further, even if these were mobile efficiencies, mobile is out of the relevant market.

10   739.   The agreements Microsoft wrote were "in response to the allegations by the FTC and

11          other regulators that [Microsoft] might not actually do what [they] said they were going

12          to do." Bond (Microsoft) Hr'g Tr. 179:11-16.

13   740.   Satya Nadella and Phil Spencer, and to a lesser extent Sarah Bond, are the final decision

14          makers for these agreements. Bond (Microsoft) Hr'g Tr. 185:6-20.

15   741.   These agreements were unusual for Microsoft. Bond (Microsoft) Hr'g Tr. 198:7-9.

16   742.   Dr. Bailey did not verify any of the efficiencies that Microsoft claims. Bailey

17          (Defendants' Expert) Hr'g Tr. 820:5-11.

18       F.    **F. Microsoft's Recently Executed or Proposed Agreements Fail to Replace**

19             **the Competitive Intensity Likely to Be Lost from the Proposed Acquisition.**

20   743.   The side agreements that Microsoft has offered to third parties during the pendency of

21          regulatory review of the Proposed Transaction would not replace competition lost

22          because of the merger. The impact of these agreements is unclear, as even Mr. Stuart,

23          CFO of Microsoft Gaming, was unaware of any analysis of the profit and loss impact of

24          entering agreements to put *Call of Duty* on Nintendo, or entering other agreements with

25          Nvidia, Ubitus, Boosteroid, Nware, and EE. Stuart (Microsoft) Hr'g Tr.  1046:7-1047:2;

26          934:1-15. Microsoft Gaming CEO Phil Spencer admitted that Microsoft's offer to Sony

27          was offered "as part of us getting passed into this regulatory review." Spencer

28          (Microsoft) Hr'g Tr. 446:12-19. Even Mr. Spencer conceded the inadequacy of these

proposals when he testified that "the best thing" to judge his promise not to foreclose competitors is "the actions that we've taken as a publisher." Spencer (Microsoft) Hr'g Tr. 359:24-360:13.

744.   Moreover, even if Microsoft complies with the terms of the contracts it has entered with streaming services Ubitus, Boosteroid, Nware, and EE, Microsoft has provided no evidence of any benefits of those agreements to gamers in the United States, and ultimately did not present testimony from the executive who negotiated these agreements. *See* Bond (Microsoft) Hr'g Tr. 182:10-18. Ms. Bond's inability to identify where Ubitus is located, *see* Bond (Microsoft) Hr'g Tr. 182:6-7, and Mr. Zimring's unawareness of Nware's and EE's cloud gaming services, *see* Zimring (Google) Hr'g Tr. 487:12-15, are consistent with minimal U.S. significance.

745.   While Dr. Carlton opined that "Microsoft has also signed deals with cloud gaming services providers Ubitus, Boosteroid, and Nware to give them access to Activision content post transaction… [which] brings a clear benefit to consumers." PX5004 at 037, his analysis did not consider the locations of Ubitus, Boosteroid, and Nware (Taiwan, Ukraine, and Spain, respectively), the location of those companies' cloud gaming servers, or the size and scope of those companies' cloud gaming services. Carlton (Expert) Hr'g Tr. 893:16-:6-896:19. Dr. Carlton's analysis of the benefits of these three agreements was based on the simple existence of the contracts. Carlton (Expert) Hr'g Tr. 897:11 ("[T]hey exist, yes.").

746.   Similarly, Dr. Carlton opined that Microsoft's deal with Nvidia "would allow Nvidia to stream COD and other Activision games to any Nvidia subscriber that has purchased a stand-alone version of the game for PC," PX5004 at -036 to -037, but could not recall (and provided no evidence of) ever reading the full terms of the Nvidia agreement. Carlton (Microsoft) Hr'g Tr. 886:5-890:9.

747.   The terms in the agreement between Microsoft and Nvidia include an "Unanticipated and Unforeseeable Future Events" clause which, as Ms. Bond (Microsoft's signatory to the agreement) testified, means that if either Microsoft or Nvidia does not realize more

success as a result of their ten-year agreement, they can renegotiate at any time. Bond (Microsoft) Hr'g Tr. 202:6-22; PX3381 (Eisler (Nvidia) Hr'g Testimony) at 127:1-17, 127:25-128:8. ██████████████████████████████████ ████████████████████████████████ PX3381 (Eisler (Nvidia) Hr'g Testimony) at 128:19-129:3.

748.   Dr. Carlton's opinion on whether these contracts completely solve competitive concerns or guarantee an absence of competitive harms has been stricken, Hr'g Tr. 1115:19 - 1116:2, which undermines the credibility of his analysis on other parts of the contracts as well.

749.   Dr. Lee testified that the agreements Microsoft signed with "Nvidia, Ubitus and Boosteroid, to support their services with Activision content if the Proposed Transaction consummated do not make it evident that these agreements would eliminate or offset harm in the Gaming Services Markets arising from the likely foreclosure of Microsoft's rivals from Activision content as a result of the Proposed Transaction." Lee Written Direct ¶ 213.

750.   Dr. Lee's reasoning was that "an independent Activision would have a greater economic incentive to support Microsoft's rivals than the Merged Entity. Hence, if brining Activision content to these gaming services were in the Merged Entities economic interests, then it would likely be in an independent Activision's interests to do so as well." Lee Written Direct at ¶ 214.

751.   Dr. Lee testified that the benefits arising from these agreements would not likely be merger specific. Lee Written Direct at ¶ 214.

752.   Dr. Lee also reasoned that these agreements only pertain to cloud gaming services and do not address likely harm in the Content Library market." Lee Written Direct ¶ 215

753.   Dr. Lee also found that these agreements do not address foreclosure of rivals offering content library services alongside cloud gaming services, *i.e.*, PlayStation Plus Premium and Amazon's Luna+.  Lee Written Direct ¶ 216.

754.   Dr. Bailey did not assess how foreclosure of Activision content would affect competition. Bailey (Defendants' Expert) Hr'g Tr. 820:12-23.

**Agreement with Nintendo**

755.   On December 7, 2022, the day before the Commission voted to challenge the Proposed Transaction in this Court, Microsoft signed a letter of intent purporting to bring certain to-be-developed *Call of Duty* games to Nintendo. PX4578 (Microsoft) at 001; RX1212.

756.   ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████ PX7065 (Singer (Nintendo) Dep.) at 119:15-122:6.

757.   ███████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████ PX7057 (Wright (Microsoft) Corp. Dep.) at 7:8-8:22.

758.   ████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████████ ███████ PX4578 (Microsoft) at 005 (Nintendo Side Letter); RX1212 at 005.

759.   ███████████████████████████████████████████████████ ██████████████████████████████████████████████ PX7065 (Singer (Nintendo) Dep.) at 126:9-17, 177:22-178:8.

760.   In the letter agreement between Microsoft and Nintendo, Microsoft testified that the term ████████████████████████████████████████████████ PX7057 (Wright (Microsoft) Corp. Dep.) at 20:15-21:2.

761.   ███████████████████████████████████████████████████ ███████████████ PX7057 (Wright (Microsoft) Corp Dep.) 21:15-22:9 ██████ ███████████████████████████████████ PX2093 at 005 ███████████████████████████████████████████████████ ████████████████████████████████████████████████

1  ████████████████████████████████████████████████████████

2  ███████████████████████████

3  762.    Microsoft Gaming CFO Tim Stuart testified that he was not aware of any analysis of the

4          profit and loss impact to Microsoft from having executed an agreement with Nintendo for

5          *Call of Duty.* Stuart (Microsoft) Hr'g Tr. 933:18-24. Mr. Stuart testified that Microsoft

6          did not run a financial model on *Call of Duty* going to Nintendo. Stuart (Microsoft) Hr'g

7          Tr. 1046:7-1047:2.

8  763.    Microsoft Gaming CEO Phil Spencer testified that if *Call of Duty* is ported to the Switch,

9          it will not look the same as *Call of Duty* on Xbox. Spencer (Microsoft) Hr'g Tr. 335:13-

10         336:3; PX7028 (Spencer (Microsoft) Dep.) 191:16-192:4.

11 764.    ████████████████████████████████████████████████████

12         █████████████████████████████████████████████████

13         ██████████████████████████████████████████████████

14         ███████████████████████████████  PX7065 (Singer (Nintendo) Dep.) at

15         101:23-102:23; 183:5-11, 184:11-186:14.

16 765.    ████████████████████████████████████████████████████

17         ██████████████████████████  PX7057 (Wright (Microsoft) Corp. Dep.) at

18         28:25-29:20.

19 766.    ████████████████████████████████████████████████████

20         ██████████████  PX7028 (Spencer (Microsoft) Dep.) at 178–82. At the evidentiary

21         hearing, Mr. Spencer testified that he was not aware of the economic effect of the

22         agreement or the effect on Microsoft's profit and loss. Spencer (Microsoft) Hr'g Tr.

23         336:16-25. Mr. Spencer further testified that he was not aware of any work done by

24         Microsoft to determine the effect of the agreement on Microsoft' deal model. Spencer

25         (Microsoft) Hr'g Tr. 337:15-338:5.

26 767.    ████████████████████████████████████████████████████

27         ███████████████████████████████████████  PX7048 (Booty (Microsoft)

28         Dep.) at 174:9-174:25.

1    768.   ████████████████████████████████████████████████

2    ████████████████████████████████████████████████████

3    ████████████████████ PX7040 (Stuart (Microsoft) Dep.) at 379:10-383:8; 385:23-387:11;

4    387:12-388:16; 377:13-379:9.

5    769.   ████████████████████████████████████████████

6    █████████ PX0070 at 004.

7    **Agreement with Nvidia and Foreign Cloud Gaming Companies**

8    770.   ████████████████████████████████████████

9    ████████████████████████████████ Microsoft signed an agreement

10   purporting to bring Activision games to Nvidia. RX1211; PX1784.

11   771.   ██████████████████████████████████████████

12   █████████████████████████████████████████████████ PX7060

13   (Eisler (Nvidia) Dep.) at 104:9-15.

14   772.   ██████████████████████████████████████████████

15   ████████████████████████ PX7055 (Wright (Microsoft) Dep.) at 102:22-

16   103:25.

17   773.   ███████████████████████████████████████████

18   █████████████████████████████████████████████ PX7055

19   (Wright (Microsoft) Dep.) at 126:5-23.

20   774.   Microsoft could have offered its first-party content at any time to Nvidia, outside of this

21   transaction. Bond (Microsoft) Hr'g Tr. 201:20-23.

22   775.   If either Nvidia or Microsoft does not realize more success because of the agreement,

23   either can renegotiate. Bond (Microsoft) Hr'g Tr. 202:15-22.

24   776.   ███████████████████████████████████████████

25   ████████████████████████████████████████████████████

26   █████████ PX7055 (Wright (Microsoft) Dep.) at 97:10-98:10.

27

28

777. ███████████████████████████████████████

███████████████████████████████████████ PX7048

(Booty (Microsoft) Dep.) at 172:11-173:3.

778. ███████████████████████████████████████

PX0070 at 004.

779. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████ PX7057 (Wright (Microsoft) Corp

Dep.) at 109:1-110:18, 111:5-112:9.

780. Under the agreement with Microsoft, ██████████████████

████████████████████████████████████

██████████ PX7057 (Wright (Microsoft) Dep.) at 114:10-115:4, 116:9-20.

781. ███████████████████████████████████

████████████████████████ PX7057 (Wright (Microsoft) Corp.

Dep.) at 49:2-52:25.

782. Microsoft did not perform any financial analysis of the Nvidia, Boosteroid, or Ubitus Agreements. Stuart (Microsoft) Hr'g Tr. 934:1-15; PX7055 (Wright (Microsoft) Dep.) at 94:4-95:5, 133:10-134:16, 135:10-19, 160:12-21, 161:8-22; 177:7-16.

783. ███████████████████████████████████████

███████████████████████ PX7055 (Wright (Microsoft) Dep.) at 198:16-22, 200:3-8; PX7057 (Wright (Microsoft) Corp Dep.) at 45:25-46:4; Bond (Microsoft) Hr'g Tr. 207:2-14.

784. ███████████████████████████████████████

███████████████████████████████████

███████████████████████ PX7057 (Wright (Microsoft) Corp. Dep.) at 27:6-28:7, 42:10-43:21.

785. ████████████████████████████████████████████████

████████████████████████████████████████ PX7057 (Wright (Microsoft) Corp

Dep.) at 38:6-22.

786. ████████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████ PX7055 (Wright (Microsoft) Dep.) at

145:18-148:12; 153:1-14.

**Discussions with Sony**

787. No agreement has been reached with Sony. PX1771 (Microsoft) at 001. In their

Opposition Memorandum, Defendants referenced an email SIE CEO Jim Ryan sent on

the day the deal was announced, in an attempt to cast doubt over Mr. Ryan's assessment

of the competitive impact of the proposed transaction. Opp'n Memo, at 3. However, Mr.

Ryan explained in his testimony that concern about the transaction increased over time

based on continued communications with Microsoft. PX7053 (Ryan (Sony) Dep. Vol. 1)

at 77:18-78:8, 78:21-79:4.

788. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████ PX3378 at 017-019 (Ryan (Sony) Hr'g Testimony at 61:2-11, 63:25-

64:05, 64:10-15).

789. ████████████████████████████████████████████

████████████████████████████ PX3378 at 019 (Ryan (Sony) Hr'g Testimony

at 65:16-19). ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ PX3378 at 019-020 (Ryan (Sony) Hr'g

Testimony at 66:17-67:6. ████████████████████████

1   ███████████████████████████████████████████████████

2   ████████████████████ PX3378 at 020 (Ryan (Sony) Hr'g Testimony at 67:7-13).

3   790.  ████████████████████████████████████████████

4   █████████████████████████████████████████████████

5   ██████████████████████████████████████████████████

6   ████████████████████████████ PX7053 (Ryan (Sony) Dep. Vol. 1) at 59:9-12,

7   70:13-23. ████████████████████████████████████

8   ██████████████████████████████████ PX7053 (Ryan (Sony) Dep. Vol. 1)

9   at 62:20-63:8.

10  791.  ████████████████████████████████████████████

11  █████████████████████ PX7053 (Ryan (Sony) Dep. Vol. 1) at 62:20-63:8.

12  792.  ██████████████████████████████████████████████████

13  ██████████████████████████████████ PX7053 (Ryan

14  (Sony) Dep. Vol. 1) at 63:16-24.

15  793.  ████████████████████████████████████████████

16  ██████████████████████████████████████████████████

17  ██████████████████████████████████████████████████

18  ██████████████████████████████ PX7053 (Ryan (Sony) Dep.) at 69:19-

19  70:2 (discussing PX3110 at 037 (Microsoft Proposal to Sony, Dec. 23, 2022)).

20  794.  Microsoft Gaming CEO Phil Spencer admitted in testimony that Microsoft's proposal to

21  Sony was made "as part of us getting passed into this regulatory review." Spencer

22  (Microsoft) Hr'g Tr. 446:12-19.

23  795.  ████████████████████████████████████████ PX7053

24  (Ryan (Sony) Dep. Vol. 1) at 59:9-12, 70:13-23.

25  796.  Microsoft Gaming CFO Tim Stuart testified that he was not aware of any analysis of the

26  financial implications to Microsoft Gaming of any of Microsoft's proposals to Sony.

27  Stuart (Microsoft) Hr'g Tr. 934:16-20.

28  **Merger Specificity**

797.    Microsoft's proposed agreements with third parties also lack the requisite merger specificity to make them relevant in the analysis of the anticompetitive effects of Microsoft's acquisition of Activision.

798.    The agreement entered into between Nvidia and Microsoft for gaming content is not dependent on the Activision deal closing. RX1211 at -002 ████████████████ ████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████████ ██████████████████ RX1211 at -002. Microsoft could have entered into an agreement with Nvidia for Microsoft's games at any time, and therefore the agreement is not specific to Activision deal. Bond (Microsoft) Hr'g Tr. 201:20-23.

799.    Furthermore, ████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ *See* PX8000 (Eisler (Nvidia) Decl.) ¶ 41. ████████████████ ████████████████████████████████ *See* PX3104 (Nvidia) at 018–20 ██████████████████████████ ████████████████████████████████ ████████████████████████████████ PX8000 (Eisler (Nvidia) Decl.) ¶ 43 ██████████ ████████████████████ PX8000 (Eisler (Nvidia) Decl.) ¶¶ 44; *see also* PX3104 at 19–20. ████████████████████████ ████████████████████████████████████ ████████████████████████ PX8000 (Eisler (Nvidia) Decl.) ¶¶ 45–46.

800.    Activision was in favor of putting its content on subscription services for the right price. Activision CEO Bobby Kotick testified that Activision would "evaluate an opportunity to

1    offer its content on a subscription service." Kotick (Activision) Hr'g Tr. 746:22-25.

2    Activision had in fact identified "principles of a potential commercial arrangement to put

3    Activision content back on GeForce Now." Kotick (Activision) Hr'g Tr. 755:18-22.

4    801.    Similarly for the Nintendo agreement, Microsoft's agreement with Nintendo regarding

5    Call of Duty is not specific to this merger because, as Activision CEO Bobby Kotick

6    testified, Activision wanted to make Call of Duty games for the new Nintendo console.

7    Kotick (Activision) Hr'g Tr. 767:10-23.

1    **V.    PROPOSED CONCLUSIONS OF LAW**

2    1.    Section 7 of the Clayton Act prohibits mergers when "the effect of such acquisition may

3          be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

4    2.    Section 5 of the FTC Act proscribes "[u]nfair methods of competition in or affecting

5          commerce, are hereby declared unlawful." 15 U.S.C. § 45(a)(1).

6    3.    An acquisition that violates Section 7 of the Clayton Act, by definition, is a violation of

7          Section 5 of the FTC Act. *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454

8          (1986).

9    4.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Federal Trade

10         Commission, whenever it has reason to believe that a proposed merger is unlawful, to seek

11         preliminary injunctive relief to prevent consummation of a merger until the Commission

12         has the opportunity to adjudicate the merger's legality in an administrative proceeding.

13   5.    Specifically, Section 13(b) "allows a district court to grant the Commission a preliminary

14         injunction '[u]pon a proper showing that, weighing the equities and considering the

15         Commission's likelihood of ultimate success, such action would be in the public

16         interest.'" *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999) (quoting

17         15 U.S.C. § 53(b)).

18   6.    The purpose of a § 13(b) proceeding "is not 'to determine whether the antitrust laws have

19         been or are about to be violated. That adjudicatory function is vested in the FTC in the

20         first instance.'" *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 67 (D.D.C. 2009) (quoting

21         *FTC v. Whole Foods Mkt. Inc.*, 548 F.3d 1028, 1042 (D.C. Cir. 2008) (Tatel, J.,

22         concurring); *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984) ("Our

23         present task is not to make a final determination on whether the proposed merger violates

24         Section 7, but rather to make only a preliminary assessment of the merger's impact on

25         competition."); *FTC v. Meta Platforms Inc.*, No. 5:22-cv-04325-EJD, 2022 WL

26         16637996, at *5 (N.D. Cal. Nov. 2, 2022) ("[T]he scope of the Section 13 (b) inquiry is

27         necessarily limited and narrow.").

28

7.      Preliminary injunctions under § 13(b) "are meant to be readily available to preserve the status quo while the FTC develops its ultimate case." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 352 (3d Cir. 2016) ("The purpose of Section 13(b) is to preserve the status quo and allow the FTC to adjudicate the anticompetitive effects of the proposed merger in the first instance."); *FTC. v. Food Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976) ("The only purpose of a proceeding under § 13 is to preserve the status quo until FTC can perform its function."); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001) ("Section 13(b) itself embodies congressional recognition of the fact that divestiture is an inadequate and unsatisfactory remedy in a merger case, a point that has been emphasized by the United States Supreme Court.") (citation omitted).

8.      Likelihood of ultimate success is not determined by a "statistical calculation of the parties' odds" of winning on the merits. *FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2022 WL 16637996, at *5 (N.D. Cal. Nov. 2, 2022). Although a court is "charged with exercising their 'independent judgment' and evaluating the FTC's case and evidence on the merits," "[i]n summary, . . . Section 13(b)'s 'likelihood of ultimate success' inquiry . . . mean[s] the likelihood of the FTC's success on the merits in the underlying administrative proceedings, as opposed to success following a Commission hearing, the development of an administrative record, and appeal before an unspecified Court of Appeals." *FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2022 WL 16637996, at *5–6 (N.D. Cal. Nov. 2, 2022) (citing *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1090–91 (S.D.N.Y. 1977) ("[W]hile the statute requires us to consider the FTC's likelihood of ultimate success and to exercise our independent judgment in that regard, it appears that it does not require the FTC to prove, or us to find, probable success on the merits but something less.")).

9.      "[A]t this preliminary phase [the FTC] just has to raise substantial doubts about a transaction." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008); *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984) ("'serious, substantial,

difficult' questions"). As to market definition, for example, the FTC's burden is simply to "rais[e] some question of whether [a market] is [] well-defined." *FTC v. Whole Foods Mkt. Inc.*, 548 F.3d 1028,1037 (D.C. Cir. 2008). The FTC's burden is met by a "tenable showing," even if there is also "conflicting evidence on the relevant product market" or "market shares." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984).

10. Accordingly, to carry their responsive burden on likelihood of success, Defendants must dispel doubts about the legality of their transaction, such that the court would be "certain[]" and have "no doubt that [the] merger would not substantially lessen competition." *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008).

11. Even as to the ultimate merits, and all the more so "[a]t this [preliminary injunction stage under Section 13(b)], any 'doubts are to be resolved against the transaction.'" *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3rd Cir. 2016) (quoting *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) (Posner, J.)).

12. If there are adequate questions or doubts about the transaction's legality, § 13(b) temporary relief is warranted—even if ultimately "post-hearing, the FTC may accept the rebuttal arguments proffered by the [defendants]." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 725 (D.D.C. 2001).

13. The statute "places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984).

14. "Under this more lenient standard, 'a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities.'" *FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999) (quoting *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984)).

15. And "[w]hen the [FTC] demonstrates a likelihood of ultimate success, a counter showing of private equities alone would not suffice to justify denial of a preliminary injunction barring the merger." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984) (citing *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981)).

16.   In weighing the equities under § 13(b), "public equities receive far greater weight." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984). Public equities include "effective enforcement of the antitrust laws" and ensuring the Commission's ability to obtain adequate relief if it ultimately prevails on the merits. *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991). "[T]he preservation of competition is always in the public interest." *United States v. Tribune Publ'g Co.*, No. CV 16-01822-AB, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016).

17.   Defendants often complain about the "cost that delaying [their proposed] transaction would exact" on them, but courts "must afford such concerns little weight" to avoid undermining "section 13(b)'s purpose of protecting the 'public-at-large, rather than individual private competitors.'" *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991) (quoting *FTC v. Nat'l Tea Co.*, 603 F.2d 694, 697 n.4 (8th Cir. 1979)).

18.   Defendants' assertion "that a preliminary injunction would force them to abandon" their proposed transaction is a private equity at best, and "private equities alone do not outweigh the Commission's showing of likelihood of success." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984). "[A]lthough the court recognizes the time, resources, and effort that Defendants have put into planning this transaction, the Defendants' stated intention to abandon the transaction prior to the merits proceeding is a private equity and cannot on its own overcome the public equities that favor the FTC." *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 74 (D.D.C. 2018); *see also FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 882 n.8 (E.D. Mo. 2020).

19.   "[A] 'risk that the transaction will not occur at all,' by itself, is a private consideration that cannot alone defeat the preliminary injunction." *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1041 (D.C. Cir. 2008); *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1346 (4th Cir. 1976) (holding that such arguments are irrelevant to § 13(b) proceedings); *FTC v. Rhinechem Corp.*, 459 F. Supp. 785, 791 (N.D. Ill. 1978) ("That leaves the claimed injury [from the target's] announced intention of walking away from the acquisition. [But] the equities, and consequently the injuries, to be reckoned in section 13(b) cases are not

private ones, but public ones."); *FTC v. Rhinechem Corp.*, 459 F. Supp. 785, 791 (N.D. Ill. 1978) ("[T]his conclusion is particularly appropriate where . . . the alleged private injury is caused by the parties' own decision to, in effect, cancel the deal in the event that an injunction be issued.").

20.     Plaintiff FTC has shown that it is likely to succeed on the merits of its Section 7 challenge in the agency's administrative court, and the equities favor issuing a preliminary injunction.

### A.     The FTC Is Likely to Succeed on the Merits of Its Section 7 Challenge

21.     In the administrative merits proceeding, the FTC's burden will be to prove that the effect of the Acquisition "*may be* substantially to lessen competition, or to tend to create a monopoly" in violation of Section 7 of the Clayton Act. *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984) (emphasis in original) ("It is well established that a section 7 violation is proven upon a showing of reasonable probability of anticompetitive effect").

22.     At this preliminary stage, the Ninth Circuit has explained that the government can meet "its burden of demonstrating a likelihood of success by presenting evidence sufficient to raise serious, substantial, difficult questions regarding the anticompetitive effects of the proposed [transaction]." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984) (cleaned up); *see also FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008) ("[A]t this preliminary phase [the FTC] just has to raise substantial doubts about a transaction. One may have such doubts without knowing exactly what arguments will eventually prevail.").

23.     "Because the issue in this action for preliminary relief is a narrow one, [courts] do not resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984); *see also Calif. v. Am. Stores Co.*, 872 F.2d 837, 841 (9th Cir. 1989) ("At this stage, we do not resolve conflicts

1

in the evidence."), *rev'd on other grounds*, 495 U.S. 271 (1990); *FTC v. H.J. Heinz Co.*,

2

246 F.3d 708, 714 (D.C. Cir. 2001) (the FTC "is not required to *establish* that the proposed

3

merger would in fact violate Section 7" (emphasis in original)); *FTC v. CCC Holdings*

4

*Inc.*, 605 F. Supp. 2d 26, 67 (D.D.C. 2009) ("the district court's task is not to determine

5

whether the antitrust laws have been or are about to be violated. That adjudicatory function

6

is vested in the FTC in the first instance." (quoting *FTC v. Whole Foods Mkt.*, 548 F.3d

7

1028, 1042 (D.C. Cir. 2008) (Tatel, J., concurring))); *see also FTC v. Whole Foods Mkt.*,

8

548 F.3d 1028, 1048 (D.C. Cir. 2008) (Tatel, J., concurring) ("Although courts certainly

9

must evaluate the evidence in section 13(b) proceedings and may safely reject expert

10

testimony they find unsupported, they trench on the FTC's role when they choose between

11

plausible, well-supported expert studies.").

12

24.     Rather, this Court's task is only to "measure the probability that, after an administrative

13

hearing . . . the Commission will succeed in proving that the effect of the [proposed]

14

merger 'may be substantially to lessen competition, or to tend to create a monopoly' in

15

violation of section 7." *FTC v. H.J. Heinz,* 246 F.3d 708, 714 (D.C. Cir. 2001) (quoting

16

15 U.S.C. § 18).

17

25.     Clayton Act § 7 analysis "necessarily focuses on 'probabilities, not certainties.'" *St.*

18

*Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys. Ltd*, 778 F.3d 775, 783 (9th

19

Cir. 2015) (quoting *Brown Shoe v. United States*, 370 U.S. 294, 323 (1962)).

20

26.     This entails "'a prediction of [the merger's] impact upon competitive conditions in the

21

future; this is what is meant when it is said that the amended § 7 was intended to arrest

22

anticompetitive tendencies in their incipiency.'" *St. Alphonsus Med. Ctr.-Nampa Inc. v.*

23

*St. Luke's Health Sys. Ltd*, 778 F.3d 775, 783 (9th Cir. 2015) (quoting *United States v.*

24

*Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963)); *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs.*

25

*Corp.*, 449 F. Supp. 1158, 1172 (D. Haw. 1978) (observing that "the lower incipiency

26

threshold of Clayton 7" is easier to meet than the Sherman Act).

27

27.     "[S]urely one premise of an antimerger statute such as § 7 is that corporate growth by

28

internal expansion is socially preferable to growth by acquisition." *United States v. Phila.*

*Nat. Bank*, 374 U.S. 321, 370 (1963). "Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output." *Brown Shoe Co.*, 370 U.S. at 346 n.72.

28.   At the merits phase, which in this case is the administrative proceeding that begins on August 2, 2023, Courts and the Commission have traditionally analyzed Section 7 claims under a burden-shifting framework. *See St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015); *Otto Bock HealthCare N. Am., Inc.*, No. 9378, 2019 WL 5957363, at *11 (F.T.C. Nov. 1, 2019); *Polypore Int'l, Inc.*, No. D-9327, 2010 WL 9549988, at *9 (F.T.C. Nov. 5, 2010).

29.   The Supreme Court has explained that all mergers "must be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate, or other." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967).

30.   The same burden-shifting framework applies to both horizontal and vertical mergers. *See Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *19 (F.T.C. Mar. 31, 2023) (applying the burden-shifting framework to a vertical merger); *see United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019). Here, the Proposed Acquisition is a vertical transaction. "Economic arrangements between companies standing in a supplier-customer relationship are characterized as 'vertical.'" *Brown Shoe v. United States*, 370 U.S 294, 323 (1962).

31.   At the merits phase in a § 7 case, [t]he plaintiff must first establish a prima facie case that a merger is anticompetitive." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015); *United States v. Bazaarvoice, Inc.*[1], No. 13-CV-00133-WHO, 2014 WL 203966, at *64 (N.D. Cal. Jan. 8, 2014).

---

[1] "We note for the Court that this case, like the other Department of Justice federal-court merger challenge cases cited herein, was decided following a full merits trial.  Unlike the (Continued…)

32.    To establish a prima facie case at the merits trial, the Government's burden will be to show a "reasonable probability" that the Proposed Acquisition would substantially lessen competition. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *19 (F.T.C. Mar. 31, 2023); ("'reasonable likelihood' of a substantial lessening of competition" (quoting *Brown Shoe*, 370 U.S. 294, 362 (1962))).

33.    In general, "[a] reasonable probability is, of course, less than a certainty, or even a likelihood." *United States v. Koziol*, 993 F.3d 1160, 1186 (9th Cir. 2021) (quoting *United States v. Joseph*, 716 F.3d 1273, 1280 (9th Cir. 2013) (internal quotation marks omitted)), *cert. denied*, 142 S. Ct. 1372 (2022).

34.    The Government's burden of production at this step will be low. Even at the ultimate merits—and all the more so at the preliminary injunction stage under Section 13(b)—any "doubts are to be resolved against the transaction." *Otto Bock HealthCare N. Am., Inc.*, 2019 WL 2118886, at *2 (F.T.C. May 6, 2019) (Chappell, A.L.J.) (quoting *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) (internal quotation marks omitted)).

35.    If the Government is able to carry its initial burden, "[t]he burden [will] then shift[]to the defendant to rebut the prima facie case." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015).

36.    "[I]f the [defendant] successfully rebuts the *prima facie* case, the burden of production [will] shift[] back to the Government and merge[] with the ultimate burden of persuasion, which is incumbent with the Government at all times." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (quoting *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008)).

37.    Here, Plaintiff has more than met its burden of establishing a likelihood of success on the merits. Although either path can suffice, the Government has shown a likelihood of

---

FTC, the Department of Justice does not house an adjudicatory and remedial function akin to the one embedded in the FTC's statutory construction."

success on liability under both the ability-and-incentive and *Brown Shoe* frameworks. *See In the Matter of Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *33 (F.T.C. Mar. 31, 2023); *infra* Conclusions of Law § V.E.

38.  The Government has raised sufficiently serious, substantial, difficult questions to warrant temporary relief under § 13(b). *Infra* Conclusions of Law at § V.E. The Proposed Acquisition has a reasonable probability of substantially lessening competition through foreclosure in the markets for High-Performance Consoles, Multi-Game Content Library Subscription Services, and Cloud Gaming Subscription Services (the "Relevant Markets"). *Infra* Conclusions of Law at § V.E.1.

39.  The Proposed Acquisition also has a reasonable probability of harming innovation in the Relevant Markets. *Infra* Conclusions of Law § V.E.2. An emerging market like Cloud Gaming Subscription services is particularly susceptible to innovation harm. *Infra* Conclusions of Law § V.E.2.

40.  New entry or expansion is unlikely to be sufficient to offset the competitive harm of the Proposed Acquisition. *Infra* Conclusions of Law § V.F.

41.  Any proposed efficiencies or alleged procompetitive benefits are unlikely to offset the competitive harm in the Relevant Markets. *Infra* Conclusions of Law § V.G.

42.  Indeed, proposed remedies, such as the agreements with third parties offered by Microsoft, are of questionable relevance to a § 13(b) proceeding. *See FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345 (4th Cir. 1976) (holding FTC was "entitled to preserve the status quo pending adjudication" regardless of what "ultimate remedy" might eventually be deemed appropriate); *Infra* Conclusions of Law § V.H. And in any event, Microsoft's proposed remedies would fail to restore pre-merger competition.

43.  Again, "at this preliminary phase [the FTC] just has to raise substantial doubts" about whether a transaction poses a reasonable probability of lessening competition. *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008).

1
2

### B.   High-Performance Consoles, Multi-Game Content Library Subscription Services, and Cloud Gaming Subscription Services Are Relevant Markets

3
4
5
6

44.   The Supreme Court has recognized that Section 7 prohibits acquisitions that may "substantially lessen competition within the area of effective competition." *Brown Shoe v. United States*, 370 U.S. 195, 324 (1962) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957) (internal quotations omitted).

7
8
9
10
11
12

45.   Acquisitions that pose a reasonable probability of harm in *any* relevant market violate § 7. *Crown Zellerbach Corp. v. FTC*, 296 F.2d 800, 812 (9th Cir. 1961) ("In the statutory phrase 'in any line of commerce', the word entitled to emphasis is 'any'."); *United States v. Bertelsmann SE & Co. KGaA*, No. CV 21-2886-FYP, 2022 WL 16949715, at *14 (D.D.C. Nov. 15, 2022) ("The Court is unswayed by the defendants' tactic of enumerating other markets or submarkets in which competition would not be harmed by the merger.").

13
14
15
16
17
18
19

46.   To determine the "area of effective competition," courts "reference . . . a product market (the 'line of commerce') and a geographic market (the 'section of the country')." *Brown Shoe v. United States*, 370 U.S. 194, 324 (1962). "Often, the first steps in analyzing a merger's competitive effects are to define the geographic and product markets affected by it." *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565 (6th Cir. 2014). Whether the transaction at issue is horizontal or vertical, courts use the same set of analytic tools to define the affected market. *See Brown Shoe v. United States*, 370 U.S. 194, 324–28 (1962).

20
21
22
23
24
25

47.   It is well-settled that "the boundaries of the relevant market must be drawn with sufficient breadth to . . . recognize competition where, in fact, competition exists." *Brown Shoe v. United States*, 370 U.S. 294, 326 (1962); *see also United States v. Kimberly-Clark Corp.*, 264 F. Supp. 439, 452–53 (N.D. Cal. 1967) (citing *Brown Shoe C*o*.,* 370 U.S. 294, 325) ("[W]ithin a market, 'well-defined submarkets may exist, which, in themselves, constitute product markets for antitrust purposes.'").

26
27
28

48.   The existence of arguable functional substitutes does not affect the existence of relevant markets or submarkets for premium or specialized versions of products. *E.g.*, *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 252 (1959) ("[C]hampionship boxing is

the 'cream' of the boxing business, and . . . is a sufficiently separate part of the trade or commerce to constitute the relevant market."); *Whole Foods Mkt., Inc.*, 548 F.3d at 1032 (endorsing viability of submarket for "premium, natural, and organic supermarkets"); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 995 (N.D. Cal. 2010) (finding plausible an alleged relevant market that included only Microsoft's and Sony's gaming consoles, and excluded Nintendo's console).

49.   A product market's "outer boundaries" are determined by the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 198 (D.D.C. 2018) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 194, 325 (1962)).

50.   Even at the merits stage, "[r]elevant markets need not have precise metes and bounds." *Pac. Steel Grp. v. Comm. Metals Co.*, No. 20-CV-07683, 600 F. Supp. 3d 1056, 1070 (N.D. Cal. 2022).

51.   "[E]ven if alternative submarkets exist . . . or if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by the government unusable." *United States v. Bertelsmann SE & Co.*, No. 21-2886-FYP, 2022 WL 16949715, at *14 (D.D.C. 2022); *see also Newcal Indus., Inc. v. Ikon Office Sol'n*, 513 F.3d 1038, 1045 (9th Cir. 2008). "[E]numerating other markets or submarkets in which competition would *not* be harmed by the merger" is a non sequitur. *Bertelsmann SE & Co.*, No. 21-2886-FYP, at *14 (emphasis added).

52.   Whether a market can be characterized as "nascent" or "emerging" bears "limited weight" on whether it constitutes a relevant market. *See FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2023 WL 2346238, at *19 (N.D. Cal. Feb. 3, 2023).

53.   To determine the validity of a relevant antitrust market definition, courts generally look to two types of evidence: "the 'practical indicia' set forth by the Supreme Court in *Brown Shoe* and testimony from experts in the field of economics" regarding the Hypothetical Monopolist Test ("HMT"). *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 27 (D.D.C. 2015).

54. There is "no requirement to use any specific methodology in defining the relevant market." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 482 (9th Cir. 2021). As such, courts have determined relevant antitrust markets using, for example, only the *Brown Shoe* factors, or a combination of the *Brown Shoe* factors and the HMT. *See, e.g.*, *Lucas Auto. Eng., Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 766–68 (9th Cir. 2001) (relying on *Brown Shoe* factors alone in review of district court's determination of relevant market); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 20–21 (D.D.C. 2017) (using HMT and *Brown Shoe* factors to analyze relevant market).

55. In a § 13(b) proceeding, the Government's burden is only to "rais[e] some question of whether" a market is "well-defined." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037 (D.C. Cir. 2008). Here, under both the *Brown Shoe* practical indicia, *infra* Conclusions of Law § V.B.1, and the HMT, *infra* Conclusions of Law § V.B.2, the relevant markets are High-Performance Consoles, Multi-game Content Library Subscription Services, and Cloud Gaming Subscription Services. Harm is also likely to occur in broader relevant product markets. *Infra* Conclusions of Law § V.B.3.

56. Defendants miscite *Pistacchio v. Apple Inc.*, 2021 WL 949422 (N.D. Cal. 2021) and *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098 (N.D. Cal. 2022). In both cases, the plaintiff made insufficient allegations of a single-brand product market. *Pistacchio*, 2021 WL 949422, at *1-2; *Reilly*, 578 F. Supp. 3d at 1107. The court found in each case that the plaintiff's allegations failed to account for the exclusion of similar products (of different brands) from their proposed market definition. *Id.* Moreover, neither *Pistacchio* nor *Reilly* categorically ruled out a subscription-based payment market could be a relevant market for the purposes of Clayton § 7. Here, the FTC does not allege a single-brand market and has proffered economic analyses based on the practical indicia set forth in *Brown Shoe* and the Hypothetical Monopolist Test.

### 1. The Relevant Markets Satisfy the *Brown Shoe* Practical Indicia

57. In *Brown Shoe,* the Supreme Court identified a series of "practical indicia" courts may consider in determining the relevant product market. The indicia include "industry or public recognition of the [market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962); *see also Otto Bock*, 2019 WL 2118886, at *5 (Chappell, A.L.J.); *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 21 (D.D.C. 2017); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011).

58. Relevant markets "can exist even if only some of these [*Brown Shoe*] factors are present." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997); *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *33 (F.T.C. Mar. 31, 2023); *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 308-309 (7th Cir. 1976); *see Int'l T. & T. Corp. v. Gen. T. & E. Corp.*, 518 F.2d 913, 932–33 (9th Cir. 1975) ("These indicia were listed with the intention of furnishing practical aids in identifying zones of actual or potential competition rather than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue.").

59. The market for High Performance Consoles satisfies sufficient *Brown Shoe* indicia factors, including industry and public recognition; characteristics and uses; sensitivity to price changes; distinct prices; and distinct customers. *See* Plaintiff's Pre-trial Findings of Fact ("PPFF") § II.A.

60. The market for Multi-Game Content Library Subscription Services satisfies sufficient *Brown Shoe* indicia factors, including industry and public recognition; benefits, characteristics and uses; sensitivity to price changes; distinct pricing and marketing; and distinct customers. *See* PPFF § II.C.

61. The market for Cloud Gaming Subscription Services satisfies the *Brown Shoe* indicia factors, including industry and public recognition, characteristics and uses, unique

production facilities, distinct pricing and marketing, and distinct customers. *See* PPFF §
II.D.

### 2. The Relevant Markets Satisfy the HMT

62. Courts and the Commission may, alternatively or in addition, use the Hypothetical
Monopolist Test to assess the relevant product market. *See FTC v. Advocate Health Care
Network*, 841 F.3d 460, 468–69 (7th Cir. 2016) (applying the HMT to define a relevant
geographic market); *see also FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338
(3d Cir. 2016); *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 167 (3d Cir.
2022) ("Courts and the FTC frequently use the hypothetical monopolist test to determine
the relevant geographic market"); *Horizontal Merger Guidelines* § 4.1.1.

63. Under the HMT, a candidate market constitutes a relevant antitrust market if a
hypothetical monopolist could profitably impose a "small but significant and non-
transitory increase in price" ("SSNIP"), or a reduction in product quality or service, on at
least one product of the merging parties in the candidate market. The candidate market
does not satisfy the HMT if customers switching to alternative products would make such
a price increase unprofitable. *See Horizontal Merger Guidelines* §§ 4, 4.1.1; *see also
Sidibe v. Sutter Health*, No. 12-CV-04854-LB, 2019 WL 2078788, at *4 (N.D. Cal. May
9, 2019); *United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966,
at *28 (N.D. Cal. Jan. 8 2014).

64. The market for High Performance Consoles satisfies the HMT. *See* PPFF § II.A.

65. The market for Multi-Game Content Library Subscription Services satisfies the HMT. *See*
PPFF § II.C.

66. The market for Cloud Gaming Subscription Services satisfies the HMT. *See* PPFF § II.D.

### 3. Harm is Also Likely to Occur in Broader Relevant Product Markets

67. "[E]ven if alternative submarkets exist . . . or if there are broader markets that might be
analyzed, the viability of such additional markets does not render the one identified by the
government unusable." *United States v. Bertelsmann SE & Co.*, No. 21-2886-FYP, 2022
WL 16949715, at *14 (Nov. 15, 2022 D.D.C. 2022).

1

2

3

68. High-Performance Consoles are a relevant product market for evaluating the likely competitive effects of the Proposed Acquisition. *Supra* Conclusions of Law § V.B.1 & § V.B.2.; *see* PPFF § II.A.

4

5

6

69. The anticompetitive effects of the Proposed Acquisition are also reasonably likely to occur in a broader market for gaming consoles that includes High-Performance Consoles and the highly differentiated Nintendo Switch. *See* PPFF § II.B.

7

8

9

70. Multi-Game Content Library Subscription Services are a relevant product market for evaluating the likely competitive effects of the Proposed Acquisition. *Supra* Conclusions of Law § V.B.1. & § V.B.2*; see* PPFF § II.C.

10

11

12

71. Cloud Gaming Subscription Services are a relevant product market for evaluating the likely competitive effects of the Proposed Acquisition. *Supra* Conclusions of Law § V.B.1. & § V.B.2.; *see* PPFF § II.D.

13

14

15

16

17

72. The anticompetitive effects of the Proposed Acquisition are also likely to occur in any relevant antitrust market that contains Cloud Gaming Subscription Services, including a combined Multi-Game Content Library and Cloud Gaming Subscription Services market. *See* PPFF § II.E.

**C.      The United States is the Relevant Geographic Market**

18

19

20

21

22

23

24

25

26

73. The relevant market in which to assess the anticompetitive harms of the Acquisition necessarily includes the relevant geographic market, or the area of competition affected by the merger. *See Sysco Corp.*, 113 F. Supp. 3d 1, 48 (D.D.C. 2015) ("[T]he proper question to be asked . . . [is] where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate.'" (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 357 (1963)); *see also Advocate Health Care Network*, 841 F.3d at 476 (citing *Phila. Nat'l Bank*, 374 U.S. at 357) (relevant geographic market is "the place where the 'effect of the merger on competition will be direct and immediate'"); *see also Horizontal Merger Guidelines* § 4.2.

27

28

74.   The relevant geographic market is the region in "which consumers can practically turn for alternative sources of the product and in which the antitrust defendant faces competition." *FTC v. Staples Inc.*, 970 F. Supp. 1066, 1073 (D.D.C. 1997).

75.   As the Supreme Court has explained, the relevant geographic market must "correspond to the commercial realities of the industry" as determined by a "pragmatic, factual, approach." *Brown Shoe v. United States*, 370 U.S. 294, 336 (1962).

76.   Here, the United States is the relevant geographic market in which to analyze the effects of the Proposed Acquisition. *See* PPFF § II.F.

77.   Under Section 7 of the Clayton Act, 15 U.S.C. § 18, the government need only show a substantial lessening of competition in "any section of the country." Sales into the United States is a "section of the country." *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 620–21 & n.20 (1974) (finding "section of the country" to be synonymous with "relevant geographical market," which can be the United States as a whole.)

78.   The Clayton Act does not require analysis of whether a transaction results in anticompetitive effects in products sold outside the United States. 15 U.S.C. § 18.

**D.      Activision's Gaming Content Is a Related Product to the Relevant Markets**

79.   In vertical transactions, upstream inputs to downstream products in a relevant product market are referred to as "related products." *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *28 (F.T.C. Mar. 31, 2023).

80.   The Government need not prove that the related product constitutes a relevant antitrust market. *See Brown Shoe v. United States*, 370 U.S. 294, 325–26, 344 (1962) (finding a Section 7 violation when only a relevant product market was shown); *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593–97, 607 (1957) (same).

81.   No court has held that the government must prove monopoly power in a related product market to prove that a merger violates the Clayton Act. Instead, the proper inquiry here is whether Activision supplies related products on which Microsoft's rivals rely. *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (accepting the district court's

finding of a relevant antitrust product market for downstream multichannel video distribution in which alleged harm from transaction would occur, but not requiring definition of an antitrust product market around the related product of upstream programming).

82. Activision's gaming content is a related product to High-Performance Gaming Consoles, Multi-Game Content Subscription Services, Cloud Gaming Subscription services, and the broader markets discussed above, serving as a substantially important input for the Relevant Markets. *See* PPFF § III.

**E.    The Proposed Acquisition Has a Reasonable Probability of Substantially Lessening Competition in the Relevant Markets**

**1.    Foreclosure of Microsoft's Rivals in the Relevant Markets**

83. As the Supreme Court has explained, "[t]he primary vice of a vertical merger . . . is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a clog on competition, which deprives rivals of a fair opportunity to compete." *Brown Shoe v. United States*, 370 U.S. 294, 323–24 (1962) (cleaned up).

84. Foreclosure in the vertical merger context can mean either "foreclosing competitors of [one party] from access to a potential source of supply, or from access on competitive terms." *Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 673 (S.D.N.Y. 2002); *see also Sprint Nextel Corp. v. AT&T, Inc.*, 821 F. Supp. 2d 308, 330 (D.D.C. 2011) (explaining rivals "paying more to procure necessary inputs" is the type of injury "that the antitrust laws were designed to prevent").

85. Importantly, the Clayton Act does not require that there be complete foreclosure to run afoul of antitrust laws. *See Brown Shoe v. United States*, 370 U.S. 294, 323 n.39 (1962) (citing S. Rep. No. 81-1775, at 4298 (1950)) (explaining that the goal of Section 7 is "to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act."); *Brown Shoe v. United States*, 370 U.S. 294, 328–29 (1962) ("[T]he tests for measuring the legality of any particular economic

arrangement under the Clayton Act are to be less stringent than those used in applying the Sherman Act.").

86. "Such foreclosure may be achieved by increasing prices, withholding or degrading access, reducing service or support, or otherwise increasing the costs or reducing the efficiency or efficacy" of rival products. *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *32 (F.T.C. Mar. 31, 2023); *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 605 (1957) (finding vertical foreclosure in violation of § 7 although competitors "did obtain higher percentages of the General Motors business in later years").

87. "Case law provides two different . . . standards for evaluating the likely effect of a vertical transaction." *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *32 (F.T.C. Mar. 31, 2023). Harm can be proven through a showing that the combined firm would have the ability and incentive to foreclose competition and/or through a *Brown Shoe* vertical multifactor analysis. *Brown Shoe v. United States*, 370 U.S. 294, 328–29 (1962); *see United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (examining the district court's analysis under an ability-and-incentive framework).

88. The Supreme Court in *Brown Shoe* set forth a multifactor analysis for assessing liability in the context of vertical mergers. *Brown Shoe v. United States*, 370 U.S. 294, 328–34 (1962). These factors include: "the size of the share of the market foreclosed," the "nature and purpose of the arrangement," any "trend toward concentration in the industry," and entry barriers, among others. *Brown Shoe v. United States*, 370 U.S. 294, 328–34 (1962); *Ford Motor Co. v. United States*, 405 U.S. 562, 566–70 (1972); *see also Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *33 (F.T.C. Mar. 31, 2023).

89. The multifactor analysis of *Brown Shoe* and progeny is not a "precise formula[]," and not every factor must be present or even considered to support a finding of liability. *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *32 (F.T.C. Mar. 31, 2023) (finding liability when four *Brown Shoe* liability factors were met). In *Ford Motor*, for example, the Supreme Court affirmed that a vertical merger was illegal after considering "the effect

1   of raising barriers to entry," "the number of competitors in the . . . industry," and the
2   amount of foreclosure.) *Ford Motor Co. v. United States*, 405 U.S. 562, 566–70 (1972).

3   90.    The ability and incentive analysis focuses "on whether a transaction is likely to increase
4           the ability and/or incentive of the merged firm to foreclose rivals." *Illumina, Inc., & Grail,*
5           *Inc.*, No. 9401, 2023 WL 2823393, at *33 (F.T.C. Mar. 31, 2023); *Union Carbide Corp.*,
6           59 F.T.C. 614, 1961 WL 65409, at *34–35 (1961) (finding anticompetitive harm where
7           the merged firm has the power to exclude competing producers from a segment of the
8           market).

9   91.    While "it is the power [to harm competitors] that counts, not its exercise," *Union Carbide*
10          *Corp.*, 59 F.T.C. 614, 1961 WL 65409, at *19 (1961) (Lipscomb, A.L.J.), courts may
11          examine a merged firm's incentives to foreclose the relevant market when considering
12          whether there is the potential for competitive harm. *See, e.g.*, *Ford Motor Co. v. United*
13          *States*, 405 U.S. 562, 571 (1972) (finding that because Ford "made the acquisition in order
14          to obtain a foothold" in the aftermarket spark plug market, "it would have every incentive
15          to . . . maintain the virtually insurmountable barriers to entry" in that market through
16          foreclosure); *see also United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019)
17          (examining the district court's analysis under an ability and incentive framework).

18  92.    Satisfying either the *Brown Shoe* framework or the ability and incentive standard is
19          enough for the plaintiff to carry its initial burden on liability. *Illumina, Inc., & Grail, Inc.*,
20          No. 9401, 2023 WL 2823393, at *33 (F.T.C. Mar. 31, 2023).

21  93.    But here, Plaintiff has satisfied its burden as required for a §13(b) preliminary injunction
22          and has shown a likelihood of success in the administrative proceeding under both the
23          *Brown Shoe* and the ability and incentive standards. *Infra* Conclusions of Law at § E.E.1.

24  94.    Plaintiff has established *Brown Shoe* functional liability factors sufficient to warrant
25          temporary § 13(b) relief. *See* PPFF § IV.

26  95.    The Proposed Acquisition's "nature and purpose" is anticompetitive. *Brown Shoe v.*
27          *United States*, 370 U.S. 294, 329–30 (1962). The Proposed Acquisition's purpose is to
28          transform an independent, "platform-agnostic" source of supply into a captive one

controlled exclusively by Microsoft. *See* PPFF §§ IV.A. & IV.B. The nature and purpose of the Proposed Acquisition is also anticompetitive because the Proposed Acquisition is a response to other vertical mergers and would in turn contribute to further vertical consolidation of the industry. *United States v. Sybron Corp.*, 329 F. Supp. 919, 929 (E.D. Pa. 1971); PPFF § I.E.1. Finally, the acquirer's past conduct following similar transactions also demonstrates its likely anticompetitive nature. *See* PPFF §§ I.H., IV.C; *see also Warner Commc'ns Inc.*, 742 F.2d at 1162-63 (identifying "prior mergers by the firms in question" as a factor to consider when analyzing likelihood of success).

96.    Here, there is also a "trend toward [further] concentration in the industry." *Brown Shoe v. United States*, 370 U.S. 294, 332–33 (1962); *see also Warner Commc'ns Inc.*, 742 F.2d at 1162–63 (identifying "industry trends toward concentration" as a "[f]actor[] to consider when determining the impact on competition")." *See* PPFF § I.E.1. Post-acquisition, this trend towards concentration may accelerate as future entrants must either "ante up the additional capital to vertically integrate or face a number of increased market perils." *U.S. Steel Corp. v. FTC*, 426 F.2d 592, 605 (6th Cir. 1970).

97.    Defendants argue that foreclosure of Activision content from rivals in the Relevant Markets could cause competitive responses by the few existing competitors. But "remaining vigor cannot immunize a merger if the trend in that industry is toward oligopoly." *Brown Shoe Co. v. United States*, 370 U.S. 294, 333 (1962).

98.    The Proposed Acquisition would also increase entry barriers in the Relevant Markets, yet another factor that weighs against it. *See Ford Motor Co. v. United States*, 405 U.S. 562, 568–72 (1972) (explaining that, after Ford made its vertical acquisition, "it would have every incentive to . . . maintain the virtually insurmountable barriers to entry to the aftermarket") (citing *Brown Shoe v. United States*, 370 U.S. 294, 323–24 (1962)). *See* PPFF §§ I.E–G., III., IV.B.

99.    Courts—including the Supreme Court—have held that the creation or increase of entry barriers militates in favor of prohibiting a vertical merger. *See Ford Motor Co. v. United States*, 405 U.S. 562, 568–71 (1972); *U.S. Steel*, 426 F.2d at 605. Such barriers can include

"possible reliance on suppliers from a vertically integrated firm with whom [a new entrant in the relevant market] is also competing" and "the psychological 'fears' of smaller rivals competing with large integrated concerns." *U.S. Steel Corp.*, 426 F.2d at 605 (citing *Procter & Gamble*, 386 U.S. at 578).

100.   Microsoft's past behavior following its acquisition of ZeniMax, another upstream publisher of AAA video gaming content shows that Microsoft has the strong incentive to foreclose Activision content from its rivals and substantially lessen competition. *Brown Shoe Co. v. United States,* 370 US. 294, 332 (1962) ("[I]t is apparent both from past behavior of Brown and from the testimony of Brown's President, that Brown would use its ownership of Kinney to force Brown shoes into Kinney stores."); *U.S. v. Joseph Schlitz Brewing Co.*, 253 F. Supp. 129, 149 (N.D. Cal. 1966).

101.   Despite Defendants' insistence that the Multi-Game Content Subscription Services and Cloud Gaming Subscription Markets are not "markets" due to their relatively small size compared to gaming more generally, the Clayton Act prohibits transactions that would substantially lessen competition within "in any line of commerce" regardless of size. *Crown Zellerbach Corp. v. FTC*, 296 F.2d 800, 812 (9th Cir. 1961) ("In the statutory phrase, 'in any line of commerce,' the word entitled to emphasis is 'any'…The line of commerce need not even be a large part of the business of any of the corporations involved.").

102.   Microsoft has the ability and incentive to use control of Activision content to weaken its rivals in the Relevant Markets. *See* PPFF §§ IV.A.–D.

103.   The Government will be able to carry its burden in the merits proceeding without necessarily specifying the precise actions Microsoft would take to weaken it rivals in the Relevant Markets. *E.g.*, *United States v. Sybron Corp.*, 329 F. Supp. 919, 928–29 (E.D. Pa. 1971) (observing that even if "absolute foreclosure" would be unlikely, "there are many more subtle avenues available").

104.   Microsoft has the ability to control access to Activision content in many ways. PPFF § IV. A.

105.   The evidence, including as to Microsoft's past behavior after its acquisition of ZeniMax, demonstrates Microsoft has incentive to foreclose its rivals. *See* PPFF §§ IV.B., IV.C.

106.   Plaintiff has also established that Microsoft has the incentive and ability to foreclose its rivals in the Relevant Markets, *see* PPFF §§ IV.A-C.

### 2.   Harm to Innovation in the Relevant Markets

107.   Cognizable anticompetitive harm under Section 7 includes harm to innovation. *See Otto Bock*, 2019 WL 5957363, at *2 (finding that the acquisition "is likely to cause future anticompetitive effects in the form of higher prices and less innovation"); *Polypore Int'l, Inc.*, 2010 FTC LEXIS 17, at *281–82, 552 (F.T.C. Mar. 1, 2010) (Chappell, A.L.J.) (finding that in one market "innovation competition has been eliminated post-acquisition" and that innovation had been impacted in another); *R.R. Donnelley & Sons Co.*, No. 9243, 1995 WL 17012641, at *73 (F.T.C. July 21, 1995) (recognizing that competitive harm under Section 7 may "include a prediction of adverse effects in competitive dimensions other than price—reductions in output, product quality, or innovation"); *see also Horizontal Merger Guidelines* § 6.4 (explaining that harm to innovation can be an anticompetitive effect of a merger). In fact, in *United States v. AT&T, Inc.*, the D.C. Circuit made clear that it "d[id] not hold that quantitative evidence of price increase is required in order to prevail on a Section 7 challenge. Vertical mergers can create harms beyond higher prices for consumers, including decreased product quality and reduced innovation." 916 F.3d 1029, 1045–46 (D.C. Cir. 2019).

108.   In addition, the Federal Trade Commission has long recognized the special importance of protecting competition in nascent markets, much like the relevant market for Cloud Game Subscription Services here:

> While monopolies are to be abhorred wherever they appear, it is of particular importance that they be arrested in an industry which appears destined for far greater expansion and growth. Strong and vigorous competition is the catalyst of rapid economic progress. Any lessening of competition is therefore doubly harmful in a new industry since its inevitable effect is to slow down the growth rate of the industry. *Union Carbide Corp.*, 59 F.T.C. 614, 1961 WL 65409, at *35 (Sept. 25, 1961).

109.   That the market may be an emerging one poised for rapid growth can make it particularly susceptible to antitrust harm. *Bazaarvoice*, 2014 WL 203966 at *76 ("[R]apid technological progress may provide a climate favorable to increased concentration of market power rather than the opposite.") (quoting *Greyhound Computer Corp., Inc. v. IBM Corp.*, 559 F.2d 488, 497 (9th Cir. 1977)).

110.   The Proposed Acquisition has a reasonable probability of harming innovation competition in the Relevant Markets. *See* (PPFF § IV.D.3.)

### F.    Defendants Fail to Meet their Burden to Show Entry Will Be Timely, Likely, and Sufficient to Counteract the Competitive Harm from the Proposed Acquisition

111.   At the administrative merits hearing, Defendants will bear the burden of providing evidence that "ease of entry" rebuts Plaintiff's *prima facie* case. *Otto Bock*, 2019 WL 5957363, at *12 (citing *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 n.7 (D.C. Cir. 2001); *see also H&R Block*, 833 F. Supp. 2d at 73 (noting that defendants "carry the burden to show" that entry or expansion is sufficient "to fill the competitive void" that would result from the merger) (internal quotations omitted).

112.   At this preliminary stage, Defendants would need to go further and leave "no doubt." *Whole Foods Mkt.*, 548 F.3d at 1035.

113.   "The mere existence of potential entrants does not by itself rebut the anti-competitive nature of an acquisition." *Chi. Bridge & Iron Co N.V. v. FTC*, 534 F.3d 410, 436 (5th Cir. 2008).

114.   Entry or expansion must be "'timely, likely, and sufficient in its magnitude, character, and scope' to counteract a merger's anticompetitive effects." *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 222 (D.D.C. 2017) (citations omitted).

115.   In assessing whether entry is likely, courts often look to the history of entry, including the "inability of new firms to gain traction," to assess "how difficult it is for new entrants to compete on the same playing field as the merged firm." *Anthem*, 236 F. Supp. 3d at 222–

24 (dismissing an expert's "breezy assurances" that developing a provider network is "not a big barrier to entry or expansion") (citations and quotation marks omitted).

116. Defendants have not shown that entry is timely, likely, and sufficient and thus, fail to demonstrate that it would counteract the competitive harm from the Proposed Acquisition. *See* PPFF § IV.E.1.

### G. Defendants Fail to Meet their Burden to Demonstrate That Their Proposed Efficiencies and Any Other Alleged Procompetitive Benefit Offset the Competitive Harm

117. In the merits proceeding, the stronger the *prima facie* case "the greater [Defendants'] burden of production on rebuttal." *Polypore*, 2010 WL 9549988 at *9; *see also FTC v. H.J. Heinz Co.*, 246 F.3d 708, 725 (D.C. Cir. 2001); *Baker Hughes*, 908 F.2d at 991.

118. "The Supreme Court has never expressly approved an efficiencies defense to a § 7 claim." *Saint-Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788–89 (9th Cir. 2015). To the contrary, the Court has repeatedly "cast doubt" on such a defense. *Saint-Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788–89 (9th Cir. 2015). And this Circuit "remain[s] skeptical about the efficiencies defense in general and about its scope in particular." *Saint-Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 790 (9th Cir. 2015).

119. To the extent they are valid at all, efficiencies cannot be based on self-serving testimony or the estimates of business executives but must be "reasonably verifiable by an independent party." *Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *59 (F.T.C. Mar. 31, 2023) (citing *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 72–73 (D.D.C. 2018)); *see also United States v. Bertelsmann SE & Co. KGaA*, No. CV 21-2886-FYP, 2022 WL 16949715, at *35 (D.D.C. Nov. 15, 2022) (finding "defendants had failed to verify the efficiencies" and therefore the court did not consider the evidence).

120. Even assuming the validity of the efficiencies defense, Defendants bear the burden of producing "clear evidence showing that the merger will result in efficiencies that will

*offset* the anticompetitive effects and ultimately benefit consumers." *Otto Bock*, 2019 WL 2118886, at *50 (Chappell, A.L.J.) (citing *Penn State Hershey*, 838 F.3d at 350) (emphasis added); *see also FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 175–76 (3d Cir. 2022). In assessing such efficiency claims, courts have applied strict standards in their review. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720–21 (D.C. Cir. 2001); *H&R Block*, 833 F. Supp. 2d at 89.

121. No court has held that efficiencies could immunize an otherwise anticompetitive merger from a §13(b) preliminary injunction. *See Otto Bock Healthcare North America, Inc.*, Dkt. No. 9378, 2019 WL 2118886, at *50 (F.T.C. May 6, 2019) (Chappell, A.L.J.) (observing that "[r]esearch does not reveal a case that permitted an otherwise unlawful transaction to proceed based on claimed efficiencies."); *United States v. Anthem*, 855 F.3d 345, 353 (D.C. Cir. 2017) ("[I]t is not at all clear that [efficiencies] offer a viable legal defense to illegality under Section 7.") (citing *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580, (1967) ("Possible economies cannot be used as a defense to illegality.")); *FTC v. Penn State Hershey*, 838 F.3d 327, 347–48 (3rd Cir. 2016) ("Contrary to endorsing [an efficiencies] defense, the Supreme Court has instead, on three occasions, cast doubt on its availability . . . . Based on [the Supreme Court's past statements] and on the Clayton Act's silence on the issue, we are skeptical that such an efficiencies defense even exists.") (citations omitted); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 91 (D.D.C 2011) ("The difficulty in substantiating efficiency claims in a verifiable way is one reason why courts 'generally have found inadequate proof of efficiencies to sustain a rebuttal of the government's case.'").

122. Courts that do assess such efficiency claims, have applied strict standards in their review. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720–21 (D.C. Cir. 2001); *H&R Block*, 833 F. Supp. 2d at 890. Specifically, "the court must undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 721 (D.C. Cir. 2001); *see also FTC v. Wilh. Wilhelmsen Holding ASA*,

341 F. Supp. 3d 27, 72 (D.D.C. 2018); *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 72–73 (D.D.C. 2009).

123.  Assuming *arguendo* that the efficiency defense is even potentially available, Defendants would bear the heavy burden to show that their efficiencies claims are cognizable, meaning that they are "merger-specific efficiencies that have been verified and do not arise from anticompetitive reductions in output or service." *Horizontal Merger Guidelines* § 10 ("Efficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means."); *see also FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 176 (3d Cir. 2022); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720-21 (D.C. Cir. 2001); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 137 n.15 (D.D.C. 2016); *Sysco Corp.*, 113 F. 3d Supp. 1, 81–82 (D.D.C. 2015).

124.  To substantiate each efficiency, Defendants would be required to demonstrate that "it is possible to 'verify by reasonable means the likelihood and magnitude of each asserted efficiency, how and when each would be achieved (and any costs of doing so), how each would enhance the merged firms' ability and incentive to compete, and why each would be merger specific." *Otto Bock*, 2019 WL 2118886, at *50 (Chappell, A.L.J.) (citing *H&R Block*, 833 F. Supp. 2d at 89); *see also Hackensack*, 30 F.4th 166-67; *Horizontal Merger Guidelines* § 10.

125.  To demonstrate merger specificity, Defendants would need to show that the claimed efficiencies "represent a type of cost saving that could not be achieved without the merger." *Wilhelmsen*, 341 F. Supp. at 72; *see also Hackensack*, 30 F.4th at 176 ("*i.e.*, the efficiencies cannot be achieved by either party alone").

126.  Even verifiable, merger-specific, efficiencies are no defense absent "clear evidence" that they "will offset the anticompetitive effects and ultimately benefit consumers." *Otto Bock*, 2019 WL 2118886, at *50 (Chappell, A.L.J.) (citing *Penn State Hershey*, 838 F.3d at 350). "The critical question raised by the efficiencies defense is whether the projected savings from the mergers are enough to overcome the evidence that tends to show that possibly greater benefits can be achieved by the public through existing, continued competition."

*Cardinal Health*, 12 F. Supp. 2d at 63*; see also Anthem*, 855 F.3d at 355–56 (affirming district court's rejection of the efficiencies defense "because the amount of cost saving that is both merger-specific and verifiable would be insufficient to offset the likely harm to competition"); *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 918 (E.D. Mo. 2020) ("[E]ven granting Defendants every dollar of their claimed efficiencies . . . and making the implausible assumption that they would pass every penny of those efficiencies on to their customers, Defendants' claimed efficiencies still would not offset the likely competitive harm to those same customers.").

127. Whether characterized as an efficiency defense or some other type of procompetitive benefit, defendants must offset the anticompetitive concerns, be merger specific, be verifiable and non-speculative, and not arise from anticompetitive reductions in output or service. *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 176 (3d Cir. 2022) (rejecting "[Defendants'] claim they are not making an efficiencies defense" and "thus the stringent standard developed in other circuits need not apply.").

128. In addition, efficiencies must be in the same relevant market as the anticompetitive practice. *See United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 370 (1963) ("If anticompetitive effects in one market could be justified by procompetitive consequences in another, the logical upshot would be that every firm in an industry could, without violating § 7, embark on a series of mergers that would make it in the end as large as the industry leader."); Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 972 ("The general argument favoring an efficiency defense does not justify the merger that is prima facie illegal in one market at the same that it achieves substantial economies in a different market.").

129. Courts have repeatedly rejected the argument that unlawful transactions should be permitted because it better enables them to compete against a larger rival within the market. *United States v. American Airlines Grp. Inc.*, 2023 WL 3560430, at *39 (D. Mass. May 19, 2023) ("The defendants' desire to keep pace with Delta or to replace it as the

strongest domestic competitor in the northeast might be 'procompetitive' in the business sense of the word, but it is not on these facts 'procompetitive' under the law.'").

130.    In the context of procompetitive benefits, expert testimony that "expresses an opinion about what conduct the antitrust laws should and should not punish" inappropriately instructs the factfinder and is either excluded or given no weight. *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1363 (N.D. Ga. 2017), *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018); *Arista Networks, Inc. v. Cisco Sys. Inc.*, No. 16-cv-00923-BLF, 2018 WL 8949299, at *4 (N.D. Cal. June 15, 2018).

131.    Where, as here, Defendants have failed to produce evidence that merger-specific, verifiable efficiencies will "neutralize if not outweigh the harm caused by the loss of competition and innovation," *Anthem*, 855 F.3d at 369 (Millett, J., concurring), the purported efficiencies defense fails. *See* PPFF § IV.E.2.

132.    Defendants cannot reliably quantify the claimed value of any efficiency resulting from the Proposed Acquisition. *See* PPFF § IV.E.2.

133.    Defendants have also failed to demonstrate that their claimed efficiencies are merger specific. *See* PPFF § IV.E.2.

134.    Defendants also have not met their burden to show that efficiencies would be passed through to consumers. *See* PPFF § IV.E.2.

135.    Defendants have failed to demonstrate efficiencies would offset the harm from this anticompetitive acquisition. *See* PPFF § IV.E.2.

### H.    Proposed Remedies Are of Questionable Relevance in a § 13(b) Proceeding

136.    "Likelihood of success on the merits" means on the "antitrust merits" in the administrative proceeding. *See FTC v. Meta Platforms Inc.*, No. 5:22-cv-04325-EJD, 2022 WL 16637996, at *6 (N.D. Cal. Nov. 2 2022).

137. Because a 13(b) Proceeding does not reach the ultimate merits of the transaction, it cannot resolve what the appropriate remedy would be if the Commission were ultimately to find a violation. *See United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 556 (1971).

138. The agreements Microsoft signed with third parties in an attempt to allay antitrust concerns in this matter constitute a proposed remedy. *See Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *48–51 (F.T.C. Mar. 31, 2023) (finding an agreement "cobbled together well after the Acquisition was announced," contingent on the Proposed Acquisition closing and unimplemented when the merger was consummated, to be a proposed remedy "crafted in anticipation of legal concerns about the Acquisition").

139. The Supreme Court has indicated that it is proper to consider proposed remedies only after a finding of liability, at the subsequent remedy stage of a merits proceeding. *See United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 556 (1971) (observing that the trial court in a merits proceeding "naturally did not reach the question of remedy" after having "found no violation of § 7")); *see also Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *51, 74 (F.T.C. Mar. 31, 2023).

140. Even assuming Defendants' preferred remedy is relevant to analyzing "likelihood of success" in a § 13(b) proceeding, it would be as part of Defendants' rebuttal burden, not part of the FTC's initial burden. *Cf. Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *51 (F.T.C. Mar. 31, 2023) (proceeding, in dicta, to analyze a proposed remedy at the rebuttal stage). As such, the proposed remedy would need to dispel any substantial doubts and serious questions about the transaction's legality. *See Warner Commc'ns*, 742 F.2d at 1162; *Whole Foods Mkt.*, 548 F.3d at 1035.; FTC v. *H.J. Heinz Co.*, 246 F.3d 708, 725 (D.C. Cir. 2001). Defendants have failed to demonstrate their proposed remedies would offset the harms. *See* PPFF § IV.F.

141. Proposed remedies and their purported benefits that rely upon speculation or self-serving evidence proffered by defendants are subject to increased scrutiny. *See Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986) ("Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight.");

*FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 76-77 (D.D.C. 2009) ("The uncertainty of the public benefit of [Defendants' claimed] innovative products is too long in coming and too uncertain in result to hold much weight against the FTC's interest in enforcing the antitrust laws."); *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 913 (E.D. Mo. 2020) (the merging parties' professed efficiencies must be "more than mere speculation and promises about post-merger behavior"); *FTC v. Meta Platforms Inc.*, WL 2346238, at *29 (N.D. Cal. Feb. 3, 2023) ("subjective corporate testimony is generally deemed self-serving and entitled to low weight"); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 99 (D.D.C. 2017) (noting that actions taken "to avoid antitrust scrutiny" are given "little weight in predicting" that company's future behavior in a post-merger world).

142.  It is well-established that "conduct remedies are disfavored"—like those proposed by Defendants—even though they may be the "least burdensome to the defendant," because they "risk excessive government entanglement in the market." *Saint Alphonsus Med. Ctr. Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 793 (9th Cir. 2015).

143.  The Supreme Court has instructed that "all doubts as to the remedy are to be resolved in [the government's] favor." *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961).

144.  The terms of agreements are critical to understanding the actual effect of those agreements. ATA Airlines, Inc. v. Fed. Exp. Corp., 665 F.3d 882, 888 (7th Cir. 2011) ("If someone tells you 'I promise you X, but don't hold me to it,' the promisor is making clear that he is not inviting reliance."); *see also id.* ("The doctrine of indefiniteness that makes a contract unenforceable when it omits a crucial term that cannot be supplied by interpretation has particular force when the contract is one between sophisticated commercial entities and involves a great deal of money.").

145.  *United States v. AT&T* does not support the proposition that behavioral promises can act to defuse anticompetitive effects of a transaction. In that case, involving a permanent

injunction, the plaintiff failed to prove any likelihood of harm, and the evaluation of behavioral promises were mere dicta. 310 F. Supp. 3d 161, 241 & n.51 (D.D.C. 2018). Here, by contrast, the FTC has raised serious questions whether the transaction poses a reasonable probability of harm to competition.

146.   Neither does *FTC v. Arch Coal* inform the consideration of remedies in this case. 329 F. Supp. 2d 109 (D.D.C. 2004). In *Arch Coal*, the defendants had offered a divestiture of a fully functioning production facility prior to the issuance of any complaint against the transaction. *Id.* at 113,

147.   Finally, *United States v. United Health Grp*., 2022 WL 4365867 (D.D.C. 2022), does not offer a coherent framework for evaluating remedies in a merger case. In that matter, another permanent injunction case, the district judge did not find any violation but nevertheless seemed to order a remedy. 2022 WL 4365867 at *27 (D.D.C. 2022). Ordinarily, a judge cannot impose an order on a defendant after a finding of no liability.

## I.   Temporary Relief to Preserve the Status Quo is in the Public Interest

148.   "When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone does not justify denial of a preliminary injunction." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984) (citing *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981)); *FTC v. ProMedica Health Sys., Inc.*, No. 3:11-cv-00047, 2011 WL 1219281, at *60 ("[P]ublic equities are paramount").

149.   "Section 13(b) itself embodies congressional recognition of the fact that divestiture is an inadequate and unsatisfactory remedy in a merger case, a point that has been emphasized by the United States Supreme Court." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001) (citation omitted). Defendants' speculation that divestiture may still be "possible" after the administrative proceeding, Oppo Br. at 4, is a non sequitur. *See*

*Warner Commc'ns Inc.*, 742 F.2d at 1165 (rejecting defendants' argument "that effective relief would still be possible" following the administrative proceeding).

150. As there are "substantial doubts" regarding the Proposed Acquisition's legality, *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008), the Government has demonstrated a likelihood of ultimate success. As a result, the public interest favors granting temporary relief under § 13(b) to preserve the status quo pending the administrative adjudication. *E.g.*, *Staples, Inc.*, 970 F. Supp. at 1091.

151. Public equities include "effective enforcement of the antitrust laws" and ensuring the Commission's ability to obtain adequate relief if it ultimately prevails on the merits. *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991). "[T]he preservation of competition is always in the public interest." *United States v. Tribune Publ'g Co.*, No. CV 16-01822-AB, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016). This includes the potential for "any new competition that would have occurred, absent the merger." *Staples, Inc.*, 970 F. Supp. at 1091.

152. In weighing the equities under § 13(b), "public equities receive far greater weight." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984). *See also United States v. Tribune Publ'g Co.*, No. CV 16-01822-AB, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016). ("That the government enforces antitrust law on behalf of the public interest necessarily weighs heavily in the balance-of-hardships calculus."); *FTC v. Meta Platforms Inc.,* No. 5:22-cv-04325-EJD, 2022 WL 16637996, at *6 (N.D. Cal. Nov. 2, 2022) ("Public equities, which include 'economic effects and pro-competitive advantages for consumers and effective relief for the commission,' are accorded greater weight than private equities.") (quoting *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir.1989); *FTC v. ProMedica Health Sys., Inc.*, No. 3:11-cv-00047, 2011 WL 1219281, at *60 ("[P]ublic equities are paramount").

153. In a merger case—whether horizontal or vertical—the public interest in ordering a preliminary injunction is particularly strong due to the difficulty of implementing a post-

acquisition divestiture that would effectively restore lost competition. *FTC v. Dean Foods Co.*, 384 U.S. 597, 606 (1966) ("Administrative experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture."); *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 217 (D.D.C. 2018) ("Divestitures may not succeed at restoring competition to the post-merger market."); *FTC v. Advoc. Health Care*, No. 15-cv-11473, 2017 WL 1022015, at *16 (N.D. Ill. Mar. 16, 2017) ("[I]f the Court does not enter an injunction and allows the parties to merge, then it may be more difficult to order effective relief after a trial on the merits by unscrambling merged assets to recreate pre-merger competition.") (internal quotations omitted); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 87 (D.D.C. 2015) (finding that a preliminary injunction appropriate because "the merging parties would have already combined their operations and they would be difficult to separate, even by a subsequent divestiture order").

154. "[I]f [any] benefits of a merger [would still be] available after the trial on the merits, they do not constitute public equities weighing against a preliminary injunction." *ProMedica Health Sys., Inc.*, 2011 WL 1219281, at *80; *see also H.J. Heinz Co.*, 246 F.3d at 726.

155. To the extent private equities are considered, the court "must afford such concerns little weight," to avoid "undermin[ing] section 13(b)'s purpose of protecting the 'public-at-large, rather than individual private competitors.'" *Univ. Health, Inc.*, 938 F.2d at 1225 (quoting *Nat'l Tea Co.*, 603 F.2d at 697 n.4).

156. Defendants' assertion "that a preliminary injunction would force them to abandon" their proposed transaction is a private equity at best, and "private equities alone do not outweigh the Commission's showing of likelihood of success." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984); *FTC v. Rhinechem Corp.*, 459 F. Supp. 785, 790-1 (N.D. Ill 1978) (finding executive statements on the record in court that the acquisition will be abandoned if a preliminary injunction is issued, and the loss of potential procompetitive benefits as a result, an insufficient private equity to overcome the private equities contemplated in Section 13(b)).

157. The merger agreement does not terminate on July 18, 2023 unless one of the Defendants chooses to terminate it. Consequently, the dissolution of the deal would be entirely the result of Defendants' own choice. Such a choice cannot be the basis for a private equity. ECF 177 (Defendants' Proposed Finding of Fact ¶ 8). "[A]lthough the court recognizes the time, resources, and effort that Defendants have put into planning this transaction, the parties' stated intention to abandon the transaction prior to the merits proceeding is a private equity and cannot on its own overcome the public equities that favor the FTC." *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 73–74 (D.D.C. 2018); *FTC v. Heinz*, 246 F.3d 708, 727 (D.C. Cir. 2001); see *also FTC v. Whole Foods Mkt.*, 548 F. 3d 1028, 1041 1042 (D.C. Cir. 2008) (remanding to district court to determine the equities but instructing the court to "remember that a 'risk that the transaction will not occur at all,' by itself, is a private consideration that cannot alone defeat the preliminary injunction'"); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001) (reversing the district court's finding that a preliminary injunction would cause abandonment of the merger because "[i]f the merger makes economic sense now, the appellees have offered no reason why it would not do so later"); *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 218 (D.D.C. 2018) (ordering injunctive relief despite "additional time and resources" spent by defendants to litigate the proposed transaction"); *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345–46 (4th Cir. 1976); *FTC v. Rhinechem Corp.*, 459 F. Supp. 785, 791 (N.D. Ill. 1978).

158. Congress intended temporary relief under § 13(b) to be "readily available to preserve the status quo while the FTC develops its ultimate case." *FTC v. Whole Foods Mkt. Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008). It is appropriate here.

Dated: June 30, 2023                                    Respectfully submitted,

                                                        */s/ James H. Weingarten*
                                                        James H. Weingarten
                                                        Peggy Bayer Femenella
                                                        James Abell
                                                        Cem Akleman
                                                        J. Alexander Ansaldo

Error

Michael T. Blevins
Amanda L. Butler
Nicole Callan
Maria Cirincione
Kassandra DiPietro
Jennifer Fleury
Michael A. Franchak
James Gossmann
Ethan Gurwitz
Meredith R. Levert
David E. Morris
Merrick Pastore
Stephen Santulli
Edmund Saw

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3570

Erika Wodinsky

Federal Trade Commission
90 7th Street, Suite 14-300
San Francisco, CA 94103

*Counsel for Plaintiff Federal Trade Commission*