James H. Weingarten, DC Bar No. 985070
Peggy Bayer Femenella, DC Bar No. 472770
James Abell, DC Bar No. 990773
Cem Akleman, FL Bar No. 107666
Meredith R. Levert, DC Bar No. 498245
Jennifer Fleury, NY Bar No. 5053178
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3570
*jweingarten@ftc.gov; pbayer@ftc.gov:*
*jabell@ftc.gov; cakleman@ftc.gov;*
*jfleury@ftc.gov; mlevert@ftc.gov*

Erika Wodinsky, Cal. Bar No. 091700
90 7th Street, Suite 14-300
San Francisco, CA 94103
Tel: (415) 848-5190
*ewodinsky@ftc.gov*

[Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION**, | Case No. 3:23-cv-2880-JSC |
| Plaintiff, | **PLAINTIFF FEDERAL TRADE COMMISSION'S RULE 62(d) MOTION FOR INJUNCTION PENDING APPEAL** |
| v. | |
| **MICROSOFT CORP.** | Dept.:  Courtroom 8 |
| and | Honorable Jacqueline Scott Corley |
| **ACTIVISION BLIZZARD, INC.**, | Expedited Relief Requested |
| Defendants. | |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that Plaintiff Federal Trade Commission ("FTC" or "Commission") shall move and hereby does move the Court for expedited relief in the form of entry of an Rule 62(d) injunction pending resolution of the FTC's appeal from the Court's Opinion (ECF 305). This injunction is necessary to preserve the status quo while Court of Appeals reviews the Court's Opinion denying the FTC's request for a preliminary injunction pursuant to Federal Trade Commission Act § 13(b), 15 U.S.C. § 53(b), preventing Defendant Microsoft Corporation ("Microsoft") from completing its proposed acquisition of Defendant Activision Blizzard, Inc. ("Activision") (the "Proposed Acquisition") or a substantially similar acquisition while the FTC's review of the merits of the Proposed Acquisition is pending. In the alternative, Plaintiff respectfully moves for an injunction preventing Defendants from completing the Proposed Acquisition until after the Court of Appeals has ruled on Plaintiff's motion for a stay pending appeal that it also is filing contemporaneously in the appellate court.

## ISSUE TO BE DECIDED

Whether, pursuant to Federal Rule of Civil Procedure 62(d), the Court should enter an injunction preventing Microsoft and Activision from consummating the Proposed Acquisition or a substantially similar acquisition until after the Court of Appeals has had the opportunity to adjudicate the FTC's appeal from the Court's Opinion (ECF 305) in this matter.

# TABLE OF CONTENTS

ARGUMENT ......................................................................................................... 1

I.   THE APPLICABLE LEGAL STANDARD .................................................... 1

II.  THE FTC IS LIKELY TO SUCCEED ON THE MERITS OF THE APPEAL ............... 2

    A.  The Court Applied the Wrong Legal Standard to This Section 13(b) Proceeding ...... 3

    B.  The Court Erred as a Matter of Law When It Concluded That Microsoft Was Likely to Foreclose Rivals in the Market for Multigame Subscription Library Services but Found that Asserted Benefits to Microsoft's Game Pass Customers Outweighed that Foreclosure. ........................................................................................... 4

    C.  The Court Erred in Relying on Microsoft's Offers to and Agreements with Rivals to Find that the FTC Had Failed to Raise Substantial Questions about Incentive. .......... 7

    D.  The Court's Partial Foreclosure Analysis Constitutes Reversible Error. ................... 8

    E.  The Court Misapplied the Law and Ignored the FTC's Evidence in Evaluating Incentive to Foreclose ........................................................................................ 9

        1)  The Court erred as a matter of law when it found that evidence of Microsoft's stated intent outweighed the evidence of incentive to foreclose .......................... 10

        2)  The Court committed reversible error when it improperly assigned the FTC the burden of producing a smoking gun document ................................................ 11

    F.  The Court committed reversible error when it found that the record contains conflicting evidence on the anticompetitive effects of the merger but held that the FTC had not established a likelihood of success on the merits. ............................... 12

    G.  The Court Erred in Disregarding the *Illumina* decision, which applies in the FTC merits proceeding ................................................................................................ 13

III. THE FTC AND THE PUBLIC INTEREST WILL BE IRREPARABLY HARMED IF THE MERGER IS ALLOWED TO PROCEED ..................................... 15

IV.  ENTRY OF AN INJUNCTION PENDING APPEAL WILL NOT SUBSTANTIALLY INJURE DEFENDANTS ....................................................... 16

V.   AN INJUNCTION IS IN THE PUBLIC INTEREST ........................................ 16

CONCLUSION ....................................................................................................... 17

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ................................. 10

*Bradt v. T-Mobile US, Inc.*, 19-cv-07752-BLF, 2020 WL 1233939
 (N.D. Cal. Mar. 13, 2020) .......................................................................................... 2

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .................................................. 4, 5, 6, 7

*Cal. Dental Ass'n v. FTC*, 224 F.3d 942 (9th Cir. 2000) .................................................... 10

*Chicago Bd. of Trade v. United States*, 246 U.S. 231 (1918) .............................................. 10

*Filtrol Corp. v. Slick Corp.*, No. 69-607-ALS, 1969 WL 219 (C.D. Cal. Dec. 29, 1969),
 *aff'd*, 428 F.2d 826 (9th Cir. 1970) ........................................................................ 13, 14

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) ....................................................... 4

*Fruehauf Corp. v. FTC*, 603 F.2d 345 (2d Cir. 1979) ......................................................... 5

*FTC v. Dean Foods Co.,* 384 U.S. 597 (1966) ............................................................. 14, 16

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) .............................................. 7, 13, 14

*FTC v. Lab. Corp. of Am.*, No. 10-cv-1873, 2011 WL 3100372 (C.D. Cal. Mar. 11, 2011) ....... 16

*FTC v. Meta Platforms, Inc.*, No. 5:22-cv-04325-EJD, 2023 WL 2346238
 (N.D. Cal. Feb. 3, 2023) ............................................................................................ 11

*FTC v. Qualcomm Inc.*, 935 F.3d 752 (9th Cir. 2019) ........................................................ 2

*FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018) ................................................... 16

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991) ................................................ 16

*FTC v. Warner Commc'n's Inc.*, 742 F.2d 1156 (9th Cir. 1984) ................................... *passim*

*FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) .................................. 7, 16

*Golden Gate Rest. Ass'n v. City & County of San Francisco*, 512 F.3d 1112
 (9th Cir. 2008) ........................................................................................................ 2

*Gulf & W. Indus., Inc. v. Great A&P Tea Co.*, 476 F.2d 687 (2d Cir. 1973) ........................... 6

*Index Newspapers LLC v. U.S. Marshals Service*, 977 F.3d 817 (9th Cir. 2020) .................... 2

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) ....................................................... 2

*M.A. Mobile Ltd. v. Indian Inst. of Tech. Kharagpur*, No. 3:08-cv-02658-WHO, 2019 WL 6525752 (N.D. Cal. Dec. 4, 2019) ........................................................................................2

*Miss. River Corp. v. FTC*, 454 F.2d 1083 (8th Cir. 1972) ..........................................................10

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................................2, 15

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*, 778 F.3d 775 (9th Cir. 2015) ...........................................................................................................6

*United States v. Am. Cyanamid Co.*, 719 F.2d 558 (2d Cir. 1983) ...........................................4, 5

*United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019) .................................................3, 11

*United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ........................8, 10, 17

*United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549 (1971) ............................................7

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ..............................................10

*United States v. Sybron Corp.*, 329 F. Supp. 919 (E.D. Pa. 1971) ..............................................8

**Rules**

Federal Rule of Civil Procedure 62 ...............................................................................................1

**Other Authorities**

Herbert J. Hovenkamp, *Competitive Harm from Vertical Mergers* (2020) ....................................8

Plaintiff Federal Trade Commission ("FTC" or the "Commission") respectfully moves for an injunction pursuant to Federal Rule of Civil Procedure 62(d) enjoining the proposed transaction between Defendants Microsoft Corporation and Activision Blizzard, Inc. ("Activision") pending appellate review of the Court's Opinion denying Plaintiff's request for a preliminary injunction. Alternatively, the FTC respectfully requests that the Court temporarily enjoin the transaction pending a ruling by the Court of Appeals for the Ninth Circuit on an emergency application for an injunction pending appeal that the FTC intends to file.

Pursuant to the Court's modification of the temporary restraining order previously entered, Defendants may consummate Microsoft's proposed acquisition of Activision (the "Proposed Acquisition") after 11:59 p.m. on July 14, 2023. Op. at 53. Accordingly, the FTC respectfully requests a ruling on this Motion as soon as possible.

The FTC respectfully submits that this Court's denial of the FTC's motion for a preliminary injunction raises serious, substantial issues for the Court of Appeals to resolve. An injunction pending appeal is necessary to preserve the *status quo*, which would otherwise be irreparably altered if the Proposed Acquisition were consummated during appellate review. An injunction will preserve the FTC's ability to obtain effective relief if it were to ultimately prevail. An injunction also would prevent irreparable injury to consumers and competition that will arise upon consummation of the Proposed Acquisition. By contrast, a stay pending appeal will not substantially injure Defendants, and an injunction is in the public interest. For these reasons, the Court should temporarily enjoin the consummation of the Proposed Acquisition while the Court of Appeals resolves Plaintiff's appeal.

## ARGUMENT

### I.   THE APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 62(d) provides in relevant part: "While an appeal is pending from an interlocutory order or final judgement that . . . refuses . . . an injunction, the court may . . . grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). Motions for injunctive relief under Rule 62(d) are evaluated

using "the traditional four-factor test applicable to motions to stay: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken v. Holder*, 556 U.S. 418, 426 (2009); *Bradt v. T-Mobile US, Inc.*, 19-cv-07752-BLF, 2020 WL 1233939, at *1 (N.D. Cal. Mar. 13, 2020) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987));[1] *M.A. Mobile Ltd. v. Indian Inst. of Tech. Kharagpur*, No. 3:08-cv-02658-WHO, 2019 WL 6525752, at *2 (N.D. Cal. Dec. 4, 2019). The first two factors of the standard are the "most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Index Newspapers LLC v. U.S. Marshals Service*, 977 F.3d 817, 824 (9th Cir. 2020). "The applicant for a stay 'need not demonstrate that it is more likely than not they will win on the merits,' but rather must show 'a reasonable probability' or 'fair prospect' of success." *FTC v. Qualcomm Inc.*, 935 F.3d 752, 755-57 (9th Cir. 2019) (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 966-67 (9th Cir. 2011)). Where the federal government is a party, the public interest merges with the asserted harm to the government. *Nken*, 556 U.S. at 435.

These factors operate along a sliding scale: the stronger the showing on the merits, the less harm is required, and vice versa. *See, e.g.*, *Leiva-Perez*, 640 F.3d at 966; *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1115-16 (9th Cir. 2008). Where the balance of harms and public interest weigh in favor of a stay and the court deems that the stay movant has made a sufficient showing of success on appeal, a stay should be granted. *See Leiva-Perez*, 640 F.3d at 966-70. Here, all four factors support the grant of an injunction to maintain the status quo pending appeal.

## II.     THE FTC IS LIKELY TO SUCCEED ON THE MERITS OF THE APPEAL

Granting an injunction pending appeal is warranted because the FTC is likely to succeed

---

[1] *Hilton* cites to Rule 62(c) which became Rule 62(d) when the Federal Rules of Civil Procedure were amended in 2018. *See Bradt*, 2020 WL 1233939, at *1 n.1.

on appeal. The FTC respectfully identifies the following examples of errors in the Court's Opinion.

**A. The Court Applied the Wrong Legal Standard to This Section 13(b) Proceeding**

The Court erred in applying the wrong legal standard to the FTC's request for a preliminary injunction. The FTC sought a preliminary injunction in this Court pursuant to Section 13(b) of the FTC Act, pending completion of the Commission's adjudication of the merger's legality. Under Ninth Circuit precedent, the Court's task in a Section 13(b) proceeding is "not to make a final determination on whether the proposed merger violates Section 7" of the Clayton Act. *FTC v. Warner Commcn's Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984). Rather, as the Court correctly recognized at the outset of these proceedings, the FTC "can meet 'its burden of demonstrating a likelihood of success by presenting evidence sufficient to raise serious, substantial, difficult questions regarding the anticompetitive effects of the proposed [transaction].'" Order re Evidentiary Hr'g on Prelim. Inj. Mot. (ECF 76) at 2 (quoting *Warner Commc'ns*, 742 F.2d at 1164); *see also* Op. at 22. Accordingly, "the Court does not resolve conflicts in the evidence—the question is simply whether the FTC 'has met its burden of showing a likelihood of success on the merits.'" Op. at 23 (quoting *Warner Commc'ns*, 742 F.2d at 1164).

In its Order, the Court at first recited the proper *Warner Communications* standard. Op. at 22-23. But when the Court turned to whether the FTC had made a sufficient showing as to anticompetitive effects, the Court inexplicably deviated from *Warner Communications*. Instead, the Court applied the standard applicable to trials on the antitrust merits, relying on government cases seeking *permanent* injunctions. In that context, federal district courts bear the responsibility for determining the antitrust merits in the first instance; there is no separate administrative proceeding to follow. In *United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019), for example, the United States sought a permanent injunction; the government there had the burden to *prove* the ultimate merits—not merely to raise "serious, substantial" questions as to the merits. And yet the Court here held the FTC to the same burden from *AT&T*, holding that "with this proposed vertical merger, the outcome 'turn[s] on whether, notwithstanding the

1   proposed merger's conceded procompetitive effects, the [g]overnment has met its burden of

2   establishing, through 'case-specific evidence,' that the merger of [Microsoft] and [Activision],

3   at this time and in this remarkably dynamic industry, is likely to substantially lessen competition

4   in the manner it predicts.'" Op. at 31 (quoting *AT&T*, 916 F.3d at 1037). That is decidedly not

5   the standard applicable to this preliminary Section 13(b) proceeding, and the Court erred in

6   holding the FTC to the standard applicable to a full trial on the merits of a vertical merger. The

7   same error affected other aspects of the Court's analysis as well. *See, e.g.*, Op. at 30 (relying on

8   *AT&T* and other non-Section 13(b) cases), 31 ("the court must engage in a comprehensive

9   inquiry") (quoting *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 190 (D.D.C. 20198), 46

10   (applying *AT&T* merits standard).

11   **B. The Court Erred as a Matter of Law When It Concluded That Microsoft Was**

12   **Likely to Foreclose Rivals in the Market for Multigame Subscription Library Services but**

13   **Found That Asserted Benefits to Microsoft's Game Pass Customers Outweighed That**

14   **Foreclosure**

15   The Court erred as a matter of law when it concluded that the FTC had not demonstrated

16   a likelihood of success with respect to the anticompetitive effects of the Proposed Acquisition in

17   the market for Multigame Library Subscription Services. *See* Op. at 47-48. As the Supreme Court

18   has explained, "[t]he primary vice of a vertical merger . . . is that, by foreclosing the competitors

19   of either party from a segment of the market otherwise open to them, the arrangement may act

20   as a clog on competition, which deprives rivals of a fair opportunity to compete." *Brown Shoe*

21   *Co. v. United States*, 370 U.S. 294, 323-24 (1962) (cleaned up); *see Ford Motor Co. v. United*

22   *State*s, 405 U.S. 562, 573 (1972); *United States v. Am. Cyanamid Co*., 719 F.2d 558, 566 (2d

23   Cir. 1983). And here, of course, the FTC needed only raise substantial questions about whether

24   such foreclosure was likely.

25   The Court assumed for purposes of its analysis that "Multigame Content Library

26   Services" constitute a relevant antitrust product market. Op. at 28. The Court acknowledged that

27   it was "undisputed that the combined firm has significant financial incentive to include *Call of*

*Duty* in Game Pass," Microsoft's market-leading multigame content library subscription service. Op. at 47; *see* Op. at 14-15 (stating that Game Pass had over 25 million subscribers by the end of 2022 and noting Sony was the "second most popular" service). The Court "accept[ed] for preliminary injunction purposes it is likely *Call of Duty* will be offered exclusively on Game Pass, and not offered on rival subscription services." Op. at 47. These propositions together constitute a finding that the combined firm is likely to foreclose rivals from *Call of Duty* in the market for multigame library subscription services. That alone should suffice for the Court to enjoin the transaction pending the FTC's review of the merits.

The Court further erred as a matter of law when it failed to apply the Supreme Court's *Brown Shoe* multifactor liability framework to the likely foreclosure. *See, e.g.*, *United States v. Am. Cyanamid Co.*, 719 F.2d 558, 567 (2d Cir. 1983) (reversing district court and remanding for application of *Brown Shoe* factors for assessing vertical merger foreclosure); *Fruehauf Corp. v. FTC*, 603 F.2d 345, 352 (2d Cir. 1979) (describing Brown Shoe as "the fountainhead of § 7 analysis of vertical mergers"). The Court faulted the FTC for not referencing *Brown Shoe* in its opening or closing arguments, but the FTC relied on this theory throughout this case. *See, e.g.*, FTC Mot. for TRO (ECF 7) at 17-18; FTC Initial Proposed Findings of Fact & Conclusions of Law at 108-11; FTC Final Proposed Findings of Fact & Conclusions of Law ("FFOF") at 170-71, 174, 179-83.

The Court's single paragraph addressing *Brown Shoe*'s foreclosure factors simply asserts that "the FTC does not make any new arguments not considered above." Op. at 50. That is incorrect. For example, the Court simply skipped over the question of whether potential foreclosure of Activision's AAA content from Microsoft's current and future rivals would be more than de minimis. *Brown Shoe*, 370 U.S. at 328. Similarly, despite conceding that one factor of the FTC's *Brown Shoe* theory involved the proposed merger increasing barriers to new entry, the Court failed to address this factor.

The Court notably failed to address the "nature and purpose" of this vertical merger—a factor the Supreme Court termed "most important . . . to examine." *Brown Shoe*, 370 U. S. at

329.  If the vertical arrangement resembles "a tying contract," the Supreme Court makes clear that it "is inherently anticompetitive" and "is likely substantially to lessen competition although only a relatively small amount of commerce is affected." *Id*. (internal quotation marks omitted). And yet, the Court accepted "for preliminary injunction purposes it is likely *Call of Duty* will be offered exclusively on Game Pass, and not offered on rival subscription services"; therefore, the Court found that the combined firm is likely to require purchasing a Game Pass subscription if a user wants to access *Call of Duty* via subscription service. Op. at 47. That is "quite analogous to . . . a tying clause." *Brown Shoe*, 370 U.S. at 332. Accordingly, the Proposed Acquisition "is inherently anticompetitive" even if "only a relatively small amount of commerce is affected." *Id*. at 329. The Court instead concluded that "the record does not support a finding of a serious question as to whether *Call of Duty* Game Pass exclusivity will probably substantially lessen competition in the subscription services market." Op. at 47. Similarly, the Court discounted evidence of Microsoft's past conduct suggesting the nature and purpose of the arrangement was akin to a tie, again contravening the Supreme Court's express reliance on such evidence to prohibit a vertical merger. *See Brown Shoe*, 370 U.S. at 332; *Gulf & W. Indus., Inc. v. Great A&P Tea Co.*, 476 F.2d 687, 697 (2d Cir. 1973).

The Court erred further in balancing the likely foreclosure in the subscription services market against the alleged benefits from putting *Call of Duty* on Game Pass. Op. at 47. According to the Court, adding *Call of Duty* to Game Pass will increase Game Pass users, which in turn will give Microsoft more incentive to invest in other games. *See* Op. at 47-48. Even if a merger allows the merged entity to provide better service to its customers, "the Clayton Act does not excuse mergers that lessen competition or create monopolies simply because the merged entity can improve its operations." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 792 (9th Cir. 2015). "It is difficult enough in § 7 cases to predict whether a merger will have future anticompetitive effects without also adding to the judicial balance a prediction of future efficiencies." *Id*. at 790. Once the Court concluded that it is likely that the combined firm would make *Call of Duty* exclusive to Game Pass, the Court committed reversible error

when it substituted this erroneous balancing in place of the *Brown Shoe* factors for assessing foreclosure. Here, too, the Court improperly held the FTC to a burden far greater than the Ninth Circuit's "serious, substantial questions" standard. *Warner Commc'ns*, 742 F.2d at 1162.

**C. The Court Erred in Relying on Microsoft's Offers to and Agreements with Rivals to Find that the FTC Had Failed to Raise Substantial Questions about Incentive**

In finding lack of incentive to foreclose in the console and cloud markets, the Court relied, respectively, on Microsoft's putative offer to Sony to keep *Call of Duty* on PlayStation consoles and on Microsoft's "post-FTC complaint agreements with five cloud-streaming providers." Op. at 38, 49. The Court's reliance and analysis here on these putative "remedies" is erroneous on multiple grounds.

First, such offers and agreements are not properly considered in deciding the issue of whether the FTC has raised substantial questions about incentive to foreclose. Because a § 13(b) proceeding does not reach the ultimate merits of the transaction, it cannot resolve what the appropriate remedy would be if the Commission were ultimately to find a violation. *See generally United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 556 (1971) (observing that even a final adjudicator "naturally [does] not reach the question of remedy" if it does not first find liability).

Second, even if they were properly considered, the Court's analysis is inadequate as a matter of law. To preclude the FTC from showing a likelihood of success, putative remedies would need to dispel any substantial doubts and serious questions about the transaction's legality. *See Warner Commc'ns*, 742 F.2d at 1162; *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 725 (D.C. Cir. 2001). Here, the Court instead simply assumed from the existence of the agreements and offers that they are procompetitive. Op. at 38, 49. For example, the Court's assertion that the Sony offer is "just as favorable as Sony's current deal with Activision," Op. at 38, has no support other than the Court's own reading of a few of the offer's terms and ignores the evidence that the offer does not remedy the potential harms to competition in the console market. According to the Court, this suffices to

show somehow that the offer to Sony would have procompetitive effects on "output" and yield "significant efficiencies." Op. at 48. The Court erred in making up for Defendants' lack of evidence about the effects of these "remedies" in the relevant markets. *See, e.g.*, Hr'g Tr. at 933-34 (Microsoft Gaming CFO confirming no analysis of the effects of any of the "remedies" on Microsoft Gaming's business).

### D. The Court's Partial Foreclosure Analysis Constitutes Reversible Error

First, the Court was incorrect that the FTC omitted a theory of partial foreclosure from "its original moving papers," Op. at 45. *See, e.g.*, Compl. ¶¶ 117-25 (alleging merger would give Microsoft ability and incentive to engage in numerous strategies comprising partial foreclosure); FTC Mot. for TRO (ECF 7) at 20-22 (discussing Microsoft's ability and incentive to degrade (i.e., partially foreclose) Activision content on rival platforms).

Second, the Court erred as a matter of law in stating that "[i]f the FTC has not shown a financial incentive to engage in full foreclosure, then it has not shown a financial incentive to engage in partial foreclosure." Op. at 45. Even assuming *arguendo* that the FTC had failed to submit evidence sufficient to raise substantial questions about full foreclosure (i.e., completely withholding Activision content), the Court's statement about partial foreclosure is incorrect. Partial foreclosure is in fact less costly for the combined firm than full foreclosure. While full foreclosure means giving up all revenues from the withheld input, partial foreclosure simply entails raising rivals' costs or degrading the input rivals may purchase relative to the foreclosing firm's product. The Supreme Court found a vertical merger violated § 7 even where the merged firm was only financially incentivized to engage in partial foreclosure. *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 605 (1957). *See also, e.g.*, *United States v. Sybron Corp.*, 329 F. Supp. 919, 928-29 (E.D. Pa. 1971) ("[A]bsolute foreclosure . . . would not be a profitable course for an integrated [firm] . . . .  Yet, there are many more subtle avenues available to an integrated firm to increase its manufacturing sales, without risking retail sales."); Hovenkamp, *Competitive Harm from Vertical Mergers* at 8 (2020), *available at* https://scholarship.law.upenn.edu/faculty_scholarship/2218. Partial foreclosure can include, for

example, making Activision content available first or appear better on Microsoft products and services as compared to rivals.

Third, contrary to the Court's assertion that "the record does not include any evidence Microsoft has engaged in such conduct in the past," Op. at 46, there was ample evidence that Microsoft has deployed and contemplated such partial foreclosure strategies in the past. For example, Microsoft Gaming's CFO stated publicly after Microsoft's acquisition of Zenimax that Microsoft would not be pulling Zenimax content off of any rival, but instead Microsoft "want[s] that content in the long run to be either first or better or best or pick your differentiated experience on our platform." Hr'g Tr. at 955-56 (discussing PX9192). "We will want Bethesda [i.e., Zenimax] content to show up the best as on our platforms." Hr'g Tr. at 957. "'First' could mean showing up first on a Microsoft platform as compared to another platform," and as Microsoft decided with Zenimax game Starfield. Hr'g Tr. at 958. "Better" could mean better resolution, safety, security or other features versus rivals. Hr'g Tr. at 960. The Gaming CFO confirmed that "things like Starfield and Redfall did show up first on Xbox so we're following through on the things I said there." Hr'g Tr. at 961. The CFO later told Microsoft Gaming's CEO that he "wish[ed] we could just go out and say we are taking it all [i.e., Zenimax titles] exclusive at this point." Hr'g Tr. at 964; PX4377.

The Court's failure even to address the FTC's arguments and evidence regarding partial foreclosure strategies constitutes reversible error.

**E. The Court Misapplied the Law and Ignored the FTC's Evidence in Evaluating Incentive to Foreclose**

The Court misapplied the law in when it analyzed the evidence about the combined firm's incentive to foreclose. The Court assumed that the FTC had met its burden with respect to relevant product markets, found for the FTC on the issue of relevant geographic market, and accepted that the combined firm would have the ability to foreclose. Op. at 27-28, 33. Nevertheless, the Court found that the combined firm did not have the incentive to foreclose rivals. Op. at 33-50. In reaching that determination, however, the Court improperly resolved

"conflicts in the evidence" (that the Court itself identified) in violation of *Warner Communications*. 742 F.2d at 1164 (holding that in a Section 13(b) proceeding courts "do not resolve conflicts in the evidence" or "undertake an extensive analysis of the antitrust issues"). Indeed, the Court not only weighed evidence, it ignored the FTC's evidence that more than sufficed to raise substantial questions about the combined firm's incentive to foreclose. In some instances, the Court contradicted itself about the weight the evidence was to be given. Following are examples of these errors.

1. **The Court erred as a matter of law when it found that evidence of Microsoft's stated intent outweighed the evidence of incentive to foreclose**

Although the Court correctly identified the issue as being whether the combined firm has the incentive to foreclose rivals, Op. at 33, the Court erred as a matter of law when it relied on evidence of Microsoft's "intent" and when it found that such evidence outweighed the evidence of incentive to foreclose. Intent is not an element of a claim that a merger violates the antitrust laws. *E. I. du Pont de Nemours*, 353 U.S. at 607. "Honest intentions, business purposes and economic benefits are not a defense to violations of an antimerger law," *Miss. River Corp. v. FTC*, 454 F.2d 1083, 1089 (8th Cir. 1972), and "good motives will not validate an otherwise anticompetitive practice." *Cal. Dental Ass'n v. FTC*, 224 F.3d 942, 948 (9th Cir. 2000). Other than when specific intent is required as an element of conspiracy or attempt, evidence of intent is relevant only to the extent it helps illuminate competitive effects. *See Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) ("knowledge of intent may help the court to interpret facts and to predict consequences"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603 (1985); *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) ("Evidence of the intent . . . is relevant only to the extent it helps us understand the likely effect of the monopolist's conduct.").

Contrary to this established law, the Court reviewed and relied upon evidence of Microsoft's supposed intent as if intent itself were an element that the FTC was required to prove. First, the Court relied on Microsoft's efforts to reach deals with some (but not all) of its rivals

1    and found that "this conduct is inconsistent with an *intent* to foreclose." Op. at 34 (emphasis

2    added). Second, the Court relied upon testimony from Microsoft executives that "there are no

3    plans to make *Call of Duty* exclusive to Xbox." Op. at 35. As an initial matter, this is inconsistent

4    with the Court's acceptance that it is "likely" that Microsoft will make *Call of Duty* exclusive to

5    Xbox's Game Pass subscription service. Op. at 47. But more fundamentally, the Court

6    committed an error of law when it relied upon the self-serving testimony of Microsoft executives

7    that they do not intend to foreclose rivals as a reason to find the FTC had failed to make its prima

8    facie case regarding incentive. *See* Op. at 35-36.

9         Such promises—in or out of court—have little or no probative value in assessing the

10   incentive that a combined firm will face. *See FTC v. Meta Platforms, Inc.*, No. 5:22-cv-04325-

11   EJD, 2023 WL 2346238, at *25 (N.D. Cal. Feb. 3, 2023) (according little weight to statements

12   made during the course of litigation). That "Microsoft executives consistently testified that there

13   are no plans to make *Call of Duty* exclusive to Xbox," Op. at 35, is irrelevant to the issues

14   properly before the Court: what are the likely *incentives* of the combined firm and has the FTC

15   raised serious questions as to whether these incentives indicate a reasonable probability that

16   competition may be substantially lessened if Defendants merge. *See AT&T*, 916 F.3d at 1045

17   (observing that testimony with respect to the competitive effects of a vertical merger is of "little

18   probative value" if it "involve[s] promises or speculations about the employees' future, post-

19   merger behavior"). The evidence regarding incentive cannot be balanced against mere promises

20   not to foreclose. Self-serving avowals about intentions and plans cannot suffice to prevent the

21   FTC from having a fair opportunity to adjudicate a merger's lawfulness.

22        **2.   The Court committed reversible error when it improperly assigned the FTC the**

23        **burden of producing a smoking gun document**

24        The Court erred in requiring the FTC to produce documentary evidence to overcome

25   Microsoft's stated intent not to make *Call of Duty* exclusive to Xbox consoles. Op. at 36. It is

26   not the FTC's burden to produce documents to contradict a company's self-serving statements

27   made in the shadow of litigation about its intentions. But even putting that aside, the Court here

28

1    ignored such "smoking gun" evidence.

2        The FTC introduced extensive evidence that Microsoft's top executives understood that

3    they could lose money on sales of Activision content on PlayStation, but could recoup those

4    losses with increased Game Pass subscribers and more revenue from Activision titles on Xbox

5    consoles. Coming out of a meeting with Microsoft's CEO and CFO, the Microsoft Gaming

6    finance team modeled the *loss* in revenues to the combined firm if revenues from Activision

7    sales on Sony's PlayStation declined. Hr'g Tr. at 1006-13; PX1190; PX4319. This analysis,

8    which was shared with Microsoft's top executives and planned to be shown to the Board,

9    demonstrated that Microsoft could lose revenue from Activision sales on PlayStation (contrary

10   to the official deal valuation model presented to Microsoft's Board), but could make up for those

11   losses through a combination of increasing subscribers to Game Pass and shifting Activision

12   revenues away from PlayStation to Xbox. Hr'g Tr. 1015-22, 1023-29; PX4358; PX4359;

13   PX4367; PX4467; PX4472. The CFO testified that the number of new Game Pass subscribers

14   and the shift in Activision revenues to Xbox that would be required to make up for revenues lost

15   on PlayStation were both "reasonable" and "achievable." Hr'g Tr. at 1029. This is as close to a

16   smoking gun regarding analysis of incentive to foreclose as one is likely to see in a case of this

17   kind. Despite this, the Court ignored this evidence and concluded that the FTC's incentive

18   evidence was insufficient. *See, e.g.*, Op. at 36, 40.

19       This evidence raises substantial questions about the competitive effects of the Proposed

20   Acquisition, including about the incentive to foreclose rivals. Ignoring this evidence of incentive,

21   especially while crediting Microsoft executives' self-serving statements about the Company's

22   "intent," constitutes a reversible misapplication of the legal standard. *See Warner Commc'ns.*,

23   742 F.2d at 1164 ("Because the issue in this action for preliminary relief is a narrow one, we do

24   not resolve the conflicts in the evidence.").

25       **F. The Court committed reversible error when it found that the record contains**

26   **conflicting evidence on the anticompetitive effects of the merger but held that the FTC had**

27   **not established a likelihood of success on the merits**

28

The Court conceded a point that necessarily should have yielded finding a likelihood of success: "at best, 'the record contains conflicting evidence on the anticompetitive effects of the merger.'" Op. at 52 (quoting *Warner Commc'ns*, 742 F.2d at 1165). But when that is true, then the FTC has demonstrated "a likelihood of success." As *Warner* explains: "[W]e do not ignore the evidence presented by the defendants which conflicts with the Commission's evidence. Because the issue in this action for preliminary relief is a narrow one, we do not resolve the conflicts in evidence . . . . We hold only that the Commission has met its burden on showing a likelihood of success on the merits." *Warner Commc'ns*, 742 F.2d at 1164.

### G. The Court Erred in Balancing the Equities

In balancing the equities, the Court (1) inappropriately looked to the FTC, instead of Defendants, to "point to beneficial economic effects"; (2) failed to address the FTC's evidence and arguments regarding immediate harm to innovation competition and harm resulting from sharing of competitively sensitive information between the two companies; and (3) failed to address the FTC's evidence and arguments about the efficacy and difficulty of cleanly separating two companies *after* such sharing has commenced, recurring problems that are the very reason Congress enacted FTC Act § 13(b).

First, "[s]ection 13(b) places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard; the Commission need not show irreparable harm to obtain a preliminary injunction." *Warner Commc'ns, Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984). Yet the Court's equities analysis would effectively require the FTC to prove irreparable harm, contravening the statutory text and purpose. The Court also erroneously looked to the FTC to "point to beneficial economic effects". Op. At 52 ("[T]he FTC cannot point to beneficial economic effects as a public equity."). *See H.J. Heinz Co*., 246 F.3d at 726.

Second, the harms identified by the FTC in this case are of the kind that are considered irreparable in this Circuit. In *Filtrol Corp. v. Slick Corp*., No. 69-607-ALS, 1969 WL 219, at *8 (C.D. Cal. Dec. 29, 1969), *aff'd*, 428 F.2d 826 (9th Cir. 1970), the district court found a risk that "through the acquisition the distributor would gain a preferred position vis-a-vis its

competitors . . . and would have power to deny supply to competitors or to supply inferior quality." *Id*. In light of this risk, the district court found it necessary to issue a preliminary injunction to ensure that the distributor would not gain "access to [the supplier's] treasury and to its competitive development and research plans." *Id*. Here, the FTC submitted evidence that the proposed acquisition will lead to similar harms in the relevant markets. For example, as a current supplier of gaming content to Microsoft's rivals, Activision has access to competitively significant information from those rivals. FFOF ¶¶ 662-71. Absent a stay, Microsoft will gain access to Activision's data and to the competitive development and research plans of its rivals to which Activision is privy. As in *Filtrol*, the public and competition will be irreparably harmed from any resulting halt to or slowdown of any future joint projects that Microsoft's rivals were working on with Activision. *See* 1969 WL 219, at *8; *see* FFOF ¶ 671.

Third, the Court assumed, without support and contrary to record evidence, that divestiture down the road would be both simple and effective at remedying any interim harms. Op. at 52. To the contrary, it would be difficult to prevent Microsoft from using the information it will obtain from Microsoft about its rivals in the relevant markets even if a divestiture is subsequently ordered. *See Filtrol Corp.*, 1969 WL 219, at *8; *H.J. Heinz*, 245 F.3d at 726 ("Section 13(b) itself embodies congressional recognition of the fact that divestiture is an inadequate and unsatisfactory remedy in a merger case); *FTC v. Dean Foods Co.,* 384 U.S. 597, 606 n.5 (1966) ("Administrative experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture."). As to whether post-consummation divestiture would be *effective*, Activision's own CEO testified that putting Activision titles on Microsoft's Game Pass service would result in "destruction of value" and "degrade the economics" of Activision's content. Hr'g Tr. at 729, 752. Yet the Court failed to analyze the extent to which this predicted destruction would likely occur or the extent to which it would be remediable by the Commission if it were to find the Proposed Acquisition unlawful. * * *

Plaintiff respectfully submits that it has established a likelihood of success on appeal and,

at a minimum, has raised substantial questions about the Court's Opinion. Accordingly, an injunction pending resolution of this issue by the Ninth Circuit Court of Appeals is warranted.

## III. THE FTC AND THE PUBLIC INTEREST WILL BE IRREPARABLY HARMED IF THE MERGER IS ALLOWED TO PROCEED

Where the federal government is a party to the litigation, the public interest merges with the asserted harm to the government. *Nken*, 556 U.S. at 435. Consummation of the Proposed Acquisition while the appeal is pending will irreparably harm the public interest and the FTC.

If the Proposed Acquisition is consummated, the harm to the public begins immediately. If a preliminary injunction is not granted, Microsoft and Activision can begin to share confidential business information and long-term strategic planning information and can begin to make plans for exclusivity of Activision content. For example, as the Court assumed, "it is likely *Call of Duty* will be offered exclusively on Game Pass, and not offered on rival subscription services." Op. at 47. The harms in the market for multi-game subscription services will begin immediately upon consummation of the Proposed Acquisition as Microsoft and Activision begin operationalizing the full foreclosure that the Court assumed is "likely." This will result in ongoing harm to consumers that will be difficult to remedy after the full litigation process runs its course.

Another example of immediate harm arises from Microsoft's gaining access to its rivals' sensitive information about their work with Activision to optimize Activision content for their products and services. *See supra.* Microsoft and its competitors currently share information with Activision to engage in procompetitive innovations. *See supra.* Those rivals will likely stop sharing information with a combined firm. *See, e.g.*, PX7053 (Ryan (Sony) Dep.) at 34:16 ("We simply could not run the risk of a company that was owned by a direct competitor having access to that information."). Even if the FTC eventually wins on appeal, the harm to competition from shutting off the flow of information is an immediate competitive harm, and the lost time and effort on innovation cannot later be restored even the merger is later unwound. *See supra.*

These harms will manifest even if "Microsoft and Activision will act as parent and

subsidiary" with "no planned dismantling of operations." Op. at 52. "Effective enforcement is made difficult when the FTC must undo a merger after it has been consummated." *FTC v. Lab. Corp. of Am.*, No. 10-cv-1873, 2011 WL 3100372, at *22 (C.D. Cal. Mar. 11, 2011) (citing *FTC v. Freeman Hosp.*, 69 F.3d 260, 272 (8th Cir. 1995)); *see also Whole Foods Market*, 548 F.3d at 1033-34. As several courts have noted, "once an anticompetitive acquisition is consummated, it is difficult to 'unscramble the egg.'" *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217 n.23 (11th Cir. 1991); *see, e.g.*, *FTC v. Dean Foods Co.*, 384 U.S. 597, 606 (1966) ("Administrative experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture."); *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 217 (D.D.C. 2018) ("Divestitures may not succeed at restoring competition to the post-merger market."). The sharing of strategic information in ways that are harmful to competitors cannot be "unscrambled."

## IV.   ENTRY OF AN INJUNCTION PENDING APPEAL WILL NOT SUBSTANTIALLY INJURE DEFENDANTS

Defendants will not be substantially injured by the brief delay from Plaintiff's appeal of this Court's Order. There is no evidence that the parties are required to abandon the Proposed Acquisition should the Court grant a stay that extends past July 18, 2023. Microsoft has publicly stated that it is seeking to stay its appeal of the United Kingdom's ruling against the merger. *See* https://twitter.com/BradSmi/status/1678796043545350144?s=20 (last accessed on July 12, 2023). Microsoft's willingness to delay an appeal elsewhere supports finding that delay here will not substantially injure Defendants. Accordingly, any alleged harm to Defendants from a stay while the appellate process in this country plays out is far outweighed by the substantial public interest in maintaining competition.

## V.   AN INJUNCTION IS IN THE PUBLIC INTEREST

As discussed above with respect to the injuries to the public if the merger is consummated, denial of an injunction pending appeal would undermine the strong public interest in the effective enforcement of the antitrust laws by denying the public the opportunity to obtain

full and complete relief should the FTC ultimately prevail on the merits. *See E. I. du Pont de Nemours*, 366 U.S. at 323. Substantial harm to competition will likely occur during the pendency of the appeal. Not least, bringing *Call of Duty* exclusively to Game Pass and allowing Microsoft access to its competitors' sensitive information about optimizing *Call of Duty* will manifest immediate harms to the public. It is in the public interest to maintain the *status quo* while the Court of Appeals assesses the merits of this Court's decision denying the motion for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant an injunction pending appeal of this Court's Opinion denying Plaintiff's motion for a preliminary injunction. Alternatively, Plaintiff respectfully requests that the Court temporarily enjoin the Acquisition pending a ruling by the Court of Appeals on an emergency application for an injunction pending appeal that Plaintiff intends to file.

Dated: July 13, 2023

Respectfully submitted,

*/s/ James H. Weingarten*
James H. Weingarten
Peggy Bayer Femenella
James Abell
Cem Akleman
J. Alexander Ansaldo
Michael T. Blevins
Amanda L. Butler
Nicole Callan
Maria Cirincione
Kassandra DiPietro
Jennifer Fleury
Michael A. Franchak
James Gossmann
Ethan Gurwitz
Meredith R. Levert
David E. Morris
Merrick Pastore
Stephen Santulli
Edmund Saw

PLAINTIFF'S RULE 62(d) MOTION FOR INJUNCTION PENDING APPEAL
CASE NO. 3:23-CV-2880-JSC

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3570

Erika Wodinsky
90 7th Street, Suite 14-300
San Francisco, CA 94103
Tel: (415) 848-5190

*Counsel for Plaintiff Federal Trade Commission*