James H. Weingarten, DC Bar No. 985070
Peggy Bayer Femenella, DC Bar No. 472770
James Abell, DC Bar No. 990773
Cem Akleman, FL Bar No. 107666
Meredith R. Levert, DC Bar No. 498245
Jennifer Fleury, NY Bar No. 5053178
James Gossmann, DC Bar No. 1048904
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3570
*jweingarten@ftc.gov; pbayer@ftc.gov:*
*jabell@ftc.gov; cakleman@ftc.gov;*
*jfleury@ftc.gov; mlevert@ftc.gov;*
*jgossmann@ftc.gov*

Erika Wodinsky, Cal. Bar No. 091700
90 7th Street, Suite 14-300
San Francisco, CA 94103
Tel: (415) 848-5190
*ewodinsky@ftc.gov*

[Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

**FEDERAL TRADE COMMISSION**,

        Plaintiff,

    v.

**MICROSOFT CORP.**

and

**ACTIVISION BLIZZARD, INC.,**

      Defendants.

Case No. 3:23-cv-2880

*Hearing: As soon as the matter may be heard.*

**PLAINTIFF FEDERAL TRADE COMMISSION'S REPLY TO DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION MOTION**

**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## TABLE OF CONTENTS

ARGUMENT ................................................................................................................1

I.   The FTC raises "substantial questions" about the legality of the Acquisition .................2

   A.   Defendants Fail to Rebut the FTC's Market Definitions.............................................2

      1.   Defendants' Assertions about Nintendo and PCs Ignore the Evidence. ...............3

      2.   Multi-Game Content Library and Cloud Gaming Subscription Services Are
         Relevant Antitrust Markets ....................................................................................5

   B.   Microsoft has both the incentive and ability to foreclose competitors .......................7

      1.   Microsoft's decision to make ZeniMax games exclusive is powerful evidence of
         incentive to foreclose ............................................................................................7

      2.   Microsoft's deal model for valuing Activision does not constrain its ability to
         foreclose rivals ......................................................................................................9

      3.   The Proposed Acquisition may substantially lessen competition in the multi-
         game content library and cloud gaming markets ................................................ 11

   C.   Microsoft's commitments to foreign regulators and private agreements are not
      relevant here.............................................................................................................. 12

   D.   Defendants' interest in completing the acquisition cannot outweigh the public
      equities ...................................................................................................................... 14

CONCLUSION .......................................................................................................... 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Brown Shoe v. United States*, 370 U.S. 294 (1962) ........................................................ 3, 5

*FTC v. Elders Grain*, Inc., 868 F.2d 901 (7th Cir. 1989) .................................................. 2

*FTC v. Exxon Corp.*, 636 F.2d 1336 (D.C. Cir. 1980) ...................................................... 14

*FTC v. Food Town Stores, Inc.*, 539 F.2d 1339 (4th Cir. 1976) ...................................... 13

*FTC v. H.J. Heinz*, 246 F.3d 708 (D.C. Cir. 2001) ................................................ 12, 13, 14

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) ............................... 2

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ........................................................ 15

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984) ............................ 2, 12, 13

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ......................... 2, 3, 13, 14

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) ..................... 14

*Greyhound Computer Corp., Inc. v. Int'l Bus. Machines Corp.*, 559 F.2d 488
    (9th Cir.1977) ........................................................................................................... 12

*In re Illumina*, No. 9401, 2023 WL 2823393 (F.T.C. Mar. 31, 2023) ............................ 13

*In the Matter of Union Carbide Corp.*, 59 F.T.C. 614, 1961 WL 65409 (1961) ............... 6

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021) ............... 3

*TRW, Inc. v. FTC*, 647 F.2d 942 (9th Cir. 1981) ............................................................... 3

*United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019) ........................................... 7

*United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHO, 2014 WL 203966
    (N.D. Cal. Jan. 8, 2014) ........................................................................................ 4, 12

*United States v. Bertelsmann SE & Co.*, No. 21-2886-FYP, 2022 WL 16949715
    (D.D.C. Nov. 15, 2022) ............................................................................................. 4

*United States v. Kimberly-Clark Corp.*, 264 F. Supp. 439 (N.D. Cal. 1967) ................... 11

Defendants' arguments might be persuasive if they were aimed at the applicable law, the FTC's actual claims, and the record evidence. They are not. Defendants assert that the upcoming hearing must decide the merits of their deal, lest they be forced to renegotiate their self-imposed July 18 deadline for completing their transaction. But the law, as this Court already ruled, is that the FTC need only present "evidence sufficient to raise serious, substantial, difficult questions regarding the anticompetitive effects" of Microsoft's acquisition of Activision. Order (Dkt. No. 76) at 2. Defendants assert that the "FTC's central claim is that the combined firm would withhold certain Activision content—in particular, *COD*—from Sony." Opp. at 14. But that is a strawman. The FTC's actual claim is that it is reasonably probable that the combined firm will have the ability and incentive to harm competition, including from future competitors, in several ways in multiple markets where the competitive effects of this transaction will be felt, including consoles, content subscription, and cloud gaming services.

As for the evidence, Defendants focus on points irrelevant in a § 13(b) proceeding (e.g., ex post agreements with companies operating outside the United States) and ignore the voluminous record developed for the merits trial on August 2. Contrary to Defendants' arguments, the evidence shows the following: 1) the Nintendo Switch is not a "Generation 9" console, and Microsoft's executives and Board all track "Generation 9" market shares that exclude Nintendo; 2) that Microsoft tells game developers that game subscription services (like Xbox Game Pass) are additive to—and do not only cannibalize—game sales; 3) that cloud gaming will be a critical part of gaming's future; 4) that content is critical to the success of the Xbox ecosystem, inclusive of console, game subscription, and cloud services; 5) that after Microsoft acquired video game developer ZeniMax in 2021, Microsoft decided to make ZeniMax games exclusive despite the costs of making content exclusive; and 6) that Microsoft values the "mobile" strategy it touts for Activision at ▇▇▇▇▇ of the financial value Microsoft ascribes to acquiring Activision. And this is but a fraction of the evidence supporting the FTC's request for a preliminary injunction.

## ARGUMENT

Defendants incorrectly attempt to cast this hearing as the merits trial to determine

whether the Proposed Acquisition is unlawful. *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984) ("Our present task is not to make a final determination on whether the proposed merger violates Section 7[.]"). As the Court already explained, the FTC has the "burden of demonstrating a likelihood of success by presenting evidence sufficient to raise serious, substantial, difficult questions regarding the anticompetitive effects of the proposed [transaction.]" Docket No. 76 at 2 (citation omitted, brackets in original). Once the FTC raises "serious, substantial, difficult questions," Defendants must dispel any doubts about the legality of their transaction, such that the Court would be "certain[]" and have "no doubt that [the] merger would not substantially lessen competition." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1035-36 (D.C. Cir. 2008). "[A]ny 'doubts are to be resolved against the transaction.'" *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016) (quoting *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989)).

The evidence here amply demonstrates that the FTC satisfies the §13(b) standard and that the equities weigh entirely in favor of preliminarily enjoining the transaction.

**I.     The FTC raises "substantial questions" about the legality of the Acquisition**

Defendants endeavor to turn the Court away from the correct legal standard at this preliminary proceeding, while failing to dispel the substantial questions that the FTC has raised. Far from "claiming that it needs to offer only scant proof," Opp. at 2, the FTC intends to present testimony from senior Microsoft executives, and has more documents supporting its position than it can feasibly introduce during the hearing. *See* Ex. I to Fleury Dec. in Support of FTC's Motion for a Temporary Restraining Order (Dkt. No. 10) (FTC's Part 3 exhibit list). Relying here on only a fraction of the evidentiary record available in the administrative hearing on the merits that is set to begin on August 2, the FTC will show that the Microsoft-Activision entity has the incentive and the ability to harm competition in several well-defined relevant antitrust markets. Finally, neither Microsoft's ex post agreements nor groundless claims of private injury outweigh the public interest in maintaining the status quo until a full administrative trial on the merits, which begins in just 6 weeks.

**A.     Defendants Fail to Rebut the FTC's Market Definitions**

1    The purpose of defining a relevant antitrust market is to determine the "locus of

2    competition" and enable analysis of a proposed acquisition's competitive effects. *TRW, Inc. v.*

3    *FTC*, 647 F.2d 942, 947 (9th Cir. 1981) (quoting *Brown Shoe v. United States*, 370 U.S. 294, 324

4    (1962)). The FTC's proposed relevant markets are supported both quantitatively and

5    qualitatively, using either the Hypothetical Monopolist Test (HMT) or the Supreme Court's

6    *Brown Shoe* factors. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 (9th Cir.

7    2021) ("[N]o requirement to use any specific methodology in defining the relevant market.").

8    Defendants fail to even mention the HMT or the *Brown Shoe* factors, and their unsupported

9    assertions about the proposed relevant markets fail to persuade that any of the alleged markets is

10   not a "locus of competition" relevant to analyzing this transaction.[1]

11       **1.  Defendants' Assertions about Nintendo and PCs Ignore the Evidence.**

12       The qualitative and quantitative evidence demonstrates that the Nintendo Switch is

13   properly excluded from a market comprised of high-performance video game consoles. The

14   Xbox Series X and S and PlayStation 5 are recognized as Generation 9 consoles with similar

15   technical capabilities, while the Switch lacks these capabilities and is not Generation 9. PX7048

16   at 42:19-25. Microsoft and Sony's documents and testimony show that the two firms benchmark

17   their pricing and performance features against each other's Generation 9 consoles, not the

18   Nintendo Switch. PX1635-002; PX1752-001; PX3081-040; PX1747-020; PX6000 at 537:14-19

19   (Nintendo competes with Microsoft "to a much lesser extent" than PlayStation does.); PX1950-

20   001 (Switch is not a console, "as it is really a portable gaming device."). Microsoft leadership

21   emphasizes only Generation 9 console competition (i.e., not including Nintendo) to investors, PX

22   9015-005; PX9084-005, and analyzes Microsoft's share of the Generation 9 console market,

23   excluding Nintendo Switch. PX1747-009; PX1240-019. Defendants are quick to point out that

24   Nintendo "has thrived without [Call of Duty] for the past decade," Opp. at 11, but that only

25   supports the FTC's point: Nintendo has sold well without *Call of Duty* in part *because* it has a

26

27   ---
     [1] Defendants also continue to muddy the standard applicable here. *See* Opp. at 10. In the
28   Section 13(b) stage, the FTC need only "rais[e] some question of whether [the candidate
     market] is well-defined." *Whole Foods Mkt.*, 548 F.3d at 1037.

different set of content aimed at a different set of consumers than the high-performance consoles. PX7054 at 89:19-90:10.

Defendants' critiques of Dr. Lee's analysis are likewise unavailing. Dr. Lee, unlike Defendants' experts, thoroughly examined the evidence in this matter, including evidence demonstrating that Nintendo Switch differs from high-performance consoles in terms of its performance, price, and content library.[2] PX5000-075-84. Dr. Lee also concluded that, even if the Switch were included in the market, the likely anticompetitive effects of the Proposed Acquisition are the same as in the high-performance console market. PX5000-069.

Defendants' arguments regarding PCs likewise fail. There are significant differences between the prices of high-performance consoles and those of PCs optimized to play video games. PX4182-004.  Microsoft's own market analysis concluded that "Nintendo and PC are not seen as real competitors to Xbox One or PlayStation 4" by consumers and characterizes the PC as "an expensive hobbyist platform." PX5000-093. Sony ███████████████████████ ████████████████████████████████████████████████. PX3085-022. Importantly, Microsoft benefits if players switch to purchasing games on PCs as PCs are part of Microsoft's dominant Windows ecosystem. PX7011-010 at 35:9-23.

"[E]ven if alternative submarkets exist . . . or if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by the government unusable." *United States v. Bertelsmann SE & Co.*, No. 21-2886-FYP, 2022 WL 16949715, at \*14 (D.D.C. Nov. 15, 2022). The fact that the Nintendo Switch and Gaming PCs may compete in some broad sense with high performance consoles does not render that product market invalid. "[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *United States v. Bazaarvoice, Inc*., No. 13-cv-00133-WHO, 2014 WL 203966, at \*26 (N.D. Cal. Jan. 8, 2014) (citation omitted). Rather, the question is whether the

---

[2] Nintendo Switch's content library is focused on Nintendo's own well-known, family-friendly content and is part of what differentiates Nintendo Switch from the high-performance consoles. PX7053 at 21:6-22:3.

proposed relevant antitrust market "recognize[s] competition where, in fact, competition exists." *Brown Shoe v. United States*, 370 U.S. 294, 326 (1962). Both the high-performance console market and the alternative broader console market easily meet that the § 13(b) standard for properly defined relevant markets.

### 2. Multi-Game Content Library and Cloud Gaming Subscription Services Are Relevant Antitrust Markets.

*First*, Defendants' argument that multi-game content library subscription services "are not their own market, but rather an alternative way for consumers to pay for . . . games that are otherwise offered as standalone buy-to-play or free-to-play games," Opp. at 12, rests on a single cite from one of Defendants' retained experts. That expert incorrectly claims that buy-to-play sales constrains content and cloud gaming services and fails to engage with Microsoft's own statements about its Game Pass subscription service. *See* PX5001-115-117. Microsoft executives tout Game Pass to developers on the grounds that putting a game on Game Pass will add to and not simply cannibalize, the game's buy-to-play revenue. PX1767-001; PX7003 at 139:7-19.

The FTC's proposed multi-game content library subscription service market accords with the evidence. For example, firms offering multi-content subscription services benchmark their pricing off each other. Microsoft Gaming's CFO testified that "PlayStation's top two SKUs are 14.99 and 17.99 relative to our 9.99 and 14.99. We have an opportunity to move up the price . . . to reach their pricing." PX7007 at 102:16-103:19. ███████████████
███████████. PX7053 at 19:4-8. Amazon █████████. PX3206-004.
Market participants also view content library services as a distinct product segment. For example, ██████████████████████████
███████████████████. PX1995-008. And ██████████████████
████████████████████████████████████
███████████████████ PX0003-007.

Defendants' narrow focus on potential for cannibalization of buy-to-play sales from multi-game content library subscription services does nothing to undermine this evidence. Even if Game Pass cannibalized sales of individual games, there is no evidence that individual game

prices constrain or cannibalize Game Pass sales. Nor could there be, because multi-game content libraries are a distinct product with qualities that cannot be replicated by any individual game.

*Second*, cloud gaming subscription services also are a well-defined market. While Defendants refer here to cloud gaming as a "euphemism," a "feature," a "capability" and "unproven," (Opp. at 13, 22), Microsoft's own documents show that cloud gaming services is a distinct product segment with distinct competitors. For example, a 2019 Microsoft document identifies "Game Streaming Subscription Competitors," including Xbox Game Pass, Google Stadia, PlayStation Now (today's PlayStation Plus Premium), and Nvidia GeForce Now – all products that offer cloud streaming services. PX1613-003. A 2020 Microsoft Gaming presentation describes the "Game Streaming Competitive Landscape" as including Google, Sony, Nvidia, and Amazon. PX1110-024; PX4182-002. Microsoft told the investor community that Microsoft "continue[d] to lead in the fast-growing cloud gaming market." PX9012-006.

Cloud gaming subscription services also provide consumers with unique benefits, such as the ability to play high-end video games with lowered powered devices. PX8000-002. These benefits help to explain why industry participants, including Microsoft, view cloud gaming as a way of expanding the market by appealing to consumers who wish to play games without having to use a console. PX80000-002; PX1538-006; PX7036 at 93:18-24.

Defendants' focus on cloud gaming subscriptions as a nascent market is both irrelevant and misleading. The antitrust laws are designed for the protection of competition, including in markets that are still developing. *In the Matter of Union Carbide Corp.*, 59 F.T.C. 614, 1961 WL 65409, at *35 (1961). Documents from Microsoft and Sony demonstrate that the pursuit of Cloud gaming is ████████████████████████████████████████████. PX4057-001 ("████████████████████████████████████████.") PX1043-004 ("███████████████████████.") PX3272-010, 12. ██████████████████████ ██████████████████████████████████████ In fact, Microsoft recently rolled out direct integration of its cloud gaming service on Samsung Smart TVs ████████████████ ████████████████████████████ PX7055 at 51:6-52:2, 56:5-57:9; PX7041 at 26:21-27:3.

**B.    Microsoft has both the ability and incentive to foreclose competitors**

Microsoft has the ability and incentive to foreclose or partially foreclose Activision content post-acquisition. Microsoft's prior actions with its ZeniMax acquisition is one of many pieces of evidence demonstrating this fact. Defendants generalize about vertical mergers and their effects. Opp. at 19. But *this* case is about the effects of *this* merger. And while Defendants argue that vertical mergers are not a source of concern for courts, the law is clear that vertical mergers can lessen competition in a variety of ways and can violate the antitrust laws. *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1037 (D.C. Cir. 2019). This vertical merger—the largest ever in the gaming industry and in Microsoft's own history—is not exempt from antitrust review.

Defendants mischaracterize the nature of foreclosure analysis in vertical mergers. In their telling, this is a case about whether Microsoft will pull *Call of Duty* from PlayStation. But that is not the FTC's claim. Vertical mergers can result in harm via *total* foreclosure, for example, withholding Activision games entirely from rivals, or via *partial* foreclosure, for example, degrading Activision content or otherwise offering an inferior product to rivals. Both result in harm to consumers, and evidence demonstrates that both types of foreclosure would harm competition here. Defendants fail to acknowledge partial foreclosure is even possible and fail to rebut the harms that flow from it here.

Defendants' arguments here alternate between contradicting and omitting necessary evidence. For example, Defendants refer to Microsoft's offer to make Activision content available to Sony, but the assertions that follow are pure *ipse dixit* as to what Sony "is presumably worried" about, rather than reliance on the record evidence. Opp. at 15. Sony viewed Microsoft's proposal as uneconomical and insufficient because, *inter alia*, it failed to include access to non-*Call of Duty* games. PX7053 at 70:13-23; PX7043 at 61:2-67:13. Without citation, Defendants baldly assert that "[m]ost PlayStation gamers do not play [COD] at all." Opp. at 3. The evidence, however, ████████████████████████ ████████████████████████████████████████████ PX7053 at 54:14-55:2; PX8001-011.

**1.    Microsoft's decision to make ZeniMax games exclusive is powerful evidence**

**of incentive to foreclose.**

Microsoft's actions following its 2021 acquisition of ZeniMax speak louder than Defendants' words. ZeniMax makes "████████████████████████████████████████ ████████████████████████████████." PX7049 at 268:5-16. The evidence shows that soon after acquiring ZeniMax, and contrary to Microsoft's prior representations, Microsoft determined that all future ZeniMax games would be exclusive to the Xbox ecosystem.

During antitrust review of the ZeniMax deal, Microsoft represented to the European Commission that it "would not have an incentive to cease making ZeniMax games available for purchase on rival consoles." PX1651-0125-129. But immediately after announcing the acquisition, Microsoft evaluated whether to take all future ZeniMax content exclusive, and while Microsoft concluded that doing so would yield lower revenues than continuing to make ZeniMax content available on other platforms, Microsoft decided nevertheless to make all future ZeniMax content exclusive to the Xbox ecosystem.

Microsoft determined that the first two ZeniMax games as to which Microsoft had free reign, *Redfall* and *Starfield*, would be Xbox exclusives ████████████████████████ ████████████████████████████████████████ PX4435-001 ████████████████████ ████████████████████████████████████████ ████████████████████████.

Defendants put great stock in Microsoft's concerns about "infuriating gamers" if it were to foreclose rivals' access to Activision content, Opp. at 16, but those same concerns did not stop the ZeniMax decision. One ZeniMax executive publicly apologized to fans who were frustrated by Microsoft's decision to make new ZeniMax games exclusive to the Xbox ecosystem, but the decision stands. PX9186-004-05, Tr. 12:9-16:6.

Defendants omit crucial details in their attempt to distinguish ZeniMax. First, Defendants highlight that the "first two ZeniMax games Xbox released post-acquisition . . . were exclusives *for Sony*." Opp. at 17. Defendants fail to note that preexisting contracts between ZeniMax and Sony obligated Microsoft to release those almost-finished games as Sony exclusives. PX7053 at

29:8-29:21. Second, Defendants try to distinguish *Redfall* and *Starfield* as being unlike *Call of Duty* because those games do not "materially feature multi-player play" or lacked "existing cross-platform gaming communities." Opp. at 17. "[M]aterially feature" does much work here; *Redfall* is a AAA co-op shooter game, with multi player modes, that was designed to enable cross-platform play. PX 4079 at 316:7-318:7; PX7012 at 407:19-21. In any event, such distinctions had no role in Microsoft's ZeniMax decision, which applied to *all* future ZeniMax games. The surest sign of Defendants' struggle to distinguish Activision's content from ZeniMax's is the multi-hyphenate description ("existing, multi-player, cross-platform") Defendants need to append to  *Call of Duty* to try to make their point. Opp. at 17.

Faced with the ZeniMax evidence, Defendants pivot to Microsoft's 2014 acquisition of *Minecraft*. Defendants concoct their own category of a "popular franchise with substantial cross-platform play" to shoehorn *Minecraft* and *Call of Duty* together. Opp. at 16. Defendants fail to note that *Minecraft* is played across many kinds of devices, including mobile phones, tablets, and the Switch. Even if Microsoft took *Minecraft* off of rival consoles and subscription and cloud gaming services, it would still be available for play on many other devices. The context for *Call of Duty* is very different. PX5001-064, 092-93. And Microsoft still engages in forms of partial exclusivity and foreclosure with *Minecraft*. For example, the *Minecraft* version available on PlayStation was developed for PlayStation 4; although it can be played on PlayStation 5, it cannot take full advantage of PlayStation 5's features. PX7058 at 245:12-246:17. Microsoft has optimized *Minecraft* for its own Gen 9 consoles. *Id.*

Microsoft's ZeniMax decision is powerful evidence as to Microsoft's incentives here and should give this Court significant pause when considering Defendants' assurances that "Microsoft intends to operate Activision similarly to other recent acquisitions. . . " Opp. at 4.

### 2.   Microsoft's deal model for valuing Activision does not constrain its ability to foreclose rivals

Defendants argue that Microsoft's deal valuation shows that it will not make Activision content exclusive. But this is a red herring. First, Microsoft's deal valuations "consistently" assume a target company will continue to run as it has. So if a studio releases its games

multiplatform, the valuation assumes the same going forward. PX7042 at 223:4-14, 246:4-13, 249:25-250. The deal valuation model simply does not address whether Microsoft will take future games exclusive. PX4672-001. Indeed, Microsoft's ZeniMax valuation model assumed all future ZeniMax releases would be multiplatform, and in reality many became exclusive to Xbox. PX7042 at 223:4-14; 246:4-13, 249:24-250:10.

Second, Microsoft's own internal documents ███████████████████████████
███████████████████████████████████████████████████. *See* Opp. at 15. ████████
██████████████████████████████████████████████████████████████████████.
PX4341-0025. ███████████████████████████████████████████████████████████
████████████ PX7040 at 97:15-19. ███████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████ Finally, as the ZeniMax decisions show, ████████████████
███████████████████████████████████████████████████████
███████████████████████████████████. PX4672-001.

### 3. The Proposed Acquisition may substantially lessen competition in high-performance consoles and all consoles

Defendants try mightily to use the fact that Microsoft and Sony are fierce competitors in the high-performance console and broader console markets to suggest (incorrectly) that the FTC's case is about protecting Sony and not competition itself. Opp. at 15, 18. The FTC's evidence and sound economics show otherwise. Dr. Lee concludes that this transaction would likely result in "[l]ess or degraded content available on Sony PlayStation consoles, leading to lower quality products and reduced choice in the Console Markets." PX5001-23. Dr. Lee will testify to the economic harm to competition and consumers—for example, an increase in price—from the foreclosure of Activision content on PlayStation in the high-performance console market. PX5000-231-34. The fact that Microsoft has already reduced the quality of PlayStation's portfolio of games through terminating the development of *Redfall* and *Starfield* for Sony's console buttresses Dr. Lee's conclusions. PX5000-230-31. Other non-price harms from the proposed acquisition include lost innovation. For example, ████████████████████

PLAINTIFF'S REPLY TO DEFENDANTS' OPP. TO PRELIM. INJ. MOTION, CASE NO. 3:23-CV-2880
10

1

2

3    ████████████████████████████ PX7053-30, 34-36, 39.

4        Defendants' speculation about Sony's potential responses to anticompetitive conduct,

5    Opp. at 18, does not persuade. Whether Sony can or should "invest in other first-party or third

6    party-games" is irrelevant. And if an anticompetitive merger would spur counter acquisitions,

7    that counts *against* the merger, not in favor of it.  *E.g. United States v. Kimberly-Clark Corp.*,

8    264 F. Supp. 439, 460 (N.D. Cal. 1967).

9            **4.  The Proposed Acquisition may substantially lessen competition in the multi-**

10                **game content library and cloud gaming markets**

11       Defendants incorrectly claim that there is "*absolutely no evidence*" that Activision would put

12   its content on cloud or content subscription services absent this deal. Opp. at 4 (emphasis in

13   original). But Activision executives have testified that they would put Activision content on such

14   services given the right economic terms. PX7006 at 169:7-25; 204:13-205:10; *see also* PX2133-

15   001; PX2406-001. Activision titles, including multiple *Call of Duty* titles, were available on

16   Nvidia's GeForce Now between June 2017 and February 2020.  PX8000-008-09.  Activision █

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████. PX8000-009-010.

19   As recently as December 2021, ████████████████████████████

20   ████████████████████████████ PX2197-001. Activision games

21   have appeared on Sony's PlayStation Plus in the past. PX2189-015; PX7054 at 23:24-25:2. And

22   Activision ████████████████████████████████████████

23   ████████████████████████████████████████████

24   ████████████████ PX2006-001.

25      Defendants also attempt to downplay both the viability of the cloud gaming market and

26   Microsoft's primacy in it. Opp. at 22-23. Microsoft and other market participants have

27   acknowledged that cloud gaming is a viable service. PX9012-006; PX8000-002 ("…NVIDIA

28   believes that cloud gaming represents the future of gaming and will continue to grow

1   significantly"); PX3272-012, 010 (stating ████████████████████████

2   ███████████████████████████████████████████████████████

3   █████████████").

4       Again, Microsoft's prior strategic decisions demonstrate the risk of foreclosure that is likely

5   to harm competition in cloud gaming. In 2021, Microsoft removed its games from Nvidia's

6   GeForce NOW cloud gaming service "so as to not compete with xCloud." PX1030-001. Dr. Lee

7   opines that foreclosure arising from the proposed transaction would likely harm competition in

8   the subscription and cloud gaming services markets relative to the but-for world in which

9   Microsoft does not acquire Activision. PX5000-221. Such foreclosure weakens Microsoft's

10  competitors in each market and increases Microsoft's power in markets where Microsoft is

11  already a market leader. PX5000-223. In the nascent cloud market, harm from this foreclosure is

12  likely to be magnified in the future if entrants and smaller players are disadvantaged. PX5000-

13  235; *United States v. Bazaarvoice, Inc*., No. 13-CV-00133-WHO, 2014 WL 203966, at *76

14  (N.D. Cal. Jan. 8, 2014) ("[R]apid technological progress may provide a climate favorable to

15  increased concentration of market power rather than the opposite." (quoting *Greyhound*

16  *Computer Corp., Inc. v. Int'l Bus. Machines Corp*., 559 F.2d 488, 497 (9th Cir.1977)).

17      **C.     Microsoft's commitments to foreign regulators and private agreements are**

18          **not relevant here**

19          Defendants tout Microsoft's commitments to foreign regulators and agreements it has

20  reached with certain third parties, Opp. at 8, but none of that is relevant here. At the preliminary

21  injunction stage, courts "do not resolve the conflicts in the evidence . . . or undertake an

22  extensive analysis of the antitrust issues. *Warner Commc'ns*, 742 F.2d. at 1164. Predicting the

23  government's "likelihood of success" in a § 13(b) proceeding is limited to the threshold question

24  of liability, not the subsequent question of what remedy may be appropriate.  *H.J. Heinz Co.*, 246

25  F.3d at 714.

26          The Court, therefore, should decline Defendants' invitation to engage in an "extensive

27  analysis" and decide whether Defendants' European and private remedies suffice to answer the

28  substantial questions the FTC has raised. The FTC is "entitled to preserve the status quo pending

adjudication" regardless of what "ultimate remedy" might eventually be deemed appropriate. *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345 (4th Cir. 1976). The proper forum to raise such defenses is during the trial on the merits that begins in 6 weeks on August 2.

Even if Defendants' proposed remedies were relevant here, they would properly be considered as part of Defendants' rebuttal burden, not part of the FTC's initial burden. *Cf. In re Illumina*, No. 9401, 2023 WL 2823393 at *50-51 (F.T.C. Mar. 31, 2023). This is, in fact, what happened in Europe with respect to this transaction—Microsoft offered remedies to address a finding of liability.[3] European Commission Press Release IP/23/2705, Mergers: Commission clears acquisition of Activision Blizzard by Microsoft, subject to conditions (May 15, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_2705.

In any event, under U.S. law, any proposed remedy would need to dispel any and all doubts about the transaction's legality. *See Warner Commc'ns*, 742 F.2d at 1162; *Whole Foods,* 548 F.3d at 1036.; *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 725 (D.C. Cir. 2001). There are serious questions as to whether Microsoft's agreements meet that heavy burden. First, some of Microsoft's agreements are with foreign companies that have no meaningful business in the United States. The Agreements are facially ambiguous and present significant questions. For example, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ PX7065 at 126:9-17, 177:22-178:8, 150:18-151:11, 154:16-156, 158:5-12. A section labeled "Unanticipated and Unforeseeable Future Events" in Nvidia's agreement with Microsoft allows Microsoft to renegotiate the agreement if it is not profitable for Microsoft. PX7044 at 159:11-164:19; PX1781-010-11. These loopholes and ambiguities give Microsoft wide latitude to ensure

---

[3] The United Kingdom's Competition and Markets Authority blocked this transaction after considering Microsoft's proposed remedies. Press Release, Competition and Markets Authority, Microsoft/Activision deal prevented to protect innovation and choice in cloud gaming, (Apr. 26, 2023), https://www.gov.uk/government/news/microsoft-activision-deal-prevented-to-protect-innovation-and-choice-in-cloud-gaming.

that whatever faux "competition" occurs pursuant to them will be largely subject to Microsoft's own business interests. Third, multiple rival firms have not reached agreements with Microsoft. Defendants devote space to unsupported speculation about why a rival like Sony would not sign Microsoft's offer. Opp. at 15. But Jim Ryan's testimony highlights the shortcomings and loopholes of Microsoft's proposals to Sony. PX7053 at 61:2-67:13, 70:13-23.

**D.    Defendants' interest in completing the acquisition cannot outweigh the public equities**

Defendants claim that granting a preliminary junction at this stage "would kill the deal, robbing consumers of the 'beneficial economic effects and procompetitive advantages' resulting from this merger." Opp. at 24. "[A] 'risk that the transaction will not occur at all,' by itself, is a private consideration that cannot alone defeat the preliminary injunction." *Whole Foods*, 548 F.3d at 1041. Defendants' claimed injury would be of their own making, resulting from their own agreed termination date, a date that could be extended. "[T]he parties' stated intention to abandon the transaction prior to the merits proceeding is a private equity, and cannot on its own overcome the public equities that favor the FTC." *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 774 (D.D.C. 2018).

Defendants' reliance on *Heinz* and *Exxon* are particularly misplaced. *H.J. Heinz Co.*, 246 F.3d at 708 (cited in Opp. at 10, 23) states that, if the FTC establishes a likelihood of success, then private equities "should not affect the outcome of the proceeding." *Id.* at 727 n.25. Courts "must afford such [private] concerns little weight, lest we undermine section 13(b)'s purpose of protecting the public-at-large, rather than the individual private competitors." *Id.* (citation omitted). *FTC v. Exxon Corp.*, 636 F.2d 1336 (D.C. Cir. 1980) (cited in Opp. at 2, 10), explains that "[i]n enacting [§13(b)], Congress further demonstrated its concern that injunctive relief be *broadly available to the FTC.*" *Id.* at 1343 (emphasis added).

Finally, Defendants simply invent an argument that Section 13(b) injunctions "apply chiefly in the context of horizontal mergers." Opp. at 23. Congress ensured that the antitrust laws apply with equal force to all mergers. *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967). Regardless, if Microsoft actually intends to operate Activision as a truly separate entity, Opp. at

23, then it should suffer little to no private hardship from relief that temporarily preserves Activision as a separate company.

## <u>CONCLUSION</u>

For the forgoing reasons, Plaintiff Federal Trade Commission respectfully requests that the Court enter the requested preliminary injunction.


Dated: June 20, 2023                           Respectfully submitted,

                                               */s/ James H. Weingarten*
                                               James H. Weingarten
                                               Peggy Bayer Femenella
                                               James Abell
                                               Cem Akleman
                                               J. Alexander Ansaldo
                                               Michael T. Blevins
                                               Amanda L. Butler
                                               Nicole Callan
                                               Maria Cirincione
                                               Kassandra DiPietro
                                               Jennifer Fleury
                                               Michael A. Franchak
                                               James Gossmann
                                               Ethan Gurwitz
                                               Meredith R. Levert
                                               David E. Morris
                                               Merrick Pastore
                                               Stephen Santulli
                                               Edmund Saw

                                               Federal Trade Commission
                                               600 Pennsylvania Avenue, NW
                                               Washington, DC 20580
                                               Tel: (202) 326-3570

                                               Erika Wodinsky

                                               Federal Trade Commission
                                               90 7th Street, Suite 14-300
                                               San Francisco, CA 94103

                                               *Counsel for Plaintiff Federal Trade*
                                               *Commission*