James H. Weingarten, DC Bar No. 985070
Peggy Bayer Femenella, DC Bar No. 472770
James Abell, DC Bar No. 990773
Cem Akleman, FL Bar No. 107666
Meredith R. Levert, DC Bar No. 498245
Jennifer Fleury, NY Bar No. 5053178
James Gossmann, DC Bar No. 1048904
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3570
*jweingarten@ftc.gov; pbayer@ftc.gov:*
*jabell@ftc.gov; cakleman@ftc.gov;*
*jfleury@ftc.gov; mlevert@ftc.gov;*
*jgossmann@ftc.gov*

Erika Wodinsky, Cal. Bar No. 091700
90 7th Street, Suite 14-300
San Francisco, CA 94103
Tel: (415) 848-5190
*ewodinsky@ftc.gov*

[Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]

Attorneys for Plaintiff Federal Trade Commission

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **MICROSOFT CORP.** <br><br> and <br><br> **ACTIVISION BLIZZARD, INC.,** <br><br> Defendants. | Case No. 3:23-cv-2880 <br><br> *Hearing: As soon as the matter may be heard.* <br><br> **PLAINTIFF FEDERAL TRADE COMMISSION'S NOTICE OF MOTION AND EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER PURSUANT TO FEDERAL TRADE COMMISSION ACT § 13(b)** <br><br> **UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that, as soon as the matter may be heard, Plaintiff Federal Trade Commission ("FTC" or "Commission") shall move and hereby does move the Court for entry of a temporary restraining order ("TRO") pursuant Federal Trade Commission Act § 13(b), 15 U.S.C. § 53(b) and Civil L.R. 7-2 to preserve the status quo while this Court reviews Plaintiff's Complaint for a Preliminary Injunction Pursuant to FTC Act § 13(b) to prevent Defendant Microsoft Corporation ("Microsoft") from completing its proposed acquisition of Defendant Activision Blizzard, Inc. ("Activision") (the "Proposed Acquisition") or a substantially similar acquisition while the FTC's review is pending.

On December 8, 2022, the FTC commenced an administrative proceeding to determine whether the Proposed Acquisition violates the antitrust laws. The evidentiary hearing in that proceeding will begin on August 2, 2023. The United Kingdom has already issued orders finding the deal anticompetitive under UK competition law and barring its completion. Defendants nonetheless have represented to Plaintiff that they may complete their deal after June 15, 2023, leaving Plaintiff no choice but to file its Complaint to maintain the status quo while the FTC administrative proceeding is pending.

Defendants also refused to stipulate to a TRO unless Plaintiff filed its Complaint in Defendants' preferred venue. Plaintiff, therefore, respectfully requests this Court enter a TRO prior to 8:59 p.m. Pacific Time on Thursday, June 15, 2023 that prevents Defendants from completing the Proposed Acquisition or a substantially similar acquisition while Plaintiff's request for a preliminary injunction is pending.

## ISSUE TO BE DECIDED

Whether, pursuant to Federal Trade Commission Act § 13(b), 15 U.S.C. § 53(b), the Court should enter a TRO preventing Microsoft and Activision from consummating the Proposed Acquisition or a substantially similar acquisition until after this Court has had the opportunity to adjudicate the FTC's request for a preliminary injunction.

# TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................................... 3

ARGUMENT ...................................................................................................................... 6

A.    The FTC Has Raised Merits Questions Sufficient to Warrant Entry of a
Temporary Restraining Order. ............................................................................. 8

    i.    There are multiple relevant markets in which to analyze the Proposed
Acquisition's competitive effects. ........................................................... 9

        1. High-performance consoles are a relevant antitrust product market. .............. 11

        2. Multi-game content library subscription services are a relevant
product market. .................................................................................... 13

        3. Cloud gaming subscription services are a relevant product market. ............... 15

        4. A combined multi-game content library and cloud gaming subscription
services market also is a relevant product market. ........................................ 16

        5. The United States is the relevant geographic market. .................................... 16

    ii.    The Proposed Acquisition may substantially lessen competition in at least one of
the relevant markets. ............................................................................ 17

        1. Activision is a leader in developing the most sought after content in video
gaming that drives product adoption and gamer engagement. ........................ 18

        2. As the owner of Activision content, Microsoft would have the ability to harm
rivals in the relevant markets. ................................................................... 20

        3. The Proposed Acquisition would increase Microsoft's incentive to
disadvantage rivals by withholding or degrading Activision content in the
relevant markets. .................................................................................. 21

        4. Withholding Activision content from, or degrading Activision content on,
Microsoft's rivals will harm competition and consumers in the relevant
markets. ................................................................................................ 21

        5. Microsoft's statements and past actions indicate that will likely act on its
incentives to disadvantage rivals by withholding or degrading Activision
content. ................................................................................................ 22

B.    The Equities Weigh in Favor of Temporarily Restraining the Proposed
Acquisition. ..................................................................................................... 23

CONCLUSION ................................................................................................................. 24

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>

3

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........................................10, 17, 18

4

*Cal. v. Am. Stores Co.*, 872 F.2d 837 (9th Cir. 1989), *rev'd on other grounds*, 495 U.S. 271
(1990)........................................................................................................................................8

5

*FTC v. Affordable Media*, 179 F.3d 1288 (9th Cir. 1999) .................................................2

6

*FTC v. Exxon Corp.*, No. 79-1975, 1979 WL 1654 (D.D.C. July 28, 1979) ...........................2, 6

7

*FTC v. Food Town Stores, Inc.*, 539 F.2d 1339 (4th Cir. 1976)......................................9

8

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ..................................2, 8, 9, 23

9

*FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2022 WL 16637996

10

(N.D. Cal. Nov. 2, 2022) .......................................................................................................7

11

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020)...........................9

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016)............................2

12

*FTC v. Sanford Health*, 926 F.3d 959 (8th Cir. 2019)....................................................10

13

*FTC v. Sanford Health*, No. 1:17-cv-133, 2017 WL 10810016 (D.N.D. Dec. 15, 2017) ...........6

14

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991).....................................8, 23

15

*FTC v. Universal Premium Servs. Inc.*, No. CV 06-0849 SJO, 2006 WL 8442134

16

(C.D. Cal. Mar. 14, 2006) ....................................................................................................2

17

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984)................................*passim*

18

*FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ..........................*passim*

19

*In re Illumina, Inc.*, Dkt. No. 9401, 2023 WL 2946882 (F.T.C. Mar. 31, 2023) ....................18

20

*In re Union Carbide Corp.*, 59 F.T.C. 614 (1961)..........................................................18

21

*Meta Platforms*, 5:22-cv-04325-EJD, 2023 WL 2346238 (N.D. Cal. Feb. 3, 2023)............10, 11

22

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021) ................10, 11

23

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775

24

(9th Cir. 2015) ......................................................................................................................10

25

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982) ..........10

26

*United States v. Bazaarvoice*, No. 13–cv–00133–WHO, 2014 WL 203966
(N.D. Cal. Jan. 8, 2014) ......................................................................................................17

27

28

1

*United States. v. AT&T, Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018)...............................................18

2

*Yankees Ent & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657
    (S.D.N.Y. 2002)...........................................................................................................17

3

## Statutes

4

15 U.S.C. § 18.....................................................................................................................3, 8

5

15 U.S.C. § 45.....................................................................................................................3, 8

6

15 U.S.C. § 53(b).............................................................................................................*passim*

7

## Other Authorities

8

H.R. Rep. No. 93-624 (1973) (Conf. Rep.), *as reprinted in* 1973 U.S.C.C.A.N. 2523.................1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants will provide no assurances past June 15, 2023, that they will not close the Proposed Acquisition. The FTC is seven weeks away from commencing an evidentiary hearing to evaluate whether the Proposed Acquisition violates U.S. antitrust law. Six weeks ago, the United Kingdom Competition & Markets Authority ("UK CMA") issued orders finding that the Proposed Acquisition violates UK competition law and barring its consummation (the "UK CMA Orders"). Defendants have stated that they may complete their deal despite the FTC's upcoming evidentiary hearing and despite the UK CMA Orders. The FTC accordingly filed this case pursuant to FTC Act § 13(b), 15 U.S.C. § 53(b), to preliminarily enjoin Defendants from consummating their Proposed Acquisition pending the outcome of the FTC administrative proceeding. But Defendants will not even agree to refrain from completing their deal while this Court considers the FTC's request for a preliminary injunction. Plaintiff has no choice but to seek—and is entitled to—a TRO pursuant to § 13(b) to preserve the status quo while the FTC's request for a preliminary injunction is pending.

Section 13(b) of the FTC Act provides that "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond." 15 U.S.C. § 53(b). Unlike Federal Rule of Civil Procedure 65(b), Section 13(b) of the FTC Act does not prescribe any time limitations for a TRO. Because Section 13(b) was enacted to preserve the FTC's ability to order relief upon completion of its administrative proceedings, *see* H.R. Rep. No. 93-624, at 31 (1973) (Conf. Rep.), *as reprinted in* 1973 U.S.C.C.A.N. 2523, 2533, courts issue TROs under Section 13(b) for the period of time it takes the court to decide the FTC's request for a preliminary injunction. *See, e.g.*, *FTC v. Intercontinental Exchange, Inc. et al*, No. 3:23-CV-01710, Docket No. 39 (N.D. Cal. Apr. 21, 2023) (granting FTC's emergency motion for TRO).

"Section 13(b) places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156,

1159 (9th Cir. 1984) (per curiam). "Under this more lenient standard, 'a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities.'" *FTC v. Affordable Media*, 179 F.3d 1288, 1233 (9th Cir. 1999) (quoting *Warner Commc'ns*, 742 F.2d at 1160). In weighing the equities under § 13(b), "public equities receive far greater weight." *Warner Commc'ns*, 742 F.2d at 1165. These public equities include effective enforcement of the antitrust laws and ensuring the Commission's ability to obtain relief if it ultimately prevails on the merits. *Id.*; *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001). Preliminary injunctions under § 13(b) "are meant to be readily available to preserve the status quo while the FTC develops its ultimate case." *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008); *FTC v. Penn State Hershey Med.* Ctr., 838 F.3d 327, 352 (3d Cir. 2016) ("The purpose of Section 13(b) is to preserve the status quo and allow the FTC to adjudicate the anticompetitive effects of the proposed merger in the first instance.").

These same principles apply to the FTC's request for a TRO under Section 13(b). *See FTC v. Universal Premium Servs. Inc.*, No. CV 06-0849 SJO, 2006 WL 8442134, at *3 (C.D. Cal. Mar. 14, 2006). The FTC need not "make precisely the same showing at the temporary restraining order and preliminary injunction stages." *FTC v. Exxon Corp.*, No. 79-1975, 1979 WL 1654, at *3 n.6 (D.D.C. July 28, 1979). When, as here, the "factual and legal issues are massive," and the FTC has had but a short time to prepare its case for a TRO, the FTC "should not be deprived of the opportunity of 'fleshing out'" its TRO showing at a later hearing on the requested preliminary injunction. *Id*.

Defendants' refusal to state that they will abide by the UK CMA Orders and not complete their deal after losing their bid for regulatory clearance in the UK, and while the FTC's antitrust review is still pending, necessitated the filing of this action for a preliminary injunction. Their refusal to wait to complete their transaction while this Court decides whether to grant a preliminary injunction necessitates entry of the requested TRO.

Plaintiff's Complaint and this motion present only a fraction of the evidence collected in the administrative proceeding, and the evidence cited herein is more than sufficient to grant the

requested restraining order. The evidence includes documents and testimony from Defendants and third parties demonstrating the existence of each of the alleged relevant antitrust markets and demonstrating Microsoft's ability and incentive to use control of Activision content to harm rivals in each of those markets. The evidence includes Microsoft documents and testimony about its most recent multi-billion-dollar acquisition of a video game developer called ZeniMax and its decision to make ZeniMax content exclusive to Microsoft's products in the relevant markets. The evidence includes expert economic analysis concluding that the Proposed Transaction is likely to substantially lessen competition and harm consumers in each of the relevant markets. Plaintiff is entitled to a TRO under FTC Act § 13(b).

## **FACTUAL BACKGROUND**.[1]

On January 18, 2022, Defendants announced the Proposed Acquisition, pursuant to which Defendant Microsoft, which owns Xbox, will acquire Defendant Activision, one of the most valuable video game developers in the world with games such as *Call of Duty*, *Diablo*, and *Overwatch*, in a vertical merger valued at nearly $70 billion that will increase Microsoft's already considerable power in video games. Compl. ¶ 1. If consummated, the Proposed Acquisition would be the largest in the history of the video game industry and the largest in Microsoft's history. *Id*.

On December 8, 2022, the Commission found reason to believe that the Proposed Acquisition would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45, commenced administrative proceedings before an Administrative Law Judge on the antitrust merits of the Proposed

---

[1] References to "Compl." are to Plaintiff's Complaint for a Temporary Restraining Order and Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act filed in this case. The allegations in the Complaint are incorporated herein by reference. References to Exhibits are to exhibits to the Declaration of Jennifer Fleury in support of this motion.

Acquisition, and set an evidentiary hearing to begin August 2, 2023. Compl. at ¶ 16..[2] At that time, the FTC did not seek a preliminary injunction under Section 13(b) of the Federal Trade Commission Act because closing of the Proposed Acquisition was contingent on review of the Proposed Acquisition by various foreign competition authorities, including the UK CMA. Defendants told the FTC administrative law judge at the initial scheduling conference in that matter that Defendants expected that the "deal . . . could go forward and could close" upon approval from authorities in Europe and the UK. Ex. X (Pretrial Conference Transcript, *In re Microsoft Corp. & Activision Blizzard, Inc.*, Docket No. 9412 (FTC Jan. 3, 2023)) at 10. Defendant Microsoft later told this Court that "a deal cannot close – at the moment cannot close until multiple regulatory proceedings go forward." Ex. W (Transcript of Proceeding, *DeMartini v. Microsoft Corp.*, No. C-22-08991-JSC, 2023 WL 2588173 (N.D. Cal. Jan. 19, 2023)) at 18.

The FTC administrative proceeding has moved rapidly. Fact discovery (including thirty-two depositions and document discovery of Defendants and third parties) was completed in April. The parties have completed service of expert reports and have exchanged final witness lists and exhibit lists. Pretrial briefs and motions *in limine* are due in July. The evidentiary hearing begins on August 2. *See* Ex. F (Scheduling Order & Amended Scheduling Order, *In re Microsoft Corp & Activision Blizzard, Inc.*, Docket No. 9412 (FTC Jan 4, 2023, May 12, 2023)).

On April 26, 2023, the UK CMA issued a report finding that the Proposed Transaction violated UK competition law because it was expected to result in a substantial lessening of competition in cloud gaming.  Ex. G (UK CMA Orders, including April 26, 2023 Final Report on the Anticipated Acquisition by Microsoft of Activision Blizzard, Inc.). On May 5, the UK CMA entered an interim order, effective as of that date, prohibiting the Proposed Acquisition, and, on May 18, issued a proposed final order that would prohibit any merger or acquisition

---

[2] In the administrative proceeding, Complaint Counsel—and not the Commission—litigates the challenge to the Proposed Acquisition.  Moreover, the parties to the proposed acquisition are termed "Respondents." We use "FTC" and "Defendants" here for simplicity of reference.

between Microsoft and Activision for a ten-year period. Ex. G. On May 26, 2023, Defendants noticed an appeal. Ex. E. (Summary of Application for Microsoft's appeal of the UK CMA's April 26, 2023 findings).

Recent press reports indicate Defendants are considering taking the extraordinary step of consummating the Proposed Acquisition despite the UK CMA Orders. Ex. D (*Microsoft is Exploring Options to Close Activision Deal Despite UK Block*, MLEX (June 1, 2023)); Ex. H (*Microsoft's Smith Set for Talks with UK Chancellor Over Activision Deal Ban*, BLOOMBERG (June 2, 2023)).  On May 24, 2023, the FTC requested clarity from Defendants (1) that Defendants would continue to refrain from consummate the Proposed Acquisition while the UK review was pending and (2) at least five business days' notice prior to Defendants' consummating either the Proposed Acquisition or a substantially similar transaction. Ex. Z (Email chain between B. Wilkinson, C. Akleman, et al.) at 13–15. On June 2, Defendants informed the FTC that they "are considering all options and intend to close the transaction as soon as possible." Ex. Z at 11–12. Defendants notified the FTC that they "will not close on or before June 15," and stated that they "do not intend to provide additional or more specific notice of the closure of the transaction." Ex. Z at 12. On June 2, the FTC requested Defendants' basis for their position that they could complete the Proposed Acquisition despite the UK CMA Order. Ex. Z at 9–10. Defendants replied on June 7 that "Microsoft is considering all lawful options to close as soon as possible, and does not intend to discuss its ex-US legal strategy with the FTC" and reiterated that they "will not be providing . . . any additional information about the closing of the transaction." Ex. Z at 8–9.

On June 8, Plaintiff informed Defendants that it would be seeking preliminary injunctive relief in federal court pursuant to FTC Act § 13(b) and asking Defendants to stipulate to a TRO that would preserve the status quo until a federal court ruled on Plaintiff's complaint. Ex. Z at

7–8. Defendants declined to stipulate to a TRO unless Plaintiff agreed to file its case in the U.S. District Court for the District of Columbia. Ex Z at 1–7.

Despite the Complaint in this Court, the ongoing FTC administrative proceeding, and the UK CMA Orders, Defendants have represented that they may complete the Proposed Acquisition or a substantially similar transaction at any time after June 15, 2023.

## **ARGUMENT**

Defendants' refusal to stipulate that they will not complete the Proposed Acquisition or a substantially similar transaction while proceedings before this Court are pending necessitates temporary relief to preserve the status quo. Without preliminary relief, Defendants can complete their deal, which could "preclude effective relief if the Commission ultimately prevails and divestiture is ordered." *Warner Commc'ns*, 742 F.2d at 1165. FTC Act § 13(b) accordingly provides that "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest . . . a temporary restraining order or a preliminary injunction may be granted without bond." 15 U.S.C. § 53(b). "Section 13(b) places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard." *Warner Commc'ns*, 742 F.2d at 1159. "The decision whether to grant preliminary relief turns on a determination of the likelihood of the Commission's success on the merits and on a balance of the equities." *Id.* at 1162. While nearly all of the case law applying § 13(b) to merger cases arises in the context of FTC requests for preliminary injunctions—because defendants nearly always stipulate to entry of a TRO—the principles favoring preliminary relief apply with heightened force to Plaintiff's request for a TRO, which seeks relief for a more limited duration and purpose than the requested preliminary injunction..[3] *See, e.g.*, *Exxon*, 1979 WL 1654, at *3 n.6.

---

[3] While Defendants here refused to stipulate unless Plaintiff agreed to file elsewhere, merging parties commonly stipulate to a temporary restraining order. *E.g.*, Order Granting Stip. (ECF No. 19), *FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD (N.D. Cal. July 29, 2022); *FTC v. Sanford Health*, No. 1:17-cv-133, 2017 WL 10810016, at *1 (D.N.D. Dec. (Continued…)

*First*, the Commission meets its burden of showing a likelihood of success because it "present[s] evidence sufficient to raise 'serious, substantial, difficult' questions regarding the anticompetitive effects" of the Proposed Acquisition. *Warner Commc'ns*, 742 F.2d at 1164. These questions are "fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance." *Id.* at 1162; *see also FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2022 WL 16637996, at *5 (N.D. Cal. Nov. 2, 2022) (quoting *Warner Commc'ns*, 742 F.2d at 1162). The purpose of a § 13(b) case "is not . . . to determine whether the antitrust laws . . . are about to be violated." *Whole Foods Mkt.*, 548 F.3d at 1035 (quotation marks omitted) . Rather, "at this preliminary phase [the FTC] just has to raise substantial doubts about a transaction.  One may have such doubts without knowing exactly what arguments will eventually prevail." *Id.* at 1036. Here, Plaintiff's Complaint alone suffices to raise merits questions sufficient to warrant "thorough investigation, study, deliberation and determination by the FTC" and to preserve this Court's ability to provide the requested preliminary injunction. But because fact discovery in the administrative proceeding closed in April, there is even more evidence available that further justifies entry of a TRO..[4]

*Second*, the equities weigh strongly in favor of granting the requested TRO. In weighing the equities under Section 13(b), "public equities receive far greater weight" than private interests. *Warner Commc'ns*, 742 F.2d at 1165. This is because preliminary relief under § 13(b) is "meant to be readily available to preserve the status quo while the FTC develops its ultimate case." *Whole Foods Mkt.*, 548 F.3d at 1036. The public equities include effective enforcement of the antitrust laws and ensuring the Commission's ability to obtain adequate relief if it

---

15, 2017); Order Granting Plaintiff's Mot. for Entry of Stip. Temp. Restr. Order, *FTC v. RAG-Stiftung*, No. 19-cv-02337, 2020 WL 532980 (D.D.C. Feb. 3, 2020), ECF No. 9.

[4] Plaintiff attaches for reference its exhibit list in the administrative proceeding as Ex. I to the Fleury Declaration. Plaintiff includes in this Motion citations to a small portion of this evidence. In the event the Court believes a fuller factual record is warranted at the TRO stage, Plaintiff requests that the Court enter an interim TRO and set an expedited schedule for submission of such briefing or evidence from discovery in the FTC administrative proceeding as the Court may find helpful.

PLAINTIFF'S MEM. OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER
CASE NO. 3:23-CV-2880

ultimately prevails on the merits. *Id.*; *H.J. Heinz*, 246 F.3d at 726; *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991). Here, the public equities are even stronger because the administrative hearing begins August 2. Allowing Defendants to complete their deal on the eve of the FTC evidentiary hearing would thwart the public's interest in effective enforcement of the antitrust laws and the Commission's ability to obtain adequate relief if the Proposed Transaction is unlawful. The only possible harm to private interests from entry of the requested TRO is the modest delay in Defendants' ability to complete their deal in spite of the UK CMA Order while the FTC's request for a preliminary injunction is pending before the Court.

### A.   The FTC Has Raised Merits Questions Sufficient to Warrant Entry of a Temporary Restraining Order.

The FTC administrative proceeding will determine whether the effect of the Proposed Acquisition "*may be* substantially to lessen competition, or to tend to create a monopoly" in violation of Clayton Act § 7, 15 U.S.C. § 18, and FTC Act § 5, 15 U.S.C. § 45. *Warner Commc'ns*, 742 F.2d at 1160 (emphasis in original). "It is well established that a section 7 violation is proven upon a showing of reasonable probability of anticompetitive effect." *Id.* At this stage, the FTC "does not need detailed evidence of anticompetitive effects," *Whole Foods Mkt.*, 548 F.3d at 1035. Because the issue is a "narrow one," courts at the preliminary injunction stage—let alone the TRO stage—"do not resolve the conflicts in the evidence . . . or undertake an extensive analysis of the antitrust issues." *Warner Commc'ns*, 742 F.2d at 1164; *see also Cal. V. Am. Stores Co.*, 872 F.2d 837, 841 (9th Cir. 1989), *rev'd on other grounds*, 495 U.S. 271 (1990) ("At this stage, we do not resolve conflicts in the evidence."). To the extent Defendants assert defenses, justifications, or possible remedies for the deal's illegality that purportedly outweigh or negate Plaintiff's showing, such assertions are not relevant to the issue of whether to grant a TRO..[5]

---

[5] To justify denial of preliminary relief, Defendants must dispel any and all "substantial doubts" about the legality of their transaction, such that the court is "certain[]" and has "no doubt that [the] merger would not substantially lessen competition." *Whole Foods Mkt.*, 548 (Continued…)

In this case, Plaintiff FTC readily meets the standard for granting preliminary relief, not least because Plaintiff already has developed substantial evidence of anticompetitive effects in relevant antitrust markets.

### i. There are multiple relevant markets in which to analyze the Proposed Acquisition's competitive effects.

Microsoft's acquisition of Activision for nearly $70 billion will create a vertically integrated firm with substantial assets in video game consoles (via Microsoft's Xbox consoles), video game subscription services (via Microsoft's Xbox Game Pass service), video game cloud streaming (via Microsoft's Xbox Cloud Gaming service), and video game content (via Activision's video game franchises and Microsoft's own video game studios). Accordingly, there are several markets relevant to evaluating the Proposed Acquisition's competitive effects. These relevant markets range from the more established market for video game consoles to newer markets for services that allow gamers to subscribe to a video game library and for services that allow gamers to play games via cloud streaming. On the merits—*i.e.*, in the pending administrative proceeding—the FTC needs to show that the Proposed Acquisition may substantially lessen competition in only one relevant market to meet its burden of showing the Proposed Acquisition's illegality. *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 885 (E.D. Mo. 2020) ("[C]ompetitive harm in *any* relevant product market is enough to make out a prima facie case for violation of the Clayton Act.").

"Determination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton Act." *St. Alphonsus Med. Ctr.-Nampa*

---

F.3d at 1035. If substantial doubts or serious questions remain, temporary § 13(b) relief is appropriate—even if ultimately "post-hearing, the FTC may accept the rebuttal arguments proffered by the [defendants]." *H.J. Heinz Co.*, 246 F.3d 708, 725. Moreover, any putative "remedies" Defendants may proffer are irrelevant to determining likelihood of success on the merits. *See FTC v. Food Town Stores, Inc.*, 539 F.2d 1339 at 1345 (4th Cir. 1976). Even if they were relevant, such "remedies" also would need to dispel any and all substantial doubts and serious questions about the transaction's legality. *See Warner Commc'ns*, 742 F.2d at 1162; *Whole Foods Mkt.*, 548 F.3d at 1036.; *H.J. Heinz Co.*, 246 F.3d at 725.

*Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (quoting *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974)). "The relevant product market is determined by examining the reasonable interchangeability of use between the product and substitutes for it." *Warner Commc'ns*, 742 F.2d at 1163 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). Notably, within a broader market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325. The definition of the relevant market is "dependent upon the special characteristics of the industry involved." *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982). "The overarching goal of market definition is to 'recognize competition where, in fact, competition exists.'" *Meta Platforms*, 5:22-cv-04325-EJD, 2023 WL 2346238, at *9 (N.D. Cal. Feb. 3, 2023) (quoting *Brown Shoe*, 370 U.S. at 326). "The relevant geographic market is the area of effective competition where buyers can turn for alternate sources of supply." *St. Alphonsus*, 778 F.3d at 784 (internal quotation marks omitted).

"Courts have used both qualitative and quantitative tools to aid their determinations of relevant markets. A qualitative analysis of the relevant antitrust market, including submarkets, involves 'examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'" *Meta Platforms*, 2023 WL 2346238, at *9 (quoting *Brown Shoe*, 370 U.S. at 325). "A common quantitative metric used by parties and courts to determine relevant markets is the Hypothetical Monopolist Test ('HMT')." *Id.*.[6] The HMT "asks whether a hypothetical monopolist that owns a given set of products likely would impose at least a small but significant and nontransitory increase in price (SSNIP) on at least one product in the market, including at least one product sold by one of the merging firms. If enough consumers would respond to a

---

[6] *See, e.g.*, *Optronic Techs.*, 20 F.4th at 482 n.1; *FTC v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019) ("The district court employed the 'hypothetical monopolist test,' which is commonly used in antitrust actions to define the relevant market.").

SSNIP—often calculated as a five percent increase in price—by making purchases outside the proposed market definition so as to make the SSNIP not profitable, then the proposed market is defined too narrowly." *Meta Platforms*, 2023 WL 2346238, at *15 (internal quotation marks and citations omitted). In sum, there is "no requirement to use any specific methodology in defining the relevant market." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 (9th Cir. 2021).

In this case, both the *Brown Shoe* factors and the HMT independently establish the relevant antitrust markets as defined below..[7]

### 1. High-performance consoles are a relevant antitrust product market.

The latest "Generation 9" high-performance consoles that Microsoft (with its Xbox Series X and S consoles) and its primary video game console competitor Sony (with its PlayStation 5 console) sell comprise a relevant antitrust product for analyzing the competitive effects of the Proposed Acquisition. *See* Compl. ¶¶ 71–84. In the alternative, even if the relevant product market with respect to video game consoles is broadened to include the Nintendo Switch, the FTC can still meet its burden of showing an antitrust violation given the effects in that broader video game console market. *See* Compl. ¶ 85. Quantitative and qualitative evidence support the existence of each of these alternative proposed markets as a relevant antitrust market.

New generations of video game consoles are released every five to ten years. Compl. ¶ 35. In 2020, Microsoft and Sony launched their respective Generation 9 consoles, the Xbox Series X and Series S and the Sony PlayStation 5. Compl. ¶36. These are the only Generation 9 consoles for sale today. Compl. ¶¶ 36, 79. Nintendo is the other large video game console

---

[7] The Complaint in this action and the FTC's complaint in the underlying administrative action are identical with respect to the allegations about relevant antitrust markets and competitive effects. Although the Complaint and evidence cited therein more than suffices to meet the standard for obtaining the requested TRO, as further support, Plaintiff includes herein additional evidence discovered during the administrative proceeding.

manufacturer, and it launched its Switch device (which is designed to allow portable, handheld use) in 2017. Compl. ¶ 36. The Nintendo Switch is not a Generation 9 console and is highly differentiated from the Xbox Series X and S and Sony PlayStation 5 consoles. Compl. ¶ 36, 73. The Switch has less computational performance than the Generation 9 high-performance consoles. Compl. ¶ 41. Microsoft's Xbox Series X and S and Sony's PlayStation 5 are characterized by greater computational power, different content portfolios, different form factors (they are not portable or handheld), different technical specifications, generally higher prices, and different release cadences than the Nintendo Switch and any other handhold devices. Compl. ¶ 74–79 (detailing evidence). Microsoft and Sony high-performance consoles appeal to different gaming audiences than the Nintendo Switch, with the former being geared to more mature content for more serious gaming and the latter tending to appeal to more casual and family-friendly gaming. Compl. ¶ 81. As one Microsoft executives agreed, "[T]he Nintendo Switch is a competitor of the Xbox and hardware sales but to a much lesser extent than Sony Play[S]tation." Ex. J (Wright Dep. (PX7055)) at 34:2–10.

Microsoft's ordinary course documents distinguish the Nintendo Switch from the Microsoft and Sony high-performance, Generation 9 consoles. Compl. ¶ 80. For example, Microsoft executives receive regular reports tracking Generation 9 console sales, and Microsoft's Board of Directors receives share information that includes Xbox Series X and S and Sony PlayStation 5 and expressly excludes Nintendo. Ex. K (PX1214) at 017.

The evidence also supports an alternative broader video game console market comprising consumer devices that are designed for and that are primarily used for playing video games. *See generally* Compl. ¶ 85. This alternative relevant antitrust market includes Microsoft Xbox Series X and S, Sony PlayStation 5, and Nintendo Switch, as well as other home video game consoles and handheld consoles. Other gaming devices, such as personal computers designed for gaming ("Gaming PCs") and mobile devices, are properly excluded from even this broader market because they differ from high-performance consoles and the broader set of video game consoles in price, hardware, performance, and functionality. Compl. ¶¶ 83–84. These

devices are not commercially reasonable alternatives to high-performance consoles or to the products (including the Nintendo Switch) that comprise a broader video game console market. Compl. ¶ 83. For example, one of Microsoft's executives testified in another recent antitrust case that she does not "view the Xbox console as a replacement or substitute" for the iPhone or iPad. Ex. L (Wright (Microsoft) trial testimony, *Epic Games, Inc. v. Apple, Inc.*, No. C-20-5640 YGR (N.D. Cal.)) at 537:22-538:18.

The expert opinions of Dr. Robin S. Lee, Professor of Economics at Harvard University, further support finding that high-performance consoles (or, in the alternative, video game consoles more broadly) constitute a relevant antitrust market. Dr. Lee's opening expert report served in the administrative proceeding is attached as Exhibit C to the Fleury Declaration. Among other analyses, Dr. Lee used the HMT framework and reviewed qualitative evidence to evaluate each of these markets. *See* Ex. C (Lee Report) ¶¶ 172–78. Dr. Lee concluded that both a market comprising high-performance consoles (*i.e.*, the Microsoft Xbox Series X and S and the Sony PlayStation 5) and a broader video game console market (*i.e.*, a market that also includes the Nintendo Switch and other video game consoles and handhelds) pass the HMT and constitute relevant product markets for evaluating the competitive effects of the Proposed Acquisition. *See* Ex. C ¶¶ 179–266.

There is ample basis for finding that the FTC has a sufficient likelihood of success (*i.e.*, has raised substantial enough questions) in proving the existence of at least one of the console markets alleged to be a relevant antitrust market.

### 2. Multi-game content library subscription services are a relevant product market.

Multi-game content library subscription services are a relevant product market for evaluating the competitive effects of the Proposed Acquisition. Compl. ¶ 86. This market includes services that offer unlimited access to a library of video games that are predominantly played on non-mobile devices and are available to play at zero additional cost beyond the subscription fee, either via download or cloud streaming. Compl. ¶ 87; Ex. C ¶¶ 123–33.

1  Microsoft is already a significant player in this market through its Xbox Game Pass offerings
2  and is the market leader in this market, with an announced 25 million Game Pass subscribers,
3  including 13 million subscribers in the US. Compl. ¶ 88; Ex. C ¶ 125.

4      Services in this market seek to offer a new method of accessing video games by offering
5  access to an entire library of games for a periodic fee, rather than requiring gamers to buy
6  individual games for a fixed cost. Compl. ¶ 90; Ex. C fig. 10. Products in this market include
7  Xbox Game Pass, Sony's equivalent services (PlayStation Plus Extra and PlayStation Plus
8  Premium), Nintendo Switch Online, Amazon Luna+ and Prime Gaming, EA Play, and
9  Ubisoft+. Ex. C ¶¶ 123–33, 329. Buying individual games in the traditional manner ("buy-to-
10  play") is not a commercially reasonable substitute and buy-to-play games are properly excluded
11  from this relevant market. Compl. ¶ 92; Ex. C ¶¶ 319–326; 330. Microsoft executives tout
12  Game Pass to third-party game developers as "additive, rather than as a replacement for
13  traditional buy-to-play games." Compl. ¶ 92.

14      Dr. Lee's economic analysis also supports finding that this market, which he refers to as
15  "Content Library Services," constitutes a relevant antitrust market for assessing the competitive
16  effects of the Proposed Acquisition. *See* Ex. C ¶¶ 328–36. Dr. Lee concluded that products
17  offering content library services impose significant price constraints on one another. *See* Ex. C
18  ¶¶ 279–91, 332. Content Library Services products offer features that are absent from other
19  gaming services that do not offer a content library. *See* Ex. C ¶¶ 292–97, 333. "Specifically, by
20  replacing the cost of purchasing individual titles with a periodic subscription fee, content library
21  services such as Xbox Game Pass allow subscribers to play a wider set of games at a lower cost
22  and allow them to discover titles and genres that they would not otherwise have played. These
23  features are absent from gaming services that do not offer a content library, including cloud
24  gaming services . . . that do not offer a content library." Ex. C ¶ 333. Qualitative evidence also
25  shows that market participants view content library services as a distinct product segment. *See*
26  Ex. C ¶ 334. Dr. Lee further concludes that this proposed market satisfies the HMT. *See* Ex. C
27  ¶ 335.

28

1
2

### 3. Cloud gaming subscription services are a relevant product market.

3    Cloud gaming services that offer the ability to play predominantly non-mobile video
4  games via cloud streaming also constitute a relevant antitrust market for evaluating the
5  Proposed Acquisition's competitive effects. Compl. ¶¶ 96–97. Cloud gaming services include
6  both multi-game content library subscription services that offer the ability to play games in the
7  library via cloud streaming, and services that offer streaming via a "bring your own game"
8  ("BYOG") approach where users stream individual games that they already own. Compl. ¶ 98.
9  Products in this market include Microsoft's Xbox Game Pass Ultimate (Microsoft's Game Pass
10  subscription tier that offers access to the Game Pass game library and cloud streaming of those
11  games), PlayStation Plus Premium (Sony's similar offering), Nvidia's GeForce Now (which
12  offers BYOG cloud streaming), and Amazon's Luna+ and Prime Gaming (which offers its own
13  content library and cloud streaming). Ex. C ¶ 329.

14    Cloud gaming services are designed to reach a different set of consumers than other
15  forms of game distribution because these services enable gaming on devices, such as cheaper
16  PCs, MacBooks, tablets, and smart TVs, that otherwise do not support playing technically
17  complex games. Compl. ¶ 100. Cloud gaming services accordingly reduce the need for gamers
18  to purchase expensive hardware like a high-performance video game console or a gaming PC.
19  Compl. ¶ 99; Ex. C ¶¶ 298–300. As an executive with one of the leading cloud gaming services
20  averred, "cloud gaming provides a high-end gaming experience . . . without requiring customers
21  to upgrade the latest graphics card, PC, or console." Ex. M (Eisler (Nvidia) Decl.) ¶ 9. Cloud
22  gamers also play more hours and engage more with video games than other users. Compl. ¶
23  102; Ex. C ¶ 303.

24    Market participants expect this relatively new market to grow rapidly. Industry
25  participants including Defendant Microsoft acknowledge the value of cloud gaming and expect
26  that cloud gaming can expand the audience for video games. Ex. C ¶ 302 (citing evidence). For
27  instance, a senior cloud gaming executive testified that "cloud gaming has a profitable future."

28

1    Ex. N (Fisher (Nvidia) Dep.) at 63:14-20.

2         Dr. Lee's opinions also support the conclusion that cloud gaming subscription services

3    constitute a relevant product market for analyzing the competitive effects of the Proposed

4    Acquisition. Ex. C ¶¶ 337–48. For example, Dr. Lee analyzes the substantial qualitative

5    evidence that Microsoft itself "considers cloud gaming services as a distinct product segment

6    and other cloud gaming service providers as competitors." Ex. C ¶ 342 (discussing evidence).

7    He also concludes that a market comprising cloud gaming subscription services satisfies the

8    HMT. Ex. C ¶ 344–48.

9              **4.  A combined multi-game content library and cloud gaming**

10                 **subscription services market also is a relevant product**

11                 **market.**

12        As an alternative to two separate content library and cloud gaming markets, a single

13   market that includes products that offer services in either or both of those markets also

14   comprises a relevant antitrust market. For example, Microsoft's Game Pass Ultimate offers a

15   combination of access to content library and cloud streaming services. The combined market

16   includes products that also offer both library and cloud streaming services (e.g., PlayStation

17   Plus Ultimate and Amazon Luna+) and all of the products that compete with either library

18   services (e.g., EA Play) or cloud gaming services (e.g., Nvidia GeForce Now) but not both. Ex.

19   C fig. 22.

20        Dr. Lee concluded that this combined market also is a relevant product market. Ex. C ¶¶

21   271–327. His analysis again rests on qualitative and quantitative economic evidence, including

22   evidence that products in the combined market have similar pricing and that providers of these

23   services view other products in this market as their primary competitors and constraints on

24   pricing. Ex. C ¶¶ 279–91. Dr. Lee also analyzed why other types of gaming subscriptions and

25   buy-to-play games are properly excluded from this market. Ex. C ¶¶ 313–26. This combined

26   market also passes the HMT. Ex. C ¶ 327.

27              **5.  The United States is the relevant geographic market.**

28

1    The United States is the relevant geographic market for analyzing the Proposed

2    Acquisition's competitive effects. Even though "technology knows no borders," the "area of

3    effective competition" is the United States because the "realities of selling" differ across

4    national borders due to differences including in regulatory regimes, intellectual property

5    considerations, and availability. *United States v. Bazaarvoice*, 13–cv–00133–WHO, 2014 WL

6    203966, at *27, *68 (N.D. Cal. Jan. 8, 2014). Microsoft Xbox senior executives track console

7    market share specifically in the United States and report those U.S. shares to its Board of

8    Directors. Ex. K at -024. Consumer preferences and gaming behavior differ across countries—

9    e.g., *FIFA* soccer games are more popular in Europe, and *Call of Duty* is more popular in the

10   United States—and Microsoft accordingly differentiates its sales and marketing strategies by

11   country. Compl. ¶ 106; Ex. Y (PX1074) at 002; Ex. O (Zerza (Activision) Dep.) at 317:11–

12   318:2; Ex. Q (Ryan (Sony) Dep.) at 41:8–41:13.

13          **ii.     The Proposed Acquisition may substantially lessen competition in at least

14                  one of the relevant markets.**

15          At the administrative proceeding on the merits, the FTC's burden will be to show that

16   the Proposed Acquisition may substantially lessen competition or tend to create a monopoly.

17   Again, at this stage in this Court, the FTC "just has to raise substantial doubts about a

18   transaction." *Whole Foods Mkt.*, 548 F.3d at 1036). In a vertical merger, anticompetitive harm

19   may arise from the combined firm having the power to foreclose "competitors of the purchasing

20   firm in the merger from access to a potential source of supply, or from access on competitive

21   terms." *Yankees Ent & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657,

22   673 (S.D.N.Y. 2002).  The FTC may meet its initial burden by making a fact-specific showing

23   that the vertical merger poses a reasonably probability of competitive harm. *Brown Shoe*, 370

24   U.S. at 325.

25          One way for the FTC to make its prima facie case is to present evidence of the combined

26   firm's ability and incentive to foreclose or disadvantage its competitors. *See, e.g.*, *United States.

27   v. AT&T, Inc.*, 310 F. Supp. 3d 161 at 243-46 (D.D.C. 2018). Another way is to satisfy the

28

Supreme Court's *Brown Shoe* framework. *See Brown Shoe*, 370 U.S. at 328-29; *In re Illumina, Inc.*, Dkt. No. 9401, 2023 WL 2946882, at *42 (F.T.C. Mar. 31, 2023). Either way, the relevant inquiry does not require proof that the merged firm will actually withhold all of its output from rivals, but rather whether they have the "power to exclude" competing producers from a segment of the market. *In re Union Carbide Corp.*, 59 F.T.C. 614, *19 (1961). Evaluated under either *Brown Shoe* or in terms of ability and incentive, the FTC has raised substantial doubts about the Proposed Acquisition, which is reasonably likely to substantially lessen competition in the relevant markets by creating a combined firm with the ability and increased incentive to withhold Activision's valuable gaming content from, or degrade Activision's content for, Microsoft's rivals. Compl. ¶ 109.

> **1. Activision is a leader in developing the most sought after content in video gaming that drives product adoption and gamer engagement.**

Activision is a leader among an already limited number of companies able to produce the most expensive, high-quality, popular video game content that generates substantial revenues and drives gamer engagement with video game products and services. Compl. ¶¶ 3–7. Such video game content is commonly referred to in the industry as "AAA" content and constitutes "a minority in terms of overall titles that are launched in a given year." Ex. A (Spencer (Microsoft) IH) at 38:11–16; *see also* Compl. ¶ 3; Ex. A at 56:10-13; Ex. R (Stuart (Microsoft) IH) at 91:23-92:24; Ex. S (Leder (Microsoft) Dep.) at 97:1-97:18..[8]  AAA content—including Activision games—drives gamer engagement and purchasing decisions in the relevant markets.

 Microsoft Gaming's CEO testified that "Microsoft needs AAA content to drive acquisition of users across its services and products." Ex. B (Spencer (Microsoft) Dep.) at 219:3–7. Microsoft estimates that an exclusive AAA release can meaningfully shift console

---

[8] "IH" refers to investigational hearing, the term for sworn testimony taken during the FTC's pre-complaint investigation.

share in the United States. Compl. ¶ 61. Microsoft strategy documents explain that "[t]here is a virtuous relationship between content and subscriber scale" in its multi-game library and cloud streaming services products. Compl. ¶ 62 (alteration in original). Microsoft executives have emphasized the importance of AAA content as driving gamer engagement with products and services in the relevant markets at issue in this case. Compl. ¶ 63. As Microsoft Gaming's CEO testified, AAA content means the "games gamers want to play." Ex. A at 239:24-240:25.

Activision content is particularly valuable in the video game industry. For example, Activision's *Call of Duty* franchise consists of a series of AAA games and is, in Activision's own words, "one of the most successful entertainment franchises of all time," with total revenues since it first launched in 2003 of more than $27 billion. Compl. ¶¶ 7, 67. In 2020, *Call of Duty* had more than 150 million monthly active users. Compl. ¶ 7. Activision develops other AAA gaming content, including its *Overwatch* and *Diablo* franchises. Compl. ¶ 5. Activision itself touts its content as "influenc[ing] players' subscription decisions" and "influenc[ing] hardware purchase decisions." Compl. ¶ 66. Activision is, accordingly, able to negotiate a higher revenue share than is standard in exchange for making its content available on products and services. *See* Ex. O (Zerza (Activision) Dep.) at 30:17-31:13. The standard split of revenues from video games between the game developer and a given video game product or service is 70% to the developer and 30% to the platform owner. Compl. ¶ 115. Activision, however, receives an ██% revenue share from sales of its gaming content on Xbox and PlayStation 5. Compl. ¶ 115.

Dr. Lee's economic analysis also supports the conclusion that products in the relevant markets compete by offering valuable and differentiated content, that industry participants acknowledge that such content is important to attracting consumers to these products, and that differentiated and exclusive content has significant effects on sales of products in the relevant markets. *See* Ex. C ¶¶ 376–406. For example, Dr. Lee used a "discrete choice model," to model consumer demand for video game console sales and titles that can predict the impact of making exclusive popular third-party video game titles that have typically been released on multiple

consoles. Ex. C ¶¶ 401–06. This discrete choice model predicts an average increase of 8.9 percentage points in Xbox's share of console sales in the 12 months following a *Call of Duty* title release if that release were exclusive to Xbox. Ex. C ¶ 403.

### 2. As the owner of Activision content, Microsoft would have the ability to harm rivals in the relevant markets.

Activision content constitutes a large fraction of video game sales, revenue, and engagement on Microsoft and Sony video game consoles. For example, *Call of Duty: Modern Warfare 2* had the highest game sales on both Xbox and PlayStation of any title in 2022. *See* Ex. C figs. 2 & 3. According to the head of Sony's gaming business, "*Call of Duty* is the largest third-party franchise for [Sony], directly generating ▮▮▮▮▮ in United States spending . . . in 2021." Ex. T (Ryan (Sony) Decl.) ¶ 27. "*Call of Duty* players . . . account[] for over ▮▮ of overall PlayStation spending." *Id.*

The Proposed Acquisition would give Microsoft complete control over Activision's content, thereby giving Microsoft the ability to fully withhold Activision content from rivals, raise rivals' costs, change the terms and timing of access to Activision content, or degrade the quality of Activision content available on rivals' consoles and subscription services. Compl. ¶ 116. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ Ex. A at 63:21-64:3. Microsoft would also have the ability to reduce efforts to optimize Activision content for rival products. Compl. ¶ 120. Currently, Activision collaborates closely with gaming hardware manufacturers to ensure an optimal experience for gamers; however, Microsoft will have the ability to reduce such collaboration and optimization if it owns Activision. Compl. ¶ 120; Ex. Q at 34:13-34:24.

Dr. Lee's economic analysis corroborates the evidence that Microsoft would have the ability to foreclose its rivals in each of the relevant markets if the Proposed Transaction is completed. Ex. C ¶¶ 440–81. Dr. Lee's analysis confirms that Activision content drives console and gaming service sales and engagement, and that its content comprises a large fraction of

video game revenues and engagement on Microsoft and Sony video game consoles. Ex. C ¶¶ 445–52. The fact that Activision is able to command a greater than normal revenue share is evidence that Activision content meaningfully affects console sales and subscription services to a greater degree than most other content. Ex. C ¶¶ 453–59.

### 3. The Proposed Acquisition would increase Microsoft's incentive to disadvantage rivals by withholding or degrading Activision content in the relevant markets.

In addition to giving Microsoft the ability to harm rivals, the Proposed Acquisition would increase Microsoft's incentive to disadvantage them in the relevant markets. Gaming is a growing and lucrative market in which Microsoft is well-positioned already. Compl. ¶ 121. The combined firm would be incentivized to disadvantage Microsoft rivals to promote sales of Microsoft's video gaming products and services. Compl. ¶ 122. Activision content has a unique ability to drive gaming product adoption and gamer engagement, which further increases the merged entity's incentive to use the content to favor Microsoft's gaming products and services. Compl. ¶¶ 123–25; Ex. P (Schnakenberg (Activision) IH) at 68:18–69:11.

Dr. Lee's analysis supports the conclusion that the merged entity would likely have the economic incentive to engage in foreclosure in each of the relevant markets. Ex. C ¶¶ 515–97. For example, he presents a quantitative economic model that examines the merged entity's incentives to withhold Activision content from Sony PlayStation consoles. Ex. C ¶¶ 549–86. The model predicts that, although foreclosure has substantial costs these costs are more than offset by the considerable upside to Microsoft from bringing additional players to Xbox console and Xbox Game Pass as a result of Activision content being exclusive to those products and services. Ex. C ¶ 585.

### 4. Withholding Activision content from, or degrading Activision content on, Microsoft's rivals will harm competition and consumers in the relevant markets.

The harms to competition and consumers from withholding or degrading Activision

content include reduced consumer choice, reduced product quality, higher prices, and less innovation. Compl. ¶ 131–32. Dr. Lee's economic analysis demonstrates that the Proposed Acquisition is likely to harm competition and consumers in each of the relevant markets. Ex. C ¶¶ 598–661. For example, Dr. Lee provides a quantitative estimate of the harm that would arise as a result of a reduction in the quality of Sony PlayStation consoles if Activision content were foreclosed. Ex. C ¶¶ 646–55. Dr. Lee also concludes that countervailing factors, including entry or expansion into the relevant markets or purported efficiencies from the Proposed Acquisition, do not suffice to offset the harm to competition. Ex. C ¶¶ 662–84.

> ### 5. Microsoft's statements and past actions indicate that will likely act on its incentives to disadvantage rivals by withholding or degrading Activision content.

Microsoft acquired numerous video game developers over the past decade. Ex. A at 69:14–70:2. Microsoft evaluates video game content acquisitions in terms of the acquisition's ability to benefit Microsoft products and has implemented a strategy of taking acquired content exclusive.  A Microsoft internal strategy document for its Game Pass subscription service that was circulated to senior executives, including Microsoft's CFO and CEO, explains that Game Pass needs "differentiated" content, meaning content that is "exclusive" to GamePass and is "blockbuster" in terms of having a large number of players. Ex. AA (PX1065) at -017; Ex. A at 103:6–104:15. And consistent with that strategy, Microsoft previously announced that it planned to make future Activision content exclusive to Game Pass. Compl. ¶ 126.

Microsoft's strategy documents show ██████████████████████████████████████████████████████████████████████████████████████████████ For example, ██████████████████████████████████████████████████████████████████████████████████████████████ Ex. U (PX1791) at –013; *see also* Ex. V (PX1811) at -004.

Microsoft's actions after its last acquisition of a major video game developer exemplify its strategy of making content exclusive. In March 2021, Microsoft acquired ZeniMax Media

Inc., the parent of Bethesda Softworks LLC, another developer and publisher of AAA games. Compl. ¶ 12. After that acquisition was completed, Microsoft announced that several of the newly acquired ZeniMax would become Microsoft exclusives. Compl. ¶ 12. Discovery has revealed that Microsoft executives analyzed various options for ZeniMax content, from making the content available on rival platforms to making the content exclusive, and ultimately decided to make all future ZeniMax content exclusive. For example, in November 2021, Microsoft executives discussed a decision by Microsoft Gaming CEO Phil Spencer to make "all" ZeniMmax games exclusive to Xbox going forward. Ex. AB (PX4334) at -001; Ex. AC (PX4375) at -001; Ex. AD (Stuart Dep.) at 360:13-366:23 (discussing PX4334); Ex. AD at 370:13-374:6 (discussing PX4375)].

**B.      The Equities Weigh in Favor of Temporarily Restraining the Proposed Acquisition.**

When balancing the equities here, "public equities receive far greater weight" than private interests. *Warner Commc'ns*, 742 F.2d at 1165. These public equities include effective enforcement of the antitrust laws and ensuring the Commission's ability to obtain adequate relief if it ultimately prevails on the merits. *Id.*; *FTC v. H.J. Heinz Co*., 246 F.3d 708, 726 (D.C. Cir. 2001); *FTC v. Univ. Health, Inc*., 938 F.2d 1206, 1225 (11th Cir. 1991).

Without a temporary restraint, Defendants may complete their deal and harm both this Court's ability to order adequate relief in this case and the FTC's ability to obtain adequate relief if it ultimately concludes that the Proposed Transaction violates the law. Moreover, allowing Defendants to complete their deal on the eve of the FTC evidentiary hearing would thwart the public's interest in effective enforcement of the antitrust laws. The only possible harm to private interests from entry of the requested TRO is the short delay in Defendants' ability to complete their deal while the FTC's request for a preliminary injunction is pending before the Court. That modest harm cannot outweigh the public equities.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSION

For the forgoing reasons, Plaintiff respectfully requests that the Court enter a TRO before 8:59 p.m. Pacific Time on June 15, 2023, preventing Defendants from consummating the Proposed Acquisition until after 11:59 p.m. Pacific Time on the fifth business day after the Court rules on the FTC's Complaint in this action, or a date set by the Court, whichever is later.

Dated: June 12, 2023                     Respectfully submitted,

                                         /s/ James H. Weingarten
                                         James H. Weingarten
                                         Peggy Bayer Femenella
                                         James Abell
                                         Cem Akleman
                                         J. Alexander Ansaldo
                                         Michael T. Blevins
                                         Amanda L. Butler
                                         Nicole Callan
                                         Maria Cirincione
                                         Kassandra DiPietro
                                         Jennifer Fleury
                                         Michael A. Franchak
                                         James Gossmann
                                         Ethan Gurwitz
                                         Meredith R. Levert
                                         David E. Morris
                                         Merrick Pastore
                                         Stephen Santulli
                                         Edmund Saw

                                         Federal Trade Commission
                                         600 Pennsylvania Avenue, NW
                                         Washington, DC 20580
                                         Tel: (202) 326-3570

                                         Erika Wodinsky

                                         Federal Trade Commission
                                         90 7th Street, Suite 14-300
                                         San Francisco, CA 94103

                                         *Counsel for Plaintiff Federal Trade Commission*